IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KOKI HOLDINGS CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 18-313 (CFC) |
| v. | ) | |
| | ) | |
| KYOCERA SENCO INDUSTRIAL | ) | |
| TOOLS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
kjacobs@mnat.com
michael.flynn@mnat.com
*Attorneys for Plaintiff*
*Koki Holdings, Co. Ltd.*

OF COUNSEL:

Paul Devinsky
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8000

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
*Attorneys for Defendant*
*Kyocera Senco Industrial Tools,*
*Inc.*

OF COUNSEL:

Robert S. Rigg
David Bernard
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, IL 60601
(312) 609-7500

Amol A. Parikh
Thomas DaMario
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL  60606
(312) 372-2000

July 31, 2019

# TABLE OF CONTENTS

I.     Introduction ........................................................................................1

       A.     Plaintiff's Reply Position ........................................................1

II.    Technology Background ....................................................................1

       A.     Plaintiff's Opening Position ....................................................1

              1.     U.S. Patent No. 8,118,204 ...........................................2

              2.     U.S. Patent No. RE42,987 ...........................................4

              3.     U.S. Patent Nos. 7,156,012 and 7,398,647 .................5

              4.     U.S. Patent No. 7,325,709 ...........................................6

III.   Disputed Constructions ....................................................................7

       A.     "push portion" .........................................................................7

              1.     Plaintiff's Opening Position .........................................8

              2.     Defendant's Answering Position .................................13

              3.     Plaintiff's Reply Position ...........................................16

              4.     Defendant's Sur-Reply Position .................................21

       B.     "a trigger valve exterior frame to which the main valve
              control channel is fluidly connected" .................................25

              1.     Plaintiff's Opening Position .......................................25

              2.     Defendant's Answering Position .................................29

              3.     Plaintiff's Reply Position ...........................................33

              4.     Defendant's Sur-Reply Position .................................36

       C.     "closed end formed by joining of the two opposing
              walls" .....................................................................................38

              1.     Plaintiff's Opening Position .......................................38

2.      Defendant's Answering Position ...............................................43

3.      Plaintiff's Reply Position .......................................................47

4.      Defendant's Sur-Reply Position ..............................................50

D.      "a handle portion extending from the housing" ................................52

1.      Plaintiff's Opening Position.......................................................52

2.      Defendant's Answering Position ...............................................54

3.      Plaintiff's Reply Position .......................................................57

4.      Defendant's Sur-Reply Position ..............................................60

E.      "the battery pack having an extending portion extending
from the housing" ........................................................................62

1.      Plaintiff's Opening Position.......................................................62

2.      Defendant's Answering Position ...............................................65

3.      Plaintiff's Reply Position .......................................................67

4.      Defendant's Sur-Reply Position ..............................................68

F.      "a bottom view"........................................................................69

1.      Plaintiff's Opening Position.......................................................69

2.      Defendant's Answering Position ...............................................71

3.      Plaintiff's Reply Position .......................................................73

4.      Defendant's Sur-Reply Position ..............................................75

## TABLE OF AUTHORITIES

**Cases**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
 350 F.3d 1365 (Fed. Cir. 2003) ............................................................39, 45, 50

*Al-Site Corp. v. VSI Int'l, Inc.*,
 174 F.3d 1308 (Fed. Cir. 1999) ...................................................................18, 23

*Athletic Alts., Inc. v. Prince Mfg., Inc.*,
 73 F.3d 1573 (Fed. Cir. 1996)...........................................................................29

*Bd. of Regents v. BENQ Am. Corp.*,
 533 F.3d 1362 (Fed. Cir. 2008)..........................................................................55

*Becton, Dickinson and Co. v. Tyco Healthcare Grp.*,
 616 F.3d 1249 (Fed. Cir. 2010) ...................................................................*passim*

*Belden Inc. v. Berk-Tek LLC*,
 610 Fed. App'x 997 (Fed. Cir. 2015)..................................................................39

*Blackbird Tech LLC v. ELB Elec.*,
 No. 15-cv-56 (RGA), 2016 WL 7451622 (D. Del. Dec. 28, 2016),
 *overruled on other grounds*, 895 F.3d 1374 (Fed. Cir. 2018) ...........................11

*Broadcom Corp. v. Emulex Corp.*,
 732 F.3d 1325 (Fed. Cir. 2013) ......................................................54, 57, 65, 68

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
 358 F.3d 1371 (Fed. Cir. 2004) ...................................................................*passim*

*Edios Display, LLC v. AU Optronics Corp.*,
 779 F.3d 1360 (Fed. Cir. 2015).........................................................................27

*Engel Indus., Inc. v. Lockformer Co.*,
 96 F.3d 1398 (Fed. Cir. 1996) ...............................................................55, 59, 60

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group, LLC*,
 879 F.3d 1332 (Fed. Cir. 2018)..........................................................................27

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
 No. 12-540-LPS, 2013 WL 4657506 (D. Del. Aug. 28, 2013) ..........................13

*Gaus v. Conair Corp.*,
  363 F.3d 1284 (Fed. Cir. 2004) ............................................................55, 59, 61

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
  304 U.S. 364 (1938)..............................................................................................29

*Hill-Rom Services, Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ..................................................................11, 12

*Hoechst Celanse Corp. v. BP Chemicals Ltd.*,
  78 F.3d 1575 (Fed. Cir. 1996)............................................................................40

*In re Garnero*,
  412 F.2d 276 (CCPA 1969) ........................................................................44, 48

*In re Nordt Dev. Co.*,
  881 F.3d 1371 (Fed. Cir. 2018) ..........................................................44, 47, 48

*In re Rosuvastatin Calcium Patent Litig.*,
  No. 07-359-JJF-LPS, 2009 WL 1220542 (D. Del. May 4, 2009) .....................40

*Key Pharm. v. Hercon Labs. Corp.*,
  161 F.3d 709 (Fed. Cir. 1998) ...................................................................13, 22

*LifePort Scis. LLC v. Endologix, Inc.*,
  No. 12-1791-GMS, 2015 WL 4141819 (D. Del. July 9, 2015).........................15

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
  No. 09-80-LPS, 2015 WL 7737308 (D. Del. Dec. 1, 2015)...............................13

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
  800 F.3d 1366 (Fed. Cir. 2015).........................................................................10

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).........................................................................38

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014).................................................................................26, 69

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)......................................................................................29, 71

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................................1, 43

*Rapistan Systems Advertising Corp. v. Daifuku Am. Corp.*,
    No. A-03-CA-682-LY, 2006 WL 6112186 (W.D. Tex. Feb. 9,
    2006) ..................................................................................................................49

*Regalo Int'l LLC v. Munchkin, Inc.*,
    No. 15-1103-LPS, 2016 WL 7107229 (D. Del. Dec. 6, 2016).........................20

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014) ........................................................................10

*Schoenhaus v. Genesco, Inc.*,
    440 F.3d 1354 (Fed. Cir. 2006) ...................................................................55, 56

*Sollami Co. v. Kennametal Inc.*,
    No. 06-0062, 2006 WL 6211761 (W.D. Pa. Aug. 29, 2006).............................49

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
    806 F.3d 1356 (Fed. Cir. 2015) .................................................................*passim*

*TEK Global, S.R.L. v. Sealant Sys. Int'l*,
    920 F.3d 777 (Fed. Cir. Mar. 29, 2019)..........................................................9, 16

*Terlep v. Brinkmann Corp.*,
    418 F.3d 1379 (Fed. Cir. 2005)..........................................................................33

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008)..........................................................................46

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000)..........................................................................45

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...................................................................*passim*

*Wasica Finance GmbH v. Schrader Int'l, Inc.*,
    No. 13-1353-LPS, 2019 WL 1011321 (D. Del. Mar. 4, 2019) ........54, 58, 65, 68

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) .......................................................9, 14, 16, 23

*Zeroclick LLC v. Apple, Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018) ...................................................................16, 18

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    No. 16-679-RGA, 2018 WL 3038515 (D. Del. June 19, 2018) ..............9, 17, 18

## Rules and Statutes

35 U.S.C. § 112 ....................................................................................*passim*

35 U.S.C. § 112, ¶ 2 ................................................................................29, 71, 73

35 U.S.C. § 112, ¶ 6 ...............................................................................*passim*

**T**ABLE OF **E**XHIBITS

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| 1 | U.S. Patent No. RE42,987 | A001-A020 |
| 2 | U.S. Patent No. 7,156,012 | A021-A055 |
| 3 | U.S. Patent No. 7,325,709 | A056-A070 |
| 4 | U.S. Patent No. 8,118,204 | A071-A080 |
| 5 | U.S. Patent No. 7,398,647 | A081-A114 |
| 6 | Declaration of Dr. Glenn E. Vallee in Support of Plaintiff's Opening Claim Construction Brief | A115-A162 |
| 7 | Declaration of John Pratt, Ph.D. in Support of Defendant's Responsive Claim Construction Brief | A163-A185 |
| 8 | Reply Declaration of Dr. Glenn E. Vallee in Support of Plaintiff's Reply Claim Construction Brief | A186-A207 |
| 9 | Defendants Invalidity Contentions | A208-A217 |
| 10 | 2/15/07 Amendment SN 11/078,476 | A218-A230 |
| 11 | U.S. Patent No. 6,609,464 | A231-A274 |
| 12 | 7/12/10 - Final office action - Rejecting Claims SN 12/088524 | A275-A281 |
| 13 | 11/9/10 - Amendment - SN 12/088524<br>12/14/10 - Office Action - Rejecting Claims SN 12/088524<br>6/21/11 - Final Office Action - Rejecting Claims - SN 12/088524 | A282-A303 |
| 14 | McGraw Hill Online - Shigley's Mechanical Engineering Design, Eighth Edition - Budynas-Nisbett | A304-A310 |
| 15 | Home Depot - Senco SNS41 16 Gauge Construction Stapler | A311-A313 |
| 16 | Replacement Parts - Senco SNS41 Nailer Parts | A314-A323 |
| 17 | MM Tool Parts - Senco SNS41 Parts - Nailer | A324-A329 |
| 18 | Hitachi Pneumatic Tool Parts List - Coil Nailer Model NV 65AH | A330-A334 |
| 19 | Hitachi Pneumatic Tool Parts List - Strip Nailer Model NR 83A2 | A335-A339 |
| 20 | Hitachi Pneumatic Tool Parts List - Cordless Strip Nailer Model NR 1890DC | A340-A344 |

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| 21 | Jabetc - Pushing Push Lever for Hitachi NR83A Framing Nailer Nail Gun | A345-A347 |
| 22 | Grizzley Model H6143 16 Gauge Finish Nailer Instruction Manual | A348-A368 |
| 23 | Fix - Magazine Pusher Assemble 714021 | A369-A371 |
| 24 | Design of Machinery | A372-A373 |
| 25 | Injection Molding - Forming Techniques for Plastics | A374-A376 |

## I.      Introduction

### A.      Plaintiff's Reply Position

Koki's proposed constructions properly begin with the plain meaning of the claim terms as informed by the intrinsic evidence and are consistent with and supported by the written description. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005). On the other hand, Kyocera Senco proposes litigation-driven constructions that impermissibly narrow or rewrite the claims. Often times, Kyocera Senco proposes constructions that read out preferred embodiments, which is virtually never correct. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). For these reasons, as detailed below, Kyocera Senco's proposed constructions should be rejected and Koki's adopted.

## II.     Technology Background

### A.      Plaintiff's Opening Position

The technology at issue in this matter involves fastener driving tools, which include staplers, nailers, or other fastener tools. The primary product in this field has been powered nailers or nail guns. An example of a nail gun developed by Koki is provided below:



A powered nailer is a tool that is used to drive nails, staples, or other linearly driven fasteners into wood, metal, or other types of material. Powered nailers are used in many types of construction, ranging from heavy-duty and high-volume applications (*e.g.*, framing houses, building decks, applying roof shingles) to smaller jobs and precision work (*e.g.*, assembling furniture, installing cabinets, securing crown molding). (*See* Ex, 6, Vallee Decl. at ¶¶ 27-28.) As explained below, each of the Asserted Patents is directed to aspects of powered nailers.

### 1. **U.S. Patent No. 8,118,204**

The '204 patent is directed a compact nail gun which can be easily used in narrow places. FIG. 1 shows a side view of the tool and FIG. 2 shows a bottom view of the tool.



(*see also* Ex. 4, Col. 2:64-67.)

Generally, the tool 1 comprises (i) a housing 2 having a handle portion 2B formed to extend from a trunk portion 2A; (ii) an ejection unit attached to the lower portion of the housing 2; (iii) a magazine 5 attached to the ejection unit; (iv) a motor housed in the housing 2; and (v) a battery pack 3 for driving the motor. The magazine 5 is attached such that it is inclined in a side view (Ex. 4, FIG. 1) with respect to the trunk portion 2A of the housing 2 and is inclined in a bottom view (Ex. 4, FIG. 2) with respect to the handle portion 2B of the housing 2. (Ex. 4, Col. 3:15-4:9.) By having the inclined magazine overlap with the battery pack, the tool is made compact so that it can be conveniently be used in narrow places. (Ex. 4, Col. 1:59-63; 5:43-52.)

2.    **U.S. Patent No. RE42,987**

The '987 patent is generally directed to a nail gun that has a novel nosepiece design that permits accurate nail placement into pre-punched metal connector holes by employing a push lever mechanism that allows the user to easily locate the nail prior to firing. FIG. 1 shows an example of the tool and FIG. 3 shows a cross-sectional view of the push lever mechanism.



The tool includes a safety having a lower safety portion 22 located near the nosepiece. The lower safety portion 22 has a lower end 12b and is capable of reciprocal movement in parallel with the reciprocal movement direction of the blade 7. (Ex. 1, Col. 4:45-65). The lower end 12b is normally positioned in an upper position and is retracted above the nail tip 4c, thus allowing the user to locate the nail tip before initiating the driving action. (*Id.*) Once the nail tip is set,

the lower end 12b of the lower safety portion 22 is prevented from moving downward and trigger 11 can be pulled to initiate the driving action. (Ex. 1, Col. 5:13-42).

### 3.   **U.S. Patent Nos. 7,156,012 and 7,398,647**

The '647 patent is a continuation of the '012 patent. The '012 and '647 patents are generally directed to a nail gun that optimizes the relationship (ratio) between the effective cross-sectional area of the main valve control channel (for exhausting compressed air) and the volume of the main valve chamber. This optimization allows the nail gun to achieve rapid firing which reducing the consumption of compressed air.

FIG. 1 shows a cross-sectional view of one example of the nail gun and FIG. 3 shows a partial cross-sectional view of the main valve chamber (8) and main valve control channel (40). The main valve chamber is highlighted in green and the main valve control channel is highlighted in blue:



FIG. 1

FIG. 3

The ratio of the cross-sectional area of main valve control channel (blue) to the internal volume of the main valve chamber (green) is defined as a specified ratio. Claim 1 of the '012 patent specifies that the ratio obtained from dividing the internal volume of the main valve chamber measured in $m^3$ by the cross-sectional area of main valve control channel measured in $m^2$ is not more than 1.0. Claims 1 and 10 of the '647 patent specify that this ratio is not more than 0.8.

### 4.    **U.S. Patent No. 7,325,709**

The '709 patent is directed to a nail gun with a highly rigid and light weight magazine that facilitates hand-holding. FIG. 2 shows the cross-sectional shape of the magazine.



The magazine has an accommodation portion (a relevant portion of which is colored in yellow) provided between two opposing guide walls 25A and in an expanding portion 22A having two opposing walls such that the distance between the walls is gradually increased from a location at the sharp end side of the nails 10 toward the heads of the nails 10. (Ex. 3, Col. 4:44-48; 5:38-43.) The guide portions 25 serve as reinforcing ribs for the magazine further strengthening the magazine.

## III.   Disputed Constructions

The parties dispute six terms from the asserted patents.

### A.   "push portion"

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 14-19 in U.S. Patent No. RE42,987 ("the '987 Patent") | "a portion capable of reciprocal movement" | Means-plus-function claim term subject to 35 U.S.C. § 112 Structure: safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety |

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| | | portion 22<br>Function: "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward" |

### 1.    Plaintiff's Opening Position

The term "push portion" appears in claims 14, 18, and 19 of the '987 patent:

> a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position.

(Ex. 1, '987 patent, col. 10:57-65; *see also* 11:20-29, 11:43-51.) The dispute surrounding the term "push portion" is whether, read in the context of the claim, the term means "a portion capable of reciprocal movement," as proposed by Koki, or whether the term is a means-plus-function claim element subject to 35 U.S.C. § 112, ¶ 6, as proposed by Kyocera Senco. As explained below, the term "push portion" connotes sufficiently definite structure to a skilled artisan such that means-plus-function treatment is not warranted, and instead, a skilled artisan would understand that a "push portion" means "a portion capable of reciprocal movement."

Means-plus-function treatment presumptively does not apply for this term. Where a limitation does not use the word "means," "there is a      rebuttable

presumption that § 112, ¶ 6 does not apply." *See TEK Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 786 (Fed. Cir. Mar. 29, 2019). Only "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure," can the rebuttable presumption be overcome. *See id.* (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015)). Specifically with respect to a term including the word "portion," courts in this district have made clear that the term "portion" does not "recite a function and may be 'understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.' In other words, the "portion" terms are broad, but identifiable." *Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-679-RGA, 2018 WL 3038515, at *8 (D. Del. June 19, 2018) (finding the term "portion" is not a nonce word). As a result, even when a claim uses the term "portion," there is still the rebuttable presumption that § 112, ¶ 6 does not apply. See *id.* Kyocera Senco has failed to overcome this presumption; the term "push portion" recites more than sufficiently definite structure.

"Paragraph 6 does not apply when 'the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. . . . To determine whether the claim limitation at issue connotes sufficiently definite structure to a person of ordinary skill in the art, we look first to intrinsic evidence, and then, if necessary, to the extrinsic evidence." *TEK   Global*,

920 F.3d at 786; *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) ("In undertaking this analysis, we ask if the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6.") (quoting *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014)). Here, the claim language and the specification confirm that the limitation connotes sufficient structure.

First, the claim language itself connotes sufficiently definite structure to a skilled artisan. Claim 14 recites

> a nail gun for driving a nail into a work piece, the nail gun comprising … **a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center**, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position.

(Ex. 1, '987 patent at col. 10:44-45, 57-65 (emphasis added); *see also* 11:20-29, 11:43-12:2.) Based on the plain language of the claim, the "push portion" thus is a discrete part of the nail gun with "an end that is movable following a nosepiece." (*See also* Ex. 6, Vallee Decl. at ¶ 41.) The claim further explains that when the push portion of the nail gun is prevented from moving downward, the operation of the trigger switch is enabled and at least a tip of the nail protrudes farther in a tip-side direction than the push portion so the nail tip can be aligned. (Ex. 1, '987 patent at col. 10:44-45, 57-65; *see also* 11:20-29, 11:43-12:2.) In the

context of the claim, a person of ordinary skill in the art would understand that "push portion" is a portion of the nail gun that is a capable of reciprocal movement. (*Id.*; Ex. 6, Vallee Decl. at ¶ 42.)

As noted above, the term "portion" is **not** a nonce word that is subject to means-plus-function treatment under § 112, ¶ 6. However, even if the word "push" were considered functional, "defining a particular claim term by its function is not improper and is not sufficient to render a term means-plus-function." *See Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). Indeed, "[m]any devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'" *Id.*; *see also Blackbird Tech LLC v. ELB Elec.*, No. 15-cv-56 (RGA), 2016 WL 7451622, at **4-5 (D. Del. Dec. 28, 2016), *overruled on other grounds*, 895 F.3d 1374 (Fed. Cir. 2018) ("'Fastening mechanism' is sufficient structure even though it invokes a class of structures, rather than a specific structure, and it uses a functional name to do so.") Thus, there is nothing improper about defining "push portion" as "a portion capable of reciprocal movement," particularly where, as here, the claim further defines the push portion has having an end that is movable following the nosepiece.

The specification also supports Koki's proposed construction. In an exemplary embodiment, a lower safety portion 22 in the fastening tool is "*capable*

*of reciprocal movement*, in parallel with the reciprocal movement direction of the blade 7, between upper and lower dead centers as guided by a nose 13." (Ex. 1, '987 patent at 4:45-65).[1] The lower end 12b of the lower safety portion 22 is normally positioned in an upper position and is retracted above the nail tip 4c, thus allowing the user to locate the nail tip before initiating the driving action. (*Id*.) The specification further explains that the operation of the trigger switch is enabled when the end of the lower end 12b of the lower safety portion 22 is prevented from moving downward and at least a tip of the nail protrudes from the nosepiece farther than the push portion such that the nail tip can be aligned with a desired position. (*Id*. at 5:13-42). Based on the specification, one of ordinary skill in the art would understand that the "push portion" is a structural part of the nail gun capable of reciprocal movement with an end that follows the nosepiece, and that structure further allows for operation of the tool under certain circumstances (*i.e.*, when end of push portion is prevented from moving downward). (*See* Ex. 6, Vallee Decl. at ¶ 43.)[2]

---

[1]   Emphasis in the quoted material is added unless otherwise noted.

[2]   While the specification describes one embodiment of the "push portion," absent a disclaimer, the claims should not be limited to the particular system described in the specification. *See, e.g., Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("[W]e do not read limitations from the embodiments in the specification into the claims.").

### 2.    Defendant's Answering Position

Asserted claims 14-19 of the '987 Patent each require a "push portion" for performing recited functions.[3] Kyocera Senco contends that the "push portion" should be construed as a means-plus-function limitation subject to 35 U.S.C. § 112, ¶ 6 because the term "fails to recite sufficiently definite structure." *See Masimo Corp. v. Philips Elecs. N. Am. Corp.*, No. 09-80-LPS, 2015 WL 7737308, at *6-7 (D. Del. Dec. 1, 2015). Thus, the Court should apply the two-step process for construing means-plus-function limitations: (1) "identify the particular claimed function" and (2) "look to the specification and identify the corresponding structure for that function." *See Fairchild Semiconductor Corp. v.    Power Integrations, Inc.*, No. 12-540-LPS, 2013 WL 4657506, at *3 (D. Del. Aug. 28, 2013) (citation omitted).

---

[3] Koki's inclusion of extraneous extrinsic evidence in the form of a lengthy declaration by Dr. Vallee (*see* Ex. 6) unnecessarily distracts from the Court's task of construing the disputed claim terms. Dr. Vallee's declaration should be given no weight as his opinions are contrary to the clear intrinsic record. *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) ("[I]f the meaning of a disputed claim term is clear from the intrinsic evidence – the written record – that meaning, and no other, must prevail; it cannot be altered or superseded by witness testimony or other external sources simply because one of the parties wishes it were otherwise."). While extrinsic evidence is rarely helpful to courts when construing disputed claim terms, Kyocera Senco is forced to submit its  own, limited expert declaration from Dr. John Pratt to address several erroneous opinions in Dr. Vallee's declaration, which needs to be considered only in the event the Court considers Dr. Vallee's declaration. (*See* Ex. 7 ("Pratt Decl.").) Kyocera Senco's primary positions rely solely on intrinsic evidence.

The term "push portion" fails to recite any structure at all. Words such as "portion" are "black box" recitations that "reflect nothing more than verbal constructs" and using such terminology "is tantamount to using the word 'means'" for performing the recited functions. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015). Indeed, "portion" conjures up infinite possibilities of what its *structure* could potentially entail. Further, the word "push" merely describes the *function* of the generic "portion" without imparting any definite structure – the *portion* performs the function of *pushing*. Together, "push" and "portion" provide no definite structure, and the term "push portion" has no readily understood meaning in the pertinent art. (Ex. 7, Pratt Decl. ¶¶ 35-40.) Notably, Koki attempts at one point to define the "push portion" as "a discrete part of the nail gun with an end" (*see supra* at 10), which provides no more information of its structure than "push portion."

The remainder of the claim language simply describes "push portion" in functional terms and thus similarly fails to connote sufficiently definite structure. For example, the claims explain that the "push portion" has "an end that is movable following the nosepiece and that is normally positioned in an upper dead center." (Ex. 1, '987 Patent at 10:57-59.) But simply referring to a generic movable "end" tells us nothing more than that this generic "push portion" has an end – just like every other structure in existence. Next, the "push portion's"

function is described, "wherein operating of the trigger switch is enabled when the end of the push portion is prevented from moving downward." (*Id.* at 10:59-61.) In other words, the "push portion" performs the function of enabling a trigger switch.

Koki turns to the specification in an attempt to demonstrate that "push portion" is structural (*supra* at 11-12), but fails to mention that "push portion" is not used in the detailed description of the '987 Patent *at all*. Rather, Koki points to the *structure* in the specification that *corresponds to the claimed function*: the lower safety portion 22. (*Id.*) All this demonstrates is that there is corresponding structure to the claimed function of the "push portion" limitation. *See LifePort Scis. LLC v. Endologix, Inc.*, No. 12-1791-GMS, 2015 WL 4141819, at *4 n.8 (D. Del. July 9, 2015) ("[A] description of structure in the specification is not enough to avoid application of [means-plus-function].").

Koki's own proposed construction, "a portion capable of reciprocal movement," is purely functional and demonstrates the utter lack of structure in the "push portion" limitation. Indeed, Koki's construction provides nothing more than a black box recitation of a generic structure, a portion, that is capable of some sort of movement. Thus, Koki's own attempted functional construction demonstrates that means-plus-function interpretation is appropriate here.

Thus, the disputed claim term should be construed as a means-plus-function term in accordance with 35 U.S.C. § 112, ¶ 6. The claimed function and corresponding structure are outlined in Kyocera Senco's construction above, which Koki has not disputed in the event that "push portion" is construed as a means-plus-function limitation.

### 3.   Plaintiff's Reply Position

Kyocera Senco does not even address the presumption that Section 112, ¶ 6 does not apply because the term "push portion" does not use the words "means". *See TEK Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 786 (Fed. Cir. 2019); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc). To overcome the presumption, Kyocera Senco must prove that the "claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Zeroclick LLC v. Apple, Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) (citations omitted). Kyocera Senco failed to meet this burden.

Kyocera Senco has not demonstrated that "portion" is a nonce word such that means-plus-function treatment is warranted. Instead, Kyocera Senco merely asserts that the word "portion" is broad. However, breadth of a claim term is not a reason to apply means-plus-function treatment. Quite the contrary. As noted in Koki's Opening, courts in this district have made clear that the term "portion"

"may be 'understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.' In other words, the 'portion' terms are broad, but identifiable." *Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-679-RGA, 2018 WL 3038515, at *8 (D. Del. June 19, 2018) ("'Portion' is not a nonce word.").

In addition, Kyocera Senco analyzes the term "push portion" in a vacuum, totally out of context from the remainder of the claim language. The claims do not simply refer to a generic "end" as asserted by Kyocera Senco, but instead impart structure to that "end". Specifically, the claims specify that the "push portion" has an "end *that is movable following the nosepiece and is normally positioned in the upper dead center*." (*See* Ex. 1, '987 patent, at claim 14.) (emphasis added). The claim recites that the nosepiece is the structure through which nails are ejected and is located at the lower end of the nail gun's body. (*Id.*) The claim language surrounding the phrase "push portion" connotes further structure because  it informs a person of skill in the art that the push portion has an end, that the end of the push portion is normally located in an upper dead center, and that the end of the push portion is movable following the nosepiece that is located at the lower end of the nail gun's body. Thus, in the context of the full claim which describes how the "push portion" is connected to other components (and relative to those components), the term portion is not simply a functional term. *See Zimmer*, No. 16-

679-RGA, 2018 WL 3038515, at *8 (finding "portion" is not functional given the remainder of the claim describes how that "portion" is connected to other claim elements); *see also Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1319 (Fed. Cir. 1999) (claim limitation "attaching portion attachable to a portion of said frame of said pair of eyeglasses" was not a means-plus-function element because the limitation was not written in traditional means-plus-function format and because the claim supplied structural, not functional, connections).

Kyocera Senco's reliance on the "wherein" clause is equally unavailing. First, the mere fact that the "push portion" limitation may incorporate functional language does not automatically convert the words into means for performing such functions. *Zeroclick LLC*, 891 F.3d at 1008 ("Many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'") Second, the wherein clause here does not recite the function of the "push portion," but instead recites a function of the "trigger switch," namely that the "trigger switch" can be used if the "push portion" is prevented from moving downward. (*See* Ex. 1, '987 patent at claim 14.)

Kyocera Senco's assertion that Koki's own proposed construction is functional and generic is misguided and (again) ignores the full context of the claim in which the term appears. Replacing the word "push portion" with Koki's proposed construction in claim 1 of the '987 patent yields the following:

18

> a [**portion capable of reciprocal movement**] with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the [**portion capable of reciprocal movement**] is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position

The surrounding language in the claim makes clear the "portion capable of reciprocal movement" (*i.e.*, "push portion") has an end, that the end is normally located in an upper dead center, and that the end is movable following the nosepiece that is located at the lower end of the nail gun's body.

Koki has also shown that a person of skill in the art would have understood that a "push portion" in the context of the claim and written description refers to a limited class of structures. Koki's expert, Dr. Vallee explained how the  term "push" is used by persons of skill in the art to describe a portion of the nailer that is capable of reciprocal movement. (Ex. 6, Vallee Decl. at ¶ 42; Ex. 8, Vallee Supp. Decl. at ¶¶ 22, 27.) Dr. Vallee went on to provide specific examples to "push" components in nail guns that are capable of reciprocal movement, including a push lever (*i.e.*, a lever capable of reciprocal movement), a push arm (*i.e.*, an  arm capable of reciprocal movement), a magazine pusher (*i.e.*, component inside the nail magazine used to push fasteners into a drive channel which is also capable of reciprocal movement). Dr. Vallee also provided other examples of "push" components that are used within nail guns available on the market, including

citations to numerous parts list and operating instructions showing that "push" components are structural components commonly associated with nail guns. (*See* Ex. 8, Vallee Supp. Decl. at ¶¶ 23-25 (discussing exhibits 18-24 which show various "push"-type components used in nail guns and other mechanical devices).)

Kyocera Senco has failed to show otherwise. Instead it merely asserts that the term "push portion" conjures up an infinite number of possibilities of structure. But Kyocera Senco's declarant, Dr. Pratt, did not identify a single example of such a structure and cited no evidence to support his conclusory testimony. *Regalo Int'l LLC v. Munchkin, Inc.*, C.A. No. 15-1103-LPS, 2016 WL 7107229, at *5 (D.   Del. Dec. 6, 2016) ("Munchkin has not explained why a [POSITA]…would not know what specific class of structures could be used to attain the 'relatively swingable' character…. Munchkin has not met its burden of proving that 35 U.S.C. 112 (6) applies….").

Because Kyocera Senco has not shown that § 112¶ 6 applies or offered an alternative construction, Koki's construction should be adopted.

In the event the Court were nonetheless to find § 112, ¶ 6 applies, Kyocera Senco misidentifies the corresponding structure associated with what it contends is the alleged function. Kyocera Senco alleges the claimed function of the "push portion" is "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward." The only structure needed   to

implement this recited function is a lower safety portion. The claim requires (i) the "push portion" have a movable end following the nosepiece and that is normally positioned in an upper dead center and (ii) the operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward. The written description explains that (i) the lower safety portion 22 has a lower end 12b that is located near the ejection opening 5a of the nail ejection portion (*i.e.*, nose portion) and is movable following nose portion (Ex. 1, '987 patent at col. 4:45-56) and (ii) operation of the trigger switch is enabled when the end of the lower end 12b of the lower safety portion 22 is prevented from moving downward (*Id.* at 5:13-42). As a result, even if § 112, ¶ 6 were found to apply, the corresponding structure for performing the claimed function is simply the lower safety portion.

### 4.     Defendant's Sur-Reply Position

Defendant previously explained how the asserted claims of the '987 Patent require a generic "push portion" for performing recited functions and thus this element should be construed as being a means-plus-function limitation. (*SeeSupra* at 13-16).[4]

---

[4]     Koki continues to unnecessarily distract from the Court's task of construing the disputed claim terms by submitting a *second* lengthy declaration by Dr. Vallee (*see* Ex. 8), bringing the total page count of Koki declarations to *forty- five pages* and the total page count of Koki's extrinsic evidence  exhibits to an unwieldly *210 pages*. As with his original declaration (Ex. 6), Dr. Vallee's new   declaration

In its Reply, Koki first argues that Defendant has not demonstrated that "portion" is a nonce word and instead contends that Defendant "merely asserts that the word 'portion' is broad." (*Supra* at 16). Unsurprisingly, Koki fails to cite to where Defendant "merely asserts" as such. In truth, Defendant explained in detail that "portion" is nothing more than a "black box" recitation that "reflect[s] nothing more than [a] verbal construct[]." (*Id*. at 14). Next Koki argues that Defendant "analyzes the term 'push portion' in a vacuum, totally out  of context from the remainder of the claim language." (*Id*. at 17). Again, this is not true, as Defendant explained that "[t]he remainder of the claim language simply describes the 'push portion' in functional terms and thus similarly fails to connote sufficiently definite structure." (*Id*. at 14).

Rather than explain how the functional language that relates specifically to the "push portion" term imparts any structure, Koki instead discusses the structure of the claimed nosepiece and how "[t]he claim recites that the nosepiece is the structure through which nails are ejected and is located at the lower end of the nail gun's body." (*Id*. at 17). But the dispute is not whether the "nosepiece"

should be given no weight as his opinions are contrary to the clear intrinsic record. *Key Pharm. v. Hercon Labs. Corp*., 161 F.3d 709, 716 (Fed. Cir. 1998) ("[I]f the meaning of a disputed claim term is clear from the intrinsic evidence – the written record – that meaning, and no other, must prevail; it cannot be altered or superseded by witness testimony or other external sources simply because one of the parties wishes it were otherwise.").

connotes sufficiently definite structure and thus Koki's arguments here are irrelevant to the question of whether the recited "push portion" is subject to means-plus- function interpretation. Koki goes on to recite the claim language describing "push portion" in functional terms with the barebones assertion that this language imparts structure – "the push portion has an end, that the end of the push portion is normally located in an upper dead center, and that the end of the push portion is movable following the nose piece . . . ." (*Supra* at 17). But this claim language does not provide any indication as to the ***structure*** of the generic "push portion." Rather, it simply explains that some "black-box" structure has a generic end (like every other structure in existence) and can move.[5]

Koki then argues that its own construction is not functional and generic. (*Id.* at 18-19). But Koki does not explain why its ***construction*** is not purely functional. Instead, Koki repeats its arguments that the same surrounding functional claim language discussed above is structural and thus similarly imparts structure to its construction. (*Id.*) Indeed, Koki's refusal to explain why its   proposed ***construction*** itself (and not the surrounding claim language) is structural is a tacit admission of the opposite.

---

[5]   Koki's reliance on the 1999 case *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308 (Fed. Cir. 1999) is misplaced. In 2005, the Federal Circuit overruled the "strong presumption" previously relied upon by the Federal Circuit "that a limitation lacking the word 'means' is not subject to § 112, para. 6." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (*en banc*).

Koki again points to Dr. Vallee's declarations, arguing that this extrinsic evidence demonstrates that "push" is somehow structural. (*Id*. at 19-20). But Dr. Vallee simply points to other generic structures that perform the function of "pushing." (*Id*.).[6] Just because other components also perform a similar function as the "push portion," that does not suddenly impart structure to "push."

Finally, Koki raises for the first time an alternative proposed construction should the Court find that "push portion" is subject to means-plus-function interpretation. (*Id*. at 20-21). Koki's late hour disclosure of an alternative construction should be disregarded.

Koki's untimely proposed construction attempts to limit the corresponding structure in the specification to the generic lower safety portion 22 – itself a "black box" generic placeholder much like the "push portion" limitation. But Koki's corresponding structure does not include the structure described in the specification that provides for ***how*** the "lower safety portion 22" is prevented from moving downward to enable operation of the trigger switch. The components that allow for such a function are more than just the lower safety portion 22, and instead include, in full, safety portion 12 that is mechanically coupled to trigger 11,

---

[6] Dr. Vallee also provides new opinions, for example at ¶¶ 23–25 and Exhibits 18-24 of his supplemental declaration, that go well beyond the scope of permissible rebuttal. Nevertheless, all Dr. Vallee is providing is additional extrinsic evidence that should be disregarded.

the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22. (*See* Ex. 1, '987 Patent at 5:24–62).

Thus, the Court should adopt Defendant's proposed construction.

**B.** **"a trigger valve exterior frame to which the main valve control channel is fluidly connected"**

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 2, 3, and 4 in U.S. Patent No. 7,156,012 (the "'012 Patent") | "a trigger valve exterior frame connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel" | Indefinite under pre-AIA 35 U.S.C. § 112 |

**1.** **Plaintiff's Opening Position**

The plain meaning should control for this term from claims 2-4 of the '012 patent, that is "a trigger valve exterior frame connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel." On the other hand, Kyocera Senco asserts that the limitation "a trigger valve exterior frame to which the main valve control channel is fluidly connected" is indefinite under 35 U.S.C. § 112 purportedly because "a channel cannot be fluidly connected to a frame." (*See* Ex. 9 (Kyocera Senco Invalidity Cont. Cover Pleading) at 8.)

The Supreme Court has held that "a patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (alteration in original, quotation omitted). A "patent is invalid for indefiniteness if its claims, read in light of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124. Here, the claims are clear on their face and there is no uncertainty as to their scope – the trigger valve exterior frame is fluidly connected to the main valve control channel. (Ex. 2, '012 patent at col. 30:40-41; *See also* Ex. 6, Vallee Decl. at ¶ 47.)

Moreover, the specification discloses a trigger valve exterior frame that forms a trigger valve 6 which is connected to the main valve control channel. (Ex. 2, '012 patent, at col. 7:22-27 ("The trigger valve 6 shown in FIG. 1 and FIG. 2 mainly includes an outer valve bush 10, an inner valve bush 11… [and] [t]he outer valve bush 10 and inner valve bush 11 are fixed to the frame 60 *to form a trigger valve exterior frame which constitutes an outer wall of the trigger valve*"); 7:38-40 ("The trigger valve 6 is fluidly connected to a main valve control channel 40").) Thus, the claim language recites exactly that which the specification discloses.

The specification further explains that the main valve control channel is connected to a space between the components of the trigger valve exterior frame

(*i.e.*, outer valve bush 10 and an inner valve bush 11) and opens into the trigger valve 6. (*Id.* at 7:40-43.) A person of ordinary skill in the art reading  these passages would understand that the trigger valve exterior frame is connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel. (Ex. 6, Vallee Decl. at ¶¶ 47-48); *see also Edios Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1366 (Fed. Cir. 2015) (finding the claim term "contact hole" definite when the term is viewed in context of the entire patent, including the specification); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group, LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018) (finding claim language and specification provide reasonable certainty as to the meaning of the disputed claim term, particularly where the claim included additional functional language).

Kyocera Senco takes the claim term out of context and to a level of abstraction when it argues that "a channel cannot be fluidly connected to a frame." As explained above, the specification explains that the main valve control channel is connected to the outer valve bush 10 and inner valve bush 11 such that the space between those two bushes opens into the trigger valve. Moreover, the figures illustrate that the main valve control channel (40) is connected to the trigger valve exterior frame:



(Ex. 2, '012 patent at Fig. 2 (annotated).) The trigger valve exterior frame is shown in green and the main valve control channel is shown in light blue. The location where the trigger valve exterior frame is connected to the main valve control channel is shown by the red circles. (Ex. 6, Vallee Decl. at ¶ 49.) Because the claims, read in light of the intrinsic evidence, inform a person skilled in the art with reasonable certainty about the scope of the invention, claims 2-4 of the '012 patent are not indefinite.

### 2.    Defendant's Answering Position

Under pre-AIA 35 U.S.C. § 112, ¶ 2,[7] a specification must include "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "[T]he primary purpose of the requirement is 'to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights.'" *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) (quoting *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938)). The Supreme Court recently explained the proper standard under which to consider indefiniteness: "[W]e read § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

Here, "a trigger valve exterior frame to which the main valve control channel is *fluidly* connected," as found in claims 2-4 of the '012 Patent, provides no reasonable certainty and is therefore indefinite under 35 U.S.C. § 112, ¶ 2.

At its outset, this phrase raises questions as to the scope of the claims because a channel logically cannot be *fluidly* connected to an exterior frame.   (Ex.

---

[7]   Pre-AIA 35 U.S.C. § 112 applies here because the '012 Patent was filed in 2005 (*see* Ex. 2, '012 Patent at p. 1), well before the America Invents Act went into effect in 2013.

7, Pratt Decl. ¶ 42.)[8] Rather, a channel can be fluidly connected to a chamber within a frame, but not to the frame itself. (*Id.*) Moreover, the claimed "trigger valve exterior frame" houses multiple different fluid channels and chambers, and thus it is unclear exactly to what channels or chambers (if any) the claimed main valve control channel is fluidly connected. (*Id.* ¶ 43.) For example, claim 2 of the '012 Patent recites the following channels and chambers disposed within the trigger valve exterior frame: (1) "a main valve intake channel being defined between the valve piston and the trigger valve exterior frame"; (2) "an air discharge channel being defined between the valve piston and the trigger valve exterior frame"; and (3) "a trigger valve chamber being defined by the trigger valve exterior frame." (Ex. 2, '012 Patent at 30:46-48, 51-53, 61-62.)[9] Thus, even if we were to assume that the claims were intended to be drafted as a main valve control channel fluidly connected to a chamber or channel within the trigger valve exterior frame, the claims still fail to provide reasonable certainty as to which of these three channels and chambers the main valve control channel is fluidly connected.  (Ex. 7, Pratt Decl. ¶ 43.)    Thus, the claims fail to inform those skilled

---

[8] The claim language itself clearly shows that the claims are indefinite and Dr. Pratt's declaration simply confirms as such. Thus, the Court need not consider Dr. Pratt's declaration here unless the Court also considers Dr. Vallee's declaration.

[9]  Claim 4 of the '012 Patent, which depends from claim 2, further recites "a trigger valve intake channel" and a "trigger valve control channel" housed within the trigger valve exterior frame.  (*See* Ex. 2, '012 Patent at 31:8-9, 12-13.)

in the art about the scope of the invention with reasonable certainty, and the claims are indefinite.

Koki never addresses these logical inconsistencies in the claims, and instead simply repeats the claim language verbatim with the barebones assertion that the language is clear. (*See supra* at 26 ("Here, the claims are clear on their face and there is no uncertainty as to their scope – the trigger valve exterior frame is fluidly connected to the main valve control channel.").) Instead, Koki turns straight to the specification in an attempt to save this facially nonsensical and indefinite claim term. But the Federal Circuit has "repeatedly and consistently . . . recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (citations omitted); *see also id*. ("Even a nonsensical result does not require the court to redraft the claims.") (internal quotations omitted).

Nevertheless, the specification does not save this claim term from being indefinite, and in fact the specification actually supports Kyocera Senco's position – the trigger valve exterior frame described in the specification houses multiple chambers and channels and thus it is unclear to which of these the claimed main valve control channel is fluidly connected. Specifically, as shown in annotated Figure 2 below, the trigger valve exterior frame houses, partially or fully, the following *five* distinct channels and chambers: main valve intake channel 20, air

channel 22, trigger valve control channel 16, trigger valve intake channel 14, and
trigger valve chamber 13:



**'012 Patent at Figure 2 (Annotated)**


(*See* Ex. 2, '012 Patent at 7:52-8:37.) Thus, the specification does nothing to
resolve the uncertainty of the claim language itself.  (Ex. 7, Pratt Decl. ¶ 44.)

Koki glosses over this issue and instead focuses on the specification's
description that "fluid can pass between the trigger valve and the main control
valve channel," language which is also found in Koki's proposed construction.
(*Supra* at 27). But the claims do not recite "*a trigger valve* fluidly connected to  the
main valve control channel" as Koki wishes – instead they recite "*a trigger*

32

*valve exterior frame.*"[10] *See Chef Am.*, 358 F.3d at 1374 ("[W]e construe the claim as written, not as the patentees wish they had written it.").

Therefore, the court should find that the disputed term is indefinite under pre-AIA 35 U.S.C. § 112.

### 3.    Plaintiff's Reply Position

Kyocera Senco's indefiniteness challenges are premature and should be raised, if at all, during the summary judgment phase of the case. But in the event the Court were to consider these assertions during *Markman*, Kyocera Senco's assertion that this term is indefinite because "a channel logically cannot be fluidly connected to an exterior frame" ignores the plain and unambiguous language of the claim and instead requires taking claim language (which is by its nature a terse recitation rather than a fully elaborated description)[11] to a needless and almost

---

[10] Tellingly, Koki repeatedly omits the word "fluidly" when describing the specification's description of the trigger valve exterior frame, the very word over which the parties' dispute is centered. (*See, e.g.*, *supra* at 26 ("[T]he specification discloses a trigger valve exterior frame that forms a trigger valve 6 *which is connected* to the main valve control channel."), 26-27 ("The specification further explains that the main valve control channel *is connected* to a space between the components of the trigger valve exterior frame . . . ."), 27 ("[T]he trigger valve exterior frame *is connected* to the main valve control channel . . . ."), 28 ("The location where the trigger valve exterior frame *is connected* to the main valve control channel is shown by the red circles.")). Koki is implicitly admitting that there is no written description of "a trigger valve exterior frame to which the main valve control channel is *fluidly* connected."

[11] *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) (noting that "[t]he construction of claims is simply a way of elaborating the normally terse claim language").

absurd level of abstraction. The plain language of the claim requires that the main valve control channel be fluidly connected to a trigger valve exterior frame. Figure 2 of the '012 patent shows exactly that:



The trigger valve exterior frame is shown in green, the main valve control channel is shown in light blue, and the location where the trigger valve exterior frame is fluidly connected to the main valve control channel is shown by the red circles, as well as the portion shown in yellow. (*see also* Ex. 6, Vallee Decl. at ¶ 49; Ex. 8, Vallee Supp. Decl. at ¶¶ 29-30.) It is at the location identified by the red circles and yellow where the fluid is exchanged between the main valve control channel and the trigger valve exterior frame. The written description (and claims) thus demonstrate that the trigger valve exterior frame is fluidly connected to the

main valve control channel, which is entirely consistent with Koki's proposed construction which recites that the trigger valve exterior frame is connected to the main valve control channel such that fluid can pass between the trigger valve and the main valve control channel.

Kyocera Senco's identification of additional channels or chambers within the trigger valve is not relevant. As an initial matter, the plain language of the claim does not require the main valve control channel to be connected to any particular channel, thus, identification of the various channels that may be in the trigger valve is unnecessary. Moreover, the fact that the trigger valve may include any number of channels does not mean that the trigger valve exterior frame is not fluidly connected to the main valve control channel. To the contrary, regardless of whether the main valve control channel is connected to one or more specific channels within the frame, all the claim requires is that the trigger valve exterior frame be fluidly connected (directly or indirectly) to the main valve control channel. (*See also* Ex. 8, Vallee Supp. Decl. at ¶ 31.)

Moreover, other portions of the claim recite the connections between the main valve control channel and channels in the trigger valve that Kyocera Senco asserts is somehow unclear. (*See e.g.*, Ex. 2, '012 patent at col. 30:46-51 (main valve intake channel connecting main valve control channel to accumulator); 30:51-54 (air discharge channel connecting main valve control channel      to

35

atmosphere); *see also* Ex. 8, Vallee Supp. Decl. at ¶ 32.) For other channels identified by Kyocera Senco, the claims do not require any connection between the main valve control channel and those channels or chambers, but instead connect other components within the tool. (*See* Ex. 2, '012 patent at col. 31:8-11 (trigger valve intake channel connecting accumulator to trigger valve chamber); col. 31:13-15 (trigger valve control channel connecting trigger valve chamber and atmosphere); *see also* Ex. 8, Vallee Supp. Decl. at ¶ 32.) Thus, while not relevant to deciding that the trigger valve exterior frame is connected to the main valve control channel, Kyocera Senco's assertion that it is unclear whether the main valve control channel is connected to other channels is demonstrably incorrect.

Accordingly, Koki's proposed construction should be adopted.

### 4.    Defendant's Sur-Reply Position

Defendant previously explained how Koki repeatedly and consistently ignored the word "fluidly" found in the claim language at issue when discussing how the trigger valve exterior frame is connected to the "main valve control channel." (*Supra* at 32 n.10). In apparent response, Koki repeats its  same arguments from its Opening Brief but this time includes the word "fluidly." But by adding the word "fluidly," Koki reveals the nonsensical and indefinite nature of this claim, as a channel cannot be ***fluidly*** connected to a frame. Indeed, at one point, Koki asserts that "[i]t is at the location identified by the red circles    and

yellow where the fluid is exchanged between the main valve control channel and the trigger valve exterior frame." (*Id*. at 34). But Koki provides no explanation (and there is not one) as to how fluid can be exchanged between a solid object and a channel. In truth, Koki is referring to the fluid exchange between the main valve control channel and one of the many channels/chambers ***housed within the trigger valve exterior frame***. But because the claims do not provide any reasonable certainty as to which of these many channels/chambers the main valve control channel is fluidly connected, this claim is indefinite. (*See id*. at 29-32).

Koki argues that Defendant's "identification of additional channels or chambers within the trigger valve is not relevant" because "the plain language of the claim does not require the main valve control channel to be connected to any particular channel." (*Id*. at 35). But Koki misses the point. If the trigger valve exterior frame simply housed a single channel/chamber, it is possible that a person of ordinary skill in the art could read past the facially nonsensical claim language that requires a channel to be *fluidly* connected to a frame and determine that the patentee instead meant that the channel is fluidly connected to the channel/chamber housed within that frame. However, since the claim at issue recites multiple channels/chambers all housed within the trigger valve exterior frame, a person of ordinary skill in the art would not be able to reconcile the *fluidly*

connected ambiguity and ultimately determine with reasonable certainty as to which, if any, of these channels/chambers the main valve control channel is *fluidly* connected.

For similar reasons, Koki's reference to other portions of the claim (*see id*. at 35-36) does nothing to resolve the ambiguity as to the actual limitation at issue – "a trigger valve exterior frame to which the main valve control channel is fluidly connected." *Merck & Co., Inc. v. Teva Pharm. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Thus, the Court should adopt Defendant's proposed construction.

### C.   <u>"closed end formed by joining of the two opposing walls"</u>

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 1, 5, 8-10, and 14 in U.S. Patent No. 7,325,709 (the "'709 Patent") | "a closed end formed at an intersection of the two opposing walls" | "closed end formed by connecting two separate and distinct opposing walls together" |

### 1.   Plaintiff's Opening Position

The parties dispute whether the "closed end formed by joining of two opposing walls" in the asserted claims of the '709 patent allows the closed end to be formed "at an intersection of two opposing walls," as proposed by Koki, or requires the closed end be formed by "connecting two separate and distinct opposing walls together," as proposed by Kyocera Senco. Kyocera    Senco's

construction of the term attempts to improperly import undisclosed limitations into the claim language.

Nothing in the claims, specification, or prosecution history of the '709 patent requires that the "closed end" be formed by "connecting two separate and distinct" walls, as suggested by Kyocera Senco. Indeed, including this requirement would improperly import methods of manufacture limitations into product claims. *See Belden Inc. v. Berk-Tek LLC*, 610 Fed. App'x 997, 1004 (Fed. Cir. 2015) (finding a product claim does not become a product-by-process claim simply because a limitation recites a process characteristic unless the claim recites a specific method by which the structure must be achieved (citing *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371-72 (Fed. Cir. 2003))). Here, the fact that the claim language recites joining of two opposing walls does not require those walls to be separate and distinct and then subsequently connected as part of the manufacturing process. Because the claims here do not require a specific method of manufacture, it would be improper to import such a method as proposed by Kyocera Senco.

Even assuming the term "closed end" were nonetheless considered to recite a method of manufacture, the specification of the '709 patent discloses that the method would include forming the magazine, including the "closed end," from a single piece of material, rather than "connecting two separate and distinct"   pieces

of material. The specification explains that "magazine 22 is made from a soft non-ferrous metal such as aluminum and magnesium, and *is produced by extrusion molding into a shape such that the casing thereof covers the nails 10*." (Ex. 3, '709 patent at 4:39-42.) It would be apparent to one skilled in the art that the extrusion process would result in a *single piece of material* forming the magazine 22—including the closed end—rather than two "separate and distinct" pieces of material, which then require connection. (*See* Ex. 6, Vallee Decl. at ¶¶ 53- 58.) Kyocera Senco's proposed construction conflicts with this understanding because a magazine formed from a single piece of material would not "connect[] two separate and distinct opposing walls." *See In re Rosuvastatin Calcium  Patent Litig.*, No. CIV 07-359-JJF-LPS, 2009 WL 1220542, at *6 (D. Del. May 4,  2009), *report and recommendation adopted*, No.  CIV.A.07-805JJFLPS, 2009 WL 3378602 (D. Del. Oct. 20, 2009) ("One of the preferred embodiments of the [asserted] patent is not formed by the process Defendants would read into the claim. . . . As the Federal Circuit has repeatedly held, 'it is unlikely that an inventor would define [her] invention in a way that excluded the preferred embodiment, or that persons of a skill in [her] field would read the specification in such a way.'" (quoting *Hoechst Celanse Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996))); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583

(Fed. Cir. 1996) ("[an interpretation excluding the preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support.").

The prosecution history also conflicts with Kyocera Senco's proposed construction. During prosecution of the application that resulted in the '709 patent, the applicant noted that "a closed end where opposing walls are joined" may consist of a single piece of material, rather than "connecting two separate and distinct opposing walls." Specifically, in response to a Patent Office rejection relying on U.S. Patent No. 6,609,646 to Miller, et al. ("Miller"), the applicant admitted that "it is readily apparent that [] Fig. 20 of Miller et al. shows a closed end where opposing walls are joined." (Ex. 10, Response to Office Action dated 2007-02-15 at 10.) Miller describes a magazine assembly for a fastening tool, where the nose portion of the tool contains guide posts which slide into the magazine for alignment between the magazine and the nose portion. (Ex. 11, Miller at Abst.) FIG. 20 of Miller shows the cross section of magazine housing 1010, which is shown in exploded view in FIG. 19.



configured to receive the [fasteners]. Ex. 11, Miller at 18:1-3. Miller further

explains that "[i]n the example illustrated [in FIGs. 19-20], the magazine housing

1010 is *extruded from a lightweight material*, such as aluminum." Ex. 11, Miller at

17:20-22 (emphasis added). Although the applicant distinguished Miller on other

grounds (*i.e.*, magazine walls having a constant width and not a width that

increases from the closed end towards the head of the nail as required by the

claimed invention), the applicant conceded that Miller, like the claimed invention, disclosed a closed end extruded from a single piece of material. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*) ("the prosecution history provides evidence of how the PTO and the inventor understood the patent.").

It would have been apparent to one skilled in the art that such an extrusion process would result in a *single piece of material* forming the magazine housing 1010—including the fastener body portion 1028—rather than two "separate and distinct" pieces of material as proposed by Kyocera Senco. (*See* Ex. 6, Vallee Decl. at ¶ 54-57.) Because the applicant admitted during prosecution that "a closed end formed by joining of two opposing walls" includes an intersection of two opposing walls, the term should not be limited to require connecting two separate and distinct walls to form the closed end.

### 2.    Defendant's Answering Position

The asserted claims of the '709 patent are clear and unambiguous in explaining that the "closed end" is "*formed by joining*" two opposing walls. "Formed by joining" has a clear and easily understood meaning consistent with Kyocera Senco's proposed construction: "formed by connecting two separate and distinct" structures "together." In fact, this claim language is so simple and readily understood that it should not require construction at all.  Koki had the option to use

broader claim language here, including language broad enough to encompass both an integrally formed closed end and a closed end "formed by joining" two opposing walls together. But Koki did not. Instead, it chose the clear and unambiguous language "formed by joining." *See Chef Am.*, 358 F.3d at 1374 ("[W]e construe the claim as written, not as the patentees wish they had written it.").

Koki does not argue for a different plain and ordinary meaning of "formed by joining." In fact, Koki entirely ignores the claim language itself. Instead, Koki accuses Kyocera Senco of attempting to "improperly import methods of manufacture limitations into product claims." (*Supra* at 39.)  But Kyocera Senco  is doing no such thing, as "formed by joining" is a structural limitation. *See, e.g.*, *In re Nordt Dev. Co.*, 881 F.3d 1371, 1375 (Fed. Cir. 2018) (finding that "injection molded" in a product claim connotes an "integral structure"); *see also id.* ("The *Garnero* court found that the limitation ['interbonded one to another by interfusion'] 'is as capable of being construed as a structural limitation as 'intermixed,' 'ground in place,' 'press fitted,' 'etched,' and 'welded,' all of which at one time or another have been separately held capable of construction as structural, rather than process, limitations."") (quoting *In re Garnero*, 412 F.2d 276, 279 (CCPA 1969)). Indeed, "words of limitation that can connote with equal force a structural characteristic of the product or a process of manufacture are

commonly and by default interpreted in their structural sense, unless the patentee has demonstrated otherwise." *3M Innovative Props. Co. v. Avery Dennison Corp*., 350 F.3d 1365, 1371 (Fed. Cir. 2003).

Here "formed by joining" connotes the very structural characteristic that Kyocera Senco urges in its claim construction: two separate and distinct opposing walls are connected together to form a closed end. The opposite of two separate and distinct walls of course is an integrally formed closed end, which the Federal Circuit has already construed structurally. *See Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (holding that "integral" describes a structural requirement). Of course, if "integral" is structural, then its opposite—"formed by joining"—is also structural.

Next, Koki turns to an embodiment in the specification as supposed support for its construction (*Supra* at 39-40), but "[w]hen claim language has as plain a meaning on an issue as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning." *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015). "Here the specification does not provide a basis for reasonably adopting a construction that contradicts the plain meaning of the claim language." *Id*.    Indeed, the detailed

description never explicitly mentions "formed by joining," let alone redefines it in scope such that it is broader than the plain and ordinary meaning.[12]

Koki next cites to the prosecution history in an attempt to alter the plain meaning of "formed by joining," (*supra* at 41-43) but this attempt falls flat as well. Notably, the specific language at issue here, "formed by joining," is never mentioned in Koki's cited portions of the prosecution history. Indeed, this language isn't even found in the version of the claims cited in the prosecution history. (*See generally*, Ex. 10, at 2, 5.) Koki also goes off on a tangent arguing about what a prior art reference discloses (*supra* at 42-43), but this is extrinsic evidence that has no bearing on the meaning of the asserted claims. *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (finding it was "improper to rely on extrinsic evidence" when "an analysis of the intrinsic evidence alone . . . resolve[d] any ambiguity in a disputed claim term").

Therefore, the Court should adopt Kyocera Senco's construction and construe the disputed term as "closed end formed by connecting two separate and distinct opposing walls together."

---

[12]    In addition, Koki forgets that "the claims of the patent need not encompass all disclosed embodiments." *See TIP Sys., LLC v.  Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008).

### 3.      Plaintiff's Reply Position

Kyocera Senco's proposed construction not only imports additional limitations into the claims, but far worse, imports limitations that are not supported by any intrinsic evidence.

By myopically focusing on the "formed by joining" language, Kyocera Senco ignores the remainder of its proposed construction which additionally requires "two separate and distinct opposing walls." Nowhere in the specification is there any requirement that the magazine be formed by joining two separate and distinct walls. Indeed, such a requirement would be inconsistent with every embodiment disclosed in the primary intrinsic evidence of claim term meaning: the written description. Here, the written description explains that the "magazine 22 … is produced by extrusion molding into a shape such that the casing thereof covers the nails 10." (Ex. 3,'709 patent at col. 4:39-42.) This extrusion process necessarily results in a single piece of material. (*See* Ex. 6, Vallee Decl. at ¶¶ 53-58.) Kyocera Senco's interpretation which excludes the preferred embodiment (indeed, every embodiment) cannot be correct. *See Vitronics*, 90 F.3d at 1583 ("[An interpretation excluding the preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support.").

Kyocera Senco attempts to justify importing methods of manufacture into apparatus claims by relying on *In re Nordt Dev. Co.*, 881 F.3d 1371, 1375 (Fed.

Cir. 2018) and *In re Garnero*, 412 F.2d 276, 279 (CCPA 1969). However, both of these cases involved claims where a specific process known in the art was explicitly recited in the claims. As Kyocera Senco admits in its Response, in *Nordt*, the court found "that '***injection molded***' in a product claim connotes an 'integral structure.'" (emphasis added); *see also Nordt*, 881 F.3d at 1371. Injection molding is a specific process particular to the manufacturing industry, which yields a specific and known structural result. (Ex. 8, Vallee Supp. Decl. at ¶¶ 38-40 (citing Ex. 25).) Similarly, Kyocera Senco's reliance on *Garnero* is misplaced. In *Garnero*, the court found that the limitation "interbonded one to another ***by interfusion***" to be a structural limitation. *Garnero*, 412 F.2d at 279. This is because the claim at issue recited a specific process—"by interfusion"—known in the art to yield a particular structural result. Interfusion was defined in the patent-at-issue in *Garnero* as "taking [] initially unexpanded perlite particles and heating them rapidly for expansion so that combined water associated with the particles is released as a vapor which operates as a flux which enables the particles to become stuck together at temperatures as low as 1400 degrees F." *Id.* at 277. Undoubtedly, that was a specific process known in the art that yielded a specific result.

Both *Nordt* and *Garnero* required a specific method of manufacture ***in the claims*** (*i.e.*, "injection molded" and "by interfusion"). Conversely here, "joining"

of the two opposing walls in the '709 patent is not limited to a specific process that is known in the art. The '709 patent claim language does not recite a specific method of manufacture, but instead merely indicates an intersection of two opposing walls, a structural feature. As such, it is improper for Kyocera Senco to import methods of manufacture into an apparatus claim.

Indeed, other courts have rejected similar arguments, finding that "joining" or "joined" does not necessarily require that two pieces be "separate and distinct," but merely that an intersection is identified. *See Sollami Co. v. Kennametal Inc.*, No. 06-0062, 2006 WL 6211761, at *17 (W.D. Pa. Aug. 29, 2006) ("'joining   said surface along an edge' means that the side surface intersects the forward surface to define an edge. The [term] is not limited to a two-piece construction."); *Rapistan Systems Advertising Corp. v. Daifuku Am. Corp.*, No. A-03-CA-682-LY, 2006 WL 6112186, at *3 (W.D. Tex. Feb. 9, 2006) (recognizing that "joined wall segments" means "sections of a wall are joined together, whether by separate manufacture and subject connection or *by unitary manufacture*.") (emphasis added).

Finally, Kyocera Senco attempts to avoid the statements made by the applicant during prosecution by arguing that the specific language "formed by joining" was not in the claim language at the time of the applicant's remarks. But this timeline does not impact the applicant's statements about what is shown in Miller. As explained in Koki's Opening, Miller shows a unitary magazine  housing

construction in Fig. 20 (*see supra* at 41-42), and indicates that "the magazine housing 1010 is *extruded* from a lightweight material." In describing Miller, the applicant specifically indicated that "Fig. 20 of Miller et al. shows a closed end *where opposing walls are joined*." (Ex. 11, Miller at 17:20-22.) Whether the "joining" claim language was subsequently added is of little importance as it is clear that the applicant interpreted two opposing walls being joined as encompassing two walls of the same unitary construction, rather than two "separate and distinct" walls.

### 4.    Defendant's Sur-Reply Position

Koki's Reply continues to ignore the clear and unambiguous meaning of "formed by joining." In fact, Koki never even disputes that the plain meaning of "formed by joining" is consistent with Defendant's construction. Instead, as with its Opening Brief, Koki again skips over the claim language entirely and goes straight to the specification in an attempt to alter the plain meaning of the disputed term. But "[h]ere the specification does not provide a basis for reasonably adopting a construction that contradicts the plain meaning of the claim language." *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015).

Koki again suggests that Defendant is attempting to import methods of manufacture into apparatus claims (*see supra* at 47-49) despite the clear case law to the contrary. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("[W]ords of limitation that can connote with

50

equal force a structural characteristic of the product or a process of manufacture are commonly and by default interpreted in their structural sense, unless the patentee has demonstrated otherwise.").

Koki attempts to distinguish from this clear precedent by suggesting that "here, '*joining*' of the two opposing walls in the '709 patent is not limited to a specific process known in the art." (*Supra* at 48-49).[13] But Koki once again ignores the full language of the disputed claim term – "*formed by* joining," not just "*joining*." In fact, Koki repeatedly argues as to the meaning of "joining" *in isolation*. (*See id*. at 12 ("[O]ther courts have rejected similar arguments, finding that '*joining*' or '*joined*' does not necessarily require that two pieces be 'separate and distinct . . . .'"), 13 ("Whether the '*joining*' claim language was subsequently added is of little importance as it is clear that the applicant interpreted two opposing walls being *joined* as encompassing two walls of the same  unitary construction . . . .")). By continuing to ignore the full language of the disputed claim term, "*formed by joining*," Koki implicitly admits what is already abundantly clear – the plain and ordinary meaning necessitates a "closed end formed by connecting two separate and distinct opposing walls together."

Thus, the Court should adopt Defendant's proposed construction.

---

[13]    All emphasis is added herein unless otherwise indicated.

### D.   <u>"a handle portion extending from the housing"</u>

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 12, 13, and 15 of U.S. Patent No. 8,118,204 (the "'204 Patent") | "a portion of the housing forming a handle and extending from another portion of the housing" | "a handle portion extending from a separate and distinct housing" |

### 1.   Plaintiff's Opening Position

Claims 12 and 13 of the '204 patent recite "[a] portable fastening tool comprising: a housing" and "a handle portion extending from the housing in a handle extending direction" The dispute relating to these terms is whether the "handle portion" can be a portion of the housing, as proposed by Koki, or whether the "handle portion" must be separate and distinct from the housing, as proposed by Kyocera Senco. A person of ordinary skill in the art reading the specification would understand that "a handle portion" is "a portion of the housing forming a handle and extending from another portion of the housing."

FIG. 1 of the '204 patent illustrates the claimed fastener driving tool:



Ex. 4,'204 patent, FIG. 1 (annotated). The fastening tool includes a   housing

2. The housing generally constitutes a cylindrical trunk portion 2A (yellow) and a

handle portion 2B (red) jointed generally in the shape of the letter T when viewed

in a side view to the trunk portion. (*See* Ex. 4, '204 patent at col. 3:32-35). Based

on the specification, the "handle portion" is a portion of the housing forming a

handle (*i.e.*, handle portion 2B) and extending from another portion of the housing

(*i.e.*, cylindrical trunk portion 2A), which is the construction proposed by Koki.

(*See also* Ex. 6, Vallee Decl. at ¶¶ 59-61.)

Kyocera Senco's proposed construction contradicts the specification and the

understanding of one of ordinary skill in the art. Here, Kyocera Senco's

requirement that the handle portion be separate and distinct from the housing is not

supported by any disclosed embodiment, and in fact is contrary to the disclosed

embodiment where the handle portion is part of the housing and extends from another portion of the housing. A claim construction that reads out the preferred embodiment disclosed in the specification is rarely correct. *See Vitronics*, 90 F.3d at 1583 (a claim construction that excludes the preferred embodiment is 'rarely, if ever, correct and would require highly persuasive evidentiary support'); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct.") (internal quotation marks and citation omitted); *Wasica Finance GmbH v. Schrader Int'l, Inc.*, No. 13-1353-LPS, 2019 WL 1011321, at *4 (D. Del. Mar. 4, 2019) (refusing to interpret claim limitation in a manner that excludes a disclosed embodiment). Moreover, a person of ordinary skill in the art would understand that a "handle portion" is the portion of the housing forming a handle and extending from a portion of the housing, and not separate and distinct from the housing. (Ex. 6, Vallee Decl. at ¶¶ 60-61.)

### 2.  Defendant's Answering Position

Claims 12, 13, and 15[14] of the '204 Patent list two separate and distinct elements: (1) a housing; and (2) a handle portion extending from the housing. Where a claim lists elements separately, "the clear implication of the  claim

---

[14]   Koki refers only to claims 12 and 13 of the '204 patent in its opening brief (*see supra* at 52), but asserted claim 15 of the '204 patent also includes the disputed language.

language" is that those elements are "distinct component[s]" of the patented invention. *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004); *see also Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1404-05 (Fed. Cir. 1996) (concluding that where a claim provides for two separate elements, a "second portion" and a "return portion," these two elements "logically cannot be one and the same"). Further, because the claim explicitly states that the handle portion "*extend[s]*" from the housing, the housing and the handle portion *must* be construed as separate and distinct components to avoid rendering the claims nonsensical—a component cannot be connected to itself. *Becton, Dickinson and Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1255 (Fed. Cir. 2010). In fact, the Federal Circuit in *Becton, Dickinson* provided substantial guidance for such a situation:

> Indeed, *Becton's assertion that the spring means and the hinged arm can be the same structure renders the asserted claims nonsensical*. Independent claim 1 of the '544 patent describes the spring means as being "connected to" the hinged arm and *independent claim 24 describes it as "extending between" the hinged arm and a mounting means. If the hinged arm and the spring means are one and the same, then the hinged arm must be "connected to" itself and must "extend between" itself and a mounting means, a physical impossibility*. A claim construction that renders asserted claims facially nonsensical "cannot be correct." *Schoenhaus v. Genesco, Inc*., 440 F.3d 1354, 1357 (Fed. Cir. 2006); *see Bd. of Regents v. BENQ Am. Corp*., 533 F.3d 1362, 1370 (Fed. Cir. 2008) (refusing to adopt a claim construction that "would effect [a] nonsensical result").

*Id.* (emphasis added). Here, Koki's proposed construction, "a portion of the housing forming a handle and extending from another portion of the housing," similarly renders the asserted claims nonsensical and thus "cannot be correct." *Schoenhaus*, 440 F.3d at 1357.

Koki doesn't spend any time discussing how its proposed construction is supported by the plain language of the claims and instead looks straight to the specification (*see supra* at 52-54), even though one must "[f]irst . . . look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582. The reason is exceedingly obvious—the claims have a clear plain and ordinary meaning that is consistent with Kyocera Senco's proposed construction. Tellingly, "the specification does not provide a basis for reasonably adopting a construction that contradicts the plain meaning of the claim language" as nothing in the specification redefines the plain and ordinary meaning of "a handle portion *extending from* the housing." *See Straight Path*, 806 F.3d at 1361.

Essentially, Koki is asking the Court to redraft the claims to cover embodiments disclosed in the specification, but that is not the Court's role in claim construction. *See Chef Am*, 358 F.3d at 1374 ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether  to make them operable or to sustain their validity.") (citations omitted). *Id*.   Instead,

the Court should "construe the claim as written, not as the patentees wish they had written it." *Id*.

Therefore, the Court should adopt Kyocera Senco's construction and construe the disputed term as "a handle portion extending from a separate and distinct housing."

### 3.   Plaintiff's Reply Position

Kyocera Senco's litigation-driven position is based on the misguided notion that the handle portion must be completely separate from the housing. The plain language of the claim has no such requirement. All the claim language requires is that the handle portion extend from the housing, not that the handle portion be completely separate and distinct from the housing. As a result, Koki's proposed construction is supported by the plain language of the claim whereas Kyocera Senco's is not.

Indeed, requiring the handle portion to be separate and distinct from the housing would impermissibly read out every single embodiment disclosed in the written description. *See Vitronics*, 90 F.3d at 1583 (a claim construction that excludes the preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support"); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct.") (internal

quotation marks and citation omitted); *Wasica Finance GmbH v. Schrader Int'l, Inc.*, No. 13-1353-LPS, 2019 WL 1011321, at *4 (D. Del. Mar. 4, 2019)   (refusing to interpret claim limitation in a manner that excludes a disclosed embodiment). As explained in Koki's Opening, FIG. 1 of the '204 patent illustrates the claimed fastener driving tool:



(Ex. 4, '204 patent, FIG. 1 (annotated).) The fastening tool includes a housing 2 that constitutes a cylindrical trunk portion 2A (yellow) and a handle portion 2B (red) jointed generally in the shape of the letter T when viewed in a side view to the trunk portion. (*See* Ex. 4, '204 patent at col. 3:32-35). As disclosed in the specification, the "handle portion" is a portion of the housing forming a handle (*i.e.*, handle portion 2B in red) and extending from another portion of the   housing

(*i.e.*, cylindrical trunk portion 2A in yellow). This is the exact construction proposed by Koki.

Kyocera Senco's reliance on *Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004), *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398 (Fed. Cir. 1996), and *Becton, Dickinson and Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249 (Fed. Cir. 2010) is misguided. In *Gaur*, the court was tasked with determining whether an "electrical operating unit" and a "pair of spaced-apart electrically exposed conductive probe networks" were separate components. The Court found these were separate components based on the written description that consistently described the "electrical operating unit" and a "pair of spaced-apart electrically exposed conductive probe networks" as separate components and further explained that the principal advantage of the claimed invention was these components were separate. *See Gaur*, 363 F.3d at 1288-90. Unlike *Gaur*, here nothing in the claims or written description requires the handle portion to be separate and distinct from the housing. In fact, as noted above, requiring the handle portion be separate and distinct from the housing would improperly exclude every disclosed embodiment.

In *Engel*, the court heavily relied on the written description and prosecution history in finding the "second portion" and "return portion" to be separate and distinct components. Specifically, the written description stated that "a second portion 24 is bent rearwardly whereby this portion 24 extends opposite a portion of

the duct wall. A return portion 26 is also provided...." *Engel*, 96 F.3d at 1405. The court found that the use of the language "also provided" means the "second portion" and "return portion" cannot logically be the same. *Id*. It also noted that the applicant had distinguished prior art and that its amendments and arguments required the "second portion" and "return portion" be separate and distinct components. *Id*.

Similarly, in *Becton*, the Court found that the claimed "spring means" was a separate element from the "hinged arm" because nothing in the written description suggested the "hinged arm" could function as a spring and, instead, described the "spring means" and "hinged arm" as separate components with separate functions and even cautioned against using a "hinged arm" to perform the same function as the "spring means." *Becton*, 616 F.3d at 1254-55.

Unlike in *Engel* and *Becton*, here the '204 patent specification does not logically require the "handle portion" be separate and distinct from the "housing." To the contrary, the '204 patent explains that the handle portion is a portion of the housing that forms a handle that extends from another part of the housing.

### 4.   Defendant's Sur-Reply Position

Koki argues that "[a]ll the claim language requires is that the handle portion extend from the housing, not that the handle portion be completely separate and distinct from the housing." (*Supra* at 57). But those two   statements,

separated by a comma, cannot logically be reconciled. Indeed, the plain and unambiguous language of "a handle portion extending from the housing" mandates two separate and distinct components as a component cannot logically be connected to itself. *See Becton, Dickinson and Co. v. Tyco Healthcare Grp*., 616 F.3d 1249, 1255 (Fed. Cir. 2010).

Koki attempts to distinguish the case law cited by Defendant by delving into the specific facts of each case while ignoring the basic tenets these cases set forth. (*See supra* at 59-60). For example, Koki never disputes that where a claim lists elements separately, such as here, "the clear implication of the claim language" is that those elements are "distinct component[s]" of the patented invention. *Gaus v. Conair Corp*., 363 F.3d 1284, 1288 (Fed. Cir. 2004). With this "clear implication" in hand, the requirement that the "housing" and "handle portion" be separate and distinct components is further solidified because the claims require that the "handle portion *extend[] from* the housing." *See Becton*,  616 F.3d at 1255 ("If the hinged arm and the spring means are one and the same,

then the hinged arm must be 'connected to' itself *and must 'extend between' itself and a mounting means, a physical impossibility*.").[15]

---

[15] Koki attempts to draw focus from the Federal Circuit's analysis of the asserted claim's clear and unambiguous language in *Becton* by incorrectly suggesting that the Court relied solely on the specification. (*Supra* at 60). But the Federal Circuit simply looked to the specification as further support for what the clear and unambiguous claim language stated.   *See Becton*, 616 F.3d at

Koki has no response to this clear and unambiguous claim language, and Koki's repeated turns to the specification cannot save it here. *Straight Path*, 806 F.3d at 1361 ("When claim language has as plain a meaning on an issue as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning."); *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written, not as the patentees wish they had written it.").

Thus, the Court should adopt Defendant's proposed construction.

### E.    "the battery pack having an extending portion extending from the housing"

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 12, 13, and 15 of the '204 Patent | "the battery pack has an extending portion that attaches to a portion of the housing" | "the battery pack extending portion extends directly from the housing" |

#### 1.    Plaintiff's Opening Position

Claims 12 and 13 of the '204 patent recite "[a] portable fastening tool comprising: a housing" and "a battery pack supported by the battery      pack

---

1254 ("The unequivocal language of the asserted claims of the #544 patent requires a spring means that is separate from the hinged arm."); *see also id.* ("The specification, *moreover, confirms*, that the spring means is a separate element from the hinged arm . . . .").

supporting portion, the battery pack having an extending portion extending from the housing." The dispute relating to this term is whether the battery pack extends from a portion of the housing, as proposed by Koki, or whether the battery pack must extend directly from the housing (which would not include the handle portion), as proposed by Kyocera Senco.[16]

A person of ordinary skill in the art reading the specification   would understand that the plain meaning for this term is "the battery pack has an extending portion that attaches to a portion of the housing." FIGS. 1 and 3 illustrates the claimed fastener driving tool with a housing having a trunk portion (yellow) and handle portion (red), a battery pack supporting portion (green), and a battery pack (blue).

---

[16]  Given that Kyocera Senco's position that "a handle portion extending from the housing" requires the handle portion be separate and distinct from the housing, Kyocera Senco's proposed construction for "battery pack having an extending portion extending from the housing" appears drafted to exclude infringement if a battery pack extends from the handle portion of the housing. This litigation-driven interpretation would exclude the preferred embodiment disclosed in the '204 patent and thus is improper.



With reference to FIGS. 1 and 3, the specification explains that the battery pack

(blue) is attached to the handle portion (red) through the battery pack supporting

portion (green):

> This housing 2 is constituted to include a generally cylindrical trunk
> portion 2A, and a handle portion 2B jointed generally in the shape of
> letter T, as viewed in a side view, to the trunk portion 2A. At the
> trailing end portion of the handle portion 2B (or at the free end portion
> on the side opposed to the trunk portion 2A) of the housing 2,
> moreover, there is disposed *a battery pack 3, attached to the end of
> handle portion 2B through a battery pack supporting portion 2C*, for
> housing the not-shown battery as the power source. Moreover, a
> trigger switch 4 is disposed at the handle portion 2B of the housing 2
> and near the trunk portion 2A.

(Ex. 4, '204 patent at col. 3:30-42.) This portion of the specification makes clear

that the battery pack is connected to the handle portion through the battery pack

supporting portion. This understanding is consistent with Koki's proposed

construction which is that the battery pack has an extending portion that "attaches to a portion of the housing." (*See also* Ex. 6, Vallee Decl. at ¶¶ 64-65.)

Kyocera Senco's proposed construction also contradicts the specification and the understanding of one of ordinary skill in the art. As noted above, a claim construction that reads out the preferred embodiment disclosed of the specification is rarely correct. See *Vitronics*, 90 F.3d at 1583; *Broadcom*, 732 F.3d at 1333; *Wasica*, No. 13-1353-LPS, 2019 WL 1011321, at * 4 (D. Del. Mar. 4, 2019). Here, Kyocera Senco's proposed construction would require that the battery pack extending portion extend directly from a portion of the housing that would <u>not</u> include the handle portion. This position is contrary to the disclosed embodiment where the battery pack extends from the handle portion. Moreover, a person of ordinary skill in the art would understand this term to mean that the battery pack attaches to a portion of the housing, which in this case is the handle portion. (*See* '204 patent at col. 3:38-40 ("a battery pack 3, attached to the end of handle portion 2B through a battery pack supporting portion 2C"); Ex. 6, Vallee Decl. at ¶¶ 64-65.)

### 2. Defendant's Answering Position

The dispute here falls with the proper interpretation of "a handle portion extending from the housing" as discussed in the immediately preceding section. Kyocera Senco simply seeks to make clear what is already readily apparent from

the claim language of claims 12, 13, and 15[17] of the '204 Patent, the battery pack extending portion extends *directly* from the housing. Under its plain and ordinary meaning, "extending from" means to extend directly from a given point towards a given direction. Thus, the battery pack extending portion cannot extend indirectly from the housing, such as with an intervening component between the battery pack extending portion and the housing.

As with basically every other disputed claim limitation, Koki ignores the plain and unambiguous claim language and instead turns to the specification in an attempt to redraft the claims. (*Supra* at 63-65.) But "[h]ere the specification does not provide a basis for reasonably adopting a construction that contradicts the plain meaning of the claim language." *Straight Path*, 806 F.3d at 1361; *see also id.* ("When claim language has as plain a meaning on an issue as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning.").

Therefore, the court should adopt Kyocera Senco's construction and construe the disputed term as "*the battery pack extending portion extends directly from the housing.*"

---

[17]     Once again, Koki does not reference asserted claim 15 in its   opening brief. (*See supra* at 62.)

### 3.      Plaintiff's Reply Position

Contrary to Kyocera Senco's position, nothing in the plain language of the claim requires that the battery pack extending portion extend *directly* from the housing. All the claim requires is that the battery pack have an extending portion that extends from the housing. This understanding is reflected in Koki's proposed construction, which is that the "battery pack has an extending portion that attaches to a portion of the housing."

Turning to the written description for guidance yields the same result. FIGS. 1 and 3 of the '204 patent illustrate the claimed fastener driving tool with a housing having a trunk portion (yellow) and handle portion (red), a battery pack supporting portion (green), and a battery pack (blue).



As noted in Koki's Opening, the written description explains that the battery pack (blue) is attached to the handle portion (red) through the battery pack supporting

portion (green). (See Ex. 4, '204 patent at col. 3:30-42 ("At the trailing end portion of the handle portion 2B []of the housing 2 … there is disposed ***a battery pack 3, attached to the end of handle portion 2B through a battery pack supporting portion 2C***") (emphasis added). It makes clear that the battery pack is connected to the handle portion through the battery pack supporting portion, consistent with Koki's proposed construction that the battery pack has an extending portion that "attaches to a portion of the housing."

On the other hand, Kyocera Senco's proposed construction would require that the battery pack extending portion extend directly from a portion of the housing that would <u>not</u> include the handle portion. Such a reading would exclude preferred embodiments, , which is "rarely correct." See *Vitronics*, 90 F.3d at 1583; *Broadcom*, 732 F.3d at 1333; *Wasica*, 2019 WL 1011321, at * 4.

### 4.    Defendant's Sur-Reply Position

As Defendant explained previously, the dispute here falls with the proper interpretation of "a handle portion extending from the housing." (*Supra* at 65-66). Koki does not dispute this assertion. Accordingly, if the Court adopts Defendant's construction of "a handle portion extending from the housing," the Court should also make clear what is readily apparent from the claim language here – the battery pack extending portion extends *directly* from the  housing

without any intervening components (such as a handle portion) between the battery pack extending portion and the housing.

Thus, the Court should adopt Defendant's proposed construction.

### F.    "a bottom view"

| Asserted Claim(s) | Koki's Construction | Kyocera Senco's Construction |
|---|---|---|
| Claims 12, 13, and 15 of the '204 Patent | "a view that is perpendicular to the side view" | Indefinite under the second paragraph of pre-AIA 35 U.S.C. § 112 |

### 1.    Plaintiff's Opening Position

A person of ordinary skill in the art would understand that in the context of the '204 patent, the term "bottom view" means "a view that is perpendicular to the side view." Claims 12 and 13 of the '204 patent claim the configuration of a portable fastening tool and explains the configuration of various components based on a side view and a bottom view. Although Kyocera Senco asserts the term "bottom view" is indefinite under 35 U.S.C. § 112, it cannot meet its burden of showing by clear and convincing evidence that the scope of claims 12 and 13 is not reasonably certain. *Nautilus*, 134 S. Ct. at 2124. For instance, claim 12 explains that in the side view (i) the magazine is inclined with respect to the ejecting direction; (ii) when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine; (iii) when the ejection unit is placed downwardly, an upper end of the battery pack is positioned lower than an upper end of the housing; and (iv) the

69

motor is positioned lower than the handle portion. (Ex. 4, '204 patent, col. 8:7-21.) The claim also explains that the magazine is inclined with respect to the handle portion in a bottom view. (*Id*. at 10-11.)

The specification also explains that the "bottom view" is perpendicular to the side view. For instance, FIG. 1 of the '204 patent shows the "side view" and FIG. 2 of the '204 patent shows the bottom view:



Side View                                    Bottom View

(Ex. 4, FIG. 1; FIG. 2; col. 2:64-67 ("FIG. 1 is a lefthand side elevation of an electric fastening tool according to an embodiment; FIG. 2 is a bottom view of the electric fastening tool according to the embodiment"); col. 3:15-17 (FIG. 1 is a lefthand side elevation of an electric fastening tool (or a portable fastening tool) according to the invention; FIG. 2 is a bottom view of the same electric fastening tool).) As further explained in the specification, the side view means the right and left sides of the case, in which the electric fastening tool is seen from the   operator

70

in case the operator grips the handle portion of the electric fastening tool and "the bottom view is taken in FIG. 1 from below the electric fastening tool." (Ex. 4, '204 patent, col. 3:22-26.) Based on these portions of the specification and figures, a skilled artisan would understand that the bottom view is a view that is perpendicular to the side view. (*See* Ex. 6, Vallee Decl. at ¶¶ 68-70.)

### 2.    Defendant's Answering Position

As discussed *supra*, under pre-AIA 35 U.S.C. § 112, ¶ 2,[18] a specification must include "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The Supreme Court explained the proper standard under which to consider indefiniteness: "we read § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.

Here, the "bottom view" claim limitation, found in claims 12, 13, and 15 of the '204 Patent,[19] is indefinite because it provides no reasonable certainty as to the scope of the invention. A person of ordinary skill in the art would not be able to determine the specific position and orientation of the "bottom view." (Ex. 7,  Pratt

---

[18]   Pre-AIA 35 U.S.C. § 112 applies here because the '204 Patent was filed in 2006 (*see* Ex. 4, '204 Patent at p. 1), well before the America Invents Act went into effect in 2013.

[19]   Once again, Koki's brief only refers to claims 12 and 13 of the '204 Patent (*see supra* at 69) when asserted claim 15 also contains the disputed limitation.

Decl. ¶ 47.) Instead, there are multiple possible interpretations of the "bottom view" and thus it is unclear exactly what orientation is being claimed. Koki's own construction demonstrates the ambiguity of the "bottom view" limitation, as there are multiple potential views that are "perpendicular to the side view." (*Id*.)

In fact, even Koki recognized that simply claiming a "bottom view" without further explanation is unclear. During prosecution of the '204 patent,   the Examiner noted that the similar "side view" limitation was unclear:

> [T]hese limitations are entirely subjective based among other things, the position with which the user holds the tool. The overlap of the magazine in relation to the magazine is based upon the view from a side. However, it is not even clear from the claims which side is being claimed. Even assuming arguendo that the claim positively claimed a side, the examiner asserts that an operator could manipulate the tool to meet this limitation when it is view from a side. Additionally, an operator could grip the handle and pivot or rotate the tool so that the battery pack winds up in a position lower than the upper body.

(*See* Ex. 12, 2010-07-12 Office Action at 3-4.) In response, Koki amended two pending, *unasserted* claims 1 and 5 "to clarify the 'side view' and the 'bottom view.'" (*See* Ex. 13, 2010-11-09 Amendment at 7.) With respect to the "bottom view" limitation, Koki clarified that this view is "perpendicular to the (said) side view and includes a view of the extending portion of the magazine." (*Id*. at 2, 4; *see also id*. at 7.) These claims, and their explicit definition of "bottom view," eventually issued as unasserted claims 1 and 7.   (*See* Ex. 4, '204 Patent claims    1,

7.) Koki explained that in light of these amendments, pending claims 1 and 5 (i.e., issued claims 1 and 7) now "clearly define *the bottom view in which the magazine is inclined with respect to the handle portion*." (*See* Ex. 13, 2010-11-09 Amendment, p. 7 (emphasis in original).)

But asserted claims 12, 13, and 15 do not include any such clarifying language and instead simply recite "a bottom view" without any context. Thus, as Koki recognized, they are unclear. As the Examiner noted, such a limitation is "entirely subjective based [on,] among other things, the position with which the user holds the tool" and "an operator could manipulate the tool to meet this limitation." (*See* Ex. 12, 2010-07-12 Office Action at 3-4). Thus, without such clarifying language, a person skill in the art cannot determine with reasonable certainty *which* of the potentially infinite views is the "bottom view," and thus "bottom view" is indefinite under 35 U.S.C. § 112, ¶ 2.  (Pratt Decl. ¶¶ 48-49.)

### 3. Plaintiff's Reply Position

Kyocera Senco's indefiniteness challenge is both premature and misguided.

The specification of the '204 patent makes clear that the "bottom view" is "a view that is perpendicular to the side view." (*See* Ex. 4, FIG. 1; FIG. 2; col. 2:64-67 ("FIG. 1 is a lefthand side elevation of an electric fastening tool according to an embodiment; FIG. 2 is a bottom view of the electric fastening tool according to the embodiment"); col. 3:15-17 (FIG. 1 is a lefthand side elevation of an electric

fastening tool (or a portable fastening tool) according to the invention; FIG. 2 is a

bottom view of the same electric fastening tool); *see also* Ex. 8, Vallee Supp. Decl.

at ¶36.) As shown below, the illustrations show that the bottom view (Fig. 2) is

perpendicular to the side view (Fig. 1):



Side View       Bottom View

Despite the clear and unambiguous language and figures in the written

description showing the claimed "bottom view," Kyocera Senco asserts there are

"multiple possible interpretations of the 'bottom view'". Yet, Kyocera Senco does

not provide any sort of example of other interpretations of the claimed "bottom

view." That is because there is no other reasonable interpretation based on the

intrinsic evidence.

Kyocera Senco's reliance on the prosecution history of unasserted pending

claims 1 and 5 (issued claims 1 and 7) is not relevant. As Kyocera Senco

acknowledges, during prosecution the Examiner rejected unasserted claims 1 and 5

because the term "side view" was unclear. Notably, the Examiner **never objected to the term "bottom view"** in those claims, or in asserted claims 12, 13, and 15. That is because, as discussed above, there is only one bottom view disclosed in the specification, and that bottom view is "a view that is perpendicular to the side view."

### 4.    Defendant's Sur-Reply Position

Koki suggests that Defendant "does not provide any sort of example of other interpretations of the claimed 'bottom view'" (*supra* at 74), but this is not true. As explained in Defendant's Response Brief, "such a limitation is 'entirely subjective based [on,] among other things, the position with which the user holds the tool' and 'an operator could manipulate the tool to meet this limitation.'" (*id*. at 72 (quoting Ex. 12, 2010-07-12 Office Action at 3–4)). Further, "Koki's own construction demonstrates the ambiguity of the 'bottom view' limitation, as there are multiple potential views that are 'perpendicular to the side view.'" (*Id*. at 72). Rather than address this serious uncertainty in the "bottom view" limitation, Koki pretends that the ambiguity, and Defendant's explanation of the ambiguity,  is not there.

Koki next argues that the prosecution history is not relevant. (*Supra* at 74-75). But tellingly, Koki has no response to *its own admission* during prosecution of the '204 Patent that "bottom view," without additional claim language   defining

the "bottom view," is unclear. (*See* Ex. 13, 2010-11-09 Amendment at 7 (Koki arguing during prosecution that, in light of the added claim language that the "bottom view" is "perpendicular to the (said) side view and includes a view of the extending portion of the magazine," the claims now "clearly define the bottom view . . . .")).

Thus, the Court should adopt Defendant's proposed construction.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Michael J. Flynn*
_____
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
michael.flynn@mnat.com
*Attorneys for Plaintiff*
*Koki Holdings, Co. Ltd.*

OF COUNSEL:

Paul Devinsky
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC  20001
(202) 756-8000

RICHARDS, LAYTON & FINGER, P.A.

/s/ *Kelly E. Farnan*
_____
Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
 *Attorneys for Defendant Kyocera*
 *Senco Industrial Tools, Inc.*

OF COUNSEL:

Robert S. Rigg
David Bernard
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, IL 60601
(312) 609-7500

Amol A. Parikh
Thomas DaMario
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
444 West Lake Street
Chicago, IL  60606
(312) 372-2000

July 31, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 31, 2019, upon the following in the manner indicated:

Kelly E. Farnan, Esquire                                      *VIA ELECTRONIC MAIL*
Sara M. Metzler, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
*Attorneys for Defendant Kyocera Senco*
*Industrial Tools, Inc.*

Robert S. Rigg, Esquire                                      *VIA ELECTRONIC MAIL*
David Bernard, Esquire
VEDDER PRICE
222 North LaSalle Street
Chicago, IL  60601
*Attorneys for Defendant Kyocera Senco*
*Industrial Tools, Inc.*

/s/ *Michael J. Flynn*

_____
Michael J. Flynn (#5333)