# EXHIBIT 1

US00RE42987E

(19) **United States**

(12) **Reissued Patent** (10) **Patent Number:** **US RE42,987 E**

Akiba (45) **Date of Reissued Patent:** **Dec. 6, 2011**

(54) **NAIL GUN WITH SAFETY PORTION MECHANISM FOR PREVENTING MISFIRES**

(75) Inventor: **Yoshitaka Akiba**, Tokyo (JP)

(73) Assignee: **Hitachi Koki Co., Ltd.**, Tokyo (JP)

(21) Appl. No.: **12/201,413**

(22) Filed: **Aug. 29, 2008**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,820,788**
Issued: **Nov. 23, 2004**
Appl. No.: **10/659,438**
Filed: **Sep. 11, 2003**

U.S. Applications:
(63) Continuation of application No. 10/119,721, filed on Apr. 11, 2002, now Pat. No. 6,641,018, which is a continuation of application No. 09/861,546, filed on May 22, 2001, now Pat. No. 6,394,332.

(30) **Foreign Application Priority Data**

May 23, 2000 (JP) ................................ 2000-151263

(51) Int. Cl.
**B25C 1/04** (2006.01)
(52) **U.S. Cl.** .......................................... **227/8**; 227/130
(58) **Field of Classification Search** ............. 227/8, 120, 227/130, 142
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,629,106 A * 12/1986 Howard et al. .................. 227/8

| | | | |
|---|---|---|---|
| 5,193,730 A | * | 3/1993 | Tanaka et al. ...................... 227/8 |
| 5,238,167 A | * | 8/1993 | Howard et al. ............... 227/110 |
| 5,452,835 A | * | 9/1995 | Shkolnikov ...................... 227/8 |
| 5,551,621 A | * | 9/1996 | Vallee .............................. 227/8 |
| 5,579,975 A | * | 12/1996 | Moorman ......................... 227/8 |
| 5,662,257 A | * | 9/1997 | Mukoyama et al. ............. 227/8 |
| 5,692,663 A | * | 12/1997 | Yang ................................ 227/8 |
| 5,803,338 A | * | 9/1998 | Singer et al. .................... 227/8 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE 37 03 753 A1 8/1988

(Continued)

*Primary Examiner* — Scott A. Smith

(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57) **ABSTRACT**

A nail gun has a free end 19a and central potion of a trigger arm 19 positioned within a trigger 11, on an upper end 12a of a safety portion 12 and at a plunger 17, respectively. When the trigger 11 is pivoted on its pivot end 16, pivoting movement of the trigger 11 moves a pivot end 18 of the trigger arm 19 to press the central portion of the trigger arm 19 into contact with the plunger 17 and, with the plunger 17 serving as a fulcrum, to press the free end 19a downward against the upper end 12a of the safety portion 12. If downward movement of the safety portion 12 is obstructed when the trigger 11 is pivoted, the upper end 12a contacted by the free end 19a of the trigger arm 19 serves as a fulcrum around which the trigger arm 19 pivots with movement of the trigger 11, whereupon the central portion of the trigger arm 19 presses the plunger 17 inward so that an activation switch 10 activates a blade 7 to eject a nail through a nose piece 5.

**22 Claims, 11 Drawing Sheets**



**US RE42,987 E**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,836,501 | A * | 11/1998 | Lai | 227/8 |
| 5,862,969 | A * | 1/1999 | Lee | 227/8 |
| 6,059,161 | A * | 5/2000 | Chang et al. | 227/8 |
| 6,116,488 | A * | 9/2000 | Lee | 227/8 |
| 6,199,739 | B1 * | 3/2001 | Mukoyama et al. | 227/8 |
| 6,205,894 | B1 * | 3/2001 | Tanaka | 81/470 |
| 6,371,348 | B1 * | 4/2002 | Canlas et al. | 227/8 |
| 6,394,332 | B2 * | 5/2002 | Akiba | 227/8 |
| 6,422,446 | B1 * | 7/2002 | Liu | 227/8 |
| 6,641,018 | B2 * | 11/2003 | Akiba | 227/8 |
| 6,820,788 | B2 * | 11/2004 | Akiba | 227/8 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3703753 | * | 8/1988 |
| DE | 30 21 884 C2 | | 7/1989 |
| DE | 3021884 | * | 7/1989 |
| DE | 40 32 231 C2 | | 9/1992 |
| DE | 4032231 | * | 9/1992 |
| JP | 6-47667 Y | | 1/1992 |
| JP | 4-136677 U | | 12/1992 |
| JP | 7-27093 Y | | 12/1992 |
| JP | 5-53873 U | | 7/1993 |
| JP | 6-47665 | * | 12/1994 |
| JP | 6-47665 Y2 | | 12/1994 |
| JP | 7-27093 Y2 | | 6/1995 |
| JP | 7-53907 | * | 12/1995 |
| JP | 7-53907 Y2 | | 12/1995 |
| WO | WO 00/16947 A1 | | 3/2000 |

* cited by examiner

KHD 001126



FIG.1



FIG.2

KHD 001127

# FIG.3



KHD 001128

FIG.4



FIG.5



FIG.6



FIG.7



KHD 001129

# FIG.8



KHD 001130

# FIG.9



KHD 001131

FIG.10



KHD 001132

Case 1:18-cv-00313-CFC-CJB   Document 153-1   Filed 06/26/20   Page 10 of 450 PageID #: 3503

# FIG.11



KHD 001133



FIG.12

FIG.13

KHD 001134

Case 1:18-cv-00313-CFC-CJB   Document 153-1   Filed 06/26/20   Page 12 of 450 PageID #: 3505

# FIG.14



KHD 001135

# FIG.15



Case 1:18-cv-00313-CFC-CJB   Document 153-1   Filed 06/26/20   Page 14 of 450 PageID #: 3507

# FIG.16



KHD 001137

US RE42,987 E

1

## NAIL GUN WITH SAFETY PORTION MECHANISM FOR PREVENTING MISFIRES

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

This *is a reissue of U.S. Pat. No. 6,820,788, which* is a continuation of application Ser. No. 10/119,721 filed Apr. 11, 2002 now U.S. Pat. No. 6,641,018 which is a continuation of application Ser. No. 09/861,546 filed May 22, 2001; now U.S. Pat. No. 6,394,332; the disclosure of which is incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a nail gun that drives a nail through, for example, the hole of a connection clasp and to a nail gun that can accurately drive nails into a desired drive position.

2. Description of the Related Art

A variety of different types of clasp fixing nail guns have been proposed. U.S. Pat. No. 5,193,730 discloses a nail gun that separates nails one at a time from a nail band and supplies the nail to a nail injection hole of the nosepiece. The nail tip is protruded from the end of the nosepiece before the nail gun drives the nail.

The nail gun further has a safety mechanism with a work-piece contact member, an intermediate lever, and an operation lever. The work-piece contact member extends from the nose of the nail gun to the base of the intermediate lever. When the trigger of the nail gun is pressed, the operation lever moves toward or away from an activation plunger, depending on the position of the work-piece contact member and the intermediate lever. That is, the work-piece contact member is raised into its lowermost position as long as the nose of the nail gun is not pressed against a work piece. If the trigger is pressed at this time, the intermediate lever pivots greatly and guides movement of the operation lever away from the activation plunger. On the other hand, when the nose of the nail gun is pressed against a work piece, the contact member is raised into its upper position. If the trigger is pulled at this time, pivoting movement of the intermediate lever is restricted so that the operation lever moves into contact with the activation plunger, thereby setting off a nail driving operation. In other words, the safety mechanism prevents the nail gun from firing when no work piece is present by changing the pivot path of the operation lever.

### SUMMARY OF THE PRESENT INVENTION

It is conceivable to lengthen the stroke of the work-piece contact member, that is, the distance that the work-piece contact member can move, by increasing the length of the intermediate lever. However, the intermediate lever can only be lengthened within the movement range of the trigger. Therefore, it is difficult to lengthen the stroke of the work-piece contact member. As a result, the lower end of the work-piece contact member must always be positioned fairly near the nail ejection opening, even when the work-piece contact member is at its upper dead center. This makes it difficult to see the nail tip so that it is difficult to position the nail at the precise position where it is to be driven into the work piece.

2

Also, the intermediate lever and the operation lever are provided in a narrow space above the trigger and operate in a fairly complicated manner against urging force of springs. A slight error in component or position dimensions, abrasion caused by friction, or dust, dirt, and the like clinging to components could easily become the cause of misfires. As a result, reliability of the nail gun suffers.

It is an objective of the present invention to overcome the above-described problems and provide a nail gun that more easily allows visual confirmation of the nail tip location and that uses a simpler configuration, which improves reliability by helping prevent the danger of misfires.

In order to achieve the above-described objective, a nail gun according to the present invention includes a body; a nail ejection portion connected to the body and having a tip formed with a nail ejection hole; a magazine connected to the nail ejection portion, the magazine feeding nails one at a time to the ejection portion; a blade supported in the body capable of reciprocal movement in opposing first and second directions and, when activated, driven in the second direction to the nail ejection portion to strike a nail in the nail ejection portion and to eject the nail through the nail ejection hole; an activation switch having a protruding plunger, the activating switch activating the blade when the plunger is pressed inward; a trigger having a trigger pivot end and a trigger free end, the trigger being supported pivotably on the body at the trigger pivot end; a trigger arm positioned within the trigger, the trigger arm having a trigger-arm pivot end, a central portion, and a trigger-arm free end, the trigger-arm pivot end being pivotably disposed at a position between the plunger and the trigger free end, the central portion being disposed at a position adjacent to the plunger; a safety portion having a first-side end disposed in contact with the trigger-arm free end and a second-side end positioned near the nail ejection hole, the safety portion being supported capable of reciprocal movement in the first and second directions between an upper dead center and a lower dead center; and urging means for urging the safety portion into the upper dead center; wherein when the trigger is pivoted on the trigger pivot end, pivoting movement of the trigger moves the trigger-arm pivot end to press the central portion of the trigger arm into contact with the plunger and, with the plunger serving as a fulcrum, to press the trigger-arm free end in the second direction against the first-side end of the safety portion.

With this configuration, a long stroke can be achieved for the safety portion. Therefore, the lower end of the safety portion can be separated from the nail tip in the initial condition, so that whether the nail tip is properly set in the clasp hole can be visually confirmed with ease. That is, the position where nails will be driven into the work piece can be accurately set.

Also, only the trigger arm is provided within the trigger and the safety portion is configured from only the upper safety portion and the lower safety portion. Operations are more reliable because the configuration is so simple.

If movement of the safety portion in the second direction is obstructed when the trigger is pivoted on the trigger pivot end, then the first-side end of the safety portion contacted by the trigger-arm free end serves as a fulcrum around which the trigger arm pivots with movement of the trigger, whereupon the central portion presses the plunger inward so that the activation switch activates the blade.

As a result, a nail driving operation can be reliably performed.

### BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects, features and advantages of the invention will become more apparent from reading the fol-

US RE42,987 E

3

lowing description of the embodiments taken in connection with the accompanying drawings in which:

FIG. **1** is a cross-sectional side view showing a nail gun according to a first embodiment of the present invention;

FIG. **2** is a side view showing connected nails used in the nail gun of FIG. **1**;

FIG. **3** is a cross-sectional view showing details of a safety portion and surrounding components of the nail gun in FIG. **1**, while the trigger is not pulled;

FIG. **4** is front view showing a cam member of the safety portion;

FIG. **5** is a side view of the cam member of FIG. **4**;

FIG. **6** is a back view of the cam member of FIG. **4**;

FIG. **7** is a cross-sectional view taken along line VII-VII of FIG. **4**;

FIG. **8** is a front view of the safety portion;

FIG. **9** is a cross-sectional view showing the trigger of the nail gun pulled while the nail gun is pressed against a work piece;

FIG. **10** is a cross-sectional view showing a nail driving operation;

FIG. **11** is a cross-sectional view showing the trigger of the nail gun pulled while no work piece obstructs downward movement of the safety portion;

FIG. **12** is a cross-sectional view showing the cam member pivoted by downward movement of the safety portion in the situation shown in FIG. **11**;

FIG. **13** is a cross-sectional view showing a lower portion of the safety portion moving upward when pressed against a work piece while the cam member is pivoted as shown in FIG. **12**;

FIG. **14** is a cross-sectional view showing a safety portion according to a second embodiment of the present invention;

FIG. **15** is a cross-sectional view showing disconnection of upper and lower portions of the safety portion of FIG. **14** when the trigger is pulled while nothing obstructs downward movement of the safety portion; and

FIG. **16** is a cross-sectional view showing the lower portion of the safety portion of FIG. **14** moving independently upward when pressed against a work piece while upper and lower portions are disconnected as shown in FIG. **15**.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Next, a nail gun according to a first embodiment of the present invention will be provided while referring to FIGS. **1** to **13**. To facilitate explanation, the directional terms up, down, front, and rear will be used referring to orientation in which the nail gun is intended to be used and as indicated in FIG. **1**.

As shown in FIG. **1**, a nail gun **1** includes a nail ejection portion **5**, a magazine **6**, a drive portion **8**, a trigger **11**, and a safety portion **12**. The magazine **6** houses connected nails **3** that are supplied to the nail ejection portion **5**. As shown in FIG. **2**, the connected nails **3** are arranged on a single plane, separated by a fixed distance, and connected by a connection band **3**a. Each nail **4** typically has a circular head **4**a at its upper end, a cylindrical body **4**b, and an acutely pointed tip **4**c. As shown in FIG. **1**, the magazine **6** includes a feeder **14** and a feeder spring (not shown). The feeder **14** receives pressure from the feeder spring and feeds the nails **4** to the nail ejection portion **5**, which is formed by a nosepiece **13** of the nail gun **1**.

The nail ejection portion **5** is formed at its lower end with a nail ejection hole **5**a. The tip **4**c of the lead nail **4** within the

4

nail ejection portion **5** protrudes downward out of the nail ejection hole **5**a, so that the position of the nail tip **4**c can be visually confirmed with ease.

The drive portion **8** houses a blade **7**. The blade **7** is capable of reciprocal movement in the drive portion **8** to drive nails supplied to the nail ejection portion **5** out from the ejection hole **5**a.

The nail gun **1** also includes a handle **9** and an activation switch **10**. The handle **9** is held by the user to support the nail gun **1**. The activation switch **10** is for controlling a nail driving operation of the nail gun **1**. As shown in FIG. **3**, the activation switch **10** includes a downward-protruding plunger **17** substantially at its center. The plunger **17** is supported capable of reciprocal movement in the vertical direction. While the plunger **17** is positioned at its lower dead center, the activation switch **10** is maintained OFF, so the nail gun **1** remains in a non-activated condition. However, as the plunger **17** moves from its lower dead center to its upper dead center, the activation switch **10** is turned ON, so that the nail gun **1** starts a nail driving operation.

As shown in FIG. **3**, the trigger **11** is supported adjacent to the activation switch **10** on a pivot shaft **16** so as to be capable of pivotable movement centered on the pivot shaft **16**. The user uses a finger of the hand he or she uses to hold the handle **9** to pull the trigger **11**. The trigger **11** is provided with a support portion **18** that pivotally supports a trigger arm **19**. The trigger arm **19** is supported in a posture with the central portion in contact with the tip of the plunger **17** and with the other end **19**a in contact on an upper end **12**a of the safety portion **12**.

The safety portion **12** is supported capable of reciprocal movement, in parallel with the reciprocal movement direction of the blade **7**, between upper and lower dead centers as guided by a nose **13**, which configures the nail ejection portion **5**. The safety portion **12** is configured from an upper safety portion **20**, a cam member **21**, and a lower safety portion **22**.

The upper safety portion **20** has a substantial reversed L-shape, and includes the upper end **12**a, a vertical section **20**c, and a horizontal section **20**d. The upper end **12**a is disposed in contact with the underside of the free end **19**a of the trigger arm **19**. A spring **15** is disposed beneath the horizontal section **20**d for constantly urging the safety portion **12** toward its upper dead center.

The lower safety portion **22** is supported capable of reciprocal movement in parallel with the reciprocal movement direction of the blade **7**, as guided by pins **23**, **24** provided in the nose **13**. The lower safety portion **22** includes a lower end **12**b and an engagement recess portion **22**a. The lower end **12**b is located near the ejection opening **5**a of the nail ejection portion **5**. When the safety portion **12** is in its upper dead center following the urging of the spring **15**, the lower end **12**b is retracted above the nail tip **4**c as shown in FIG. **3**. On the other hand, when the safety portion **12** is in its lower dead center, the lower end **12**b protrudes beyond the nail tip **4**c of the nail **4** in the nail ejection portion **5** as shown in FIG. **11**. The engagement recess portion **22**a is provided in the upper portion of the lower safety portion **22** and includes an upper plate **22**b and a lower plate **22**c, wherein the upper plate **22**b protrudes further than the lower plate **22**c. A spring **25** is provided for constantly urging the lower safety portion **22** downward when the nail gun **1** is oriented as in the drawings. Said differently, when the nail gun **1** is oriented for driving a nail upward, for example, into a ceiling fixture, the spring **25** prevents the lower safety portion **22** from sagging downward.

The cam member **21** is pivotably supported on a shaft **20**a provided to a lower portion of the upper safety portion **20**. As

US RE42,987 E

5

shown in FIGS. **4** to **8**, the cam portion **21** includes a lower end **21**a and two guide protrusions **21**b. As shown in FIG. **3**, the lower end **21**a fits in the engagement recess portion **22**a of the lower safety portion **22**. As shown in FIG. **4**, the guide protrusions **21**b are provided symmetrically on either side of the cam portion **21**. As shown in FIGS. **1** and **12**, the guide protrusions **21**b fit in guide grooves **5**b provided in the side surfaces of the nail ejection portion **5**. The guide grooves **5**b are formed in a diagonally extending shape, so that when the guide protrusions **21**b move downward in the guide grooves **5**b, the cam member **21** separates from the engagement recess portion **22**a as shown in FIG. **11**.

Next, an explanation will be provided for operation of the nail gun **1**. In this example, the nail gun **1** is used to fix in place a connection clasp **2** shown in FIG. **9**. The connection clasp **3** is preformed with a hole **2**a. First, the nail tip **4**c protruding from the nail ejection hole **5**a is set directly into the hole **2**a of the connection clasp **2**. Because the nail tip **4**c protrudes from the nail ejection hole **5**a, the nail tip **4**c can be easily aligned with the clasp hole **2**a. Once the nail tip **4**c is set, the lower end **12**b of the lower safety portion **22** presses against an upper surface **2**b of the clasp **2**, so the safety portion **12** is prevented from moving downward.

Next, the user pulls the trigger **11** of the nail gun **1**. When the user pulls the trigger **11**, the trigger **11** pivots centered on the pivot shaft **16** toward the activation switch **10**, that is, from the orientation shown in FIG. **1** to the orientation shown in FIG. **9**. The support portion **18** of the trigger arm **19** moves upward so that the central portion of the trigger arm **19** abuts against the tip of the activation switch **10**. As a result, the plunger **17** serves as a fulcrum so that force from the support portion **18** presses the other end **19**a of the trigger arm **19** down against the upper end **12**a of the safety portion **12**. However, the upper end **12**a remains in place because the upper surface **2**b of the clasp **2** prevents the safety portion **12** from moving. Therefore, the upper end **12**a serves as a fulcrum so that force from the support portion **18** presses the central portion of the trigger arm **19** upward against the plunger **17** when the trigger **11** is pulled. When the plunger **17** is pressed in, the activation switch **10** is turned ON, thereby starting operation of the nail gun **1** so that the nail **4** in the nail ejection portion **5** is driven downward as shown in FIG. **10**.

The above explanation is for the situation wherein the trigger **11** is pulled after the nail tip **4**c protruding from the nail ejection hole **5**a was set in the clasp hole **2**a. Next, with reference to FIGS. **11** to **13**, an explanation will be provided for operations performed when the nail tip **4**c is not set in the clasp hole **2**a, that is, when the nail ejection port is not located in abutment with a work piece.

In the same manner as described above, when the trigger **11** is pulled in this case, the support portion **18** of the trigger arm **19** moves so that the central portion of the trigger arm **19** abuts against the tip of the plunger **17**. Accordingly, the tip of the plunger **17** functions as a fulcrum so that force from the support portion **18** presses the other tip **19**a of the trigger arm **19** down against the upper end **12**a. However, because there is no work piece to prevent downward movement of the safety portion **12** in this case, the safety portion **12** moves from its upper dead center to its lower dead center against the urging force of the spring **15**. The plunger **17** remains positioned at its lower dead center so the activation switch **10** does not turn ON.

As the safety portion **12** moves from its upper dead center to its lower dead center, the cam member **21** moves downward with the upper safety portion **20**. As shown in FIG. **12**, the two guide protrusions **21**b provided on the side surface of the cam member **21** are fitted in the guide grooves **5**b provided on the

6

outer side of the nail ejection portion **5**. Therefore, the cam member **21** follows the slanted shape of the guide grooves **5**b in association with downward movement of the guide protrusions **21**b in the guide grooves **5**b and pivots on the pivot shaft **20**a. As shown in FIG. **11**, when the safety portion **12** moves downward to near its lower dead center, the cam member **21** separates from the lower safety portion **22**. Described in more detail, the lower end **21**a of the cam member **21** pulls away from the lower plate **22**c of the engagement recess portion **22**a, but remains in contact with the upper plate **22**b. The downward urging force of the spring **25** urges the upper plate **22**b into abutment with the lower end **21**a of the cam member **21**. At this time, the lower end **12**b protrudes beyond the nail tip **4**c. In this situation, if the lower end **12**b is pressed against a work piece, or for some other reason the lower safety portion **22** is raised upward from its lower dead center, then all that will happen is that as shown in FIG. **13** the lower safety portion **22** will move upward against the urging force of the spring **25**. That is, neither the cam member **21** nor the upper safety portion **20** will move upward. Accordingly, activation switch **10** will not be turned ON, because the trigger arm **19** will not be raised upward.

According to the present embodiment, no other components besides the trigger arm **19** are provided within the trigger **11** and supported pivotably on the trigger **11**. Moreover, when the safety portion **12** can move into its lower dead center without obstruction, the plunger **17** serves as a fulcrum when the other tip **19**a of the trigger arm **19** presses the upper safety portion **12**a down toward its lower dead center. With this configuration the safety portion **12** can have a long stroke, that is, the safety portion **12** moves a long distance from its upper dead center into its lower dead center. Therefore, the lower end **12**b of the safety portion **12** can be raised up further above the nail tip **4**c, thereby making it easier to visually confirm the position of the nail tip **4**c so that the nail is to be driven into the work piece with greater positional accuracy.

Also, because the trigger arm **19** pivots with the tip of the plunger **17** serving as a fulcrum, the force at which the safety portion **12** can be pressed downward can be increased. As a result, the following effects can be achieved. It will be possible to move the safety portions **20**, **22** downward, even if the safety portions **20**, **22** become difficult to move downward because dirt and the like cling to the safety portions **20**, **22**, the cam member **21**, or other components. This enhances reliability of the nail gun. Also, the safety portions **20**, **22** can be reliably lowered, even if the load on the spring **15**, which is for supporting the safety portions **20**, **22** in the upper dead center, is increased because the weight of the safety portions **20**, **22** is increased for some reason, for example to increase the strength of, or to lengthen, the safety portions **20**, **22**.

Next, a second embodiment will be explained while referring to FIGS. **14** to **16**. According to the second embodiment, a safety portion **120** includes an upper safety portion **200**, a lower safety portion **220**, and a connector **30**. The upper safety portion **200** and the lower safety portion **220** are formed with holes **200**e and **220**e, respectively. The connector **30** is slidably engaged in the holes **200**e, **220**e, thereby connecting the safety portions **200**, **220** together. The connector **30** includes pins **31** on its inside tip. Downward slanting grooves **5**e are formed in the inner surfaces of the nail ejection portion **5**. The pins **31** are fitted in the grooves **5**e.

When the safety portion **120** is in its upper dead center as shown in FIG. **14**, the safety portions **200**, **220** are connected together by the connector **30**, and so move vertically in an integral manner. However, when the lower safety portion **220** moves downward without obstruction, the pin **31** slides inward following the guide groove **5**e. Once the safety por-

US RE42,987 E

7

tions **200**, **220** move downward by a predetermined amount or more, then as shown in FIG. **15** the connector **30** pulls out of the hole **220**e of the lower safety portion **220**. As a result, there is no danger that the nail gun will fire. Also, even if after this the lower safety portion **220** is raised upward for some reason, then as shown in FIG. **16** the lower safety portion **220** alone will merely move vertically. Again, there is no danger that the nail gun will fire.

What is claim is:

**1**. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of the switch is pressed;

a trigger member supported pivotally on said body; and

a safety mechanism having a first member disposed in contact with a free end portion of said trigger member and a second member positioned near said nail ejection member and connecting member between said first and second members, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position, wherein when the trigger member is pivoted, pivoting movement of said trigger member moves to press said predetermined portion of said switching mechanism and to press the free end portion of said trigger member in the second direction against said first member of said safety mechanism.

**2**. A nail gun as claimed in claim **1**, wherein when movement of said safety mechanism is unobstructed, said safety mechanism moves freely in the second direction from the first position to the second position.

**3**. A nail gun as claimed in claim **1**, wherein when movement of said safety mechanism is obstructed trigger member presses the predetermined portion of said activation switch so that said activation switch activates the blade.

**4**. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of the switch is pressed;

a trigger member supported pivotally on said body; and

a safety mechanism having a first member disposed in contact with a free end portion of said trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said safety mechanism including separation mechanism to separate connection between said first and second members of said safety mechanism when said free end portion of said trigger member moves said first member in the second direction by a predetermined amount or greater, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position, wherein when movement of said safety mechanism is unobstructed, said safety mechanism moves freely in the second direction from the first position to the second

8

position, and wherein when movement of said safety mechanism is obstructed said trigger member presses the predetermined portion of said switch so that said activation switch activates the blade.

**5**. A nail gun as claimed in claim **4**, wherein said separation mechanism includes a cam member pivotally supported at said connecting member of said safety mechanism to engage with a recess portion formed with said second member of said safety mechanism, and wherein when movement of said safety mechanism is obstructed, pressing force of said trigger member free end acts to release the engagement of said cam with said recess.

**6**. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of said switch is pressed;

a trigger member supported pivotally on said body; and

a safety mechanism having a first member disposed in contact with a free end of said trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said first and second members of said safety mechanism being supported in parallel with said nail pushing mechanism to move in said first and second directions, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position, wherein when movement of said safety mechanism is unobstructed, said safety mechanism moves freely in the second direction from the first position to the second position, and wherein when movement of said safety mechanism is obstructed trigger member presses the predetermined portion of said activation switch so that said activation switch activates the blade.

**7**. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of the switch is pressed;

a trigger member supported pivotally on said body;

a safety mechanism having a first member disposed in contact with a free end of the trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said first and second members of said safety mechanism being supported in parallel with said blade to move in said first and second directions, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position; and

an elastic member for positioning said safety mechanism into said first position, and wherein when the trigger is pivoted, pivoting movement of said trigger moves said trigger member moves to press the predetermined portion of said switch and to press the free end portion of

KHD 001141

US RE42,987 E

9

said trigger member in the second direction against said first member of said safety mechanism.

**8.** A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of the switch is pressed;

a trigger member supported pivotably on said body; and

a safety mechanism having a first member disposed in contact with a free end portion of the trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said safety mechanism including separation mechanism to separate connection between said first and second members of said safety mechanism when said free end portion of said trigger member moves said first member in the second direction by a predetermined amount or greater, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position, said first and second members of said safety mechanism being supported in parallel with said nail pushing mechanism to move in said first and second directions, and wherein when the trigger is pivoted, pivoting movement of said trigger moves to press the predetermined portion of the switch and to press the free end portion of said trigger member in the second direction against said first member of said safety mechanism.

**9.** A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of the switch is pressed;

a trigger member supported pivotably on said body;

a safety mechanism having a first member disposed in contact with a free end portion of said trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said safety mechanism including separation mechanism to separate connection between said first and second members of said safety mechanism when said free end portion of said trigger member moves said first member in the second direction by a predetermined amount or greater, said safety mechanism being supported capable of movement in said first and second directions between a first position and a second position, said first and second members of said safety mechanism being supported in parallel with said nail pushing mechanism to move in said first and second directions; and

an elastic member for positioning said safety mechanism into said first position, wherein when the trigger is pivoted, pivoting movement of said trigger member moves to press the predetermined portion of the switch and to press the free end portion of said trigger member in the second direction against said first member of said safety mechanism, wherein when movement of said safety

10

mechanism is unobstructed, said safety mechanism moves freely in the second direction from the first position to the second position, and wherein when movement of said safety mechanism is obstructed said trigger member presses the predetermined portion of said activation switch so that said activation switch activates the blade.

**10.** A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nail ejection member connected to said body;

a blade supported in said body capable of movement in opposing first and second directions and, when activated, driven in said second direction to strike a nail in said nail ejection member;

an activation switch for activating said blade when a predetermined portion of said switch is pressed;

a trigger member supported pivotably on said body;

a safety mechanism having a first member disposed in contact with said trigger member, a second member positioned near said nail ejection member and connecting member between said first and second members, said first and second members of said safety mechanism being supported in parallel with said blade to move in said first and second directions, wherein when the trigger is pivoted, pivoting movement of said trigger member moves to press the predetermined portion of said switch and to press a free end of the trigger member in the second direction against said first member of said safety mechanism.

**11.** A nail gun as claimed in claim **10**, wherein when movement of said safety mechanism is unobstructed, said safety mechanism moves freely in the second direction from the first position to the second position.

**12.** A nail gun as claimed in claim **10**, wherein when movement of said safety mechanism is obstructed said trigger member presses the predetermined portion of said activation switch so that said activation switch activates the blade.

**13.** A nail gun as claimed in claim **10**, which further comprises a separation mechanism to separate connection between said first and second members of said safety mechanism when said trigger member moves said first member in the second direction by a predetermined amount or greater.

**14.** A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body;

a magazine *housing a plurality of connected nails and* that disposes *said connected* nails one at a time to the nosepiece;

a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece;

a trigger switch that activates the striking mechanism, the trigger switch being provided in the body,

a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position.

*15. A nail gun according to claim 14,* wherein *said connected nails are arranged on a single plane.*

US RE42,987 E

11

16. A nail gun according to claim 14, wherein the tips of the connected nails are arranged in a single line.

17. A nail gun according to claim 14, wherein said magazine further includes a feeder which feeds said connected nails by pressure from a feeder spring.

18. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body;

a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nose-piece;

a striking mechanism that strikes a lead nail of the con-nected nails disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece;

a trigger switch that activates the striking mechanism, the trigger switch being provided in the body,

a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward,

when the lead nail reaches the nosepiece, at least a tip of the lead nail protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail can be easily aligned with a desired position.

19. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body;

a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nose-piece;

a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece;

a trigger switch that activates the striking mechanism, the trigger switch being provided in the body,

a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward,

at least a tip of the nail disposed in the nosepiece protrud-ing from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position, and

12

said magazine is disposed at the position of said tip of the nosepiece.

20. A nail gun for driving a nail into a work piece, the nail gun comprising:

a body;

a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body;

a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nose-piece;

a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece;

a trigger switch that activates the striking mechanism, the trigger switch being provided in the body,

a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center;

a trigger pivotable in the upward direction;

a first safety member that moves downward in response to the trigger arm pivoting in the upward direction;

a second safety member disposed in parallel with the first member, extending toward the work piece, and including a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center;

a third safety member which is disposed between and com-municates with the first member and the second member, wherein

operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward,

at least a tip of the nail disposed in the nosepiece protrud-ing from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position,

activation of the striking mechanism is enabled when the end of the push portion is obstructed from moving down-ward upon pivoting the trigger in the upward direction,

when downward movement of the push portion is unob-structed, pivoting the trigger in the upward direction will not activate the striking mechanism.

21. A nail gun according to claim 20, wherein

when the trigger is pivoted in the upward direction and the second member has moved downward without obstruc-tion, force applied to the second member in the upward direction will not move the first member upward.

22. A nail gun as claimed in claim 21, wherein the third member is pivotably supported by a shaft.

* * * * *

KHD 001143

# EXHIBIT 2



US008118204B2

(12) **United States Patent**   (10) **Patent No.:**   **US 8,118,204 B2**

Ishida et al.   (45) **Date of Patent:**   **Feb. 21, 2012**

(54) **PORTABLE FASTENING TOOL**

(75) Inventors: **Hideki Ishida**, Ibaraki (JP); **Hitoshi Tsuzuki**, Ibaraki (JP); **Takeshi Matsuoka**, Ibaraki (JP)

(73) Assignee: **Hitachi Koki Co., Ltd.**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 171 days.

(21) Appl. No.: **12/088,524**

(22) PCT Filed: **Sep. 1, 2006**

(86) PCT No.: **PCT/JP2006/317803**

§ 371 (c)(1),
(2), (4) Date: **Mar. 28, 2008**

(87) PCT Pub. No.: **WO2007/043260**

PCT Pub. Date: **Apr. 19, 2007**

(65) **Prior Publication Data**

US 2009/0266863 A1   Oct. 29, 2009

(30) **Foreign Application Priority Data**

Sep. 30, 2005   (JP) ............................... P2005-285902

(51) **Int. Cl.**
***B25C 1/04***   (2006.01)

(52) **U.S. Cl.** ............................ 227/130; 227/156; D8/68

(58) **Field of Classification Search** .......... 227/129–134, 227/156; D8/68
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,845,617 A | * | 2/1932 | Metcalf | ........................... 227/96 |
| 3,708,095 A | * | 1/1973 | Briggs, Jr. | ................... 227/126 |
| 3,771,709 A | | 11/1973 | Breschinsky | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP   0 663 269   7/1995

(Continued)

OTHER PUBLICATIONS

Taiwanese Office Action issued in Taiwanese Patent Application No. TW 095136170 dated Oct. 4, 2010.

*Primary Examiner* — Paul Durand

(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57) **ABSTRACT**

To provide a compact portable fastening tool which can be easily pushed at its handle portion onto a punched side, even in case a magazine is attached at an inclination with respect to the horizon, so that it can be easily used even in a narrow place. An electric fastening tool **1** comprises: a housing **2** having a handle portion **2B** formed to extend from a trunk portion **2A**; an ejection unit attached to the lower portion of the housing **2**; a magazine **5** attached to the ejection unit; a motor housed in the housing **2**; a battery pack **3** for driving the motor; a flywheel rotationally driven by the motor; a follower shaft selectively rotated by the kinetic energy of the flywheel; and a plunger adapted to be linearly moved in the housing **2** by the rotation of the follower shaft thereby to drive the nail fed into the ejection unit. The magazine **5** is so attached that it is inclined in a side view with respect to the trunk portion **2A** of the housing **2** and that it is inclined in a bottom view with respect to the handle portion **2B** of the housing **2**.

**15 Claims, 3 Drawing Sheets**





KHD 000730

**US 8,118,204 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,820,705 | A | 6/1974 | Beals |
| 3,893,610 | A | 7/1975 | Smith |
| 4,121,745 | A * | 10/1978 | Smith et al. .................... 227/8 |
| 4,161,272 | A * | 7/1979 | Brockl .......................... 227/131 |
| 4,298,072 | A * | 11/1981 | Baker et al. .................... 173/13 |
| 4,640,452 | A * | 2/1987 | Matt et al. .................... 227/131 |
| 4,811,885 | A * | 3/1989 | Lai ............................... 227/131 |
| 5,320,270 | A * | 6/1994 | Crutcher ....................... 227/131 |
| 5,511,715 | A * | 4/1996 | Crutcher et al. .............. 227/131 |
| 6,431,430 | B1 * | 8/2002 | Jalbert et al. ................. 227/131 |
| 6,607,111 | B2 * | 8/2003 | Garvis et al. ................. 227/131 |
| 6,669,072 | B2 * | 12/2003 | Burke et al. .................. 227/131 |
| 6,755,336 | B2 * | 6/2004 | Harper et al. ................. 227/129 |
| 6,779,697 | B2 * | 8/2004 | Lin ............................... 227/120 |
| 6,796,475 | B2 * | 9/2004 | Adams ............................. 227/2 |
| 6,886,730 | B2 * | 5/2005 | Fujisawa et al. ................. 227/8 |
| 6,971,567 | B1 * | 12/2005 | Cannaliato et al. .............. 227/2 |
| 6,974,061 | B2 * | 12/2005 | Adams et al. .................... 227/2 |
| 7,469,811 | B2 * | 12/2008 | Shima et al. ................. 227/131 |
| 7,494,036 | B2 * | 2/2009 | Shima et al. ................. 227/131 |
| 2002/0104869 | A1 | 8/2002 | Garvis |
| 2004/0084501 | A1 | 5/2004 | Lin |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 927 605 A2 | 7/1999 |
| JP | 6-278051 | 10/1994 |
| JP | 2002-127039 | 5/2002 |

* cited by examiner

KHD 000731

U.S. Patent      Feb. 21, 2012      Sheet 1 of 3      US 8,118,204 B2

FIG. 1



FIG. 2



KHD 000732

## FIG. 3



KHD 000733

## FIG. 4



## FIG. 5



KHD 000734

US 8,118,204 B2

**1**

## PORTABLE FASTENING TOOL

### RELATED APPLICATIONS

This application is the U.S. National Phase under 35 U.S.C. §371 of International Application No. PCT/JP2006/317803, filed Sep. 1, 2006, which claims priority of Japanese Patent application No. JP2005-285902, filed on Sep. 30, 2005, the contents of which are herewith incorporated by reference.

### TECHNICAL FIELD

The present invention relates to a portable fastening tool for punching nails with a driving force established by a battery.

### DESCRIPTION OF RELATED ART

A portable fastening tool of this kind is constituted by: a housing having a handle portion extending generally in a side elevation of T-shape from a generally cylindrical trunk portion; an ejection unit attached to the lower portion of the housing; a magazine attached to the ejection unit; a motor housed in the housing; a battery for driving the motor; a flywheel rotatably supported by the housing and rotationally driven by the motor; a follower shaft rotatably supported by the housing and selectively rotated by the kinetic energy of the flywheel; and a plunger linearly moved in the housing by the rotation of the follower shaft to drive the nails fed into the ejection unit.

Of these portable fastening tools, there is a type, in which the nails connected in a step shape are housed in the magazine. In the portable fastening tool of this type, the magazine is so attached to the housing that it is inclined in a side view at the same angle as the connection angle of nails (as referred to JP-A-6-278051 and JP-A-2002-127039, for example).

In the portable fastening tool of the related art, on the other hand, the handle portion is formed at such an angle as close to the horizontal direction, so that the trunk portion of the housing may be easily pushed onto the punching side. Moreover, easy use of the portable fastening tool in a narrow place is also considered by keeping the trailing end portion of the handle portion of the housing (or the free end portion on the opposite side of the trunk portion) lower than the trunk portion.

### SUMMARY OF INVENTION

In the related-art portable fastening tool, the magazine for housing a number of nails connected in the step shape is attached obliquely in a side view to the housing. In order to avoid the interference with the magazine, the handle portion has to be likewise inclined. If the handle portion is excessively inclined, however, there arise a problem to make it hard to push the trunk portion onto the punching side. If the trailing end portion of the handle portion of the housing is higher than the end portion on the trunk side, the portable fastening tool becomes tall as a whole thereby to deteriorate the operability and workability of the machine in a narrow place.

The invention has been conceived in view of the problems thus far described, and has an object to provide a compact portable fastening tool which can be easily pushed at its handle portion onto a punched side, even in case a magazine is attached at an inclination with respect to the horizon, so that it can be easily used even in a narrow place.

In order to achieve the above-specified object, according to an aspect of the invention, there is provided a portable fastening tool comprising: a housing having a handle portion formed generally in a T-shape in side elevation to extend from

**2**

a generally cylindrical trunk portion; an ejection unit attached to the lower portion of the housing; a magazine attached to the ejection unit; a motor housed in the housing; a battery for driving the motor; a flywheel rotatably supported in the housing and rotationally driven by the motor; a follower shaft rotatably supported in the housing and selectively rotated by the kinetic energy of the flywheel; and a plunger adapted to be linearly moved in the housing by the rotation of the follower shaft thereby to drive the nail fed into the ejection unit. The portable fastening tool is characterized: in that the magazine is so attached that it is inclined in a side view with respect to the trunk portion of the housing and that it is inclined in a bottom view with respect to the handle portion of the housing.

According to another aspect of the invention, the magazine is attached at its one end to the ejection unit and at its other end to the trailing end portion of the handle portion of the housing such that the magazine is deflected to the right or left on its one end and is inclined in its bottom view by a predetermined angle with respect to the handle portion of the housing.

According to another aspect of the invention, the magazine is so arranged as to overlap a portion of at least the handle portion of the housing or the battery in a side view.

According to another aspect of the invention, there is provided a portable fastening tool comprising: a housing including a trunk portion and a handle portion; a battery disposed at the end portion of the housing; an ejection unit disposed at the lower end of the housing; a drive source caused by the battery to generate a driving force; a punching portion driven by the drive source; an ejection port for punching the nails fed to the ejection unit by the punching portion; and a magazine for holding the nails fed to the ejection unit. The portable fastening tool is characterized: in that the magazine is attached so obliquely from the side of the ejection port to the handle portion so as to avoid interference with the battery.

According to another aspect of the invention, even in case the magazine is attached at an inclination with respect to the horizon, the position of the handle portion of the housing can be held nearly horizontal while avoiding the magazine, and the portable fastening tool can be easily pushed to the punching side while gripping the handle portion, so that the nailing operations can be stabilized.

According to another aspect of the invention, the magazine is so arranged that its portion overlaps either the portion of the handle portion of the housing or the battery in the side view. As a result, the height of the trailing end portion (or the end portion on the opposite side of the trunk portion) of the handle portion (i.e., the height from the leading end punching point of the trunk portion) can be held small to make the electric fastening tool 1 so compact that it can be conveniently used in the narrow place, so that it can nail even a narrow place highly efficiently.

According to another aspect of the invention, the magazine is mounted obliquely, as viewed from the ejection port, with respect to the handle portion so as to avoid the interference with the battery. Even if the magazine is attached obliquely in the top plan view to the handle portion of the housing, the battery or a heavy component can be arranged at the low position so that the portable fastening tool can be well balanced in its weight and less damaged in its operation.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a lefthand side elevation of an electric fastening tool according to an embodiment;

FIG. **2** is a bottom view of the electric fastening tool according to the embodiment;

US 8,118,204 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

FIG. **3** is a broken righthand side elevation showing the internal configuration of the electric fastening tool according to the embodiment;

FIG. **4** is a side elevation showing the nailing operation using the electric fastening tool according to the embodiment; and

FIG. **5** is a side elevation of nails connected in a step shape.

DESCRIPTION OF THE EMBODIMENTS

An embodiment of the invention is described in connection with an electric fastening tool as one mode of embodiment of a portable fastening tool with reference to the accompanying drawings.

FIG. **1** is a lefthand side elevation of an electric fastening tool (or a portable fastening tool) according to the invention; FIG. **2** is a bottom view of the same electric fastening tool; FIG. **3** is a broken righthand side elevation showing the internal constitution of the same electric fastening tool; FIG. **4** is a side elevation showing the nailing operation using the same electric fastening tool; and FIG. **5** is a side elevation of nails connected in a step shape. In the following, the right and left sides of the electric fastening tool will means the right and left sides of the case, in which the electric fastening tool is seen from the operator in case the operator grips the handle portion of the electric fastening tool. Moreover, the top plan view is taken in FIG. **1** from above the electric fastening tool, and the bottom view is taken in FIG. **1** from below the electric fastening tool.

In an electric fastening tool **1** according to this embodiment, numeral **2** designates a housing made of a resin and acting as an exterior member. This housing **2** is constituted to include a generally cylindrical trunk portion 2A, and a handle portion 2B jointed generally in the shape of letter T, as viewed in a side view, to the trunk portion 2A. At the trailing end portion of the handle portion 2B (or at the free end portion on the side opposed to the trunk portion 2A) of the housing **2**, moreover, there is disposed a battery pack **3**, attached to the end of handle portion 2B through a battery pack supporting portion 2C, for housing the not-shown battery as the power source. Moreover, a trigger switch **4** is disposed at the handle portion 2B of the housing **2** and near the trunk portion 2A.

At the lower end of the housing **2**, as shown in FIG. **1**, there is disposed an ejection unit **17**, to which a flat box-shaped magazine **5** is attached obliquely, in a side view, to the trunk portion 2A. In this magazine **5**, as shown in FIG. **5**, there are housed a number of nails **6**, which are connected in a step shape. More specifically, the magazine **5** is attached, at its one end, to the ejection unit **17** (as located at the lower end portion of FIG. **1**) disposed at the leading end of the trunk portion 2A of the housing **2** and, at its other end, to the trailing end portion of the handle portion 2B of the housing **2** and near the battery pack **3**. In the state shown in FIG. **1**, the magazine **5** is inclined obliquely upward from the ejection unit **17** disposed at the leading end of the trunk portion 2A of the housing **2** toward the trailing end portion of the handle portion 2B. As a result, the magazine **5** forms a triangular shape, in a side view, together with the trunk portion 2A and the handle portion 2B of the housing **2**.

Thus, the electric fastening tool (or the portable fastening tool) **1** according to this embodiment is characterized in that the magazine **5** is attached obliquely in the bottom view (as taken from the side of the ejection port 17a of the ejection unit **17**) to the handle portion 2B of the housing **2**, as shown in FIG. **2**. More specifically, the magazine **5** is attached so obliquely in a bottom view to the handle portion 2B of the housing **2** that it is turned in its entirety by a predetermined

angle θ leftward (or upward of FIG. **2**) on the ejection unit **17** disposed at the leading end of the trunk portion 2A of the housing **2**. Here in this embodiment, the magazine **5** is attached obliquely to the handle portion 2B by turning it leftward of the bottom view on the ejection unit **17** disposed at the leading end of the trunk portion 2A of the housing **2**. Alternatively, however, the magazine **5** may also be attached obliquely to the handle portion 2B by turning it rightward (or downward of FIG. **2**).

As described above, the magazine **5** is attached obliquely of the side view to the trunk portion 2A of the housing **2** and obliquely of the bottom view to the handle portion 2B of the housing **2**. As shown in FIG. **1**, however, the magazine **5** is arranged to have its portion overlapping the battery pack **3** disposed at the trailing end portion of the handle portion 2B of the housing **2**, as shown in FIG. **1**, and is attached so obliquely to the handle portion 2B that its overlapping portion may have no interference (or overlap) with the battery pack **3**, as shown in FIG. **2**. Therefore, the inclination angle θ (as referred to FIG. **2**), as taken in top plan view, of the magazine **5** with respect to the handle portion 2B of the housing **2** is set at such a value that a portion (which overlaps the battery pack **3** in a side view) of the housing **2** may not interfere, in a bottom view, with the battery pack **3**.

The internal constitution of the housing **2** is described with reference to FIG. **3**.

In the trunk portion 2A of the housing **2**, there is housed a horizontal position a motor **7** acting as a drive source, from which an output shaft (or motor shaft) **8** extends in the direction of the center of rotation thereof (i.e., in the direction normal to the sheet of FIG. **3**). A drive gear **9** is fixed on the end portion of the output shaft **8**.

On the side of the motor **7** in the trunk portion 2A of the housing **2**, moreover, there is arranged the not-shown rotatable follower shaft in parallel with the output shaft **8** of the motor **7**. This follower shaft has a pinion **10** fixed thereon and bears a flywheel **11** rotatably. This flywheel **11** meshes with the aforementioned drive gear **9**.

Between the flywheel **11** and the follower shaft, although not shown, there is disposed a clutch mechanism for turning ON/OFF their connection selectively. This clutch mechanism is constituted to include a clutch spring wound on the flywheel **11** and the follower shaft, an electromagnetic solenoid acting as an actuator for winding the clutch spring on the outer circumference of the follower shaft, and a drive circuit for driving the electromagnetic solenoid.

In the trunk portion 2A of the housing **2**, moreover, there is so housed a plunger **12** meshing with the pinion **10** that it can move reciprocally and linearly upward and downward of FIG. **3** along a guide rail **13**. To the leading end (as located on the lower end of FIG. **3**) of the plunger **12**, there is attached a blade (or a punching portion) **14** for punching out the nails **6**. Here, the plunger **12** is biased in such a direction (upward of FIG. **3**) by the not-shown return spring as to return to the initial position.

Here are described the actions of the electric fastening tool **1** thus constituted.

The operator grips the handle portion 2B of the housing **2**, as shown in FIG. **4**, to hold the electric fastening tool **1** at one hand. When the trigger switch **4** is pulled and turned ON, the motor **7** is energized by the battery housed in the battery pack **3**. The rotations of the output shaft **8** of the motor **7** are transmitted by the drive gear **9** to the flywheel **11** so that the flywheel **11** is rotationally driven to store the kinetic energy. At this time, the clutch mechanism is in OFF state, and the flywheel **11** and the driven shaft are disconnected. The flywheel **11** is freely (idly) rotating with respect to the follower

KHD 000736

US 8,118,204 B2

5

shaft, so that the transmission of the power (or the kinetic energy) from the flywheel 11 to the follower shaft is blocked.

After lapse of a predetermined time period, the electromagnetic solenoid is energized by the not-shown drive circuit so that it is driven. Then, the clutch mechanism is turned ON to connect the flywheel 11 and the follower shaft so that the kinetic energy of the flywheel 11 is transmitted to rotate the follower shaft. When the driven shaft is thus rotationally driven, the pinion 10 fixed on the driven shaft rotates together, thereby to push the meshing plunger 12 in the punching direction (downward of FIG. 3) against the biasing force of the not-shown return spring. Then, the blade 14 attached to the leading end of the plunger 12 is also pushed in the same direction to impinge at its leading end against the nail 6 housed in the magazine 5. By this impinging force, the nail 6 is pushed from the ejection port 17a of the ejection unit 17 so that it is driven into a material such as wood W, as shown in FIG. 4.

When the nail 6 is driven into the wood W, as described above, the energization of the electromagnetic solenoid is interrupted and turned OFF, and the clutch mechanism is also turned OFF to disconnect the flywheel 11 and the follower shaft. Then, the follower shaft can rotate freely with respect to the flywheel 11 so that the plunger 12 and the blade 14 attached to the plunger 12 are moved upward of FIG. 3 their initial positions by the biasing force of the not-shown return spring.

By thus repeating the operations thus far described, the nails 6 shown in FIG. 5 can be continuously driven into the wood W shown in FIG. 4.

In the electric fastening tool 1 according to the embodiment, even if the magazine 5 having the nails 6 housed in the step shape, as shown in FIG. 5 is attached at an inclination with respect to the horizontal direction, the magazine 5 can be so attached while avoiding the handle portion 2B of the housing 2 as to hold the handle portion 2B at an angle near a horizontal direction. Moreover, the electric fastening tool 1 can be entirely shortened and can be easily pushed while gripping the handle portion 2B, so that it can punch the nails 6 stably.

Moreover, the magazine 5 is so arranged that its portion overlaps either the trailing end portion of the handle portion 2B of the housing 2 or the battery pack 3 in the side view. As a result, the height of the trailing end portion of the handle portion 2B (i.e., the height from the leading end punching portion of the trunk portion 2A) can be held small to shorten the entire length of the trunk portion 2A. Thus, the electric fastening tool 1 can be made so compact that it can be conveniently used in the narrow place, as shown in FIG. 4, so that it can nail even a narrow place highly efficiently.

In the embodiment, moreover, the magazine 5 is mounted obliquely in a top plan view, as shown in FIG. 2, with respect to the handle portion 2B so as to avoid the interference with the battery pack 3. As a result, the battery can be easily attached to or detached from the battery pack 3 so that it can be replaced easily and promptly. Even if the magazine 5 is attached obliquely in the top plan view to the handle portion 2B of the housing 2, the battery or a heavy component can be arranged at the low position so that the electric fastening tool (or the portable fastening tool) 1 can be well balanced in its weight and less damaged in its operation.

The embodiment of the invention has been described on the electric fastening tool as one example of the portable fastening tool. However, the invention can also be naturally applied to another portable fastening tool such as a gas fastening tool,

6

in which a gas is burned by sparking it with a battery so that the nail is driven by the explosive force (or the combustion energy) of the gas.

The invention claimed is:

1. A portable fastening tool comprising:

a housing having a handle portion formed generally in a T-shape in a side view to extend from a main body disposed at first end of the handle portion, the main body including a nailing mechanism;

an ejection unit attached to a lower end of the housing and configured to eject nails in an ejecting direction;

a magazine attached to the ejection unit and having an extending portion extending from the ejection unit;

a motor housed in the housing;

a battery pack for driving the motor disposed at a second end of the handle portion opposite to the first end;

a battery pack supporting portion for supporting the battery pack, the battery pack supporting portion being provided at the second end of the handle portion;

a flywheel rotatably supported in the housing and rotationally driven by the motor; and

a plunger adapted to be linearly moved in the housing by the rotation of the flywheel thereby to drive a nail from the ejection unit, wherein the magazine is inclined with respect to the ejecting direction in said side view,

wherein the magazine is inclined with respect to the handle portion of the housing in a bottom view which is perpendicular to said side view and includes a view of the extending portion of the magazine,

wherein, in the side view when the ejection unit is placed downwardly, the battery pack has a portion which elongates below the handle portion,

wherein, in the side view when the ejection unit is placed downwardly, the battery pack supporting portion has a portion which elongates below the handle portion,

wherein the magazine has an overlap portion overlapping said portion of the battery pack and said portion of the battery pack supporting portion in said side view, and

wherein the magazine is connected to said portion of the battery pack supporting portion which elongates below the handle portion.

2. The portable fastening tool as set forth in claim 1, wherein the magazine is attached at one end of the magazine to the ejection unit, and

wherein the magazine is deflected to the right or left on the one end of the magazine and is inclined with respect to the handle portion in said bottom view by a predetermined angle.

3. The portable fastening tool as set forth in claim 1, wherein an upper end of the battery pack is positioned lower than an upper end of the main body in the side view when the ejection unit is placed downwardly.

4. The portable fastening tool as set forth in claim 1, wherein:

the battery pack has an inserting portion configured to be inserted in the handle portion, and

the inserting portion is located at off-center of the battery pack.

5. The portable fastening tool as set forth in claim 1, wherein:

the battery pack supporting portion is configured so that the battery pack is inserted thereinto, and

the magazine is connected to said portion of the battery pack supporting portion via a bolt at a position not overlapping with the battery in said side view.

KHD 000737

US 8,118,204 B2

7

6. The portable fastening tool as set forth in claim 1, wherein the magazine is connected to a side portion of the battery pack supporting portion.

7. A portable fastening tool comprising:

a battery pack;

a handle portion having the battery pack at a first end portion thereof;

a batter pack supporting portion for supporting the battery pack, the battery pack supporting portion being provided at a second end portion of the handle portion opposite to the first end portion;

a main body connected to the handle portion;

an ejection unit disposed at the end of the main body and configured to eject nails in an ejecting direction; and

a magazine connected to the ejection unit and having an extending portion extending from the ejection unit,

wherein the magazine is inclined with respect to the ejecting direction when viewed from a side of the magazine,

wherein the magazine is inclined with respect to the handle portion in a bottom view which is perpendicular to said ejecting direction and includes a view of the extending portion of the magazine,

wherein, in the side view when the ejection unit is placed downwardly, the battery pack and the battery pack supporting portion elongate below the handle portion,

wherein the magazine has an overlap portion overlapping a portion of the battery pack which elongates below the handle portion and a portion of the battery pack supporting portion which elongates below the handle portion in a side of the magazine, the side view being perpendicular to the bottom view and includes side views of the handle portion, the main body and the magazine, and

wherein the magazine is connected to said portion of the battery pack supporting portion which elongates below the handle portion.

8. The portable fastening tool as set forth in claim 7, wherein an upper end of the battery pack is positioned lower than an upper end of the main body in the side view when the ejection unit is placed downwardly.

9. The portable fastening tool as set forth in claim 7, wherein:

the battery pack has an inserting portion configured to be inserted in the handle portion, and

the inserting portion is located at off-center of the battery pack.

10. The portable fastening tool as set forth in claim 7, wherein:

the battery pack supporting portion is configured so that the battery pack is inserted thereinto, and

the magazine is connected to said portion of the battery pack supporting portion via a bolt at a position not overlapping with the battery in said side view.

11. The portable fastening tool as set forth in claim 7, wherein the magazine is connected to a side portion of the battery pack supporting portion.

12. A portable fastening tool comprising:

a housing;

a handle portion extending from the housing in a handle extending direction;

a battery pack supporting portion connected to the handle portion;

a motor housed in the housing;

8

a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing;

an ejection unit disposed at a lower end of the housing and configured to guide a nail in an ejecting direction; and

a magazine connected to the ejection unit,

wherein the magazine is inclined with respect to the ejecting direction in a side view, the side view being perpendicular to the handle extending direction and the ejecting direction,

wherein the magazine is inclined with respect to the handle portion in a bottom view,

wherein, in the side view when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine,

wherein, in the side view when the ejection unit is placed downwardly, an upper end of the battery pack is positioned lower than an upper end of the housing, and

wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion.

13. A portable fastening tool comprising:

a housing;

a handle portion extending from the housing in a handle extending direction and having a central axis;

a battery pack supporting portion connected to the handle portion;

a motor housed in the housing;

a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing;

an ejection unit disposed at the lower end of the housing and configured to guide a nail in an ejecting direction; and

a magazine connected to the ejection unit,

wherein the magazine is inclined with respect to the ejecting direction in a side view, the side view being perpendicular to the handle extending direction and the ejecting direction,

wherein the magazine is inclined with respect to the handle portion in a bottom view,

wherein, in the side view when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine,

wherein the central axis of the handle portion is inclined with respect to the ejecting direction,

wherein, in the side view when the ejection unit is placed downwardly, an upper end of the battery pack is positioned lower than an upper end of the housing, and

wherein, in the side view when the ejection unit is placed downwardly, a center of the battery pack is positioned lower than the central axis of the handle portion.

14. The portable fastening tool as set forth in claim 13, wherein the battery pack has an inserting portion configured to be inserted in the handle portion, and

the inserting portion is located at off-center of the battery pack.

15. The portable fastening tool as set forth in claim 13, wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion.

\* \* \* \* \*

# EXHIBIT 3



US007156012B2

(12) **United States Patent**  
Komazaki et al.

(10) Patent No.: **US 7,156,012 B2**  
(45) Date of Patent: **Jan. 2, 2007**

(54) **PNEUMATICALLY OPERATED FASTENER DRIVING TOOL**

(75) Inventors: **Yoshiichi Komazaki**, Hitachinaka (JP); **Yoshinori Ishizawa**, Hitachinaka (JP); **Masashi Nishida**, Hitachinaka (JP)

(73) Assignee: **Hitachi Koki Co., Ltd.**, Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 99 days.

(21) Appl. No.: **11/038,115**

(22) Filed: **Jan. 21, 2005**

(65) **Prior Publication Data**

US 2005/0156008 A1    Jul. 21, 2005

(30) **Foreign Application Priority Data**

Jan. 20, 2004    (JP)    .......................... P2004-011835  
Mar. 18, 2004    (JP)    .......................... P2004-078201

(51) **Int. Cl.**  
*F01L 25/04*    (2006.01)

(52) **U.S. Cl.** ............................. **91/304**; 91/461; 60/413

(58) **Field of Classification Search** ................. 60/413; 91/304, 308, 456, 461  
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,713,165 | A | * | 7/1955 | Campbell et al. ............. 91/457 |
| 3,200,716 | A | * | 8/1965 | Le Sage ...................... 91/461 |
| 3,583,496 | A | * | 6/1971 | Fehrs .......................... 91/308 |
| 3,808,620 | A | * | 5/1974 | Rothfuss et al. .............. 91/308 |
| 5,085,126 | A | | 2/1992 | Mukoyama |
| 5,715,986 | A | * | 2/1998 | Sauer ........................ 227/130 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 54-023274 | 2/1979 |
| JP | 3-208569 | 9/1991 |
| JP | 32-08569 | 9/1991 |
| JP | 5-138548 | 6/1993 |
| JP | 51-38548 | 6/1993 |
| JP | 11-033930 | 2/1999 |

* cited by examiner

*Primary Examiner*—Igor Kershteyn  
(74) *Attorney, Agent, or Firm*—Antonelli, Terry, Stout and Kraus, LLP.

(57)        **ABSTRACT**

A pneumatically operated fastener driving tool capable of reducing a time period from operation timing of a trigger to downward movement of a driver blade for fastener driving, and reducing a time period from the release timing of the trigger to a timing at which respective components are returned to their initial positions for a subsequent nail driving. As components a main valve and a trigger valve is provided. The main valve is movable within a main valve chamber connected to a main valve control channel. The trigger valve selectively provides fluid communication between the accumulator and a main valve chamber through the main valve control channel and between the main valve chamber and the atmosphere through the main valve control channel. A ratio of cross-sectional area of the main valve control channel to an internal volume of the main valve chamber is defined to a specified ratio.

**31 Claims, 16 Drawing Sheets**



KHD 000001

# FIG. 1



KHD 000002

FIG. 2



FIG. 3



KHD 000003

FIG. 4



FIG. 5



KHD 000004

U.S. Patent        Jan. 2, 2007        Sheet 4 of 16        US 7,156,012 B2

# FIG. 6



# FIG. 7



KHD 000005

# FIG. 8



KHD 000006

FIG. 9



FIG. 10



KHD 000007

# FIG. 11



KHD 000008

## FIG. 12



## FIG. 13



KHD 000009

FIG. 14



FIG. 15



KHD 000010

# FIG. 16



KHD 000011

Case 1:18-cv-00313-CFC-CJB    Document 153-1    Filed 06/26/20    Page 43 of 450 PageID #: 3536

FIG. 17



FIG. 18



KHD 000012

# FIG. 19



KHD 000013



KHD 000014



KHD 000015



KHD 000016



KHD 000017

US 7,156,012 B2

1

## PNEUMATICALLY OPERATED FASTENER DRIVING TOOL

### BACKGROUND OF THE INVENTION

The present invention relates to a fastener driving tool such as a nail gun driven by compressed air, and more particularly, to such fastener driving tool improving drive response and decreasing air consumption.

Heretofore, fastener driving tools such as nail guns have existed which drive fasteners such as nails or staples using compressed air as the power source. In such fastener driving tools, compressed air is supplied to a piston upper chamber defined by an inner surface of a cylinder and a piston for rapidly displacing the piston to perform nailing. Compressed air is supplied from an external source and temporarily stored in an accumulator formed within a frame of the nail gun. The accumulator and the piston upper chamber are connected by a channel, but one or more valves which are switched between open and shut-off positions are provided along this channel. These valves are designed to open or shut-off the channel by supplying or expelling compressed air in valve chambers constituted by the spaces each adjacent to each valve. Typically the structure is such that a first valve is activated as a result of external operation of a trigger or the like, and this operation allows a downstream passage to be communicated with or to be shut-off from the first valve. Thus, a downstream valve chamber is brought into communication with or shutting-off from the upstream passage, thereby sequentially activating or deactivating the downstream valves.

In addition, a time period starting from completion of the nail driving operation to restoration to an initial state for the next nailing operation is dependent upon the circulation speed of the compressed air in the fastener driving tool after the trigger is released, and the movement speed of the valves in proportion to this circulation speed. That is, the time period is dependent on the shut-off speed for shutting off the piston upper chamber in the cylinder from the accumulator by a valve caused by, after releasing the trigger or the like, circulation of the compressed air through the channel in the fastener driving tool as a result of the returning motion of a plunger which had been pressed by this trigger.

In a conventional fastener driving tools as disclosed in Japanese Patent Publication No.S58-50833, valve activation is performed sequentially from valves whose valve chamber volume is small to valves with large valve chamber in order to stabilize operation of the valves irrespective of the speed with which the trigger is pulled. Since with this structure the valves are sequentially activated by compressed air, a time period starting from pulling the trigger and/or pushing operation of a push lever against a workpiece to a start of the nailing driving motion is highly dependent upon the time required to sequentially activate the valves.

In order to reduce this time period and increase response, Japanese Patent Publication No. H7-112674 discloses a nail gun, in which a main valve is divided into first and second valves, so that kinetic energy of the first valve is utilized to improve the operating speed of the second valve.

With this structure in which the main valve is divided into two valves, only the time period from when the second valve begins to move until it moves to maximum displacement is reduced. The time period from both pulling the trigger and pushing the push lever onto the workpiece to the operation timing of the first valve is still not reduced. In addition, since only the time period from when the second valve begins to move until it moves to maximum displacement is reduced,

2

it was only possible to reduce the time period from when the trigger is pulled until nailing is performed. Consequently, a time period from the completion timing of the nail driving operation to the start timing of the next nail driving operation cannot be reduced when continuous nailing is performed. That is, a response cannot be improved.

Laid-open Japanese Patent Application Kokai No. H11-33930 discloses a structure in which, an internal volume of a main valve chamber for accommodating therein a main valve is increased. With this arrangement, air damping behavior due to compression of the main valve chamber does not occur when the main valve rises and is contained in the main valve chamber.

With this structure in which the volume of the main valve chamber is increased, the amount of compressed air accumulated in the main valve chamber increases. For this reason, the time period for discharging the compressed air out of the main valve chamber is increased, which degrades the response.

Laid-open Japanese Patent Application Kokai No. H5-138548 discloses communication of a piston lower chamber with a trigger valve chamber. The movement speed of a valve piston and a main valve are increased as a result of the pressure which is generated from the movement of the piston.

With this structure in which the piston lower chamber and trigger valve chamber are connected, at the instant that the piston passes through the one-way valve disposed at an intermediate region of the cylinder, compressed air flows into the trigger valve chamber and closes the main valve. Therefore, the nailing force was reduced. Moreover, extremely complicated structure results.

Another conventional fastener driving tool has been proposed. The tool includes a trigger valve and main valve. A trigger valve exterior frame internally defines a trigger valve chamber. The trigger valve includes a plunger extending through the trigger valve exterior frame and the trigger valve chamber and slidably movable as a result of the movement of the trigger and the abutment of the push lever against the workpiece. The movement of the plunger selectively shuts off a fluid communication between the accumulator and the trigger valve chamber and between the trigger valve chamber and an atmosphere. However, the resultant arrangement cannot provide high response for discharging compressed air from the main valve.

Still another conventional fastener driving tool is proposed in which a main valve is not provided, but a trigger valve is additionally equipped with a valve piston. The valve piston is reciprocally slidably disposed in a trigger valve exterior frame, and has one side in the sliding direction facing the accumulator. The valve piston alternately opens and blocks a channel from the piston upper chamber connected to the trigger valve exterior frame to the accumulator and a channel from the piston upper chamber to the atmosphere. With this fastener driving tool, the displacement of the valve piston serves to select the air channel and control the nailing of the fastener. However, the speed of the displacement of the valve piston is low, and the delay in the displacement of this valve piston can cause other control to be delayed as well. Consequently, the problem arises that the time lag from when the operator begins the nailing operation until the fastener is actually driven becomes large, response becomes poor to lower workability. In addition, the problem arises that when many fasteners are to be driven in a short period of time, the aforementioned time lag makes continuous nailing difficult to perform.

KHD 000018

US 7,156,012 B2

3

In addition, with the conventional fastener driving tools, after nailing, in order to return the piston to the pre-nailing position, the piston upper chamber and the atmosphere are communicated with each other for releasing the compressed to the atmosphere, while the valve is closed for preventing the compressed air from flowing from the accumulator into the piston upper chamber.

However, during the period from when the valve begins to close until it is completely closed, the accumulator and the piston upper chamber are communicated with each other, and the piston upper chamber and the atmosphere are also communicated with each other. Accordingly, the compressed air in the accumulator would in some cases flow unnecessarily into the piston upper chamber and is expelled into the atmosphere. This causes an increase in air consumption, which consequently requires a high-performance compressor or the like to produce compressed air.

SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a fastener driving tool improving the response and continuous shots or nailing performance in nailing work, yet reducing the consumption of compressed air.

This and other objects of the present invention will be attained by A fastener driving tool including a frame, a cylinder, a piston, a main valve, a main valve chamber section, a trigger valve, and a main valve control channel section. The frame defines therein an accumulator that accumulates a compressed air. The cylinder is disposed within the frame. The piston is reciprocally slidably disposed within the cylinder. A piston upper chamber is defined by an inner peripheral surface of the cylinder and an upper surface of the piston. The main valve alternately opens and blocks a fluid communication between the piston upper chamber and the accumulator. The main valve chamber section defines therein a main valve chamber in which the main valve is movably disposed. The main valve chamber provides a maximum internal volume. The trigger valve alternately opens and blocks a fluid communication from the accumulator to the main valve chamber, and a fluid communication from the main valve chamber to an atmosphere. The main valve control channel section defines therein a main valve control channel that provides a fluid connection between the main valve chamber and the trigger valve. A value obtained dividing the maximum internal volume of the main valve chamber by a cross-sectional area of the main valve control channel being not more than 1.0.

In another aspect of the invention, there is provided a fastener driving tool including a frame, a cylinder, a piston, a trigger, and a trigger valve provided with a trigger valve exterior frame, a valve piston and a plunger. The frame defines therein an accumulator for accumulating a compressed air. The cylinder is disposed within the frame. The piston is reciprocally slidably disposed within the cylinder. A piston upper chamber is defined by the frame, an inner peripheral surface of the cylinder and an upper surface of the piston. The trigger functions as an operation input member. A trigger valve alternately opens and blocks a fluid communication between the piston upper chamber and the accumulator and a fluid communication between the piston upper chamber and an atmosphere. The trigger valve exterior frame is in fluid communication with the piston upper chamber and is formed with a through hole. The valve piston is reciprocably slidably disposed in the trigger valve exterior frame. The valve piston is movable between its top dead center where piston upper chamber is communicated with

4

the atmosphere and its bottom dead center where the piston upper chamber is communicated with the accumulator. The valve piston has a first section exposed to the accumulator and formed with a trigger valve intake channel opened to the accumulator and a second section in sliding contact with the trigger valve exterior frame. A trigger valve chamber is defined by the second section and the trigger valve exterior frame and provides a maximum internal volume. The plunger is movable between its top dead center and its bottom dead center and has a first portion associated with the valve piston and a second portion associated with the through hole. A trigger valve control channel is formed between the second portion and the through hole and has a cross-sectional area. The trigger valve control channel is opened when the plunger is moved to its top dead center. A value obtained from dividing the maximum volume of the trigger valve chamber measured in $m^3$ by the cross-sectional area of the trigger valve control channel is not more than 0.20.

Further, in the fastener driving tool including the frame, the cylinder, the piston, the trigger, and the trigger valve provided with the trigger valve exterior frame, the valve piston and the plunger, the trigger valve intake channel has a cross-sectional area of not less than $2.75 \times 10^{-6}$ $m^2$, and the trigger valve chamber has a maximum internal volume of $4.0 \times 10^{-7}$ $m^3$.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings;

FIG. 1 is a cross-sectional view of the fastener driving tool according to the first embodiment of the present invention;

FIG. 2 is an enlarged cross-sectional view of a trigger valve in the fastener driving tool according to the first embodiment;

FIG. 3 is a partial cross-sectional view particularly showing a main valve in the fastener driving tool according to the first embodiment;

FIG. 4 is an enlarged cross-sectional view particularly showing the trigger valve in the fastener driving tool according to the first embodiment, with a plunger having been pushed upward;

FIG. 5 is an enlarged cross-sectional view particularly showing the trigger valve in the fastener driving tool according to the first embodiment, with the plunger having been pushed upward and a valve piston then having moved to its bottom dead center;

FIG. 6 is a graph showing the relationship between a valve piston displacement time (T2) and a ratio of volume (V2) of trigger valve chamber to a cross-sectional area (S2) of a trigger valve control channel in the fastener driving tool according to the first embodiment;

FIG. 7 is a graph showing the relationship between a time period (T1) until a main valve returns to its initial position after a plunger returns to its initial position and a cross-sectional area (St) of a trigger valve intake channel in the fastener driving tool according to the first embodiment;

FIG. 8 is a partial cross-sectional view particularly showing the main valve in the fastener driving tool according to the first embodiment, with the main valve having moved to the top dead center;

FIG. 9 is a graph showing the relationship between a main valve displacement time (T1) and a ratio of volume (V1) of main valve chamber to a cross-sectional area (S1) of a main valve control channel in the fastener driving tool according to the first embodiment;

KHD 000019

US 7,156,012 B2

5

FIG. **10** is a graph in which a solid line curves shows the relationship between the main valve displacement time (T**1**) and the ratio of volume (V**1**) of main valve chamber to the cross-sectional area (S**1**) of the main valve control channel, and a broken line curves shows the relationship between air consumption amount (NL) and the ratio (V**1**/S**1**) or (V**1**/Sm) in which "Sm" designates a main intake control channel according to the first embodiment;

FIG. **11** is an enlarged cross-sectional view particularly showing the trigger valve in the fastener driving tool according to the first embodiment, with the valve piston having moved to the bottom dead center and the plunger then having returned to its original position;

FIG. **12** is a partial cross-sectional view particularly showing a main valve according to a modification to the first embodiment;

FIG. **13** is a cross-sectional view of the fastener driving tool according to a second embodiment of the present invention;

FIG. **14** is an enlarged cross-sectional view particularly showing a trigger valve in the fastener driving tool according to the second embodiment;

FIG. **15** is an enlarged cross-sectional view particularly showing the trigger valve in the fastener driving tool according to the first embodiment, with a plunger having been pushed upward;

FIG. **16** is a cross-sectional view of the fastener driving tool according to the second embodiment, with a main valve having moved to the top dead center;

FIG. **17** is a cross-sectional view of a fastener driving tool according to a third embodiment of the present invention;

FIG. **18** is an enlarged cross-sectional view particularly showing a trigger valve in the fastener driving tool according to the third embodiment;

FIG. **19** is an enlarged cross-sectional view particularly showing the trigger valve in the fastener driving tool according to the third embodiment, with a plunger having been pushed upward;

FIG. **20**(*a*) is a graph showing the relationship between time and pressure in a trigger valve chamber **13**, a main valve chamber **8**, an accumulator **2**, a piston upper chamber **4***a*, and a return chamber **33** in a fastener driving tool according to the first embodiment;

FIG. **20**(*b*) is a graph showing the relationship between the time and a displacement of a main valve according to the first embodiment;

FIG. **20**(*c*) is a graph showing the relationship between the time and a displacement of a valve piston according to the first embodiment;

FIG. **20**(*d*) is a graph showing the relationship between the time and a displacement of a piston according to the first embodiment;

FIG. **21**(*a*) is a graph showing the relationship between time and pressure in a trigger valve chamber **13**', a main valve chamber **8**', an accumulator **2**', a piston upper chamber **4***a*' and a return chamber **33**' in a comparative fastener driving tool;

FIG. **21**(*b*) is a graph showing the relationship between the time and a displacement of a main valve according to the comparative fastener driving tool;

FIG. **21**(*c*) is a graph showing the relationship between the time and a displacement of a valve piston according to the comparative fastener driving tool;

FIG. **21**(*d*) is a graph showing the relationship between the time and a displacement of a piston according to the comparative fastener driving tool;

6

FIG. **22**(*a*) is a graph showing the relationship between time and pressure in a trigger valve chamber **13**, a main valve chamber **8**, an accumulator **2**, a piston upper chamber **4***a*, and a return chamber **33** in the fastener driving tool according to the first embodiment;

FIG. **22**(*b*) is a graph showing the relationship between the time and a displacement of a main valve according to the first embodiment;

FIG. **22**(*c*) is a graph showing the relationship between the time and a displacement of a valve piston according to the first embodiment;

FIG. **22**(*d*) is a graph showing the relationship between the time and a displacement of a piston according to the first embodiment;

FIG. **22**(*e*) is a graph showing the relationship between the time and a displacement of a tool itself according to the first embodiment;

FIG. **23**(*a*) is a graph showing the relationship between time and pressure in a trigger valve chamber **13**', a main valve chamber **8**', an accumulator **2**', a piston upper chamber **4***a*', and a return chamber **33**' in another comparative fastener driving tool;

FIG. **23**(*b*) is a graph showing the relationship between the time and a displacement of a main valve according to the comparative fastener driving tool;

FIG. **23**(*c*) is a graph showing the relationship between the time and a displacement of a valve piston according to the comparative fastener driving tool;

FIG. **23**(*d*) is a graph showing the relationship between the time and a displacement of a piston according to the comparative fastener driving tool; and

FIG. **23**(*e*) is a graph showing the relationship between the time and a displacement of a tool itself according to the comparative fastener driving tool.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

A fastener driving tool according to a first embodiment of the present invention will be described with reference to FIGS. **1** through **11**. The fastener driving tool shown in FIG. **1** is a nail gun **1** which uses compressed air as the power source. The nail gun **1** includes a frame **60**, a handle **60**A disposed at one side of the frame **60**, and a nose **41** disposed at a lower end of the frame **60**. These frame **60**, handle **60**A and nose **41** are provided as an integral unit to form an outer frame. An accumulator **2** is formed within the handle **60**A and frame **60** for accumulating therein a compressed air delivered from a compressor (not shown) through an air hose (not shown). A cylinder **3** is provided within the frame **60**, and a piston **4***a* is reciprocal movably provided and slidably within the cylinder **3**. A driver blade **4***b* is provided integrally with the piston **4***a*, and has a free end **4***c* for abutting against the fastener **5** for driving.

A return chamber **33** which accumulates therein a compressed air to return the driver blade **4***b* to its upper dead center is provided around the lower outer peripheral surface of the cylinder **3**. A one-way valve **34** is provided in an axially intermediate portion of the cylinder **3**. An air channel **35** is formed in the cylinder **3** for allowing the compressed air to flow in only one direction, i.e., from inside the cylinder **3** to the return air chamber **33**, outside the cylinder **3**. In addition, an air channel **36** is formed at a lower portion of the cylinder **3** for providing continuous communication between the cylinder **3** and the return chamber **33**. In addition, a piston bumper **37** is provided at the bottom of the

KHD 000020

US 7,156,012 B2

7

cylinder 3 for absorbing excess energy from the driver blade 4b after nailing the fastener 5.

An operating portion 38 is provided at the base of the handle 60A. This operating portion 38 includes a trigger 39 operated by the user, an arm plate 48 which is attached pivotally movably to the trigger 39, and a push lever 42 which projects from the bottom of the nose 41 and extends to the vicinity of the arm plate 48. The push lever 42 is movable along the nose 41 and is biased away from the frame 60. In addition, a trigger valve 6 is provided at the base of the handle 60A and in confrontation with the trigger 39. As is well known in the art, the structure is such that, when both the trigger 39 is pulled and the push lever 42 is pressed against the workpiece, a plunger 7 on the trigger valve 6 is pushed upward, as shown in FIG. 2, by a linking mechanism of the arm plate 48 and the trigger 39.

A nail injection section 43 provided in conjunction with the nose 41 includes a magazine 44 and a feed mechanism 45. The magazine 44 is loaded with fasteners 5 arrayed side by side. The feed mechanism 45 is adapted for successively feeding fasteners 5 loaded in the magazine 44 to an injection opening 46 at the nose 41. The trigger valve 6 shown in FIG. 1 and FIG. 2 mainly includes an outer valve bush 10, an inner valve bush 11, a valve piston 9, a plunger 7, and a spring 12. The outer valve bush 10 and inner valve bush 11 are fixed to the frame 60 to form a trigger valve exterior frame which constitutes an outer wall of the trigger valve. The valve piston 9 is provided reciprocably slidably within the outer valve bush 10 and inner valve bush 11. The valve piston 9 and the outer valve bush 10 are formed with through holes, so that the plunger 7 is provided reciprocably slidably with respect to the through holes. The plunger 7 has a bottom end in contact with the arm plate 48. The spring 12 is interposed between the valve piston 9 and the plunger 7 for biasing the valve piston 9 and the plunger 7 in opposite directions, i.e., for biasing the valve piston 9 upward while biasing the plunger 7 downward.

The trigger valve 6 is fluidly connected to a main valve control channel 40, which is a cylindrical tube extending from a main valve chamber 8 described later. Specifically, the main valve control channel 40 is fluidly connected to a space between the outer valve bush 10 and inner valve bush 11, and opens into the trigger valve 6. This main valve control channel 40 is configured such that its cross-sectional area S1 is $3.2 \times 10^{-5}$ (m$^2$).

In addition, O-rings 17 and 25 are fitted on the inner valve bush 11. The O-ring 17 is adapted for continually blocking fluid connection between the accumulator 2 and the main valve control channel 40. The O-ring 25 is adapted for continually blocking fluid connection between the main valve control channel 40 and an atmosphere.

One side of the valve piston 9 in the sliding direction faces the accumulator 2, and the inner valve bush 11 has an accumulator side and an atmospheric side. An outer diameter at an accumulator side of the valve piston 9 is smaller than an inner diameter of the accumulator side of the inner valve bush 11 to define therebeween a main valve intake channel 20. Further, an outer diameter at an atmospheric side of the valve piston 9 is smaller than an inner diameter of the atmospheric side of the inner valve bush 11 to define therebetween an air channel 22. Further, an O-ring 21 and an O-ring 23 are disposed at the accumulator side and atmospheric side of the valve piston 9, respectively, for selectively blocking the respective channels 20 and 22.

Consequently, the main valve intake channel 20 passes between the valve piston 9 and the inner valve bush 11 to provide fluid communication between the accumulator 2 and

8

the main valve control channel 40 when the O-ring 21 is out of contact from the inner valve bush 11. Further, the air channel 22 passes between the valve piston 9 and the inner valve bush 11 to provide fluid communication between the main valve control channel 40 and the atmosphere when the O-ring 22 is out of contact from the inner valve bush 11. This air channel 22 is formed such that its cross-sectional area extending perpendicular to a flowing direction is larger than that of the main valve channel 40. As a result, the flow resistance at the air channel 22 will be lower than that of the main valve intake channel 20. The main valve intake channel 20 and air channel 22 are alternately opened and blocked due to the vertical sliding of the valve piston 9. In addition, the main intake control channel 20 is formed such that its cross-sectional area Sm is $3.2 \times 10^{-5}$ (m$^2$).

A trigger valve chamber 13 is defined by another side (lower side) of the valve piston 9 in the sliding direction and the outer valve bush 10. This trigger valve chamber 13 has an internal volume variable due to the sliding movement of the valve piston 9, and is formed such that a maximum internal volume V2 defined when the valve piston 9 is at the top dead center is $4.0 \times 10^{-7}$ (m$^3$). In addition, an O-ring 24 is fitted onto the valve piston 9 for continually blocking the fluid connection between the air channel 22 and the trigger valve chamber 13.

The plunger 7 extends through the trigger valve chamber 13, and a top end faces the accumulator 2. The valve piston 9 has first and second sliding regions relative to the valve piston 9 and the outer valve bush 10, and O-ring grooves are formed at the respective sliding regions for installing therein an O-ring 15 and an O-ring 18 for maintaining hermetic seal. An outer diameter of the first sliding region is smaller than an inner diameter of the valve piston 9 for defining therebetween a trigger valve intake channel 14, and an outer diameter of the second sliding region is smaller than an inner diameter of the outer valve bush 10 for defining therebetween a trigger valve control channel 16.

Consequently, the trigger valve intake channel 14 passes between the plunger 7 and the valve piston 9 for providing fluid communication from the accumulator 2 to the trigger valve chamber 13 when the O-ring 15 is out of contact from the valve piston 9. Further, the trigger valve control channel 16 passes between the plunger 7 and the outer valve bush 10 to provide fluid communication from the trigger valve chamber 13 to the atmosphere when the O-ring 18 is out of contact from the outer valve bush 10. The trigger valve intake channel 14 and trigger valve control channel 16 are alternately opened and blocked in accordance with the sliding motion of the plunger 7.

The trigger valve intake channel 14 is formed such that its cross-sectional area St is $2.75 \times 10^{-6}$ (m$^2$). Further, the trigger valve control channel 16 is formed such that its cross-sectional area S2 is $1.98 \times 10^{-6}$ (m$^2$). As a result, the value obtained from dividing the volume of the trigger valve chamber 13 by the cross-sectional area of the trigger valve control channel 16 is V2/S2=0.2.

The structure of the trigger valve 6 is such that, when the valve piston 9 is positioned toward the top dead center (for example FIG. 2), the main valve intake channel 20 is opened so that the accumulator 2 and the main valve control channel 40 are communicated with each other, while air channel 22 is closed by the O-ring 23 so that fluid communication between the main valve control channel 40 and the atmosphere is blocked. In addition, when the valve piston 9 is positioned toward the bottom dead center (for example FIG. 5), the main valve intake channel 20 is closed by the O-ring 21, so that fluid communication between the main valve

KHD 000021

US 7,156,012 B2

9

control channel 40 and the accumulator 2 is blocked, while air channel 22 is opened so that and the main valve control channel 40 and the atmosphere are communicated with each other.

When the plunger 7 is positioned toward the top dead center (FIG. 5), the trigger valve control channel 16 is opened so that the trigger valve chamber 13 is communicated with the atmosphere, while the trigger valve intake channel 14 is closed by the O-ring 18, so that fluid communication between the accumulator 2 and the trigger valve chamber 13 is blocked. In addition, when the plunger 7 is positioned toward the bottom dead center (FIG. 2), the trigger valve control channel 16 is closed by the O-ring 18, so that fluid communication between the trigger valve chamber 13 and the atmosphere is blocked, while the trigger valve intake channel 14 is opened so that the accumulator 2 and the trigger valve chamber 13 are communicated with each other.

A main valve section 26 is provided immediately above and around the outer peripheral surface of the cylinder 3 as shown in FIGS. 1 and 3. The main valve section 26 generally includes a main valve 19, a main valve rubber 27, a main valve spring 28, and an exhaust rubber 30. The main valve rubber 27 is fitted to the top end of the cylinder 3. The main valve spring 28 is adapted for biasing the main valve 19 toward its bottom dead center. The exhaust rubber 30 is placed above the cylinder 3. An air discharge passage 29 is formed above the cylinder 3 for discharging the compressed air in the piston upper chamber above the piston 4a. The exhaust rubber 30 is adapted for shutting off the air discharge passage 29 when the main valve 19 is coming into contact with the exhaust rubber 30. In addition, the upper end of the frame 60 is formed with an exhaust hole 49 to which the air passage 29 is connected. Thus, the compressed air in the piston upper chamber can be discharged to the atmosphere.

A main valve sectioning region 61 is provided as an upper part of the frame 60. The main valve sectioning region 61 provides a main valve chamber 8 in which the main valve 19 is vertically slidably movably provided. The main valve chamber 8 is in communication with the main valve control channel 40.

The main valve 19 has top and middle portions provided with O-rings 31 and 32, respectively. The O-ring 31 is adapted for continually blocking fluid communication between the main valve chamber 8 and the air channel 29, and the O-ring 32 is adapted for continually blocking fluid communication between the main valve chamber 8 and the accumulator 2. Thus, the main valve chamber 8 is hermetically maintained by these O-rings 31 and 32.

The main valve chamber 8 has an internal volume variable in accordance with the vertical movement of the main valve 19, but has a maximum volume V1 of $2.56 \times 10^{-5}$ (m³). As a result, the value obtained from dividing the volume V1 of the main valve chamber 8 by the cross-sectional area S1 of the main valve control channel 40 is V1/S1=0.8≦1.0. Likewise, the value obtained from dividing the volume V1 of the main valve chamber 8 by the cross-sectional area Sm of the main valve intake channel 20 is V1/Sm=0.8≦1.0. In addition, the main valve control channel 40 has a curving portion as shown at the location enclosed by a circle in FIG. 3. The curving portion is formed into a gentle arc shape.

When the main valve 19 is positioned toward the top dead center, the main valve 19 comes into contact with the exhaust rubber 30 to shut off the air exhaust passage 29, so that fluid communication between the piston upper chamber of the cylinder 3 and the atmosphere is blocked, while the

10

piston upper chamber of the cylinder 3 and the accumulator 2 are communicated with each other. On the other hand, when the main valve 19 is positioned toward the bottom dead center, the main valve 19 comes into contact with the main valve rubber 27 for blocking fluid communication between the piston upper chamber of the cylinder 3 and the accumulator 2, while the main valve 19 separates from the exhaust rubber 30 for opening the air exhaust passage 29, so that the piston upper chamber of the cylinder 3 is communicated with the atmosphere.

The nail driving operation will be described. FIG. 1 to FIG. 3 show state in which compressed air from the compressor (not shown) is accumulated in the accumulator 2 through the hose (not shown). In this state, as shown in FIG. 2, the plunger 7 is positioned at the bottom dead center, since the pressure within the accumulator 2 acts on the upper surface of plunger 7, and since biasing force of the spring 12 is imparted on the plunger 7. Since the plunger 7 is positioned at the bottom dead center, the trigger valve intake channel 14 is open to provide fluid communication between the accumulator 2 and the trigger valve chamber 13. At the same time, the trigger valve control channel 16 is closed by the O-ring 18, so the fluid connection between the trigger valve chamber 13 and the atmosphere is blocked. As a result, a part of the compressed air in the accumulator 2 flows through the trigger valve intake channel 14 and into the trigger valve chamber 13, and air in the trigger valve chamber 13 has the same pressure as in the accumulator 2.

In this case, because of the biasing force of the spring 12 and the difference in pressure receiving areas of the valve piston 9, the valve piston 9 is positioned at its top dead center. Therefore, the main valve intake channel 20 is open to communicate the accumulator 2 with the main valve control channel 40. At the same time, the air channel 22 is closed by the O-ring 23, so the connection between the main valve control channel 40 and the atmosphere is blocked. As a result, a portion of the compressed air in the accumulator 2 flows into the main valve control channel 40, and air accumulates in the main valve chamber 8 at the same pressure as in the accumulator 2.

Since the part of the compressed air in the accumulator 2 flows into the main valve chamber 8, the main valve 19 is positioned at the bottom dead center as shown in FIG. 3 as a result of downward pressing load arising from the difference in pressure receiving areas between the lower peripheral surface 52 and the upper end surface 54 of the main valve 19, along with the biasing force of the main valve spring 28.

Since the main valve 19 is positioned at the bottom dead center, the main valve 19 comes into contact with the main valve rubber 27 while separating from the exhaust rubber 30 to open the air discharge passage 29. As a result, the piston upper chamber of the cylinder 3 is brought into communication with the atmosphere. Thus, the piston upper chamber assumes the atmospheric pressure. In addition, the fluid connection between the piston upper chamber of the cylinder 3 and the accumulator 2 is blocked. Thus, compressed air in the accumulator 2 does not flow into the piston upper chamber. As a result, the piston 4a is maintained at its top dead center position.

FIG. 4 shows the state where the plunger 7 is pushed up to the top dead center by pulling the trigger 39 and pressing the push lever 42 against the workpiece. Since the plunger 7 is positioned at the top dead center, the O-ring 18 loses its sealing effect, and the trigger valve control channel 16 will be opened. As a result, the trigger valve chamber 13 and the atmosphere are communicated with each other, so the inside

KHD 000022

US 7,156,012 B2

11

of the trigger valve chamber 13 assumes the atmospheric pressure. In addition, the trigger valve intake channel 14 is closed by the O-ring 15 for blocking fluid communication between the accumulator 2 and the trigger valve chamber 13. Thus, compressed air does not any more flow from the accumulator 2 into the trigger valve chamber 13.

Since the trigger valve chamber 13 assumes the atmospheric pressure, a difference arises between the pressure imparted to the valve piston 9 at its accumulator side and the pressure imparted to the valve piston 9 in the trigger valve chamber 13. Because of the pressure difference, the valve piston 9 moves to the bottom dead center as shown in FIG. 5.

The value obtained from dividing the maximum volume V2 of the trigger valve chamber 13 by the cross-sectional area S2 of the trigger valve control channel 16 is V2/S2=0.2. This value is set smaller than that in conventional fastener driving tools. This is a design concept obtained as a result of recognition of the principle in a tube flow that there is a proportional relationship between the mass rate of flow and the cross-sectional area of the tube. More specifically, it is based on the discovery that, with fastener driving tools which have valve chambers, the time period required for the pressure in these valve chambers to drop to a specific pressure due to the discharge of air decreases in accordance with an increase in the cross-sectional area of the channels used to discharge air with respect to the volume of these valve chambers.

FIG. 6 shows the relationship between V2/S2 and the time period T2 from when the pressure inside the trigger valve chamber 13 begins to drop until the valve piston 9 moves to maximum displacement. The smaller V2/S2 is made, the smaller T2 becomes as well. For the value in this first embodiment, V2/S2=0.2, T2 is approximately 0.75 ms. Consequently, the time period required for the pressure in the trigger valve chamber 13 to drop to a specific pressure decreases, and accordingly, time period from when the plunger 7 is pressed until the valve piston 9 moves to maximum displacement can be reduced. As a result, the amount of time from when the trigger 39 and the push lever 42 are operated until the nailing motion occurs due to the displacement of the trigger valve can be further reduced. Incidentally, by making V2/S2=0.15, T2 can be made smaller, and by making V2/S2=0.10, T2 can be made smaller still, and the amount of time until the nailing motion occurs can be shortened.

Thus, by setting the maximum volume V2 of the trigger valve chamber 13 and the cross-sectional area S2 of the trigger valve control channel 16 to the aforementioned values, discharge of the compressed air from the trigger valve chamber 13 can be promptly performed, and the time period until the trigger valve chamber 13 assumes the atmospheric pressure can be reduced. Furthermore, since the discharge of air from the trigger valve chamber 13 can be improved when the valve piston 9 moves to the bottom dead center, a so-called air damper in which the pressure in the trigger valve chamber 13 impedes the movement of the valve piston 9 is not readily formed. Accordingly, the valve piston 9 can be moved immediately from the top dead center to the bottom dead center without being interrupted by the air damper. Incidentally, even though the valve piston 9 is biased toward the top dead center by the spring 12, the valve piston 9 is movable to the bottom dead center by the pressure difference since the biasing force of the spring 12 is set beforehand to be weaker than the force caused by the pressure difference.

12

As shown in FIG. 5, since the valve piston 9 is positioned at the bottom dead center, the main valve intake channel 20 is closed by the O-ring 21 to block fluid communication from the accumulator 2 to the main valve control channel 40. In addition, the O-ring 23 loses its sealing effect to open the air channel 22, so that the main valve control channel 40 is brought into communication with the atmosphere. As a result, the main valve control channel 40 and the main valve chamber 8 assume atmospheric pressure.

When the main valve chamber 8 assumes generally the atmospheric pressure, the main valve 19 then moves to the top dead center as shown in FIG. 8 as a result of the upward pressure arising from the difference in pressure receiving areas at the lower outer peripheral surface 52 and at the upper end surface 54 of the main valve 19. When the main valve 19 begins to move toward the top dead center, the accumulator 2 and the piston upper chamber in the cylinder 3 are brought into fluid communication with each other. Thus, because of the pressure imparted to the lower outer peripheral surface 52 as well as to the lower end surface 53 of the main valve 19, the main valve 19 moves rapidly toward the top dead center, and comes into contact with the exhaust rubber 30 to close the air discharge passage 29 whereupon the piston upper chamber is shut off from the atmosphere. In this case, the accumulator 2 is also shut off from the atmosphere.

By the movement of the main valve 19 toward its upper dead center, the fluid in the main valve chamber 8 is discharged into the main valve control channel 40. As described above, the value obtained from dividing the maximum volume V1 of the main valve chamber 8 by the cross-sectional area S1 of the main valve control channel 40 is V1/S1=0.8. This value is set smaller than that in the conventional fastener driving tools. This is a design concept which, just as with the design concept described above, was also obtained as a result of recognition of the flow principle that, with fastener driving tools which have valve chambers, the time period required for the pressure in these valve chambers to drop to a specific pressure due to the discharge of air decreases in accordance with an increase in cross-sectional area of the channels used to discharge air with respect to the volume of these valve chambers.

FIG. 9 shows the relationship between V1/S1 and the time period T1 from when the pressure in the main valve chamber 8 begins to drop until the main valve 19 moves to maximum displacement. The smaller V1/S1 is made, the smaller T1 becomes as well. For the value in this first embodiment, V1/S1=0.8 at which T1 is approximately 7.0 ms. Consequently, the time period required for the pressure in the main valve chamber 8 to drop to a specific pressure decreases. Accordingly, the time period from when the plunger 7 is pressed as a result of the trigger 39 and the push lever 42 being operated until the main valve 19 moves to maximum displacement can be reduced. As a result, the time period from when the trigger 39 and the push lever 42 are operated until the nailing motion occurs because of the displacement of the main valve 19 can be reduced. Incidentally, if V1/S1 is set to 1.0, T1 becomes 7.5 ms, which is sufficiently small. If V1/S1 is set to 0.6, T1 can be made even smaller, about 5.0 ms. Thus, time period until the nailing motion occurs can be further shortened.

In the first embodiment, a bending section is provided in the main valve control channel 40. However, the bending section does not cause significant flow path resistance, since the bending section is configured into an gentle arcuate shape. Consequently, there is no obstruction in the flow of air in the main valve control channel 40. Furthermore, as

KHD 000023

US 7,156,012 B2

13

described above, the air in the main valve chamber 8 passes from the main valve control channel 40 through air channel 22 of the trigger valve 6 and is discharged into the atmosphere. In this case, since cross-sectional area of the air channel 22 is larger than that of the main valve control channel 40 in terms of air flowing passage, the air channel 22 does not prevent the air from flowing from the main valve chamber 8 into the atmosphere. Consequently, the time period from when the trigger 39 and the push lever are operated until the nailing motion occurs can be shortened.

Thus, by setting the maximum volume of the main valve chamber 8 and the cross-sectional area of the main valve control channel 40 to the aforementioned values, the compressed air in the main valve chamber 8 will escape more quickly, so that the time period until the main valve chamber 8 assumes the atmospheric pressure can be reduced. Furthermore, a so-called air damper in the main valve chamber 8 is not readily formed because of the improvement on the shape of the main valve control channel 40 and improvement on passing of air through the air channel 22. Accordingly, the escape of air from the main valve chamber 8 can be improved even when the main valve 19 rises to the top dead center. Consequently, the main valve 19 can be moved immediately from the bottom dead center to the top dead center.

By the movement of the main valve 19 from its bottom dead center to the top dead center, the compressed air rapidly flows from the accumulator 2 into the piston upper chamber, thereby rapidly moving the piston 4a toward its bottom dead center. Thus, the fastener 5 is driven by the tip end 4c of the driver blade 4b connected to the piston 4a. The air in the underside of the piston 4a in the cylinder 3 flows through air channel 36 into the return air chamber 33. Further, a portion of the compressed air in the piston upper chamber also flows through the air channel 35 into the return air chamber 33, after the piston 4a is moved past the air channel 35.

FIG. 11 shows the state where the plunger 7 has just returned to the bottom dead center after release of the trigger 39 or after the pressing of the push lever 42 against the workpiece is stopped. The plunger 7 has moved to the bottom dead center because of the pressure applied to the upper end face of the plunger 7 from the accumulator 2 and the biasing force of the spring 12.

By the movement of the plunger 7 to the bottom dead center, the trigger valve control channel 16 is closed by the O-ring 18, while the O-ring 15 loses its sealing effect. Thus, the compressed air in the accumulator 2 flows through the trigger valve intake channel 14 into the trigger valve chamber 13.

In this case, as described above, the cross-sectional area St of the trigger valve intake channel 14 is set to $2.75 \times 10^{-6}$ (m²), which is relatively larger than that of the conventional tool. This is due to a design concept obtained as a result of recognition of the tube flow principle that there is a proportional relationship between the mass rate of flow and the cross-sectional area of the tube. More specifically, it is based on the discovery that, with fastener driving tools having valve chambers, the time period required for the pressure in these valve chambers to be increased to a specific pressure due to introduction of the compressed air thereinto is reduced in accordance with an increase in the cross-sectional area of the channels used for the introduction of the compressed air with respect to the volume of these valve chambers.

FIG. 7 shows the relationship (solid line curve) between the cross-sectional area (St) of the trigger valve intake channel 14, and the time period T1 until the main valve

14

returns to the initial position. FIG. 7 also shows the relationship (broken line curve) between the cross-sectional area (St) and air consumption volume NL. As the cross-sectional area St decreases, the main valve return time period can be reduced and the air consumption volume can be decreased. These curves T1 and NL appear as convex functions toward the lower direction. Therefore, the reducing or decreasing effects are not greatly exhibited at the greater range of the cross-sectional area. Taking the phenomena into consideration, the specific value was determined experimentally to be $2.75 \times 10^{-6}$ (m²). As a result, the time period required for the pressure in the trigger valve chamber 13 to rise to a specific pressure due to the inflow of compressed air is reduced. Thus, the time period from when the pressing force on the plunger 7 ceases until the valve piston 9 returns to the pre-nailing position can be shortened.

By the introduction of the compressed air into the trigger valve chamber 13, the valve piston 9 is moved to its top dead center. Thus, the O-ring 23 blocks fluid communication between the air channel 22 and the main valve control channel 40, while the O-ring 21 loses its sealing effect so that the accumulator 2 is fluidly connected to the main valve chamber 8 via the main valve intake channel 20 and the main valve control channel 40. Thus, compressed air flows from the accumulator 2 into the main valve chamber 8.

As described above, the value obtained from dividing the maximum volume V1 of the main valve chamber 8 by the cross-sectional area S1 of the main valve control channel 40 is V1/S1=0.8. This value is set smaller than that of the conventional fastener driving tools. As with the design concept for the trigger valve intake channel 14, this value is determined based on the design concept that, with fastener driving tools having valve chambers, the time period required for the pressure in these valve chambers to be increased to a specific pressure by the introduction of the compressed air thereinto is reduced in accordance with an increase in the cross-sectional area of the channels used for the introduction of the compressed air with respect to the volume of these valve chambers.

FIG. 10 shows the relationship between V1/S1, and the time period T1 until the main valve 19 returns to the initial position (lower dead position). FIG. 10 also shows the relationship between V1/S1 and the air consumption volume NL. The lower V1/S1 becomes, the lower T1 becomes as well. For the value in this first embodiment, V1/S1 is set to 0.8 at which T1 is approximately 7.0 ms. Consequently, the time period required for the pressure in the main valve chamber 8 to rise to a specific pressure by the introduction of compressed air thereinto can be reduced. Thus, the time period from when the valve piston 9 begins to return to the pre-nailing position (toward the top dead center) until the main valve 19 closes the main valve rubber 27 can be reduced. As a result, the time period to the restoration timing for the subsequent nail driving operation after the actual nail driving operation can be reduced. More specifically, the time period from when the trigger 39 and the push lever 42 are operated until the main valve reaches its bottom dead center as a result of the movement of the valve piston 9 to the pre-nailing position can be reduced. Further, since the time period for the main valve to be closed is reduced, the amount of compressed air flowing from the accumulator 2 to the piston upper chamber can be reduced during movement of the main valve 19 toward its bottom dead center. Incidentally, even if V1/S1 is set to 1.0, T1 will be approximately 7.5 ms, which is sufficiently small in comparison to the conventional examples. If V1/S1 is set to 0.6, T1 can be made even smaller, approximately 5.5 ms. Consequently, the

KHD 000024

US 7,156,012 B2

15                                                              16

time period, following nailing, for the return to the pre-nailing state can be further reduced, while the amount of compressed air which flows from the accumulator 2 to the piston upper chamber can be further decreased.

In addition, the value obtained from dividing the maximum volume V1 of the main valve chamber 8 by the cross-sectional area Sm of the main valve intake channel 20 is likewise set to V1/S1=0.8. The main valve intake channel 20 and the main valve control channel 40 become a contiguous inflow passage directing to the main valve chamber 8. In this connection, the main valve intake channel 20 should provide a performance at least equal to that of the main valve control channel 40. As a result, V1/Sm was also set to 1.0 or less. In addition, V1/S1 and V1/Sm need not be the same value provided that they are both 1.0 or less. Incidentally, there is the curved area at the main valve control channel 40. However, the curved area does not lead to a significant flow resistance because of the gentle arcuate shape in the curved area. Thus, there is no obstruction in the flow of air to be directed into the main valve chamber 8.

As a result, the compressed air can instantaneously flow into the main valve chamber 8 so that a downward pressing force arises because of the difference in pressure receiving areas among the lower outer peripheral surface 52, the lower end surface 53, and the top end surface 54 of the main valve 19. In this first embodiment, by setting both V1/S1 and V1/Sm to 0.8, the time period required for the main valve 19 to move to the bottom dead center, that is, to return the main valve 19 to its pre-nailing position can be reduced to approximately 3.8 ms. This returning movement is also due to the pressing force arising from the compressed air flowing into the main valve chamber 8 and the biasing force of the main valve spring 28.

Upon movement of the main valve 19 to its bottom dead center, the main valve 19 is coming into contact with the main valve rubber 27 to shut off fluid connection between the accumulator 2 and the piston upper chamber. Further, immediately before the main valve 19 reaches its bottom dead center, the main valve 19 is separated from the exhaust rubber 30 for providing fluid communication from the piston upper chamber with the atmosphere. As a result of the structural relationships, the main valve 19 is separated from the exhaust rubber 30 prior to the complete return of the main valve 19 to the bottom dead center. In this instance, since the accumulator 2 and the piston upper chamber are not yet completely blocked from each other, the accumulator 2 is connected to the atmosphere through the piston upper chamber and the air discharge passage 29, so that the compressed air is discharged unnecessarily into the atmosphere. However, by setting VI/S1 and V1/Sm to 1.0 or less, and also setting the cross-sectional area St of the trigger valve intake channel 14 to 2.75×0⁻⁶ (m²), the time period for the main valve 19 to move to the bottom dead center can be shortened, so that the unwanted consumption of the compressed air due to leakage of compressed air from the accumulator 2 to the atmosphere can be reduced as is apparent from FIG. 10.

Then, underside of the piston 4a is then pressed by the compressed air accumulated in the return air chamber 33, and the piston 4a rapidly moves to its top dead center. The air in the piston upper chamber is released from the exhaust hole 49 to the atmosphere through the air discharge passage 29, and the fastener driving tool 1 returns to the initial state shown in FIG. 1.

FIG. 12 shows a modification to the main valve control channel 40. In the first embodiment shown in FIG. 3, the bending portion (enclosed by the circle 51) of the main valve control channel 40, is configured into the gentle arcuate shape. In the modification shown in FIG. 12, the bending portion can include at least two bent areas. In the latter case, the bending angle is preferably not less than 100°. With this arrangement, air can be smoothly flowed into the main valve chamber 8, and the air in the main valve chamber 8 can be smoothly discharged therefrom, without excessive channel resistance. As an another modification, the cross-sectional area of the trigger valve intake channel 14 can be made large such as 3.00×10⁻⁶ (m²) or 3.25×10⁻⁶ (m²). In so doing, the unit rate of flow of the compressed air entering the trigger valve chamber 13 increases, so that the time period required for the pressure increase in the trigger valve chamber 13 can be shortened.

Next, a fastener driving tool according to a second embodiment of the present invention will be described with reference to FIG. 13 to FIG. 16. The overall structure of the fastener driving tool 101 shown in FIG. 13 is substantially the same as the first embodiment except that the valve piston 9 in the first embodiment is not provided. Consequently, a detailed description will be omitted. In FIGS. 13 through 16, like parts and components are designated by reference numerals added with 100 to the reference numerals shown in FIGS. 1 through 11.

A nail gun 101 includes a frame 160, a handle 160A, a nose 141 having an injection opening 146, an accumulator 102, a cylinder 103, a piston 104a, a driver blade 104b and its tip end 104c, a return air chamber 133, one way valve 134, air channels 135, 136, a piston bumper 137, a trigger 139, a trigger valve 106 including a plunger 107, a push lever 142, a magazine 144, and a main valve 126.

The trigger valve 106 shown in FIGS. 13 and 14 mainly includes a valve bush 110, a plunger 107, and a spring 112. The valve bush 110 formed with a through hole is fixed to the frame 160 to form a trigger valve exterior frame which constitutes an outer wall of the trigger valve 106. The plunger 107 is provided reciprocably slidably with respect to the through hole of the valve bush 110. The plunger 9 has a bottom end in contact with the trigger 139. The spring 112 is interposed between the frame 160 and the plunger 107 for biasing the plunger 107 downward.

The trigger valve 106 is fluidly connected to a cylindrical main valve control channel 140 extending from a main valve chamber 108. Specifically, the main valve control channel 140 is configured such that its cross-sectional area S1 is 3.2×10⁻⁵ (m²).

In addition, an O-rings 125 is fitted on the valve bush 110 for continually blocking fluid connection between the main valve control channel 140 and an atmosphere. A trigger valve chamber 113 is defined by the frame 160 and the valve bush 110 secured to the frame 160.

The plunger 107 extends through the trigger valve chamber 113, and has an upper portion extending through a through-hole formed in the frame 160. An annular space is defined between the through-hole and the plunger 107 for serving as a main valve intake channel 120. The main valve intake channel 120 has a cross-sectional area Sm of 3.2×10⁻⁵ (m²). The cross-section extends in a direction perpendicular to the flowing direction. An O-ring 115 is fitted at the through-hole of the frame 160 for shutting off the main valve intake channel 120 when the plunger 107 is moved to its top dead center.

The plunger 107 has a lower section associated with the through hole of the valve bush 110. The lower section has an outer diameter slightly smaller than an inner diameter of the through hole of the valve bush 110 for defining an air channel 116 therebetween. This air channel 116 has a

KHD 000025

US 7,156,012 B2

17

cross-sectional area of at least $3.2 \times 0^{-5}$ (m²). An O-ring 118 is fitted onto the lower section of the valve bush 110 for closing the air channel 116 when the plunger 107 is moved to the bottom dead center. The main valve intake channel 120 and air channel 116 are alternately blocked in accordance with the sliding motion of the plunger 107.

The main valve 126 is provided at an upper end and around an outer peripheral surface of the cylinder 103 as shown in FIG. 13. The main valve 126 includes a main valve 119 and a main valve spring 128 for biasing the main valve 119 toward its bottom dead center. An discharge passage 129 is formed above the main valve 119, and an exhaust port 149 in communication with the discharge passage 129 is formed at an upper portion of the frame 160.

A main valve sectioning region 161 is provided as a part of the frame 160 for defining a main valve chamber 108 in which the main valve 119 is vertically movably disposed. The main valve chamber 108 is in communication with the main valve control channel 140.

The main valve chamber 108 is hermetically provided by O-rings (not shown). The main valve chamber 8 has an internal volume variable in accordance with the vertical movement of the main valve 119, but has a maximum volume V1 of $2.56 \times 10^{-5}$ (m³). As a result, the value obtained from dividing the volume V1 by the cross-sectional area S1 of the main valve control channel 40 is V1/S1=0.8≦1.0. Likewise, the value obtained from dividing the volume V1 by the cross-sectional area Sm of the main valve intake channel 120 is V1/Sm=0.8≦1.0. In addition, the main valve control channel 140 has a curving portion. The curving portion is formed into a gentle arcuate shape.

The nail driving operation will be described. FIGS. 13 and 14 show a state in which compressed air from the compressor (not shown) is accumulated in the accumulator 102 through the hose (not shown). In this state, as shown in FIG. 14, the plunger 107 is positioned at its bottom dead center by the biasing force of the spring 112. Since the plunger 107 is positioned at the bottom dead center, the main valve intake channel 120 is open to provide fluid communication between the accumulator 102 and the trigger valve chamber 113. At the same time, the air channel 116 is closed by the O-ring 118, so the fluid connection between the trigger valve chamber 113 and the atmosphere is blocked.

As shown in FIG. 14, since the trigger valve chamber 113 is in communication with the main valve control channel 140, a portion of the compressed air in an accumulator 102 also flows into the main valve control channel 140. Therefore, compressed air is accumulated in the main valve chamber 108 at the same pressure as in the accumulator 102.

Since the part of the compressed air in the accumulator 102 flows into the main valve chamber 108, the main valve 119 is positioned at its bottom dead center as shown in FIG. 13 as a result of downward pressing load arising from the difference in pressure receiving areas between a lower peripheral surface 142 and an upper end surface 143 of the main valve 119, along with the biasing force of the main valve spring 128.

Since the main valve 119 is positioned at the bottom dead center, the main valve 119 comes into contact with an upper end of the cylinder 103 to block fluid communication between the accumulator 102 and the piston upper space in the cylinder 103. In this case, the main valve 110 is separated from the frame 160 to open the air discharge passage 129. As a result, the piston upper chamber of the cylinder 103 is brought into communication with the atmosphere through the air discharge passage 129. Thus, the piston upper chamber assumes the atmospheric pressure. In addition, since the

18

fluid connection between the piston upper chamber and the accumulator 102 is blocked, compressed air in the accumulator 102 does not flow into the piston upper chamber. As a result, the piston 104a is maintained at its top dead center position.

FIGS. 15 and 16 show the state where the plunger 107 is pushed up to the top dead center by pulling the trigger 139 and pressing the push lever 142 against the workpiece. Since the upper portion of the plunger 107 extends through the O-ring 115, the fluid connection between the trigger valve chamber 113 and the accumulator 102 is blocked. In addition, the O-ring 118 loses its sealing effect to open the trigger valve control channel 116. As a result, the trigger valve chamber 113 and the atmosphere are fluidly connected to each other, so the inside of the trigger valve chamber 113 assumes the atmospheric pressure. The cross-sectional area of the air channel 116 is greater than that of the main valve channel 140. Thus, the channel resistance in air channel 116 is smaller than that in the main valve channel 140. The main valve control channel 140 connected to the trigger valve chamber 113 is also connected to the atmosphere, and in addition, the main valve chamber 108 connected to the main valve control channel 140 is also connected to the atmosphere and assumes the atmosphere pressure.

When the main valve chamber 108 assumes roughly the atmospheric pressure, the main valve 119 moves to its top dead center as shown in FIG. 16 because compressed air pressure is applied to the lower outer peripheral surface 147 of the main valve 119 whereas the atmospheric pressure is applied to the upper end face 143 of the main valve. When the main valve 119 begins to move toward the top dead center, the accumulator 102 and a piston upper chamber in the cylinder 103 are brought into communication with each other, so that compressed air pressure is also applied to the lower end face 148 of the main valve 119. Thus, the main valve 119 moves rapidly toward the top dead center. As a result, the top end face of the main valve 119 comes into contact with the frame 160 to close the exhaust hole 149, so that fluid communication between the piston upper chamber and the atmosphere is blocked.

In the second embodiment, similar to the first embodiment, the value obtained from dividing the maximum volume V1 of the main valve chamber 108 by the cross-sectional area S1 of the main valve control channel 140 is V1/S1=0.8. This is a design concept which, just as with the design concept in the first embodiment, was obtained as a result of recognition of the flow principle that, with fastener driving tools having valve chambers, the time period required for the pressure in these valve chambers to drop to a specific pressure due to the discharge of air can be reduced in accordance with an increase in cross-sectional area of the channels used to discharge air with respect to the volume of these valve chambers.

The relationship between V1/S1 and the time period T1 from when the pressure in the main valve chamber 108 begins to drop until the main valve 119 moves to maximum displacement is basically the same as that shown in FIG. 9. For the value in this second embodiment, even if V1/S1 is 0.8, T1 is approximately 7.0 ms. Further, even if V1/S1 is set to 1.0, T1 will be approximately 7.5 ms, which is sufficiently small in comparison with the conventional tools. With a fastener driving tool which is at least equipped with the main valve 119, the time period required for the pressure in the main valve chamber 108 to drop to a specific pressure due to the discharge of air can be reduced. Accordingly, the time period from when the trigger 139 and the push lever 142 are operated until the nailing motion occurs because of the

KHD 000026

US 7,156,012 B2

19

displacement of the main valve 119 can be reduced. Incidentally, if V1/S1 is set to 0.6, T1 can be made even smaller, about 5.0 ms. Thus, time period until the nailing motion occurs can be further shortened. These values for T1 are sufficiently smaller than those in conventional fastener driving tools.

The air in the main valve chamber 108 passes through the main valve control channel 140 and through the air channel 116 of the trigger valve 106 and is discharged into the atmosphere. In this case, since cross-sectional area of the air channel 116 is larger than that of the main valve control channel 140, the air channel 116 does not prevent the air from flowing from the main valve chamber 108 into the atmosphere. Consequently, the time period from when the trigger 139 and the push lever are operated until the main valve 119 is moved to the top dead center can be shortened.

Thus, by setting the maximum volume of the main valve chamber 108 and the cross-sectional area of the main valve control channel 140 to the aforementioned values, the compressed air in the main valve chamber 108 can be discharged quickly, so that the time period until the main valve chamber 108 assumes the atmospheric pressure can be reduced. Furthermore, a so-called air damper in the main valve chamber 108 is not readily formed because of the improvement on the shape of the main valve control channel 140 and improvement on passing of air through the air channel 116. Accordingly, the discharge of air from the main valve chamber 108 can be improved even when the main valve 119 rises to the top dead center. Consequently, the main valve 119 can be moved immediately from the bottom dead center to the top dead center.

By the movement of the main valve 119 from its bottom dead center to the top dead center, the compressed air rapidly flows from the accumulator 102 into the piston upper chamber, thereby rapidly moving the piston 104a toward its bottom dead center. Thus, the fastener is driven by the tip end 104c of the driver blade 104b connected to the piston 104a. The air in the underside of the piston 104a in the cylinder 103 flows through air channel 136 into the return air chamber 133. Further, a portion of the compressed air in the piston upper chamber also flows through the air channel 135 into the return air chamber 133, after the piston 104a is moved past the air channel 135.

When the trigger 139 is returned or the pressing of the push lever 142 against the workpiece is stopped, the plunger 107 moves to the bottom dead center because of the pressure applied to the plunger 107 from the accumulator 102 and the biasing force of the spring 112 (FIG. 14).

By the movement of the plunger 107 to the bottom dead center, the air channel 116 is closed by the O-ring 118, while the O-ring 115 loses its sealing effect. Thus, the compressed air in the accumulator 102 flows through the main valve intake channel 120 into the trigger valve chamber 113. In this case, because the trigger valve chamber 113 is in communication with the main valve control channel 140, the main valve chamber 108 is communicated with the accumulator 102 through the main valve intake channel 120. Thus compressed air is introduced into the main valve chamber 108.

As described above, the value obtained from dividing the maximum volume V1 of the main valve chamber 108 by the cross-sectional area S1 of the main valve control channel 140 is V1/S1=0.8. This value is set smaller than that of the conventional fastener driving tools. As with the design concept for the trigger valve intake channel 14, this value is determined based on the design concept that, with fastener driving tools having valve chambers, the time period

20

required for the pressure in these valve chambers to be increased to a specific pressure by the introduction of the compressed air thereinto is reduced in accordance with an increase in the cross-sectional area of the channels used for the introduction of the compressed air with respect to the volume of these valve chambers.

The graph shown in FIG. 10 is also available in the second embodiment. The lower V1/S1 becomes, the lower T1 becomes as well. Since V1/S1 is set to 0.8, T1 is approximately 7.0 ms. Consequently, the time period required for the pressure in the main valve chamber 108 to rise to a specific pressure by the introduction of compressed air thereinto can be reduced. Thus, the time period from when the main valve 119 begins to return to the pre-nailing position (toward the bottom dead center) until the main valve 119 closes the top end of the cylinder 103 can be reduced. As a result, the time period from when the trigger 139 and the push lever 142 are operated until the main valve 119 reaches its bottom dead center (until the pre-nailing state for the subsequent nail driving operation) can be reduced. Further, since the time period for the main valve 119 to be closed is reduced, the amount of compressed air flowing from the accumulator 102 to the piston upper chamber can be reduced during movement of the main valve 119 toward its bottom dead center. Incidentally, even if V1/S1 is set to 1.0, T1 will be approximately 7.5 ms, which is sufficiently small in comparison to the conventional tools. If V1/S1 is set to 0.6, T1 can be made even smaller, approximately 5.5 ms. Consequently, the time period, following nailing, for the return to the pre-nailing state can be further reduced, while the amount of compressed air which flows from the accumulator 102 to the piston upper chamber can be further decreased.

In addition, the value obtained from dividing the maximum volume V1 of the main valve chamber 108 by the cross-sectional area Sm of the main valve intake channel 120 is likewise set to V1/S1=0.8. The main valve intake channel 120 and the main valve control channel 140 become a contiguous inflow passage directing to the main valve chamber 108. In this connection, the main valve intake channel 120 should provide a performance at least equal to that of the main valve control channel 140. As a result, V1/Sm was also set to 1.0 or less. In addition, V1/S1 and V1/Sm need not be the same value provided that they are both 1.0 or less. Incidentally, there is the curved area at the main valve control channel 140. However, the curved area does not lead to a significant flow resistance because of the gentle arcuate shape in the curved area. Thus, there is no obstruction in the flow of air to be directed into the main valve chamber 108.

As a result, the compressed air can instantaneously flow into the main valve chamber 108 so that a downward pressing force is imparted on the main valve 108 because of the difference in pressure receiving areas between the lower outer peripheral surface 147 and the top end surface 143 of the main valve 119. In the second embodiment, by setting both V1/S1 and V1/Sm to 0.8, the time period required for the main valve 119 to move to the bottom dead center, that is, to return the main valve 119 to its pre-nailing position can be reduced to approximately 3.8 ms. This returning movement is also due to the pressing force arising from the compressed air flowing into the main valve chamber 108 and the biasing force of the main valve spring 128.

Upon movement of the main valve 119 to its bottom dead center, the main valve 119 is coming into contact with the upper end of the cylinder 103 to shut off fluid connection between the accumulator 102 and the piston upper chamber.

KHD 000027

US 7,156,012 B2

21

Further, immediately before the main valve 119 reaches its bottom dead center, the main valve 119 is separated from the frame 160 for providing fluid communication from the piston upper chamber with the atmosphere. As a result of the structural relationships, the main valve 119 is separated from the frame 160 prior to the complete return of the main valve 119 to the bottom dead center. In this instance, since the accumulator 102 and the piston upper chamber are not yet completely blocked from each other, the accumulator 102 is connected to the atmosphere through the piston upper chamber and the air discharge passage 129, so that the compressed air is discharged unnecessarily into the atmosphere. However, by setting V1/S1 and V1/Sm to 1.0 or less, the time period for the main valve 119 to move to the bottom dead center can be shortened, so that the unwanted consumption of the compressed air due to leakage of compressed air from the accumulator 102 to the atmosphere can be reduced as is also apparent from FIG. 10.

Then, underside of the piston 104a is then pressed by the compressed air accumulated in the return air chamber 133, and the piston 104a rapidly moves to its top dead center. The air in the piston upper chamber is released from the exhaust hole 149 to the atmosphere through the air discharge passage 129, and the fastener driving tool 1 returns to the initial state shown in FIG. 13.

In the second embodiment, the bending portion of the main valve control channel 140 is configured into the gentle arcuate shape. As a modification, the bending portion can include at least two bent areas. In the latter case, the bending angle is preferably not less than 100°. With this arrangement, air can be smoothly flowed into the main valve chamber 108, and the air in the main valve chamber 108 can be smoothly discharged therefrom, without excessive channel resistance. With this arrangement, can be reduced the first time period from operation timing of the trigger 139 and the push lever 142 to the actual driving operation, and the second time period from release timing of the plunger 107 to the timing at which the main valve 119 has returned to its pre-driving position.

A fastener driving tool according to a third embodiment of the present invention will next be described with reference to FIGS. 17 through 19. The overall structure of the fastener driving tool 201 is substantially the same as the first embodiment except that the main valve section 26 in the first embodiment is not provided. In FIGS. 17 through 19, like parts and components are designated by reference numerals added with 200 to the reference numerals shown in FIGS. 1 through 11.

A nail gun 201 includes a frame 260, a handle 260A, a nose 241 having an injection opening 246, an accumulator 202, a cylinder 203, a piston 204a, a driver blade 204b and its tip end 204c, a return air chamber 233, one way valve 234, air channels 235, 236, a piston bumper 237, a trigger 239, a trigger valve 206 including a plunger 207, and a magazine 244.

A piston upper chamber 266 is defined by the piston 204a, the cylinder 203, and the frame 260. The piston upper chamber 266 extends into an upper section of the frame 260. Further, an air channel 262 extends from the piston upper chamber 266 to the trigger valve 206.

The trigger valve 206 shown in FIGS. 17 and 18 mainly includes a valve bush 210, a valve piston 209, the plunger 207, and a spring 212. The valve bush 210 formed with a through hole is fixed to the frame 260 to form a trigger valve exterior frame which constitutes an outer wall of the trigger valve 206. The valve piston 209 is reciprocally slidably disposed in the valve bush 210. The plunger 207 is provided

22

reciprocally slidably with respect to the through hole of the valve bush 210. The plunger 207 has a bottom end in contact with the trigger 239. The spring 212 is interposed between the valve piston 209 and the plunger 207 for biasing the valve piston 209 and the plunger 207 in opposite directions, that is, the valve piston 209 is biased upward, and the plunger 207 is biased downward.

An air channel 262 having a circular cross-section is formed within the frame 260 and extends from the piston upper chamber 266. The air channel 262 is connected to the trigger valve 206. In addition, an exhaust pipe 263 is provided in the handle 206A and has one end serving as an exhaust hole 249 opened at an end face of the handle 260A. The exhaust pipe 263 is connected to the trigger valve 206 at a position below the location at which the air channel 262 is connected to the trigger valve 206. Further, in the trigger valve 206, a valve plate 264 formed with a hole is disposed at a position between the connecting position between the air channel 262 and the trigger valve 206 and the connecting position between the exhaust pipe 263 and the trigger valve 206. The valve piston 209 extends through the hole of the valve plate 264. Further, a space is defined between the hole of the valve plate 264 and the valve piston 209. The space serves as an air channel 222.

Another air channel 220 is formed at the part of the frame 260, the part serving as a part of the trigger valve 206. The air channel 220 is adapted to provide a communication between the accumulator 202 and the trigger valve 206.

One end of the valve piston 209 in the sliding direction faces the accumulator 202. A valve piston rubber 221 is fitted in the vicinity of the opening of air channel 262 and at the upper end portion (a small diameter section) of the valve piston 209. The valve piston rubber 221 is adapted to come into -contact with the frame 260 near the periphery of air channel 220 when the valve piston 209 is at its top dead center (FIG. 18), and come into contact with an area near the periphery of the center hole of the valve plate 264 when the valve piston 209 is at its bottom dead center (FIG. 19). The air channel 222 provides fluid communication between the piston upper chamber 266 and the air channel 262 when the valve piston rubber 221 is released from the valve plate 264 in accordance with the movement of the valve piston 209 to its upper dead center.

The valve piston 209 has a large diameter section provided with an O-ring 224 in sliding contact with the valve bush 210. The O-ring 224 provides sealing at the boundary between the valve piston 209 and the large diameter section.

A trigger valve chamber 213 is defined by one end (lower end) of the large diameter section of the valve piston 209 and the valve bush 210. The trigger valve chamber 213 has an internal volume variable due to the sliding movement of the valve piston 209, and is formed such that a maximum internal volume V2 defined when the valve piston 209 is at the top dead center is $4.0 \times 10^{-7}$ (m$^3$). The O-ring 224 is adapted for blocking the fluid connection between the air channel 222 and the trigger valve chamber 213.

The plunger 207 extends into the trigger valve chamber 213, and a top end faces the accumulator 2. The small diameter section of the valve piston 209 is formed with a central bore 261 in communication with the accumulator 202, and the large diameter section of the valve piston 209 is formed with a stepped bore in communication with the central bore 261. An O-ring 215 is assembled at the stepped bore.

The plunger 207 has a small diameter section in association with the stepped bore. The outer diameter of the small diameter section of the plunger 207 is smaller than an inner

KHD 000028

US 7,156,012 B2

23

diameter of the stepped bore. The small diameter section of plunger **207** is slidingly engagable with the O-ring **215** (FIG. 19) when the plunger **207** is moved to its top dead center. A trigger valve intake channel **214** is defined by the central bore **261**.

The plunger **207** has a large diameter section provided with an O-ring **218** and in association with the through hole of the valve bush **210**. An outer diameter of the large diameter section of the plunger **207** is smaller than an inner diameter of the through hole of the valve bush **210** to thus define a trigger valve control channel **216**.

Consequently, the trigger valve intake channel **214** provides fluid communication between the accumulator **202** and the trigger valve chamber **213** when the small diameter section of the plunger **207** is disengaged from the O-ring **215**. Further, the trigger valve control channel **216** provides fluid communication from the trigger valve chamber **213** to the atmosphere when the O-ring **218** is out of contact from the valve bush **210**. The trigger valve intake channel **214** and trigger valve control channel **216** are alternately opened and blocked in accordance with the sliding motion of the plunger **207**.

The trigger valve intake channel **214** is formed such that its cross-sectional area St is $2.75{\times}10^{-6}$ (m²). Further, the trigger valve control channel **216** is formed such that its cross-sectional area S2 is $1.98{\times}10^{-6}$ (m²). As a result, the value obtained from dividing the maximum volume of the trigger valve chamber **213** by the cross-sectional area of the trigger valve control channel **216** is V2/S2=0.2.

The structure of the trigger valve **206** is such that, when the valve piston **209** is positioned at the top dead center (FIG. 18), the valve piston rubber **221** is in abutment with the frame **260** near the air channel **220**. Since the air channel **220** is closed by the valve piston rubber **221**, the communication between the accumulator **202** and the piston upper chamber **266** through the air channels **262** and **220** is blocked. Further, the air channel **222** is opened to allow fluid communication between the piston upper chamber **266** and the exhaust pipe **263** through the air channels **262**, **220**,222. On the other hand, when the valve piston **209** is positioned at the bottom dead center (FIG. 19), the valve piston rubber **221** is seated on the valve plate **264** to close the air channel **222**. Thus, fluid communication between the piston upper chamber **266** and the exhaust pipe **263** is shut off. Further, the air channel **220** is opened to provide fluid communication between the accumulator **202** and the piston upper chamber **266** through the air channels **262** and **220**.

When the plunger **207** is positioned at the top dead center (FIG. 19), the trigger valve control channel **216** is opened so that the trigger valve chamber **213** is communicated with the atmosphere, while the trigger valve intake channel **214** is closed by the O-ring **215** so that fluid communication between the accumulator **202** and the trigger valve chamber **213** is blocked. On the other hand, when the plunger **207** is positioned at its bottom dead center (FIG. 18), the trigger valve control channel **216** is closed by the O-ring **218**, so that fluid communication between the trigger valve chamber **213** and the atmosphere is blocked, while the trigger valve intake channel **214** is opened so that the accumulator **202** and the trigger valve chamber **213** are communicated with each other.

The nail driving operation will be described. FIGS. **17** and **18** show a state in which compressed air from the compressor (not shown) is accumulated in the accumulator **202** through the hose (not shown). In this state, as shown in FIG. **18**, the plunger **207** is positioned at its bottom dead center by the biasing force of the spring **212**. Since the plunger **207**

24

is positioned at the bottom dead center, the main valve intake channel **214** is open to provide fluid communication between the accumulator **202** and the trigger valve chamber **213**. At the same time, the trigger valve control channel **216** is closed by the O-ring **218**, so the fluid connection between the trigger valve chamber **213** and the atmosphere is blocked.

In this case, because of the biasing force of the spring **212** and the difference in pressure receiving areas between the lower end area and the upper end area of the valve piston **210**, the valve piston **209** is positioned at its top dead center. Therefore, air channel **220** is closed by the valve piston rubber **221** to shut off communication between the accumulator **202** and the air channel **262**. At the same time, since the air channel **222** is opened by the valve piston rubber **221**, the air channel **262** and the exhaust pipe **263** are fluidly connected to each other. Thus, the piston upper chamber **266** assumes the atmospheric pressure, and the piston **204**a is positioned at its top dead center as shown in FIG. **17**.

FIG. **19** shows the state where the plunger **207** is pushed up to the top dead center by pulling the trigger **239**. In this state, the O-ring **218** loses its sealing effect to open the trigger valve control channel **216**. As a result, the trigger valve chamber **213** and the atmosphere are fluidly connected to each other, so the trigger valve chamber **213** assumes the atmospheric pressure. Further, since the trigger valve intake channel **214** is closed by the O-ring **215**, fluid communication between the accumulator **202** and the trigger valve chamber **213** is blocked.

Since the pressure in the trigger valve chamber **213** becomes atmospheric pressure, pressure difference is provided between the accumulator side and the trigger valve chamber side of the valve piston **209**. Thus, the valve piston **209** is moved to its bottom dead center.

The relationship between V2/S2 and the time period T2 from when the pressure in the trigger valve chamber **213** begins to drop until the valve piston **209** moves to maximum displacement is basically the same as that shown in FIG. **6**. In the third embodiment, if V2/S2 is 0.2, the time period for the valve piston **209** to move from its top dead center to its bottom dead center is approximately 0.75 ms. With a fastener driving tool which is at least equipped with the valve piston **209**, by making the cross-sectional area of the trigger valve used to discharge the air larger with respect to the volume of the trigger valve **213**, the time period required for the pressure in the trigger valve chamber **213** to drop to a specific pressure because of the discharge of air can be decreased. Accordingly, the time period from when the plunger **207** is pressed until the valve piston **209** moves to maximum displacement can be shortened. As a result, the time period from when the trigger **239** is operated until the nailing motion occurs due to the displacement of the valve piston **209** can be shortened. Incidentally, if V2/S2 is set to 0.15, T2 can be made even smaller, and if V2/S2 is set to 0.10, T2 can be made smaller still. These values for T2 are sufficiently smaller than those in conventional fastener driving tools.

Thus, by setting the maximum volume V2 of the trigger valve chamber **213** and the cross-sectional area S2 of the trigger valve control channel **216** to the aforementioned values, discharge of the compressed air from the trigger valve chamber **213** can be promptly performed, and the time period until the trigger valve chamber **213** assumes the atmospheric pressure can be reduced. Furthermore, since the discharge of air from the trigger valve chamber **213** can be improved when the valve piston **209** is moved to the bottom dead center, a so-called air damper in which the pressure in

KHD 000029

US 7,156,012 B2

25

the trigger valve chamber **213** impedes the movement of the valve piston **209** is not readily formed. Accordingly, the valve piston **209** can be moved immediately from the top dead center to the bottom dead center without being interrupted by the air damper. Incidentally, even though the valve piston **209** is biased toward the top dead center by the spring **212**, the valve piston **209** is movable to the bottom dead center against the biasing force because of the pressure difference since the biasing force of the spring **212** is set beforehand to be weaker than the force caused by the pressure difference.

As shown in FIG. **19**, when the valve piston **209** reaches its bottom dead center, the air channel **222** is closed by the valve piston rubber **221** to block fluid communication between the air channel **262** and the exhaust pipe **263**. At the same time, the air channel **220** is opened by the valve piston rubber **221**, so that the accumulator **202** and air channel **262** are fluidly connected to each other. Thus, air flows from the accumulator **202** into the piston upper chamber **266**, and the piston upper chamber **266** provides the pressure level the same as that in the accumulator **202**. In this instance, since the pressure in the piston upper chamber **266** becomes greater than the pressure in the piston lower chamber in the cylinder **203**, the piston **204***a* moves rapidly to its bottom dead point. Thus, the fastener is driven by the tip end **204***c* of the driver blade **204***b*. The air in the underside of the piston **204***a* in the cylinder **203** flows through an air channel **236** into the return air chamber **233**. Further, a portion of the compressed air in the piston upper chamber **266** flows through the air channel **235** into the return air chamber **233**, after the piston **204***a* is moved past the air channel **235**.

When the trigger **207** is returned, the plunger **207** moves to its bottom dead center because of the pressure applied from the accumulator **202** and the biasing force of the spring **212**. In this case, as described above, the cross-sectional area St of the trigger valve intake channel **214** is set to $2.75 \times 10^{-6}$ (m²), which is relatively larger than that of the conventional tool. This is due to a design concept in that the mass rate of flow is proportional to the cross-sectional area of the tube. That is, it is based on the discovery that, with fastener driving tools having valve chambers, the time period required for the pressure in these valve chambers to be increased to a specific pressure due to introduction of the compressed air thereinto is reduced in accordance with an increase in the cross-sectional area of the channels used for the introduction of the compressed air with respect to the volume of these valve chambers.

At this point, since the cross-sectional area St of the trigger valve intake channel **214** is set to $2.75 \times 10^{-6}$ (m²), the pressure in the trigger valve chamber **213** instantaneously rises. As a result, the time period required for the pressure in the trigger valve chamber **213** to rise to a specific pressure due to the flow of compressed air can be decreased. Thus, the time period from when the pressing force on the plunger **207** ceases until the valve piston **209** returns to the pre-nailing position can be shortened. The valve piston rubber **221** provided on the valve piston **209** comes into contact with the frame **260** at the top dead center of the valve piston **209**, and comes into contact with the valve plate **264** at the bottom dead center of the valve piston **209**. Therefore, a fluid connection between the piston upper chamber **266** and the accumulator **202**, and a fluid connection between the piston upper chamber **266** and the exhaust pipe **263** is alternately provided.

However, in more detailed aspect, during the movement of the valve piston **209** from its bottom dead center to its top dead center, the valve piston rubber **264** is out of contact

26

from the frame **260** and from the valve plate **264**. Accordingly, the connection between the piston upper chamber **266** and the accumulator **202** and the connection between the piston upper chamber **266** and the atmosphere can be simultaneously formed. As a result, the accumulator **202** and the atmosphere are connected, and the compressed air in the accumulator **202** is discharged into the atmosphere even during the movement of the valve piston **209** from its bottom dead center to its top dead center, which results in a waste of compressed air. However, since the valve piston **209** in the third embodiment can move from the bottom dead center to the top dead center more quickly than with the conventional tools, the amount of wasted compressed air which is unnecessarily discharged can be reduced.

At that point, the air channel **220** is closed by the valve piston rubber **221** to block communication between the accumulator **202** and the air channel **262**. Thus, the flow of air from the accumulator **202** to the piston upper chamber **266** stops. In addition, air channel **222** is opened, so that air channel **262** and the exhaust pipe **263** are fluidly connected to each other. As a result, the air which has been accumulated in the piston upper chamber **266** is discharged to the atmosphere through the air channel **262**, **222**, exhaust pipe **263** and the exhaust hole **249**. Thus, the piston upper chamber **266** assumes the atmospheric pressure.

Consequently, the piston **204***a* moves rapidly to the top dead point because the bottom of the piston **204***a* is imparted with a pressing force by the compressed air accumulated in the return air chamber **233**, and the fastener driving tool **201** returns to the state shown in FIG. **17**. Incidentally, the cross-sectional area of the trigger valve intake channel **214** can be made larger such as $3.00 \times 10^{-6}$ (m²) or $3.25 \times 10^{-6}$ (m²). With this arrangement, the unit rate of flow of the compressed air entering the trigger valve chamber **213** increases, so that the time period required for the pressure increase in the trigger valve chamber **213** can be shortened.

Characteristic in nailing motion of the fastener driving tool according to the first embodiment will be described chronologically in comparison with a comparative fastener driving tool. In the graph shown in FIG. **20**, the characteristics of the process of driving a nail into wood are shown for the fastener driving tool **1** involved in the first embodiment, and in the graph shown in FIG. **21**, the characteristics of the process of driving a nail into wood with a fastener driving tool are shown for the comparative fastener driving tool.

In these graphs, the x-axis represents time, and y-axis in FIG. **20**(*a*) represents pressure in the trigger valve chamber **13**, the main valve chamber **8**, the accumulator **2**, the piston **4***a* upper chamber, and the return chamber **33** in the fastener driving tool according to the first embodiment. Further, Y-axes in FIGS. **20**(*b*) through **20**(*d*) represent a displacement of the main valve **19**, a displacement of the valve piston **9**, and a displacement of the piston **4***a* according to the first embodiment. Here, the origin of the x-axis (0 ms) represents the time at which the plunger **7** is pressed and the pressure in the trigger valve chamber **13** begins to drop. The same is true with respect to FIGS. **21**(*a*) through (*d*) for the comparative fastener driving tool.

The dimensions in the comparative fastener driving tool involved in the nailing process were: maximum main valve chamber volume V1'=$2.56 \times 10^{-5}$ (m³); main valve control channel cross-sectional area S1'=$0.8 \times 10^{-5}$ (m²); V1'/S1'=3.2; maximum trigger valve chamber volume V2'=$4.0 \times 10^{-7}$ (m³); trigger valve control channel cross-sectional area S2'=$0.465 \times 10^{-6}$ (m²); V2'/S2'=0.86. The dimensions in the fastener driving tool involved in the first embodiment were:

KHD 000030

US 7,156,012 B2

27

maximum main valve chamber **8** volume V1=$2.56\times10^{-5}$ (m$^3$); main valve control channel **40** cross-sectional area S1=$3.2\times10^5$ (m$^2$); V1/S1=0.8; maximum trigger valve chamber **13** volume V2=$4.0\times10^{-7}$ (m$^3$); trigger valve control channel **16** cross-sectional area S2=$1.98\times10^{-6}$ (m$^2$); V2/S2=0.2.

In FIGS. **20** and **21**, A and A' represent the timing at which pressure drop in the trigger valve chamber **13** is started, B and B' represent the timing at which the pressure in the trigger valve chamber **13** becomes atmospheric pressure, C and C' represents the timing at which the movement of the main valve **19** toward its upper dead center is started, D and D' represent the timing at which the main valve **19** reaches its top dead center, E and E' represent the timing at which movement of the valve piston **9** toward its bottom dead center is started, F and F' represent the timing that the valve piston **9** reaches its bottom dead center, and G and G' represent the timing at which the piston **4a** reaches its bottom dead center.

By pressing the plunger **7**, the pressure in the trigger valve chamber **13** drops and, in conjunction with this pressure change, the valve piston **9** begins to be displaced from the top dead center. At that point, since V2/S2=0.2 in the first embodiment has been set smaller than the value V2'/S2'=0.86 in the comparative tool, so the compressed air in the trigger valve chamber **13** can be instantaneously discharged through the trigger valve control channel **16** into the atmosphere. As a result, only 3.0 ms was required for the pressure drop to the atmosphere in the trigger valve chamber **13**, whereas 11.3 ms was required for the pressure drop in the comparative tool (see B and B'). Further, only 0.74 ms was required for moving the valve piston **9** to its bottom dead center in the first embodiment whereas 0.85 ms was required for the movement in the comparative tool (see F and F').

Because of the displacement of the valve piston **9** toward its bottom dead center, the O-ring **23** loses its sealing effect, so that the air channel **22** and the main valve control channel **40** are fluidly connected to each other and the pressure in the main valve chamber **8** begins to drop. At that point, since V1/S1=0.8 in the first embodiment is smaller than V1'/S1'=3.2 in the comparative tool, the compressed air in the main valve chamber **8** can be instantaneously discharged through the main valve control channel **40** and the air channel **22** into the atmosphere. As a result, 22.4 ms was required for the pressure drop in the conventional main valve chamber to the minimum value for starting movement of the main valve from its bottom dead center. On the other hand, only 6.1 ms was required for the pressure drop in the main valve chamber **8** to the minimum value for starting movement of the main valve **19** from its bottom dead center (see C and C'). During this period, the pressure in the main valve chamber **8** rises temporarily due to the displacement of the main valve **19**. However, since the cross-sectional area of the air channel **22** was set to be smaller than the cross-sectional area of the main valve control channel **40**, excessive back-pressure is not applied to the main valve chamber **8**. Then, the main valve **19** in the first embodiment reaches the top dead point after 7.1 ms (see D).

By the movement of the main valve **19** toward its top dead center, the compressed air flows from the accumulator **2** to the piston upper chamber, so that the piston upper chamber becomes highly pressurized. Due to the pressure difference between the upper chamber and lower chamber of the piston **4a**, the piston **4a** drops to the bottom dead center for driving the fastener **5**. As a result of this, the process from when the worker pulls the trigger **39** until the fastener **5** is driven in

28

completed. In the first embodiment, the process only requires 11.3 ms, whereas the comparative tool requires 27.1 ms (see F and F'). This difference clearly represents an improvement on the nailing response.

In addition, as a result of experimentation using a variety of fastener driving tools and investigating what degree of improvement in the response was sufficient for the effect to be perceived, it was found that if nailing occurred within 12 ms after the trigger is pulled and the push lever was pressed against the workpiece, the response was perceived to be good, the work became easy to perform, and it became easy to drive fasteners in a continuous manner. Moreover, it was found that as this amount of time grew longer, the response gradually grew worse, and in the vicinity of the 27.1 ms of the conventional tool, the work became difficult to perform and it became difficult to drive fasteners in a continuous manner. From this perspective as well, the response was improved, and the work performance was improved as well based on the fastener driving tool **1** in the first embodiment.

Next, an entire one-shot process starting from the pushing timing of the plunger **7** to the recovery timing to the initial state for starting the next nail driving operation will be described with reference to FIGS. **22**(a) through **23**(e). These graphs are particularly useful for the explanation of the process of returning to the initial state.

In these graphs, the x-axis represents time, and y-axis in FIG. **22**(a) represents pressure in the trigger valve chamber **13**, the main valve chamber **8**, the accumulator **2**, the piston **4a** upper chamber, and the return chamber **33** in the fastener driving tool according to the first embodiment. Further, Y-axes in FIGS. **22**(b) through **22**(d) represent a displacement of the main valve **19**, a displacement of the valve piston **9**, a displacement of the piston **4a**, and a displacement of a tool itself according to the first embodiment. Here, the origin of the x axis (0 ms) represents the time at which the plunger **7** is pressed and the pressure in the trigger valve chamber **13** begins to drop. The same is true with respect to FIGS. **23**(a) through (e) for another comparative fastener driving tool.

The dimensions in the comparative fastener driving tool involved were; maximum main valve chamber volume V1'=$2.621\times10^{-5}$ (m$^3$); main valve control channel cross-sectional area S1'=$1.963\times10^{-5}$ (m$^2$); V1'/S1'=1.335; main valve intake channel cross-sectional area Sm'=$0.41\times10^{-5}$ (m$^2$); V1'/Sm'=6.5; trigger valve intake channel cross-sectional area St'=$1.78\times10^{-6}$ (m$^2$). The dimensions in the fastener driving tool involved in the first embodiment were: maximum main valve chamber **8** volume V1=$2.56\times10^{-5}$ (m$^3$); main valve control channel **40** cross-sectional area S1=$3.2\times10^5$ (m$^2$); V1/S1=0.8; main valve intake channel **20** cross-sectional area Sm=$3.2\times10^5$ (m$^2$); V1/Sm=0.8; trigger valve intake channel cross-sectional area St=$2.75\times10^{-6}$ (m$^2$).

In FIGS. **22**(a) through **23**(e), A through G and A' through G' are the same as those shown in FIGS. **20**(a) through **21**(d). H and H' represent the timing at which the returning motion of the main valve is started. I and I' represent the timing at which the main valve is returned to its initial position. J and J' represent the timing at which the returning motion of the valve piston is started. K and K' represent the timing at which the valve piston is returned to its initial position. L and L' represent the timing at which the piston is returned to its initial position. M and M' represent the timing at which the entire tool is displaced by a maximum amount.

In the first embodiment, 6.9 ms was required for starting nail driving by starting the movement of the piston **4a** whereas the comparative tool required 22.2 ms for the

KHD 000031

US 7,156,012 B2

29

30

starting (see FIGS. 22(d) and 23(d)). In reaction to the movement of the piston, the tool body itself begins to move upward. Subsequently the piston 4a reaches the bottom dead center, and nailing was completed after 11.3 ms in the first embodiment, as opposed to after 26.9 ms in the comparative tool. The upward displacement of both the fastener driving tool 1 and the comparative tool at this point was 5 mm. Further, in the first embodiment, the upward displacement of the tool itself reached 10 mm at 18.6 ms, whereas in the comparative tool, the upward displacement of the tool itself reached 10 mm at 35.1 ms (see FIGS. 22(e) and 23(e)).

At this point, the relative position between the push lever 42 and the nose 41 was restored to the initial position, and the plunger 7 which has been biased upward by the push lever 42 is returned to its initial position. In the first embodiment, the valve piston 9 began to move due to the pressure of the accumulator 2 and the pressing force of the spring 12 at 18.6 ms, and the valve piston 9 was returned to the initial position at 20.3 ms. On the other hand, in the comparative tool, the valve piston began to move at 35.2 ms, and returned to the initial position at 37.4 ms (See FIGS. 22(c) and 23(c)).

By the movement of the valve piston 9, the compressed air in the accumulator 2 flows into the main valve chamber 8 through the main valve intake channel 20 and the main valve control channel 40. As a result in the first embodiment, the main valve 19 began to move at 21.4 ms, whereas in the comparative tool, the main valve 19' began to move at 38.9 ms (see H and H'). In addition, in the first embodiment, the main valve 19 was returned to the initial position at its bottom dead center at 25.2 ms, whereas in the comparative tool, the main valve 19' was returned to the initial position at its bottom dead center at 44.3 ms (see I and I'). Simultaneously, the compressed air filled in the piston upper chamber is released to the atmosphere through air channel 29 and the exhaust hole 49, and the tool was returned to the initial state.

As described above, in the first embodiment, the time period from the moment when either the pulling of the trigger 39 is released or the pressing of the push lever 42 against the workpiece is released (18.6 ms) until the main valve is closed (25.2 ms) was 25.2 ms−18.6 ms=6.6 ms. On the other hand, in the comparative tool, the time period was 44.3 ms−35.2 ms=9.1 ms.

In addition, experimentations were conducted using a variety of fastener driving tools for investigating how much the time period needed to be shortened in order for a sufficient improvement on response to be perceived, the time period being from the moment when either the pressing of the trigger 39 was released or the pressing of the push lever 42 against the workpiece is released until the main valve is closed. As a result of experiments, it was found that if the time period is within 7 ms, the response was perceived to be extremely good facilitating driving work and continuous driving.

Therefore, since the first embodiment requires the time period of within 7 ms, the transition to the next nailing operation can proceed rapidly to improve the response. In addition, because of the prompt closure of the main valve, unnecessary air consumption can be avoided.

While the invention has been described in detail with reference to specific embodiments thereof, it would be apparent to those skilled in the art that various changes and modifications may be made therein without departing from the spirit and scope of the invention.

What is claimed is:

1. A fastener driving tool comprising:
a frame defining therein an accumulator that accumulates a compressed air;
a cylinder disposed within the frame;
a piston reciprocally slidably disposed within the cylinder, a piston upper chamber being defined by an inner peripheral surface of the cylinder and an upper surface of the piston;
a main valve which alternately opens and blocks a fluid communication between the piston upper chamber and the accumulator;
a main relative position chamber section defining therein a main valve chamber in which the main valve is movably disposed, the main valve chamber providing a maximum internal volume;
a trigger valve which alternately opens and blocks a fluid communication from the accumulator to the main valve chamber, and a fluid communication from the main valve chamber to atmosphere; and
a main valve control channel section defining therein a main valve control channel that provides a fluid connection between the main valve chamber and the trigger valve, the main valve control channel having a cross-sectional area, a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² being not more than 1.0.

2. The fastener driving tool as claimed in claim 1, further comprising:
a push lever in pressure contact with a workpiece; and
a trigger functioning as an operation input member; and
wherein the main valve is reciprocally movably provided in the main valve chamber for alternately providing a fluid communication between the piston upper chamber and the accumulator and between the piston upper chamber and the atmosphere; and
wherein the trigger valve comprises:
a trigger valve exterior frame to which the main valve control channel is fluidly connected;
a valve piston reciprocally slidably disposed within the trigger valve exterior frame and having one end exposed to the accumulator and another end, the valve piston being movable between a top dead center and a bottom dead center, a main valve intake channel being defined between the valve piston and the trigger valve exterior frame for providing fluid connection between the accumulator and the main valve control channel when the valve piston is moved to the upper dead center, and an air discharge channel being defined between the valve piston and the trigger valve exterior frame for providing fluid connection between the main valve control channel and the atmosphere when the valve piston is moved to the bottom dead center, a main valve intake channel and the air discharge channel being alternately opened; and
a plunger movable in an axial direction thereof between its top dead center and its bottom dead center and extending through the valve piston and the trigger valve exterior frame, a trigger valve chamber being defined by the trigger valve exterior frame, the another end of the valve piston and the plunger, the air discharge channel having a cross-sectional area not less than the cross-sectional area of the main valve control channel.

3. The fastener driving tool as claimed in claim 2, wherein the main valve intake channel has a cross-sectional area, a

US 7,156,012 B2

31

ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve intake channel measured in m² being not more than 1.0.

**4.** The fastener driving tool as claimed in claim **2**, wherein the plunger has a first section exposed to the accumulator and extending through the valve piston, and a second section extending through the trigger valve exterior frame, a trigger valve intake channel being defined between the first section and the valve piston for providing a fluid connection between the accumulator and the trigger valve chamber when the plunger is moved to its bottom dead center, and a trigger valve control channel being defined between the second section and the trigger valve exterior frame for providing a fluid connection between the trigger valve chamber and the atmosphere when the plunger is moved to its top dead center, the trigger valve intake channel and the trigger valve control channel being alternately opened.

**5.** The fastener driving tool as claimed in claim **4**, wherein the trigger valve intake channel has a cross-sectional area of not less than 3.00×10⁻⁶ m².

**6.** The fastener driving tool as claimed in claim **4**, wherein the trigger valve intake channel has a cross-sectional area of not less than 3.25×10⁻⁶ m².

**7.** The fastener driving tool as claimed in claim **4**, wherein the trigger valve intake channel has a cross-sectional area of not less than 2.75×10⁻⁶ m².

**8.** The fastener driving tool as claimed in claim **2**, wherein a ratio obtained from dividing a maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² is not more than 0.20.

**9.** The fastener driving tool as claimed in claim **8**, wherein a ratio obtained from dividing the maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² is not more than 0.15.

**10.** The fastener driving tool as claimed in claim **9**, wherein a ratio obtained from dividing the maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² is not more than 0.10.

**11.** The fastener driving tool as claimed in claim **2**, wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.8, and

wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by a cross-sectional area of the main valve intake channel measured in m² is not more than 0.8.

**12.** The fastener driving tool as claimed in claim **2**, wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.6, and

wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve intake channel measured in m² is not more than 0.6.

**13.** The fastener driving tool as claimed in claim **2**, wherein the main valve control channel has a curving portion along its path, the curving portion being composed of one of a continuous arcuate portion and discontinuous two bending portions.

32

**14.** The fastener driving tool as claimed in claim **13**, wherein the two bending portions provide bending angles of not less than 100°.

**15.** The fastener driving tool as claimed in claim **2**, wherein a ratio obtained from dividing the maximum volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.8.

**16.** The fastener driving tool as claimed in claim **2**, wherein a ratio obtained from dividing the maximum volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.6.

**17.** The fastener driving tool as claimed in claim **1**, further comprising:

a push lever in pressure contact with a workpiece; and

a trigger functioning as an operation input member; and

wherein the main valve is reciprocably movably provided in the main valve chamber for alternately providing a fluid communication between the piston upper chamber and the accumulator and between the piston upper chamber and the atmosphere; and

wherein the trigger valve comprises:

a trigger valve frame to which the main valve control channel is fluidly connected, the trigger valve frame having a first through hole serving as a main valve intake channel and exposed to the accumulator and a second through hole; and

a plunger movable in an axial direction thereof between its top dead center and its bottom dead center relative to the trigger valve frame, the plunger having a first section closing the first through hole when the plunger is moved to its upper dead center for closing the main valve intake channel to shut off fluid communication between the accumulator and the main valve control channel and opening the main valve intake channel to provide communication between the accumulator and the main valve control channel, the plunger also having a second section extending through the second trough hole, an air discharge channel being defined between the second through hole and the second section, the air discharge channel being opened when the plunger is moved to its top dead center to provide fluid communication between the main valve control channel and the atmosphere and being closed when the plunger is moved to its bottom dead center, the main valve intake channel and the air discharge channel being alternately opened by the movement of the plunger.

**18.** The fastener driving tool as claimed in claim **17**, wherein the main valve intake channel has a cross-sectional area, a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve intake channel measured in m² being not more than 1.0.

**19.** The fastener driving tool as claimed in claim **18**, wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.8, and

wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve intake channel measured in m² is not more than 0.8.

**20.** The fastener driving tool as claimed in claim **18**, wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by

KHD 000033

US 7,156,012 B2

33

the cross-sectional area of the main valve control channel measured in m² is not more than 0.6, and

wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve intake channel measured in m² is not more than 0.6.

**21.** The fastener driving tool as claimed in claim **17,** wherein the main valve control channel has a curving portion along its path, the curving portion being composed of one of a continuous arcuate portion and discontinuous two bending portions.

**22.** The fastener driving tool as claimed in claim **21,** wherein the two bending portions provide bending angles of not less than 100°.

**23.** The fastener driving tool as claimed in claim **17,** wherein the air discharge channel has a cross-sectional area equal to or greater than that of the main valve control channel.

**24.** The fastener driving tool as claimed in claim **17,** wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.8.

**25.** The fastener driving tool as claimed in claim **17,** wherein a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m³ by the cross-sectional area of the main valve control channel measured in m² is not more than 0.6.

26. A fastener driving tool comprising:

a frame defining therein an accumulator for accumulating a compressed air;

a cylinder disposed within the frame;

a piston reciprocally slidably disposed within the cylinder, a piston upper chamber being defined by the frame, an inner peripheral surface of the cylinder and an upper surface of the piston;

a trigger functioning as an operation input member;

a trigger valve alternately opening and blocking a fluid communication between the piston upper chamber and the accumulator and a fluid communication between the piston upper chamber and an atmosphere, the trigger valve comprising:

a trigger valve exterior frame in fluid communication with the piston upper chamber and formed with a through hole;

a valve piston reciprocably slidably disposed in the trigger valve exterior frame, the valve piston being movable between its top dead center where piston upper chamber is communicated with the atmosphere and its bottom dead center where the piston upper chamber is communicated with the accumulator, the valve piston having a first section exposed to the accumulator and formed with a trigger valve intake channel opened to the accumulator and a second section in sliding contact with the trigger valve exterior frame, a trigger valve chamber being defined by the second section and the trigger valve exterior frame, and providing a maximum internal volume; and

a plunger movable between its top dead center and its bottom dead center and having a first portion associated with the valve piston and a second portion associated with the through hole, a trigger valve control channel being formed between the second portion and the through hole and having a cross-sectional area, the trigger valve control channel being opened when the plunger is moved to its top

34

dead center, a ratio obtained from dividing the maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² being not more than 0.20.

**27.** The fastener driving tool as claimed in claim **26,** wherein the ratio obtained from dividing the maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² is not more than 0.15.

**28.** The fastener driving tool as claimed in claim **26,** wherein the ratio obtained from dividing the maximum volume of the trigger valve chamber measured in m³ by the cross-sectional area of the trigger valve control channel measured in m² is not more than 0.1.

**29.** A fastener driving tool comprising:

a frame defining therein an accumulator for accumulating a compressed air;

a cylinder disposed within the frame;

a piston reciprocally slidably disposed within the cylinder, a piston upper chamber being defined by the frame, an inner peripheral surface of the cylinder and an upper surface of the piston;

a trigger functioning as an operation input member;

a trigger valve alternately opening and blocking a fluid communication between the piston upper chamber and the accumulator and a fluid communication between the piston upper chamber and an atmosphere, the trigger valve comprising:

a trigger valve exterior frame in fluid communication with the piston upper chamber and formed with a through hole;

a valve piston reciprocably slidably disposed in the trigger valve exterior frame, the valve piston being movable between its top dead center where piston upper chamber is communicated with the atmosphere and its bottom dead center where the piston upper chamber is communicated with the accumulator, the valve piston having a first section exposed to the accumulator and formed with a trigger valve intake channel opened to the accumulator and a second section in sliding contact with the trigger valve exterior frame, a trigger valve chamber being defined by the second section and the trigger valve exterior frame and providing a maximum internal volume; and

a plunger movable between its top dead center and its bottom dead center and having a first portion associated with the valve piston and a second portion associated with the through hole, a trigger valve control channel being formed between the second portion and the through hole and having a cross-sectional area, the trigger valve control channel being opened when the plunger is moved to its top dead center, the trigger valve intake channel having a cross-sectional area of not less than $2.75 \times 10^{-6}$ m², and the trigger valve chamber having a maximum internal volume of $4.0 \times 10^{-7}$ m³.

**30.** The fastener driving tool as claimed in claim **29,** wherein the trigger valve intake channel has the cross-sectional area of not less than $3.00 \times 10^{-6}$ m².

**31.** The fastener driving tool as claimed in claim **29,** wherein the trigger valve intake channel has the cross-sectional area of not less than $3.25 \times 10^{-6}$ m².

* * * * *

KHD 000034

**EXHIBIT 4**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/088,524 | 03/28/2008 | Hideki Ishida | 085819-0037 | 2007 |

20277          7590          06/21/2011
MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC 20005-3096

| EXAMINER |
|---|
| DURAND, PAUL R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3721 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/21/2011 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

mweipdocket@mwe.com

PTOL-90A (Rev. 04/07)

KHD 001079

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 12/088,524 | ISHIDA ET AL. |
| | Examiner | Art Unit | |
| | PAUL DURAND | 3721 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>14 April 2011</u>.
2a) ☒ This action is **FINAL**.  2b) ☐ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) <u>1,2,5,8-15 and 17-20</u> is/are pending in the application.
  4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) <u>1,2,5,8-15 and 17-20</u> is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☒ The drawing(s) filed on <u>28 March 2008</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  a) ☒ All  b) ☐ Some * c) ☐ None of:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☒ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
  * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)   **Office Action Summary**   Part of Paper No./Mail Date 20110615

KHD 001080

Application/Control Number: 12/088,524                                    Page 2

Art Unit: 3721

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

2.      Claims 1, 2, 5, 8-15 and 17-20 are rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention.

In claims 1, 5, 17 and 18, the examiner cannot find support in the disclosure which identifies the newly added recitation of the battery supporting unit being provided on an end of the handle.

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

3.      Claims 1, 2, 5, 8-15 and 17-20  are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

In claims 1, 5, 17, 18 and 20, the limitation regarding the side view of the too in a downward position is indefinite in that it is unclear what downward encompasses and the relation of this position to the tool overall.  The downward position can be varied by the actual position of the tool and the position of the user.

KHD 001081

Application/Control Number: 12/088,524                                      Page 3
Art Unit: 3721

In claims 1, 5, 17 and 18, it is unclear to the examiner what the battery

supporting structure encompasses.


### Response to Arguments

4.      Applicant's arguments with respect to the claims have been considered but are

moot in view of the new ground(s) of rejection.


### Conclusion

5.      Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

KHD 001082

Application/Control Number: 12/088,524                                    Page 4
Art Unit: 3721

6.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to PAUL DURAND whose telephone number is (571)272-4459.  The examiner can normally be reached on IFP.

       If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Rinaldi I. Rada can be reached on 571-272-4467.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

       Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/PAUL R. DURAND/
Primary Examiner, Art Unit 3721
June 16, 2011

KHD 001083

Docket No.: 085819-0037                                    **PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of | : | Customer Number: 20277 |
| Hideki ISHIDA, et al. | : | Confirmation Number: 2007 |
| Application No.: 12/088,524 | : | Group Art Unit: 3721 |
| Filed: March 28, 2008 | : | Examiner: DURAND, PAUL R. |
| For: PORTABLE FASTENING TOOL | : | |

### RESPONSE UNDER 37 C.F.R. § 1.116

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the Office Action dated June 21, 2011, wherein a three-month shortened statutory period for response is set to expire on September 21, 2011, Applicants respectfully request reconsideration of the above-identified application in view of the following amendments and remarks.

Attachment: Replacement Sheets (2)

DM_US 29686047-1.085819.0037

KHD 001087

Application No.: 12/088,524

## AMENDMENT TO THE SPECIFICATION

*Please amend the paragraph beginning at page 7, line 10 of the specification as follows:*

In an electric fastening tool 1 according to this embodiment, numeral 2 designates a housing made of a resin and acting as an exterior member. This housing 2 is constituted to include a generally cylindrical trunk portion 2A, and a handle portion 2B jointed generally in the shape of letter T, as viewed in a side view, to the trunk portion 2A. At the trailing end portion of the handle portion 2B (or at the free end portion on the side opposed to the trunk portion 2A) of the housing 2, moreover, there is disposed a battery pack 3, attached to the end of handle portion 2B through a battery pack supporting portion 2C, for housing the not-shown battery as the power source. Moreover, a trigger switch 4 is disposed at the handle portion 2B of the housing 2 and near the trunk portion 2A.

2

DM_US 29686047-1.085819.0037

KHD 001088

Application No.: 12/088,524

## AMENDMENT TO THE DRAWINGS

*The attached sheets of the drawings replace the original sheets of the drawing including FIGS.*

*1-3.  In the amendment, reference numeral 2C for a battery pack supporting portion has been*

*provided.*

Attachment: Replacement Sheets (2)

3

DM_US 29686047-1.085819.0037

KHD 001089

Application No.: 12/088,524

## REMARKS

**Amendments**

The specification and the drawing have been amended to clearly show "a battery pack supporting portion 2C" as recited by claims 1, 5, 17 and 18. No new matter has been added.

**Patentability under 35 U.S.C. § 112**

Claims 1, 2, 5, 8-15 and 17-20 were rejected under 35 U.S.C. § 112, first paragraph, as allegedly failing to comply with the written description requirement. The Examiner asserted that "a battery pack supporting portion provided on an end of the handle portion" is not supported by the original disclosure. Applicants respectfully traverse this rejection for at least the following reasons.

Applicants submit that originally filed FIGS. 1-3 clearly disclose that a battery pack supporting portion is provided between the battery pack 3 and the handle portion 2B. As illustrated by amended FIGS. 1-3, the battery pack 3 is attachable or attached to the handle portion 2B via the battery pack supporting portion **2C** which is provided at the end of the handle portion 2B. Applicants further submit that one of ordinary skill in the art would readily understand that a battery pack, which is detachable, is attached to the handle through an attachment portion, which is a battery pack supporting portion.

As such, Applicants submit that the originally filed disclosure, in particular, FIGS. 1-3, clearly support the feature "*a battery pack supporting portion for supporting the battery pack, the battery pack supporting portion being provided at a second end portion of the handle portion*" as recited by claims 1 and 5, and "*a battery pack supporting portion connected to the handle portion*" as recited by claims 17 and 18. Thus, it is requested that the Examiner withdraw the rejection of the claims under 35 U.S.C. § 112, first paragraph.

4

KHD 001090

Application No.: 12/088,524

Claims 1, 2, 5, 8-15 and 17-20 were rejected under 35 U.S.C. § 112, second paragraph, as allegedly being indefinite. The Examiner asserted that the side view of the tool in a downward position is indefinite. Applicants respectfully traverse this rejection for at least the following reasons.

Applicants respectfully remind the Examiner that the test for definiteness under 35 U.S.C. § 112, second paragraph, is whether "those skilled in the art would understand what is claimed when the claim is read **in light of the specification**." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576, 1 USPQ2d 1081, 1088 (Fed. Cir. 1986).  In light of the specification and the drawings, one of ordinary skill in the art would readily understand what the downward position refers to.

For example, the downward position of the tool in the side view is the position illustrated in FIGS. 1 and 3. Page 11, lines 21-25 of the specification refers to the <u>punching direction</u> as the <u>downward</u> direction of FIG. 3. Further, page 10, lines 17-20 describes the downward direction. As such, it is clear to one of ordinary skill in the art that the limitation "in the side view when the ejection unit is placed downwardly" means that the tool is placed as shown in FIGS. 1 or 3. Further, as shown in FIG. 1 and 3, in the side view when the ejection unit is placed downwardly, the battery pack 3 has a portion which elongates below the handle portion 2B, and the battery pack supporting portion 2C has a portion which elongates below the handle portion 2B.  In other words, the battery pack 3 and the battery pack supporting portion 2C have elongated portions in the downward direction, i.e., the punching direction (see, annotated FIG. 3 as shown below).  For example, the shaded area of the annotated FIG. 3 corresponds to the battery pack supporting portion 2C. Further, a bolt is provided to connect the magazine 5 and the battery pack supporting portion 2C.  Accordingly, as the claimed downward position is defined with respect

5

DM_US 29686047-1.085819.0037

KHD 001091

**Application No.: 12/088,524**

to the punching direction, the downward position of the tool is clear and definite, at least in light of the specification and the drawings.

*FIG. 3*



Bolt

Elongated portions of battery pack 3 and battery pack supporting portion 2C

Downward Direction (Punching Direction)

The Examiner further asserted that it is unclear to the <u>Examiner</u> what the battery supporting structure encompasses.  Applicants respectfully traverse this rejection for at least the following reasons.

As set forth above, the test for definiteness under 35 U.S.C. § 112, second paragraph, is whether "**those skilled in the art** would understand what is claimed when the claim is read **in light of the specification**." Further, as argued regarding the rejection under 35 U.S.C. § 112, first paragraph, the battery pack supporting portion is clearly illustrated in FIGS. 1-3.  Applicants again submit that one of ordinary skill in the art would readily understand that a battery pack, which is detachable, is attached to the handle through an attachment portion, which is in the

6

KHD 001092

**Application No.: 12/088,524**

present disclosure a battery pack supporting portion.  Further, as illustrated above, the configuration of the battery pack supporting portion 2C is clear in light of the drawings.  As such, Applicants submit that the limitation of "battery pack supporting portion" is clear and definite.

Based on the foregoing, Applicants submit that the claims are clear and definite under 35 U.S.C. § 112, second paragraph.  Thus, it is requested that the Examiner withdraw the rejection of the claims under 35 U.S.C. § 112, second paragraph.

DM_US 29686047-1.085819.0037

KHD 001093

Application No.: 12/088,524

## CONCLUSION

Having fully responded to all matters raised in the Office Action, Applicants submit that all claims are in condition for allowance, an indication for which is respectfully solicited. If there are any outstanding issues that might be resolved by an interview or an Examiner's amendment, the Examiner is requested to call Applicants' attorney at the telephone number shown below.

To the extent necessary, a petition for an extension of time under 37 C.F.R. 1.136 is hereby made. Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account 500417 and please credit any excess fees to such deposit account.

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

Takashi Saito
Limited Recognition No. L0123

600 13th Street, N.W.
Washington, DC  20005-3096
Phone:  202.756.8000  TS:MaM
Facsimile:  202.756.8087
**Date:  September 16, 2011**

**Please recognize our Customer No. 20277 as our correspondence address.**

8

KHD 001094

Replacement Sheet: Application No. 12/088,524

## FIG. 1



## FIG. 2



1/3

KHD 001095

Replacement Sheet: Application No. 12/088,524

## FIG. 3



KHD 001096

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

20277    7590    10/13/2011
MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC 20005-3096

| EXAMINER |
| --- |
| DURAND, PAUL R |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3721 | |

DATE MAILED: 10/13/2011

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 12/088,524 | 03/28/2008 | Hideki Ishida | 085819-0037 | 2007 |

TITLE OF INVENTION: PORTABLE FASTENING TOOL

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 01/13/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.   THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT.   SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.   THIS STATUTORY PERIOD CANNOT BE EXTENDED.   SEE 35 U.S.C. 151.   THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION.   IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

KHD 001099

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

20277        7590        10/13/2011
MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC 20005-3096

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/088,524 | 03/28/2008 | Hideki Ishida | 085819-0037 | 2007 |

TITLE OF INVENTION: PORTABLE FASTENING TOOL

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 01/13/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| DURAND, PAUL R | 3721 | 227-130000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

KHD 001100



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/088,524 | 03/28/2008 | Hideki Ishida | 085819-0037 | 2007 |

20277      7590      10/13/2011
MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC 20005-3096

| EXAMINER |
|---|
| DURAND, PAUL R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3721 | |

DATE MAILED: 10/13/2011

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 186 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 186 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

KHD 001101

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. | Applicant(s) |
| --- | --- | --- |
| | 12/088,524 | ISHIDA ET AL. |
| | **Examiner** | **Art Unit** | |
| | PAUL DURAND | 3721 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MEPE 1308.

1. ☒ This communication is responsive to *the after final amendment filed 9/16/2011.*

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1,2,5,8-15 and 17-20.*

4. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☒ All    b) ☐ Some*    c) ☐ None   of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☒ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☒ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____.

/PAUL R. DURAND/
Primary Examiner, Art Unit 3721

KHD 001103

Application/Control Number: 12/088,524                                    Page 2
Art Unit: 3721

## EXAMINER COMMENT

### *Drawings*

1.   The replacement drawings were received on 9/16/2011. These drawings are accepted as not constituting new matter.

### *Specification*

2.   The amended matter to the specification has been considered and is accepted. The amendment on page 7 does not constitute new matter, but rather clarifies features shown in the figures.

KHD 001104

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL INFORMATION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KOKI HOLDINGS CO., LTD., | |
|        Plaintiff, | |
| v. | C.A. No. 18-313-CFC |
| KYOCERA SENCO INDUSTRIAL TOOLS, INC., | |
|        Defendant. | |

**INITIAL EXPERT REPORT OF KEVEN MILLER**
<u>**REGARDING INVALIDITY**</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    QUALIFICATIONS ............................................................................................. 2

III.   LEGAL STANDARDS ....................................................................................... 3

     A.    Invalidity ................................................................................................. 3
     B.    Prior Art .................................................................................................. 4
     C.    Anticipation ............................................................................................ 4
     D.    Obviousness ............................................................................................ 5
     E.    Indefiniteness ......................................................................................... 6
     F.    Written Description ................................................................................. 7
     G.    Enablement ............................................................................................. 7
     H.    Claim Construction ................................................................................ 7

IV.    LEVEL OF ORDINARY SKILL IN THE ART ................................................. 9

V.     DOCUMENTS AND THINGS REVIEWED ................................................... 10

VI.    SUMMARY OF OPINIONS ............................................................................ 10

VII.   OVERVIEW OF THE ASSERTED PATENTS AND PRIOR ART ............... 11

     A.    U.S. Patent No. RE42,987 .................................................................... 11
     B.    U.S. Patent No. 8,118,204 .................................................................... 15
     C.    U.S. Patent No. 7,325,709 .................................................................... 17
     D.    U.S. Patent Nos 7,398,647 and 7,156,012 ........................................... 20

VIII.  INVALIDITY OF THE ASSERTED PATENTS ............................................. 23

     A.    U.S. Patent No. RE 42,987 ................................................................... 23
        1.    Claim 14 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 23
        2.    Claim 15 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 34
        3.    Claim 16 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 36
        4.    Claim 17 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 38
        1.    Claim 18 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 39
        2.    Claim 19 of the `987 Patent is Obvious Based on Singer in view of Klaus ....................................................................... 41
        3.    Claim 14 of the `987 Patent is Obvious Based on Moorman in view of Klaus ....................................................................... 43

# TABLE OF CONTENTS
### (continued)

Page

4. Claim 15 of the `987 Patent is Obvious Based on Moorman in view of Klaus ................................................................................. 54
5. Claim 16 of the `987 Patent is Obvious Based on Moorman in view of Klaus ................................................................................. 56
6. Claim 17 of the `987 Patent is Obvious Based on Moorman in view of Klaus ................................................................................. 58
7. Claim 18 of the `987 Patent is Obvious Based on Moorman in view of Klaus ................................................................................. 59
8. Claim 19 of the `987 Patent is Obvious Based on Moorman in view of Klaus ................................................................................. 61

B. U.S. Patent No. 8,118,204 .......................................................................... 64
1. Claim 12 of the `204 Patent is Obvious Based on Kondo in view of Buck ................................................................................. 64
2. Claim 13 of the `204 Patent is Obvious Based on Kondo in view of Buck ................................................................................. 78
3. Claim 15 of the `204 Patent is Obvious Based on Kondo in view of Buck ................................................................................. 84
4. Claims 12, 13, and 15 of the `204 Patent are Invalid Under 35 U.S.C ................................................................................. 84

C. U.S. Patent No. 7,325,709 .......................................................................... 89
1. Claim 1 of the `709 Patent is Anticipated By Novak ............................. 89
2. Claim 5 of the `709 Patent is Obvious Based on Novak in view of Ohuchi ................................................................................. 101
3. Claim 8 of the `709 Patent is Anticipated by Novak ............................ 103
4. Claim 9 of the `709 Patent is Obvious Based on Novak in view of Monacelli ................................................................................. 104
5. Claim 10 of the `709 Patent is Anticipated by Novak ........................... 106
6. Claim 14 of the `709 Patent is Obvious Based on Novak in view of Ohuchi ................................................................................. 110
7. Claim 1 of the `709 Patent is Anticipated by Schrepferman ................. 111
8. Claim 5 of the `709 Patent is Obvious Based on Schrepferman in view of Ohuchi ................................................................................. 124
9. Claim 8 of the `709 Patent is Anticipated by Schrepferman ................. 126
10. Claim 9 of the `709 Patent is Anticipated by Schrepferman ................. 127
11. Claim 10 of the `709 Patent is Anticipated by Schrepferman ............... 128
12. Claim 14 of the `709 Patent is Obvious Based on Schrepferman in view of Ohuchi ................................................................................. 132
13. Claim 1 of the `709 Patent is Anticipated by Wingert ......................... 132
14. Claim 5 of the `709 Patent is Obvious Based on Wingert in view of Ohuchi ................................................................................. 146
15. Claim 8 of the `709 Patent is Anticipated by Wingert ......................... 148
16. Claim 9 of the `709 Patent is Obvious Based on Wingert in view of Monacelli ................................................................................. 149

## TABLE OF CONTENTS
(continued)

                                                                                    **Page**

    17.    Claim 10 of the `709 Patent is Anticipated by Wingert........................ 151
    18.    Claim 14 of the `709 Patent is Obvious Based on Wingert in view of Ohuchi ....................................................................... 155
    19.    Claim 1 of the `709 Patent is Anticipated by Schell............................. 155
    20.    Claim 5 of the `709 Patent is Obvious Based on Schell in view of Ohuchi ....................................................................... 167
    21.    Claim 8 of the `709 Patent is Anticipated by Schell............................. 169
    22.    Claim 9 of the `709 Patent is Anticipated by Schell............................. 170
    23.    Claim 10 of the `709 Patent is Anticipated by Schell........................... 172
    24.    Claim 14 of the `709 Patent is Obvious Based on Schell in view of Ohuchi ....................................................................... 176
    25.    Claim 1 of the `709 Patent is Obvious Based on Ohuchi in view of any one of Novak, Schrepferman, Schell, and Wingert........................ 176
    26.    Claim 5 of the `709 Patent is Obvious Based on Ohuchi in view of any one of Novak, Schrepferman, Schell, and Wingert........................ 186
    27.    Claim 10 of the `709 Patent is Obvious Based on Ohuchi in view of any one of Novak, Schrepferman, Schell, and Wingert .................... 187
    28.    Claim 14 of the `709 Patent is Obvious Based on of Ohuchi in view of any one of Novak, Schrepferman, Schell, and Wingert............ 191
  D.    U.S. Patent No. 7,398,647................................................................... 192
    1.    Claim 1 of the `647 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 192
    2.    Claim 10 of the `647 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 210
    3.    Claim 1 of the `647 Patent is Anticipated by the SN325+.................... 214
  E.    U.S. Patent No. 7,156,012................................................................... 229
    1.    Claim 1 of the `012 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 229
    2.    Claim 2 of the `012 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 232
    3.    Claim 3 of the `012 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 243
    4.    Claim 4 of the `012 Patent is Obvious Based on Ishizawa in view of the SN325+ .............................................................. 250
    5.    Claim 1 of the `012 Patent is Anticipated by the SN325+.................... 254
    6.    Claims 2, 3, and 4 of the `012 Patent are Invalid Under 35 U.S.C ........ 257

IX.    CONCLUSION.......................................................................................... 260

| EXHIBIT | TITLE |
|---------|-------|
| Ex. 1 | *Curriculum Vitae* of Keven Miller |
| Ex. 2 | SN325+ Test Protocol |

**HIGHLY CONFIDENTIAL INFORMATION**

## I.      INTRODUCTION

1.      My name is Keven Miller.  By my education, training, and experience, as evidenced by my curriculum vitae (Ex. 1), I am qualified to testify as an expert and as to the subject matter of my expertise regarding my opinions expressed in this Report.  I am being compensated at a rate of $250/hour ($300/hr for deposition/court time and $175/hour for travel) for my work in this case, plus out-of-pocket expenses.  My compensation does not depend in any way on the outcome of any issue in this case.

2.      I have been retained by Kyocera Senco Industrial Tools, Inc. ("Defendant" or "Kyocera Senco") as an expert to provide my independent and objective opinions in connection with the above-captioned case, pending before the United States District Court for the District of Delaware.  Specifically, I have been asked to provide an opinion regarding the validity of U.S. Patent No. RE 42,987 (the "'987 Patent"), U.S. Patent 8,118,204 (the "'204 Patent"), U.S. Patent 7,325,709  (the "'709 Patent"), U.S. Patent 7,398,647 (the "'647 Patent") and U.S. Patent 7,156,012 (the "'012 Patent") (collectively, "the Asserted Patents") assigned to Plaintiff Koki Holdings Co., Ltd. ("Plaintiff" or "Koki").  I also expect to provide opinions in rebuttal to Koki's expert report(s) regarding infringement and other related issues.

3.      I provide this Report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).  This Report provides both the substance of the facts and opinions on which I presently expect to testify at the hearing in this matter as well as a summary of the bases and reasons for my opinions.

4.      I expect to testify at the hearing regarding the matters stated in this Report if asked to do so.  I reserve the right to supplement this Report based on additional information I may receive prior to the hearing, and to testify at the hearing in response to any opinions put forth by experts retained by Koki or other witnesses presented at trial.

HIGHLY CONFIDENTIAL INFORMATION

## II.   QUALIFICATIONS

5.      I earned a Bachelor of Science in Mechanical Engineering from Rensselaer Polytechnic Institute.  I also took several courses towards my Master of Science in Mechanical Engineering at the University of Rhode Island and the Hartford Graduate Center, although I chose not to continue my master's degree in favor of other pursuits.

6.      My experience with powered fastening tools began with Stanley Bostitch in 1993 as a design engineer.  I initially learned the art and trade by designing manufacturing & quality improvements to the diverse pneumatic nailer product line, frequently traveling to customers, construction and industrial sites to fix tools and be informed of application specific requirements.  I also diagnosed malfunctioning tools on the assembly floor and was tasked with quality oversight of 7 assembly lines.

7.      The business was focused on expanding industrial presence where the tools were required to be durable and fast operating and I worked on developed teams designing new products for the industrial market.  Specifically, I designed magazine assemblies, guide bodies and actuation mechanisms. This combined experience lead to a role as international applications development engineer for the company in which I designed tool variants for new applications and automation equipment.  I spent about 5 years with Stanley Bostitch.

8.      Starting in 1998, I worked for Stanley Black & Decker as a project leader designing pneumatic framing nailers and worked closely with other design teams developing pneumatic finish nailers and cordless nailers.  I had oversight of the entire tool design and made contributions to the design of elements of other products.  Specifically I have patents related to actuation mechanisms, jam clearing, fastener depth setting, magazines and pneumatic designs, including the following U.S. Patent Numbers: 6609646, 6648202, 6679413, 6705501, 6772931, 6938812, 6997365, 7185712, 7527106, and 9221161. The design goals were focused on developing features and performance that made the user more productive.

**HIGHLY CONFIDENTIAL INFORMATION**

9.      I also was a lead project engineer for cordless nailer development.  Our team investigated a number of energy storage technologies for application to a handheld fastening tool, including composite and gas springs, and chemical storage.  A number of prototypes were built and patents applied for including U.S. Patent Number 7938305.  I then worked on pneumatic finish nailer development (Precision Point tools) during which I was a company representative for an industry ISO safety standard working group.

10.      My final leading role was as a project engineer overseeing the development of a direct fastening tool that uses powder loads to drive hardened fasteners.  I worked for Stanley Black & Decker for almost 20 years until January 2017.

11.      A copy of my curriculum vitae, which provides more detail on my qualifications and expertise in powered nailers, is attached as Exhibit 1.

## III.    LEGAL STANDARDS

12.      In preparing my opinions in this report, counsel for Defendant provided me with the applicable legal standards.  This section indicates my understanding of certain legal principles relevant to my opinions in this report.

### A.    Invalidity

13.      I am informed and understand that under U.S. patent law, each claim of the Asserted Patents are presumed valid, and each such claim may be invalidated only if clear and convincing evidence is presented to prove its invalidity. I understand that clear and convincing evidence is such evidence that produces an abiding conviction that the truth of the factual contentions are highly probable. As explained herein, my analysis of the invalidity of the Asserted Patents will be undertaken from the perspective of what would have been known or understood by one of ordinary skill in the art relevant to the Asserted Patents. I understand that whether any of the claims of the Asserted Patents are anticipated or rendered

HIGHLY CONFIDENTIAL INFORMATION

Wingert, and Schell and in further view of Ohuchi.  Further, in my opinion claims 1, 5, 10, and 15 of

obvious based on Ohuchi in view of any one of Novak, Schrepferman, Wingert, and Schell.

39.   In my opinion, Claims 1 and 10 of the **'647 Patent** are obvious based on Ishizawa in view

of the SN325+ and claim 1 is also anticipated by the SN325+.

40.   In my opinion, Claims 1, 2, 3, and 4 of the **'012 Patent** are obvious based on Ishizawa in

view of the SN325+.  Further, in my opinion claim 1 of the '012 Patent is anticipated by the SN325+.

Further, in my opinion claims 2, 3, and 4 of the '012 Patent are indefinite.

## VII.   OVERVIEW OF THE ASSERTED PATENTS AND PRIOR ART

### A.   U.S. Patent No. RE42,987

41.   The '987 Patent is titled "Nail Gun with Safety Portion Mechanism for Preventing

Misfires" and has a priority date of May 23, 2020.  The '987 Patent and its claims focus on "a nail gun

that drives a nail through, for example, the hole of a connection clasp and to a nail gain that can accurately

drive nails into a desired drive position."  '987 Patent at 1:20-24.  Such a nailer has a narrow purpose of

attaching metal connectors with preformed holes (e.g. a hinge) to various substrates, such as wood.  Since

the metal connectors have preformed holes, it's important to be able to locate the tip of the nail in the

hole so that the nail is accurately placed.  This is generally achieved by having the tip of the forwardmost

nail exposed past the nose of the nailer so that the tip of the nail can be aligned with the hole prior to

driving.

42.   In addition, for safety reasons nailers also use a safety mechanism in the nose of the nailer

that does not allow the driving stroke to begin until the safety mechanism (and thus the nose of the nailer)

is adequately pressed against a workpiece.  The standard safety mechanism includes some form of a

spring-loaded lever that is biased in a downward position.  When the safety mechanism is pressed against

a workpiece, it is pushed upward against the bias of the spring.  A mechanical, pneumatic, electrical or

11

**HIGHLY CONFIDENTIAL INFORMATION**

other signal from the safety mechanism permits the driving stroke to begin when the safety mechanism is push upward into its upper position.

43.     However, such a safety mechanism is not as desirable for a metal connector nailer where clear view of the tip of the nail is desired for accurate placement. The '987 Patent addressed this with a "push portion" that moves and functions opposite from the standard safety mechanism described above in that the "push portion" is normally biased in an upwards position so that the tip of the nail isn't blocked by the "push portion," as shown in the image below.



**'987 Patent at Figure 3**

12

**HIGHLY CONFIDENTIAL INFORMATION**

44.     However, the named inventors of the '987 Patent were not the first to find solutions to this well-known issue with metal connector nailers and their safety mechanism, including solutions developed by Senco in the 1990's.   U.S. Patent No. 5,579,975 to Moorman, patented on December 3, 1996 ("Moorman") and U.S. Patent No. 5,803,338 to Singer et al., patented on September 8, 1998 ("Singer"), each assigned to Senco, disclose a metal connector nailer where the magazine of the nailer moves to expose the tip of the forwardmost nail in the magazine, such as shown in the images below.



**Moorman Figure 1**



**Singer Figure 1**

13

**HIGHLY CONFIDENTIAL INFORMATION**

45.     U.S. Patent No. 4,509,668 to Klaus et al., patented on April 9, 1985 ("Klaus") also discloses an alternate safety mechanism for a metal connector nailer where the safety mechanism is biased upwards to allow clear visibility of the tip of the nail, as shown in the images below.



**Klaus Figures 1 and 2**



**Klaus Figure 3**

HIGHLY CONFIDENTIAL INFORMATION

46.     As discussed in more detail below, the claimed invention of the '987 Patent is fully disclosed by Singer, Moorman, and Klaus.  *See infra* at § VIII.A.

### B.     U.S. Patent No. 8,118,204

47.     The '204 Patent is titled "Portable Fastening Tool" and has a priority date of September 30, 2005. The '204 Patent and its claims focus on a compact nailer that is ergonomically balanced.  '204 Patent at 1:47-63.   A compact design allows the nailer to be used in narrower spaces while an ergonomically balanced tool helps a user handle the tool with ease.

48.     The '204 Patent purports to address this by presenting a design of a cordless nailer with an angled magazine and a lowered motor such as shown in the image below.



**'204 Patent Figure 1**

49.     However, the named inventors of the '204 Patent were not the first to consider such a design for a cordless tool.  Angled magazines have been around for decades and are not new.  In fact, U.S. Design Patent No. D440,136 to Buck, patented on April 10, 2001 ("Buck") discloses the *identical*

**HIGHLY CONFIDENTIAL INFORMATION**

arrangement that the '204 Patent named inventors claim to have invented, as shown in the comparison images below:



**'204 Patent at Figure 2 (Left) and Buck at Figure 2 (Right)**



**'204 Patent at Figure 1 (Left) and Buck at Figure 3 (Right)**

**HIGHLY CONFIDENTIAL INFORMATION**

**Buck Figure 2**

### 3.   Claim 15 of the `204 Patent is Obvious Based on Kondo in view of Buck

181.    In my opinion, Claim 15 of the `204 Patent is obvious based on Kondo in view of Buck.

#### a)   The `204 Patent, Claim 15, preamble

*"The portable fastening tool as set forth in claim 13,"*

182.    *See* claim 13, above.

#### b)   The `204 Patent, Claim 15, "motor is positioned lower than the handle portion" limitation

*"wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion."*

183.    This limitation is identical to the "motor is positioned lower than the handle portion" limitation found in Claim 12, and thus this limitation is met by Kondo for the same reasons as discussed above.  *See supra* at § VIII.B.1.i).

### 4.   Claims 12, 13, and 15 of the `204 Patent are Invalid Under 35 U.S.C. § 112

184.    In my opinion, Claims 12, 13, and 15 of the '204 Patent are indefinite, lack enablement, and/or lack written description under 35 U.S.C. § 112.

185.    First, in my opinion claims 12, 13, and 15 lack  sufficient written description under § 112 because the specification fails to provide an adequate written description of "the battery pack having an extending portion extending from the housing" in combination with other elements of the asserted claims. By their plain language, each of these claims requires "a housing," "a handle portion *extending from the housing*," and "a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion *extending from the housing*."  Thus, these claims require the following separate and distinct components: (1) a housing; (2) a handle that extends from the housing; and (3) a battery pack supporting portion.  I understand that the Court agreed with this understanding by construing "a handle

84

**HIGHLY CONFIDENTIAL INFORMATION**

portion extending from the housing" to mean "a handle portion extending from a separate and distinct housing."  I also understand that at the claim construction hearing, counsel for Koki agreed with my understanding that the "battery pack supporting portion" is not part of the housing.  *See* D.I. 53 at p.2. The claim further requires that the battery pack have an extending portion that also extends from the housing.

186.   However, the only embodiment described in the specification does not include both a handle portion that extends from the housing *and* a battery pack extending portion that extends from the housing.  Instead, as shown below, the only battery pack extending portion described in the specification extends *from the handle portion* and not the *housing* as required by these claims.  Thus, in my opinion there is insufficient written description of "the battery pack having an extending portion extending from the housing," thereby rendering claims 12, 13, and 15 of the '204 Patent invalid.



**'204 Patent Figure 1**

85

HIGHLY CONFIDENTIAL INFORMATION

187.    While I expect to discuss in detail Koki's allegations of infringement of the '204 Patent in a separate rebuttal report, in my opinion Koki is attempting to stretch the scope of its claims beyond what the named inventors actually invented in an attempt to assert infringement against Defendant's Fusion F-15 Nailer.  The '204 Patent disclosed a single nailer arrangement where the handle and housing form a "T-shape," such as shown in the image above.  In contrast, Defendant's Fusion F-15 Nailer, shown in the image below, has an arrangement where the handle and housing form a closed loop – i.e. a second support in addition to the handle extends from the main body of the nailer.



**Fusion F-15 Nailer**

188.    The '204 Patent describes no such arrangement as found in the Fusion F-15 Nailer because the inventors did not contemplate such a design when the patent application was first filed.  Thus, in my opinion these claims lack sufficient written description, at least based on the manner in which Koki is interpreting the claims for purposes of infringement and the Court's claim construction.

HIGHLY CONFIDENTIAL INFORMATION

475.    This limitation is equivalent to the "first channel" limitation found in Claim 1 of the '647 Patent.  The claimed "main valve control channel" here is equivalent to the "first channel" claimed in the '647 Patent and thus this limitation is met by the SN325+ for the same reasons as discussed above.  *See supra* at § VIII.D.3.g).

### i)    The `012 Patent, Claim 1, "ratio" limitation

***"the main valve control channel having a cross-sectional area, a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m3 by the cross-sectional area of the main valve control channel measured in m2 being not more than 1.0."***

476.    This limitation is similar to the "ratio" limitation found in Claim 1 of the '647 Patent.  As explained immediately above, the claimed "main valve control channel" here is equivalent to the "first channel" claimed in the '647 Patent.  Thus, this limitation is present in the SN325+ for the reasons discussed above.  *See supra* at § VIII.D.1.i).  The calculated ratio, .578, is well below the claimed 1.0 ratio.

### 6.    Claims 2, 3, and 4 of the `012 Patent are Invalid Under 35 U.S.C. § 112

477.    Claims 2, 3, and 4 of the '012 Patent are indefinite, lack enablement, and/or lack written description under 35 U.S.C. § 112.

478.    Specifically, in my opinion, claims 2, 3, and 4 are indefinite because they do not, with reasonable certainty, inform a person skilled in the art about the scope of the invention.  Each of these claims require "a trigger valve exterior frame to which the main valve control channel is fluidly connected."  This phrase on its face has questionable validity because a channel cannot be fluidly connected to an exterior frame.  Rather, a channel can be fluidly connected to a chamber or channel within a frame, but not to the frame itself.

479.    Upon a closer look at the claims, the scope of this phrase becomes even more uncertain.  The claimed "trigger valve exterior frame" houses multiple different fluid channels and chambers, and

HIGHLY CONFIDENTIAL INFORMATION

thus a person of ordinary skill in the art would have difficulty understanding exactly to what channels or chambers (if any) the claimed main valve control channel is fluidly connected. For example, claim 2 of the '012 Patent recites the following channels and chambers are all contained within the trigger valve exterior frame: (1) "a main valve intake channel being defined between the valve piston and the trigger valve exterior frame"; (2) an air discharge channel being defined between the valve piston and the trigger valve exterior frame"; and (3) "a trigger valve chamber being defined by the trigger valve exterior frame." ('012 Patent at 10:46-62).  While at first glance I assumed that the patent draftsman intended to draft these claims such that the main valve control channel is fluidly connected to a chamber or channel within the trigger valve exterior frame, I realize now that the multiple channels and chambers within the trigger valve exterior frame make it impossible to know exactly which of these channels or chambers the main valve control channel is intended to be fluidly connected.  Thus, in my opinion a person of ordinary skill in the art would be unable to determine with reasonable certainty which of these three channels and chambers the main valve control channel is fluidly connected.

480.    I reviewed the specification and it does not provide any clarification as to which of these three channels and chambers the main valve control channel is fluidly connected.  The specification actually describes additional channels and chambers housed within the trigger valve exterior frame. The annotated figure below shows a trigger valve exterior frame that houses, partially or fully, five distinct channels and chambers: main valve intake channel 20, air channel 22, trigger valve control channel 16, trigger valve intake channel 14, and trigger valve chamber 13:

**HIGHLY CONFIDENTIAL INFORMATION**



**'012 Patent Figure 2**

*See also, e.g.*, '012 Patent at 7:52-8:37. Thus, the specification does not assist in resolving the uncertainty of the claim language itself.  In conclusion, I believe that "a trigger valve exterior frame to which the main valve control channel is fluidly connected" fails to convey to one of ordinary skill in the art with reasonable certainty as to the scope of the invention.

**HIGHLY CONFIDENTIAL INFORMATION**

## IX.    CONCLUSION

481.    For the reasons set forth above, my opinions regarding the Asserted Patents are generally summarized as follows.

482.    In my opinion, Claims 14-19 of the '987 Patent are rendered obvious by Singer in view of Klaus and are also rendered obvious by Moorman in view of Klaus.

483.    In my opinion, Claims 12, 13, and 15 of the '204 Patent are rendered obvious by Kondo in view of Buck.  In addition, in my opinion, Claims 12, 13, and 15 of the '204 Patent are indefinite and lack sufficient written description.

484.    In my opinion, Claims 1, 8, and 10 of the '709 Patent are anticipated by each of Novak, Schrepferman, Wingert, and Schell.  Further, in my opinion claim 9 is anticipated by each of Schrepferman and Schell and is obvious based on each of Novak and Wingert and in further view of Monacelli.  Further, in my opinion claims 5 and 14 are obvious based on each of Novak, Schrepferman, Wingert, and Schell and in further view of Ohuchi.  Further, in my opinion claims 1, 5, 10, and 15 of obvious based on Ohuchi in view of any one of Novak, Schrepferman, Wingert, and Schell.

485.    In my opinion, Claims 1 and 10 of the '647 Patent are obvious based on Ishizawa in view of the SN325+ Nailer and claim 1 is also anticipated by the SN325+ Nailer.

486.    In my opinion, Claims 1, 2, 3, and 4 of the '012 Patent are obvious based on Ishizawa in view of the SN325+ Nailer.  Further, in my opinion claim 1 of the '012 Patent is anticipated by the SN325+ Nailer.  Further, in my opinion claims 2, 3, and 4 of the '012 Patent are indefinite.

487.    I reserve the right to modify my opinions set forth in this report based on any documents, testimony, and/or information that becomes available to me after the date of this report.

488.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

February 28, 2020

Keven Miller

Keven Miller

**HIGHLY CONFIDENTIAL INFORMATION**

EXHIBIT 1

**HIGHLY CONFIDENTIAL INFORMATION**

# KEVEN E. MILLER

3 Woodbine Lane, Exeter RI 02822, 860-389-3574, kmiller08406@gmail.com

## PROFILE

A results-oriented engineer with a background in project management, mechanical design, analysis and manufacturing. Possesses strong problem solving skills, a customer and end user focus, effective leadership qualities and is capable of achieving results in a team environment or autonomously. Is very motivated to engage in new challenges.

## EXPERIENCE

**KVH Industries, Middletown RI**

**Scrum Master - Mechanical Engineer**                          **Jan 2017-Present**

Leading engineer of a discipline and cultural diverse team. Teams' goal is to stay step ahead of the fast-moving communications technology launching new products ahead of competitors. Scrum master role is to drive and help the team meet commitments of a 2-week sprint, prepare and present biweekly demonstrations and unblock the team, interacting with and influencing all functions of the company. Also responsible to design, prototype & test mechanical hardware for the next generation of antennas.

**Stanley Black & Decker, Bostitch Division, East Greenwich, RI**

**Sr. Project Engineer**                                         **August 2004-Jan 2017**

Leader of programs developing innovative products, including powder actuated and cordless fastening technologies, directing a cross functional team of mechanical, electrical, software and manufacturing engineers. Technical liaison and lead contact for a variety of consultants including solitary inventors, mechanical and electrical design & analysis firms, composite manufacturers and lithium-ion battery suppliers. Works closely with marketing from field research to the development of product proposals and specifications. Also partners with legal consul on patent applications and prosecutions. Develops test methods and performs diagnostic testing using LabVIEW system design software. Contributes to all aspects of the design process using Pro/Engineer CAD software. Liaison for rewriting of ANSI and ISO standards. Also worked as a dedicated industrial application engineer for 1 year. PMP trained, but not certified.

**Black & Decker, Power Tools Division, Towson, MD**

**Project Engineer**                                            **June 1998-August 2004**

Leading role in providing the infrastructure needed to design, manufacture and source pneumatic products. Project leader for internally developed pneumatic nailers within a structured tollgate product development process. Responsibilities include creation of product specification and QFD, design FMEA, scheduling, conceptual and detail design (utilizing Six Sigma), prototyping, testing and supplier selection. Provided continued support of manufacturing in a resident engineering role for

production and VAVE/DTV initiatives. Also supported the production, sales and service departments.

**Stanley Works Bostitch Division, East Greenwich, RI**

**HIGHLY CONFIDENTIAL INFORMATION**

### Applications Engineer, European Division                    Jan 1997-June 1998

Recruited by management for a newly created position. Provided liaison between the European sales force and domestic engineering and manufacturing, assisted sales and marketing with evaluating customer's application needs and engineered products for new applications. Participated in due diligence process for a European acquisition and facilitated the integration of their engineering department.

### Design Engineer/Product Improvement Team Member          August 1993-Jan 1997

Formulated layout design concepts, tested prototypes and produced production drawings. Designed and detailed drafting of investment and die castings, sheet metal parts, CNC machine parts, injection moldings, extrusions, weldments and powder metal and metal injection molding parts. Familiar with fixturing, assembly and production (utilizing Kaizen and JIT methods), grinding, heat treatment, welding and a wide range of materials. Integral part of a seven member team dedicated to improving product quality and increasing manufacturing volume and efficiency. Responsible for the product quality, customer satisfaction and resulting design change/engineering analysis of eight product lines. Also worked as a field engineer for direct sales.

### General Dynamics, Electric Boat Division, Groton CT

### Mechanical Design Engineer                               June 1990-Sept 1993

Mechanical engineer for Virginia class weapons handling system. Responsible for the design of mechanisms, hydraulic actuators, finite element analysis, shock analysis and incorporation of cost reducing manufacturing processes.

### Co-op Engineering Assignments

General Dynamics, Electric Boat Division, Groton CT & United Technologies, Sikorsky Aircraft, Stratford CT

### EDUCATION

University of Rhode Island, MSME Candidate

Hartford Graduate Center, Non Matriculated MS

Rensselaer Polytechnic Institute, B.S. Magna Cum Laude, Mechanical Engineering

**HIGHLY CONFIDENTIAL INFORMATION**

Below is a list of patents where I am listed as the primary inventor:

| PATENT NO. | TITLE |
|---|---|
| US 6609646 | MAGAZINE ASSEMBLY FOR FASTENING TOOL |
| US 6648202 | PNEUMATIC FASTENING TOOL |
| US 6679413 | MAGAZINE ASSEMBLY FOR FASTENING TOOL |
| US 6705501 | CONTACT TRIP ASSEMBLY FOR FASTENING TOOL |
| US 6772931 | MAGAZINE ASSEMBLY FOR FASTENING TOOL |
| US 6938812 | MAGAZINE ASSEMBLY FOR FASTENING TOOL |
| US 6997365 | CONTACT TRIP ASSEMBLY FOR FASTENING TOOL |
| US 7185712 | FASTENING TOOL APPARATUS AND METHOD FOR OPERATING THE ENGINE OF FASTENING TOOL |
| US 7527106 | METHOD FOR OPERATING THE ENGINE OF FASTENING TOOL |
| US 9221161 | FASTENING TOOL |

Below is a list of patents where I am listed as a co-inventor:

| PATENT NO. | TITLE |
|---|---|
| US 7175064 | FASTENER TOOL |
| US 7320422 | FASTENER TOOL |
| US 7938305 | FASTENER DRIVING DEVICE |
| US 8042717 | FASTENER DRIVING DEVICE WITH CONTACT TRIP HAVING AN ELECTRICAL ACTUATOR |
| US 8556148 | FASTENER TOOL |
| US 8833626 | FASTENING TOOL |
| US 9242359 | FASTENING TOOL WITH DUAL PNEUMATIC HANDLES |

# EXHIBIT 6

**HIGHLY CONFIDENTIAL INFORMATION**


**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KOKI HOLDINGS CO., LTD., | |
| Plaintiff, | |
| v. | C.A. No. 18-313-CFC |
| KYOCERA SENCO INDUSTRIAL TOOLS, INC., | |
| Defendant. | |


**REBUTTAL EXPERT REPORT OF
<u>KEVEN MILLER REGARDING NON-INFRINGEMENT</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  QUALIFICATIONS ........................................................................................... 2

III.  LEGAL STANDARDS ....................................................................................... 2

IV.  LEVEL OF ORDINARY SKILL IN THE ART ................................................ 3

V.  DOCUMENTS AND THINGS REVIEWED ..................................................... 6

VI.  SUMMARY OF OPINIONS ............................................................................... 6

VII.  OVERVIEW OF THE ASSERTED PATENTS .................................................. 7

    A.  U.S. Patent No. RE 42,987 ...................................................................... 7
    B.  U.S. Patent No. 8,118,204 ........................................................................ 7
    C.  U.S. Patent No. 7,325,709 ........................................................................ 8
    D.  U.S. Patent Nos. 7,398,647 and 7,156,012 .............................................. 8

VIII.  NON-INFRINGEMENT OF THE ASSERTED PATENTS .............................. 9

    A.  U.S. Patent No. RE 42,987 ...................................................................... 9
    B.  U.S. Patent No. 8,118,204 ........................................................................ 18
    C.  U.S. Patent No. 7,325,709 ........................................................................ 30
    D.  U.S. Patent Nos. 7,398,647 and 7,156,012 .............................................. 36

IX.  NON-PRACTICE OF THE ASSERTED PATENTS ........................................ 37

X.  CONCLUSION .................................................................................................... 37

HIGHLY CONFIDENTIAL INFORMATION

## I.      INTRODUCTION

1.      My name is Keven Miller.  By my education, training, and experience, as evidenced by my curriculum vitae (Ex. 1), I am qualified to testify as an expert and as to the subject matter of my expertise regarding my opinions expressed in this Report.  I am being compensated at a rate of $250/hour ($300/hr for deposition/court time and $175/hour for travel) for my work in this case, plus out-of-pocket expenses.  My compensation does not depend in any way on the outcome of any issue in this case.

2.      I have been retained by Kyocera Senco Industrial Tools, Inc. ("Defendant" or "Kyocera Senco") as an expert to provide my independent and objective opinions in connection with the above-captioned case, pending before the United States District Court for the District of Delaware.  Specifically, I have been asked to provide an opinion regarding whether certain Kyocera Senco products infringe one or more of U.S. Patent No. RE 42,987 (the "'987 Patent"), U.S. Patent 8,118,204 (the "'204 Patent"), U.S. Patent 7,325,709  (the "'709 Patent"), U.S. Patent 7,398,647 (the "'647 Patent") and U.S. Patent 7,156,012 (the "'012 Patent") (collectively, "the Asserted Patents") assigned to Plaintiff Koki Holdings Co., Ltd. ("Plaintiff" or "Koki").  I have also been asked to provide an opinion regarding whether certain Koki products practice the Asserted Patents.  Previously, I submitted my Initial Expert Report of Keven Miller Regarding Invalidity, dated February 28, 2020 ("Initial Miller Report").

3.      I have also been asked to provide opinions in rebuttal to the Opening Expert Report of Glenn Vallee, Ph.D., dated February 28, 2020 ("Opening Vallee Report").  This report provides my opinions in rebuttal to the Opening Vallee Report.

4.      I provide this Report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). This Report provides both the substance of the facts and opinions on which I presently expect to

**HIGHLY CONFIDENTIAL INFORMATION**

testify at the hearing in this matter as well as a summary of the bases and reasons for my opinions.

5.      I expect to testify at the hearing regarding the matters stated in this Report if asked to do so.  I reserve the right to supplement this Report based on additional information I may receive prior to the hearing, and to testify at the hearing in response to any opinions put forth by experts retained by Koki or other witnesses presented at trial.

## II.      QUALIFICATIONS

6.      A summary of my qualifications can be found in the Initial Miller Report at ¶¶ 5-11 as well as Ex. 1 to the Initial Miller Report.

## III.      LEGAL STANDARDS

7.      In preparing my opinions in this report, counsel for Defendant provided me with the applicable legal standards.  This section indicates my understanding of certain legal principles relevant to my opinions in this report.

8.      I understand that a patent infringement analysis is a two-step process.  First, the patent claims are construed by the Court to determine their proper scope.  Second, the construed claims are compared to the allegedly infringing product or process to determine whether those products or processes fall within the scope of the claims either literally or under the doctrine of equivalents.

9.      I understand that the Court has already construed certain claim terms.  My understanding of those claim terms and the principles of claim construction is discussed in the Initial Miller Report at ¶¶ 24-28.

10.      I have also been informed that to literally infringe a means-plus-function claim limitation, the accused product must perform the identical function with structure that is either the same or equivalent to the corresponding structure in the specification.  I have further been

2

HIGHLY CONFIDENTIAL INFORMATION

experience in hand-held power tools would thus qualify as a person of ordinary skill in the art with respect to the Asserted Patents.

## V.      DOCUMENTS AND THINGS REVIEWED

22.      In making my opinions in this report, I considered and studied the Asserted Patents, their file histories, and the claim construction order issued by the Court.  I also reviewed certain documents produced by the parties and certain deposition testimony taken in this case.  I also reviewed all of the Exhibits and documents cited or referenced in this report.

23.      I also reviewed the Opening Expert Report of Dr. Vallee and all Exhibits and documents cited therein.

24.      In addition to considering the above materials, I also relied on my personal education, experience, training, and knowledge of the relevant technical fields, and on my understanding of the applicable legal principles as explained to me by counsel for Defendant and as stated in this report.

## VI.     SUMMARY OF OPINIONS

25.      This section contains a summary of the main opinions and conclusions that I provide in this report.

26.      In my opinion, Kyocera Senco's JoistPro 150XP does not infringe claims 14-19 of the '987 Patent.

27.      In my opinion, Kyocera Senco's Fusion F-15 does not infringe claims 12, 13, and 15 of the '204 Patent.

28.      In my opinion, Kyocera Senco's FramePro 325XP and 325FRHXP do not infringe claims 1, 3-5, 8-10, and 14 of the '709 Patent.

HIGHLY CONFIDENTIAL INFORMATION

## VII.   OVERVIEW OF THE ASSERTED PATENTS

### A.   U.S. Patent No. RE42,987

29.   I described the technology of the '987 Patent in my Initial Report.  *See* Initial Miller Report at ¶¶ 41-46.  In his overview of the '987 Patent, Dr. Vallee contends that "[t]he invention of the '987 patent offers significant benefits to the operator, as it allows the operator to see the tip of the nail, thereby allowing the nail to be accurately driven through predrilled holes while still having the necessary safety features."  Opening Vallee Report at ¶ 59.  While Dr. Vallee may be correct that the safety contact design described in the '987 Patent may have benefits with respect to metal connector nailers, the design was by no means new at the time of the alleged invention of the '987 Patent.  As I explained in my Initial Report, the named inventors of the '987 Patent were not the first to consider using a safety mechanism that left the tip of the nail visible.  Initial Miller Report at ¶¶ 44-46.

### B.   U.S. Patent No. 8,118,204

30.   I described the technology of the '204 Patent in my Initial Report.  *See* Initial Miller Report at ¶¶ 47-51.  In his overview of the '204 Patent, Dr. Vallee contends that "[t]he invention of the '204 patent offers significant benefits to the operator, as it provides an angled magazine arrangement which results in a nailer which is compact in size and therefore may be easily used in a narrow space.  The angled magazine arrangement also allows the battery pack of electric nailers to be moved forward, improving the balance of the nailer and thereby making it easier to hold, resulting in less operator fatigue."  Opening Vallee Report at ¶ 52.  While Dr. Vallee may be correct that the design described in the '204 Patent may have some ergonomic and balance benefits, the design was by no means new at the time of the alleged invention of the '204 Patent.  As I explained in my Initial Report, the named inventors of the '204 Patent were

HIGHLY CONFIDENTIAL INFORMATION

not the first to consider such an ergonomic design for a powered nailer.  Initial Miller Report at ¶¶ 49-51.

### C.   U.S. Patent No. 7,325,709

31.   I described the technology of the '709 Patent in my Initial Report.  *See* Initial Miller Report at ¶¶ 52-55.  In his overview of the '709 Patent, Dr. Vallee contends that "[t]he invention of the '709 patent offers significant benefits to the operator, as it results in a lighter weight magazine having increased rigidity, which improves nail feeding.  The lighter weight, in addition to the reduced height region at the rear which facilitates easier gripping of the magazine, results in improved nailer control, easier loading, improved comfort and less operator fatigue.  The light weight design also allow the magazine to be designed to accommodate longer and an increased number of nails without significantly adding to the weight of the nailer."  Opening Vallee Report at ¶ 67.  But the design described in the '709 Patent was by no means new at the time of the alleged invention of the '709 Patent.  As I explained in my Initial Report, the named inventors of the '709 Patent were not the first to consider an angled cross-section for a magazine.  Initial Miller Report at ¶¶ 54-55.

### D.   U.S. Patent Nos. 7,398,647 and 7,156,012

32.   I described the technology of the '647 and '012 Patents in my Initial Report.  *See* Initial Miller Report at ¶¶ 56-60.  In his overview of the '647 and '012 Patents, Dr. Vallee contends that "[t]he invention of the '012 and '647 patents offer significant benefits to the operator.  The invention results in a fast acting trigger which improves nailing performance, allows faster operation and improves the responsiveness of the nailer.  It also reduces air consumption which in turn reduces compressor wear and lowers the amount of electricity or fuel required to operate the compressor."  Opening Vallee Report at ¶ 64.  While Dr. Vallee may be correct that the volume/area ratio described in the '647 and '012 Patents may increase the speed

8

HIGHLY CONFIDENTIAL INFORMATION

of operation of the nailer and decrease air consumption, the concept was by no means new at the time of the alleged invention of the '204 Patent.  As I explained in my Initial Report, the named inventors of the '647 and '012 Patents were not the first to consider altering these volumes and areas to increase response time and reduce air consumption.  Initial Miller Report at ¶¶ 57-60.

## VIII.   NON-INFRINGEMENT OF THE ASSERTED PATENTS

33.     I understand that Dr. Vallee believes that several products sold by Kyocera Senco infringe the asserted claims of the Asserted Patents.  *See* Initial Vallee Report at ¶ 68.  I disagree with Dr. Vallee's opinion that: (1) the Fusion F-15 infringes the asserted claims of the '204 Patent; (2) the JoistPro 150XP infringes the asserted claims of the '987 Patent; and (3) the FramePro 325FRHXP and FramePro 325XP infringe the asserted claims of the '709 Patent.

34.     In the paragraphs that follow, I summarize the bases for my conclusion that Kyocera Senco's Accused Products do not infringe the asserted claims of the asserted patents.  I note that while I provide images of the Accused Products throughout my report, I may use the actual product samples to demonstrate where and how various claim elements are met.  I may also use other portions of the documents that I cite herein to support my opinions.

### A.     U.S. Patent No. RE 42,987

35.     I understand that Dr. Vallee contends that the JoistPro 150XP infringes claims 14, 15, 16, 17, 18, and 19 of the '987 Patent.  *See* Opening Vallee Report at ¶ 116.  I disagree as the JoistPro 150XP does not meet at least the following claim limitation required by each of claims 14, 15, 16, 17, 18, and 19: "a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center."

36.     I understand that the Court construed "push portion" as a means-plus-function limitation having the following function and structure: (function) "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward"; (structure)

HIGHLY CONFIDENTIAL INFORMATION

safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22.  I understand that Dr. Vallee contends that the JoistPro 150XP has a "push portion" under the Court's construction. Opening Vallee Report at ¶¶ 133-138.  I disagree.  In my opinion, the JoistPro 150XP does not have a "push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center."

37.     I believe it is important to first fully explain the structure and operation of the safety portion 12 and its upper safety portion 20, cam member 21, and lower safety portion 22. The '987 Patent explains that the upper safety portion 20, cam member 21, and lower safety portion 22 are mechanically coupled such that linear movement of the upper safety portion 20 mechanically translates to corresponding linear movement of the cam member 21 and lower safety portion 22.  *See, e.g.*, '987 Patent at 5:56-60 ("[B]ecause there is no work piece to prevent downward movement of the safety portion 12 in this case, the safety portion 12 moves from its upper dead center to its lower dead center against the urging force of the spring 15."), 5:63-65 ("As the safety portion 12 moves from its upper dead center to its lower dead center, the cam member 21 moves downward with the upper safety portion 20."), 6:5-7 ("[W]hen the safety portion 12 moves downward to near its lower dead center, the cam member 21 separates from the lower safety portion 22.").  Thus, when the trigger 11 is pulled, the mechanical coupling between the trigger 11 and safety portion 12 results in the safety portion 12, including the upper and lower safety portions 20, 22 and cam member 21, moving downward.  *Id*.  When the tool, and thus lower end 12b of the safety portion 12 is pressed against a workpiece, the safety portion 12 is prevented from moving downward when the trigger 11 is pulled because of the contact between the lower end 12b and the workpiece.  *Id*. at 5:13-49.

10

**HIGHLY CONFIDENTIAL INFORMATION**

38.     Thus, it is these three components of the safety portion 12 (upper and lower safety portions 20, 22 and cam member 21) that work together to achieve the function of the claimed "push portion:" "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward."  At a high level, in my opinion the claimed "push portion" is classified as a purely mechanical safety.

39.     With respect to the JoistPro 150XP, Dr. Vallee points, without much explanation, to various structures on the JoistPro's safety mechanism as allegedly meeting the required structure of the claimed "push portion:" the upper safety portion 20, cam member 21, and lower safety portion 22.  However, Dr. Vallee fails to explain how his identified upper safety portion 20, cam member 21, and lower safety portion 22 work together to achieve the function of the claimed "push portion:" "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward."  This is because these components do not perform the claimed function because the JoistPro's safety mechanism also requires additional pneumatic components and a pressurized air supply to operate.

40.     The figures below label the various components of the JoistPro 150XP's safety mechanism along with a brief description of each component and its operation.  The white and silver cylinders the photograph immediately below contains various inputs/outputs controlled by the black trigger.

11

**HIGHLY CONFIDENTIAL INFORMATION**



Trigger arm that actuates the trigger switch cycling plunger

Trigger portion that actuates the trigger switch safety plunger

41.     The white valve housing and black trigger are shown disassembled in the images below.  The white valve housing contains various inputs/outputs controlled by the trigger.  With reference to these images, the white valve housing includes a "cycle activating plunger" which, when sufficiently depressed by the pivoting trigger arm on the trigger, initiates a driving cycle of the nailer.  The white valve housing also includes a "safety activating plunger" which, when sufficiently depressed by the trigger portion of the trigger, opens a fluid connection between a safety plunger and a pressurized air source.

**HIGHLY CONFIDENTIAL INFORMATION**





trigger portion that actuates the trigger switch safety plunger

pivoting trigger arm that actuates the trigger switch cycling plunger

cycle activating plunger, depressed by trigger paddle

safety activating plunger depressed by trigger

Fluid connection from safety plunger to the upper safety portion

42.    As seen in the image below, the white valve housing also provides a fluid connection between a pressurized air source and a sealed air cylinder.  Thus, when the safety activating plunger is depressed, pressurized air flows from an air source, through the fluid connection, into the air cylinder, and against the upper safety portion.

HIGHLY CONFIDENTIAL INFORMATION



43.    The JoistPro 150XP's safety mechanism also includes an upper safety portion comprising two components and a lower safety portion, as shown in the image below.  The right-most component shown in this image below is configured to reciprocate up and down within the sealed air cylinder identified in the image above.  When the JoistPro 150XP's upper safety portion reciprocates up and down within the cylinder, the lower safety portion also moves up and down in a corresponding fashion.  Importantly, the JoistPro 150XP does not have a cam element between the upper and lower safety portion as is required by the Court's construction of "push portion."

14

HIGHLY CONFIDENTIAL INFORMATION



44.    However, in contrast to the '987 Patent's "push portion," the JoistPro 150XP must be connected to a pressurized air source for the safety to properly function. Once connected to an air supply, when a user pulls the trigger, a portion of the trigger presses against the safety activating plunger which opens fluid communication to the sealed air cylinder. Pressurized air then moves into the cylinder which pushes against the upper safety portion, causing the entire safety portion to move downward. If the JoistPro 150XP is not connected to an air supply, the safety portion does not move downward when the trigger is pressed to the absence of pressurized air pressing against the top of the upper safety portion. In other words, in the absence of these pneumatic components, the JoistPro 150XP's safety mechanism does not satisfy the requirement that the claimed "push portion" enables "operation of the trigger switch . . . when the end of the push portion is prevented from moving downward." This is in stark contrast to the '987 Patent's purely mechanical "push portion," which operates with or without the presence of a pressurized air supply. Thus, the alleged "push portion" identified by Dr. Vallee does not meet the claimed function.

15

**HIGHLY CONFIDENTIAL INFORMATION**

45.      In addition, the alleged safety portion 12 identified by Dr. Vallee is not "mechanically coupled to trigger 11." Rather, the JoistPro 150XP's alleged safety portion 12 only *temporarily contacts* the alleged trigger during various portions of an operation cycle.



46.      "Mechanically coupled" requires more than temporary contact or coupled movement between two components. Rather, a mechanical coupling requires mechanical elements such as links, dovetails, adhesive, pins, or any other kind of fastening schema. An inherent trait of a mechanical coupling is that, in the absence of an energy source, mechanically coupled elements remain coupled. Thus, since the alleged "safety portion" is not mechanically coupled to any "trigger arm," the JoistPro 150XP does not have a "push portion" under the Court's construction.

47.      In summary, I believe that there are seven essential differences between the JoistPro 150XP and the teaching of the '987 Patent: (1) the JoistPro 150XP's safety mechanism

16

HIGHLY CONFIDENTIAL INFORMATION

is pneumatically powered and needs additional components to perform the claimed function; (2) the JoistPro 150XP's "upper safety portion" identified by Dr. Vallee is not mechanically coupled to the trigger; (3) the JoistPro 150XP's reciprocating safety portion does not have a cam; (4) the JoistPro 150XP's actual "upper safety portion" does not engage with the trigger arm; (5) the JoistPro 150XP's cam element identified by Dr. Vallee does not translate; (6) the JoistPro 150XP's cam element identified by Dr. Vallee alternatively engages and disengages the trigger arm; and (7) the JoistPro 150XP's cam element does not separate itself from a lower safety portion. These differences are substantial and thus based on these differences as well as the reasons described above, in my opinion the JoistPro 150XP does not have a "push portion" under the Court's construction.

48.   I also disagree with Dr. Vallee's opinion that the JoistPro 150XP meets the "push portion" limitation under the doctrine of equivalents. Opening Vallee Report at ¶ 138. With respect to the function/way/result test, Dr. Vallee essentially repeats the exact same sentiment (with different wording) for the function, way, and result. *Id.* For example, Dr. Vallee states that the "function" is "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward" and the "way is the exact same thing: "having operation of the trigger switch enabled when the end of the push portion . . . is prevented from moving downward." *Id.* In my opinion, Dr. Vallee's high level analysis is just a regurgitation of the claim construction provided by the Court and does not explain how the JoistPro 150XP has **structure** equivalent to the "push portions" structure: "safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22." Instead, Dr. Vallee's analysis ignores the Court's construction of "push portion." In addition, even at a high-level Dr. Vallee's analysis is improper as the

17

HIGHLY CONFIDENTIAL INFORMATION

"way" the JoistPro 150XP achieves the claimed function is through the use of pneumatic components whereas the '987 Patent uses purely mechanical components to achieve the function. I also disagree with Dr. Vallee's insubstantial differences analysis, as all he states is that "it is immaterial whether the JoistPro 150XP also uses a pneumatic element" but fails to provide any reason as to why. *Id.* In truth, the JoistPro 150XP utilizes a safety mechanism that is well-beyond the scope of what the named inventors of the '987 Patent invented, and I believe that Dr. Vallee's analysis is simply one of improperly stretching the scope of the claims to encompass any safety mechanism that achieves the same goal of the '987 Patent's "push portion" while ignoring the narrow structure required by the Court's claim construction.

**B.    U.S. Patent No. 8,118,204**

49.    I understand that Dr. Vallee contends that the Fusion F-15 infringes claims 12, 13, and 15 of the '204 Patent. *See* Opening Vallee Report at ¶ 70. I disagree as the Fusion F-15 does not meet at least the following claim limitation required by each of claims 12, 13, and 15: "a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing."

50.    I understand that the Court construed "a handle portion extending from the housing" to mean "a handle portion extending from a *separate and distinct* housing." I also understand that the Court construed "the battery pack having an extending portion extending from the housing" to mean "the battery pack has an extending portion that attaches to a portion of the housing." I also understand that at the Claim Construction Hearing, counsel for Koki admitted that "[t]he battery pack supporting portion is not part of the housing." *Markman* Hearing Tr. at 72:2-3 (2019-10-02).

51.    I understand that Dr. Vallee contends that the Fusion F-15 has a "battery pack having an extending portion extending from the housing." Opening Vallee Report at ¶¶ 82-84. I

18

HIGHLY CONFIDENTIAL INFORMATION

disagree. In my opinion and in view of the claim constructions and admissions by Koki's counsel above, the Fusion F-15 does not have a battery pack that attaches to a portion of the housing.

52.    The Court's claim constructions and Koki's counsel's admission establish a few requirements to satisfy the asserted claims of the '204 Patent. Most importantly, the handle portion, the housing, and the battery pack supporting portions are all separate and distinct—no portion of the handle portion may overlap with any portion of the housing, etc. Dr. Vallee understood and abided by this requirement in his analysis of the Fusion F-15 when identifying the Fusion F-15's alleged "housing," "handle portion," and "battery pack supporting portion." However, when hamstrung by these requirements, Dr. Vallee identified arbitrary and non-existent boundaries between each of these three components in an attempt to satisfy the claim limitation requiring that "the battery pack ha[s] an extending portion extending from the housing." The image below, reproduced from Dr. Vallee's Opening Report, shows the arbitrary boundaries he created, namely the "housing" in blue, the "handle portion" in yellow, and the "battery pack supporting portion" in red.

**HIGHLY CONFIDENTIAL INFORMATION**



**Opening Vallee Report at ¶ 79**

53.   Most importantly with respect to this claim limitation, Dr. Vallee's identification of the Fusion F-15's battery pack supporting portion is incorrect.  Most egregiously, Dr. Vallee misidentifies portions of the Fusion F-15's battery pack supporting portion as "housing."  The battery pack supporting portion includes ***at least*** the additional area highlighted in green in the image below.

**HIGHLY CONFIDENTIAL INFORMATION**



**Opening Vallee Report at ¶ 79 (Annotated in Green)**

54.     The reason for Dr. Vallee's misidentification of this portion of the battery pack supporting portion as "housing" is clear, as it is necessary for Dr. Vallee to also find that "the battery pack ha[s] an extending portion extending from the housing."  As shown in the image below from Dr. Vallee's report, the very portion of the Fusion F-15's battery pack supporting portion that Dr. Vallee misidentifies as "housing" is the very portion of the housing from which he contends the battery pack extends.

21

HIGHLY CONFIDENTIAL INFORMATION



**Opening Vallee Report at ¶ 83**

55.     Dr. Vallee misidentifies portions of the Fusion F-15's battery pack supporting portion as "handle portion."  The battery pack supporting portion includes ***at least*** the additional area highlighted in green in the image below.



**Opening Vallee Report at ¶ 79 (Annotated in Green)**

56.     In my opinion, the "battery pack supporting portion" on the Fusion F-15 includes the entire widened structure at the base of the handle portion, as shown highlighted in green in the image below:

22

HIGHLY CONFIDENTIAL INFORMATION



battery pack
supporting portion

57.    My identification of the battery pack supporting portion on the Fusion F-15 is supported by the specification, prosecution history, and a person of ordinary skill in the art's understanding of the term.  The term itself describes the function of the battery pack supporting portion: it supports the battery pack.  The specification supports this straightforward interpretation by explaining that the "battery pack supporting portion 2C" is "for housing the not-shown battery as the power source."  '204 Patent at 3:38-41.  The prosecution history also confirms this understanding.  *See* 2011-09-16 Office Action Response at p. 4 ("Applicants further submit that one of ordinary skill in the art would readily understand that a battery pack, which is detachable, is attached to the handle through an attachment portion, which is a battery pack supporting portion.").  While the written description of the battery pack supporting portion

HIGHLY CONFIDENTIAL INFORMATION

is limited to this single sentence, the figures reproduced below all point to a widened structure at

the base of the handle as the "battery pack supporting portion."



**'204 Patent Figures 1 and 2 (Annotated)**

58.     Applicant also provided the below shaded drawing during prosecution of the

Asserted Patent, which indicates that the "battery pack supporting portion" includes the

elongated portion indicated by the dashed-line oval.



**2011-09-16 Office Action Response at Page 6**

59.     Several unasserted claims of the '204 Patent confirm that this entire widened

structure at the base of the handle is the "battery pack supporting portion."  For example,

24

**HIGHLY CONFIDENTIAL INFORMATION**

unasserted claim 1 of the '204 Patent claims a "battery pack supporting portion [that] has a portion which elongates below the handle portion" and "the magazine is connected to said portion of the battery pack supporting portion which elongates below the handle portion." Thus, the "battery pack supporting portion" is at least broad enough to encompass the portion of this widened structure that "elongates below the handle portion" and connects to the magazine. Similar language in claims 5, 6, 7, 10, and 11 confirms this understanding.

60.     The '204 Patent's identification of the entire widened structure at the base of the handle as "battery pack supporting portion" makes sense since this widened structure exists solely for the purpose of interfacing with and supporting the battery pack. If the tool was not battery powered and instead was, for example, pneumatically powered, such a widened structure would not be required at the base of the handle. This is most apparent in contrasting the base of the handle of Kyocera Senco's JoistPro 150XP, a pneumatically powered nailer, with the base of the handle of Kyocera Senco's cordless Fusion F-15, as shown below.

HIGHLY CONFIDENTIAL INFORMATION




**JoistPro 150XP (Left) and Fusion F-15 (Right)**

61.    As can be seen, the JoistPro 150XP does not have a widened structure at the base of the handle because it does not use a battery pack, and thus does not have a "battery pack supporting portion."  In contrast, the Fusion F-15 has a widened structure at the base of the handle that extends along the entire length of the battery pack — i.e., the battery pack supporting portion which supports the battery.  Thus, the claim language, specification, drawings, prosecution history, and understanding of a person of ordinary skill in the art all support my opinion that the "battery pack supporting portion" claimed in the '204 Patent includes the entire widened structure at the base of the handle portion.

62.    Applying this interpretation to the Fusion F-15 Nailer, in my opinion the entire structure highlighted in green below is the "battery pack supporting portion."

26

**HIGHLY CONFIDENTIAL INFORMATION**



63.    This entire widened structure at the base of the Fusion F-15 performs the function of supporting the battery pack.  Because the battery pack on the Fusion F-15 nailer has a larger profile than the handle portion, the Fusion F-15's battery pack supporting portion has a larger profile designed to mate with the Fusion F-15's battery pack, as shown in the images below.

27

**HIGHLY CONFIDENTIAL INFORMATION**



widened base designed to mate
flush with the battery pack

battery pack

64.     ==In addition, this entire widened structure at the base of the Fusion F-15's handle also serves as the attachment portion for the battery to attach to the tool.  For example, as shown in the images below, elongated grooves extend along the length of the battery pack supporting portion that mate with tongues on the battery pack making for a sliding tongue and groove connection, thereby serving as an attachment portion.==

HIGHLY CONFIDENTIAL INFORMATION



65.     Since the entire widened structure at the base of the handle is the "battery pack supporting portion," the Fusion F-15 does not satisfy the claim limitation "the battery pack having an extending portion extending from the housing."  This is because the battery pack extends entirely from the battery pack supporting portion, ***not*** the housing, as shown in the image below.

HIGHLY CONFIDENTIAL INFORMATION



66.    As noted above, counsel for Koki admitted that the "battery pack supporting portion" is not part of the "housing."  Thus, because the battery pack supporting portion on the Fusion F-15 extends entirely from the battery pack supporting portion and *not* the housing, the Fusion F-15 nailer does not include the claim limitation: "the battery pack having an extending portion extending from the housing."

**C.    U.S. Patent No. 7,325,709**

67.    I understand that Dr. Vallee contends that the FramePro 325FRHXP and FramePro 325XP infringe claims 1, 3, 4, 5, 8, 9, 10, and 14 of the '709 Patent.  *See* Opening Vallee Report at ¶ 70.  I disagree as the FramePro 325FRHXP and FramePro 325XP do not meet at least the following claim limitation required by each of claims 1, 3, 4, 5, 8, 9, 10, and 14: "wherein the one end of the magazine close to the sharp end of the fastener is a closed end formed by joining of the two opposing walls of the accommodation portion."

HIGHLY CONFIDENTIAL INFORMATION

## IX.   NON-PRACTICE OF THE ASSERTED PATENTS

79.   I understand that Dr. Vallee believes that several products sold by Koki practice the asserted claims of the Asserted Patents. *See* Initial Vallee Report at ¶ 404. I am not providing an opinion as to whether the Koki products analyzed by Dr. Vallee practice their respective Asserted Patent(s).

## X.   CONCLUSION

80.   For the reasons set forth above, my opinions regarding the Asserted Patents are generally summarized as follows.

81.   In my opinion, Kyocera Senco's JoistPro 150XP does not infringe claims 14-19 of the '987 Patent.

82.   In my opinion, Kyocera Senco's Fusion F-15 does not infringe claims 12, 13, and 15 of the '204 Patent.

83.   In my opinion, Kyocera Senco's FramePro 325XP and 325FRHXP do not infringe claims 1, 3-5, 8-10, and 14 of the '709 Patent.

84.   I reserve the right to modify my opinions set forth in this report based on any documents, testimony, and/or information that becomes available to me after the date of this report.

85.   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

March 27, 2020

Keven Miller

# EXHIBIT 7

HIGHLY CONFIDENTIAL INFORMATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KOKI HOLDINGS CO., LTD.,

      Plaintiff,

v.

KYOCERA SENCO INDUSTRIAL TOOLS, INC.,

      Defendant.

C.A. No. 18-313-CFC

**REPLY EXPERT REPORT OF KEVEN MILLER
REGARDING INVALIDITY**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     QUALIFICATIONS ............................................................................................. 2

III.    LEGAL STANDARDS ......................................................................................... 2

IV.     LEVEL OF ORDINARY SKILL IN THE ART ................................................. 2

V.      DOCUMENTS AND THINGS REVIEWED ..................................................... 4

VI.     SUMMARY OF OPINIONS ............................................................................... 4

VII.    INVALIDITY OF THE ASSERTED PATENTS ............................................... 5

        A.      U.S. Patent No. RE 42,987 ..................................................... 5
        B.      U.S. Patent No. 8,118,204 ...................................................... 23
        C.      U.S. Patent No. 7,325,709 ...................................................... 42
        D.      U.S. Patent No. 7,398,647 ...................................................... 80
        E.      U.S. Patent No. 7,156,012 ...................................................... 103

VIII.   CONCLUSION ................................................................................................... 111

**HIGHLY CONFIDENTIAL INFORMATION**

## I.      INTRODUCTION

1.      My name is Keven Miller.  By my education, training, and experience, as evidenced by my curriculum vitae, I am qualified to testify as an expert and as to the subject matter of my expertise regarding my opinions expressed in this Report.  I am being compensated at a rate of $250/hour ($300/hour for deposition/court time and $175/hour for travel) for my work in this case, plus out-of-pocket expenses.  My compensation does not depend in any way on the outcome of any issue in this case.

2.      I have been retained by Kyocera Senco Industrial Tools, Inc. ("Defendant" or "Kyocera Senco") as an expert to provide my independent and objective opinions in connection with the above-captioned case, pending before the United States District Court for the District of Delaware.  I am the same Keven Miller who previously authored a report opining on the invalidity of U.S. Patent No. RE 42,987 (the "'987 Patent"), U.S. Patent No. 8,118,204 (the "'204 Patent"), U.S. Patent No. 7,325,709 (the "'709 Patent"), U.S. Patent No. 7,398,647 (the "'647 Patent") and U.S. Patent No. 7,156,012 (the "'012 Patent") (collectively, "the Asserted Patents") assigned to Plaintiff Koki Holdings Co., Ltd. ("Plaintiff" or "Koki"), dated February 28, 2020 ("Initial Miller Report").  I am also the same Keven Miller who previously authored a report opining on whether certain Kyocera Senco products infringe the Asserted Patents, dated March 24, 2020 ("Rebuttal Miller Report").  The Rebuttal Miller Report also contained my rebuttal to the opinions provided in the Opening Expert Report of Glenn Vallee, Ph.D., dated February 28, 2020 ("Opening Vallee Report").

3.      I have also been asked to provide opinions supporting my Initial Miller Report and in reply to the Rebuttal Expert Report of Glenn Vallee, Ph.D. ("Rebuttal Vallee Report").  This report provides my opinions in support of my Initial Miller Report and in rebuttal to the Rebuttal Vallee Report.

HIGHLY CONFIDENTIAL INFORMATION

4.      I provide this Report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).  This Report provides both the substance of the facts and opinions on which I presently expect to testify at the hearing in this matter as well as a summary of the bases and reasons for my opinions.

5.      I expect to testify at the hearing regarding the matters stated in this Report if asked to do so.  I reserve the right to supplement this Report based on additional information I may receive prior to the hearing, and to testify at the hearing in response to any opinions put forth by experts retained by Koki or other witnesses presented at trial.

## II.     QUALIFICATIONS

6.      A summary of my qualifications can be found in the Initial Miller Report at ¶¶ 5-11 as well as Ex. 1 to the Initial Miller Report.

## III.    LEGAL STANDARDS

7.      My understanding of the applicable legal standards can be found in my Initial and Rebuttal Expert Reports.  (*See* Initial Miller Report at ¶¶ 12-28; Rebuttal Miller Report at ¶¶ 7-15).

## IV.     LEVEL OF ORDINARY SKILL IN THE ART

8.      My opinions on the level of ordinary skill in the art as well as Dr. Vallee's proposed level for the Asserted Patents can be found in my Initial and Rebuttal Expert Reports.  (*See* Initial Miller Report at ¶¶ 12-28; Rebuttal Miller Report at ¶¶ 29-32).

9.      Dr. Vallee opines that an "industrial designer," as used in my proposed level of ordinary skill in the art, "would not have the requisite experience to design the types of powered nailers disclosed in the Asserted Patents."  (Rebuttal Vallee Report at ¶ 36).  I disagree.  I have personally worked with several industrial designers who have the requisite experience in powered nailer design to design the types of powered nailers disclosed in the Asserted Patents.  In fact, John Buck, who is the named inventor on the prior art reference Buck asserted against the '204 Patent,

HIGHLY CONFIDENTIAL INFORMATION

### 2. Claims 12, 13, and 15 of the '204 Patent Are Invalid under 35 U.S.C. § 112

79.    Dr. Vallee disagrees with my opinion that claims 12, 13, and 15 lack sufficient description under 35 U.S.C. § 112 because the specification fails to describe an adequate written description of the Court's construction of the term "the battery pack having an extending portion extending from the housing" in combination with other elements of the asserted claims.  (Rebuttal Vallee Report at ¶¶ 128-130; *see also* Initial Miller Report at ¶¶ 185-188).

80.    Dr. Vallee opines that "[o]ne of skill in the art would understand, after reading the disclosure of the '204 Patent and in light of the Court's claim construction, any portion of the nailer's exterior, exclusive of the handle portion, is generally referred to as the housing."  (Rebuttal Vallee Report at ¶ 129).  Dr. Vallee provides his breakdown of the housing (green), handle portion (blue), battery pack supporting portion (yellow), and battery pack (purple), in the annotated figure from the '204 Patent below.



**HIGHLY CONFIDENTIAL INFORMATION**

**Rebuttal Vallee Report at ¶ 129 (Annotating '204 Patent at Fig. 1)**

81.     As can be seen, Dr. Vallee labels two separate and distinct portions of the '204 Patent as "housing" in green, which are separated by a blue "handle portion," and somewhere within that "handle portion" is a yellow "battery pack supporting portion."  Dr. Vallee doesn't explain how the "housing" can somehow stop and start at a whim to satisfy his interpretation of the claims—all he does is cite to one sentence from the specification that states that "numeral 2 designates a housing." (*Id*.).  The Court construed "handle portion extending from a housing" as requiring a housing separate and distinct from a handle portion.  In my opinion, his interpretation of the claims conflicts with this claim construction, as Dr. Vallee's alleged housing portion highlighted in green at the bottom of the above picture is entirely separated from the rest of the housing by the handle.

82.     I also disagree with Dr. Vallee's interpretation of the "battery pack supporting portion," which I believe again is an interpretation not based on the specification but instead based on an attempt to maintain a claim of infringement against Kyocera Senco's Fusion F-15 Nailer while also maintaining the validity of the asserted claims.  The claims require that "the battery pack having an extending portion extending from *the housing*" and so Dr. Vallee must find a portion of the housing from which the battery pack can extend.  That explains his motivation for misidentifying the portion highlighted in green at the bottom of the above picture as "housing" when in reality it is part of the "battery pack supporting portion."  The annotated image below from the '204 Patent was reproduced from Dr. Vallee's Rebuttal Report and includes an area indicated by a red "B."  At this exact spot indicated by the red "B," the '204 Patent depicts a latching mechanism that allows a user to selectively attach and release the battery pack from the

HIGHLY CONFIDENTIAL INFORMATION

rest of the nailer.  Thus, this area, which Dr. Vallee mistakenly identifies in green as "housing," _supports the battery_ and thus must necessarily be a part of the "battery pack supporting portion."



**Rebuttal Vallee Report at ¶ 129 (Annotating '204 Patent at Fig. 3)**

83.     Thus, since Dr. Vallee's interpretation of the asserted claims and the specification of the '204 Patent is incorrect, he has failed to explain why the asserted claims are valid under the correct interpretation.   Under the correct interpretation, I previously explained that the specification fails to describe an adequate written description of the Court's construction of the term "the battery pack having an extending portion extending from the housing."  (Initial Miller Report at ¶¶ 185-188).

84.     Dr. Vallee also disagrees with my opinion that claims 12, 13, and 15 are indefinite under 35 U.S.C. § 112 because they do not, with reasonable certainty, inform a person skilled in the art about the scope of the invention with respect to the limitation "wherein the magazine is

HIGHLY CONFIDENTIAL INFORMATION

a)    **Claim Element 1(g)**

*"the main valve control channel having a cross-sectional area, a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in m3 by the cross-sectional area of the main valve control channel measured in m2 being not more than 1.0"*

220.    In disagreeing that my combination practices this limitation, Dr. Vallee incorporates by reference his arguments with respect to the similar "ratio" limitation found in claim 1 of the '647 Patent.  Thus, I disagree with Dr. Vallee's opinions with respect to this limitation for the same reasons as discussed above.  *See supra* at § VII.D.1.c).

3.    **Claims 2, 3, and 4 of the '012 Patent Are Invalid under 35 U.S.C. § 112**

221.    Dr. Vallee disagrees with my opinion that claims 2, 3, and 4 of the '012 Patent are indefinite under 35 U.S.C. § 112 because the claims do not, with reasonably certainty, inform a person skilled in the art about the scope of the limitation "a trigger valve exterior frame to which the main valve control channel is fluidly connected."  (Rebuttal Vallee Report at ¶¶ 301-311; *see also* Initial Miller Report at ¶¶ 477-480).

222.    Dr. Vallee asserts that a "skilled artisan would further understand that the exterior frame has to be in [] fluid communication with the main control valve so that the air above the main valve can pass through it to release air to atmosphere and actuate the nailer."  (Rebuttal Vallee Report at ¶ 305; *see also id*. at ¶ 308).  Dr. Vallee then provides an "in other words," in which he essentially removes any requirement for "***fluidly*** connected" altogether from the scope of this claim limitation:  "the main valve control channel must be connected to the frame to seal the channel and allow air to be directed through it in a controlled manner."  (*Id*. at ¶ 305).  Dr. Vallee is plainly explaining a ***mechanical*** connection between the structure that forms the main valve control channel and the exterior frame of the trigger valve.  There is also a second relevant connection, a ***fluid*** connection between the main valve control channel (the actual space within the

108

HIGHLY CONFIDENTIAL INFORMATION

structure that forms the channel) and the channels/chambers housed within the trigger valve exterior frame.  Thus, these two connections at their bases form a mechanical connection between two structures and a fluid connection between two spaces that are formed by the aforementioned structures.  What the claims, and Dr. Vallee, are improperly doing is mixing together these two types of connections in a nonsensical manner.  The main valve control channel can be fluidly connected to a channel/chamber within the trigger valve exterior frame (a space fluidly connected to a space), but the main valve control channel cannot be fluidly connected to the trigger valve exterior frame itself (a space fluidly connected to a solid structure).

223.   Dr. Vallee describes the specification's description of the trigger valve as support for his position that the claims are not indefinite.  (*See* Rebuttal Vallee Report at ¶ 307).  As I explained in my Initial Report, "I reviewed the specification and it does not provide any clarification" as to the scope of this claim limitation.  (Initial Miller Report at ¶ 480).

224.   Dr. Vallee's identification of other limitations with respect to the various channels and chambers within the trigger valve exterior frame misses the point.  As I stated in my Initial Report, "[w]hile at first glance I assumed that the patent draftsman intended to draft these claims such that the main valve control channel is fluidly connected to a chamber or channel within the trigger valve exterior frame, I realize now that the multiple channels and chambers within the trigger valve exterior frame make it impossible to know exactly which of these channels or chambers the main valve control channel is intended to be fluidly connected."  (Initial Miller Report at ¶ 479).  In other words, the presence of these multiple chambers within the trigger valve exterior frame creates ambiguity as to the scope of the limitation "a trigger valve exterior frame to which the main valve control channel is fluidly connected."  Thus, since all words in a claim should

109

HIGHLY CONFIDENTIAL INFORMATION

be given meaning, and a person of ordinary skill in the art is unable to ascertain with reasonable certainty the scope of "fluidly connected," in my opinion these claims are indefinite.

### 4. Objective Indicia of Non-Obviousness

225. Dr. Vallee contends that there are objective indicia of non-obviousness with respect to the asserted claims of the '012 Patent because of alleged commercial success of Koki products that allegedly practice the asserted claims. (Vallee Rebuttal Report at ¶ 312). Dr. Vallee specifically focuses on the supposedly novel "ratio" which results in a "fast acting trigger which improves nailing performance" and "reduces air consumption." (*Id.*). He then references the industry praise he analyzed with respect to the '647 Patent. (*Id.* at ¶ 313). Thus, I incorporate by reference my response to the alleged industry praise identified by Dr. Vallee with respect to the '647 Patent.

226. Dr. Vallee also points to some sales figures of these Koki products that allegedly practice the asserted claims of the '012 Patent as evidence of commercial success. (*Id.* at ¶¶ 314-315). But Dr. Vallee doesn't explain how these sales are tied to the supposedly novel "ratio" of the claimed invention. Instead, he just says that, based on his experience, he believes that "these high level of sales demonstrate commercial success of the products, particularly in view of the high praise that the tools have received for their improved response time and air consumption efficiencies." (*Id.* at ¶ 315). However, as I explained above, these publications also praised other features of these products, and thus it is not clear what, if any, of this praise and the "ratio" feature can be attributed to the alleged commercial success of these products.

## VIII. CONCLUSION

227. For the reasons set forth above, my opinions regarding the Asserted Patents are generally summarized as follows.

**HIGHLY CONFIDENTIAL INFORMATION**

228.    In my opinion, Claims 14-19 of the '987 Patent are rendered obvious by Singer in view of Klaus and are also rendered obvious by Moorman in view of Klaus.

229.    In my opinion, Claims 12, 13, and 15 of the '204 Patent are rendered obvious by Kondo in view of Buck.  In addition, in my opinion, Claims 12, 13, and 15 of the '204 Patent are indefinite and lack sufficient written description.

230.    In my opinion, Claims 1, 8, and 10 of the '709 Patent are anticipated by each of Novak, Schrepferman, Wingert, and Schell.  Further, in my opinion Claim 9 is anticipated by each of Schrepferman and Schell and is obvious based on each of Novak and Wingert and in further view of Monacelli.  Further, in my opinion Claims 5 and 14 are obvious based on each of Novak, Schrepferman, Wingert, and Schell and in further view of Ohuchi.  Further, in my opinion Claims 1, 5, 10, and 15 are obvious based on Ohuchi in view of any one of Novak, Schrepferman, Wingert, and Schell.

231.    In my opinion, Claims 1 and 10 of the '647 Patent are obvious based on Ishizawa in view of the SN325+ Nailer and Claim 1 is also anticipated by the SN325+ Nailer.

232.    In my opinion, Claims 1, 2, 3, and 4 of the '012 Patent are obvious based on Ishizawa in view of the SN325+ Nailer.  Further, in my opinion Claim 1 of the '012 Patent is anticipated by the SN325+ Nailer.  Further, in my opinion Claims 2, 3, and 4 of the '012 Patent are indefinite.

233.    I reserve the right to modify my opinions set forth in this report based on any documents, testimony, and/or information that becomes available to me after the date of this report.

234.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

**HIGHLY CONFIDENTIAL INFORMATION**

April 24, 2020

Keven Miller
_____
Keven Miller

# EXHIBIT 8



# Transcript of Keven Miller

**Date:** June 5, 2020
**Case:** Koki Holdings Co., Ltd. -v- Kyocera Senco Industrial Tools, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3     ------------------------x

4     KOKI HOLDINGS CO.,      :

5     LTD.,                   :

6            Plaintiff,       : Civil Action No.

7       -v-                   : 18-313(CFC)

8     KYOCERA SENCO INDUSTRIAL:

9     TOOLS, INC.,            :

10           Defendant.       :

11    ------------------------x

12

13       Videotaped Deposition of KEVEN EDWARD MILLER

14                 Conducted Virtually

15                Friday, June 5, 2020

16                    9:59 a.m.

17

18

19

20    Job No.: 301178

21    Pages: 1 - 260

22    Reported by: Pamela L. Beck

23

24

25

1              Videotaped Deposition of KEVEN EDWARD

2    MILLER, conducted virtually:

3

4

5

6

7              Pursuant to Notice, before Pamela L. Beck,

8    Court Reporter and Notary Public in and for the

9    Commonwealth of Pennsylvania.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Keven Miller
Conducted on June 5, 2020                                    3

```
 1            A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF:

 3        AMOL A. PARIKH, ESQUIRE

 4        amparikh@mwe.com

 5        THOMAS DaMARIO, ESQUIRE

 6        PAUL DEVINSKY, ESQUIRE

 7        McDERMOTT WILL & EMERY

 8        444 West Lake Street

 9        Chicago, Illinois 60606-0029

10        (312) 372-2000

11

12    ON BEHALF OF DEFENDANT:

13        DAVID BERNARD, ESQUIRE

14        dbernard@vedderprice.com

15        VEDDER PRICE P.C.

16        222 North LaSalle Street

17        Chicago, IL 60601

18        (312) 609-7500

19

20    ALSO PRESENT:

21        Glenn Vallee, Ph.D.

22        Ryan Grzelak, AV Tech

23        Michael Pietanza, Videographer

24

25
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    4

```
1              C O N T E N T S

2    EXAMINATION OF KEVEN EDWARD MILLER        PAGE

3         By Mr. Parikh                          7

4         By Mr. Bernard                       256

5         By Mr. Parikh                        257

6

7              E X H I B I T S

8         (Attached to transcript)

9    K. MILLER    DEPOSITION EXHIBIT           PAGE

10   Exhibit 1    Initial Expert Report of      14

11                Keven Miller

12   Exhibit 2    Rebuttal Expert Report of     17

13                Keven Miller Regarding

14                Non-Infringement

15   Exhibit 3    Reply Expert Report of Keven  17

16                Miller Regarding Invalidity

17   Exhibit 4    Supplemental Reply Expert     18

18                Report of Keven Miller

19                Regarding Invalidity

20   Exhibit 5    Patent US RE42,987 E          24

21   Exhibit 6    Patent US 8,118,204 B2        25

22   Exhibit 7    Patent US 7,325,709 B2        25

23   Exhibit 8    Patent US 7,398,647 B2        26

24   Exhibit 9    Patent US 7,156,012 B2        26

25
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    5

```
 1              E X H I B I T S    C O N T I N U E D

 2     Exhibit 10     Patent US 2001/0009260 A1        56

 3     Exhibit 11     Amendment                       153

 4     Exhibit 12     Patent US 6,609,646 B2          153

 5     Exhibit 13     Patent 3,908,884               167

 6     Exhibit 14     15 Ga. Cordless Angled          178

 7                    Finish Nailer

 8     Exhibit 15     Reply Expert Report of          178

 9                    Glenn Vallee, Ph.D.

10     Exhibit 16     Patent 5,720,423               200

11     Exhibit 17     Patent US D440,136 S            200

12     Exhibit 18     opening expert report           216

13                    Of Glenn Vallee, Ph.D.

14     Exhibit 19     Patent 5,803,338               231

15     Exhibit 20     Patent 4,509,668               231

16     Exhibit 21     Patent 5,579,975               231

17

18

19

20

21

22

23

24

25
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    180

| | | |
|---|---|---|
| 1 | that he is calling that portion in red the battery | 16:15:50 |
| 2 | pack supporting portion. | 16:15:55 |
| 3 | Q     Now, if you could -- | 16:15:58 |
| 4 | MR. PARIKH:  Ryan, please pull up Exhibit | 16:16:00 |
| 5 | 14. | 16:16:04 |
| 6 | Q     If I could direct your attention to the | 16:16:14 |
| 7 | second page, which ends in 10. | 16:16:16 |
| 8 | MR. PARIKH:  Ryan, if you could zoom in | 16:16:20 |
| 9 | on the -- I guess it would be the box on the middle | 16:16:23 |
| 10 | right, it says YK0848. | 16:16:27 |
| 11 | Q     Mr. Miller, do you understand that the | 16:16:41 |
| 12 | battery back supporting portion that Dr. Vallee -- | 16:16:45 |
| 13 | let me withdraw that. | 16:16:53 |
| 14 | Do you understand that Dr. Vallee | 16:16:54 |
| 15 | identifies part No. YK0848 as meeting the battery | 16:16:56 |
| 16 | pack supporting portion? | 16:17:02 |
| 17 | A     I don't agree with that, that that | 16:17:03 |
| 18 | supports the battery pack, but that is what he's | 16:17:08 |
| 19 | saying, yes. | 16:17:13 |
| 20 | Q     And if you -- | 16:17:14 |
| 21 | MR. PARIKH:  Ryan, if you could go to the | 16:17:19 |
| 22 | last page, the last line of the table, please. | 16:17:21 |
| 23 | Q     Mr. Miller, the part No. YK0848 that's | 16:17:34 |
| 24 | identified as a PCB actuator assembly.  Do you see | 16:17:41 |
| 25 | that? | 16:17:45 |

Transcript of Keven Miller
Conducted on June 5, 2020                                    181

| | | |
|---|---|---|
| 1 | A    I do. | 16:17:46 |
| 2 | Q    The PCB actuator assembly physically | 16:17:47 |
| 3 | connects to the battery when the battery is inserted | 16:17:51 |
| 4 | into the tool, correct? | 16:17:54 |
| 5 | A    I call it a terminal block.  What Dr. | 16:18:00 |
| 6 | Vallee is pointing to, that's the terminal block | 16:18:03 |
| 7 | that the battery connects to, that the electrical | 16:18:08 |
| 8 | connections -- where the contacts are made of the | 16:18:09 |
| 9 | electrical connection. | 16:18:17 |
| 10 | Q    When you use the term terminal block, are | 16:18:18 |
| 11 | you referring to part No. YK0848? | 16:18:20 |
| 12 | A    I'm referring to the red highlighted area | 16:18:27 |
| 13 | on page 27 of Dr. Vallee's reply report. | 16:18:29 |
| 14 | Q    Part No. YK0848, correct? | 16:18:38 |
| 15 | A    That includes a PCB and everything else, | 16:18:43 |
| 16 | so it's not just the part, it's additional | 16:18:47 |
| 17 | materials. | 16:18:49 |
| 18 | Q    So, when we use the term terminal block, | 16:18:49 |
| 19 | you'll understand what I'm referring to, right? | 16:18:52 |
| 20 | A    I described what he has highlighted in | 16:18:55 |
| 21 | red as a terminal block. | 16:18:57 |
| 22 | Q    And if we refer to -- if we use the term | 16:19:00 |
| 23 | terminal block, that's going to be referring to what | 16:19:04 |
| 24 | Dr. Vallee has identified in red, correct? | 16:19:07 |
| 25 | A    Sure. | 16:19:11 |

Transcript of Keven Miller
Conducted on June 5, 2020                                              182

| | | |
|---|---|---|
| 1 | Q      Do you agree that the -- let me withdraw | 16:19:18 |
| 2 | that. | 16:19:20 |
| 3 |      The battery pack physically connects to | 16:19:21 |
| 4 | the terminal block when it's inserted into the tool, | 16:19:25 |
| 5 | correct? | 16:19:30 |
| 6 |      A      The battery pack's electrical contacts | 16:19:30 |
| 7 | make contacts with the mating elements in the | 16:19:36 |
| 8 | terminal block to make the connection to have | 16:19:38 |
| 9 | electricity flow from the battery to the tool. | 16:19:42 |
| 10 | Q      If I could direct your attention to page | 16:19:47 |
| 11 | 24 of Exhibit 15.  I believe you have a hard copy in | 16:19:50 |
| 12 | front of you as well.  The battery upper lip also | 16:20:01 |
| 13 | connects to the terminal block, correct? | 16:20:06 |
| 14 | A      I disagree with that.  The upper lip | 16:20:17 |
| 15 | actually goes in between the battery pack supporting | 16:20:25 |
| 16 | portion and the terminal block, in my opinion. | 16:20:30 |
| 17 | Q      Well, that wasn't my question.  My | 16:20:37 |
| 18 | question was whether the battery pack upper lip | 16:20:39 |
| 19 | contacts the terminal block? | 16:20:43 |
| 20 | A      It does not, no, I don't agree that it | 16:20:47 |
| 21 | does. | 16:20:49 |
| 22 | Q      You don't believe that the battery pack | 16:20:53 |
| 23 | upper lip contacts the terminal block? | 16:20:57 |
| 24 |      MR. BERNARD:  Asked and answered. | 16:21:01 |
| 25 | A      The area that is in green, shown in | 16:21:03 |

Transcript of Keven Miller
Conducted on June 5, 2020                                      183

| | | |
|---|---|---|
| 1 | green -- I've got the battery pack here.  So, the | 16:21:07 |
| 2 | area that's shown in green top lip I don't -- I | 16:21:15 |
| 3 | disagree that it contacts the terminal block. | 16:21:24 |
| 4 | Q     Is there anything in the terminal block | 16:21:57 |
| 5 | that stops the movement of the battery pack? | 16:21:59 |
| 6 | A     What do you mean by movement? | 16:22:05 |
| 7 | Q     When the battery pack is connected -- let | 16:22:08 |
| 8 | me withdraw that. | 16:22:12 |
| 9 | When the battery pack is connected to the | 16:22:12 |
| 10 | terminal block, are there any portions besides the | 16:22:14 |
| 11 | battery pack terminals that are, in your opinion, in | 16:22:18 |
| 12 | contact with the terminals on the tool? | 16:22:22 |
| 13 | A     Contact with the terminals on the tool? | 16:22:27 |
| 14 | Q     When the battery pack -- | 16:22:37 |
| 15 | A     The only thing that's in contact with the | 16:22:38 |
| 16 | terminals on the tool are the actual blades in the | 16:22:40 |
| 17 | battery pack. | 16:22:46 |
| 18 | Q     Is the battery pack in contact with any | 16:22:48 |
| 19 | part of the terminal block other than the terminals? | 16:22:51 |
| 20 | A     The battery pack contacts the terminal | 16:23:05 |
| 21 | block when it's inserted, but not on the upper lip. | 16:23:09 |
| 22 | Q     You disagree with Dr. Vallee? | 16:23:15 |
| 23 | A     Dr. Vallee, yes, I disagree. | 16:23:18 |
| 24 | Q     You agree that the terminal block is | 16:23:37 |
| 25 | separate and distinct from the housing and the | 16:23:39 |

Transcript of Keven Miller
Conducted on June 5, 2020                                            184

```
1    handle portion, right?                                16:23:43

2         A     The terminal block is -- in my opinion,    16:23:46

3    it is assembled, it is connected to the battery       16:23:52

4    supporting portion.                                   16:23:58

5         Q     That wasn't my question.  My question was  16:23:59

6    that the terminal block is a separate component from  16:24:01

7    the housing and the handle portion, is that correct?  16:24:05

8         A     That's a separate portion from the         16:24:11

9    housing.  The handle and the battery supporting       16:24:15

10   portion, yes, it's separate.                          16:24:18

11        Q     When you say battery supporting portion,   16:24:24

12   you're talking about your opinion as to what the      16:24:26

13   battery pack supporting portion is, correct?          16:24:28

14        A     Correct.                                    16:24:32

15        Q     Now, you don't dispute that the terminal   16:24:35

16   block has a connection tab that connects the          16:24:37

17   terminal block to the housing, correct?               16:24:40

18        A     The terminal block has a tab that retains  16:24:46

19   the terminal block to the battery supporting          16:24:56

20   portion, in my opinion.                               16:25:03

21        Q     Let's assume for a moment, Mr. Miller --   16:25:10

22   let me take a step back.                              16:25:14

23              You and Dr. Vallee have differing          16:25:16

24   opinions on which component is the battery back       16:25:19

25   supporting portion, correct, we can agree on that?    16:25:27
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    185

| | | |
|---|---|---|
| 1 | A    My opinion is informed by the '204 | 16:25:31 |
| 2 | Patent. | 16:25:33 |
| 3 | Q    That's not what I asked, Mr. Miller. | 16:25:36 |
| 4 | My question was that you and Dr. Vallee | 16:25:37 |
| 5 | have differing opinions on which component is the | 16:25:40 |
| 6 | battery pack supporting portion, is that correct? | 16:25:43 |
| 7 | A    Obviously that, yes, we disagree on what | 16:25:49 |
| 8 | the battery pack supporting portion is. | 16:25:52 |
| 9 | Q    Let's assume for a moment that Dr. Vallee | 16:26:04 |
| 10 | is correct in his identification of the battery pack | 16:26:08 |
| 11 | supporting portion as the terminal block. | 16:26:14 |
| 12 | Are you with me? | 16:26:20 |
| 13 | A    Okay. | 16:26:21 |
| 14 | Q    Under that assumption that Dr. Vallee is | 16:26:22 |
| 15 | correct that the terminal block can be the battery | 16:26:25 |
| 16 | pack supporting portion, you would concede that the | 16:26:32 |
| 17 | Fusion F-15 infringes the asserted claims of the | 16:26:36 |
| 18 | '204 Patent, correct? | 16:26:40 |
| 19 | A    No. | 16:26:42 |
| 20 | Q    Why not? | 16:26:42 |
| 21 | A    Because of the claim construction, the | 16:26:53 |
| 22 | claim construction says the battery pack has an | 16:26:58 |
| 23 | extending portion that attaches to a portion of the | 16:27:02 |
| 24 | housing.  The battery pack, in my opinion, connects | 16:27:09 |
| 25 | to a battery supporting portion. | 16:27:22 |

Transcript of Keven Miller
Conducted on June 5, 2020                              186

```
1       Q     Which you identified as the battery pack      16:27:26

2    supporting portion, Dr. Vallee identifies as part of   16:27:32

3    the housing, right?                                     16:27:34

4       A     Actually, he makes a very tortured            16:27:36

5    comparison evaluation of what he considers to be my    16:27:39

6    battery pack supporting portion.  He actually in       16:27:46

7    figure -- on page 20, he shows an area in yellow       16:28:01

8    that he identifies as the handle, and then he shows    16:28:08

9    on page 21 an area in green that he identifies as      16:28:12

10   housing.  I was in my report, I'm sorry.  I was        16:28:27

11   referencing my report.                                 16:28:34

12           So, this is the Vallee report.  So, yeah,      16:28:35

13   on page 20, he has figures where he identifies         16:28:39

14   sections that he considers to be handle, that I        16:28:44

15   consider to be battery back supporting.  And then he   16:28:50

16   identifies areas that he considers to be housing       16:29:00

17   that I also consider to be battery back supporting     16:29:03

18   portion.                                                16:29:07

19      Q     Could you turn to Exhibit 2, which is         16:29:23

20   your non-infringement report.  I'd like to direct      16:29:26

21   your attention to paragraph 52.                         16:29:33

22      A     Exhibit 2, page --                            16:29:42

23      Q     19.                                            16:29:51

24      A     15?                                            16:29:51

25      Q     19.                                            16:29:53
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    187

| | | | |
|---|---|---|---|
| 1 | A | 19. | 16:29:54 |
| 2 | Q | 1-9. | 16:29:54 |
| 3 | A | Okay. | 16:30:04 |

4    Q    In paragraph 52 on the fourth line, you    16:30:05

5    see, and you agree that Dr. Vallee understood and    16:30:07

6    abided by the requirements that's listed above, in    16:30:13

7    his analysis of the Fusion F-15 when identifying the    16:30:17

8    Fusion F-15's alleged housing, handle portion and    16:30:21

9    battery back supporting portion.    16:30:25

10           Do you see that?    16:30:30

11    A    I'm just going to read the paragraph, if    16:30:30

12    I may.    16:30:33

13    Q    Sure.  I'll withdraw that question and    16:30:33

14    reask it once you're done reading the paragraph.    16:30:41

15    A    I read it.    16:31:25

16    Q    In paragraph 52, you state that the    16:31:25

17    Court's claim construction, and apparently KOKI's    16:31:29

18    counsel's admission, establish that the handle    16:31:32

19    portion, the housing and the battery back supporting    16:31:37

20    portion are also separate and distinct, right?    16:31:41

21    A    I do.    16:31:43

22    Q    And in the sentence starting on the    16:31:45

23    fourth line, you agree that Dr. Vallee understood    16:31:48

24    and abided by that requirement, correct?    16:31:51

25    A    Yes, he did his best to abide by that    16:31:58

Transcript of Keven Miller
Conducted on June 5, 2020                                    188

| | | |
|---|---|---|
| 1 | requirement. | 16:32:02 |
| 2 | Q     You criticized Dr. Vallee that -- for | 16:32:03 |
| 3 | your belief that he identified arbitrary and | 16:32:07 |
| 4 | nonexistent boundaries, right? | 16:32:09 |
| 5 | A     Yes. | 16:32:15 |
| 6 | Q     Now, if we turn back to Exhibit 15. | 16:32:16 |
| 7 | A     Exhibit 15, I don't have that in front of | 16:32:26 |
| 8 | me. | 16:32:28 |
| 9 | Q     Sorry, that's Dr. Vallee's reply report. | 16:32:29 |
| 10 | A     Oh, yes, I'm sorry.  I thought it was on | 16:32:34 |
| 11 | the screen. | 16:32:37 |
| 12 | Q     Actually, you know what, let's stick with | 16:32:38 |
| 13 | Exhibit 2, which is your non-infringement report, | 16:32:40 |
| 14 | and turn to paragraph 56, please. | 16:32:45 |
| 15 | A     Okay. | 16:32:54 |
| 16 | Q     You identify on page 23 what you contend | 16:32:55 |
| 17 | is the battery back supporting portion, correct? | 16:33:00 |
| 18 | A     That's the -- what I would consider the | 16:33:04 |
| 19 | back view of the battery back supporting portion. | 16:33:08 |
| 20 | Q     The portion that you identify in green on | 16:33:14 |
| 21 | page 23, that's part of the molded housing of the | 16:33:18 |
| 22 | tool, right? | 16:33:22 |
| 23 | A     As is the handle, as is the housing.  I | 16:33:28 |
| 24 | would say that the same is true in the '204 Patent, | 16:33:32 |
| 25 | you know, it's a one complete molded part.  But the | 16:33:42 |

Transcript of Keven Miller
Conducted on June 5, 2020                                    189

| | | |
|---|---|---|
| 1 | Court has created separate and distinct portions. | 16:33:47 |
| 2 | Q     And there are no mold lines in which you | 16:33:53 |
| 3 | identify on page 23 differentiating the housing, the | 16:33:57 |
| 4 | handle and the battery back supporting portion, | 16:34:01 |
| 5 | right? | 16:34:05 |
| 6 | A     What do you mean by mold lines? | 16:34:06 |
| 7 | Q     Do you know what a mold line is? | 16:34:07 |
| 8 | A     I know what a mold line is.  It's a | 16:34:13 |
| 9 | parting line between pieces of the tooling when the | 16:34:16 |
| 10 | plaster part is made. | 16:34:21 |
| 11 | Q     And you don't identify any mold lines in | 16:34:23 |
| 12 | the image that's on page 23 of Exhibit 2, do you? | 16:34:26 |
| 13 | A     I'm going to look at the tool to see if | 16:34:39 |
| 14 | there are any. | 16:34:41 |
| 15 | Q     That was not my question, Mr. Miller.  My | 16:34:42 |
| 16 | question was about your report. | 16:34:45 |
| 17 | A     I don't identify any, no. | 16:34:46 |
| 18 | Q     There's nothing in the claim that -- of | 16:34:52 |
| 19 | the '204 Patent that requires that only the battery | 16:34:54 |
| 20 | back supporting portion support the battery, right? | 16:34:58 |
| 21 | A     The claims only say that the battery back | 16:35:12 |
| 22 | supports the battery back.  It doesn't say the | 16:35:15 |
| 23 | battery back is supported by anything but the | 16:35:19 |
| 24 | battery back supporting portion. | 16:35:20 |
| 25 | Q     So, you would agree that Claim 12 would | 16:35:23 |

Transcript of Keven Miller
Conducted on June 5, 2020                                   190

| | | |
|---|---|---|
| 1 | be met if the battery pack is supported by the | 16:35:26 |
| 2 | battery back supporting portion as well as other | 16:35:30 |
| 3 | parts of the housing, correct? | 16:35:34 |
| 4 | MR. BERNARD:  Mischaracterizes prior | 16:35:36 |
| 5 | testimony. | 16:35:38 |
| 6 | Q     Let me withdraw that. | 16:35:46 |
| 7 | Mr. Miller, would Claim 12 be met if the | 16:35:47 |
| 8 | battery pack was supported by the battery back | 16:35:54 |
| 9 | supporting portion as well as portions of the | 16:35:57 |
| 10 | housing? | 16:36:02 |
| 11 | A     I don't know.  I'd have to do a separate | 16:36:07 |
| 12 | analysis under your construction of the claim. | 16:36:09 |
| 13 | Q     Well, I'm not asking you to do a separate | 16:36:14 |
| 14 | analysis.  I'm asking you your understanding of the | 16:36:16 |
| 15 | law of infringement. | 16:36:19 |
| 16 | A     Well, you're basically narrowing the | 16:36:20 |
| 17 | scope of the claim by making some assumptions. | 16:36:25 |
| 18 | Q     I'm not.  So, Mr. Miller, what I'm asking | 16:36:28 |
| 19 | you is:  Would -- in your understanding of the law | 16:36:30 |
| 20 | of infringement that you applied in this case, if a | 16:36:36 |
| 21 | battery pack was supported by a battery pack | 16:36:38 |
| 22 | supporting portion and other aspects of the tool, | 16:36:44 |
| 23 | would the claim be met? | 16:36:47 |
| 24 | A     Again, I would have to study it further. | 16:37:03 |
| 25 | I can't say that right now. | 16:37:05 |

Transcript of Keven Miller
Conducted on June 5, 2020                                           191

| | | |
|---|---|---|
| 1 | Q     As you sit here today, you don't know? | 16:37:12 |
| 2 | A     Correct. | 16:37:14 |
| 3 | Q     Now, if I could direct your attention to | 16:37:14 |
| 4 | the '204 Patent, figure 3.  Let me know when you're | 16:37:22 |
| 5 | there. | 16:37:34 |
| 6 | A     Yep. | 16:37:34 |
| 7 | Q     Actually, let's turn back to figure 2. | 16:37:36 |
| 8 | Now, you assert that your opinion that the -- what | 16:37:38 |
| 9 | you've identified in green as the battery back | 16:37:43 |
| 10 | supporting portion is consistent with figure 2 of | 16:37:46 |
| 11 | the '204 Patent, right? | 16:37:49 |
| 12 | A     It's consistent with figure 1 and figure | 16:37:51 |
| 13 | 2. | 16:37:54 |
| 14 | Q     Now, if we turn to figure 3 -- | 16:38:00 |
| 15 | A     Are we talking about this patent itself, | 16:38:03 |
| 16 | or are we talking about how the Fusion applies to | 16:38:05 |
| 17 | this patent? | 16:38:07 |
| 18 | Q     I'm just talking about the patent itself. | 16:38:08 |
| 19 | A     Okay.  So, the battery back supporting | 16:38:10 |
| 20 | portion is identified in three areas.  It's | 16:38:17 |
| 21 | identified in figure 1 and figure 2 and figure 3. | 16:38:19 |
| 22 | Q     Let's turn to figure 3.  In figure 3 -- | 16:38:23 |
| 23 | before we do that.  The battery back supporting | 16:38:29 |
| 24 | portion is identified by reference numeral 2C, | 16:38:31 |
| 25 | correct? | 16:38:36 |

Transcript of Keven Miller
Conducted on June 5, 2020                                        221

| | | |
|---|---|---|
| 1 | A        Well, you said is 22A separate from 22. | 17:30:27 |
| 2 | Q        Let me ask it a slightly different way. | 17:30:31 |
| 3 | Is 22A a separate component than the lower safety | 17:30:33 |
| 4 | portion 22? | 17:30:41 |
| 5 | A        Dr. Vallee identifies the lower safety | 17:30:46 |
| 6 | portion in the bottom right-hand view as being one | 17:30:49 |
| 7 | piece, as being 22 in two places. | 17:30:54 |
| 8 | Q        He identifies the lower safety portion | 17:31:01 |
| 9 | 22, and then he separately identifies a cam surface | 17:31:03 |
| 10 | 22A, correct? | 17:31:07 |
| 11 | A        22A is, in my view, a shaft with a piston | 17:31:10 |
| 12 | on the end of it, and it is clipped, permanently | 17:31:16 |
| 13 | fixed to 22. | 17:31:21 |
| 14 | Q        How is it clipped?  Let me withdraw that. | 17:31:32 |
| 15 | What you identified is -- let me withdraw | 17:31:45 |
| 16 | that.  The lower left picture is two separate | 17:31:49 |
| 17 | pieces, right, 22 and 22A that are connected? | 17:31:56 |
| 18 | A        They are permanently connected together. | 17:32:04 |
| 19 | Q        But at one point they were two separate | 17:32:06 |
| 20 | pieces, correct? | 17:32:09 |
| 21 | A        From the construction, it appears that | 17:32:13 |
| 22 | way, yes.  But in execution, they are permanently | 17:32:15 |
| 23 | connected together, in the application of the | 17:32:24 |
| 24 | nailer. | 17:32:31 |
| 25 | Q        Right, but the lower safety portion is a | 17:32:34 |

Transcript of Keven Miller
Conducted on June 5, 2020                                          222

```
 1    separate component than the cam surface, which is a          17:32:38
 2    separate component than the upper safety portion,            17:32:42
 3    correct?                                                     17:32:46
 4          A     Can you say that again.                          17:32:52
 5          Q     Sure.  If -- I can withdraw that                 17:32:53
 6    question.                                                    17:33:01
 7                Now, in the JoistPro 150, the lower              17:33:05
 8    safety portion, the cam and the upper safety portion         17:33:09
 9    work together to achieve the claim function of the           17:33:13
10    push portion, right?                                         17:33:19
11          A     My opinion is the JoistPro does not have         17:33:21
12    a cam.  And there's other things that are required           17:33:23
13    to execute the function, specifically a piston,              17:33:28
14    specifically a cylinder, specifically a valve stem,          17:33:32
15    specifically a valve housing, pneumatic air, seals.          17:33:36
16    There are other requirements for the JoistPro to             17:33:41
17    execute the required function.                               17:33:45
18          Q     So, the JoistPro 150, what Dr. Vallee has        17:33:56
19    identified as the upper safety portion, the cam              17:34:01
20    surface 22A and the lower safety portion, those              17:34:05
21    components are involved in performing the function           17:34:08
22    of the push portion, right?                                  17:34:12
23          A     Those components combined together with          17:34:22
24    all of the other elements of the JoistPro constitute         17:34:26
25    the push portion.                                            17:34:34
```

Transcript of Keven Miller
Conducted on June 5, 2020                                         223

| | | |
|---|---|---|
| 1 | Q    So, there might be other components | 17:34:38 |
| 2 | involved, but at least the cam surface 22A, the | 17:34:40 |
| 3 | lower safety portion 22, and the upper safety | 17:34:43 |
| 4 | portion 20 that Dr. Vallee identified are involved | 17:34:47 |
| 5 | in achieving the claim function, right? | 17:34:50 |
| 6 | A    Again, but not as a push portion as | 17:34:57 |
| 7 | constructed by the claim. | 17:35:00 |
| 8 | Q    That wasn't my question, Mr. Miller -- | 17:35:01 |
| 9 | well, let me take a step back. | 17:35:03 |
| 10 | So, when you say as constructed by the | 17:35:06 |
| 11 | claim, you're referring to the structure that's | 17:35:08 |
| 12 | identified as being the push portion, right? | 17:35:13 |
| 13 | A    Yes. | 17:35:15 |
| 14 | Q    Is it your understanding that only that | 17:35:15 |
| 15 | structure is permitted to perform the claim | 17:35:22 |
| 16 | function? | 17:35:25 |
| 17 | A    Insofar that the push portion as defined | 17:35:41 |
| 18 | by the structure is in the function part of the | 17:35:53 |
| 19 | construction, yes. | 17:35:59 |
| 20 | Q    In order to infringe -- let me withdraw | 17:36:09 |
| 21 | that. | 17:36:13 |
| 22 | In order to meet the push portion | 17:36:13 |
| 23 | limitation, a product must only use a safety portion | 17:36:16 |
| 24 | that is mechanically coupled to trigger 11, the | 17:36:27 |
| 25 | safety portion consisting of an upper safety portion | 17:36:31 |

Transcript of Keven Miller
Conducted on June 5, 2020                                           224

| | | |
|---|---|---|
| 1 | 20, a cam member 21, and a lower safety portion 22 | 17:36:34 |
| 2 | to perform the required function? | 17:36:39 |
| 3 | A    Or the equivalent thereof. | 17:36:44 |
| 4 | Q    And if there are -- if there's additional | 17:36:46 |
| 5 | structure that's also involved in performing the | 17:36:48 |
| 6 | recited function, then is it your understanding that | 17:36:53 |
| 7 | that limitation would no longer be met? | 17:36:59 |
| 8 | A    It's my understanding that the claim | 17:37:04 |
| 9 | overall, with the additional elements that the | 17:37:08 |
| 10 | JoistPro has, does not infringe on the claim. | 17:37:14 |
| 11 | Q    Mr. Miller, I'm trying to understand the | 17:37:21 |
| 12 | legal standards that you applied in arriving at your | 17:37:23 |
| 13 | opinions. | 17:37:28 |
| 14 | So, is it your opinion that if an accused | 17:37:28 |
| 15 | product has additional structure that's used to | 17:37:31 |
| 16 | perform the function, but it still has the structure | 17:37:35 |
| 17 | that's required by the claim, it would no longer | 17:37:40 |
| 18 | infringe? | 17:37:43 |
| 19 | A    Again, I'm not a lawyer.  I'm not well | 17:37:44 |
| 20 | versed in the legal structure and the legal | 17:37:48 |
| 21 | requirements.  I can only give you my opinions on | 17:37:51 |
| 22 | the parts, on the assembly, on what I've analyzed. | 17:37:56 |
| 23 | When it comes to legal constructions, I am not the | 17:38:02 |
| 24 | expert. | 17:38:06 |
| 25 | Q    Do you know if the JoistPro requires | 17:38:12 |

Transcript of Keven Miller
Conducted on June 5, 2020                                    259

```
1                   ACKNOWLEDGMENT OF DEPONENT

2              I, KEVEN EDWARD MILLER, do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true, correct

5    and complete transcription of the testimony given by

6    me, and any corrections appear on the attached

7    Errata Sheet signed by me.

8

9

10   _____       _____

11       (DATE)                    (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Keven Miller
Conducted on June 5, 2020                                    260

1

2      CERTIFICATE OF COURT REPORTER - E-NOTARY PUBLIC

3

4          I, Pamela L. Beck, the officer before whom the

5      foregoing proceedings were taken, do hereby certify

6      that the foregoing transcript is a true and correct

7      record of the proceedings; that said proceedings

8      were taken by me stenographically, and thereafter

9      reduced to typewriting under my supervision; and

10     that I am neither counsel for, related to, nor

11     employed by any of the parties to this case, and

12     have no interest, financial or otherwise, in its

13     outcome.

14         IN WITNESS WHEREOF, I have hereunto set my hand

15     and affixed my notarial seal this 12th day of June.

16

17

18  My commission expires January 14, 2023.

19

20

21

22

23  _____

24  E-NOTARY PUBLIC IN AND FOR THE

25  COMMONWEALTH OF PENNSYLVANIA

Transcript of Keven Miller
Conducted on June 5, 2020

261

| A |
| --- |

**a1**
5:2
**abide**
187:25
**abided**
187:6, 187:24
**able**
11:2, 28:17,
42:9, 72:14,
74:13, 74:16,
74:18, 97:19,
116:12, 154:1,
156:9, 226:10,
226:23
**about**
10:23, 15:11,
20:1, 20:18,
24:24, 35:19,
39:21, 40:20,
40:22, 50:18,
50:25, 51:11,
51:15, 54:22,
64:22, 65:19,
65:23, 65:24,
72:25, 74:21,
74:22, 75:16,
75:19, 75:20,
76:9, 76:11,
94:11, 96:2,
98:25, 99:2,
101:20, 101:21,
104:8, 107:25,
110:6, 110:7,
112:21, 113:14,
114:2, 115:25,
117:18, 118:4,
119:15, 121:5,
124:25, 126:19,
129:3, 132:19,
135:11, 136:8,
142:5, 143:12,
144:7, 145:23,
146:5, 146:6,
146:8, 146:19,
148:6, 148:7,
150:9, 150:23,

151:1, 159:4,
161:1, 161:24,
165:16, 168:12,
168:22, 171:10,
176:9, 178:14,
184:12, 189:16,
191:15, 191:16,
191:18, 206:21,
208:15, 208:17,
217:25, 232:17,
232:18, 233:6,
239:15, 239:16,
240:17, 241:8,
245:15, 253:21,
253:24, 254:2,
254:5, 254:20,
254:21, 254:25
**above**
63:9, 69:2,
77:11, 77:14,
77:19, 77:24,
78:8, 79:23,
80:17, 80:20,
83:5, 83:24,
83:25, 84:23,
86:7, 86:21,
86:23, 90:1,
90:9, 104:22,
122:6, 187:6,
193:20, 207:23,
208:5, 208:8,
208:11
**absolutely**
88:17, 93:23,
241:24
**abstract**
40:22
**abut**
238:20
**accept**
83:1
**access**
72:11
**accommodate**
210:1
**accommodation**
164:19, 165:6,
165:12, 165:24,

169:13, 169:16
**accomplish**
202:1
**according**
197:13, 199:5
**account**
43:13, 147:14,
209:24
**accumulator**
61:5, 128:16
**accuracy**
71:12, 72:19
**accurate**
11:2, 73:22
**accurately**
72:22, 74:24
**accused**
29:1, 29:5,
31:2, 31:23,
224:14
**accuses**
141:16
**achieve**
31:20, 222:9
**achieved**
218:3
**achieving**
223:5
**acknowledge**
7:11, 7:18,
259:3
**acknowledgment**
259:1
**across**
43:19, 43:21,
135:5, 170:10
**acted**
8:9, 8:12,
8:13, 240:25
**acting**
240:13, 240:14
**action**
1:6, 154:5,
155:5
**activate**
232:21
**activated**
85:16

**acts**
251:4, 251:9
**actual**
57:23, 58:4,
81:23, 107:21,
141:7, 183:16,
255:15
**actually**
31:6, 47:6,
61:10, 64:13,
84:19, 85:16,
86:24, 87:23,
90:22, 100:12,
102:22, 122:1,
122:21, 134:9,
135:8, 139:22,
145:18, 146:4,
149:2, 149:4,
150:22, 182:15,
186:4, 186:6,
188:12, 191:7,
192:5, 194:16,
197:6, 198:17,
207:23, 208:22,
208:24, 208:25,
213:1, 218:11,
218:23, 219:5,
225:1, 234:4,
239:5, 239:10,
240:12, 243:5,
243:6, 248:9,
249:12
**actuate**
246:17, 248:2,
248:5
**actuates**
225:7
**actuation**
86:16
**actuator**
180:24, 181:2
**add**
83:5, 89:22,
208:19
**added**
38:18, 208:25
**adding**
37:9, 135:25,

Transcript of Keven Miller
Conducted on June 5, 2020

137:1, 137:17, 208:19, 210:2
**addition**
128:9
**additional**
12:1, 12:19, 13:3, 14:19, 22:25, 29:3, 29:18, 30:5, 181:16, 208:20, 224:4, 224:9, 224:15, 228:19, 229:4, 230:1, 230:4, 230:13
**additionally**
228:23
**address**
55:9, 163:14
**addressing**
143:2
**adequate**
88:12
**adequately**
167:6
**admissibility**
7:13
**admission**
187:18
**admit**
78:20, 79:18
**advised**
8:18
**affect**
93:14, 206:12
**affected**
209:15, 209:18
**affects**
44:9
**affixed**
260:15
**after**
239:6, 258:8
**again**
33:21, 33:25, 34:3, 34:18, 36:21, 38:17, 39:2, 41:19, 43:20, 52:4,

52:19, 55:4, 59:23, 62:21, 64:22, 70:3, 70:14, 71:6, 72:17, 73:12, 74:21, 80:4, 81:22, 82:7, 85:4, 91:8, 92:12, 92:18, 93:4, 98:8, 99:2, 100:24, 106:15, 108:12, 111:2, 111:20, 112:3, 114:20, 115:25, 122:2, 128:5, 128:22, 130:23, 137:13, 138:18, 152:7, 152:10, 159:7, 159:11, 160:16, 166:20, 171:7, 176:23, 178:4, 178:16, 190:24, 197:17, 197:20, 205:1, 205:6, 205:12, 206:21, 212:20, 218:16, 219:23, 220:13, 222:4, 223:6, 224:19, 229:25, 230:7, 233:13, 234:25, 238:7, 240:4, 242:10, 244:22, 247:25, 248:3, 250:9, 252:25
**against**
30:20, 80:23, 87:4, 205:16, 238:15, 238:18, 241:1, 251:5, 251:10
**ago**
13:23, 257:1
**agree**
7:16, 7:17, 26:23, 40:16, 41:4, 46:24,

47:23, 56:2, 62:2, 66:14, 70:15, 73:7, 84:22, 90:4, 112:23, 114:3, 117:20, 124:3, 124:4, 124:5, 133:5, 133:9, 133:19, 136:12, 138:8, 142:21, 143:9, 151:7, 152:1, 160:3, 160:13, 161:12, 161:19, 179:25, 180:17, 182:1, 182:20, 183:24, 184:25, 187:5, 187:23, 189:25, 195:8, 196:10, 196:24, 200:15, 200:20, 202:20, 230:19, 232:4, 234:7, 238:3, 242:22, 243:8, 247:11, 250:15, 253:3, 253:18, 257:11, 258:2
**agreed**
9:12, 117:19
**ahead**
111:5, 146:22, 162:24
**air**
61:5, 61:9, 64:24, 64:25, 93:12, 93:18, 94:9, 118:15, 118:16, 118:25, 119:5, 120:3, 120:5, 120:6, 120:10, 120:12, 120:17, 121:8, 121:15, 123:4, 123:5, 123:15, 123:24, 124:1, 124:20, 126:13, 126:19, 127:3, 127:5, 127:6,

127:25, 128:3, 128:5, 128:6, 222:15, 225:25, 237:24, 237:25, 238:1, 240:15, 243:12, 243:16, 245:16, 245:20, 247:19
**al**
56:19, 154:12
**aligning**
168:15
**all**
6:11, 6:13, 7:16, 9:20, 11:24, 14:24, 16:14, 16:19, 20:9, 35:13, 38:20, 39:2, 40:16, 43:17, 50:4, 58:10, 59:12, 80:13, 86:12, 86:13, 97:23, 108:13, 109:4, 116:13, 116:18, 132:14, 137:24, 143:9, 146:5, 163:20, 163:25, 165:14, 165:23, 166:8, 166:11, 166:24, 167:1, 167:5, 174:13, 176:10, 177:10, 204:3, 204:10, 222:24, 225:16, 226:4, 238:22, 244:7, 245:1, 245:20, 245:21, 251:19, 257:11
**allege**
96:23, 157:17
**alleged**
187:8
**allow**
132:22, 236:12
**allowing**
127:6

Transcript of Keven Miller
Conducted on June 5, 2020

allows
128:6
along
77:14, 171:11
already
162:25, 241:8
also
3:20, 6:19,
29:3, 29:11,
30:6, 36:17,
53:6, 56:22,
57:10, 57:12,
57:16, 58:8,
59:14, 60:16,
62:10, 68:4,
87:22, 91:24,
96:18, 103:12,
105:6, 105:12,
123:11, 136:23,
165:6, 166:5,
170:24, 171:9,
172:2, 182:12,
186:17, 187:20,
193:17, 202:11,
208:20, 217:7,
220:21, 224:5,
227:14, 227:16,
228:4, 228:5,
228:22, 229:8,
242:3, 246:21,
249:6, 250:25,
252:3, 252:11
although
33:24
aluminum
148:23, 149:1,
149:2, 156:23,
210:15
always
135:9, 135:16,
135:20, 218:2,
245:21, 245:23
amendment
5:3, 154:4
amol
3:3, 6:16,
8:16, 16:9,
78:15, 110:3

amount
203:3, 247:25
amounts
245:21
amparikh@mwe
3:4
analysis
29:15, 29:22,
31:15, 37:11,
37:16, 55:25,
61:15, 63:15,
77:21, 100:1,
105:14, 137:9,
142:10, 142:16,
142:18, 142:22,
142:25, 146:1,
187:7, 190:12,
190:14, 212:4,
213:24, 215:17,
250:20, 250:22,
252:9, 255:5,
255:17
analyze
54:12, 136:13,
136:23, 137:5,
142:19, 178:6,
179:5
analyzed
57:16, 58:5,
58:9, 96:18,
139:10, 213:17,
224:22
analyzing
60:24
anecdote
244:25
angle
172:17, 172:20,
197:25, 208:23,
209:21
angled
5:6, 45:7,
172:25, 178:25,
201:2, 206:9,
209:8, 209:17
angles
71:3
angling
71:5, 71:6,

207:5, 208:17
another
96:11, 109:22,
109:23, 121:11,
121:21, 121:22,
125:1, 130:10,
139:7, 150:22,
166:14, 171:21,
172:2, 199:20,
211:3, 212:21,
220:10, 220:11,
244:24, 246:17,
251:18, 253:9
answer
9:10, 9:14,
9:16, 10:4,
70:22, 74:24,
75:3, 83:1,
108:18, 108:19,
110:4, 111:3,
130:15, 130:16,
130:17, 134:25,
159:15, 162:13,
162:15, 162:18,
162:24, 204:21,
204:24, 229:14,
245:2
answered
34:11, 42:11,
73:5, 82:6,
158:25, 159:6,
159:14, 182:24
answering
10:5, 78:4,
110:5
answers
9:20, 27:12
anticipated
58:22, 163:5
anybody
12:24, 37:1,
37:3, 51:14,
118:4
anything
78:5, 79:1,
79:6, 117:11,
119:25, 155:7,
178:1, 178:7,

183:4, 189:23,
205:8, 243:7,
245:11
anywhere
48:4, 114:16,
114:17, 125:19,
141:11, 218:12
apart
27:21, 96:20,
244:5, 244:7
apologize
173:25
apparatus
56:18, 67:11,
144:1, 144:4,
144:8, 144:19
apparently
187:17
appear
93:6, 119:13,
141:22, 259:6
appears
62:1, 69:11,
69:22, 118:21,
221:21
applicant
157:7, 193:6
application
36:5, 56:16,
221:23
applied
31:10, 71:2,
84:15, 190:20,
201:2, 224:12,
239:16, 240:10,
240:19, 240:21,
240:22, 240:25,
252:6
applies
142:19, 191:16,
240:5
apply
28:14, 30:25,
64:10, 64:20,
135:4, 150:13,
240:6
applying
135:23, 155:18,

Transcript of Keven Miller
Conducted on June 5, 2020

264

238:23, 239:11,
250:19
**appreciate**
178:22, 204:25,
245:5
**approach**
234:21, 234:25,
235:5, 235:7,
235:9
**april**
179:8
**arbitrarily**
73:14
**arbitrary**
188:3
**areas**
86:12, 114:23,
140:23, 186:16,
191:20, 193:19
**aren't**
95:22, 96:1,
209:6
**argue**
87:11, 116:20
**argument**
77:12, 168:13,
170:14
**around**
9:8, 69:23,
89:24, 120:19,
120:20, 121:9,
247:18, 252:23,
253:5
**arranged**
167:20
**arranges**
205:16
**array**
124:18, 124:19,
125:2, 159:9,
159:22, 166:10,
166:13, 167:2,
167:6, 169:20,
171:2, 171:6,
171:9, 171:10,
171:20, 171:24,
172:4, 172:8,
172:10, 172:12,

172:17, 172:21
**arrays**
171:5, 171:18
**arriving**
28:11, 28:16,
30:11, 224:12
**arrow**
170:2, 238:8
**arrows**
237:13, 237:19,
237:22, 238:5,
238:7
**art**
13:3, 13:5,
15:4, 15:6,
33:24, 35:10,
36:2, 36:8,
36:10, 36:14,
36:17, 37:25,
38:4, 39:15,
39:18, 40:1,
40:3, 40:7,
40:9, 40:13,
41:16, 46:18,
46:22, 46:25,
47:2, 47:22,
47:24, 48:2,
48:3, 48:7,
49:8, 56:8,
58:12, 60:24,
67:20, 68:21,
68:24, 73:2,
73:16, 74:7,
77:17, 77:23,
78:7, 79:3,
80:4, 116:10,
125:15, 131:1,
134:5, 136:13,
136:22, 137:5,
137:15, 162:7,
163:5, 163:11,
163:24, 164:4,
164:5, 165:15,
165:16, 165:19,
165:20, 166:24,
167:12, 203:11,
235:3, 235:11,
235:25

**artisan**
207:17
**asked**
34:11, 35:18,
42:11, 48:22,
48:23, 49:2,
50:9, 51:16,
73:5, 82:6,
148:6, 149:24,
158:25, 159:6,
159:14, 163:18,
171:16, 182:24,
185:3, 255:2
**asking**
10:3, 16:10,
65:23, 65:24,
72:21, 72:25,
74:21, 108:21,
117:18, 121:21,
161:1, 161:17,
162:15, 190:13,
190:14, 190:18,
196:16, 204:20,
213:22, 220:2,
255:2
**aspects**
83:11, 83:13,
190:22
**assembled**
184:3
**assemblies**
205:20, 207:15
**assembly**
180:24, 181:2,
224:22, 255:23,
256:1
**assert**
58:19, 59:14,
59:23, 118:15,
129:13, 143:3,
174:5, 191:8,
193:6, 201:6,
211:13, 214:2,
249:15
**asserted**
24:6, 24:20,
37:25, 38:4,
40:16, 40:19,

48:7, 48:12,
48:17, 48:25,
49:3, 49:7,
49:10, 49:11,
49:14, 49:15,
49:22, 50:11,
52:7, 53:12,
53:17, 56:3,
58:24, 59:17,
75:25, 77:9,
142:25, 143:4,
143:10, 143:15,
160:4, 160:14,
161:12, 161:20,
174:6, 174:14,
174:22, 175:2,
185:17, 211:18,
211:23, 212:6,
212:12, 212:19,
213:9, 213:18,
218:20, 228:9,
228:10, 228:12
**assertion**
143:21, 203:10
**assist**
29:18
**associated**
69:23
**assume**
9:2, 68:25,
69:20, 71:16,
120:21, 120:22,
133:17, 184:21,
185:9, 226:16
**assumes**
98:6
**assuming**
121:1, 152:13,
160:1
**assumption**
185:14
**assumptions**
190:17
**atmosphere**
65:2, 98:12
**atmospheric**
128:17
**attached**
4:8, 177:11,

Transcript of Keven Miller
Conducted on June 5, 2020

197:22, 259:6
**attaches**
185:23
**attending**
6:12
**attention**
21:8, 28:3,
28:18, 39:10,
60:13, 62:23,
66:6, 66:20,
66:22, 67:6,
67:18, 78:11,
79:15, 91:16,
101:6, 103:18,
104:21, 106:2,
107:6, 107:24,
114:5, 118:7,
119:18, 122:16,
122:22, 128:11,
139:19, 142:15,
155:16, 164:15,
168:2, 169:9,
179:15, 180:6,
182:10, 186:21,
191:3, 193:22,
193:25, 205:22,
206:5, 213:12,
233:1, 241:12,
247:2, 249:8
**attesting**
249:18
**attorneys**
10:16, 10:24,
11:9, 11:10,
12:23, 35:2,
35:3, 35:6
**av**
3:22
**available**
154:10, 168:25,
235:25
**aware**
20:15, 23:9,
23:13, 27:1,
27:5, 33:8,
122:9, 127:13,
150:14, 169:3,
169:5, 207:20,

207:22
**awhile**
65:17, 67:15,
237:2, 257:1
**axis**
209:14, 210:7,
233:9, 233:19,
252:24, 253:6

**B**

**b2**
4:21, 4:22,
4:23, 4:24, 5:4
**back**
51:8, 60:12,
64:16, 66:20,
70:21, 100:20,
102:1, 102:25,
104:17, 104:20,
105:8, 107:6,
108:10, 110:18,
110:19, 115:3,
117:9, 117:13,
118:6, 120:25,
125:8, 129:20,
131:18, 131:20,
133:1, 141:15,
154:19, 157:17,
173:12, 176:14,
176:16, 176:22,
176:25, 177:11,
177:16, 177:19,
177:21, 178:2,
178:8, 178:10,
178:11, 179:19,
180:12, 184:22,
184:24, 186:15,
186:17, 187:9,
187:19, 188:6,
188:17, 188:19,
189:4, 189:20,
189:21, 189:22,
189:23, 189:24,
190:2, 190:8,
191:7, 191:9,
191:19, 191:23,
192:9, 192:16,
193:13, 193:16,

194:3, 194:10,
194:20, 195:6,
195:11, 195:15,
195:19, 195:23,
195:25, 196:1,
196:2, 196:6,
196:7, 196:8,
196:9, 196:18,
197:5, 198:22,
205:5, 219:12,
223:9, 225:21,
225:23, 228:1,
228:16, 231:1,
234:5, 248:25,
249:3, 254:23,
255:4
**balance**
206:21, 206:24,
207:2, 210:10
**balloon**
229:18
**bang**
85:6
**banged**
84:13
**base**
244:3
**based**
7:13, 27:13,
88:22, 96:13,
114:25, 115:1,
115:9, 125:14,
135:8, 135:15,
141:4, 143:20,
145:17, 160:21,
215:1, 253:1,
253:3, 253:19
**basically**
89:23, 121:12,
158:21, 170:25,
190:16
**bears**
56:19, 179:1
**became**
138:4
**because**
9:25, 16:15,
54:10, 55:15,

57:25, 65:22,
69:25, 71:1,
71:14, 73:23,
75:4, 78:9,
80:3, 81:22,
84:14, 85:17,
86:4, 87:14,
94:24, 97:23,
98:15, 99:22,
112:21, 132:3,
143:5, 148:16,
149:17, 152:7,
162:15, 162:19,
174:7, 185:21,
199:19, 206:14,
209:17, 212:25,
219:23, 219:25,
227:1, 227:16,
228:2, 228:5,
228:8, 228:19,
228:23, 229:4,
229:9, 229:11,
233:25, 237:1,
249:13, 252:20,
255:6, 256:6
**beck**
1:22, 2:7, 7:5,
260:4
**been**
36:25, 50:18,
50:21, 73:13,
77:10, 109:13,
138:16, 145:9,
164:5, 173:2,
192:10, 201:6,
202:14, 202:15,
202:16, 202:18,
217:13, 232:9,
234:11
**before**
2:7, 8:5, 9:10,
10:4, 10:5,
47:17, 66:23,
89:1, 95:24,
100:13, 118:10,
154:6, 179:3,
191:23, 210:24,
235:13, 235:16,

Transcript of Keven Miller
Conducted on June 5, 2020                                    266

235:18, 238:12,
257:15, 260:4
**begins**
6:2, 51:6,
117:7, 173:10
**behalf**
3:2, 3:12,
6:17, 6:23
**being**
10:1, 48:23,
49:2, 61:5,
76:18, 78:22,
84:14, 85:11,
85:14, 85:16,
105:22, 120:4,
126:13, 148:10,
150:5, 179:19,
201:2, 201:17,
214:22, 221:6,
221:7, 223:12,
240:19, 240:21,
240:22, 240:25,
244:9
**belief**
104:11, 188:3
**believe**
16:17, 20:19,
20:23, 21:14,
21:17, 22:1,
22:21, 28:9,
34:4, 35:9,
35:19, 40:19,
46:9, 47:17,
48:14, 53:18,
54:14, 55:8,
68:21, 73:10,
79:11, 92:4,
98:21, 101:15,
104:18, 111:12,
115:4, 117:14,
117:19, 123:20,
125:25, 126:7,
126:15, 134:10,
139:15, 139:20,
147:23, 150:23,
153:9, 154:25,
160:18, 160:19,
161:6, 165:20,

170:14, 176:17,
179:7, 182:11,
182:22, 212:13,
212:23, 214:6,
214:25, 215:2,
215:5, 215:24,
220:12, 231:9,
234:15, 236:25,
242:20, 255:5
**below**
84:24, 89:8,
89:11, 194:4,
194:12, 194:17,
194:21, 195:1,
195:3, 195:8,
196:13, 196:19
**benefits**
129:16
**bernard**
3:13, 4:4,
6:22, 11:12,
16:9, 16:13,
23:7, 29:7,
30:1, 30:19,
34:11, 35:12,
37:13, 42:11,
42:19, 48:18,
52:2, 52:9,
52:14, 71:20,
73:5, 73:18,
75:2, 75:14,
75:17, 78:14,
80:1, 82:6,
89:12, 98:6,
108:24, 109:15,
110:2, 110:13,
125:6, 130:14,
158:25, 159:6,
159:14, 162:12,
162:17, 162:23,
182:24, 190:4,
202:6, 207:6,
211:2, 211:7,
225:2, 226:13,
230:6, 256:22,
257:17, 258:14
**besides**
183:10

**best**
10:4, 187:25
**bet**
72:22
**better**
242:15
**between**
22:23, 27:1,
31:22, 43:25,
60:24, 65:8,
65:11, 65:15,
66:1, 66:10,
66:17, 68:10,
72:15, 74:11,
74:12, 75:6,
76:7, 81:7,
82:23, 85:22,
92:12, 93:7,
93:25, 98:10,
99:16, 110:24,
122:12, 124:21,
139:23, 139:24,
140:13, 141:23,
142:23, 143:25,
144:4, 164:20,
164:21, 165:7,
169:18, 170:11,
172:5, 182:15,
189:9, 214:9,
251:14, 251:24,
251:25
**beyond**
238:24, 238:25
**bias**
242:11, 242:12
**biased**
239:20, 241:2,
241:5, 241:20,
241:22, 242:3,
242:7
**biases**
83:21
**big**
210:1
**bigger**
137:17, 202:3,
204:11
**billet**
148:23, 149:1,

149:16, 150:7
**bit**
33:9, 34:3,
90:6, 97:21,
149:5, 155:12,
172:25
**bits**
244:7
**blade**
43:17, 43:22,
44:9
**blades**
183:16
**block**
149:21, 181:5,
181:6, 181:10,
181:18, 181:21,
181:23, 182:4,
182:8, 182:13,
182:16, 182:19,
182:23, 183:3,
183:4, 183:10,
183:19, 183:21,
183:24, 184:2,
184:6, 184:16,
184:17, 184:18,
184:19, 185:11,
185:15
**blocked**
243:13, 243:14
**blocking**
128:18
**board**
44:9
**bodies**
207:14
**body**
86:3, 92:5,
233:19
**boil**
177:24
**bonding**
145:10
**bostitch**
45:21, 45:22,
137:19, 157:13,
157:17
**both**
39:9, 42:3,

Transcript of Keven Miller
Conducted on June 5, 2020

267

60:1, 66:16,
140:23, 142:18,
142:19, 142:20,
166:17, 169:8,
195:5, 201:8,
225:6, 225:15,
235:4, 235:13,
235:16, 235:18,
247:5
**bottom**
47:10, 66:24,
80:20, 158:5,
158:7, 158:11,
158:13, 159:5,
159:13, 179:16,
197:7, 197:8,
197:11, 197:12,
197:17, 197:23,
198:4, 198:6,
198:8, 198:11,
199:7, 199:8,
199:14, 199:20,
199:21, 199:23,
199:24, 199:25,
200:1, 214:7,
221:6
**boundaries**
188:4
**box**
153:25, 180:9
**breadth**
42:15
**break**
9:5, 9:11,
50:15, 50:23,
51:10, 97:24,
111:4, 117:1,
117:25, 118:10,
173:4, 173:15,
210:24, 211:5,
211:9, 230:21,
248:19
**breaks**
253:25
**brief**
118:5
**briefly**
47:16, 84:20,

85:17
**bring**
172:22, 172:24,
209:1
**bringing**
145:19, 148:6
**brought**
38:23, 145:9
**btb**
157:13, 157:18
**buck**
41:12, 41:15,
200:13, 200:14,
201:6, 206:3,
206:9, 207:16,
207:23, 208:2,
208:4, 208:5,
208:9, 208:11,
208:13
**buck's**
206:11
**bulk**
38:14
**bumpers**
244:6
**bunch**
150:10
**butted**
238:15

---
C
---
**cad**
54:2, 54:10,
55:12, 55:18,
55:24, 57:25,
58:1, 58:3,
96:21
**cage**
138:24, 139:3,
139:6, 139:7,
139:24, 139:25,
140:4, 140:9,
140:24, 255:1,
255:7, 255:23,
255:25
**calculate**
107:2, 133:23,
134:20, 140:20,

255:14
**calculated**
103:16, 105:25,
106:6, 106:25,
136:20, 139:16,
140:6, 140:25,
255:2, 255:12
**calculating**
139:23, 140:1,
255:19
**calculation**
88:9, 132:10,
132:12, 132:13,
139:12, 139:20,
140:22, 254:22
**calculations**
54:3, 87:15,
90:14, 95:8,
95:13
**caliper**
71:23, 72:2
**call**
13:14, 19:18,
21:12, 24:8,
44:19, 181:5,
225:15, 229:17,
229:18, 229:20,
229:23
**called**
21:10, 120:20
**calling**
180:1, 218:8,
218:10, 252:25
**calls**
23:8, 29:8,
30:2, 89:12,
108:4, 125:7,
144:15, 218:11
**cam**
22:9, 22:11,
22:14, 22:18,
214:3, 214:8,
215:1, 215:6,
215:9, 215:13,
217:5, 217:8,
217:9, 217:11,
217:12, 217:13,
217:14, 217:16,

217:18, 217:20,
217:21, 218:1,
218:4, 218:5,
218:9, 218:11,
218:13, 218:14,
218:15, 218:16,
218:20, 218:24,
219:1, 219:7,
219:8, 219:9,
219:14, 219:19,
219:21, 219:25,
220:3, 220:7,
220:9, 220:13,
220:15, 221:9,
222:1, 222:8,
222:12, 222:19,
223:2, 224:1,
228:24, 249:15,
249:22, 250:7,
250:10, 250:24,
251:1, 251:20,
252:7, 252:11,
252:12, 252:20,
252:25, 253:2,
253:7, 253:19,
253:21, 253:23
**came**
137:19
**cammed**
252:6
**camming**
251:5, 251:10,
251:12, 251:17,
251:23, 252:4,
252:11
**cams**
218:17, 220:5
**can't**
55:19, 70:22,
75:3, 80:10,
109:14, 112:4,
119:7, 122:8,
177:24, 190:25,
196:22, 199:2
**cancel**
134:14, 134:23
**canceled**
134:22

Transcript of Keven Miller
Conducted on June 5, 2020                                              268

cannot
10:22, 247:23
cap
76:4, 76:6,
76:7, 76:11,
76:12, 80:18,
80:19, 80:21,
81:2, 81:4,
81:8, 84:4,
84:7, 84:25,
85:6, 85:22,
87:4, 89:15
captively
233:18
carrying
233:7
cartridge
202:9
cartridges
202:9
case
6:6, 8:17,
13:12, 17:8,
17:25, 18:20,
20:10, 23:1,
23:12, 24:1,
24:6, 24:20,
28:11, 30:11,
31:10, 32:8,
36:4, 36:6,
57:22, 62:2,
75:25, 76:3,
97:19, 146:23,
158:18, 190:20,
260:11
casing
148:12
casting
70:7, 76:10
cause
84:21, 84:25,
246:2, 246:17,
248:2
caused
85:15, 247:24
causes
246:5
causing
85:20

center
206:10, 206:12,
207:4, 208:21,
208:24, 208:25,
209:3, 209:5,
209:7
centerline
99:1, 99:3
certain
80:10, 133:21,
141:18, 160:25,
171:11, 245:21
certainly
46:11, 78:2,
124:17, 204:1
certificate
260:2
certify
260:5
cg
209:10, 209:15,
210:4
chamber
65:8, 65:15,
66:11, 66:17,
66:19, 67:25,
68:10, 69:12,
71:5, 73:15,
75:11, 75:23,
76:6, 76:18,
76:23, 77:1,
77:4, 77:10,
77:18, 77:24,
78:8, 78:22,
79:3, 79:9,
79:13, 79:20,
79:22, 80:17,
80:20, 81:5,
81:15, 81:18,
82:5, 82:19,
82:23, 83:5,
83:8, 83:10,
83:23, 84:20,
84:23, 85:23,
86:7, 86:23,
88:6, 89:7,
89:11, 89:25,
90:8, 90:9,

104:8, 107:15,
108:15, 112:12,
113:3, 113:11,
115:12, 120:7,
120:15, 120:19,
121:9, 121:13,
123:4, 124:22,
127:8, 127:10,
128:7, 247:5
change
9:16, 20:12,
80:21, 81:2,
82:21, 84:24,
86:18, 87:1,
87:7, 87:18,
116:25, 172:13,
205:9, 206:10,
207:4, 209:21,
210:12, 210:14,
254:25
changed
39:3, 87:2
changes
21:20, 88:3,
220:10
changing
210:10, 253:15
channels
63:24, 63:25,
65:2, 70:6,
80:11, 93:14,
96:22, 97:1,
98:22, 99:5,
99:6, 99:9,
99:10, 99:14,
99:16, 108:14,
112:8, 113:4,
113:12, 114:18,
115:6, 115:24,
116:6, 118:12,
118:16, 122:11,
123:5, 123:9,
123:10, 123:15,
123:24, 125:21,
125:22, 126:2,
128:19, 128:23,
128:24, 129:4,
129:5, 129:6,

129:9, 130:8,
131:2, 132:25,
133:3, 133:7,
134:8, 243:12,
244:21, 245:8
characteristics
131:22, 131:23,
136:14, 136:23,
137:5
chat
10:12, 153:25,
254:7
check
106:8, 120:20,
120:23, 121:5,
121:7, 121:9,
124:17, 128:5,
136:19, 248:20
checked
96:21, 141:10
chicago
3:9, 3:17
chose
235:25
chris
13:16
circle
134:17, 135:7,
193:18
circles
119:15, 135:2
circuit
82:9
circular
41:10, 41:21,
41:24, 42:4,
42:9, 42:14,
42:16, 42:18,
43:13, 43:15,
43:19, 44:5,
44:7, 44:11,
44:13, 44:14,
44:15, 45:11,
45:14, 45:16,
82:9, 119:13,
120:1, 135:3
circumference
132:19, 132:21,

132:22, 133:16
**citation**
129:20
**cite**
79:1, 79:6,
126:23, 131:10,
131:14, 140:14,
141:3, 143:24,
162:9, 163:8,
251:3
**cited**
30:3, 235:9
**citing**
22:11
**civil**
1:6
**claimed**
63:6, 63:7,
102:7, 102:8,
104:2, 106:13,
193:15
**claiming**
145:3
**claims**
22:23, 27:20,
27:24, 27:25,
29:17, 32:2,
32:4, 36:5,
48:12, 48:17,
49:11, 49:15,
49:18, 49:22,
50:11, 52:7,
53:5, 53:6,
53:12, 53:17,
56:3, 56:4,
58:19, 58:24,
59:17, 75:19,
75:24, 99:22,
99:25, 112:10,
115:5, 115:20,
136:9, 141:18,
142:25, 143:4,
143:10, 143:15,
146:19, 146:25,
147:2, 147:4,
147:10, 147:12,
150:25, 153:3,
160:4, 160:15,

160:21, 160:25,
161:13, 161:20,
162:3, 163:4,
163:6, 163:15,
163:19, 163:20,
163:25, 164:6,
174:6, 174:14,
174:22, 175:2,
175:7, 175:15,
175:18, 175:21,
176:3, 176:7,
176:9, 176:10,
185:17, 189:21,
192:15, 195:5,
197:2, 200:17,
211:19, 211:23,
212:6, 212:12,
212:19, 213:9,
228:9, 228:10,
228:12, 228:25,
249:20, 250:16,
250:17, 253:1,
257:24
**clarification**
8:24, 9:1,
19:22, 256:18
**clarify**
9:15, 15:16,
21:23, 22:11,
108:25, 112:20,
117:12, 117:20
**clear**
41:14, 55:5,
85:12, 86:16,
236:6, 253:4
**clipped**
142:6, 221:12,
221:14
**clogging**
243:21
**close**
55:20, 165:4,
209:3
**closed**
143:6, 143:23,
148:15, 148:17,
149:12, 150:15,
151:18, 155:24,

157:18, 158:11,
158:12, 158:14,
158:17, 158:24,
159:4, 159:10,
159:13, 159:18,
159:19, 159:23
**closely**
32:22, 36:22,
38:19
**closer**
11:19, 81:10,
81:12, 81:19,
209:1, 209:2
**co-inventor**
57:14
**coaching**
110:15
**collaborate**
37:3
**collaborated**
33:24, 36:22
**collaborating**
32:21, 40:5
**collaborative**
258:6
**collated**
171:8
**collect**
172:11
**collectively**
20:3, 20:5,
132:9, 133:7
**column**
66:6, 114:6,
114:16, 122:22,
126:22, 126:24,
127:2, 128:12,
148:1, 156:8,
156:9, 156:10,
156:14, 156:16,
156:17, 164:15,
164:18, 166:16,
166:21, 169:12,
174:24, 194:1,
194:2, 194:7,
194:19, 195:14,
195:19, 197:11,
197:16, 197:20,

233:1, 233:3,
233:6, 233:12,
234:20, 235:10,
241:12
**com**
3:4, 3:14
**combination**
163:24, 201:5
**combine**
103:8, 116:12,
116:18, 116:21,
164:5, 206:3
**combined**
103:12, 111:13,
113:3, 113:11,
134:7, 222:23
**combining**
114:17, 145:15,
234:14
**come**
33:25, 40:8,
85:18, 158:16
**comes**
84:10, 87:25,
149:4, 150:16,
224:23, 243:21,
244:24
**comfortable**
72:24
**coming**
71:4, 204:18
**commercially**
168:25
**commission**
260:18
**common**
72:14, 129:14,
130:25, 205:16,
205:20
**commonwealth**
2:9, 260:25
**communication**
10:15, 10:18,
10:22, 65:8,
65:11, 65:15,
66:1, 74:12,
75:5
**communications**
254:4

Transcript of Keven Miller
Conducted on June 5, 2020

270

compact
203:2
company
47:18, 47:20
compare
23:23, 70:9
compared
84:15, 85:9,
92:16, 92:20,
93:3, 219:18
comparing
235:2
comparison
186:5
complete
11:2, 159:1,
159:2, 159:17,
188:25, 227:16,
259:5
completely
108:20
complicated
55:21, 235:1
component
64:3, 104:16,
109:21, 109:23,
184:6, 184:24,
185:5, 214:22,
220:15, 221:3,
222:1, 222:2,
227:23
components
108:10, 143:22,
145:15, 145:18,
146:16, 147:22,
157:10, 157:19,
157:22, 203:4,
206:16, 215:18,
215:19, 215:21,
222:21, 222:23,
223:1
compressed
127:6
compression
239:19, 241:16
compressor
89:6
compressors
245:22

comprising
169:17
computer
10:13
concede
185:16
concept
192:19
concern
211:8
concerning
14:2
conclusion
23:8, 29:8,
30:2, 125:7
conduct
48:15, 51:24,
52:5, 53:16,
54:15, 211:21
conducted
1:14, 2:2,
10:1, 91:5
configuration
64:24, 168:17,
168:20, 168:21,
169:1
configured
114:12
confirm
99:18, 109:11,
110:10
confused
16:15, 218:8
confusing
22:17
confusion
62:23
connect
81:15, 81:17,
82:4
connected
120:17, 121:21,
148:17, 158:3,
176:15, 176:17,
177:19, 178:11,
183:7, 183:9,
184:3, 192:12,
192:14, 195:20,

218:2, 220:24,
221:17, 221:18,
221:23, 225:25,
226:16
connecting
143:22, 145:18,
146:15, 147:22
connection
66:10, 66:17,
124:20, 155:5,
181:9, 182:8,
184:16, 218:4,
218:11
connections
181:8
connects
109:21, 109:23,
120:14, 121:23,
181:3, 181:7,
182:3, 182:13,
184:16, 185:24,
192:15
consider
12:8, 23:25,
36:13, 44:6,
44:12, 45:15,
54:2, 76:5,
121:11, 153:11,
153:15, 163:18,
186:15, 186:17,
188:18, 192:5,
252:2, 253:6
consideration
43:12, 209:20
considered
11:22, 12:2,
12:12, 12:20,
23:11, 32:5,
147:10, 163:20,
251:23
considering
42:21, 121:10
considers
186:5, 186:14,
186:16
consistent
152:3, 152:18,
152:21, 191:10,

191:12
consisting
215:12, 223:25
consists
101:2, 130:3
constantly
241:17
constitute
222:24
constitutes
218:4
constructed
223:7, 223:10
construction
100:19, 125:5,
176:18, 177:4,
177:5, 177:10,
177:13, 177:18,
185:21, 185:22,
187:17, 190:12,
214:10, 215:8,
215:15, 215:22,
221:21, 223:19,
249:20, 250:11,
250:18, 250:19
constructions
224:23
construing
147:10
consult
13:10
consultant
8:14
contact
84:11, 84:18,
85:17, 93:17,
94:9, 183:12,
183:13, 183:15,
183:18, 207:14,
218:4, 218:6,
218:10, 219:24,
219:25, 251:14,
251:20, 251:21,
251:22, 251:24,
251:25
contacting
219:22, 220:3,
220:5, 220:8

Transcript of Keven Miller
Conducted on June 5, 2020

271

contacts
181:8, 182:6,
182:7, 182:19,
182:23, 183:3,
183:20, 217:12,
218:1, 220:10,
252:3, 252:12
contain
37:15, 257:5
contend
48:4, 60:16,
111:9, 143:20,
151:17, 163:4,
188:16, 249:22
contends
53:4
content
32:20, 32:21,
32:23, 32:25,
33:5, 33:10,
34:23, 34:24,
35:1, 35:2,
35:6, 35:13,
35:20, 35:22,
36:23, 37:10,
38:18, 38:19,
38:20, 39:5,
39:6, 258:12
contention
49:5, 174:20
contents
18:16, 18:23,
34:13, 35:24,
37:21
contest
241:20
contested
163:20
context
29:21, 127:12,
127:13, 127:16,
254:11
continue
73:8, 210:25
continues
123:3, 157:21
contracts
121:6

contrast
23:23
controversial
110:1
conventional
165:22
conversation
13:20, 13:24,
13:25, 40:14,
40:15, 109:1,
254:9
conversations
14:3, 51:11,
54:21, 118:1,
118:3, 173:15,
254:1
coordinate
33:8, 46:11
coordinated
32:19, 38:18
copier
72:19
copies
15:8, 72:18,
153:22
copy
14:20, 16:11,
16:12, 17:11,
17:23, 18:2,
18:21, 19:1,
24:9, 24:12,
25:2, 25:5,
25:14, 25:17,
25:18, 25:24,
26:3, 26:10,
56:7, 56:9,
56:16, 56:21,
56:22, 56:25,
66:24, 154:1,
154:11, 155:4,
167:10, 167:17,
178:24, 179:6,
179:7, 182:11,
200:10, 200:12,
216:11, 231:13
cordless
5:6, 178:25
corrected
219:2

correction
21:2, 254:18
corrections
259:6
correctly
135:24
corresponding
28:24, 31:4,
219:19
could
13:10, 14:18,
16:20, 17:10,
17:17, 17:18,
21:8, 28:1,
41:17, 44:24,
55:22, 55:25,
56:5, 60:12,
65:4, 66:21,
67:6, 68:4,
68:14, 70:14,
72:22, 73:7,
73:25, 74:1,
78:11, 79:15,
82:4, 87:11,
88:20, 90:10,
91:10, 91:16,
91:25, 96:8,
96:9, 96:10,
96:13, 96:16,
97:4, 101:6,
104:20, 105:8,
106:2, 107:6,
107:23, 111:22,
111:23, 114:5,
116:18, 122:16,
127:25, 128:2,
142:12, 153:18,
154:19, 154:21,
156:3, 156:8,
156:18, 164:9,
164:15, 168:2,
171:8, 172:23,
179:15, 180:3,
180:6, 180:8,
180:21, 182:10,
186:19, 191:3,
192:22, 197:5,
197:11, 198:8,

199:2, 199:19,
200:4, 200:5,
201:11, 201:16,
205:22, 206:5,
207:17, 207:18,
210:18, 213:12,
235:23, 241:11,
242:1, 245:9,
246:17, 246:21,
246:23, 248:2,
249:3, 249:6,
256:7
couldn't
169:4
counsel
7:8, 7:12,
7:16, 8:18,
11:21, 12:11,
12:20, 15:15,
32:20, 32:21,
33:24, 36:22,
36:25, 37:4,
38:18, 38:21,
38:23, 39:4,
39:6, 40:4,
40:13, 51:11,
113:22, 118:1,
173:15, 254:1,
254:5, 254:12,
258:4, 258:9,
260:10
counsel's
187:18
couple
256:23
coupled
215:11, 223:24
course
8:22, 9:13,
19:7, 19:21,
19:24, 24:22
court
1:1, 2:8, 6:6,
7:4, 8:7, 9:18,
189:1, 215:15,
249:20, 250:11,
250:17, 260:2
court's
177:3, 177:4,

Transcript of Keven Miller
Conducted on June 5, 2020

272

177:10, 177:18,
187:17, 214:10,
215:8, 215:22
**cover**
18:22
**covers**
148:12
**create**
43:17, 87:19,
114:23, 124:20,
158:20
**created**
32:20, 36:23,
58:1, 189:1
**creates**
87:23
**creating**
34:2
**creator**
33:13, 33:14,
33:20, 33:22,
34:5, 34:7,
34:10
**criteria**
48:1, 48:2,
86:13
**critical**
148:23
**criticized**
188:2
**cross**
132:16, 135:25
**cross-section**
73:24, 87:21,
87:23, 115:9,
116:14, 118:22,
119:3, 119:8,
122:4, 124:11,
132:16, 150:11,
172:13, 172:24,
243:2, 243:6
**cross-sectional**
92:1, 103:1,
103:3, 103:7,
103:8, 103:11,
103:13, 104:6,
107:12, 107:16,
111:13, 111:14,

112:13, 113:3,
113:12, 113:19,
114:13, 114:18,
114:19, 114:22,
114:23, 115:13,
115:16, 115:18,
115:23, 116:7,
116:13, 116:18,
132:7, 133:1,
133:4, 133:8,
133:21, 133:22,
135:25, 136:24,
137:2, 137:4,
137:6, 137:16,
139:12, 139:16,
141:8, 255:14
**cross-sections**
122:13, 124:8,
126:3, 135:3
**crosses**
42:6
**crosshatched**
247:8
**crossing**
166:14
**crossover**
98:17, 103:4,
103:9, 103:13,
116:11, 116:13,
116:17, 116:19,
116:22, 130:4,
130:25
**crude**
54:2
**cubed**
107:5, 115:13
**current**
13:18, 83:2
**curve**
45:6
**cut**
48:19, 148:25,
162:20
**cutaway**
192:4
**cutout**
149:3
**cuts**
43:23, 44:8

**cutting**
43:20, 44:8
**cv**
46:13
**cycle**
94:1
**cylinder**
77:14, 77:15,
80:22, 80:24,
83:5, 87:3,
87:6, 89:24,
118:22, 119:6,
119:8, 121:8,
122:5, 124:6,
124:9, 124:12,
124:20, 126:20,
127:6, 127:7,
127:9, 203:23,
204:1, 204:8,
204:12, 222:14

**D**

**damario**
3:5, 6:18
**darker**
247:7
**dashed**
193:18
**dashed-line**
193:9
**data**
11:22, 12:19
**date**
6:8, 13:22,
100:3, 100:15,
259:11
**dated**
179:8
**dave**
52:21, 75:16,
78:16, 109:10,
110:6, 162:16
**david**
3:13, 6:22,
11:12
**day**
260:15
**dbernard@vedderp-
rice**
3:14

**deal**
43:25, 52:22,
210:2
**debris**
243:15, 243:21,
243:22, 243:25,
244:1, 244:2,
244:20, 244:24,
245:7, 245:10,
245:12
**decreasing**
87:22
**deep**
255:6
**default**
213:10
**defendant**
1:10, 3:12,
6:23
**define**
42:20, 225:5
**defined**
22:12, 29:11,
32:2, 32:3,
75:12, 76:1,
76:18, 76:23,
77:1, 77:5,
78:22, 79:4,
101:25, 223:17,
230:15, 230:18,
237:14
**defines**
156:23
**defining**
53:25, 77:3
**definition**
47:1, 48:6,
74:22
**definitively**
71:23
**degree**
39:20
**delaware**
1:2, 6:6
**density**
210:11
**depending**
43:20

Transcript of Keven Miller
Conducted on June 5, 2020

273

| | | | |
|---|---|---|---|
| **depends** 92:22, 198:19, 246:12, 247:25 | 41:11, 41:23, 42:10, 80:9, 80:19, 80:22, 84:2, 89:1, | 55:23, 71:9, 71:11, 72:15, 72:23, 88:9, 90:11, 90:13, | 135:20, 135:21, 135:23, 136:10, 140:2, 140:13, 141:10, 204:7, |
| **deponent** 259:1 | 90:21, 94:19, 95:14, 99:2, | 91:25, 96:7, 96:13, 96:16, | 204:8, 204:11, 204:12, 255:6, |
| **depos** 6:11, 7:6 | 136:19, 200:13, 204:14, 204:16, | 100:1, 100:12, 103:1, 103:7, | 255:9 |
| **deposition** 1:13, 2:1, 4:9, 6:3, 6:12, 7:2, 8:5, 8:19, 8:22, | 205:4, 205:10, 206:8, 209:2, 210:13, 236:5 **designation** | 103:11, 111:14, 116:6, 132:22, 137:6, 211:22, 244:20 | **diameters** 116:11 **die** 148:16, 148:24, 149:2, 149:3, |
| 9:13, 9:15, 9:19, 9:25, 10:22, 11:6, | 212:21 **designed** 88:24, 88:25, | **determined** 104:19, 112:11, 113:2, 113:10, | 149:18, 150:6 **differ** 214:19 |
| 12:25, 13:4, 19:7, 19:22, 24:22, 51:7, | 89:5 **designer** 39:19, 41:9, | 115:9, 115:22 **determining** 125:13, 136:14, | **difference** 31:22, 60:23, 63:16, 98:10, 99:16, 105:20, |
| 110:15, 117:6, 117:8, 118:4, 173:11, 254:11, | 41:13, 41:17, 41:20, 42:8, 43:24, 44:5, | 136:24, 147:15, 153:12 **develop** | 105:22, 141:23, 142:22, 143:25, 144:4, 145:4, |
| 254:14, 258:17 **depositions** 162:17 | 44:11, 45:14, 136:18 **designers** | 30:15, 30:16, 30:18, 34:24, 36:6, 39:25, | 145:5, 152:7, 242:5 |
| **describe** 27:16, 35:25, 52:12, 125:24, | 42:12, 136:16, 136:20, 206:22, 210:9 | 168:12, 258:2 **developed** 27:24, 40:14, | **differences** 22:8, 22:22, 27:1, 27:5, 31:17, 94:23, |
| 146:14, 147:21, 151:16, 151:21, 198:10, 198:14, | **designing** 39:22, 41:9, 41:21, 42:3, | 170:14, 235:21, 258:5, 258:8 **developing** | 110:24 **different** 23:23, 27:13, |
| 199:14, 236:25 **described** 61:4, 148:15, | 42:6, 42:9, 43:13, 88:23, 95:8, 95:10 | 46:2 **device** 29:1, 29:5, | 29:12, 29:13, 31:25, 33:10, 34:4, 42:14, |
| 151:12, 157:2, 161:16, 181:20, 198:7, 232:5 | **despite** 120:4, 126:13 **detail** | 31:23, 149:7, 149:10 **devinsky** | 44:22, 45:3, 45:5, 45:8, 46:17, 49:18, |
| **describes** 120:2, 120:3, 148:10, 199:22, | 46:16, 73:24, 119:17, 146:12, 152:25, 153:17 | 3:6, 6:18 **diameter** 87:22, 92:9, | 59:13, 61:10, 63:22, 63:23, 63:25, 64:25, |
| 200:1, 238:14 **describing** 44:21, 157:7, | **detailed** 151:1 **detect** | 92:17, 92:21, 93:3, 93:9, 94:2, 96:25, | 65:3, 71:3, 78:4, 86:11, 98:22, 99:5, |
| 198:3 **description** 151:2 | 239:7 **determine** 28:20, 31:22, | 97:18, 132:24, 134:16, 134:17, 134:25, 135:2, | 99:9, 100:10, 108:9, 109:20, 110:5, 112:22, |
| **deserts** 244:8 **design** 39:16, 39:21, | 48:16, 49:21, 51:25, 52:6, 53:16, 54:16, | 135:5, 135:6, 135:10, 135:12, 135:15, 135:16, | 129:5, 131:23, 149:15, 151:9, |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Keven Miller
Conducted on June 5, 2020

274

196:25, 197:2,
205:16, 205:19,
208:3, 208:9,
208:11, 214:21,
221:2, 232:13,
232:15, 232:16,
232:20, 232:23,
250:12, 250:18,
253:17
**differentiating**
189:3
**differentiation**
192:20
**differently**
101:16, 103:16,
208:3
**differing**
184:23, 185:5
**difficult**
10:2, 33:25,
34:16, 94:23,
109:16
**dimensioned**
92:3
**dimensions**
79:13, 79:19,
81:23, 91:13,
91:20, 92:4,
133:15, 149:5,
207:9, 256:9
**direct**
21:8, 28:2,
28:18, 31:6,
62:23, 66:6,
66:20, 66:21,
67:6, 67:18,
78:11, 79:15,
91:16, 103:18,
107:6, 107:23,
114:5, 118:7,
119:18, 122:16,
122:22, 126:16,
128:11, 142:15,
147:25, 155:8,
155:10, 155:16,
168:2, 169:9,
172:6, 174:24,
180:6, 182:10,

186:20, 191:3,
193:22, 193:25,
205:22, 206:5,
217:23, 233:1,
237:2, 241:11,
247:2, 249:7
**directed**
40:17, 144:22,
171:11, 171:12,
172:4
**direction**
69:17, 127:7,
169:19, 200:17,
201:8, 209:14,
209:22, 233:20,
237:23, 237:24,
238:5, 251:11,
253:10, 253:15,
253:17, 253:18
**directions**
233:8
**directly**
71:4
**dirt**
243:21, 243:22,
243:24, 244:1,
244:2, 244:20,
244:24, 245:7,
245:10, 245:12
**dirty**
245:16
**disagree**
52:21, 67:13,
67:16, 113:21,
131:25, 182:14,
183:3, 183:22,
183:23, 185:7,
220:1, 252:10
**disclose**
59:24, 78:21,
79:8, 83:3,
200:16, 200:21,
200:23, 202:4,
232:5, 234:8,
236:3, 236:9,
236:12
**disclosed**
91:5, 148:9,

151:5, 151:22,
152:3, 152:18,
175:16, 235:20,
235:24
**discloses**
59:15, 79:12,
202:3, 202:8,
203:24
**discount**
111:23
**discuss**
138:5
**discussed**
38:24, 40:12,
63:9, 242:10,
243:13
**discusses**
119:25, 148:1,
178:2, 233:13
**discussing**
40:6, 64:8,
64:15, 64:17,
124:2, 234:20,
256:25
**discussion**
27:7, 119:14,
136:8, 178:13,
257:2
**discussions**
11:21, 19:24,
37:23, 39:7,
51:14, 254:12
**disk**
6:2, 51:6,
113:24, 117:7,
173:10
**disposed**
76:21, 128:16
**dispute**
49:13, 49:16,
50:13, 54:24,
55:5, 56:4,
143:14, 143:18,
162:3, 174:13,
184:15, 211:17,
212:2, 213:7,
213:11, 217:17
**distinct**
123:24, 129:5,

129:8, 183:25,
187:20, 189:1,
215:6, 215:9,
215:19
**distinction**
122:12, 171:9
**distorted**
72:20
**district**
1:1, 1:2, 6:6
**diverse**
42:13
**divided**
99:23, 105:3,
107:15, 112:15,
112:16, 134:13,
134:14, 134:24
**dividing**
104:6, 112:12,
113:2, 113:10,
113:14, 115:22
**doctrine**
30:23, 30:25,
31:2, 31:11,
31:14, 31:16,
31:18, 32:6
**document**
18:16, 32:10,
47:14, 97:8,
106:22, 140:15,
141:4, 154:3,
155:12, 155:14,
160:23, 179:8,
215:25
**documentary**
100:22, 203:8,
203:12
**documentation**
100:25
**documents**
11:24, 12:18,
13:3, 13:4,
13:9, 14:17,
100:8
**doing**
24:4, 87:25,
113:5, 132:13,
132:14, 140:22,

Transcript of Keven Miller
Conducted on June 5, 2020

275

144:7, 167:9,
179:23
**done**
48:19, 55:25,
87:15, 88:9,
89:24, 90:18,
90:20, 103:10,
130:15, 144:8,
149:24, 187:14,
244:19, 256:8
**dots**
120:1
**dotted**
68:10, 70:5,
70:14, 72:10,
73:13, 73:21,
74:15, 74:25,
75:10, 92:11,
92:12, 93:6,
111:20
**dovetail**
158:4
**down**
71:5, 73:14,
74:8, 74:10,
80:24, 84:13,
85:18, 156:18,
172:21, 177:25,
209:14, 209:22,
217:25, 234:24,
238:20, 239:6,
241:3, 241:21,
247:19, 252:17,
255:6
**download**
154:1
**downward**
227:6, 238:12,
238:17, 239:1,
239:11, 239:14,
239:15, 239:20,
240:3, 240:4,
240:16, 240:22,
240:25, 241:6,
242:4, 242:7
**dr**
6:20, 11:7,
22:12, 22:15,

22:16, 27:22,
45:18, 45:20,
46:7, 46:13,
46:17, 46:21,
46:24, 47:10,
47:15, 47:20,
47:23, 48:5,
49:9, 49:13,
53:4, 54:24,
55:6, 55:9,
56:1, 56:4,
135:5, 135:23,
136:7, 152:1,
152:13, 152:15,
152:16, 152:20,
160:1, 160:6,
160:12, 160:16,
161:7, 161:10,
161:18, 179:6,
179:18, 179:23,
180:12, 180:14,
181:5, 181:13,
181:24, 183:22,
183:23, 184:23,
185:4, 185:9,
185:14, 186:2,
187:5, 187:23,
188:2, 188:9,
207:22, 208:3,
208:7, 208:10,
213:7, 213:17,
214:17, 214:21,
216:24, 217:14,
218:20, 218:25,
219:2, 219:6,
219:14, 220:1,
220:13, 220:16,
221:5, 222:18,
223:4, 249:20,
250:10, 250:15,
250:18, 250:19,
250:21, 250:23,
252:8, 252:10,
253:1, 253:3,
253:19, 256:10
**draft**
38:7, 38:10,
38:24

**drafting**
39:2
**drafts**
39:7
**draw**
170:9, 170:21,
171:9, 171:21,
172:1, 172:2
**drawing**
140:6, 140:12,
141:13, 255:13,
256:14
**drawings**
57:1, 57:25,
58:1, 58:2,
58:3, 58:14,
58:15, 71:15,
100:24, 255:3
**drawn**
73:13
**drill**
42:4
**drilled**
70:6
**drive**
44:14, 44:20,
45:10, 178:21,
203:24, 209:14,
210:7, 226:4,
233:9
**driven**
225:8
**driver**
201:22, 226:6
**drives**
205:19
**drivetrain**
201:13, 201:14,
201:21, 201:25,
203:19, 203:22
**driving**
40:17, 40:20,
40:21, 40:24,
41:5, 41:7,
41:11, 41:23,
42:1, 42:10,
42:23, 43:1,
43:8, 144:15,

144:22
**drop**
95:2, 95:6
**dropped**
237:11
**dry**
225:4, 225:5,
225:7, 225:15,
225:16
**dryers**
245:22
**due**
129:15, 233:15
**duplicate**
68:12
**durability**
44:9
**during**
8:19, 8:22,
9:13, 9:15,
10:21, 11:21,
19:6, 19:22,
19:24, 24:22,
51:10, 111:4,
117:25, 155:6,
173:15, 218:3,
238:1, 243:18,
253:25, 254:9,
254:14, 255:5
**dust**
243:15
**dynamic**
129:16, 248:11

**E**

**e**
20:20, 21:11,
21:12, 21:14,
21:15, 21:16,
21:18
**e-d-w-a-r-d**
8:4
**e-notary**
260:2, 260:24
**each**
33:15, 71:23,
98:22, 99:3,
125:24, 157:25,

170:23
**earlier**
102:2, 117:12,
124:2, 125:25,
246:8, 256:25
**early**
254:9
**ease**
129:15
**easier**
78:2
**easily**
91:10, 171:8
**eccentric**
201:24
**economy**
205:17
**edited**
32:21, 36:23,
38:5, 38:11,
38:19, 39:3
**edm'd**
149:15, 149:16,
149:21
**edward**
1:13, 2:1, 4:2,
8:3, 259:2
**effect**
94:17, 96:16,
210:9, 210:13
**effects**
94:21
**effort**
207:2, 258:6
**either**
15:4, 39:4,
48:5, 51:21,
52:7, 53:18,
100:3, 111:24,
122:1, 137:16,
145:10, 160:22,
163:4, 170:20,
177:6, 200:24,
226:6, 227:23,
228:12, 229:19,
229:21, 234:9,
236:10, 239:7,
254:4

**ejected**
167:3
**ejecting**
200:17, 201:8
**electric**
197:13, 197:18,
199:4
**electrical**
181:7, 181:9,
182:6
**electricity**
182:9
**element**
22:9, 22:12,
22:17, 22:18,
29:6, 31:23,
31:25, 121:22,
127:20, 214:9,
215:1, 215:6,
217:21, 218:13,
218:14, 218:15,
218:21, 218:24,
219:1, 219:18,
219:19, 220:10,
228:11, 247:3,
251:20, 253:23
**elements**
22:14, 23:24,
30:20, 45:3,
147:6, 182:7,
210:4, 213:6,
215:15, 215:16,
222:24, 224:9,
228:15, 228:19,
229:4, 229:21,
229:23, 230:1,
230:4, 236:4,
242:18, 242:24,
251:25, 252:1
**elevation**
198:25, 199:4
**elongated**
193:8
**elongates**
194:4, 194:11,
194:17, 194:21,
195:1, 195:2,
195:7, 196:13,

196:19
**else**
6:25, 12:24,
37:1, 44:24,
51:15, 118:4,
156:11, 167:5,
178:1, 178:8,
181:15, 211:2,
211:4, 253:16
**embodiment**
111:25, 113:9,
124:2, 146:17,
146:24, 148:9,
150:20, 151:5,
151:9, 152:3,
152:18, 152:21,
165:9, 165:14,
168:14, 175:10,
175:12, 175:16,
197:14, 198:15,
199:5, 208:4,
208:10, 208:11,
212:9, 244:18
**embodiments**
75:20, 80:6,
112:25, 113:13,
146:13, 147:20,
151:2, 151:12,
165:11, 165:23,
236:7, 236:12
**emery**
3:7, 6:19
**employ**
77:13
**employed**
260:11
**employee**
13:14, 13:15
**employees**
13:13, 13:18,
54:22
**enable**
226:10
**enabled**
227:4
**encompass**
158:21, 158:22,
159:9, 159:22

**end**
96:11, 108:4,
135:6, 135:9,
135:11, 135:16,
143:6, 143:23,
148:15, 148:17,
149:12, 150:15,
151:18, 155:24,
157:18, 158:11,
158:12, 158:14,
158:17, 158:24,
159:4, 159:10,
159:13, 159:19,
159:23, 221:12,
226:11, 226:23,
227:5, 258:16
**ends**
180:7
**engine**
205:15, 205:19
**engineer**
39:15, 39:19,
141:13, 206:8
**engineering**
39:15, 39:20,
72:8, 72:11,
255:13, 256:13
**enlarge**
137:3
**enlighten**
144:2
**enough**
111:3
**ensure**
166:5, 232:13
**entered**
244:21
**entire**
86:24
**entirely**
192:21
**entirety**
177:24, 178:6,
197:24, 257:15
**entitled**
154:4, 215:25
**entry**
61:11

Transcript of Keven Miller
Conducted on June 5, 2020

277

| | | | |
|---|---|---|---|
| **environment**<br>137:21 | **estimate**<br>97:20 | 203:12 | **execution**<br>213:2, 221:22 |
| **equal**<br>134:17 | **estimates**<br>11:18 | **evidentiary**<br>145:12, 152:11 | **exemplar**<br>54:13, 54:16, |
| **equally**<br>64:10, 64:20 | **et**<br>56:19, 154:12 | **exact**<br>11:17, 13:22 | 57:16, 57:19,<br>58:5, 58:9, |
| **equals**<br>132:15 | **evacuate**<br>85:20 | **exactly**<br>27:3, 34:1, | 140:8, 141:9,<br>255:10, 255:15, |
| **equating**<br>135:25 | **evacuated**<br>98:11 | 83:4, 121:4 | 255:24 |
| **equipment**<br>43:16, 255:7, | **evacuates**<br>84:20, 85:19 | **examination**<br>4:2, 7:22,<br>256:21 | **exhaust**<br>130:12 |
| 256:7 | **evaluate** | **examine** | **exhausting**<br>61:3, 61:8 |
| **equivalent**<br>28:24, 31:3, | 30:20, 48:24,<br>49:2, 49:19, | 97:20 | **exhausts**<br>65:1 |
| 31:4, 31:18,<br>32:5, 61:20, | 73:22 | **examined**<br>208:10, 259:3 | **exhibits**<br>14:7, 14:24, |
| 61:24, 63:4,<br>63:6, 63:25, | **evaluation**<br>186:5 | **example**<br>31:24, 34:12, | 15:2, 24:4,<br>153:20, 178:19, |
| 102:8, 102:20,<br>104:3, 106:12, | **even**<br>74:5, 80:4, | 70:3, 75:9,<br>83:15, 91:2, | 200:7, 231:4,<br>231:6, 257:4 |
| 132:4, 133:22,<br>135:20, 136:1, | 84:15, 125:9,<br>157:9, 233:15, | 112:3, 129:2,<br>130:10, 131:6, | **exist**<br>248:13 |
| 224:3, 255:20 | 233:21 | 131:7, 136:5,<br>137:18, 138:20, | **exists**<br>74:23 |
| **equivalents**<br>30:23, 30:25, | **eventually**<br>65:1, 102:15 | 146:18, 151:9,<br>156:19, 156:21, | **exit**<br>61:11 |
| 31:2, 31:12,<br>31:14, 31:16, | **ever**<br>8:7, 8:9, 8:12, | 157:13, 158:18,<br>158:22, 165:14, | **expand**<br>204:23 |
| 31:19, 32:6 | 8:13, 85:16,<br>94:21, 95:3, | 165:17, 175:10,<br>175:12, 198:15, | **expanding**<br>169:17, 229:8 |
| **ergonomic**<br>42:2 | 96:4, 244:1 | 200:25, 201:1,<br>201:3, 203:16, | **expands**<br>121:6, 121:7 |
| **errata**<br>259:7 | **every**<br>34:21, 38:17, | 210:16, 218:24,<br>220:11 | **expect**<br>124:14 |
| **error**<br>20:22, 21:19, | 74:8, 111:25,<br>152:9, 219:21, | **examples**<br>130:8, 131:9 | **expending**<br>196:1 |
| 106:24 | 220:3, 220:7 | **exceed**<br>48:2 | **experience**<br>23:14, 39:22, |
| **especially**<br>65:2 | **everybody**<br>45:8 | **exceeds**<br>46:25, 47:24 | 41:21, 42:9,<br>42:15, 47:15, |
| **esquire**<br>3:3, 3:5, 3:6, | **everyone**<br>211:2, 211:4 | **excerpt**<br>97:7 | 72:17, 76:8,<br>88:23, 91:8, |
| 3:13 | **everything**<br>12:6, 38:23, | **excuse**<br>134:21 | 91:9, 92:15,<br>92:19, 100:18, |
| **essentially**<br>32:5, 64:1, | 181:15, 243:3,<br>244:7 | **execute**<br>78:2, 222:13, | 115:1, 120:5,<br>125:2, 125:15, |
| 104:14, 112:23,<br>135:1, 141:1, | **evidence**<br>71:20, 98:7, | 222:17 | 138:7, 207:10, |
| 212:8, 255:19 | 100:22, 130:25, | **executed**<br>208:2, 244:15 | |
| **establish**<br>109:19, 187:18 | 136:3, 145:7,<br>145:13, 203:8, | | |

Transcript of Keven Miller
Conducted on June 5, 2020                                                    278

207:15, 243:19,
243:22, 244:3,
244:4, 244:23
**expert**
4:10, 4:12,
4:15, 4:17, 5:8,
5:12, 6:20, 8:9,
8:12, 15:22,
17:3, 17:19,
17:24, 18:11,
22:12, 76:3,
179:7, 212:5,
216:9, 224:24,
257:1, 257:4
**expires**
260:18
**explain**
9:23, 85:4,
121:3
**explained**
85:4
**explaining**
120:13
**explanation**
68:22, 219:5
**explanatory**
251:4
**explicit**
196:11, 196:17
**explicitly**
78:21, 79:19,
232:4
**exploded**
100:8, 100:24
**exposed**
85:7
**exposes**
59:10
**expound**
53:20
**extend**
81:13, 204:3
**extended**
195:23
**extending**
174:10, 176:19,
176:21, 185:23,
192:10, 192:15,

195:24, 196:3,
196:5
**extension**
153:9
**extensively**
107:25
**extent**
23:7, 29:8,
30:1, 32:19,
36:22, 42:6,
53:25, 125:6,
258:6
**extra**
89:18
**extreme**
148:25, 246:16
**extremely**
73:15, 243:20
**extruded**
156:22
**extrusion**
148:8, 148:11,
148:14, 148:20,
148:22, 149:11,
150:16, 157:2,
158:1

---
**F**
---
**f**
174:5, 174:15,
178:25, 179:20,
185:17, 187:7
**f-'s**
187:8
**face**
67:16
**fact**
7:15, 233:24
**factor**
94:20, 95:10
**factored**
147:12
**factors**
42:3, 43:25
**facts**
11:22, 12:1,
12:19, 98:6
**fairly**
209:3

**familiar**
192:19
**familiarize**
205:6
**far**
228:12, 247:21
**fastener**
40:17, 40:20,
40:21, 40:23,
41:5, 41:7,
41:11, 41:23,
42:1, 42:10,
42:23, 43:1,
43:8, 44:8,
144:15, 144:22,
156:24, 158:20,
158:21, 158:23,
159:9, 159:22,
166:10, 167:2,
167:6, 168:17,
168:20, 168:21,
169:19, 169:20,
170:7, 170:23,
171:2, 171:6,
171:18, 171:20,
171:22, 171:24,
172:4, 172:7,
172:8, 172:10,
172:21, 203:25,
205:16, 205:19,
225:8, 233:7
**fasteners**
44:6, 44:12,
44:14, 44:20,
45:10, 167:19,
168:15, 168:25,
170:20, 171:5,
172:19, 172:23
**fastening**
100:21, 197:13,
197:18, 199:5
**faster**
137:22, 138:4,
166:12, 204:20
**features**
225:16
**fed**
44:12

**feed**
121:8, 166:10,
166:12, 167:2,
167:6
**feedback**
206:23, 207:1
**feeder**
225:10, 225:20,
225:22, 225:23
**feeding**
61:5, 61:9
**feeds**
44:20, 45:9,
225:11
**feel**
37:22, 48:22,
49:1, 148:2
**feels**
43:23
**felt**
21:22
**female**
145:11
**field**
206:23
**fifth**
155:20
**figures**
63:20, 64:13,
68:23, 71:2,
71:12, 72:18,
74:14, 92:3,
93:5, 104:15,
186:13
**file**
54:2, 54:10,
55:16, 55:18,
55:24, 193:3,
231:10
**filed**
155:6, 235:13,
235:15, 235:17
**files**
55:13
**filing**
100:13
**fill**
121:9

Transcript of Keven Miller
Conducted on June 5, 2020

279

**final**
149:5, 149:18,
149:20, 207:25,
208:1
**financial**
260:12
**find**
20:14, 21:4,
65:18, 101:16,
106:9, 236:13
**fine**
9:4, 10:8,
16:12, 52:18,
102:24, 109:25,
110:9, 174:2,
211:1
**finish**
5:7, 10:3,
10:5, 130:14,
130:16, 162:12,
162:23, 178:25
**finished**
149:22
**fire**
84:4, 84:7,
84:9, 84:10,
84:17, 84:24,
85:10, 85:15,
86:14, 225:4,
225:5, 225:7,
225:12, 225:15,
225:16, 226:6,
238:13, 238:15
**fires**
232:13
**firing**
80:23, 232:17
**firm**
6:19, 6:25
**first**
14:10, 20:24,
24:8, 58:25,
59:6, 59:7,
59:8, 59:11,
59:12, 59:15,
60:4, 60:9,
60:15, 60:22,
60:24, 61:2,

61:3, 61:7,
61:20, 61:24,
62:4, 62:7,
62:11, 62:12,
63:2, 63:4,
63:7, 63:17,
64:4, 64:8,
64:10, 64:15,
64:20, 65:1,
65:7, 65:14,
65:18, 65:25,
66:14, 68:9,
68:13, 78:24,
79:20, 91:21,
92:2, 92:7,
96:23, 97:2,
97:11, 97:16,
98:13, 98:18,
99:23, 101:9,
102:8, 102:13,
102:18, 102:21,
102:22, 103:3,
103:5, 103:8,
104:3, 105:4,
106:10, 106:13,
109:11, 110:10,
111:9, 111:15,
112:19, 116:7,
116:14, 117:21,
130:3, 137:19,
137:23, 151:24,
171:24, 172:1
**fit**
88:2, 168:18
**five**
11:18, 49:6,
98:1
**fixed**
221:13
**flapper**
84:11
**flip**
37:21, 80:9,
89:20
**flipped**
80:11, 90:8
**flow**
93:12, 93:15,

96:17, 102:12,
127:6, 127:9,
128:3, 128:5,
128:6, 131:22,
131:23, 132:4,
135:19, 135:20,
135:21, 136:8,
136:13, 136:19,
136:23, 137:5,
137:25, 182:9,
237:23, 237:24,
237:25
**flows**
102:14, 108:13,
127:24
**fluid**
65:7, 65:14,
65:25, 66:10,
66:17, 94:1,
136:8
**focus**
64:2, 110:22,
237:5
**focused**
256:11
**focusing**
130:13, 130:20,
158:7, 161:3
**follow-up**
257:21
**following**
57:5
**follows**
117:6, 214:13
**forbids**
115:5
**force**
84:3, 84:14,
84:22, 85:11,
85:14, 85:20,
238:22, 238:23,
239:1, 239:11,
239:16, 240:5,
240:6, 240:10,
240:12, 240:13,
240:19, 240:25,
247:23, 247:25,
248:1

**forces**
43:7, 85:6,
86:12
**foregoing**
259:4, 260:5,
260:6
**form**
32:10, 38:24,
39:6, 41:7,
123:12, 129:9,
143:22, 149:18,
149:20, 150:4,
151:18, 207:6,
230:6
**formally**
7:9
**formed**
126:20, 127:5,
143:6, 143:13,
143:19, 143:21,
145:1, 145:5,
145:9, 146:3,
146:5, 147:16,
148:16, 149:12,
150:19, 151:4,
151:8, 151:11,
152:2, 152:8,
152:10, 152:16,
152:17, 152:20,
153:13, 157:18,
158:1, 158:17,
159:9, 159:20,
159:23, 160:2,
160:13, 160:11,
161:19
**former**
13:18
**forming**
11:23, 12:2,
12:9, 12:12,
12:20, 13:12,
23:11, 24:1,
32:8, 151:6
**forms**
149:2
**formula**
134:9, 135:1,
135:15

Transcript of Keven Miller
Conducted on June 5, 2020

forth
23:5, 28:6,
254:23
forward
198:20
found
61:20, 63:5,
103:24, 105:16,
117:17, 161:22,
255:18, 257:8,
257:11
four
11:19, 14:6,
98:1, 98:17,
101:2, 101:12,
101:24, 102:12,
102:15, 102:17,
103:6, 103:9,
103:13, 111:9,
111:13, 130:3,
130:24, 131:22,
132:7, 132:9,
132:25, 133:3,
133:7, 133:11,
133:17, 133:20,
133:23, 134:1,
134:8, 134:10,
134:18, 135:14,
136:15, 136:17,
136:21
fourth
187:4, 187:23
frame
75:13, 76:2,
76:5, 76:12,
76:13, 76:19,
76:22, 76:24,
77:2, 77:5,
78:23, 79:5,
89:15, 123:1,
210:14
framepro
141:17, 141:23,
141:24, 142:1,
142:2, 142:3,
142:23, 143:3,
143:11, 143:16,
160:3, 160:14,

160:20, 161:6,
161:8, 161:12,
161:20
frames
76:9
free
37:22, 148:2
frequency
43:18, 43:19,
43:21
frhxp
141:17, 141:23,
142:1, 142:23
friction
93:22, 93:24,
93:25, 94:4,
94:8, 94:10,
94:14, 94:16,
95:3, 95:9,
96:7, 96:14,
99:8, 99:10,
99:13, 99:15,
134:1, 134:2,
247:24
friday
1:15
front
15:8, 17:11,
18:3, 19:2,
24:12, 25:5,
25:18, 26:3,
26:14, 56:23,
164:11, 164:12,
179:12, 182:12,
188:7, 216:12,
231:14, 236:21
frustrate
110:3
full
8:2, 17:10
fully
12:5
function
28:23, 29:5,
29:11, 29:13,
29:17, 29:19,
29:25, 30:4,
30:6, 31:3,

31:20, 32:1,
32:4, 64:1,
88:13, 90:17,
213:6, 222:9,
222:13, 222:17,
222:21, 223:5,
223:16, 223:18,
224:2, 224:6,
224:16, 227:3,
227:9, 227:10,
227:17, 227:25,
228:20, 229:5,
229:10, 229:24,
230:2, 230:5,
230:11, 230:13,
230:16
functioned
27:22
further
81:14, 128:15,
166:4, 172:25,
190:24, 195:22,
256:17, 257:17,
258:13
fusion
174:5, 174:15,
178:25, 179:20,
185:17, 187:7,
187:8, 191:16

G

ga
5:6
gap
164:19, 165:7
gear
201:23, 204:2
gearbox
204:4
gearboxes
203:2
gears
204:6, 206:19,
207:12
general
27:5, 27:16,
35:25, 40:23,
76:8, 243:19,

246:15
generally
26:24
geometry
96:17
gestures
9:23
getting
16:14, 108:17,
210:23, 229:2,
247:21
give
11:17, 82:25,
92:4, 97:20,
152:9, 154:21,
209:25, 224:21,
237:3, 243:1,
253:8
given
8:5, 96:11,
110:1, 259:5
gives
176:5, 246:18
giving
213:23
glenn
3:21, 5:9,
5:13, 6:20,
216:9
glued
168:25
gluing
145:11
go
17:14, 20:14,
24:6, 33:15,
42:3, 52:14,
66:4, 74:1,
75:4, 95:8,
107:21, 109:2,
109:5, 110:18,
111:5, 116:24,
125:8, 126:7,
126:21, 129:23,
139:18, 144:14,
146:21, 153:25,
154:19, 156:4,
162:10, 162:24,

Transcript of Keven Miller
Conducted on June 5, 2020

281

166:4, 168:23,
176:1, 180:21,
194:19, 195:11,
204:20, 205:5,
218:23, 233:12,
234:4, 234:5,
234:24, 237:1,
238:4
**goes**
38:15, 182:15,
195:22, 228:13
**going**
8:18, 9:2,
22:7, 24:5,
29:7, 44:12,
50:14, 50:18,
50:21, 51:2,
51:16, 52:14,
52:15, 63:21,
72:21, 80:9,
82:25, 86:6,
86:10, 86:19,
86:20, 86:22,
95:1, 106:8,
109:6, 109:13,
110:25, 111:5,
117:2, 117:3,
117:13, 122:25,
140:23, 144:20,
155:11, 155:12,
156:13, 162:14,
162:21, 163:1,
166:10, 166:11,
167:10, 169:6,
171:5, 171:14,
173:2, 181:23,
187:11, 189:13,
200:9, 200:12,
202:6, 209:15,
209:21, 209:22,
210:22, 211:3,
215:16, 216:8,
228:1, 230:22,
231:11, 241:7,
245:23, 245:25,
248:5, 248:21,
254:22, 258:18
**good**
7:24, 7:25,

173:3
**governing**
28:7
**gradually**
170:17, 170:24
**grasping**
108:20
**gravity**
206:10, 206:12,
207:5, 208:21,
208:24, 209:1,
209:3, 209:5,
209:7
**great**
42:5, 42:15
**greater**
84:17, 133:12,
133:24, 134:2
**green**
182:25, 183:1,
183:2, 186:9,
188:20, 191:9
**grip**
209:2
**groove**
164:21
**group**
24:5
**grzelak**
3:22, 14:9,
15:15, 15:24,
16:3, 153:25,
216:2
**guess**
58:11, 71:21,
96:10, 150:8,
172:22, 180:9,
207:18
**guidance**
12:4
**guide**
37:23, 158:20,
163:8, 164:21,
164:25, 165:1,
165:13, 165:15,
165:16, 165:24,
166:1, 166:2,
166:5, 166:8,

166:9, 166:10,
166:17, 166:25,
167:4, 172:20,
172:22, 172:24,
179:1, 207:14,
233:19
**guided**
91:8
**guiding**
166:13
**gun**
41:1, 41:4,
41:6, 41:7,
41:11, 123:1,
123:17, 165:22
**guy**
23:17
**guys**
45:24

| H |
| --- |

**half**
11:20, 94:25,
95:1, 109:13
**halfway**
217:25
**hammer**
84:4, 84:7,
84:9, 84:10,
84:17, 84:24,
85:10, 85:15,
86:14
**hand**
9:23, 34:2,
39:2, 76:10,
260:14
**handheld**
39:22, 41:25,
42:2, 42:3
**handle**
176:15, 176:17,
177:20, 178:11,
184:1, 184:7,
184:9, 186:8,
186:14, 187:8,
187:18, 188:23,
189:4, 194:5,
194:12, 194:17,

194:21, 195:1,
195:3, 195:8,
195:20, 196:13,
196:19, 197:23,
200:24, 201:9,
207:23, 208:6,
208:8, 208:12,
209:1, 209:16
**happen**
243:12, 244:20,
246:11, 247:14
**happened**
139:9
**happens**
121:3, 246:4,
246:7, 246:14,
246:15
**happy**
55:17, 108:24,
147:24, 147:25
**hard**
14:19, 15:7,
17:11, 18:2,
19:1, 24:11,
56:9, 56:22,
56:25, 69:19,
71:6, 120:21,
120:23, 122:2,
167:16, 182:11,
216:11, 247:25
**head**
86:11, 95:10,
96:11, 142:5,
142:6, 156:24
**heading**
63:3
**hear**
70:19
**heard**
42:22, 43:1,
93:22, 144:9
**hearing**
200:19
**hears**
246:19
**heat**
148:22
**heated**
149:1

Transcript of Keven Miller
Conducted on June 5, 2020

282

heavier
206:17
height
89:22, 90:2,
90:5
help
9:23, 21:23,
37:9, 172:22
helped
12:6
helpful
19:18, 169:8
here
6:2, 6:24,
14:9, 22:6,
22:22, 23:16,
28:5, 32:9,
32:13, 49:25,
51:6, 54:14,
61:24, 66:8,
72:7, 102:7,
104:3, 106:4,
106:12, 109:16,
113:24, 117:7,
119:23, 120:8,
121:23, 121:24,
122:13, 131:21,
139:22, 173:10,
174:18, 175:9,
183:1, 191:1,
205:8, 216:21,
248:19, 250:18
hereby
7:18, 259:2,
260:5
hereunto
260:14
high
43:18, 85:9,
229:6, 229:7
high-pressure
86:1, 89:4,
89:6, 91:1,
91:2, 91:5
higher
82:2, 82:19,
83:7, 87:24
highlight
62:8, 142:17,

167:22, 193:19
highlighted
97:11, 181:12,
181:20
highlighting
15:7, 219:6
hiss
246:19
hissing
244:11
history
152:23, 153:2,
153:4, 153:7,
153:11, 153:16,
157:6, 193:3
hitachi
48:24, 49:3
hitting
43:10
hold
47:3, 76:10,
256:15
holdings
1:4, 6:4, 6:17,
8:17
hole
70:6, 118:22,
119:3, 119:9,
129:15, 131:2,
131:24, 132:5,
132:17, 133:22,
133:25, 134:3,
135:12, 135:17,
135:21, 135:22,
136:15, 136:17,
137:3, 137:7,
137:17, 138:24,
139:8, 232:17,
236:13, 236:14,
247:17, 255:1,
255:17, 255:21,
255:23, 256:1,
256:5, 256:12
holes
97:24, 98:18,
101:3, 101:13,
101:25, 102:12,
102:16, 102:17,

103:4, 103:6,
103:9, 103:14,
111:9, 111:14,
116:11, 116:14,
116:17, 116:19,
116:20, 116:22,
118:20, 118:24,
119:10, 119:12,
120:5, 120:9,
120:15, 120:16,
121:1, 121:2,
121:7, 121:14,
121:16, 121:18,
121:21, 122:1,
122:4, 122:7,
122:14, 124:6,
124:14, 124:19,
125:3, 126:3,
126:6, 126:14,
127:4, 128:1,
128:3, 129:14,
130:4, 130:11,
130:25, 131:1,
131:10, 131:23,
132:1, 132:4,
132:8, 132:9,
133:12, 133:17,
133:20, 133:24,
134:1, 134:18,
134:23, 135:4,
135:12, 135:13,
135:19, 136:1,
136:15, 136:17,
137:1, 137:17,
137:18, 139:6,
139:17, 140:24,
255:19, 256:12
hollow
150:5
hose
226:17
hot
244:8
hour
50:19, 50:22,
109:13, 173:2
hours
11:19

house
50:2, 50:7
housed
87:17
housing
69:23, 156:22,
174:10, 177:12,
183:25, 184:7,
184:9, 184:17,
185:24, 186:3,
186:10, 186:16,
187:8, 187:19,
188:21, 188:23,
189:3, 190:3,
190:10, 195:24,
196:3, 196:6,
197:24, 222:15
housings
207:13
however
49:17, 163:7,
229:25
hydraulic
134:5, 134:6,
134:7, 134:10,
134:16, 135:2,
135:4, 135:9,
135:15, 135:23,
136:10
hydraulics
127:15, 127:16,
128:9
hydride
202:16, 202:19
hypothetical
29:9, 80:2,
81:6, 82:1,
82:13, 82:17,
83:2, 92:13,
226:14
hypothetically
94:15, 116:10

I

id
139:25
idea
246:19

Transcript of Keven Miller
Conducted on June 5, 2020                                                    283

identical
28:23, 212:9
identification
14:13, 17:2,
17:22, 18:14,
24:18, 25:4,
25:12, 26:2,
26:13, 56:14,
153:21, 167:14,
178:20, 185:10,
200:8, 216:6,
219:7, 231:7
identified
15:5, 67:23,
67:24, 67:25,
69:3, 69:6,
69:13, 70:1,
80:13, 80:14,
81:19, 102:18,
103:5, 103:6,
109:12, 110:10,
110:11, 154:13,
180:24, 181:24,
186:1, 188:3,
191:9, 191:20,
191:21, 191:24,
203:16, 216:25,
217:2, 217:5,
217:8, 217:13,
217:17, 218:16,
218:25, 219:2,
219:8, 219:15,
221:15, 222:19,
223:4, 223:12,
229:12, 253:23
identifier
75:8
identifies
179:18, 180:15,
186:2, 186:8,
186:9, 186:13,
186:16, 214:17,
217:15, 217:20,
217:21, 218:13,
218:16, 219:9,
219:11, 219:17,
219:19, 220:13,
220:17, 221:5,

221:8, 221:9,
253:2
identify
6:14, 21:2,
60:4, 60:15,
62:3, 62:10,
62:12, 63:17,
64:3, 68:9,
68:13, 74:25,
76:11, 76:12,
92:6, 98:17,
101:2, 101:12,
101:15, 101:17,
104:10, 104:14,
106:20, 111:8,
118:25, 119:24,
126:2, 157:22,
170:2, 170:5,
170:17, 170:19,
188:16, 188:20,
189:3, 189:11,
189:17, 217:18,
218:20
identifying
187:7, 214:21,
250:6
igs
55:16, 55:18
il
3:17
illinois
3:9
illustrated
156:21
illustrates
201:12, 201:14
image
72:20, 158:7,
179:16, 189:12,
193:3, 214:13,
214:14, 216:25
images
216:21
immeasurable
94:23
immediate
204:6
immediately
138:2

impact
42:16, 42:17,
42:20, 42:21,
42:22, 43:1,
43:5, 43:7,
43:9, 43:14,
43:18, 44:3,
45:15, 84:25,
93:11, 94:9,
95:2, 208:20
imparted
96:14, 99:8,
99:10
imperceptible
99:17
imperceptibly
99:12
implying
196:15
important
145:24, 146:2
importantly
214:8
impossible
33:17
improved
67:11
improves
210:4
inaccurate
73:15, 73:16,
74:4
inc
1:9, 6:5
inch
95:1
inclined
200:16, 200:21,
200:24, 201:7
include
29:11, 228:15
included
107:19
includes
18:22, 123:1,
123:4, 148:17,
156:23, 181:15,
193:8, 193:13,

193:17
including
18:16, 18:24
incomplete
29:9, 80:1,
226:13
inconclusive
54:8, 54:9,
55:13, 55:14
inconsistencies
219:6
incorporate
206:8
increase
87:21, 90:2,
90:5, 93:17,
94:4, 94:24,
94:25, 137:3,
137:15, 170:24
increased
84:4, 88:7,
88:10, 94:3,
138:3
increases
93:21
increasing
87:20, 93:16,
170:17
indicate
127:3
indicated
193:7, 193:8
indicates
165:5, 166:16,
198:24
indicating
212:1, 240:20,
250:9
indication
80:5
individuals
10:9, 10:19,
10:24, 42:13
industrial
1:8, 6:5,
39:16, 39:19,
39:21, 41:8,
41:13, 41:17,

Transcript of Keven Miller
Conducted on June 5, 2020

284

41:20, 42:6,
42:8, 42:12,
43:24, 100:19,
137:21, 244:4
**industry**
115:1, 135:24,
205:14, 205:18,
205:21
**information**
12:2, 12:8,
12:11, 74:23,
91:25, 147:18
**informed**
145:22, 147:4,
185:1
**infringe**
31:1, 143:4,
160:4, 160:14,
160:20, 161:6,
161:9, 174:6,
223:20, 224:10,
224:18
**infringed**
28:21
**infringement**
22:2, 28:8,
28:12, 29:15,
29:21, 31:15,
36:4, 36:6,
49:6, 54:25,
55:2, 55:3,
55:6, 126:8,
160:11, 190:15,
190:20, 250:21,
252:9, 257:5
**infringes**
51:21, 53:5,
53:6, 53:11,
56:2, 161:12,
161:20, 185:17
**infringing**
141:18
**ingested**
245:12
**inherent**
229:13, 229:15
**inhibit**
201:1

**initial**
4:10, 12:13,
15:19, 15:21,
15:22, 16:4,
20:3, 27:23,
33:14, 37:20,
78:12, 129:20,
131:13, 139:11,
140:25, 216:1,
216:16, 251:9
**inlet**
127:21, 128:1,
128:3
**inlets**
127:23
**inner**
132:6, 132:8,
132:23, 133:11,
133:12, 133:14
**inoperable**
225:24, 243:23
**input**
33:16, 35:15,
35:17
**inquiries**
161:2
**inserted**
181:3, 182:4,
183:21, 192:10
**inside**
127:7, 127:9,
192:2, 192:7,
192:17, 193:17,
244:8, 245:16
**insignificant**
95:2, 95:6,
210:6
**insignificantly**
94:5, 94:6
**insofar**
30:12, 33:7,
38:23, 96:20,
100:7, 102:11,
114:2, 121:10,
147:5, 177:8,
223:17, 226:4,
248:17, 251:24
**instance**
20:20, 21:10,

21:15, 61:7
**instead**
7:10, 77:14,
87:4, 89:17,
129:15, 131:2,
136:15, 150:5,
209:10, 235:25,
242:5
**insubstantial**
31:17, 31:23
**intake**
62:9, 62:14,
101:18, 101:21,
101:25, 104:9,
104:10, 104:12,
107:3, 107:12,
107:16, 108:5,
108:7, 108:9,
108:12, 108:13,
109:18, 109:22,
110:7, 112:22,
139:13, 139:17,
141:8, 254:22,
255:10, 255:15,
256:3, 256:4
**integrity**
129:16
**intent**
236:5
**interest**
260:12
**interior**
139:23
**interlocking**
158:4
**internal**
104:7, 107:15,
108:14, 115:12,
115:22
**interpret**
12:7
**interpretation**
27:24, 27:25,
36:5, 36:6,
150:19, 151:4,
151:11, 152:2,
152:15, 152:17,
152:22, 160:2,

160:12, 160:18,
160:19, 161:10,
161:18, 161:22,
214:20, 250:16,
250:17, 250:20,
250:23, 250:24,
253:1, 253:3,
253:20
**interpreting**
44:19, 152:20,
153:3, 153:7
**interprets**
249:20, 250:10
**interrupt**
113:23
**interruption**
254:10
**interview**
213:23
**introduce**
216:4
**introduced**
47:7, 56:15
**introducing**
209:6
**invalid**
160:7, 160:21,
161:1, 161:9
**invalidity**
4:16, 4:19,
14:1, 15:23,
16:5, 17:20,
17:24, 18:12,
18:19, 19:7,
19:25, 20:4,
20:6, 20:8,
20:23, 36:1,
36:7, 36:20,
37:1, 37:4,
37:6, 37:11,
37:12, 37:15,
38:16, 38:22,
49:7, 160:8,
160:23, 163:13,
163:17, 232:2,
257:5
**invent**
236:7

Transcript of Keven Miller
Conducted on June 5, 2020

285

**invention**
67:10, 68:20,
68:25, 73:22,
80:5, 146:20,
147:11, 165:24,
200:25, 201:1,
234:16, 234:21,
237:9
**inventions**
236:3, 236:9
**inventor**
57:12, 154:12,
154:16, 156:6
**inventor's**
15:5
**inverted**
77:7, 91:10
**investigate**
49:17, 49:21,
50:9
**investigated**
55:12
**investigation**
48:15, 51:24,
52:5, 52:13,
53:16, 53:21,
53:22, 54:1,
54:4, 54:7,
54:15, 100:5,
100:12, 211:21,
211:25, 244:19
**involve**
233:22
**involved**
86:13, 222:21,
223:2, 223:4,
224:5
**involvement**
34:17, 34:19
**ishizawa**
56:8, 56:19,
57:1, 57:9,
57:10, 57:11,
57:12, 58:21,
59:10, 59:13,
59:23, 60:3,
62:1, 63:15,
63:19, 63:20,

64:2, 64:3,
66:21, 66:24,
67:7, 67:19,
67:20, 68:5,
68:15, 68:19,
69:5, 73:23,
74:14, 74:25,
77:4, 77:7,
77:11, 77:16,
77:22, 77:25,
78:6, 78:21,
79:2, 79:7,
79:8, 79:12,
79:18, 79:22,
80:13, 80:14,
80:16, 80:19,
81:1, 81:23,
82:10, 83:2,
86:6, 86:20,
86:22, 88:12,
88:25, 89:10,
89:14, 90:21,
90:22, 91:13,
91:20, 91:23,
91:24, 92:6,
92:13, 92:23,
98:5, 98:9,
98:13, 102:21,
137:10
**ishizawa's**
67:10, 68:19,
89:7, 91:10
**issue**
109:17
**issued**
56:19, 235:16,
235:18
**issues**
51:18, 248:2,
248:6, 248:7,
248:13, 248:14
**item**
22:8, 172:19,
239:17, 241:7,
241:8
**itself**
22:10, 105:22,
176:20, 177:14,

191:15, 191:18,
192:6, 219:3

**J**

**jam**
166:11
**january**
260:18
**job**
1:20, 41:24
**jobs**
137:20
**join**
149:17, 151:18
**joined**
150:16, 150:18,
150:24, 155:24,
157:8
**joining**
6:25, 7:2,
47:19, 143:6,
143:13, 143:19,
143:21, 145:6,
145:10, 146:3,
146:5, 147:16,
148:16, 149:13,
150:20, 151:4,
151:8, 151:12,
151:22, 152:2,
152:8, 152:16,
152:17, 152:21,
153:13, 157:19,
158:17, 159:10,
159:20, 159:23,
160:2, 160:13,
161:11, 161:19
**joints**
145:11, 158:4
**joistpro**
22:9, 22:23,
211:14, 211:17,
213:2, 213:5,
213:11, 214:3,
214:8, 214:25,
215:5, 219:1,
222:7, 222:11,
222:16, 222:18,
222:24, 224:10,

224:25, 225:10,
225:12, 226:9,
226:17, 227:15,
228:23, 230:1
**joistpro's**
218:24
**june**
1:15, 6:8,
260:15

**K**

**k-e-v-e-n**
8:3
**keep**
68:5, 88:13,
88:15, 117:2,
166:13, 172:17,
172:23
**keeping**
168:15
**keeps**
172:19
**kept**
83:2, 83:3,
94:2
**keven**
1:13, 2:1, 4:2,
4:11, 4:13,
4:15, 4:18, 6:3,
6:24, 7:15, 8:3,
14:15, 15:22,
17:4, 17:20,
18:12, 51:7,
109:16, 117:8,
154:1, 154:13,
156:5, 162:24,
173:11, 258:17,
259:2
**kind**
34:13, 41:25,
43:7, 74:9,
77:7, 120:22,
124:18, 145:12,
167:22
**klaus**
231:11, 231:14,
231:21, 232:10,
232:12, 232:20,

232:22, 234:13,
235:13, 235:15,
235:16, 235:18,
235:24, 236:20,
236:23, 237:2,
237:4, 237:5,
237:9, 237:10,
237:12, 238:2,
238:9, 238:11,
238:14, 239:2,
239:4, 239:5,
239:12, 240:11,
240:13, 240:15,
241:22, 242:13,
242:15, 243:11,
243:18, 243:22,
244:3, 244:12,
244:14, 244:15,
244:21, 245:8,
245:13, 245:19,
246:13, 247:1,
248:12, 249:4,
249:12, 249:22,
252:16

**klein**
13:16, 13:17,
13:20, 13:25,
14:4

**knowledge**
11:4, 112:9

**known**
134:4, 137:15

**koki**
1:4, 6:4, 6:17,
8:17, 49:21,
50:6, 141:16,
212:11, 213:16

**koki's**
48:11, 48:16,
49:10, 49:14,
50:10, 187:17,
211:22, 212:5,
213:8

**kondo**
200:10, 200:15,
200:20, 200:22,
200:23, 201:2,
201:5, 201:7,

201:11, 201:12,
202:3, 202:4,
202:13, 203:15,
203:22, 203:23,
203:24, 204:13,
204:15, 205:2,
205:6, 205:9,
206:3, 206:9,
206:11, 206:16,
208:24, 209:11,
209:14, 209:21,
210:3, 210:4

**ksit**
56:20, 67:4,
97:8, 179:1,
179:2, 231:10,
231:11, 231:12

**kyocera**
1:8, 6:4, 6:23,
13:13

**kyocera's**
49:6

**L**

**lab**
46:9, 46:12

**labeled**
97:8, 158:8

**laid**
32:9, 32:12,
32:13, 32:16

**lake**
3:8

**language**
107:20, 126:12,
152:8

**large**
202:1

**larger**
131:2, 203:23,
204:7

**lasalle**
3:16

**last**
11:14, 11:18,
15:5, 180:22

**late**
210:23, 229:2

**later**
7:2, 9:15,
36:9, 52:23,
204:22, 255:25

**lateral**
252:15, 252:16,
252:19, 253:6,
253:10

**law**
12:5, 31:10,
190:15, 190:19

**lawyer**
31:8, 35:18,
224:19

**lay**
208:22

**lead**
121:2, 121:14,
121:18, 122:6,
123:21, 154:16

**leads**
147:18

**leak**
246:16, 247:16,
247:18

**leaking**
244:10

**leaks**
246:18, 247:20,
248:6

**least**
39:20, 220:7,
223:2, 225:20

**leave**
206:24

**left**
113:24, 123:21,
134:15, 134:23,
203:20, 217:5,
221:16, 247:8

**left-hand**
198:17, 198:22,
198:25, 199:4

**leftward**
197:25

**legal**
8:10, 8:14,
12:4, 12:14,

12:17, 23:8,
28:7, 28:10,
28:14, 29:8,
30:2, 30:10,
30:12, 30:14,
32:15, 32:25,
33:3, 33:23,
37:8, 37:9,
51:18, 125:7,
125:8, 224:12,
224:20, 224:23

**legality**
30:13

**length**
71:4, 71:7,
71:9, 71:23,
80:15, 83:6,
92:8, 92:11,
92:24, 93:8,
93:11, 93:13,
93:16, 94:3,
94:25, 96:22,
97:16, 97:23,
98:2, 98:4,
98:8, 98:21,
99:1, 99:3,
133:16, 133:17,
204:1

**lengthen**
82:3, 82:22,
93:20

**lengthened**
79:25, 81:21

**lengths**
71:3

**less**
132:8, 134:7,
234:25

**let's**
15:18, 37:19,
59:4, 60:8,
64:2, 65:4,
71:16, 76:14,
83:14, 108:16,
109:5, 110:22,
111:7, 116:10,
128:25, 132:21,
133:1, 133:3,

Transcript of Keven Miller
Conducted on June 5, 2020

287

133:17, 134:18,
135:14, 162:1,
162:10, 184:21,
185:9, 188:12,
191:7, 191:22,
197:6, 197:10,
210:17, 226:16,
228:16, 234:4,
241:25, 246:13,
247:1
**level**
33:23, 35:10,
39:25, 40:3,
40:6, 40:9,
46:18, 46:22,
46:25, 47:10,
47:21, 47:24,
48:3, 48:7,
215:11, 229:6,
229:7
**lieu**
7:9
**life**
44:9, 72:22,
72:25
**lift**
84:21, 201:15,
204:5, 206:19
**lifter**
201:21, 203:19,
204:3
**lifting**
84:12, 201:22,
202:1
**lifts**
85:14, 86:15
**light**
147:1
**lightweight**
156:22, 207:12,
210:3
**limit**
116:5, 116:8,
116:9, 176:7,
177:5, 178:4
**limitation**
28:21, 29:4,
29:22, 30:8,

31:1, 60:5,
60:6, 61:19,
61:20, 62:4,
62:5, 62:25,
63:4, 63:5,
63:8, 64:4,
64:6, 64:9,
64:10, 64:11,
64:16, 64:18,
64:21, 92:8,
96:24, 98:18,
103:23, 103:24,
104:19, 104:22,
104:24, 104:25,
105:6, 105:12,
105:15, 105:16,
106:5, 107:7,
111:7, 117:16,
117:17, 143:19,
174:7, 211:15,
223:23, 224:7,
229:11, 230:9,
230:12, 249:16,
250:7
**limitations**
29:16, 51:25,
52:6, 53:17,
53:23, 54:17,
101:10, 143:10,
143:15, 162:7,
163:10, 163:25,
174:14, 211:18
**limited**
169:18, 175:7,
175:15
**limits**
178:8
**line**
52:15, 66:6,
68:10, 70:5,
70:14, 73:13,
75:1, 75:10,
76:17, 92:11,
111:1, 114:8,
114:11, 122:6,
122:25, 123:3,
128:12, 148:1,
155:20, 156:14,

156:17, 156:18,
164:16, 164:18,
166:16, 166:21,
166:22, 169:12,
180:22, 187:4,
187:23, 189:7,
189:8, 189:9,
194:1, 194:2,
194:7, 194:20,
195:22, 197:12,
197:16, 197:20,
233:2, 233:3,
233:6, 233:12,
234:20, 234:24,
235:9, 235:10,
241:14, 253:12
**linear**
250:1, 251:11,
251:13, 251:15,
253:16
**lined**
167:23
**lines**
72:10, 73:21,
74:15, 92:12,
93:6, 111:20,
123:21, 126:22,
127:2, 189:2,
189:6, 189:11
**linkage**
250:1
**lip**
182:12, 182:14,
182:18, 182:23,
183:2, 183:21
**listed**
187:6
**lithium-ion**
202:15
**litigation**
257:6
**little**
22:17, 33:9,
34:3, 35:14,
35:16, 46:10,
87:5, 89:21,
90:6, 97:21,
149:4, 149:5,

155:12, 172:25,
209:18, 218:7,
254:10
**load**
84:16, 87:24,
88:1, 226:19
**loading**
42:16, 42:17,
43:1, 43:5,
43:15, 43:25
**located**
81:6, 81:7,
165:2, 208:5,
208:8
**location**
72:4, 77:18,
77:23, 77:25,
78:7, 81:19,
192:7, 208:13,
208:16, 210:5
**lockout**
225:15, 225:16
**long**
11:15, 17:13,
18:21, 70:4,
80:6, 94:18,
206:25, 211:6
**longer**
69:17, 70:8,
70:23, 72:23,
73:11, 80:12,
92:9, 92:11,
92:15, 92:19,
93:2, 93:6,
93:9, 96:25,
97:17, 97:21,
98:13, 204:2,
224:7, 224:17
**look**
13:22, 59:4,
69:5, 76:17,
82:17, 83:14,
85:21, 86:12,
92:23, 98:9,
98:24, 99:1,
111:5, 114:8,
129:2, 134:9,
149:6, 150:1,

Transcript of Keven Miller
Conducted on June 5, 2020                                                288

172:16, 174:23,
189:13, 198:19,
199:20, 199:21,
199:23, 203:15,
209:13, 209:14,
246:13, 247:1
**looked**
21:5, 23:17,
23:18, 27:21,
102:2, 140:11,
140:22, 177:3,
237:1
**looking**
23:21, 37:20,
55:24, 64:13,
73:2, 81:1,
81:9, 93:1,
114:6, 118:23,
123:14, 126:11,
126:16, 156:13,
198:20, 198:21,
209:22, 240:18,
257:23
**looks**
68:2, 73:13,
83:21, 119:2,
119:7, 167:4
**lot**
23:16, 34:23,
42:2, 55:15,
55:17, 85:22,
86:5, 204:20,
255:4, 256:8
**lower**
22:10, 77:5,
80:21, 214:9,
215:13, 217:5,
218:2, 219:3,
220:24, 221:3,
221:5, 221:8,
221:16, 221:25,
222:7, 222:20,
223:3, 224:1,
237:17, 239:17,
241:17, 247:17
**lug**
249:15, 249:19,
249:23, 249:25,

250:2, 250:6,
250:9, 250:25,
251:4, 251:9,
251:13, 251:14,
251:15, 251:18,
251:20, 252:3,
252:15, 252:16,
252:19, 253:6,
253:12, 253:15
**lunch**
117:1, 118:10
**luncheon**
117:5

## M

**m-i-l-l-e-r**
8:4
**machined**
124:19
**made**
76:6, 88:4,
112:7, 116:3,
118:16, 120:4,
120:8, 120:15,
126:14, 127:3,
149:18, 149:20,
160:7, 181:8,
189:10
**magazine**
44:15, 44:16,
44:17, 44:18,
44:19, 44:20,
44:24, 45:9,
45:12, 45:15,
45:17, 143:5,
143:23, 145:1,
145:7, 145:8,
145:13, 146:15,
147:21, 148:2,
148:10, 148:11,
149:7, 149:10,
150:9, 150:15,
150:24, 151:6,
152:11, 156:21,
157:4, 158:19,
159:1, 159:2,
159:7, 159:17,
165:2, 166:3,

166:6, 166:9,
166:11, 166:19,
168:18, 172:14,
194:22, 194:24,
195:3, 197:22,
198:3, 200:16,
200:21, 200:22,
200:23, 201:2,
201:4, 201:7,
204:16, 205:3,
205:10, 205:20,
206:9, 206:11,
206:17, 207:5,
208:19, 208:23,
209:8, 209:17,
209:21, 210:3,
225:1, 225:10,
225:13, 225:18,
225:23, 226:19,
233:7, 233:13,
233:14, 233:20,
233:23, 233:25,
234:3, 234:16,
234:23, 236:1,
236:4, 236:5,
236:10, 236:17,
236:19, 239:20,
239:25, 241:2,
241:4, 241:20
**magazines**
45:6, 45:7,
45:8, 166:9,
166:12, 166:24,
167:1, 207:13
**magnesium**
210:15
**major**
43:10
**make**
14:19, 15:1,
21:3, 21:21,
24:7, 52:16,
60:19, 63:14,
77:12, 82:7,
82:14, 86:2,
86:6, 89:15,
90:15, 110:15,
111:9, 122:14,

131:10, 137:22,
150:14, 171:7,
178:5, 182:7,
182:8, 204:23,
207:2, 211:4,
241:9, 253:4,
254:18
**makes**
10:1, 186:4,
245:11
**making**
82:21, 85:5,
87:25, 130:11,
137:17, 190:17
**male**
145:11
**malfunction**
245:9, 246:2,
246:5, 246:17
**malfunctions**
246:22
**manager**
46:9
**manifold**
127:11, 127:12,
127:14, 127:17,
127:19, 127:20,
127:22
**manifolds**
128:8
**manner**
77:13
**manufacture**
129:15, 157:4
**manufactured**
149:11
**manufacturers**
245:24
**manufacturing**
145:2, 145:14,
146:15, 147:21
**many**
14:3, 42:14,
45:5, 47:17,
87:24, 113:25,
135:4, 135:12,
135:13, 146:24,
170:9, 205:16,

Transcript of Keven Miller
Conducted on June 5, 2020

289

213:4
**map**
162:6, 163:10
**mark**
14:17, 14:18
**marked**
14:12, 17:1,
17:21, 18:13,
24:17, 25:3,
25:11, 26:1,
26:12, 56:13,
153:20, 167:13,
178:19, 200:7,
215:24, 216:5,
231:6
**markings**
14:19, 15:1
**marks**
258:16
**mass**
84:10, 84:15,
84:18, 85:9,
85:17, 85:18
**material**
69:23, 87:5,
150:7, 156:22
**materials**
23:10, 181:17,
210:11, 210:14
**mating**
182:7
**matter**
6:4, 6:21,
135:3, 135:8,
135:12
**maximum**
104:7, 107:14,
115:11, 115:22
**maybe**
11:18, 21:7,
85:5, 97:17,
100:9, 103:18,
125:10, 228:1
**mcdermott**
3:7, 6:19
**mean**
9:24, 13:5,
22:11, 35:5,

35:16, 42:20,
43:5, 44:16,
46:1, 46:15,
48:19, 49:1,
49:24, 49:25,
53:20, 54:1,
58:1, 69:19,
78:14, 83:13,
86:9, 88:15,
93:5, 94:11,
106:23, 110:14,
118:12, 121:4,
121:20, 124:9,
135:21, 136:16,
147:19, 150:8,
151:9, 162:19,
165:15, 166:8,
168:12, 169:4,
170:8, 170:9,
174:20, 183:6,
189:6, 199:18,
202:7, 205:11,
209:9, 227:24,
239:9, 241:8,
245:22, 251:12,
257:22, 257:25
**meaning**
125:13, 125:17,
147:3, 147:16,
152:9, 153:3,
153:8
**means**
73:22, 146:3,
153:13, 167:6,
210:1, 219:25
**means-plus-funct-
ion**
28:21, 29:6,
29:15, 29:22,
30:7, 31:1
**meant**
251:13
**measure**
71:23, 72:7,
72:10, 72:14,
94:23, 96:10,
141:7, 255:3,
255:8, 256:2,

256:4
**measured**
94:21, 95:3,
104:8, 115:12,
115:14, 134:4,
255:4, 255:6,
256:8, 256:10
**measurements**
96:21
**measures**
95:21
**measuring**
94:7
**mechanical**
242:21, 242:23,
250:1
**mechanically**
151:17, 215:11,
223:24
**mechanism**
41:1, 201:15,
204:5, 206:19,
218:3, 219:21,
220:3, 220:7,
232:9, 232:10,
234:12, 234:13,
235:5, 235:24,
236:2, 236:11,
236:15, 236:23,
237:7, 238:2,
238:8, 239:2,
239:23, 241:5,
242:11, 244:13,
244:14, 248:8,
248:15
**mechanisms**
232:23
**meet**
12:24, 13:13,
29:5, 47:21,
48:2, 48:5,
96:23, 174:7,
211:14, 223:22,
227:15, 238:12
**meeting**
60:4, 62:4,
64:4, 92:7,
98:18, 180:15,

250:6
**meets**
29:2, 46:24,
47:23, 48:1,
51:25, 52:6,
53:17, 53:23,
54:16, 211:18,
249:15, 249:19,
250:9
**member**
215:9, 224:1,
228:24, 250:24,
250:25, 251:1
**mention**
98:15, 178:15
**mentioned**
90:7, 155:4,
156:5, 165:18,
246:8
**messages**
254:7
**messes**
244:8
**met**
30:8, 63:8,
143:11, 143:16,
174:15, 179:19,
190:1, 190:7,
190:23, 224:7,
228:4, 228:19,
228:23, 229:4,
229:11
**metal**
202:16, 202:18,
206:19
**meters**
21:11, 21:12,
21:15, 21:17,
107:5, 115:13,
115:14
**method**
129:14, 131:1,
144:1, 144:4,
144:6, 144:7,
144:19, 145:2,
145:15, 148:5
**michael**
3:23, 6:10

Transcript of Keven Miller
Conducted on June 5, 2020

290

middle
97:24, 98:24,
99:4, 99:11,
120:2, 165:2,
165:4, 172:21,
180:9, 243:2,
247:2, 247:19
might
22:5, 62:22,
90:6, 154:1,
202:16, 223:1,
248:19
miller's
48:21, 52:3,
52:10, 52:17,
110:17
mind
60:23
mine
15:21
minute
110:23, 179:22
minutes
50:19, 50:22,
50:25, 113:24,
113:25, 173:3,
211:3
mischaracterizes
35:12, 73:18,
190:4
misfires
41:2
missing
143:20
misunderstood
100:9
models
58:1, 96:21
modification
86:7
modified
82:24, 137:6,
227:24
modify
80:16, 136:14,
136:24, 137:14,
137:20, 201:7,
204:14, 204:16,

205:3
modifying
137:2
mold
149:12, 149:14,
150:1, 150:2,
150:17, 189:2,
189:6, 189:7,
189:8, 189:11
molded
188:21, 188:25
molding
148:11, 148:14,
148:21, 148:22,
149:11
moment
155:3, 160:1,
184:21, 185:9,
228:16
monitor
6:9
months
13:23
moorman
231:12, 231:14,
231:24, 234:3,
234:4, 234:8,
234:15, 234:19,
234:20, 235:4,
235:8, 235:13,
235:16, 235:18,
235:20, 236:9,
236:16, 241:25,
242:1, 242:3,
242:11, 242:16,
242:18, 248:8,
248:12, 248:16
moorman's
234:12
more
60:10, 78:1,
91:10, 94:13,
94:14, 101:5,
115:15, 144:8,
197:22, 245:10,
254:17, 258:14
morning
7:24, 7:25

most
130:11
motion
218:5, 218:6,
220:10, 220:11,
233:22, 250:2,
251:15, 251:16,
253:16
motivated
82:7, 86:2,
164:5
motivation
204:13, 204:15,
204:19, 205:3,
205:9, 206:2,
236:7, 236:8
motor
43:17, 201:12,
201:14, 201:21,
201:25, 202:5,
203:16, 203:20,
203:22, 204:2,
204:6, 204:7,
204:11, 206:19,
207:11, 207:16,
207:18, 207:19,
207:23, 208:5,
208:7, 208:9,
208:14, 208:16
motors
203:2
mounted
233:14, 233:18,
233:20
movable
233:13
move
50:14, 77:10,
77:18, 77:23,
78:7, 79:3,
82:2, 82:18,
83:23, 84:2,
86:20, 86:23,
87:5, 89:25,
108:16, 110:25,
111:5, 163:1,
166:6, 166:18,
171:14, 238:11,

238:22, 238:24,
238:25, 239:6,
239:23, 240:4,
240:6
moved
79:23, 81:12,
81:18, 83:4,
83:9, 83:10,
83:25, 88:14,
239:15, 253:10,
253:12
movement
183:5, 183:6,
240:7, 240:9,
252:20, 253:16
moves
238:16, 239:25,
240:3, 251:10,
251:13, 252:16,
253:14
moving
209:5, 209:7,
209:10, 227:5,
238:20, 253:17
much
84:12, 84:14,
87:1, 89:21,
90:6, 92:15,
92:19, 93:2,
98:3, 136:19,
206:17, 232:18,
242:15, 248:1
multi-body
214:15
multiple
10:2, 111:23,
111:24, 112:4,
112:7, 113:4,
113:12, 114:18,
115:6, 115:24,
118:12, 118:16,
120:4, 120:9,
120:15, 120:16,
122:11, 122:14,
123:9, 125:21,
125:22, 125:23,
126:2, 126:3,
126:5, 126:14,

Transcript of Keven Miller
Conducted on June 5, 2020

291

127:4, 127:21,
127:23, 128:1,
128:3, 128:23,
129:14, 130:8,
130:11, 131:1,
131:10, 132:4,
136:1, 137:17,
149:19, 170:23,
171:1, 199:20,
220:5, 257:16
**must**
22:16, 28:22,
29:11, 31:3,
74:12, 147:10,
159:2, 223:23,
238:11
**myself**
23:13, 85:5,
100:5, 205:6

**N**

**nail**
40:25, 41:4,
41:6, 41:11,
123:1, 123:16,
164:18, 165:6,
165:22, 166:6,
167:3, 170:11,
172:13, 232:17,
236:13, 239:25
**nailer**
5:7, 14:2,
42:5, 44:3,
57:17, 57:19,
57:20, 58:5,
58:9, 58:21,
58:22, 59:14,
59:24, 60:3,
67:19, 96:18,
178:25, 203:4,
221:24, 229:13,
229:15, 236:13,
245:15
**nailers**
132:1
**nails**
148:12, 166:14,
166:18, 167:22,

168:10, 168:13,
171:8, 171:10,
171:12, 172:12,
172:17, 208:19,
208:25, 225:1,
225:13, 225:18,
225:22, 226:1,
226:4, 226:9,
226:19, 227:11,
227:16, 227:18,
228:2, 228:5,
228:8, 228:9,
229:9, 229:11,
229:13, 229:15,
229:17
**name**
8:1, 8:2, 8:16,
15:5, 57:14,
212:14
**names**
45:8
**narrowing**
190:16
**naturally**
239:20
**necessarily**
172:15, 219:24,
238:24
**need**
9:5, 9:20,
19:21, 37:21,
79:24, 81:2,
82:21, 83:11,
84:3, 86:4,
86:5, 86:24,
87:17, 88:4,
88:7, 88:10,
90:1, 109:19,
116:25, 133:15,
133:16, 148:3,
155:4, 158:22,
166:9, 166:12,
166:13, 204:22,
206:13, 206:20,
211:4, 211:9,
227:1, 228:5
**needed**
86:17, 136:19,

136:20
**needs**
215:21, 240:6
**negative**
150:3, 207:1
**neither**
143:5, 243:1,
260:10
**never**
90:24, 218:19
**new**
50:14, 80:18,
236:5
**next**
10:6, 21:11,
21:16, 25:1,
25:13, 25:16,
38:13
**nicad**
202:14, 202:18
**nickel**
202:16, 202:18
**non-existent**
243:14
**non-infringement**
4:14, 14:16,
17:4, 17:7,
17:11, 19:11,
27:18, 28:2,
28:19, 32:18,
33:2, 47:9,
52:25, 141:22,
142:9, 142:13,
161:4, 186:20,
188:13, 192:23
**non-infringements**
20:8
**none**
146:13
**nonexistent**
188:4
**normally**
212:22, 212:25,
241:20
**north**
3:16
**nose**
167:2, 207:14,

238:11, 239:15,
240:3, 240:16,
241:22, 242:12
**notarial**
260:15
**notary**
2:8
**note**
170:22
**notes**
15:10, 248:20
**nothing**
112:5, 115:5,
115:20, 127:2,
168:15, 189:18,
230:3, 230:8,
230:11
**notice**
2:7
**notwithstanding**
146:17
**november**
154:5
**nowhere**
163:23, 164:3
**nr**
227:12, 227:13
**nrak**
225:14, 239:12
**nrak2**
212:8
**nrk**
212:13, 212:15,
212:18, 213:10,
225:14
**number**
14:25, 21:13,
21:17, 22:7,
69:3, 116:5,
134:22, 149:14,
214:4
**numbers**
15:6, 19:19,
66:24, 67:5,
156:13
**numeral**
67:23, 69:7,
69:13, 75:8,

Transcript of Keven Miller
Conducted on June 5, 2020

292

118:19, 119:4,
121:25, 191:24,
203:17
**numerous**
131:8, 131:9

**O**

**o-ring**
128:15, 128:16,
139:24, 140:2,
246:11, 246:12,
246:22, 247:24
**o-rings**
246:8, 247:10,
247:14, 247:22,
248:3
**object**
7:13, 29:7,
30:1, 37:13,
48:18, 48:20,
52:2, 52:9,
125:6, 202:6,
207:6, 225:2,
226:13, 230:6
**objection**
23:7, 30:19,
42:19, 52:16,
75:2, 75:14,
80:1, 89:12
**objects**
67:10
**obliquely**
197:23
**obtain**
114:18, 116:14
**obtained**
104:6
**obvious**
58:20, 77:10,
77:13, 136:16,
141:2, 164:7,
201:6, 232:9,
234:12
**obviously**
36:3, 63:23,
75:7, 88:11,
136:18, 185:7
**occur**
11:13

**occurs**
225:7, 227:10
**od**
247:18
**off-the-record**
254:10
**offered**
20:10
**offering**
23:6
**offers**
47:22
**office**
154:5, 155:5
**officer**
260:4
**often**
149:20, 246:4
**oh**
55:2, 156:10,
188:10, 240:17
**ohuchi**
162:10, 163:7
**oil**
245:18, 245:25,
246:1, 246:6
**okay**
9:3, 9:11,
9:21, 9:24,
9:25, 10:7,
10:9, 14:17,
14:24, 16:3,
16:13, 16:14,
22:6, 27:9,
30:22, 50:16,
52:18, 57:8,
57:12, 61:14,
67:8, 68:7,
75:21, 76:16,
78:19, 79:17,
82:25, 84:13,
85:10, 103:20,
105:10, 110:18,
111:2, 121:11,
121:12, 122:24,
130:1, 135:17,
138:21, 142:14,
151:3, 153:24,

155:7, 155:13,
155:15, 155:25,
156:15, 157:15,
162:2, 162:21,
168:24, 176:19,
185:13, 187:3,
188:15, 191:19,
192:24, 193:1,
195:13, 205:24,
211:2, 211:3,
211:6, 211:11,
214:12, 216:20,
232:3, 233:5,
234:6, 245:4,
249:5, 249:11,
249:14, 253:4,
254:20, 256:17
**omitted**
21:23
**once**
187:14
**one**
8:23, 9:14,
11:14, 13:14,
14:5, 20:20,
20:24, 21:10,
21:22, 24:14,
24:19, 30:14,
30:15, 33:15,
33:16, 33:17,
36:9, 41:7,
41:16, 43:10,
47:3, 60:10,
61:7, 63:20,
67:9, 68:23,
68:24, 77:17,
77:22, 78:6,
79:2, 80:9,
89:17, 89:19,
96:10, 101:5,
104:15, 109:21,
115:15, 123:4,
124:16, 124:25,
125:1, 127:7,
127:21, 127:23,
132:11, 132:17,
135:10, 135:12,
135:16, 137:19,

137:23, 138:1,
138:11, 138:15,
139:2, 139:5,
141:2, 146:23,
148:5, 149:16,
149:18, 149:21,
158:18, 166:14,
167:3, 171:4,
171:18, 172:1,
188:25, 197:8,
198:4, 199:3,
199:22, 199:24,
199:25, 200:1,
200:25, 210:13,
210:16, 218:8,
218:18, 219:9,
221:6, 221:19,
251:17, 254:9,
254:18, 256:5,
256:12, 256:15
**one-hole**
138:17, 140:9,
140:12, 140:14,
255:1
**one-inch**
94:25
**one-tenth**
96:2
**ones**
43:11, 96:3
**only**
9:8, 29:16,
29:23, 42:8,
42:13, 82:21,
127:7, 131:5,
131:13, 131:19,
133:15, 133:16,
136:3, 143:12,
148:9, 150:20,
151:5, 172:18,
183:15, 189:19,
189:21, 199:3,
199:22, 199:25,
200:1, 207:1,
223:14, 223:23,
224:21, 227:10,
252:11, 252:25,
254:8

Transcript of Keven Miller
Conducted on June 5, 2020

293

open
10:12, 85:1,
159:16, 159:17,
168:5
opened
179:4
opening
5:12, 47:4,
168:23, 216:9,
218:12, 236:25
opens
128:6
operable
244:9
operate
225:1, 225:17,
226:2, 226:22,
226:23, 228:3,
237:6, 237:9,
239:3, 239:23
operated
41:6
operation
44:3, 137:7,
218:3, 226:10,
227:4, 238:2,
242:19, 242:25,
243:11, 243:18
operator
6:2, 7:4, 51:2,
51:6, 109:6,
110:19, 113:22,
114:1, 117:3,
117:7, 173:6,
173:10, 230:22,
231:1, 248:21,
248:25, 258:16
opine
39:14
opined
208:3, 208:8
opines
207:22
opinion
21:24, 22:19,
23:4, 23:6,
29:10, 30:15,
32:9, 32:11,

32:12, 39:18,
40:1, 40:14,
40:15, 41:8,
41:15, 41:20,
42:7, 42:12,
43:24, 46:18,
49:18, 53:11,
54:10, 59:10,
63:20, 74:3,
88:20, 88:22,
89:14, 90:3,
99:15, 115:5,
116:12, 118:11,
118:14, 121:16,
122:3, 142:19,
143:12, 143:20,
144:21, 144:25,
145:4, 145:17,
145:22, 159:16,
160:25, 161:7,
161:8, 166:23,
182:16, 183:11,
184:2, 184:12,
184:20, 185:1,
185:24, 191:8,
193:12, 193:15,
199:16, 199:19,
203:8, 206:6,
206:14, 206:18,
207:7, 210:2,
210:7, 212:11,
212:17, 212:23,
213:4, 213:8,
213:16, 213:21,
213:22, 213:23,
214:11, 214:12,
215:1, 220:2,
222:11, 224:14,
227:1, 227:14,
228:3, 228:18,
228:22, 229:3,
229:9, 232:8,
234:11, 243:22,
252:5, 252:7,
252:15, 252:19
opinions
11:23, 12:3,
12:9, 12:12,

12:21, 13:12,
20:9, 20:12,
22:25, 23:11,
24:1, 27:25,
28:11, 28:16,
30:11, 30:14,
30:16, 30:18,
32:8, 32:13,
34:11, 35:24,
48:11, 49:10,
49:14, 51:21,
54:25, 55:6,
55:10, 57:22,
64:9, 64:19,
142:16, 161:4,
163:10, 163:24,
164:4, 164:8,
184:24, 185:5,
224:13, 224:21,
257:5, 257:8,
257:11, 257:22,
257:23, 258:1,
258:3, 258:9
opportunity
49:20, 49:24,
55:9, 163:14,
204:18, 204:22,
205:13
opposed
16:18, 235:2
opposing
143:6, 145:8,
145:19, 145:20,
145:23, 146:6,
146:8, 149:13,
150:9, 155:24,
157:8, 158:16,
158:20, 159:8,
159:21, 164:20,
165:1, 165:7,
169:18, 170:12,
171:3, 172:6
opposite
199:11, 240:2,
240:10, 242:12
options
87:24, 210:9
oral
254:5, 254:6

order
172:11, 202:1,
223:20, 223:22,
225:1, 227:16,
228:2, 228:20,
229:9, 237:6,
239:2, 239:7,
239:22
ordinary
33:23, 35:10,
39:18, 39:25,
40:7, 40:9,
40:13, 41:16,
46:18, 47:21,
48:1, 48:3,
136:13, 136:22,
137:4, 207:17
orientations
199:13
orifice
94:18, 137:25,
138:2
original
38:7, 53:15,
176:4, 228:1
other
10:18, 10:24,
12:17, 12:23,
13:2, 13:17,
15:1, 15:10,
20:20, 21:19,
21:20, 23:13,
23:18, 23:19,
23:22, 23:25,
28:14, 30:17,
33:5, 34:14,
34:19, 35:21,
35:23, 36:25,
37:3, 54:4,
73:24, 74:2,
74:23, 83:11,
83:13, 99:3,
129:16, 130:7,
143:9, 143:14,
150:10, 171:6,
171:20, 171:22,
171:23, 174:13,
178:13, 183:19,

Transcript of Keven Miller
Conducted on June 5, 2020

190:2, 190:22,
196:25, 198:6,
199:13, 199:15,
203:4, 203:10,
206:16, 210:1,
210:3, 211:18,
212:22, 213:6,
218:18, 222:12,
222:16, 222:24,
223:1, 235:3,
248:2, 248:4,
248:6, 253:9,
256:8
**otherwise**
245:14, 260:12
**out**
19:19, 32:9,
32:13, 32:16,
68:5, 71:4,
72:18, 74:1,
100:18, 112:21,
133:19, 138:2,
148:25, 149:4,
149:18, 149:21,
150:16, 150:20,
151:5, 160:8,
160:9, 160:22,
206:22, 208:22,
209:22, 215:21,
217:7, 245:11,
245:14, 245:16,
246:9, 246:11,
246:20, 247:15,
247:16, 248:3,
258:11
**outcome**
260:13
**outer**
97:25, 99:2
**outlet**
127:23
**outlets**
127:21
**outside**
23:10, 48:20,
52:2, 52:9,
52:17, 52:22,
89:24, 99:6,

99:9, 247:18,
254:11
**oval**
193:9, 193:18
**over**
42:6, 61:5,
61:9, 110:14,
120:6, 120:14,
124:21, 132:15,
134:11, 235:8,
235:9, 244:7
**overall**
89:16, 93:19,
93:20, 224:9
**overcome**
85:11, 85:14,
247:23
**overlap**
194:24
**overlapped**
45:23, 45:25,
46:10, 47:16
**overlapping**
194:25
**overly**
93:14
**overview**
37:24, 38:4,
237:3
**own**
27:24, 154:1

---

**P**

**pack**
174:8, 174:9,
175:3, 175:4,
175:6, 175:9,
175:13, 175:19,
175:21, 175:25,
176:6, 176:7,
176:11, 176:18,
176:20, 176:22,
177:5, 177:8,
177:9, 177:15,
177:20, 178:12,
178:14, 178:15,
180:2, 180:16,
180:18, 182:3,

182:15, 182:18,
182:22, 183:1,
183:5, 183:7,
183:9, 183:11,
183:14, 183:17,
183:18, 183:20,
184:13, 185:6,
185:8, 185:10,
185:16, 185:22,
185:24, 186:1,
186:6, 190:1,
190:8, 190:21,
192:6, 192:12,
193:7, 194:16,
194:25, 195:2,
196:12
**pack's**
182:6
**pages**
1:21, 16:10,
17:13, 18:5,
18:17, 18:21,
18:24, 57:1,
57:5
**pam**
7:5, 211:6,
211:9
**pamela**
1:22, 2:7,
260:4
**paper**
16:11, 16:12
**paragraphs**
28:3, 28:6,
28:15, 33:1
**parallel**
233:8
**pardon**
119:11, 149:23,
229:22
**parikh**
3:3, 4:3, 4:5,
6:16, 7:23,
8:16, 14:8,
14:10, 14:14,
15:13, 15:18,
16:1, 16:12,
17:18, 50:18,

50:21, 50:25,
51:9, 52:18,
52:21, 56:5,
75:15, 75:21,
75:22, 78:16,
109:4, 109:10,
109:24, 110:5,
110:18, 110:21,
113:25, 116:24,
117:10, 130:17,
130:19, 153:18,
154:7, 154:9,
154:20, 162:14,
162:21, 162:25,
163:2, 167:7,
171:14, 173:2,
173:13, 178:17,
178:21, 178:23,
180:4, 180:8,
180:21, 200:5,
211:6, 211:9,
211:12, 215:23,
216:3, 216:7,
230:20, 231:3,
231:8, 248:18,
249:2, 254:16,
256:17, 257:20,
258:13
**part**
9:23, 33:3,
72:15, 76:4,
76:6, 76:19,
76:24, 78:3,
78:23, 79:5,
95:7, 95:13,
101:19, 101:23,
102:22, 122:9,
138:11, 148:2,
148:8, 153:4,
179:19, 179:21,
180:15, 180:23,
181:11, 181:14,
181:16, 183:19,
186:2, 188:21,
188:25, 189:10,
214:15, 223:18,
228:8, 228:9,
228:10, 228:11

Transcript of Keven Miller
Conducted on June 5, 2020

295

partial
199:12
participants
6:11
particular
97:19, 136:9,
145:14, 248:15
parties
6:13, 260:11
parting
189:9
parts
27:21, 58:6,
58:8, 58:10,
100:8, 100:24,
149:17, 178:25,
190:3, 205:17,
224:22, 246:21,
246:23, 246:25
pass
102:15
passage
94:18
passages
122:13
past
72:17
patching
55:17
patents
24:5, 24:12,
24:20, 26:20,
37:25, 38:4,
40:17, 40:19,
48:8, 48:13,
48:25, 49:4,
49:7, 49:8,
49:11, 49:15,
49:23, 50:11,
52:1, 53:12,
54:17, 100:4,
163:21, 213:9,
213:18
path
64:23, 73:25,
82:9, 83:2,
137:25, 171:11,
171:12

paths
95:11
pathway
74:3
paul
3:6, 6:18
pcb
180:24, 181:2,
181:15
pdf
16:18, 58:1,
156:12
pdfs
58:3
penalties
7:12, 7:19
pending
9:9
pennsylvania
2:9, 260:25
people
10:2, 74:6,
206:25, 246:5
percent
91:11
perform
29:24, 30:4,
30:6, 31:19,
53:22, 54:4,
100:1, 137:9,
223:15, 224:2,
224:16, 228:20,
229:5, 229:10,
229:24, 230:1,
230:4
performance
137:14, 137:20,
138:3
performed
31:3
performing
29:4, 29:18,
201:21, 222:21,
224:5, 230:13
performs
29:17, 32:1
perhaps
126:10

perimeter
132:17, 132:20,
133:20, 133:23,
133:24, 134:11,
134:12, 134:20
periods
206:25
perjury
7:12, 7:20
permanently
221:12, 221:18,
221:22
permitted
223:15
perpendicular
169:19, 170:6,
170:10, 170:20,
170:23, 171:2,
171:4, 171:5,
171:18, 171:19,
171:22, 171:24,
171:25, 172:3,
172:7, 172:9,
209:15
person
39:14, 39:18,
41:22, 73:1,
136:12, 136:22,
137:4, 164:4,
166:23
personal
100:17, 138:6
personally
169:3, 217:16
perspective
114:20
peruse
155:12
ph
3:21, 5:9,
5:13, 216:10
phenomena
85:10, 85:13
phone
13:14
phrase
144:9, 147:16,
152:2, 152:16,

152:17, 153:12,
161:11, 161:19
physical
58:4
physically
181:2, 182:3
pi
132:15, 132:18,
134:11, 134:12,
134:13, 134:19,
134:21, 134:24
picture
122:8, 217:5,
221:16
piece
149:18, 167:11,
221:7, 249:25
pieces
36:10, 189:9,
221:17, 221:20
pies
134:14
pietanza
3:23, 6:10
pink
229:18
pins
201:24
piston
43:10, 89:18,
89:22, 120:7,
120:14, 124:21,
128:17, 221:11,
222:13, 237:9,
247:6
pivot
253:22, 253:24
pivotable
236:3, 236:10,
236:16, 236:18
pivoted
233:22
pivoting
234:3, 236:1
pivots
234:16, 242:6
place
13:21

Transcript of Keven Miller
Conducted on June 5, 2020

296

places
125:23, 221:7
plaintiff
1:6, 3:2, 6:17,
8:17
plaintiff's
6:20
plane
74:4, 167:20,
167:23, 167:25,
171:13, 172:3
planet
6:11, 7:5
plaster
189:10
plastic
207:13
plays
153:2, 153:7
please
6:14, 7:6, 7:8,
8:1, 8:24, 9:6,
9:16, 14:20,
15:2, 16:7,
17:18, 19:22,
21:2, 27:14,
27:16, 28:4,
35:25, 37:22,
52:12, 56:6,
66:5, 68:6,
118:8, 129:24,
132:12, 148:2,
153:19, 154:22,
155:10, 162:12,
162:24, 164:10,
167:7, 178:17,
180:4, 180:22,
188:14, 194:1,
197:4, 200:6,
211:10, 215:23,
216:3, 216:14,
231:3, 242:1
pleural
123:9, 128:24,
129:9
plug-in
86:14
plunger
139:24

plurality
114:23
pneumatic
42:1, 42:5,
56:18, 84:14,
85:6, 85:8,
91:3, 91:12,
93:13, 95:8,
95:14, 132:1,
222:15, 227:23,
228:11, 228:15,
229:4, 229:20,
229:23, 237:8,
240:15, 242:18,
242:24, 243:7,
243:20, 247:23,
248:17
pneumatically
41:6
pneumatics
91:1, 128:8,
213:5, 237:6,
244:23
point
20:11, 20:15,
37:9, 37:18,
47:2, 65:22,
90:15, 109:25,
118:15, 160:22,
171:7, 217:7,
221:19, 244:10,
253:22, 253:24
pointed
112:21
pointing
118:20, 118:21,
118:24, 119:2,
119:4, 119:8,
122:1, 122:4,
181:6, 192:5,
192:7, 192:9
points
61:11, 68:2,
86:16
poor
54:11
portable
245:22

portions
34:1, 37:22,
38:10, 38:25,
164:21, 165:1,
166:2, 166:5,
166:17, 183:10,
189:1, 190:9
posed
204:21
position
136:9, 141:22,
209:3, 238:17,
240:22, 241:6,
241:18, 241:23,
242:6, 242:8
positive
150:5
possession
58:16
possibilities
146:24
possible
80:25, 82:8,
82:15, 86:3,
87:8, 89:17,
120:16, 120:24,
121:1, 121:14,
121:18, 127:22,
127:25, 128:2,
197:8, 199:24,
202:17, 204:23,
245:8, 245:18,
247:12
possibly
90:10
potentially
96:17, 243:23,
246:9, 248:2,
248:5
power
39:22, 41:25,
42:2, 45:2,
45:4, 90:14
practical
116:23, 135:18
practice
11:8, 11:11,
11:13, 48:12,

49:10, 49:14,
50:10, 211:22,
212:6, 212:12,
212:18, 212:24,
213:8, 213:17
practiced
48:16, 49:22
preamble
234:22
preclude
113:5
precluded
23:5
precludes
230:3, 230:12
predetermined
197:25
prefer
117:2
preferred
151:2, 151:12
preformed
236:14
preload
85:13
prepare
11:5, 12:24,
13:4, 27:17,
36:1, 37:4,
257:8, 257:25,
258:1
prepared
257:1, 257:22,
257:23, 258:8
presence
245:16
present
3:20, 6:13,
7:1, 14:6,
14:10, 16:25,
17:19, 18:10,
109:1, 153:18,
167:7, 167:10,
178:17, 200:5,
216:3, 231:4,
232:16, 243:16,
244:3, 245:20,
245:21, 245:24,

Transcript of Keven Miller
Conducted on June 5, 2020                                                    297

246:1
**presenting**
15:13, 216:9
**presses**
238:18
**pressure**
85:8, 85:19,
86:16, 95:2,
95:17, 95:20,
95:21, 95:22,
95:23, 96:1,
96:4, 96:6,
96:10, 96:11,
96:12, 121:6,
121:8, 124:21,
148:25
**pressurized**
121:13
**pretty**
202:1
**prevent**
84:4
**prevented**
227:5
**preventing**
41:1
**price**
3:15, 6:23,
11:9, 11:10,
12:24, 38:9
**principles**
28:7, 28:10,
28:14
**printed**
72:18
**prior**
13:3, 13:5,
15:3, 15:6,
36:2, 36:8,
36:10, 36:14,
36:16, 37:25,
38:4, 47:19,
49:8, 56:8,
58:12, 60:24,
67:20, 68:21,
68:24, 73:16,
73:18, 80:4,
100:2, 116:10,

162:7, 163:5,
163:11, 163:17,
163:22, 163:24,
164:5, 165:15,
165:18, 165:20,
167:11, 190:4,
235:3, 235:11,
235:25
**priority**
100:3, 100:15
**probably**
47:4, 90:4,
131:9, 156:16,
247:17, 247:19
**problematic**
199:16, 199:18
**procedure**
202:2
**proceeding**
7:14, 8:10,
8:14
**proceedings**
51:4, 109:8,
173:8, 230:24,
248:23, 260:5,
260:7
**process**
27:17, 36:1,
144:10, 144:11,
148:14, 157:2,
157:3, 158:1
**produce**
148:25
**produced**
86:1, 148:10,
149:14
**producing**
148:7
**product**
9:23, 31:3,
48:24, 49:3,
144:9, 144:11,
179:4, 208:1,
223:23, 224:15
**production**
56:19, 179:1,
244:16
**products**
48:11, 48:16,

49:10, 49:14,
50:10, 143:4,
143:16, 160:4,
160:14, 160:20,
161:6, 161:8,
211:22, 212:5,
212:11, 213:8,
213:17, 235:22
**profile**
89:16
**project**
46:3, 46:6
**projects**
46:2
**proposed**
46:21, 46:25,
47:10, 47:25,
48:6, 83:9
**prosecution**
152:23, 153:2,
153:4, 153:7,
153:11, 153:15,
155:6, 157:6
**prototypes**
206:22
**protrude**
166:17
**provide**
9:10, 9:14,
10:4, 11:2,
11:22, 12:1,
12:11, 22:19,
35:22, 39:6,
48:10, 51:20,
66:16, 67:10,
77:16, 87:3,
91:13, 91:20,
91:24, 115:2,
129:20, 130:7,
131:6, 131:7,
136:3, 139:11,
157:13, 157:16,
163:9, 163:23,
164:3, 164:8,
193:2, 203:7,
204:13, 204:15,
205:3, 206:2,
207:9, 212:4,

212:17, 213:21,
213:24
**provided**
11:24, 12:4,
12:18, 12:19,
15:20, 20:13,
23:12, 23:19,
24:1, 34:23,
35:1, 35:2,
35:5, 35:19,
39:5, 40:4,
54:13, 57:25,
82:1, 164:19,
165:6, 215:24,
233:16, 233:22,
239:1, 258:4
**provides**
49:9, 65:7,
65:10, 65:14,
66:10, 78:6,
79:2, 205:9
**providing**
53:10, 57:22,
65:25, 77:22,
213:16
**psi**
96:2
**public**
2:8, 260:2,
260:24
**publication**
56:10, 56:17
**publish**
56:5
**pull**
180:4, 239:10
**pulled**
225:20, 225:23,
239:6
**pulverized**
244:6
**purely**
242:21, 242:22
**purpose**
23:21, 83:19
**purposes**
27:7, 60:24,
141:21, 142:9,

Transcript of Keven Miller
Conducted on June 5, 2020

298

142:22
**pursuant**
2:7
**push**
149:1, 211:14, 212:22, 212:25, 215:5, 215:7, 215:19, 222:10, 222:22, 222:25, 223:6, 223:12, 223:17, 223:22, 226:11, 226:24, 227:3, 227:5, 228:4, 228:12, 228:14, 228:19, 228:21, 228:22, 229:3, 229:10, 229:16, 230:9, 230:12, 230:15, 230:16, 230:17, 232:5, 234:8, 249:16, 249:19, 250:7, 250:10, 250:14
**pushing**
226:11, 226:23, 240:15
**put**
80:18, 80:19, 87:5, 89:10, 172:20, 205:19, 206:11, 226:1, 236:13, 246:5
**putting**
89:23, 116:9

**Q**

**qualifications**
46:14
**question**
9:2, 9:9, 9:10, 9:22, 10:3, 10:5, 10:6, 29:20, 33:9, 33:10, 34:3, 34:18, 34:19, 37:2, 41:19, 52:4, 52:19,

53:15, 55:4, 60:9, 62:21, 64:14, 65:13, 65:14, 74:24, 75:16, 78:5, 79:14, 80:8, 81:25, 82:1, 82:12, 82:13, 100:10, 100:11, 101:20, 101:24, 108:17, 108:19, 110:4, 110:6, 111:3, 112:23, 113:7, 113:8, 123:13, 123:14, 130:18, 130:23, 144:3, 151:1, 152:12, 152:13, 159:4, 159:11, 159:12, 159:15, 160:11, 160:12, 161:17, 162:11, 162:15, 162:18, 162:22, 163:1, 171:17, 176:3, 176:4, 176:23, 178:7, 182:17, 182:18, 184:5, 185:4, 187:13, 189:15, 189:16, 196:17, 205:1, 205:2, 219:13, 220:12, 222:6, 223:8, 226:15, 228:2, 229:1, 229:2, 229:14, 245:3
**questionable**
86:9
**questioning**
52:15, 70:15, 73:7, 111:1
**questions**
8:19, 8:23, 9:14, 35:18, 52:16, 73:9, 204:21, 204:24, 254:17, 256:18,

256:23, 257:17, 258:13
**quick**
132:10, 132:11, 178:16, 210:24, 230:20, 248:18
**quicker**
245:11, 245:14
**quote**
174:8, 251:4
**quoted**
126:12

**R**

**radius**
97:24
**raise**
208:25
**raises**
208:24
**raising**
174:1
**range**
43:19, 43:21
**rate**
86:14, 86:15, 87:21, 93:15, 135:19, 135:20
**rather**
72:9
**ratio**
99:22, 103:24, 104:6, 104:19, 104:22, 104:25, 105:2, 105:3, 105:6, 105:12, 105:15, 105:19, 105:22, 106:1, 106:5, 106:6, 106:9, 106:20, 106:25, 107:2, 107:4, 107:7, 107:9, 107:11, 107:14, 111:7, 112:11, 112:16, 113:1, 113:10, 115:8, 115:21, 117:17, 134:11

**re-examination**
257:19
**read**
31:7, 65:17, 151:24, 155:8, 177:23, 187:11, 187:15, 205:5, 259:3
**readily**
42:7, 43:6
**reading**
63:13, 187:14
**reads**
150:20, 151:5
**really**
80:12, 86:2, 109:25
**reask**
176:3, 187:14
**reason**
11:1, 47:20, 67:13, 67:16, 70:17, 70:20, 73:10, 77:16, 77:22, 78:6, 79:2, 149:17
**reasons**
63:9, 71:8, 105:17, 160:8, 213:4
**rebalance**
206:13, 206:20, 207:3, 208:18
**rebuttal**
4:12, 14:15, 15:16, 17:3, 22:1, 22:20, 52:25, 151:15, 157:12, 173:18, 210:19, 212:5, 212:18, 213:13, 218:19, 218:22
**recall**
12:22, 20:21, 38:10, 38:25, 40:5, 46:5, 59:4, 77:21, 78:5, 78:9,

Transcript of Keven Miller
Conducted on June 5, 2020

79:12, 102:2,
102:4, 118:10,
141:1, 154:8,
154:25, 174:18,
205:8, 205:11,
205:12, 246:9,
257:2
**recently**
21:5
**recess**
51:4, 109:8,
117:5, 173:8,
230:24, 248:23
**recite**
58:25, 59:5,
59:18, 175:3
**recited**
29:16, 29:23,
29:24, 47:11,
224:6, 229:10,
229:24, 230:4,
230:11
**recites**
59:7, 59:8,
65:25
**recognize**
74:7
**recollection**
35:14
**recommend**
245:24
**recommended**
246:6
**reconvened**
117:6
**record**
51:3, 51:8,
108:25, 109:5,
109:7, 110:20,
116:25, 117:4,
117:9, 173:6,
173:12, 230:23,
231:2, 231:16,
248:22, 249:1,
258:18, 258:19,
260:7
**red**
170:2, 170:21,

180:1, 181:12,
181:21, 181:24
**redesign**
81:4, 86:10,
86:19, 86:24,
87:2
**redesigned**
83:12
**reduced**
260:9
**refer**
19:6, 19:10,
19:13, 19:16,
20:3, 24:23,
25:8, 25:20,
26:6, 26:16,
27:8, 31:11,
57:8, 57:11,
57:19, 104:24,
122:10, 125:21,
126:5, 128:23,
129:8, 131:18,
131:20, 142:1,
165:20, 165:22,
169:7, 181:22,
237:22, 249:12
**reference**
11:24, 15:6,
15:11, 36:14,
40:25, 56:8,
59:19, 60:9,
67:23, 68:22,
69:6, 69:13,
77:17, 78:10,
79:7, 106:8,
118:19, 119:4,
121:25, 126:19,
136:6, 138:18,
139:18, 147:5,
162:10, 163:7,
167:11, 168:9,
179:1, 179:17,
191:24, 203:16
**referenced**
13:25, 165:16
**references**
11:8, 13:6,
15:4, 36:3,

36:4, 36:9,
36:17, 49:8,
59:8, 61:1,
75:5, 80:4,
160:22, 164:6,
235:3, 235:11,
237:11, 257:24
**referencing**
19:19, 59:3,
75:7, 122:14,
129:1, 186:11
**referred**
140:15
**referring**
12:14, 20:25,
21:25, 22:14,
25:9, 25:21,
26:7, 26:17,
31:12, 33:1,
36:17, 41:12,
41:15, 57:9,
95:14, 105:1,
108:22, 123:9,
123:16, 126:10,
138:16, 139:21,
142:3, 150:25,
181:11, 181:12,
181:19, 181:23,
195:25, 196:6,
197:21, 223:11,
238:7, 243:9,
255:9
**refers**
61:15, 120:10,
125:20
**reflect**
20:9
**reflected**
23:1, 28:15
**regard**
131:25, 197:3,
239:13
**regarding**
4:13, 4:16,
4:19, 14:16,
15:23, 16:5,
17:4, 17:20,
17:24, 18:12,

18:19, 23:1,
28:12, 29:15,
29:22, 54:25,
55:6, 64:9,
64:19
**regardless**
236:8
**reinforce**
166:2
**related**
26:21, 45:2,
160:11, 260:10
**relative**
48:24, 49:6,
49:8, 49:17,
207:12, 207:13,
207:14, 210:3
**relatively**
203:2, 203:24,
203:25
**release**
90:15
**relevant**
41:10, 41:22,
48:23, 49:2,
49:3, 91:7
**relied**
255:3, 255:13,
256:13
**rely**
36:10, 130:24,
168:7, 201:5
**relying**
57:23, 57:24,
58:4, 58:13,
58:14, 72:17,
72:19, 74:3,
130:22, 141:12
**remember**
140:22, 210:12
**remote**
6:3, 6:9,
117:8, 173:11,
258:17
**remotely**
6:12
**removing**
137:1, 137:18

Transcript of Keven Miller
Conducted on June 5, 2020

300

render
164:6, 243:23
rendered
225:24
repair
55:19
repairing
244:5
repeat
29:20, 60:9,
64:14, 226:15
replace
232:9, 234:12
replaced
87:11
reply
4:15, 4:17,
5:8, 17:19,
17:24, 18:11,
18:18, 19:13,
19:17, 20:4,
20:5, 119:19,
129:13, 131:13,
131:16, 138:13,
140:16, 168:3,
169:7, 169:23,
179:7, 181:13,
188:9, 202:21,
249:7, 249:9,
249:25
reported
1:22
reporter
2:8, 7:5, 7:6,
7:8, 7:10, 7:18,
9:19, 211:11,
260:2
reports
11:7, 11:8,
13:2, 14:1,
20:6, 20:9,
20:13, 21:20,
23:5, 23:11,
34:22, 34:23,
36:1, 36:20,
37:2, 37:4,
37:12, 37:15,
48:10, 49:16,

50:13, 51:20,
51:23, 55:8,
91:6, 100:8,
110:17, 115:2,
138:16, 163:14,
163:18, 257:4,
257:9, 257:12,
257:14, 258:9,
258:11
represent
6:15, 8:17
representation
73:12
representing
6:10, 7:5,
74:15
reproduced
169:25
requests
46:12
require
82:3, 99:22,
99:25, 112:11,
136:9, 159:24,
170:8, 175:18,
175:22, 176:10,
176:24, 195:6,
203:3, 215:9
required
29:2, 32:4,
75:24, 200:17,
214:10, 215:6,
222:12, 222:17,
224:2, 224:17,
227:15, 228:2,
228:20, 228:21,
228:24, 229:5,
229:9, 229:16,
234:8, 249:16,
250:7
requirement
159:8, 187:24,
188:1, 196:11,
196:18, 227:19,
227:20, 227:22
requirements
32:16, 176:5,
177:17, 187:6,

222:16, 224:21
requires
76:25, 107:25,
108:1, 143:21,
144:25, 158:16,
158:19, 159:19,
159:21, 172:5,
175:24, 176:18,
177:10, 177:14,
189:19, 194:15,
215:10, 215:18,
224:25, 227:16,
230:1, 237:6,
237:8
resistance
239:8
respect
23:20, 42:5,
46:5, 46:8,
47:18, 55:3,
84:22, 87:6,
90:21, 137:10,
159:12, 200:16,
200:24, 201:8,
203:4, 245:12,
257:6
respective
128:19, 129:4,
213:18
respectively
128:18
responding
22:22
response
136:7, 154:4,
155:5, 162:19,
171:15, 176:13
responses
161:25
restricted
137:25
result
31:20
results
54:6, 55:13,
55:14, 218:5,
252:20
retains
184:18

return
120:7, 120:14,
121:9, 121:13,
123:4, 123:25,
124:1, 124:21,
127:8, 127:10,
128:7
returns
86:15
reverse
127:24
reversed
238:5, 238:6
review
13:3, 33:7,
46:16, 46:21,
47:1, 65:18,
65:21, 79:10,
119:16, 147:25,
148:2, 152:23,
155:3, 174:17,
257:14, 258:10
reviewed
11:7, 11:25,
23:19, 27:19,
27:20, 27:22,
27:23, 32:20,
35:13, 36:2,
36:3, 36:4,
36:8, 36:16,
36:23, 38:5,
38:19, 46:13,
47:14, 54:1,
153:17, 155:14,
163:21, 258:12
reviewing
21:6, 21:22,
155:1
rigg
7:1, 11:12
right-hand
198:21, 199:9,
199:12, 221:6
risk
84:17
riveting
145:11
robert
6:25, 11:12

Transcript of Keven Miller
Conducted on June 5, 2020

**robust**
243:20, 244:23
**role**
153:2, 153:6
**romanette**
18:22
**room**
10:10, 85:22
**rotary**
220:11, 250:2
**rotate**
252:23, 253:5,
253:8, 253:9
**rotates**
253:21, 253:24
**rotating**
43:16
**rotation**
253:17
**rotational**
251:16, 252:20
**round**
142:5
**row**
168:16, 168:22,
172:23
**rows**
168:11, 168:14,
171:10
**rpm**
43:20
**ruler**
71:22, 71:25,
72:4
**rules**
125:5
**run**
80:24, 89:6
**running**
244:11
**ryan**
3:22, 14:8,
15:13, 16:1,
17:18, 56:5,
153:18, 154:7,
154:9, 154:20,
167:7, 167:9,
178:17, 178:21,

180:4, 180:8,
180:21, 200:5,
215:23, 216:8,
231:3

--- S ---

**s**
100:20, 219:1
**s1**
114:13, 114:19
**safely**
232:14, 232:17
**safety**
22:10, 41:1,
90:16, 214:9,
214:14, 214:18,
214:22, 215:2,
215:10, 215:12,
215:13, 216:25,
217:2, 217:3,
217:10, 217:24,
217:25, 218:2,
218:3, 219:3,
219:10, 219:15,
219:18, 220:16,
220:24, 221:3,
221:5, 221:8,
221:25, 222:2,
222:8, 222:19,
222:20, 223:3,
223:23, 223:25,
224:1, 232:9,
232:10, 232:18,
232:23, 234:12,
234:13, 235:5,
235:23, 236:1,
236:11, 236:15,
236:23, 237:6,
238:2, 238:8,
238:11, 238:16,
238:19, 239:2,
239:5, 239:15,
239:17, 239:23,
240:3, 240:4,
240:9, 240:11,
240:21, 241:5,
241:17, 241:22,
241:25, 242:3,

242:11, 242:12,
242:15, 242:16,
242:19, 242:25,
244:13, 244:14,
248:8, 248:15
**said**
15:16, 34:4,
35:23, 36:16,
47:16, 50:21,
73:6, 78:14,
81:3, 82:18,
90:24, 94:22,
98:24, 124:19,
125:25, 133:10,
154:25, 161:14,
165:10, 173:20,
198:4, 208:18,
221:1, 234:15,
241:8, 241:19,
244:2, 250:12,
255:4, 260:7
**sake**
70:15, 73:6
**same**
24:7, 26:24,
27:3, 27:6,
28:23, 31:19,
31:20, 32:1,
32:3, 41:25,
42:2, 46:2,
46:3, 46:6,
47:18, 57:14,
60:4, 60:20,
62:4, 62:8,
63:15, 64:1,
64:3, 69:9,
69:11, 69:20,
69:21, 69:22,
70:24, 71:1,
71:17, 71:21,
72:16, 87:23,
88:14, 88:15,
88:18, 89:19,
89:20, 90:7,
90:11, 94:3,
97:23, 99:1,
99:3, 104:12,
104:16, 105:17,

105:21, 106:1,
107:9, 109:12,
110:11, 117:21,
132:4, 132:7,
133:1, 133:4,
133:7, 133:18,
134:25, 135:6,
140:13, 141:1,
142:10, 142:20,
157:3, 188:24,
197:18, 204:11,
225:14, 227:12,
240:24, 248:4,
253:15, 253:18,
259:4
**saw**
41:24, 42:4,
42:18, 43:13,
43:15, 43:16,
44:2, 44:3,
44:5, 44:7,
44:11, 44:13,
44:14, 44:15,
45:11, 45:14,
45:16, 178:3,
179:4
**saws**
41:10, 41:22,
42:9, 42:14,
42:16, 43:19
**say**
19:25, 22:8,
22:17, 23:20,
32:12, 33:15,
34:1, 34:16,
34:25, 36:8,
39:5, 41:16,
46:15, 55:12,
58:15, 61:23,
67:4, 69:19,
70:7, 70:17,
70:20, 71:23,
80:10, 88:8,
93:8, 95:12,
97:17, 97:21,
98:12, 101:5,
103:23, 104:2,
105:15, 105:19,

108:6, 111:22,
115:8, 115:21,
116:4, 116:10,
120:3, 120:5,
133:3, 134:18,
135:14, 144:20,
145:4, 145:5,
147:13, 148:18,
148:19, 160:6,
160:16, 165:8,
165:10, 166:4,
170:25, 177:23,
184:11, 188:24,
189:21, 189:22,
190:25, 195:23,
196:21, 196:22,
196:23, 197:15,
204:4, 205:13,
218:24, 219:1,
222:4, 223:10,
239:14, 245:6,
246:14, 253:2,
256:13, 258:5

**saying**
16:16, 35:2,
73:20, 75:18,
94:15, 106:24,
107:1, 126:13,
135:18, 145:6,
157:7, 171:12,
180:19, 197:1,
209:10, 235:12,
243:24, 243:25,
249:19, 250:14,
250:25, 251:4,
251:19, 251:20,
256:6

**says**
21:16, 31:16,
62:24, 63:3,
66:3, 66:9,
67:12, 112:6,
114:11, 115:11,
122:25, 123:3,
127:5, 148:13,
155:20, 155:23,
166:22, 172:9,
174:12, 175:9,

180:10, 185:22,
194:10, 194:20,
195:19, 196:2,
196:4, 197:12,
217:11, 217:23,
231:10, 233:6

**scale**
69:20, 69:21,
69:22, 71:1,
71:14, 71:17,
71:21, 71:22,
72:8, 72:12,
72:16, 73:21,
93:4, 204:11

**scaling**
72:18, 74:3

**scan**
178:16, 179:21

**schedule**
9:8

**schrepferman**
167:11, 167:18,
167:19, 168:7,
168:13, 168:18,
169:2, 169:24,
170:10, 171:7,
171:19, 172:11,
172:24

**schrepferman's**
170:11

**scope**
42:6, 48:20,
52:3, 52:10,
52:17, 52:22,
190:17

**scream**
174:1

**screen**
16:2, 16:11,
18:15, 56:21,
153:23, 154:2,
167:16, 188:11

**scroll**
156:9, 156:18

**seal**
85:15, 120:19,
121:9, 128:6,
129:16, 139:24,

260:15

**sealed**
80:22

**sealing**
83:22, 84:13,
87:3

**seals**
80:23, 222:15,
245:11, 246:6,
246:7, 248:10,
248:11

**second**
47:3, 57:2,
64:3, 133:2,
180:7, 256:15

**section**
12:14, 12:17,
21:22, 21:25,
33:3, 35:10,
35:15, 35:17,
35:19, 35:20,
37:24, 38:3,
38:5, 38:6,
38:7, 38:13,
38:15, 38:21,
38:25, 61:16,
62:25, 65:9,
65:16, 66:2,
68:11, 69:1,
69:9, 76:21,
99:23, 123:14,
173:1, 174:17,
199:12, 218:8,
218:10, 237:16

**sections**
33:12, 33:19,
33:21, 34:6,
34:9, 34:14,
34:20, 35:21,
37:6, 37:8,
37:9, 37:14,
37:16, 63:22,
63:23, 149:19,
186:14

**seeing**
244:6, 244:8

**seem**
110:15

**seems**
49:5

**seen**
90:24, 91:1,
100:18, 100:20,
140:12, 154:6,
179:3, 244:12,
244:15

**selectively**
128:18

**senco**
1:8, 6:5, 6:24,
13:13, 13:18,
54:22, 100:2,
100:12, 235:21,
235:22, 235:23

**sense**
202:7, 202:10,
220:9

**sensitive**
96:2, 96:3

**sentence**
21:12, 21:16,
78:24, 187:22

**separate**
22:9, 78:2,
98:17, 101:2,
101:12, 110:25,
111:1, 123:23,
129:5, 129:8,
130:4, 130:24,
134:8, 143:22,
145:15, 145:18,
145:20, 146:16,
147:22, 151:18,
151:22, 157:9,
157:19, 161:2,
168:11, 168:14,
172:19, 183:25,
184:6, 184:8,
184:10, 187:20,
189:1, 190:11,
190:13, 215:6,
215:9, 215:15,
215:16, 215:18,
219:3, 219:15,
219:17, 220:15,
220:18, 220:19,

Transcript of Keven Miller
Conducted on June 5, 2020

303

**220:20, 220:21,**
**221:1, 221:3,**
**221:16, 221:19,**
**222:1, 222:2**
**separately**
221:9
**series**
132:3
**serve**
166:2
**sessions**
11:9, 11:11,
11:13, 11:15,
11:16
**set**
23:5, 28:6,
260:14
**settings**
100:19, 244:5
**several**
13:23, 41:9,
41:20, 151:16,
216:21
**shaft**
169:19, 170:6,
170:11, 170:24,
172:7, 221:11
**shape**
116:2, 148:11,
148:16, 148:24,
149:3, 175:19,
175:21, 175:23,
175:25, 176:8,
176:9, 177:7
**share**
15:3, 24:3,
36:21, 100:7,
125:10, 144:6,
204:17, 204:18,
218:7, 242:14,
244:24
**shared**
100:24
**sharing**
15:24, 138:7
**sheet**
57:2, 57:3,
167:19, 259:7

**shiftable**
233:8, 233:14,
233:19, 233:21,
233:25, 236:1,
236:4, 236:10,
236:16, 236:19
**shock**
84:16
**shocked**
244:9
**short**
50:23, 80:25,
82:8, 82:14,
97:3
**short-circuit**
21:7
**shorten**
89:23
**shorter**
70:2, 70:8,
70:11, 70:14,
70:16, 70:18,
70:24, 71:18,
72:23, 73:3,
73:8, 74:19,
80:12, 97:25,
98:3
**should**
12:6, 57:2,
110:1, 126:15,
147:19, 153:23,
156:16, 202:8,
231:9, 252:5,
252:6
**shouldn't**
124:10
**show**
63:20, 73:23,
124:8, 165:12,
165:14, 165:24,
170:21, 175:21,
201:21, 207:16,
207:18, 208:13
**showing**
75:9, 92:14,
140:1
**shown**
69:2, 69:10,

**69:16, 70:12,**
**88:12, 90:21,**
**101:3, 101:13,**
**102:17, 111:20,**
**111:21, 120:8,**
**149:10, 168:17,**
**169:1, 170:16,**
**182:25, 183:2,**
**192:2, 192:17,**
**198:7, 201:17,**
**201:23, 202:2,**
**210:5, 246:18,**
**249:13**
**shows**
67:19, 68:19,
73:17, 111:25,
124:11, 124:23,
145:8, 149:7,
155:23, 167:22,
175:25, 186:7,
186:8, 197:6,
197:8, 198:4,
199:24, 199:25,
200:22, 201:2,
201:3, 202:11,
202:12, 204:10,
243:3
**side**
70:13, 77:14,
80:21, 94:16,
119:5, 123:21,
128:16, 128:17,
194:22, 195:3,
198:14, 198:17,
198:21, 198:22,
198:25, 199:4,
199:9, 209:10,
210:5, 247:8,
247:9
**sides**
166:17
**sidewalls**
165:7
**sign**
258:10
**signature**
16:23, 17:15,
18:8, 19:4,

**259:11**
**signature-5tm1q**
260:22
**signed**
259:7
**significant**
93:14, 94:17,
203:3
**significantly**
92:9, 96:25,
207:7, 232:12
**signing**
257:15
**silent**
116:1, 116:4,
176:9
**similar**
43:25, 55:25,
103:23, 105:19,
105:21, 117:16,
150:1, 150:4,
212:8, 213:1,
213:11, 239:12
**similarly**
194:20
**simple**
108:17, 109:14,
109:25, 233:25
**simpler**
233:15, 233:21,
234:2, 234:25,
235:5, 235:7,
235:8
**simulations**
94:20
**since**
213:10
**singer**
231:10, 231:14,
231:17, 231:19,
232:4, 232:12,
232:20, 232:22,
232:25, 233:24,
235:4, 235:7,
235:14, 235:17,
235:19, 235:20,
236:9, 236:16,
239:18, 239:19,

Transcript of Keven Miller
Conducted on June 5, 2020

239:22, 240:2,
240:10, 240:12,
240:24, 241:2,
241:5, 241:12,
241:20, 242:10,
242:17, 242:24,
243:10, 243:11,
248:8, 248:12,
248:15
**singer's**
232:9
**single**
74:4, 111:18,
111:21, 111:25,
112:1, 113:16,
113:19, 114:3,
114:22, 124:23,
129:15, 131:2,
131:24, 132:5,
132:6, 133:4,
133:8, 133:13,
133:18, 133:22,
133:25, 134:3,
134:6, 136:1,
136:15, 136:17,
139:8, 150:7,
167:20, 167:23,
167:24, 168:16,
168:22, 171:9,
172:12, 172:17,
172:23, 256:1
**singular**
123:12
**sir**
117:15
**sit**
191:1, 205:8
**sites**
100:19
**sitting**
174:18
**situation**
238:19
**six**
11:18, 138:24,
139:6, 140:24,
255:1, 255:17,
255:19, 255:21,

255:23, 256:12
**six-hole**
138:22, 139:3,
139:13, 140:5,
140:7, 141:5
**size**
94:5, 94:20,
137:15, 202:4,
202:8, 202:9,
202:10
**skill**
33:23, 35:10,
39:14, 39:18,
40:1, 40:3,
40:7, 40:9,
40:13, 41:16,
46:18, 46:22,
46:25, 47:1,
47:10, 47:21,
47:24, 48:1,
48:3, 48:7,
73:1, 77:17,
77:22, 78:6,
79:2, 136:13,
136:22, 137:5,
164:4, 166:23,
203:10
**skilled**
74:6, 207:17
**sleeve**
233:14, 233:15,
233:18, 233:20
**sliding**
242:6, 249:25
**slightly**
99:7, 100:10,
210:10, 221:2
**small**
86:3, 89:15,
89:16, 94:24,
203:24, 203:25
**smaller**
116:11, 129:14,
131:1
**sn**
14:2, 20:19,
55:3, 58:7,
62:6, 65:3,

97:3, 98:14,
99:14, 130:10,
139:5, 140:8
**sn+**
36:10, 36:18,
57:16, 57:20,
58:5, 58:9,
58:13, 58:21,
58:22, 59:14,
59:24, 60:3,
62:3, 63:8,
63:16, 63:24,
96:18, 96:23,
98:3, 100:2,
100:13, 101:2,
101:12, 130:3,
130:7, 130:24,
131:5, 136:4,
136:15, 137:10,
138:9, 139:2,
255:10, 255:16,
255:24
**sns**
51:21, 51:25,
52:6, 53:4,
53:11, 53:17,
53:23, 54:13,
54:16, 54:22,
55:7, 56:2,
100:18
**soft**
85:1
**sold**
100:2, 100:13
**solely**
57:24
**some**
8:19, 11:8,
13:2, 21:4,
23:18, 50:4,
50:6, 54:2,
54:3, 58:6,
62:22, 74:9,
74:12, 75:5,
96:20, 110:25,
124:18, 126:12,
137:18, 145:12,
146:12, 147:17,

153:17, 166:12,
166:13, 167:1,
190:17, 206:12,
219:6
**somebody**
156:11
**someone**
6:25, 168:15
**something**
21:23, 95:21,
112:21, 134:4,
144:8, 145:7,
146:18, 151:8,
167:4, 167:5,
209:19, 244:11,
246:7, 246:19,
253:16, 253:18
**somewhat**
90:5
**sorry**
15:18, 25:14,
48:18, 48:19,
50:20, 64:14,
105:9, 113:22,
124:4, 146:21,
156:10, 156:17,
164:14, 165:9,
173:22, 186:10,
188:9, 188:10,
198:13, 200:19,
202:22, 206:2,
210:23, 237:11,
246:23
**space**
87:17, 88:1,
89:18, 89:21,
92:12, 93:6,
203:3
**speak**
109:24, 110:8,
163:6
**speaking**
20:1
**speaks**
243:4
**spec**
65:21, 65:22,
65:23, 75:5,

Transcript of Keven Miller
Conducted on June 5, 2020

305

79:10, 92:5,
113:14, 119:17,
145:22, 145:23,
151:10, 158:15
**specific**
27:4, 40:22,
59:2, 145:2,
147:5, 162:15,
171:16, 175:8,
175:18, 175:22,
176:8, 176:25,
177:6, 177:7,
208:16, 218:15
**specifically**
21:5, 27:20,
32:25, 33:15,
37:8, 39:3,
40:6, 40:11,
40:20, 43:9,
43:14, 75:4,
76:6, 137:21,
155:7, 163:10,
195:6, 197:22,
207:19, 222:13,
222:14, 222:15,
244:14
**specification**
27:9, 27:10,
27:13, 28:25,
31:5, 112:5,
122:10, 123:8,
123:11, 125:19,
126:4, 129:7,
145:24, 146:2,
146:4, 146:10,
146:14, 147:1,
147:4, 147:6,
147:9, 147:11,
147:15, 147:18,
147:21, 148:3,
148:5, 148:10,
148:13, 148:18,
150:21, 151:1,
151:23, 153:10,
163:8, 165:5,
166:15, 175:16,
176:1, 177:14,
197:10, 198:10,

198:14, 198:24,
199:14, 199:22,
205:6, 215:14,
243:4
**specifications**
26:23, 27:2
**specifics**
74:21, 146:19
**specifying**
204:5
**specs**
232:19
**speculation**
89:13
**spell**
8:1, 160:8,
160:9
**spelled**
215:21
**spoke**
13:15
**spoken**
13:17
**spring**
83:17, 83:19,
83:21, 83:24,
84:1, 84:3,
85:1, 85:13,
86:6, 86:17,
87:9, 87:11,
87:16, 87:17,
87:20, 87:21,
87:22, 87:25,
88:3, 241:16
**springs**
84:23, 86:17
**squared**
21:11, 21:12,
21:16, 21:17,
115:15, 132:15,
134:12, 134:13,
134:19, 134:24
**squares**
247:8
**stages**
201:22
**stand**
16:3

**standard**
30:10, 30:12,
30:14, 135:24,
202:9
**standards**
33:23, 51:19,
125:9, 224:12
**standing**
52:16
**stanley**
100:21, 137:19
**stapler**
53:5, 53:11
**start**
88:17, 122:25,
142:16, 234:22
**started**
47:17, 100:21
**starting**
47:9, 187:22
**starts**
38:14, 155:18,
169:13
**state**
6:15, 8:1,
39:17, 53:3,
53:10, 61:19,
79:19, 106:11,
126:18, 130:2,
187:16, 203:1,
213:15, 214:7,
249:24
**statement**
203:13
**states**
1:1, 6:5,
56:16, 67:9,
102:6, 128:15,
156:18, 164:18,
169:16, 194:3,
195:14, 197:17,
197:21, 214:14,
234:15, 234:24,
241:16
**static**
248:11
**stating**
91:9, 250:22

**stem**
84:19, 85:19,
222:14
**stenographically**
260:8
**step**
60:12, 102:1,
102:25, 104:20,
108:10, 108:24,
115:3, 120:25,
133:1, 141:15,
157:17, 184:22,
219:12, 223:9,
228:16
**stick**
111:7, 188:12
**still**
29:5, 89:19,
224:16, 242:7,
244:11, 247:19,
248:13, 253:6
**stipulate**
7:8
**stop**
43:10
**stops**
183:5
**straight**
43:22, 45:7,
108:18, 200:22,
201:3
**strap**
250:3, 250:5,
251:5, 251:10,
251:14, 251:16,
251:18, 251:21,
251:22, 252:3,
252:21, 252:23,
253:5
**streamline**
204:23
**street**
3:8, 3:16
**strength**
166:3
**stretch**
149:5
**strike**
85:18, 171:14

stroke
89:19, 89:20
stroked
84:19
stronger
86:5, 87:9,
87:16, 87:20
structural
145:6, 145:13
structure
28:23, 28:24,
29:1, 29:2,
29:3, 29:11,
29:12, 29:17,
29:18, 29:24,
30:3, 30:5,
31:4, 31:5,
31:18, 32:2,
32:3, 86:25,
116:3, 145:1,
145:7, 152:11,
175:8, 177:6,
215:4, 215:10,
223:11, 223:15,
223:18, 224:5,
224:15, 224:16,
224:20, 227:15,
227:18, 227:22,
227:24, 228:4,
228:18, 229:3,
229:12, 229:16,
230:3, 230:8,
230:16, 230:18,
236:18
structures
230:13
stuck
246:22, 246:23,
247:15, 247:21,
247:22, 248:4
studied
67:15, 146:10
study
110:24, 190:24
stuff
150:10
submitted
17:8, 17:25,

18:19, 163:13
submitting
163:17
subsequently
140:11
substance
10:23, 51:12,
51:15
substantially
31:19, 31:25,
35:4, 35:5,
35:7, 38:21,
232:22
sufficient
211:20
suggesting
209:13
summarizing
35:24
summation
34:13
supervision
260:9
supplemental
4:17, 18:11,
18:18, 19:17,
20:5, 119:19,
129:12, 131:12,
131:16, 138:13,
140:16, 140:21
supply
226:1
support
118:14, 177:9,
189:20
supported
174:8, 175:3,
176:11, 176:22,
177:16, 177:21,
178:12, 189:23,
190:1, 190:8,
190:21, 195:15,
196:8
supporting
174:9, 175:4,
175:6, 175:10,
175:13, 175:19,
175:22, 175:25,

176:6, 176:8,
176:12, 176:14,
176:16, 176:21,
176:23, 176:25,
177:6, 177:8,
177:11, 177:16,
177:19, 177:21,
178:2, 178:9,
178:10, 178:12,
178:14, 178:16,
179:19, 180:2,
180:12, 180:16,
182:15, 184:4,
184:9, 184:11,
184:13, 184:19,
184:25, 185:6,
185:8, 185:11,
185:16, 185:25,
186:2, 186:6,
186:15, 186:17,
187:9, 187:19,
188:17, 188:19,
189:4, 189:20,
189:24, 190:2,
190:9, 190:22,
191:10, 191:19,
191:23, 192:13,
192:16, 193:7,
193:13, 193:16,
194:3, 194:11,
194:16, 194:21,
195:2, 195:7,
195:16, 195:20,
196:7, 196:9,
196:12, 196:18,
203:8, 203:12,
243:4
supports
177:15, 180:18,
189:22
supposed
105:24
sure
8:18, 23:18,
24:7, 37:19,
44:25, 46:4,
50:17, 50:23,
51:1, 52:5,

52:20, 57:10,
57:21, 60:11,
60:19, 63:14,
64:15, 80:3,
87:14, 90:15,
101:6, 127:24,
132:12, 132:21,
137:8, 150:14,
173:5, 178:5,
181:25, 187:13,
205:2, 209:18,
211:4, 212:20,
222:5, 226:16,
230:8, 241:9,
254:19
surface
75:12, 76:1,
76:18, 76:23,
77:2, 77:5,
78:22, 79:4,
83:22, 84:13,
87:3, 93:17,
93:19, 93:20,
94:9, 94:13,
99:4, 99:5,
132:6, 132:8,
132:23, 133:11,
133:12, 133:14,
217:6, 217:8,
217:9, 217:12,
217:13, 217:18,
217:22, 217:24,
218:1, 218:5,
218:6, 218:9,
218:11, 218:14,
219:8, 219:14,
220:13, 220:15,
221:9, 222:1,
222:20, 223:2,
226:12, 226:24,
238:12, 238:15,
238:18, 238:20,
238:23, 238:24,
239:7, 239:11,
240:5, 240:18,
240:19, 251:5,
251:10, 251:12,
251:23, 252:4,

252:5, 252:6,
252:11, 252:12
**surfaces**
55:16, 55:18,
55:19, 217:20,
218:17, 219:9,
219:22, 219:24,
219:25, 220:4,
220:6, 220:8,
251:17
**surmise**
9:18
**surprisingly**
244:23
**swear**
7:6
**swearing**
7:9
**swell**
247:22
**swelling**
247:23
**swells**
246:6
**swing**
239:19, 250:2,
250:5, 251:5,
251:10, 251:14,
251:16, 251:18,
251:21, 251:22,
252:2, 252:21,
252:23, 253:5
**switch**
16:10, 226:11,
227:4, 228:3
**symmetric**
98:25, 99:2
**system**
96:15
**systems**
100:21, 245:20

**T**

**tab**
184:16, 184:18
**table**
18:16, 18:23,
34:12, 35:24,

37:20, 180:22
**take**
9:5, 9:10,
13:21, 21:4,
37:19, 50:15,
52:24, 60:12,
64:16, 70:21,
71:22, 86:20,
86:22, 99:24,
102:1, 102:24,
104:20, 108:10,
110:14, 111:5,
115:3, 117:1,
120:24, 133:1,
133:19, 138:2,
141:14, 147:14,
152:15, 155:3,
157:17, 184:22,
204:6, 204:18,
205:13, 205:18,
206:22, 209:24,
210:24, 219:12,
223:9, 228:16,
230:20, 246:13,
247:1, 248:18
**taken**
43:12, 209:20,
260:5, 260:8
**takes**
149:3
**taking**
143:12, 244:7
**talk**
20:18, 40:20,
76:9, 76:11,
146:4, 161:24,
165:16, 168:12,
168:22, 206:21,
208:15, 232:18
**talked**
15:11, 76:9,
107:25, 208:17
**talking**
10:2, 24:24,
75:19, 75:20,
94:11, 104:8,
110:6, 110:7,
114:2, 115:25,

121:5, 129:3,
132:19, 142:5,
150:8, 150:9,
184:12, 191:15,
191:16, 191:18,
239:14, 239:16,
240:17, 254:20,
254:21, 254:25
**talks**
64:22, 65:19,
112:21, 113:14,
124:25, 126:19,
144:7, 144:8,
145:23, 146:6,
146:8, 148:6,
148:7, 150:23,
241:8
**taller**
69:24, 69:25,
70:8
**tape**
72:6, 72:7,
116:25
**taught**
82:10, 228:14,
228:24, 228:25
**teach**
146:19
**teaches**
147:11, 163:25
**teaching**
81:24, 244:15
**teachings**
243:1
**tearing**
244:5
**tech**
3:22
**techniques**
232:13, 232:15,
232:16, 232:20
**telephone**
39:7
**tell**
51:17, 71:6,
74:16, 74:18,
75:18, 93:1,
93:5, 100:17,

111:22, 119:7,
122:8, 132:10,
248:1
**telling**
197:1
**tells**
152:10, 243:19
**temperature**
148:23
**ten**
50:19, 50:22,
50:25, 57:5,
113:23, 114:1,
116:11, 116:13
**term**
42:22, 43:1,
43:6, 45:9,
60:22, 93:22,
138:22, 146:3,
147:19, 181:10,
181:18, 181:22,
252:6
**terminal**
181:5, 181:6,
181:10, 181:18,
181:21, 181:23,
182:4, 182:8,
182:13, 182:16,
182:19, 182:23,
183:3, 183:4,
183:10, 183:19,
183:20, 183:24,
184:2, 184:6,
184:15, 184:17,
184:18, 184:19,
185:11, 185:15
**terminals**
183:11, 183:12,
183:13, 183:16,
183:19
**terminology**
109:17, 109:19,
157:8
**terms**
24:8, 73:16,
153:8
**test**
99:13, 206:23

Transcript of Keven Miller
Conducted on June 5, 2020                                                 308

| | | | |
|---|---|---|---|
| **tested**<br>90:22<br>**testified**<br>8:7, 35:9,<br>53:19, 98:21,<br>104:18, 111:12,<br>115:4, 118:11<br>**testify**<br>199:2<br>**testimony**<br>7:11, 7:19,<br>10:23, 11:3,<br>34:6, 35:12,<br>51:12, 51:15,<br>73:19, 117:12,<br>166:25, 190:5,<br>254:2, 254:5,<br>259:4, 259:5<br>**testing**<br>90:13, 90:14,<br>99:18<br>**tests**<br>90:16, 90:18,<br>90:20, 91:4<br>**text**<br>57:5, 254:7<br>**th**<br>154:5, 179:8,<br>260:15<br>**thank**<br>7:4, 8:25, 9:7,<br>9:17, 47:12,<br>50:23, 75:21,<br>83:8, 138:8,<br>211:11, 241:13,<br>254:16, 256:18,<br>256:20, 257:18,<br>258:15<br>**thanks**<br>78:16<br>**themselves**<br>6:14, 73:23,<br>147:2<br>**thereafter**<br>260:8<br>**therealong**<br>233:19<br>**thereof**<br>224:3 | **therewith**<br>233:21<br>**thing**<br>34:13, 45:9,<br>110:11, 155:9,<br>172:18, 183:15,<br>210:14, 247:21,<br>248:4<br>**things**<br>12:7, 20:15,<br>23:13, 30:13,<br>30:16, 30:17,<br>42:14, 46:12,<br>47:19, 137:23,<br>138:2, 148:6,<br>177:25, 213:22,<br>222:12, 245:16,<br>255:5<br>**think**<br>15:19, 21:6,<br>23:17, 28:17,<br>40:5, 47:6,<br>59:12, 62:22,<br>71:11, 73:6,<br>91:7, 94:22,<br>97:8, 101:15,<br>102:24, 103:15,<br>109:16, 109:19,<br>116:23, 126:12,<br>131:8, 133:10,<br>135:11, 135:22,<br>135:23, 135:24,<br>139:25, 140:19,<br>141:1, 144:6,<br>151:8, 151:24,<br>154:24, 177:3,<br>196:14, 207:25,<br>209:25, 236:6,<br>243:3, 243:25,<br>247:20, 248:19,<br>250:16, 255:7,<br>256:11<br>**thinking**<br>255:4<br>**thomas**<br>3:5<br>**thought**<br>90:24, 125:25, | **179:10, 188:10,**<br>**240:17**<br>**thousand**<br>116:22<br>**threat**<br>84:10<br>**three**<br>15:6, 39:21,<br>97:22, 98:1,<br>191:20, 215:14,<br>215:15, 215:18,<br>231:4<br>**three-dimensional**<br>74:1<br>**through**<br>20:14, 22:7,<br>22:8, 24:6,<br>28:4, 28:6,<br>28:15, 33:2,<br>33:15, 37:21,<br>44:8, 52:15,<br>56:20, 57:2,<br>61:6, 65:1,<br>75:4, 102:12,<br>102:14, 102:15,<br>108:13, 119:3,<br>119:8, 121:8,<br>121:23, 122:4,<br>124:9, 124:20,<br>128:6, 135:21,<br>135:22, 139:17,<br>140:23, 140:24,<br>149:1, 179:2,<br>201:20, 233:5,<br>236:13, 243:2,<br>257:4<br>**throughout**<br>33:13, 34:7,<br>131:9<br>**time**<br>6:8, 7:1, 7:3,<br>9:5, 11:17,<br>21:4, 45:23,<br>47:16, 51:3,<br>60:10, 94:6,<br>101:5, 109:7,<br>110:20, 117:4,<br>137:24, 154:20, | **163:13, 167:3,**<br>**173:3, 173:7,**<br>**202:13, 203:11,**<br>**206:25, 230:23,**<br>**231:2, 248:22,**<br>**249:1, 254:8,**<br>**254:9, 254:16**<br>**times**<br>93:8, 97:17,<br>97:21, 97:22,<br>98:1, 132:15,<br>132:18, 134:10,<br>134:13, 134:18,<br>134:19, 134:21,<br>134:23, 134:24,<br>257:16<br>**tiny**<br>94:18, 244:6<br>**titled**<br>18:11, 38:3,<br>40:25, 56:18<br>**today**<br>6:10, 6:24,<br>7:5, 8:5, 10:22,<br>11:3, 14:24,<br>19:7, 19:22,<br>26:7, 27:7,<br>27:12, 108:1,<br>191:1, 254:1<br>**today's**<br>6:8, 11:5<br>**together**<br>38:24, 46:3,<br>46:6, 143:22,<br>145:9, 145:19,<br>145:21, 148:7,<br>158:4, 158:16,<br>169:1, 169:9,<br>221:18, 221:23,<br>222:9, 222:23,<br>258:5<br>**told**<br>51:18, 161:5<br>**tom**<br>6:18<br>**took**<br>27:21, 96:20,<br>136:8 |

Transcript of Keven Miller
Conducted on June 5, 2020

309

toolbar
156:4
tooling
189:9
tools
1:9, 6:5,
23:16, 23:18,
23:19, 23:22,
23:24, 23:25,
27:20, 27:21,
39:22, 40:17,
42:23, 43:2,
44:1, 45:2,
49:6, 49:17,
49:21, 49:25,
50:2, 50:4,
50:6, 59:12,
86:1, 86:2,
89:5, 91:5,
91:12, 93:13,
94:5, 94:16,
94:20, 95:8,
95:15, 100:20,
130:8, 130:11,
137:21, 137:24,
142:10, 142:18,
206:24, 235:20,
243:20, 244:5,
244:8, 244:9,
244:12, 248:4
top
30:24, 47:11,
63:2, 76:12,
78:1, 81:10,
81:13, 81:20,
87:6, 87:12,
88:14, 89:18,
89:22, 97:7,
156:4, 156:13,
174:24, 183:2,
195:14, 209:9,
209:23, 217:1,
247:17
topic
50:15
tortured
186:4
total
71:7, 133:21,

133:24, 134:20,
134:22, 137:2
tough
94:6
tout
235:4
touting
233:24, 234:2,
235:8
touts
235:7
towards
83:22, 108:4,
166:18, 240:13,
240:14
traditional
42:4, 77:13,
78:1, 80:23,
91:11, 220:9
traditionally
95:7, 95:9,
95:13, 103:10
train
204:2, 204:3
training
41:10, 41:22
transcribing
9:19
transcript
4:8, 7:13,
260:6
transcription
259:5
transducer
95:17, 95:20,
96:4, 96:6
transducers
95:22, 95:24,
96:1
transform
250:1
transformed
168:22
translate
218:25
translates
251:15
treated
142:10

trial
23:6
tried
147:17
trigger
56:18, 63:21,
65:9, 65:11,
65:16, 66:2,
66:11, 66:18,
66:19, 67:11,
67:22, 67:24,
68:11, 69:1,
69:2, 69:4,
69:6, 69:9,
69:16, 69:18,
69:22, 69:25,
73:14, 74:8,
74:9, 74:11,
75:6, 80:25,
81:17, 82:24,
84:11, 84:19,
85:16, 85:18,
95:10, 101:17,
102:14, 138:9,
138:11, 138:15,
138:25, 139:3,
209:4, 215:11,
223:24, 226:11,
227:4, 228:3,
239:6, 239:10,
240:13, 240:14,
248:10
trip
84:11, 84:18,
85:17
trips
207:14
trouble
121:4
true
7:11, 7:19,
188:24, 218:4,
245:15, 259:4,
260:6
truth
22:16
truthful
11:2

try
55:20, 82:25,
88:13, 88:15,
209:2, 226:22
trying
23:17, 31:9,
31:13, 32:14,
34:8, 58:11,
60:11, 70:13,
73:1, 82:9,
89:14, 108:16,
109:2, 109:10,
109:16, 110:3,
110:9, 111:2,
130:21, 173:25,
210:12, 224:11,
239:6, 245:2,
245:6, 250:13
tubes
70:6
turn
16:7, 16:20,
17:10, 18:7,
28:1, 39:10,
47:8, 60:12,
61:12, 65:4,
68:14, 76:14,
97:4, 101:6,
104:20, 105:8,
106:2, 111:19,
118:6, 123:18,
138:13, 138:19,
139:19, 141:15,
142:12, 156:3,
156:8, 162:1,
164:9, 164:15,
164:25, 166:16,
167:18, 169:6,
169:23, 173:17,
174:22, 179:15,
186:19, 188:6,
188:14, 191:7,
191:14, 191:22,
192:22, 193:21,
197:5, 197:6,
197:10, 197:11,
197:16, 197:20,
200:4, 201:11,

201:16, 210:17,
210:18, 213:3,
213:12, 216:14,
232:1, 232:25,
234:19, 236:20,
237:10, 239:18,
242:1, 249:3
**turned**
197:24
**turning**
68:22, 104:17
**twisting**
209:6
**two**
18:24, 27:2,
44:1, 74:12,
97:17, 97:21,
97:24, 97:25,
98:24, 99:2,
99:4, 99:5,
99:9, 99:10,
108:9, 123:23,
129:4, 129:5,
133:15, 138:9,
138:11, 140:13,
143:6, 143:22,
145:8, 145:15,
145:18, 145:19,
145:20, 145:23,
146:6, 146:8,
146:15, 147:22,
148:6, 149:13,
149:17, 151:22,
157:9, 157:19,
157:22, 158:20,
159:8, 159:21,
161:2, 168:10,
168:14, 169:18,
170:11, 171:2,
171:10, 172:6,
177:17, 217:20,
218:16, 218:17,
219:21, 219:25,
220:3, 220:8,
221:7, 221:16,
221:19, 234:14,
247:7, 251:17,
251:25

**type**
32:22, 34:22,
36:24
**typed**
258:11
**types**
45:5
**typewriting**
260:9
**typical**
94:19, 132:1,
205:18
**typically**
44:4, 74:6,
77:25, 85:8,
87:19, 88:11,
93:13, 93:25,
94:19, 96:1,
120:8, 120:13,
120:15, 120:18,
120:23, 121:20,
124:18, 125:2,
132:3, 149:15,
205:14, 205:15,
220:9, 246:4,
246:14, 246:15
**typo**
20:16, 20:17,
20:20, 21:6
**typographical**
20:22, 21:19

**U**

**uh-huh**
61:18, 83:16,
97:13, 123:2,
144:24, 156:20,
158:10, 168:4,
169:11, 175:1,
195:18, 226:21,
241:15, 243:17
**unchanged**
88:21
**unclear**
218:18
**uncover**
211:25
**under**
7:11, 7:19,

31:2, 32:5,
63:3, 121:6,
177:17, 185:14,
190:12, 250:21,
260:9
**undergraduate**
39:20
**understand**
8:20, 8:23,
9:2, 10:21,
12:6, 19:25,
23:4, 24:11,
24:19, 24:24,
25:9, 25:21,
26:7, 26:17,
26:20, 31:7,
31:8, 31:9,
31:13, 32:13,
34:9, 35:1,
46:17, 49:9,
53:4, 55:18,
56:22, 57:9,
58:6, 58:11,
60:11, 61:2,
75:15, 76:4,
82:13, 104:25,
105:5, 105:11,
109:2, 109:15,
111:3, 111:4,
130:21, 138:8,
141:14, 141:16,
142:3, 147:7,
147:9, 159:3,
160:24, 166:24,
179:18, 179:23,
179:25, 180:11,
180:14, 181:19,
216:11, 216:24,
217:4, 220:1,
224:11, 225:6,
226:17, 226:20,
227:7, 236:6,
238:10, 245:2,
252:8, 256:15
**understanding**
28:7, 28:20,
29:14, 29:23,
30:7, 30:22,

31:9, 31:14,
31:21, 32:7,
32:15, 42:25,
43:4, 44:18,
44:23, 63:19,
84:9, 85:25,
91:23, 110:16,
114:21, 114:25,
121:4, 125:4,
125:11, 125:14,
125:17, 138:15,
146:2, 146:21,
146:25, 147:3,
148:20, 153:1,
153:6, 159:7,
190:14, 190:19,
201:17, 223:14,
224:6, 224:8,
225:6, 225:8,
225:9, 235:11,
239:4, 247:9
**understood**
9:22, 12:5,
27:19, 27:22,
85:5, 187:5,
187:23, 258:2
**unibody**
148:8
**united**
1:1, 6:5, 56:16
**upper**
75:12, 76:1,
76:18, 76:23,
77:1, 78:22,
79:4, 182:12,
182:14, 182:18,
182:23, 183:21,
214:9, 214:14,
214:18, 214:22,
215:2, 215:12,
216:25, 217:2,
217:3, 217:9,
217:24, 217:25,
219:9, 219:15,
219:18, 220:16,
222:2, 222:8,
222:19, 223:3,
223:25, 247:16

Transcript of Keven Miller
Conducted on June 5, 2020

311

**upward**
197:25, 239:23, 241:23, 242:6, 251:10, 253:11
**urges**
241:17
**use**
9:22, 27:9, 72:9, 74:23, 84:1, 87:8, 87:16, 96:6, 103:2, 104:14, 104:16, 115:6, 126:5, 129:14, 131:1, 138:22, 148:25, 167:4, 181:10, 181:18, 181:22, 205:15, 213:5, 223:23, 232:12, 232:15, 232:16, 232:20, 235:4, 235:25, 237:8, 242:18, 242:24, 244:12, 252:10
**user**
43:24, 246:18
**users**
100:18
**uses**
45:9, 60:20, 60:21, 122:10, 123:9, 125:20, 125:23, 128:23, 129:9, 139:2, 140:9
**using**
27:13, 37:23, 123:12, 130:8, 131:22, 139:13, 140:2, 145:1, 250:23
**usually**
70:5, 127:20, 246:18
**utility**
242:15, 242:16

**V**

**v**
1:7

**vague**
30:19, 37:13, 42:19, 75:2, 75:14, 225:2
**validity**
161:25, 162:1, 162:3, 163:15, 163:18
**vallee**
3:21, 5:9, 5:13, 6:20, 22:13, 45:18, 45:20, 46:7, 46:17, 46:24, 47:10, 47:15, 47:21, 47:23, 48:5, 49:9, 53:4, 56:1, 135:5, 135:23, 152:13, 152:20, 160:6, 160:16, 179:18, 179:23, 180:12, 180:14, 181:6, 181:24, 183:22, 183:23, 184:23, 185:4, 185:9, 185:14, 186:2, 186:12, 187:5, 187:23, 188:2, 207:22, 208:3, 208:7, 208:10, 213:17, 214:17, 214:21, 215:25, 216:10, 216:24, 217:14, 218:20, 218:25, 219:2, 219:14, 220:13, 220:16, 221:5, 222:18, 223:4, 249:20, 250:10, 252:8, 256:10
**vallee's**
11:7, 22:15, 22:16, 27:23, 46:13, 46:21, 49:13, 54:24, 55:6, 55:10,

56:4, 136:7, 152:1, 152:15, 152:16, 160:2, 160:12, 161:7, 161:10, 161:18, 179:6, 181:13, 188:9, 213:7, 219:6, 220:2, 250:15, 250:18, 250:19, 250:21, 250:23, 252:10, 253:1, 253:3, 253:19
**valves**
88:23
**varies**
92:22
**various**
58:19, 201:22
**vedder**
3:15, 6:23, 11:9, 11:10, 12:23, 38:9
**verbal**
9:20, 176:13
**verified**
7:15
**verify**
241:7
**versa**
210:15
**versed**
30:13, 224:20
**version**
138:15, 138:17, 138:22, 139:4, 139:7, 139:9, 139:14, 140:5, 140:7, 140:9, 140:12, 140:14, 141:5, 208:1, 255:18, 255:21, 255:23, 255:25, 256:5
**versions**
138:9, 138:11, 139:2, 139:5, 142:6

**versus**
6:4, 256:12
**vertical**
69:17, 237:16
**via**
10:1, 73:24, 148:8, 149:11, 158:1
**vibration**
43:17, 43:18
**vice**
210:15
**video**
6:2, 6:3, 6:9, 6:11, 7:4, 51:2, 51:6, 109:6, 110:19, 113:22, 114:1, 117:3, 117:7, 117:8, 173:6, 173:10, 173:11, 230:22, 231:1, 248:21, 248:25, 258:16, 258:17
**videoconference**
6:14, 10:1
**videographer**
3:23, 6:10
**videotaped**
1:13, 2:1, 51:7
**view**
58:20, 122:3, 146:1, 167:21, 188:19, 192:4, 197:7, 197:8, 197:12, 197:17, 197:23, 198:4, 198:8, 198:11, 198:14, 198:18, 198:21, 198:23, 198:25, 199:7, 199:8, 199:9, 199:12, 199:14, 199:20, 199:21, 199:23, 199:24, 199:25, 200:1, 204:1, 209:9, 209:11, 209:16,

Transcript of Keven Miller
Conducted on June 5, 2020

312

210:5, 210:6,
210:7, 219:23,
221:6, 221:11
**viewed**
147:1, 147:2
**viewing**
178:5
**views**
73:24, 74:2,
198:6
**violently**
166:6, 166:19
**virtually**
1:14, 2:2
**voice**
6:14, 174:1
**volume**
20:19, 54:3,
79:8, 88:19,
90:7, 98:11,
99:24, 104:7,
105:3, 107:15,
108:14, 112:12,
112:15, 112:16,
113:2, 113:10,
115:12, 115:22,
120:7, 120:14,
121:8, 121:22
**volumes**
55:19, 55:20,
55:23

---
**W**
---
**waiting**
156:10
**wall**
93:22, 93:24,
94:4, 94:8,
94:10, 94:14,
94:16, 95:3,
95:9, 96:7,
96:14, 99:8,
99:10, 99:13,
99:15, 134:1,
134:2, 150:10,
156:23, 157:22,
157:23, 157:25,
158:3, 158:8,

158:11, 158:13,
158:18, 158:22,
158:24, 159:2,
159:4, 159:12,
159:13
**walls**
143:6, 145:8,
145:19, 145:20,
145:23, 146:6,
146:9, 149:13,
151:18, 151:22,
155:24, 157:8,
157:9, 157:25,
158:16, 158:20,
159:8, 159:22,
163:8, 164:20,
165:1, 165:2,
165:13, 165:15,
165:17, 165:25,
166:1, 166:8,
166:9, 166:25,
167:4, 169:18,
170:12, 171:3,
172:6, 172:22,
172:25
**want**
9:15, 16:10,
20:12, 22:10,
60:19, 63:14,
65:21, 70:7,
75:17, 77:17,
77:23, 78:7,
79:3, 82:14,
107:21, 108:19,
108:25, 109:3,
109:24, 110:8,
110:14, 111:5,
112:20, 113:23,
116:25, 132:11,
136:17, 137:14,
142:17, 148:4,
148:24, 150:13,
155:8, 161:24,
162:23, 176:1,
178:4, 204:4,
205:13, 205:15,
210:24, 211:4,
241:9, 248:20,

253:4, 255:8
**wanted**
13:9, 15:16,
49:20, 55:10,
55:23, 84:1,
90:16, 136:17,
256:13
**wants**
128:22, 129:8
**water**
245:18, 245:20,
245:23, 245:25,
246:1
**wavy**
149:4
**way**
7:14, 31:20,
46:1, 46:11,
61:1, 64:1,
64:24, 73:22,
78:1, 80:23,
83:4, 89:17,
89:19, 106:25,
123:4, 124:16,
135:5, 135:11,
135:24, 144:7,
145:9, 167:2,
172:1, 172:2,
198:19, 199:20,
199:23, 204:3,
208:2, 215:4,
221:2, 221:22,
238:10, 240:20,
240:24, 249:19,
251:14, 253:2,
256:7
**ways**
149:15, 151:17,
151:21, 199:21,
210:8
**we'll**
36:9, 108:23,
160:10, 179:22
**we're**
6:18, 24:7,
55:5, 63:14,
64:17, 94:11,
102:24, 110:2,

114:2, 121:5,
123:14, 136:5,
150:8, 150:9,
163:1, 178:5,
239:14, 239:16
**we've**
50:18, 50:21,
107:25, 109:13,
138:16, 173:2,
206:16, 206:18,
206:19
**wear**
245:11, 245:15,
247:15, 248:3
**wearing**
245:13, 246:9
**wears**
246:11
**week**
11:14
**week's**
11:18
**weigh**
207:12
**weighs**
207:11
**weight**
208:20
**welcome**
47:13
**welding**
145:10
**went**
226:2
**west**
3:8
**whatever**
32:9, 83:3
**whereof**
260:14
**whether**
31:22, 34:18,
43:22, 48:11,
48:16, 49:21,
50:10, 51:21,
51:25, 52:6,
53:11, 53:16,
53:23, 54:16,

Transcript of Keven Miller
Conducted on June 5, 2020

313

70:22, 72:22,
72:23, 73:2,
74:18, 86:13,
88:10, 100:2,
100:12, 116:1,
117:18, 136:14,
136:24, 144:3,
144:18, 148:6,
167:3, 167:4,
174:19, 182:18,
206:23, 211:22,
213:16, 236:4
**whichever**
117:2
**whole**
43:19, 43:21,
86:10, 155:9
**width**
169:17, 170:2,
170:5, 170:6,
170:9, 170:17,
170:19, 170:21,
171:4, 171:17,
171:21, 171:23,
172:1, 172:2,
172:3, 172:5
**widths**
170:23, 171:1
**wife**
51:16, 118:5
**windows**
10:12
**wire**
87:20, 149:21
**wired**
149:15, 149:16
**wish**
199:2
**withdraw**
8:13, 25:15,
33:20, 34:5,
37:2, 37:14,
39:16, 42:17,
44:2, 54:12,
79:13, 83:9,
86:21, 88:25,
90:25, 91:15,
92:25, 94:8,

95:12, 95:23,
96:5, 98:15,
101:10, 104:17,
104:18, 106:2,
107:13, 125:12,
126:21, 128:1,
139:1, 145:16,
145:21, 145:25,
147:7, 150:2,
152:13, 158:12,
159:25, 162:21,
163:22, 180:13,
182:1, 183:8,
187:13, 190:6,
193:14, 197:4,
204:14, 206:7,
207:8, 207:20,
208:6, 212:2,
212:10, 219:13,
220:14, 221:14,
221:15, 222:5,
223:20, 225:3,
227:2, 227:21,
230:9, 232:21,
234:7, 240:7,
247:12, 250:22,
252:9, 252:14,
252:15, 255:22,
256:3
**withdrawn**
162:25
**within**
77:16, 101:17,
166:6, 166:19,
171:2, 206:16,
246:21
**without**
87:13, 165:12
**witness**
6:24, 7:7, 7:9,
7:10, 7:14,
7:17, 7:21,
47:14, 50:20,
50:23, 51:1,
76:3, 110:16,
155:14, 173:5,
256:20, 258:15,
260:14

**wobbled**
43:22
**word**
34:21, 38:17,
40:11, 40:12,
118:5, 118:11,
122:10, 125:13,
125:17, 125:20,
125:23, 126:2,
126:5, 128:23,
129:9, 152:9
**words**
9:24, 40:8,
40:11
**work**
9:8, 42:13,
42:14, 45:20,
45:24, 46:1,
46:7, 54:2,
88:19, 90:8,
90:10, 95:14,
137:19, 162:18,
222:9, 226:2,
226:12, 226:24,
236:24, 238:15,
238:18, 238:20,
238:23, 238:24,
239:7, 239:11,
240:5, 240:18,
240:19
**worked**
45:22, 46:5,
47:19, 90:12,
95:23
**workforce**
238:25
**working**
46:2
**workpiece**
238:12
**works**
234:23, 239:9
**wouldn't**
72:24, 82:3,
84:3, 84:25,
86:4, 86:5,
121:11, 208:19,
226:2, 226:4,

226:6
**wrapping**
248:19
**write**
14:25, 32:24,
33:6, 33:11,
34:15, 34:20,
34:21, 34:25,
35:10, 37:7,
37:11, 37:16,
38:3, 38:15,
38:17, 38:21,
258:9
**written**
254:5, 254:6
**wrong**
246:19
**wrote**
32:18, 35:3,
35:7, 36:20,
37:1, 38:7, 39:1

**X**

**xp**
22:23, 141:17,
142:2, 142:23,
211:14, 214:3,
214:8, 227:15
**xp's**
22:9
**x5**
114:13

**Y**

**yeah**
16:17, 22:6,
47:6, 55:2,
55:4, 57:15,
65:21, 68:7,
73:6, 81:3,
90:4, 90:10,
90:22, 96:17,
97:25, 101:8,
117:13, 123:19,
124:5, 125:8,
138:12, 139:22,
166:4, 167:1,
168:12, 176:16,

Transcript of Keven Miller
Conducted on June 5, 2020

314

**186:12, 198:3,**
204:10, 211:7,
234:22, 237:8,
238:3, 239:9,
242:5, 243:5,
243:7
**years**
39:21, 41:9,
41:21, 47:17
**yellow**
97:12, 186:7,
193:19
**yep**
88:17, 102:5,
114:7, 114:10,
118:9, 128:14,
164:17, 169:15,
191:6, 237:18,
237:21, 238:6,
241:19
**yesterday**
11:14
**yesterday's**
11:19
**yk**
179:10, 180:10,
180:15, 180:23,
181:11, 181:14

_____ Z _____

**zoom**
156:16, 180:8

_____ ( _____

**(cfc**
1:7, 6:7

_____ . _____

**.125**
132:15, 132:16,
132:18
**.578**
106:7, 106:10,
106:21
**.8**
105:2

_____ 0 _____

**0-ring**
247:16, 247:17

**0-rings**
245:13, 245:15
**000009**
179:1
**000012**
179:2
**000695**
56:20
**000724**
56:20
**0009260**
5:2, 56:17
**001157**
231:11
**001486**
231:12
**001679**
231:10
**0026**
97:8
**0029**
3:9
**012**
26:16, 26:17,
26:20, 26:24,
27:8, 27:13,
51:22, 52:1,
52:7, 53:5,
53:12, 53:18,
53:23, 54:17,
54:25, 55:7,
56:3, 57:13,
58:20, 59:17,
60:6, 60:20,
64:6, 64:11,
64:18, 64:20,
64:22, 66:4,
66:16, 75:11,
75:18, 75:24,
100:3, 100:14,
105:5, 105:12,
105:14, 105:16,
106:25, 107:8,
107:24, 111:17,
112:6, 112:11,
113:1, 113:9,
114:6, 115:21,
117:22, 122:18,

**254:21**
**02**
202:8, 203:25
**04**
173:9, 173:12
**05**
20:20, 21:12,
21:14, 21:16,
21:18, 117:5,
117:9
**06**
20:20, 21:11,
21:15, 154:5
**0848**
179:20, 180:10,
180:15, 180:23,
181:11, 181:14

_____ 1 _____

**1**
109:7, 109:9,
110:20, 117:4,
117:5
**1-9**
187:2
**1.0**
107:10
**10**
5:2, 28:19,
53:6, 56:6,
56:13, 56:15,
56:21, 57:8,
59:5, 59:8,
66:21, 114:13,
135:14, 135:19,
155:10, 155:17,
180:7, 237:14,
237:15, 237:18,
237:20, 238:6,
245:19
**100**
116:17, 116:19,
135:14, 135:19
**101**
123:1, 123:17
**105**
123:19
**106**
67:23, 67:24

**108**
68:1, 68:2
**11**
5:3, 38:1,
51:3, 51:5,
51:8, 119:20,
126:17, 153:19,
153:20, 154:3,
154:6, 154:19,
155:1, 165:17,
165:18, 223:24
**112**
18:5, 18:7,
18:8, 237:3
**117**
170:22
**12**
5:4, 119:20,
153:19, 153:20,
154:10, 154:11,
156:3, 156:4,
174:23, 175:24,
178:8, 178:14,
189:25, 190:7,
193:16, 195:11,
195:22, 196:10,
196:14, 196:17,
200:17, 215:11,
215:12, 233:6,
241:17, 260:15
**128**
83:17, 83:20,
83:21, 83:24,
84:3, 87:11
**13**
5:5, 51:3,
51:5, 122:17,
123:18, 123:22,
124:7, 124:11,
124:23, 167:8,
167:10, 167:13,
200:18
**133**
123:4
**134**
123:5, 124:16,
124:17
**135**
123:5, 123:15,

Transcript of Keven Miller
Conducted on June 5, 2020

315

123:16, 123:20,
123:23, 123:25,
124:24, 125:1
**136**
123:5, 123:15,
123:16, 123:20,
123:23
**137**
217:25
**14**
4:10, 5:6,
31:7, 31:12,
178:18, 178:19,
178:24, 179:3,
180:5, 214:7,
234:20, 260:18
**142**
172:22
**15**
5:6, 5:8, 28:4,
28:6, 28:15,
33:2, 109:7,
109:9, 174:5,
174:15, 178:18,
178:19, 178:25,
179:6, 179:11,
179:12, 179:16,
179:20, 182:11,
185:17, 186:24,
187:7, 187:8,
188:6, 188:7,
200:18
**150**
22:9, 22:23,
211:14, 214:3,
214:8, 214:25,
219:1, 222:7,
222:18, 226:10,
226:17, 227:15
**153**
5:3, 5:4
**155**
172:19
**157**
205:23, 206:1,
206:2
**16**
5:10, 122:22,

200:6, 200:7,
200:9
**167**
5:5
**17**
4:12, 4:15,
5:11, 22:6,
60:14, 67:18,
67:19, 67:22,
68:12, 69:18,
70:2, 70:10,
70:12, 70:25,
71:16, 71:19,
72:15, 73:2,
73:4, 74:17,
74:19, 81:1,
81:9, 82:18,
83:14, 85:21,
92:9, 92:23,
93:1, 109:9,
110:20, 150:23,
156:8, 156:9,
156:10, 156:14,
156:17, 197:16,
200:6, 200:7,
200:12, 233:2,
233:4, 233:5
**178**
5:6, 5:8
**18**
1:7, 4:17,
5:12, 6:7,
173:21, 173:23,
173:24, 216:5
**183**
78:13, 78:14
**187**
78:17
**19**
5:14, 57:1,
57:2, 57:3,
186:23, 186:25,
187:1, 202:9,
231:5, 231:6,
231:9, 231:16,
233:1, 237:14,
237:15, 237:16,
237:18, 237:19,

238:6, 245:19,
247:20
**197**
78:12, 78:18,
78:19

---

**2**

**2**
117:5, 117:9,
198:1
**20**
5:15, 18:21,
19:4, 93:8,
128:19, 129:4,
154:5, 155:21,
156:14, 156:17,
156:18, 186:7,
186:13, 211:3,
215:13, 217:2,
217:3, 217:24,
218:1, 219:18,
220:16, 220:18,
220:19, 220:20,
223:4, 224:1,
231:5, 231:6,
231:10, 231:20,
236:21, 250:3,
250:5, 251:5,
251:10, 251:14,
251:16, 251:18,
251:21, 251:23,
252:3, 252:21,
252:23, 253:5
**200**
5:10, 5:11
**2000**
3:10
**2001**
5:2, 56:17
**2004**
100:16, 100:17
**2006**
154:5
**201**
60:13, 68:5,
68:7, 68:8
**202**
79:16, 104:21

**2020**
1:15, 6:8,
179:9
**20200228**
215:25
**2023**
260:18
**204**
25:7, 25:8,
40:23, 97:4,
101:3, 101:7,
101:13, 102:18,
104:17, 111:8,
173:17, 174:6,
174:14, 174:23,
175:2, 175:7,
185:1, 185:18,
188:24, 189:19,
191:4, 191:11,
192:14, 193:3,
193:17, 193:21,
193:22, 194:7,
195:11, 198:7,
200:18
**205**
129:24
**207**
21:9
**208**
106:9
**209**
106:3
**21**
5:16, 128:15,
149:7, 186:9,
215:13, 217:8,
217:12, 217:24,
218:6, 218:9,
219:19, 224:1,
231:5, 231:6,
231:11, 231:23,
234:20, 242:2,
249:15, 249:19,
249:23, 249:25,
250:2, 250:6,
250:9, 250:25,
251:4, 251:9,
251:13, 251:15,

Transcript of Keven Miller
Conducted on June 5, 2020

316

251:18, 251:20,
252:3, 252:15,
252:16, 252:19,
253:6, 253:12,
253:15
**216**
5:12
**22**
18:17, 18:25,
66:7, 66:8,
128:19, 129:4,
167:18, 167:24,
168:7, 168:9,
168:10, 169:1,
169:24, 172:16,
215:14, 217:5,
217:12, 217:13,
217:21, 218:1,
218:2, 218:5,
219:14, 219:17,
220:13, 220:15,
220:18, 220:19,
220:20, 220:21,
220:24, 220:25,
221:1, 221:3,
221:4, 221:7,
221:9, 221:10,
221:11, 221:13,
221:17, 222:20,
223:2, 223:3,
224:1
**222**
3:16
**226**
62:12
**23**
38:14, 128:16,
188:16, 188:21,
189:3, 189:12
**231**
5:14, 5:15,
5:16
**232**
61:13, 102:3,
103:19, 103:21,
105:8, 105:9,
106:16, 106:18,
117:13, 117:14

**233**
102:5
**234**
106:17
**24**
4:20, 66:22,
67:7, 67:9,
155:23, 164:22,
179:8, 182:11
**243**
107:7, 107:19
**245**
62:7, 62:15,
62:18, 62:19,
101:17
**249**
107:2
**25**
4:21, 4:22,
164:20, 164:21,
165:1, 165:2,
165:7, 166:1,
166:17
**256**
4:4, 62:23,
62:24
**257**
4:5, 62:24,
63:2
**26**
4:23, 4:24,
62:11, 119:24,
126:11, 129:12,
129:19, 131:12,
131:16, 167:22
**260**
1:21, 38:15
**261**
16:7, 16:14,
16:16, 16:20
**27**
117:4, 117:5,
179:15, 179:17,
181:13, 232:2,
232:3
**28**
51:5, 51:8,
249:24, 251:8

**29**
138:14, 194:20,
243:5, 243:10,
248:22, 248:24
**2c**
191:24, 192:2,
192:17

---

**3**

**3**
173:7, 173:9
**3,908,884**
5:5, 167:12
**3.066**
21:11, 21:12,
21:14, 21:15,
21:16, 21:18
**3.14**
132:18
**3.2**
114:13
**30**
39:11, 39:17,
40:10, 66:6,
138:14, 142:16,
164:19, 211:3
**301178**
1:20
**31**
138:19
**312**
3:10, 3:18
**313**
1:7, 6:7
**32**
157:14
**325**
14:2, 20:19,
36:10, 36:18,
57:16, 57:20,
58:5, 58:7,
58:9, 58:13,
58:21, 58:22,
59:14, 59:24,
60:3, 62:3,
62:6, 63:8,
63:16, 63:24,
65:3, 96:18,

96:23, 97:3,
98:3, 98:14,
99:14, 100:2,
100:13, 100:18,
101:2, 101:12,
130:3, 130:7,
130:10, 130:24,
131:5, 136:4,
136:15, 136:20,
137:10, 138:9,
139:2, 139:5,
140:8, 141:17,
141:23, 141:24,
142:1, 142:2,
142:3, 142:23,
143:3, 143:11,
143:16, 160:3,
160:14, 161:12,
161:20, 255:10,
255:16, 255:24
**33**
127:8, 158:8
**348**
140:3
**35**
118:15, 118:16,
118:19, 119:4,
120:4, 120:10,
120:17, 121:25,
122:4, 122:6,
126:13, 127:3,
127:5, 127:25,
128:4, 128:5,
128:7, 157:13,
157:18, 166:16,
210:18, 210:21,
210:22, 211:13
**36**
156:12, 166:21,
166:22, 194:1,
194:2, 194:7,
234:24
**37**
17:13, 17:14,
148:1, 179:8,
213:12, 213:14,
213:15, 241:14,
248:24, 249:1

Transcript of Keven Miller
Conducted on June 5, 2020

317

**372**
3:10
**38**
76:17, 76:22,
164:16, 164:18,
212:13, 212:15,
212:18, 212:23,
213:10, 225:14,
227:13
**383**
78:15, 78:19,
78:20, 79:1,
79:6
**387**
79:16, 79:18,
91:17, 104:22
**390**
129:21, 129:23,
130:2, 130:20,
130:24, 131:6,
131:14, 131:18
**393**
21:9, 21:10,
21:15

**4**

**4**
173:9, 173:12
**4,509,668**
5:15, 231:21
**4-9**
173:21
**4.75**
140:2
**4.785**
132:14
**40**
114:12
**400**
89:4
**41**
51:21, 51:25,
52:6, 53:4,
53:11, 53:17,
53:23, 54:13,
54:16, 54:22,
55:3, 55:7, 56:2
**42**
214:5, 230:23,

230:25
**42,987**
4:20, 24:10,
24:16
**43**
114:8, 114:11,
214:2, 214:6,
214:7, 214:13
**433**
61:12, 61:15,
102:3, 102:6
**434**
103:21, 106:11,
106:18, 106:21,
117:16
**440,136**
5:11, 200:13
**444**
3:8
**456**
139:19, 139:22
**465**
140:13
**47**
22:7, 247:3,
247:5
**475**
63:11, 140:13
**48**
233:12, 233:18,
237:3
**49**
173:19, 173:20,
174:12
**4a**
201:20

**5**

**5**
230:23, 230:25,
231:2
**5,579,975**
5:16, 231:24
**5,720,423**
5:10, 200:10
**5,803,338**
5:14, 231:17,
231:19

**50**
173:3
**52**
168:5, 169:12,
169:23, 170:5,
170:16, 173:7,
173:9, 186:21,
187:4, 187:16
**53**
217:11, 258:18,
258:19
**54**
216:15, 216:19,
216:20
**56**
5:2, 188:14,
217:23
**57**
202:22, 202:24,
202:25, 203:1,
203:7, 205:25,
206:1, 230:25,
231:2
**58**
126:22, 126:24,
127:2, 128:12,
192:25, 193:2
**59**
1:16, 6:9,
235:10
**5th**
6:8

**6**

**6**
248:22, 248:24,
249:1, 258:18,
258:19
**6,609,646**
5:4, 154:12
**60**
126:22, 126:24,
127:3, 179:17,
179:24
**60601**
3:17
**60606**
3:9

**609**
3:18
**647**
26:6, 26:20,
26:24, 27:8,
27:10, 51:22,
52:1, 52:7,
53:7, 53:12,
53:18, 53:24,
54:17, 55:1,
55:7, 56:3,
57:13, 58:20,
58:24, 58:25,
59:5, 60:5,
60:21, 61:21,
63:5, 63:7,
64:4, 64:21,
65:4, 66:15,
75:12, 75:18,
75:25, 76:15,
76:25, 77:8,
100:3, 100:13,
100:15, 102:8,
103:24, 105:17,
106:6, 106:13,
111:8, 111:17,
112:6, 112:10,
112:25, 113:9,
115:21, 117:17,
117:21, 118:6,
119:14, 119:25,
122:19, 122:20,
122:22, 125:18,
125:19, 125:22,
126:1, 126:4,
126:19, 126:22,
128:2, 128:11,
128:22, 129:7,
154:16
**65**
197:21, 212:8,
225:14, 227:12,
239:12
**66**
197:12
**69**
143:24, 232:2

**7**

**7,156,012**
4:24, 26:11

Transcript of Keven Miller
Conducted on June 5, 2020                                    318

**7,325,709**
4:22, 25:17
**7,398**
25:14
**7,398,647**
4:23, 25:25
**709**
25:21, 57:11,
141:16, 141:18,
143:5, 143:10,
143:15, 144:14,
146:11, 146:14,
147:15, 147:25,
149:6, 151:5,
151:13, 151:23,
152:4, 152:19,
152:21, 152:24,
153:12, 153:16,
155:6, 157:4,
158:15, 159:19,
159:21, 159:24,
160:4, 160:7,
160:15, 160:20,
160:21, 160:25,
161:9, 161:13,
161:21, 161:25,
162:1, 162:4,
163:4, 163:19,
164:6, 164:9,
165:11, 166:15,
168:18, 169:6,
169:7, 170:8
**72**
157:16, 157:21,
241:16
**73**
151:15, 151:22,
157:22, 251:3
**75**
206:6
**7500**
3:18
**78**
53:1, 53:3
**79**
213:15, 213:20,
213:21

---
**8**
---
**8,118,204**
4:21, 25:2

---
**9**
---
**9**
1:16, 6:9
**90**
100:20
**9260**
56:10
**947**
254:21
**98**
91:11
**987**
22:24, 24:23,
40:22, 40:25,
210:17, 211:15,
211:19, 211:23,
212:6, 212:9,
212:12, 212:19,
212:24, 215:7,
215:17, 219:20,
228:14, 228:25,
232:5, 234:9,
249:17, 249:21,
250:8, 250:11,
250:15, 250:17,
253:21, 253:23
**99**
91:11



June 12, 2020

David Bernard, Esquire
Vedder Price, PC
222 North LaSalle Street 26th Floor
Chicago, IL 60601


Re: Deposition of **Keven Miller**
     Date: 6/5/2020
     Case: Koki Holdings Co., Ltd. -v- Kyocera Senco Industrial Tools, Inc.


Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.


Sincerely,


Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850


No. 301178

No. 301178

Re:   Deposition of **Keven Miller**
      Date: 6/5/2020
      Case: Koki Holdings Co., Ltd. -v- Kyocera Senco Industrial Tools, Inc.
      Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 94 | 1 | "Fluid and cycle" misinterpreted / not heard should be "Fluid and cylinder wall |
| 177 | 1 | specific "claim" believe in context it should be specific "shape" |
| | | |
| | | |
| 189 | 10 | "Plaster" should be "plastic" misinterpret |
| 189 | 20 | battery "back" should be battery "pack" in several places thruout |
| 215 | 11 | "Trigger a level" should be "trigger lever" |
| 239 | 19 | "swing" should be "spring" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

6/17/2020
_____
(Date)

_Keven Miller_
_____
(Signature)

No. 301178

Re:    Deposition of **Keven Miller**
Date: 6/5/2020
Case: Koki Holdings Co., Ltd. -v- Kyocera Senco Industrial Tools, Inc.
Return to: transcripts@planetdepos.com

```
                    ACKNOWLEDGMENT OF DEPONENT


            I, Keven Miller, do hereby acknowledge that

    I have read and examined the foregoing testimony, and

    the same is a true, correct and complete

    transcription of the testimony given by me and any

    corrections appear on the attached Errata sheet

    signed by me.
```

June 17, 2020 _____    *Keven Miller* _____
       (Date)                 (Signature)

# EXHIBIT 9

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KOKI HOLDINGS CO. LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 18-313-CFC |
| | ) | |
| KYOCERA SENCO INDUSTRIAL TOOLS, | ) | |
| INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPENING EXPERT REPORT OF GLENN VALLEE, PH.D.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

## Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Summary of Opinions | 1 |
| III. | Qualifications and Experience | 2 |
| IV. | Materials Considered | 5 |
| V. | Relevant Legal Principles | 6 |
| | A. Claim Construction | 7 |
| | B. Infringement | 8 |
| | 1. Literal Infringement | 9 |
| | 2. Infringement Under the Doctrine of Equivalents | 9 |
| | 3. Direct and Indirect Infringement | 10 |
| VI. | Level of Ordinary Skill in the Art | 11 |
| VII. | Claim Constructions Adopted By The Court | 15 |
| VIII. | Technology Background | 16 |
| | A. Overview of U.S. Patent No. 8,118,204 | 17 |
| | B. Overview of U.S. Patent No. RE42,987 | 18 |
| | C. Overview U.S. Patent Nos. 7,156,012 and 7,398,647 | 21 |
| | D. Overview of U.S. Patent No. 7,325,709 | 22 |
| IX. | The Accused Products Infringe The Asserted Patents | 23 |
| | A. U.S. Patent No. 8,118,204 | 24 |
| | 1. Claim 12 – FUSION F-15 | 24 |
| | 2. Claim 13 – FUSION F-15 | 39 |
| | 3. Claim 15 – FUSION F-15 | 44 |
| | B. U.S. Patent No. RE42,987 | 44 |
| | 1. Claim 14 – JoistPro 150XP | 45 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

2.       Claim 15 – JoistPro 150XP ........................................................ 57

3.       Claim 16 – JoistPro 150XP ........................................................ 57

4.       Claim 17 – JoistPro 150XP ........................................................ 59

5.       Claim 18 – JoistPro 150XP ........................................................ 60

6.       Claim 19 – JoistPro 150XP ........................................................ 63

C.    U.S. Patent No. 7,156,012 ............................................................ 65

1.       Claim 1 – SNS41 ..................................................................... 66

2.       Claim 2 – SNS41 ..................................................................... 85

3.       Claim 3 – SNS41 ..................................................................... 98

4.       Claim 4 – SNS41 ................................................................... 101

D.    U.S. Patent No. 7,398,647 .......................................................... 104

1.       Claim 1 – SNS41 ................................................................... 104

2.       Claim 10 – SNS41 ................................................................. 116

E.    U.S. Patent No. 7,325,709 .......................................................... 119

1.       Claim 1 – FramePro 325FRHXP ........................................... 119

2.       Claim 3 – FramePro 325FRHXP ........................................... 134

3.       Claim 4 – FramePro 325FRHXP ........................................... 136

4.       Claim 5 – FramePro325FRHXP ............................................ 140

5.       Claim 8 – FramePro 325FRHXP ........................................... 141

6.       Claim 9 – FramePro 325FRHXP ........................................... 143

7.       Claim 10 – FramePro 325FRHXP ......................................... 144

8.       Claim 14 – FramePro 325FRHXP ......................................... 151

9.       Claim 1 – FramePro 325XP ................................................... 152

10.     Claim 3 – FramePro 325XP ................................................... 165

11.     Claim 4 – FramePro 325XP ................................................... 167

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

12.    Claim 5 – FramePro325XP ........................................................... 171

13.    Claim 8 – FramePro 325XP .......................................................... 172

14.    Claim 9 – FramePro 325XP .......................................................... 174

15.    Claim 10 – FramePro 325XP ........................................................ 175

16.    Claim 14 – FramePro 325XP ........................................................ 182

X.    Koki's Products Practice The Asserted Patents ................................................. 183

A.    U.S. Patent No. 8,118,204 ................................................................................ 184

1.    Claim 12 – NT1865DMA ............................................................. 184

2.    Claim 13 – NT1865DMA ............................................................. 199

3.    Claim 15 – NT1865DMA ............................................................. 203

4.    Claim 12 – NR1890DC ................................................................. 203

5.    Claim 13 – NR1890DC ................................................................. 216

6.    Claim 15 – NR1890DC ................................................................. 221

B.    U.S. Patent No. RE42,987 ............................................................................... 221

1.    Claim 14 – NR65AK2 .................................................................. 222

2.    Claim 15 – NR65AK2 .................................................................. 232

3.    Claim 16 – NR65AK2 .................................................................. 232

4.    Claim 17 – NR65AK2 .................................................................. 233

5.    Claim 18 – NR65AK2 .................................................................. 234

6.    Claim 19 – NR65AK2 .................................................................. 236

7.    Claim 14 – NR38AK ..................................................................... 239

8.    Claim 15 – NR38AK ..................................................................... 249

9.    Claim 16 – NR38AK ..................................................................... 249

10.    Claim 17 – NR38AK ..................................................................... 249

11.    Claim 18 – NR38AK ..................................................................... 250

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

12.     Claim 19 – NR38AK ........................................................................... 253

C.     U.S. Patent No. 7,156,012 ................................................................... 256

1.     Claim 1 – NR90AD, NR90AE, NR90AF, and NV90AG ...................... 258

2.     Claim 1 – NT50AE2 and N3804AB3 .................................................... 271

3.     Claim 2 – NT50AE2 and N3804AB3 .................................................... 281

4.     Claim 3 – NT50AE2 and N3804AB3 .................................................... 293

5.     Claim 4 – NT50AE2 and N3804AB3 .................................................... 295

D.     U.S. Patent No. 7,398,647 ................................................................... 296

1.     Claim 1 – NR90AD, NR90AE, NR90AF, and NV90AG ...................... 296

2.     Claim 10 – NR90AD, NR90AE, NR90AF, and NV90AG .................... 308

E.     U.S. Patent No. 7,325,709 ................................................................... 313

1.     Claim 1 – NR90AD ............................................................................... 313

2.     Claim 3 – NR90AD ............................................................................... 321

3.     Claim 4 – NR90AD ............................................................................... 322

4.     Claim 8 – NR90AD ............................................................................... 324

5.     Claim 9 – NR90AD ............................................................................... 326

6.     Claim 10 – NR90AD ............................................................................. 327

7.     Claim 1 – NR90AE ............................................................................... 333

8.     Claim 3 – NR90AE ............................................................................... 342

9.     Claim 4 – NR90AE ............................................................................... 343

10.     Claim 8 – NR90AE ............................................................................... 345

11.     Claim 9 – NR90AE ............................................................................... 347

12.     Claim 10 – NR90AE ............................................................................. 348

XI.     Conclusion ........................................................................................... 354

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

I, Glenn E. Vallee, Ph.D., declare as follows:

**I.**          **INTRODUCTION**

1.          I have been retained as an independent expert consultant on behalf of Koki Holdings Co. Ltd. in the case captioned *Koki Holdings Co. Ltd. v. Kyocera Senco Industrial Tools, Inc.*, Civil Action No. 18-313-CFC, pending in the United States District Court for the District of Delaware.

2.          I understand that the patents at issue in the litigation are U.S. Patent Nos. 8,118,204 (the '204 patent), RE42,987 (the '987 patent), 7,156,012 (the '012 patent), 7,398,647 (the '647 patent), and 7,325,709 (the '709 patent) (collectively the "Asserted Patents"). I have been asked to provide my opinions on various issues pertinent to this litigation and the Asserted Patents. My opinions are set forth in this Report.

3.           In forming my opinions, I rely on my knowledge and experience in the field, and on the documents and information reference in this Report. If called to testify in this matter, I am prepared to explain in detail, with appropriate visual aids, the opinions expressed in this Report and my basis for those opinions.

4.          I am being compensated for my time at my standard rate of $250 per hour. For time spent providing deposition and trial testimony, I am being compensated at my standard rate of $350 per hour. I am also being reimbursed for reasonable expenses and out-of-pocket expenses at cost. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in the outcome of this proceeding.

**II.**          **SUMMARY OF OPINIONS**

5.          In the paragraphs that follow, I explain in detail the evidence, reasons, and analysis supporting my opinions and conclusion that certain Kyocera Senco Products and certain Koki

1

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

48.        Powered nailers are used in many types of construction-related applications, ranging from heavy-duty and high-volume applications to smaller jobs and precision work. Some example of powered nailers include: (i) framing nailers that handle large projects such as framing houses and building decks; (ii) finishing nailers used for assembling furniture and installing cabinets; (iii) brad nailers used for securing crown molding or baseboards; and (iv) roofing nailers for applying roof shingles. Nailers require a power source to drive the fastener into a workpiece during operation. Each of the Asserted Patents is directed to aspects of powered nailers.

### A.        Overview of U.S. Patent No. 8,118,204

49.        The '204 patent is directed a compact nail gun which can be easily used in smaller and narrow places. ('204 patent at col. 1:59-63.) FIG. 1 shows a side view of an exemplary tool and FIG. 2 shows a bottom view of the exemplary tool.



50.        As shown in the annotated images below, the magazine (colored yellow) is angled upward from the nose (annotated FIG. 1) and further angled relative to the handle (annotated FIG. 2). This is also explained in the '204 patent at col. 3:48-59 and col. 3:60-4:9.

17

CONTAINS HIGHLY CONFIDENTIAL INFORMATION



Side View                    Bottom View

51.        According to the written description, the tool 1 comprises (i) a housing 2 having a handle portion 2B formed to extend from a trunk portion 2A; (ii) an ejection unit attached to the lower portion of the housing 2; (iii) a magazine 5 attached to the ejection unit; (iv) a motor housed in the housing 2; and (v) a battery pack 3 for driving the motor. The magazine 5 is attached such that it is inclined in a side view (FIG. 1) with respect to the trunk portion 2A of the housing 2 and is inclined in a bottom view (FIG. 2) with respect to the handle portion 2B of the housing 2. (Col. 3:15-4:9.) By having the inclined magazine overlap with the battery pack, the tool is made compact so that it can be conveniently be used in narrow places. (Col. 1:59-63; 5:43-52.)

52.        The invention of the '204 patent offers significant benefits to the operator, as it provides an angled magazine arrangement which results in a nailer which is compact in size and therefore may be easily used in a narrow space.  The angled magazine arrangement also allows the battery pack of electric nailers to be moved forward, improving the balance of the nailer and thereby making it easier to hold, resulting in less operator fatigue.

### B.    Overview of U.S. Patent No. RE42,987

53.        The '987 patent is generally directed to a nail gun with a novel nosepiece design that permits accurate nail placement into pre-punched metal connector holes by employing a push

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

lever mechanism that allows the user to easily locate the nail prior to firing. This is accomplished by having the tip of the nail extend out of the bottom of the nosepiece.

54.     The '987 patent explains that having the nail tip extend out of the bottom of the nosepiece improves reliability of the tool because the user can identify and confirm the exact location the nail will enter the workpiece before pulling the trigger. (*See* '987 patent at col. 2:8-12.)

55.     The image below shows a real-world example of being able to locate the precise location to drive a nail. As shown in the area circled in red, the user can see the tip of the nail and then correctly align the tip of the nail into the hole in the metal clasp before pulling the trigger.



56.     One of the challenges is how to implement a safety mechanism that allows the user to see the nail but does not allow the user to drive the nail unless the tool is actually engaged with a work surface. The '987 patent combines the nail location feature described above with a related safety mechanism that prevents misfires and only allows the nailing operation to occur when the tool is properly engaged with a workpiece.

57.     FIG. 1 shows an example of the tool and FIG. 3 shows a cross-sectional view of the push lever mechanism.

19

CONTAINS HIGHLY CONFIDENTIAL INFORMATION



58.     The tool includes a safety having a lower safety portion 22 located near the nosepiece. The lower safety portion 22 has a lower end 12b and is capable of reciprocal movement in parallel with the reciprocal movement direction of the blade 7. (Col. 4:45-65). The lower end 12b is normally positioned in an upper position and is retracted above the nail tip 4c, thus allowing the user to locate the nail tip before initiating the driving action. (*Id.*) Once the nail tip is set, the lower end 12b of the lower safety portion 22 is prevented from moving downward and trigger 11 can be pulled to initiate the driving action. (Col. 5:13-42).

59.     The invention of the '987 patent offers significant benefits to the operator, as it allows the operator to see the tip of the nail, thereby allowing the nail to be accurately driven through predrilled holes while still having the necessary safety features. The invention also results in improved durability, as nailers which use probes which are typically used to position a nailer for nailing into a predrilled hole is not needed. These probes wear out over time and render the nail positioning system ineffective.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

78.     Under the insubstantial differences test, it is immaterial whether the handle portion and housing are created by the joining of two separate and distinct pieces to form the handle portion and the housing or created by a single unitary body that comprises a separate handle portion and housing since each approach results in a handle portion that is separate and distinct from the housing.

> d.    *12(c): a battery pack supporting portion connected to the handle portion;*

79.     In my opinion, the FUSION F-15 includes a battery pack supporting portion connected to the handle portion. Below are images of the FUSION F-15. I have annotated the image below to show a battery pack supporting portion (colored in red) connected to the handle portion (colored in yellow). The battery pack supporting portion is connected to the handle potion by connecting the "connection point" in housing to the "connection tab" in the battery pack supporting portion. This is illustrated in the annotated image below.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION





CONTAINS HIGHLY CONFIDENTIAL INFORMATION



*See also* KSIT000009 at 10-12 (parts lists showing battery supporting portion (part no. YK0848) being connected to handle portion).

e. **12(d): a motor housed in the housing;**

80.       In my opinion, the FUSION F-15 includes a motor housed in the housing. Below are images of the FUSION F-15. I have annotated the images to show the location of the motor inside the housing.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

### 1.    Claim 14 – JoistPro 150XP

117.      Claim 14 of the '987 patent recites:

| 14. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
|---|---|
| 14(a) | a body; |
| 14(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 14(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 14(d) | a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 14(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 14(f) | a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. |

#### a.    *Preamble: A nail gun for driving a nail into a work piece, the nail gun comprising*

118.      In my opinion, the JoistPro 150XP is a nail gun for driving a nail into a work piece. For instance, the JoistPro 150XP Operating Instruction (KSIT000082-90) and Senco's YouTube channel (https://www.youtube.com/watch?v=DebvO2QzSBI) indicates that the JoistPro 150XP is a tool that is used for driving a nail into a work piece. *See also* KSIT000013 (referring to JoistPro 150XP as a metal connector nailer); KSIT00095901 (JoistPro Training); KSIT00098322 (video of JoistPro 150XP showing same); McCardle Tr. at 136:5-148:18, 149:4-154:25 (describing what is shown in KSIT00095901 and KSIT00098322); KSIT00098332 (CAD Drawing for JoistPro 150XP).

#### b.    *14(a): a body*

119.      In my opinion, the JoistPro 150XP has a body. Below is an image of the JoistPro 150XP. I have annotated the image to identify the body of the JoistPro 150XP:

45

CONTAINS HIGHLY CONFIDENTIAL INFORMATION



Trigger Switch

132.      Mr. McCardle also testified that the JoistPro 150XP has a trigger switch. *See* McCardle Tr. at 117:7-118:19 (describing trigger switch on KSIT000014 as being identified with pound sign); *see also* KSIT00098332 (CAD Drawing for JoistPro 150XP).

> g.    ***14(f)***    ***a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position.***

133.      I understand the Court found the term "push portion" is a means-plus-function term subject to 35 U.S.C. § 112, ¶ 6 and construed the term to have the following structure and function:

> <u>Structure</u>: "safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22"

52

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

Function: "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward."

134.     In my opinion, the JoistPro 150XP has a push portion with an end that is movable following the nosepiece (*i.e.*, movable nose) and is normally positioned in an upper dead center. Below is an image of the JoistPro 150XP. I have annotated a picture of the JoistPro 150XP to show the location of the push portion on the tool.



Push Portion

135.     As to the claimed structure, the "push portion" includes a safety portion 12 that is mechanically coupled to a trigger, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22. I have provided a photograph of the safety portion 12 below. With reference to the annotations in the images, the safety portion 12 is comprised of upper safety portion 20 having a safety portion upper end 12a and a cam surface 21a. Safety portion 20 pivots about a pin located at 20a. The cam surface 21a contacts cam surface 22a and cam surface 22a connects to the lower safety portion 22. The upper safety portion 20 has a safety portion upper

53

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

end 12a which contacts the trigger arm 19 which is coupled to the trigger 11 through the support pin 18.











CONTAINS HIGHLY CONFIDENTIAL INFORMATION



*See also* McCardle Tr. at 130:8-14; KSIT00098332 (CAD Drawing for JoistPro 150XP).

136.     As to the function, the operation of the trigger switch is enabled when the end of

the push portion (*i.e.*, end of lower safety portion 22) is prevented from moving downward. At this

point, at least a tip of the nail disposed in the nosepiece is protruding from a tip of the nosepiece

and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily

aligned with a desired position. The Operating Instructions for the JoistPro 150XP explains:

> Joist Pro150XP: WORK CONTACT ELEMENT The moveable nose, which acts
> as the contact trip, is in the "depressed" position at rest to allow visibility of the
> nail points. When the tip of the nail is placed in the pre-punched metal connector
> hole and the trigger is pulled, the moveable nose moves out from the tool to detect
> the work surface. If the moveable nose does not detect the work surface close to
> the nose of the tool, the tool will not actuate.

(KSIT000082 at 85). This is also described in videos on Senco's YouTube at

https://www.youtube.com/watch?v=DebvO2QzSBI (at ~1:00 to ~1:11 and ~3:23 to ~3:58). *See*

55

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

*also* KSIT00098322 (video showing same); McCardle Tr. at 120:1-121:4, 132:18-133:22 (describing operation of safety in JoistPro 150XP); KSIT00095901 at 4, 5, 7.

137.        I understand that Kyocera Senco has argued that the "push portion" limitation is not met because the JoistPro 150XP operates via a pneumatically powered safety. I disagree with Kyocera Senco's assertion that the "push portion" limitation is not met because, as explained above, the JoistPro 150XP has a "push portion" as defined by the Court's claim construction. The claim construction adopted by the Court requires that the safety portion is mechanically coupled to trigger, but does not preclude the inclusion of an additional pneumatic component.  Surface 21a on the upper safety portion 20 contacts the cam surface 22a which is always connected to the lower safety portion 22 when the safety mechanism is activated during operation.  This contact constitutes a true cam connection, as the motion of cam surface 22a results in the motion of contacting surface 21a which causes the upper safety portion to rotate through sliding contact. I also note that "mechanically coupled" is not restricted to a continuous mechanical connection, but is generally understood by those skilled in the art as mechanical contact between components when they perform their intended function. For example, when a driver of an automobile activates the braking system, his foot is mechanically coupled to the brake pedal. When braking has been completed, the driver removes his foot from the brake pedal.

138.        To the extent this limitation is not met literally, this element is met under the doctrine of equivalents, including both the function/way/result test and the insubstantial differences test. Under the function/way/result test, the function of the "push portion" is "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward" using the structure of the "push portion" as described above. The way this feature is accomplished is by having operation of the trigger switch enabled when the end of the push portion

56

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

(as descried above) is prevented from moving downward. This approach achieves the same result, which is to enable operation of the trigger switch. Under the insubstantial differences test, it is immaterial whether the JoistPro 150XP also uses a pneumatic element in performing this function since the claimed function (*i.e.*, operation of the trigger switch) is accomplished by the "push portion" as described above.

### 2.    Claim 15 – JoistPro 150XP

139.        Claim 15 of the '987 patent recites:

| 15. | A nail gun according to claim 14, wherein said connected nails are arranged on a single plane. |
|-----|------------------------------------------------------------------------------------------------|

140.        The connected nails in the JoistPro 150XP are arranged in a single plane. The magazine in the JoistPro 150XP only accepts nails that are connected in a single plane. In addition, Senco identifies several Senco-branded 34° Angled Strip Collated Nails that can be used with the JoistPro 150XP, including item code nos. KJ17AEBD, KJ17AHBD, MD17AEBD, and MJ17AHBD, and each of these connected nails are arranged in a single plane. *See* claim 14, element (c). That the connected nails in the JoistPro 150XP are arranged in a single plane is also shown in a video on Senco's YouTube channel at

https://www.youtube.com/watch?v=DebvO2QzSBI (at ~2.39 to ~3:22) (KSIT00098322). *See also* discussion above regarding element 14(c) of the '987 patent; KSIT00095901 at 4, 5, 7.

### 3.    Claim 16 – JoistPro 150XP

141.        Claim 16 of the '987 patent recites:

| 16. | A nail gun according to claim 14, wherein the tips of the connected nails are arranged in a single line. |
|-----|---------------------------------------------------------------------------------------------------------|

142.        The tips of the connected nails in the JoistPro 150XP are arranged in a single line, as shown by the blue line below.



KHD0004074 at 4139.

    d.    ***10(c): wherein the one end of the magazine close to the sharp end of the fastener is a closed end formed by joining of the two opposing walls of the accommodation portion, the width of the accommodation portion being continuously increased from the closed end to at least a portion of the opposing walls accommodating the shaft of the fastener therebetween***

769.    In my opinion, the NR90AE meets element 10(c) of the '709 patent for the same reasons that the NR90AE meets element 1(i) of the '709 patent.

## XI.    CONCLUSION

770. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 28, 2020.

_Glenn E. Vallee_

Glenn E. Vallee, Ph.D.

354

# Exhibit A

## Glenn E. Vallee, Ph.D., P.E.

194 Meadow Lark Ln                                                    (ph) 860-399-0087
Westbrook, CT 06498                                                   gvallee@comcast net

**EDUCATION**

Ph.D.   May, 1995, University of Rhode Island, Kingston, RI
        Major: Mechanical Engineering and Applied Mechanics
        Thesis: "A Study of the Dynamic Mechanical Behavior of Elastomeric Materials Under
        Impact Loading"

M.S.    May, 1990, University of Rhode Island, Kingston, RI
        Major: Mechanical Engineering and Applied Mechanics
        Thesis: "A Study of the Effect of Geometry on the Mechanical Behavior of an
        Epichlorohydrin Elastomer Used as an Impact Absorber in Pneumatic Fastening Tools"

B.S.    May, 1985, University of Rhode Island, Kingston, RI
        Major: Mechanical Engineering

**ACADEMIC EXPERIENCE**

**Western New England University**, Springfield, MA (August 2002 to present)
***Associate Professor of Mechanical Engineering***

- Responsible for development of a curriculum of instruction for courses in solid mechanics, mechanical vibrations, materials science, mechanical design, experimental methods and New Product Development.
- Co-developed a Product Innovation and Development Center with the Colleges of Business and Law to secure corporate funding for the development of innovative new products, promote entrepreneurship, and commercialize student inventions.
- Obtained corporate sponsorship for over 40 senior projects and filed 5 utility and 9 provisional patents for product innovations.
- Director of the Mechanical Testing Lab responsible for bringing state of the art experimental capabilities to the solid mechanics lab in the Mechanical Engineering department, thus providing capabilities for research in the areas of static and dynamic material behavior of elastomers and solids under high strain rates.
- Mechanical Engineering faculty advisor for 10 interdisciplinary team projects.
- Received the one of the highest teaching evaluation ratings from students in the School of Engineering over the past five years (4.6/5.0).
- Served as faculty liaison to the Mechanical Engineering Industrial Advisory Council.
- Secured resources from corporations for laboratory equipment totaling over $35,000.
- Developed the biodiesel generation facility for sustainability at Western New England University
- Coordinator for the approval of University Patent Filings

***Courses Taught:***

Graduate Level:    ME-619  Analytical and Experimental Stress Analysis*
Senior Level:      ME-425  Design of Machine Elements
                   ME-490  Mechanical Engineering Product Innovation and Development*
                 - ME-423/BME-423/BUS 423 – Product Innovation and Development*
                   ME-435 Senior Interdisciplinary Laboratory Project (Hybrid Electric Car)
                   ME-427 Kinematics and Control of Electro-Mechanical Systems
Junior Level:      ME-320 Mechanical Vibrations
                   ME-312  Kinematics
                   ME-309  Materials Science
                   ME-314  Junior Interdisciplinary Laboratory Project (Product Innovation)*
Sophomore Level: ME-202  Statics
                   ME-203  Dynamics
                   ME-204/205 – Engineering Mechanics I and II
                   ME-208  Mechanics of Materials
Freshman Level:    ENGR-110  Computer Applications in Engineering (Labview, Matlab, MathCAD, Excel)
* course developed by Glenn Vallee

1

**University of Rhode Island**, Kingston, RI (September 1990 to January, 1998)
*Adjunct Assistant Professor*
- Responsible for development of a curriculum for instruction of senior level *Mechanical Systems Design* (Machine Design) and *Introduction to the Finite Element Method* courses, as well as the entry level *Basic Graphics* courses. Frequently incorporate real world, practical design projects into the curriculum.
- Member of the Industrial Advisory Board for the Department of Mechanical Engineering and Applied Mechanics.

*Courses Taught at Other Institutions*:
Community College of Rhode Island, Warwick, RI
Mechanics of Materials, Dynamics, Statics, Mechanical Engineering Laboratory, Machine Design
New England Institute of Technology, Warwick, RI
Engineering Economics, Electromechanical Devices, Engineering Materials

## PROFESSIONAL EXPERIENCE

**Remington Products Company, L.L.C.**, Bridgeport, CT (September 1997 to August 2002)
*Director of Engineering and Quality Assurance, Worldwide*
Directed activities of Design and Product Engineering, Quality Assurance and Manufacturing departments in the U.S., U.K. and Asia responsible for the design and development of international consumer products. Responsible for focusing new product engineering toward continuously improving customer satisfaction through improved product design, performance and quality.
- Co-authored the corporate New Product Development (NPD) process geared toward the design of electromechanical products having the highest quality which met or exceed consumer expectations. Integrated Computer Aided Engineering (CAE), Quality Assurance and consumer feedback into the design and development of international consumer products.
- Supervised the corporate laboratories (US and Hong Kong) and brought them up to UL, CSA and Demko regulatory standards. Responsible for developing all test protocols and methodologies for new product testing and qualification. Introduced electronic instrumentation techniques into the product qualification process, including strain gage techniques, photoelastic stress analysis, a variety of dynamic test methods and high speed data acquisition and control. Responsible for supervising failure analysis of products involved in product liability litigation.
- Helped introduce solid modeling (Pro/E) and rapid prototyping to an engineering department which previously designed products using only 2D CAD (CADKey and AutoCAD). Integrated (and performed) Finite Element Analysis (FEA), Design of Experiments (DOE), Failure Mode and Effects Analysis (FMEA) and formal design reviews into the NPD process.
- Introduced modern Quality Assurance techniques into the company and brought the US factory to CGMP standards. Reorganized the entire QA department and all quality systems (including the Bridgeport manufacturing facility) to improve effectiveness. Integrated QA into the NPD process and directed input from QA, returned product analysis and consumer feedback into improved products, resulting in a 35% drop in product returns over three years.
- Helped create QA offices in both Hong Kong and mainland China in order to implement much of the QA function at supplier location, resulting in improved communications and more efficient corrective actions and lot dispositions. Reduced inspection costs by over 50% while reducing manufacturing defects by nearly 20%.
- Directed all corporate research activities with local Universities in order to incorporate new technologies into new products. Projects included the development of new surface finishes and cutting materials for shaving/hair trimming applications, and advanced thermal analyses in paraffin spas.
- Managed and provided leadership to business process improvement teams aimed at improving corporate processes and efficiencies. Analyzed data including trends, historical records, customer needs, cost of quality analysis and competitive intelligence while working with all levels and functions. Responsible for presenting quarterly reports to senior management on NPD activities Quality initiatives.
- Created and programmed an electronic engineering documentation system, replacing the previous paper system and streamlining information flow. Developed an international product performance database, enabling the sharing engineering documentation, test data, product returns data and customer feedback within the worldwide organization via the internet.

**Stanley-Bostitch Company**, East Greenwich, RI (October 1985 to September 1997)

*Manager, Engineering Laboratories* (June, 1995 to September, 1997)
Responsible for managing the largest Engineering Laboratory in the Stanley Works, supervising 18 employees. Coordinated testing and allocated resources to meet stringent scheduling requirements of Product Development, Manufacturing and Marketing departments.

- Developed and implemented standard test batteries and comprehensive test methods for all product testing.
- Introduced and programmed high speed data acquisition and control systems, increasing productivity by over 50%, while providing support to new product development and existing product lines.
- Coordinated physical expansion of laboratory by 40% to support testing of all new and existing products. Responsible for performing periodic quality audits on all major products.
- Coordinated research efforts as required to solve a wide range of design and manufacturing problems throughout the company.
- Principal Finite Element Analyst for company, and technical liaison to international segments of the corporation responsible for coordinating adherence to international safety standards.
- Company representative and technical expert in product liability litigation.

*Product Design/Development Engineer* (August 1987 to June 1995)
Responsible for guiding product development from concept through production in a highly competitive manufacturing environment. Extensive design and analysis experience using Unigraphics and AutoCAD CAD/CAM software and ABAQUS and ANSYS FEA software.

*Test Engineer* (August 1986 to August 1987)
Directed and conducted activities in the engineering lab to evaluate product performance. Extensive work in the areas of vibration testing and experimental stress analysis utilizing photo elastic coatings and strain gauge technology.

*Technician* (October 1985 to August 1986)
Conducted a wide range of testing in the engineering lab to evaluate product performance. Extensive work using a variety electronic transducers and signal conditioning devices.

**RESEARCH AREAS OF INTEREST**

- Dynamic mechanical behavior of materials using experimental and Finite Element techniques
- Static and dynamic mechanical behavior of elastomeric materials
- Experimental verification techniques for Finite Element Analysis
- Finite Element Analysis and applications to design
- New product development process and methods used to reduce time to market as related to consumer and industrial products
- Unique methodologies for experimentally determining performance of consumer products and assessing consumer satisfaction.

**PROFESSIONAL ACTIVITIES**

*Professional Societies*
American Society of Mechanical Engineers
Tau Beta Pi Engineering Honor Society, Rhode Island Chapter
Pi Tau Sigma Engineering Honor Society, Rhode Island Chapter

**CONSULTING**

***Patent Litigation – Technical Expert***

<u>*Adduci, Mastriani & Schaumberg LLP,*</u> *Washington, DC*
- Served as technical expert in an ITC non-infringement patent investigation related to Certain Electronic Nicotine Delivery Systems and Components Thereof, 2019.

<u>*Hinckley, Allen & Snyder LLP,*</u> *Providence, RI*
- Provided expert declarations and deposition testimony in infringement patent litigation related to spring powered desktop staplers, 2018.

<u>*Hoffmann & Baron, LLP,*</u> *Parsippany, NJ*
- Provided expert declarations and deposition testimony in non-infringement patent litigation related to a toy car and tube track system, 2019.

<u>*McDermott Will & Emery LLP,*</u> *Washington DC*
- Provided expert declarations related to invalidity and non-infringement, deposition testimony and hearing testimony in patent litigation before the ITC related to gas spring powered nailers, 2018.
- Provided expert declarations related to infringement patent litigation related to powered nailers, 2019.

<u>*Meunier Carlin & Curfman LLC,*</u> *Atlanta, GA.*
- Provided expert declarations and deposition testimony in IPR patent litigation related to hole saws, 2016.
- Provided expert declarations in IPR patent litigation related to children's play yards, 2016.
- Provided expert declarations in IPR patent litigation related to attachments for barbecue grills, 2017.
- Provided expert declarations and deposition testimony in non-infringement patent litigation related to inflatable air mattresses with integral pumps, 2018.

<u>*Squire Patton Boggs LLP (US),*</u> *Cleveland OH.*
- Provided expert declaration and deposition testimony in IPR patent litigation, and expert declarations in ITC and US Customs litigation related to attachments for mobile devices, 2018.
- Provided expert declarations in IPR patent litigation related to cable glands, 2018.

<u>*Wilson Sonsini Goodrich & Rosati, Seattle, WA.*</u>
- Provided expert declarations in patent interference litigation related to apparatuses, systems, and methods for processing foodstuff, 2019.

***Products Liability Litigation – Technical Expert***

<u>*Conway Stoughton, L.L.C,*</u> *West Hartford, CT.*
- Provided expert reports and deposition testimony in product liability litigation related to a cold/pressure therapy device, 2017.

<u>*Hitachi Koki USA,*</u> *Norcross, GA.*
- Provided expert reports and deposition testimony in product liability litigation related to pneumatic nailers. 2011 to present.

<u>*Stanley/Black&Decker,*</u> *New Britain, CT.*
- Provided expert reports, deposition and trial testimony in product liability litigation related to pneumatic nailers, 2009 to present.

<u>*The TASA Group, Inc.,*</u> *Blue Bell, PA.*
- Provide services as a technical expert in general product liability litigation related to plumbing fittings, walking canes, acupuncture heat lamps hammer drills and electric sanders, 2015 to present.

***Design, Analysis and Product Development***

<u>Bacou-Dalloz Eye and Face group</u>, *Smithfield, RI.*
- Developed an engineering documentation system for experimental data and document control.  August, 2006.

<u>Chimney Works Company</u>, *Higganum, CT.*
- Designed an alternate knuckle boom extension system for improved positioning of prefabricated concrete chimney sections, November, 2004.
- Performed a finite element stress analysis of a prefabricated concrete chimney chase to assess strength.  April 2004.

<u>Flow Design Inc.</u>, *Springfield, MA.*
- Design and development of surgical clips and clip applier used in cardio bypass surgery, April, 2007.
- Inspection and Testing of Titanium Vascular Clips, June, 2007.
- Tooling and Testing of Titanium Surgical Clips, August, 2007.

<u>Hamilton Sundstrand Corporation</u>, *Windsor Locks, CT.*
- Performed a finite element stress analysis of a titanium starter rotor used in jet engines, February, 2003.

<u>The Hillman Group</u>, *Tempe, AZ.*
- Perform numerical simulations to optimize deck screw performance, May, 2017.

<u>Lenox Saw Company, East Longmeadow, MA.</u>
- Developed a finite element model for simulation of band saw cutting.  December, 2007.
- Developed improvements to band coil annealing processes using finite element analysis.  February, 2008.
- Developed a numerical model for the prediction of the onset of crooked cutting.  April, 2008.
- Developed a fully 3D finite element based methodology for the design of improved band saw cutting systems. October, 2010.

<u>Shark/Ninja Co.</u>, *Newton MA.*
- Supervised engineering group in mainland China responsible for Finite element Analysis, 2016-2017.

<u>S</u>*tanley Fastening Systems, East Greenwich, RI.*
- Developed and fabricated a prototype of a $CO_2$ cartridge powered fastening tool June, 2004.
- Developed a dynamic material model for a nitrile elastomer used in impact bumpers in pneumatic fastening tools.  November, 2004.
- Developed a dynamic load-deflection fixture for the experimental verification of dynamic FEA results. November, 2005.
- Designed an impact bumper for a small brad tool.  January 2006.
- Developed an energy measuring device for pneumatic fastening tools based on the Split Hopkinson Pressure Bar Apparatus.  August, 2006.

<u>Utility Composites Inc</u>., *Round Rock, TX.*
- Developed a hammer tacker for polymeric staples with integrated antennae, patent pending, 2016.

*RESEARCH/ CAPSTONE SENIOR DESIGN PROJECTS:*

**2018-2019**
- "SAE Baja Vehicle - Sprag Clutch Differential and Gear Optimization", Travis Armento.
- "SAE Baja Vehicle - Development of a Torsen Differential", David Snee.
- "Development of an Improved Guitar Bridge", Christopher Carbonaro and Matt Schluckebier.
- "Development of a PTSD Sleep Aid", Luke Langelier and Rachel Brosnan, provisional patent filed, August 2019.
- "Design and Development of an Automated Ping Pong Server",  Dylan Moriarty and NicholasRusso.
- "Design and Development of a Deflation-Proof Air Mattress", Jaimie Lamacchia.
- "Development of a Novel Bicycle Spoke Cutter and Rethreader",  Christian Thompson and Adam Vanasse.
- "Design and Development of a Powered Eyeglass Cleaner",  Aleksander Calcagno.

**2017-2018**
- "Development of an Automated Loading System for the Mechanics of Materials Bridge Busting Competition", Cole McGee and Hillary Naranjo-Majia.
- "Design of an Extruding Soldering Iron for Commercialization", filed provisional patent 2019.  Matt Hahn and Nic DeMarco.
- "Modeling Screw Withdrawal in Concrete Using Finite Element Analysis", sponsored by The Hillman Group, Tempe, AZ.  Russell Perry.
- "Design and Fabrication of A Dog Toy Making Machine", sponsored by Goodwill of Springfield, MA, Brandon Valesques.

**2016-2017**
- "Motorcycle Food Delivery System - Design and Fabrication for Commercialization", sponsored by Acres Investments, SA, Lima Peru, Jonathan Eheander.
- "Design and Fabrication of a Jeep Wrangler Door Check Mechanism", Ryan Heacox.
- "Motorcycle Food Delivery System - Design Of A Motorcycle Mount", sponsored by Acres Investments, SA, Lima Peru, Eric Murphy.
- "Comparison of Traditional and Polymer Constructed Point Shoes",  Nicole Powers
- "Development of a Novel Snow Shovel", sponsored by Ergie Shovel, Inc., Kevin Patterson, Shelbea Russel and Brett Schorr.

**2015-2016**
- "Design and Fabrication of a Dog Toy Making Machine", sponsored by Goodwill , Springfield, MA. Brenna Dillner.
- "Design and Fabrication of a Tubing Straightener for HVAC Applications", sponsored by Hilmor, Inc., East Longmeadow, MA.  Ethan Freedman.
- "Design of Safety Candle Topper".  Peter Kelley.
- "Motorcycle Food Delivery System", sponsored by Acres Investments, SA, Lima Peru.  Jean-Luc LaLiberte and Abigail Powers.

**2014-2015**
- "Design and Fabrication of a Recoil Reduction Device for Pneumatic Nailers, sponsored by Stanley/Black&Decker, North Kingston, RI.  Ryan Begley.
- "Design and Fabrication of a Recoil Reduction System for a Powder Actuated Nailer", sponsored by Stanley/Black&Decker, North Kingston, RI.  Jeffery Cooley
- "Motorcycle Food Delivery System", sponsored by Acres Investments, SA, Lima Peru.  Ronald Foshay and Gregory Porter.
- "Design & Integration of a Motorcycle Food Delivery System", sponsored by Acres  Investments, SA, Lima Peru.  Andrew McManus and Michael Tranghese.
- "Design & Fabrication of a Low Cost Motorized Transportation Vehicle". Tyler Partington
- "Design and Fabrication of a Wireless Thermocouple Housing for HVAC Applications", sponsored by Hilmor Inc., East Longmeadow, MA.  Alex Simms.
- "The Manufacture and Commercialization of Affordable Products for Goodwill Industries", sponsored by Goodwill Industries, Springfield, MA. Shane Vitorino.

**2013-2014**

- "Reinventing One Handed Clamping", sponsored by Irwin Tools, Charlotte, NC.  Chad Bennet Bonn and Andrew Leoni.
- "Design of a Hammer with Integrated Drill". Andrew Egerton and Eric Buhl.
- "Improved Motorcycle Food Delivery System", sponsored by Acres Investments, SA, Lima, Peru.  Connor Dion and Bruce Funteral.
- Design of an Improved Fire Protection Fitting".  Marcus Pelleschi.

**2011-2012**

- "Design and Fabrication of a Secondary Power Generating Unit Used to Recycle Wasted Energy", sponsored by the Nicolas Bartolomeo Co., Springfield, MA.  Leonardo Bartolomeo.
- "Design of an Inflationless Basketball, Phase II", Sponsored by PSI91 Co., Springfield, MA.  Spencer Bracco.
- "Design of a Revolutionary Two-Part Beverage Bottle", sponsored by Jesse Barbor, inventor. Scott Carlson.
- "Design and Fabrication of a Quick-Change Hole Saw Arbor", sponsored by Lenox Saw Company, East Longmeadow, MA.  Colby Conant.
- "Redesign and Fabrication of the Waterboy Water Purification System". Mike Grinaski and Matt McCormack. Recipients of the College of Engineering award for the Design Solution with the Most Impact in a Global, Economic, Environmental and/or Societal Context.  Results         published in the Proceedings of the 2014 ASME IMECE in Montreal, Can., Nov. 2014.
- "Redesign and Fabrication of the Waterboy Water Purification System, Phase II".  Brian Hamel
- "Development of a Predictive Design Methodology for Structural Polymers Subjected to Long Term Loading", sponsored by Stanley/Black&Decker, East Greenwich, RI.  Julie Jackson.  Results published in the Proceedings of the 2012 ASME IMECE in Houston, TX, Nov. 2012.
- "Design and Commercialization of the Sharp & Ready Knife Sharpening Shell".  Filed for a Provisional Patent, May 2012.  Patrick McClain.
- "Design and Fabrication of a Heated Guide Fishing Pole", Filed for a Provisional Patent.  Nick Moskwa.
- "Development of an Inflationless Basketball", Sponsored by PSI91 Co., Springfield, MA.  Patrick Nadeau.
- "Design and Fabrication of a Golf Laser Trainer", Sponsored by Ralph Thresher, inventor.  Filed for a Provisional Patent.  Nick Taber.

**2010-2011**

- "Development of a Curved Hopkinson Bar for the Measurement of Impact Load and Energy Transmission". Micah Bowen.  Results published in the Proceedings of the 2011 ASME IMECE, Denver, CO, Nov. 2011.
- "Development of a Combination Blade/Line Trimmer". Filed for a Provisional Patent, March 2011. Michael Ferrarotti.
- "Methodology for Material Selection in Product Design", sponsored by Stanley/Black&Decker, New Britain, CT, May, 2011.  Andrew Labrie.
- "Design of a One Handed Power Driven Pipe Expander", sponsored by Lenox Saw Company, East Longmeadow, MA.  Danielle Lloyd
- "Redesign of a tape Measure Housing Using Explicit Dynamic FEA", sponsored by Stanley/Black&Decker, New Britain, CT.  Justin Marsh.
- "Design and Fabrication of a One-Handed Manual Pipe Swager", sponsored by Lenox Saw Company, East Longmeadow, MA.  Frank Neher.

**2009-2010**

- "Development of a Push off Impact Pendulum for Carbide Tips", sponsored by Lenox Saw Company, East Longmeadow, MA.  Joe Bernard.
- "Finite Element Modeling of a Mortar Base Plate and Soil Interaction", sponsored by the United States Army— Cold Regions Research and Engineering Laboratory.  Kelley MacDonald
- "Design and Fabrication of a Segmented Band Saw Blade Tester", sponsored by Lenox Saw Company, East Longmeadow, MA.  Kevin Motson.
- "Design and Fabrication of a Small Engine Dynamometer".  Eric Perkins.
- "Redesign of a Fastening Tool Using Explicit Dynamic FEA", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Alex Racicot.

**2008-2009**
- "Development of a Sustainable Biodiesel Fuel Generation System – Phase 2".  Philip Casey
- "Development of a Robotic Saw Tester", sponsored by Lenox Saw Company, East Longmeadow, MA.  Edward Davis.
- "Design and Fabrication of an Automated Withdrawal Fixture for Fastener Testing", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Ross Bennet-Bonn.
- "Development of a Double Capacity Pneumatic Nailer Magazine", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Mark Herdman.

**2007-2008**
- "Development of a Biodiesel Fuel Generation System".  James Pinsonneault.  Won 3rd place in the ASME District  A Student Professional Development Conference, Old Guard Oral Presentation Competition, CCSU, New Britain, CT, April 5, 2008
- "Development of an Innovative Cordless Reciprocating Saw", sponsored by Lenox Saw Company, East Longmeadow, MA.  Christopher Leonard.
- "Determination of the Static and Dynamic Mechanical Properties of a Microcellular Urethane (MCU) Used as an Impact Bumper in Pneumatic Nailers", sponsored by Stanley Fastening Systems, East Greenwich, RI. James Goulet.
- "Reduction of Recoil in Portable, Spring Loaded Fastening Tools", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Peter Fowler.
- "Development of an Autonomous Window Washing Robot".  Michael Lastrina.  Entered in the ASME District A Design Competition, Professional, Student Professional Development Conference, CCSU, New Britain, CT, April 5, 2008.

**2006-2007**
- "Determination of Dynamic Mechanical Properties of Adhesives and Porcelains used for Dental Implants", sponsored by Beniot Family Dentistry, Old Saybrook, CT.  Tim Hickey.
- "Design and Development of a System for Measuring the Overall Efficiency of a Compressor Nailer Fastening System", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Mike Orazietti.
- "The Development of an Energy Monitoring System for Athletic Training Sleds", sponsored by SetPro Inc., Westbrook, CT.  Sean Bramhall.
- "Design and Development of a Split Hopkinson Pressure Bar Apparatus for Tensile Loading".  Dave Mucciacciaro.

**2005-2006**
- "Design and Development of a Low Cost Stud Finder for Pneumatic Fastening Tools", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Kari Kisselbrack.
- "Development of a Portable Energy Measuring Device for Pneumatic Fastening Tools", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Seth Glaser.
- "Design of a Specimen Heating System for Dynamic Material Testing".  Steven Army.
- "Design and Development of a Full Sized Charpy Impact Tester".  James Dutelle.

**2004-2005**
- "Design and Construction of a Torsion Testing Apparatus".  Robert Short.  Results published in the Proceedings of the ASEE New England Section 2006 Annual Conference.
- "Redesign of a Surgical Clip Applier", sponsored by SK3 Corporation, Springfield, MA.  Kevin Lutter.
- "Development of a Feed System for a Non-Pneumatic Nailer", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Sean O'Claire.
- "Automation of a Rebound Pendulum".  Hung Truoung.

**2003-2004**
- "Design of a Data Acquisition System for a Split Hopkinson Pressure Bar".  Steve Coduri."A Study of the Effect of Corking a Baseball Bat on Hitting Performance".  Nate Soucy."Measurement of Closeness of Shave Using Vibratory Techniques", sponsored by Remington Products Company, L.L.C., Bridgeport, CT.  Lindsay Maguire."Determination of Dynamic Modulus of Elastomeric Materials Using Rebound Measurements".  Doug

Almieda. "Development of a Cycle Counter for a Pneumatic Fastening Tool", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Joe Sibilia.
- "Optimization of a Hammer Tacker Design", sponsored by Stanley Fastening Systems, East Greenwich, RI. Joe Bielin.
- "Development of Alternate Methods for Dynamic Loading of Pneumatic Fastening Tools", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Dave White.
- "Development of a Drive Piston Retaining Device for a Pneumatic Fastening Tool", sponsored by Stanley Fastening Systems, East Greenwich, RI.  Evan Weber.

**2002-2003**
- "Determination of Material Properties at Very High Rates of Loading".  Richard Rose.

- "The Experimental and Analytical Determination of Stresses in Tennis Racquets".  Aaron Dinoto.
- "Analysis of Stress and Strain on Large Gas Pipes", sponsored by Bay State Gas Company, West Springfield, MA.  Gerry Guillmeister.


**PUBLICATIONS / PRESENTATIONS**

Vallee, G. E., Implementation of Multi-Year Product Innovation Projects", technical publication, presented at the ASME International Mechanical Engineering Congress and Exposition, Montreal, Canada, November, 2014. Paper No. IMECE2014-36443.

Jackson, J. R., Vallee, G. E.,  "Development of a Predictive Design Methodology for Structural Polymers Subject to Long-Term Loadings", technical publication, ASME International Mechanical Engineering Congress and Exposition, Houston, TX, November, 2012. Paper No. IMECE2012-87912, pp. 389-396.

Vallee, G., and Bowen, M.,  "Development of a Curved Hopkinson Bar for Long Wavelength Impact Events", technical publication, presented at the ASME International Mechanical Engineering Congress and Exposition, Denver, CO, November, 2011. Paper No. IMECE2011-62914, pp. 707-715.

Vallee, G., and Benoit, R., **"**Translating Dental Performance into Engineering Science within a Senior Capstone Design Project", technical publication and presentation at the New England Regional Conference of the American Society of Engineering Educators, Boston, MA, May, 2010.

Vallee, G., Casey, P. and Pinsinneault, J., "An Interdisciplinary Laboratory Experience for Sustainability**"**, technical publication presented at the ASME International Mechanical Engineering Congress and Exposition, Lake Buena Vista, FL, November, 2009. Paper No. IMECE2009-10389, pp. 325-334.

Vallee, G., "A Novel Course in Product Innovation", technical publication presented at the ASME International Mechanical Engineering Congress and Exposition, Boston, MA., November, 2008. Paper No. IMECE2008-66632, pp. 143-150.

Vallee, G. and Army, S., "Determination of the Temperature Dependent Dynamic Response of Elastomeric Materials Using the Split Hopkinson Pressure Bar", technical publication presented at the ASME International Mechanical Engineering Congress and Exposition, Chicago, Ill., November, 2006, Paper No. IMECE2006-13262, pp. 173-179.

Vallee, G., and Short, R., "Design and Development of an Economical Torsion Testing Machine", presented at the ASEE New England Regional Conference, WPI, Worcester, MA, March, 2006.

Northrup, S, Vallee, G., and Moriarty, J., "A Successful Interdisciplinary Design Experience", Presented at the American Society of Engineering Educators Conference, Nashville, TN., June, 2003.

Vallee, G. E., and Shukla, A., "Static and Dynamic Response of Elastomeric Materials -An Insight Into the Design of Durable Elastomeric Components", International Journal of Engineering Design, Vol. 8, No. 3, August, 1997. Presented at the International Conference on Finite Element Analysis of Rubber and Rubber-Like Materials, University of Akron, Akron, Ohio, May 19-20, 1999.

Vallee, G. E., and Shukla, A., "A Study of Elastomeric Materials Using Finite Elements", ASME Journal Of Engineering Materials and Technology, Vol. 118, No. 4, October, 1996, pp. 503-508.Vallee, G. E., and Shukla, A., "Static and Dynamic Response of Elastomeric Materials -An Insight Into the Design of Durable Elastomeric Components", International Journal of Engineering Design, Vol. 8, No. 3, August, 1997.

Vallee, G. E., and Shukla, A., "A Study of Elastomeric Materials Using Finite Elements", ASME Journal Of Engineering Materials and Technology, Vol. 118, No. 4, October, 1996, pp. 503-508.  Presented at the International Conference on Finite Element Analysis of Rubber and Rubber-Like Materials, University of Akron, Akron, Ohio, March 20-21, 1997.

Vallee, G. E. and Shukla, A., "Development of a Dynamic Load-Deflection Apparatus for Elastomeric Materials", ASTM Journal of Testing and Evaluation, Vol. 23, No. 5, September, 1995, pp. 358-364.

Schoonmaker, M., Gettens, R., Vallee, G., "Building the Entrepreneurial Mindset Through Cross-Functional Innovation Teams", Entrepreneurship Education and Pedagogy, August, 2019.

**GRANTS**

"Woody Biomass Demonstration Project at Western New England College" Massachusetts Clean Energy Center, co-PI with Dr. S. Dini and Dr. A. Klimes, Western New England College, 2010. ($74,000)

"Next Generation Wind Turbine", Department of Energy Award No. DE-EE0003276, in conjunction with FloDesign Wind Turbine, LLC.  One month summer salary to study structural dynamics of wind turbine support and control structure.

"Creation of a Product Development and Innovation Course", National Collegiate Inventors and Innovators Alliance (NCIIA), co-PI with Dr. S. Schriener and Dr. J. McKeon, Western New England College, 2008. ($25,000)

"Development of a New Computer-Aided Data Acquisition and Processing Course", Western New England College, Faculty Development Grant, Spring, 2008. ($1,500)

"Development of a Senior ME Design Elective Course in Product Innovation", Western New England College, Faculty Development Grant, Fall, 2007. ($1,500)

"Development of a Web Based Course in Applied Machine Design", Western New England College, Research Grant, Summer, 2006. ($3,000)

"Development of a Demonstration Kit for Enhanced Learning in Mechanics of Materials", Western New England College, Faculty Development Grant, Spring, 2005. ($2,000)

"A Study of the Dynamic Mechanical Properties of Elastomers Under Multiple Deformation Modes", Western New England College, Research Grant, Summer, 2003. ($3,000)

"Development of a Demonstration Kit for Enhanced Learning in Statics and Dynamics", Western New England College, Faculty Development Grant, Spring, 2003. ($1,875)

**LICENSES / PATENTS**

Registered as a Professional Engineer with the State of Rhode Island, lic. # 6765.

"Convertible Contact/Sequential Trip Trigger, US Patent No. 5,551,620, September 3, 1996.

"Convertible Contact/Sequential Trip Trigger with Double Actuation Prevention Structure", US Patent No. 5,551,621, September 3, 1996.

"Portable Drill Bit Sharpener", US Patent No. 8,690,643, April 8, 2014.

"Biopsy Spacer Device and Method of Operation", US Patent No. 8,932,251, January13, 2015.

"Water Purification System", US Patent No. 9084949, July 21, 2015.

"Biopsy Spacer Device and Method of Operation", US Patent No. 9,233,231, January 12, 2016.

"Flexible Electrical Power Strip", US Patent No. 10,038,272, July 31, 2018.

"Combination Tool", US Patent No. 10,232,449B2, March 19, 2019.

Testimony History
Glenn E. Vallee Ph.D., P.E.

| Date of Testimony | Case Name | Client | Type | Testimony | Location |
|---|---|---|---|---|---|
| 8/28-29/1997 | Stipes v. The Stanley Works, et. al. | The Stanley Works | Defendant, Nailer Accident | Deposition | Hicksville, NY |
| 12/2/1997 | Rancourt v. The Stanley Works | The Stanley Works | Defendant, Nailer Accident | Trial Testimony | Boston, MA |
| 3/6/2009 | Knight v. Community Transportation Services, Inc., et. al. | Community Transportation Services, Inc. | Defendant, Transportation Van Accident | Deposition | Springfield, MA |
| 8/20/2009 | Mosier v. Stanley Bostitch | Stanley Works | Defendant, Nailer Accident | Deposition | Birmingham, ALA |
| 4/14/2010 | Mosier v. Stanley Bostitch | Stanley Works | Defendant, Nailer Accident | Trial Testimony | Birmingham, ALA |
| 10/12/2012 | Valway v. Stanley Bostitch | Stanley Works | Defendant, Nailer Accident | Trial Testimony | Philadelphia, PA |
| 1/15/2015 | Garrity v. Medline Industries | Theresa garrity | Plaintiff Cain Failure | Deposition | Hartford, CT |
| 11/21/2015 | Kissel v. Center for Women's Health et. al. | HBW Works Supply | Defendant, Heat Lamp Accident | Deposition | Hartford, CT |
| 5/11/2016 | MILWAUKEE ELECTRIC TOOL CORPORATION v. IRWIN INDUSTRIAL TOOL COMPANY | Irwin Industrial Tool Co. | Defendant IPR Patent litigation | Deposition | Hartford, CT |
| 9/2/2016 | Wilmer Santos-Maza v. Hitachi USA | Hitachi USA | Defendant Nailer Accident | Deposition | Newark, NJ |
| 4/21/2017 | Himilton v. Stanley Bostitch | Stanley Works | Defendant Nailer Accident | Deposition | Peabody, MA |
| 12/7/2017 | Kissel v. Center for Women's Health et. al. | HBW Works Supply | Defendant, Heat Lamp Accident | Trial Testimony | Stamford, CT |
| 3/22/2018 | Cavahagh v. Coolsystems | Coolsystems | Cold therapy machine defendant | Deposition | Hartford, CT |

Testimony History
Glenn E. Vallee Ph.D., P.E.

| Date of Testimony | Case Name | Client | Type | Testimony | Location |
|---|---|---|---|---|---|
| 5/22/2018 | Amax and Worktools, Inc. v. Accco Brands Corp | Amax/Worktools | Plaintiff Desktop Spring Powered Staplers, Infringement | Deposition | Hartford CT |
| 6/19/2018 | Team World Wide v. Walmart et. al. | Coleman | Defendant, Air matresses with embedded air pumps, Noninfringement | Deposition | Atlanta, GA |
| 7/25/2018 | Kyocera Senco v. Hitachi Koki USA | Hitachi Koki USA | Defendant Gas Spring Nailers, Noninfringement | Deposition | Washington DC |
| 10/19/2018 | PopSockets LLC v. Quest UAS Corp | Quest USA Corp | Defendant Mobile Phone Accessories, IPR, Noninfringement | Deposition | Cleveland OH |
| 10/30/2018 | Kyocera Senco v. Hitachi Koki USA | Hitachi Koki USA | Defendant Gas Spring Nailers, Noninfringement | ITC Hearing Testimony | Washington DC |
| 4/12/2019 | Ever Victory v. SAS group | SAS group | Defendant Toy track and car noninfringement | Deposition | Parsippany, NJ |
| 8/14/2019 | PopSockets LLC v. Quest UAS Corp | Quest USA Corp | Defendant Mobile Phone Accessories, IPR, Noninfringement | Deposition | Cleveland OH |

# Exhibit B

Exhibit B

Materials Considered

Patents and File Histories

RE42,987 (the '987 patent),

USPN 8,118,204 (the '204 patent),

USPN 7,156,012 (the '012 patent),

USPN 7,325,709 (the '709 patent)

USPN 7,398,647 (the '647 patent)

The prosecution histories of the Asserted Patents and the references cited therein;


Discovery

Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admissions

Plaintiff's Response to Kyocera Senco Second Set of Interrogatories

Kyocera Senco's discovery responses,

McCardle Deposition Transcript and Exhibits

Klein Deposition Transcript and Exhibits


Court Papers

The Complaint and its Exhibits;

The Court's Claim Construction Order;


Websites

https://www.hardwareandtools.com/senco-products-kj17ahbd-nail-mtl-conect.131x1-1-2-2m-deca-4044.html

https://www.senco.com/company/press-news/2011/12/07/senco-introduces-joistpro-150-and-250-metal-connector-nailers

https://www.senco.com/fasteners/34-metal-connector-paper-tape-heat-treated-nails/.

https://www.senco.com/tools/details-page/framepro325frhxp

https://www.senco.com/tools/details-page/framepro325xp

https://www.senco.com/tools/details-page/joistpro-trade-150xp,

https://www.walmart.com/ip/SENCO-MD17AEBD-Metal-Connector-Nail/961997964

https://www.walmart.com/ip/SENCO-MD17AHBD-Metal-Connector-Nail/48039419

https://www.youtube.com/watch?v=0YmSB_dM7fI

https://www.youtube.com/watch?v=DebvO2QzSBI

https://www.youtube.com/watch?v=Mauh8G3H1GQ

https://www.youtube.com/watch?v=oJm8MWNtavQ;


Production Documents

KHD0001530

KHD0001536

KHD0001560

KHD0001561

KHD0001567

KHD0001775

KHD0001777

KHD0001778

KHD0001838

KHD0001839

KHD0002012

KHD0002013

KHD0003628 - 3630

KHD0003631 - 3633

KHD0003634 - 3636

KHD0003637 - 3678

KHD0003679 - 3720

KHD0003679 – 3720

KHD0003721 - 3804

KHD0003805 - 3864

KHD0003865 - 3899

KHD0003865 - 3899

KHD0003900 - 3955

KHD0003956 - 3995

KHD0003956 - 3995

KHD0003996 - 4034

KHD0004074 - 4141

KHD0004074 - 4141

KHD0004280 - 4285

KHD0004292 - 4359

KHD0004360 - 4373

KHD0004360 - 4373

KHD0004407 - 4430

KHD0004431 - 4490

KHD0004491 - 4550

KHD0004817 - 4834.

KHD0004879 - 4901

KHD0005052 - 5055

KHD0005104

KHD0007501

KHD0007527

KHD0007532

KHD0007533

KHD0007534

KHD0007535

KHD0007536

KHD0007537 - 7542

KSIT00000001 - 0004

KSIT00000005 - 0008

KSIT00000009- 0012

KSIT00000013 - 0016

KSIT00000025 - 0028

KSIT00000031 - 0041

KSIT00000042 - 0053

KSIT00000054 - 0081

KSIT00000082 - 0090

KSIT00000147 - 0157

KSIT00000159

KSIT00000168

KSIT00000190

KSIT00000199

KSIT00000279

KSIT00000301

KSIT00000302

KSIT00000303

KSIT00000312

KSIT00000475

KSIT00000476

KSIT00000477

KSIT00000478

KSIT00000481

KSIT00000495

KSIT00000496-497

KSIT00000498

KSIT00000500

KSIT00000501

KSIT00000502

KSIT00000508

KSIT00000512

KSIT00084191 - 4192

KSIT00095901

KSIT00098316

KSIT00098322

KSIT00098330

KSIT00098332

KSIT00098333

Physical samples of Koki's Practicing Products and related technical material, including design drawings and CAD models;

Physical samples of the Accused Products and related technical material, including design drawings and CAD models;

# EXHIBIT 10

**HIGHLY CONFIDENTIAL INFORMATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KOKI HOLDINGS CO. LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 18-313-CFC |
| | ) | |
| KYOCERA SENCO INDUSTRIAL TOOLS, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT REPORT OF GLENN VALLEE, PH.D.**

HIGHLY CONFIDENTIAL INFORMATION

## Table of Contents

I.       Introduction ........................................................................................ 1

II.     Materials Considered ........................................................................ 2

III.    Summary of Opinions ...................................................................... 3

IV.   Relevant Legal Principles ................................................................ 4

     A.   Claim Construction ................................................................ 4

     B.   Presumption of Validity ........................................................ 6

     C.   Standard for Anticipation ...................................................... 6

     D.   Standard for Obviousness ...................................................... 7

     E.   Standard for Indefiniteness .................................................. 10

     F.   Written Description Requirement ........................................ 10

     G.   Enablement Requirement ...................................................... 10

V.      Level of Ordinary Skill in the Art .................................................. 11

VI.    Claim Constructions Adopted By The Court .................................. 13

VII.   Technical Background .................................................................... 14

VIII.  Validity of U.S. Patent No. RE42,987 ............................................ 16

     A.   Singer In View of Klaus Does Not Render The Asserted Claims of the '987 Patent Obvious ............................................ 17

            1.    Overview of Singer ................................................ 18

            2.    Overview of Klaus .................................................. 19

            3.    Claim Elements 14(f), 18(f)-18(h), 19(f)-19(h): "a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center" ............................................ 21

     B.   Moorman In View of Klaus Does Not Render The Asserted Claims of the '987 Patent Obvious .................................... 26

            1.    Overview of Moorman .......................................... 26

HIGHLY CONFIDENTIAL INFORMATION

2. Claim Elements 14(f), 18(f)-18(h), 19(f)-19(h): "a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center".............................. 28

C. Objective Indicia of Non-Obviousness.................................................. 32

IX. Validity of U.S. Patent No. 8,118,204 ................................................. 35

A. Kondo in View of Buck Does Not Render the Asserted Claims of the '204 Patent Obvious ............................................................ 36

1. Overview of Kondo.................................................... 37

2. Overview of Buck..................................................... 37

3. Claim Elements 12(h) and 13(h): "Inclined with respect to the ejecting direction in a side view, the side view being perpendicular to the handle extending direction and the ejecting direction ............................................................ 38

4. Claim Elements 12(i) and 13(i): "Wherein the magazine is inclined with respect to the handle portion in a bottom view" ........................... 42

5. Claim Elements 12(j) and 13(j): "wherein, in the side view when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine" ............................................. 45

6. Claim Element 12 (l) and Claim 15: "wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion" .......................................... 47

7. Motivation to Combine Kondo and Buck ............................... 48

B. Claims 12, 13, and 15 of the '204 Patent Satisfy 35 U.S.C. § 112 ...................... 48

1. Allegations regarding written description.............................. 49

2. Allegations regarding indefiniteness.................................. 52

C. Objective Indicia of Non-Obviousness.................................................. 54

X. Validity of U.S. Patent No. 7,325,709 ................................................. 59

A. Novak Does Not Anticipate or Render Obvious Claims 1, 8, or 10 of the '709 Patent ............................................................ 61

1. Overview of Novak.................................................... 62

HIGHLY CONFIDENTIAL INFORMATION

2.      Claim Elements 1(g) and 10(a): "a magazine having one end and another end in a moving direction of the driver blade, and defining an accommodation portion having two opposing walls for accommodating therein a fastener array, each fastener having a shaft with a sharp-end and a head connected to the shaft, a plurality of fasteners being directed in parallel with the moving direction of the driver blade in the magazine and being positioned side by side to form the fastener array, the accommodation portion comprising an expanding portion having a width delimited between the two opposing walls in a direction perpendicular to the shaft of the fastener and to the fastener array, the width being gradually increased from the one end close to the sharp end of the fastener toward the another end close to the head of the fastener" ..................................... 63

B.      Novak In View of Ohuchi Does Not Render Claims 5 and 14 of the '709 Patent Obvious .................................................................. 68

1.      Overview of Ohuchi .................................................. 69

2.      There is No Motivation or Reason to Combine Novak and Ohuchi69

C.      Novak in View of Monacelli Does Not Render Claim 9 of the '709 Patent Obvious .......................................................................... 72

1.      Overview of Monacelli ............................................. 73

2.      There is No Motivation or Reason to Combine Novak and Monacelli ................................................................... 73

D.      Schrepferman Does Not Anticipate or Render Obvious Claims 1, 8, 9, or 10 of the '709 Patent ................................................... 75

1.      Overview of Schrepferman ...................................... 75

2.      Claim Elements 1(g) and 10(a): "a magazine having one end and another end in a moving direction of the driver blade, and defining an accommodation portion having two opposing walls for accommodating therein a fastener array, each fastener having a shaft with a sharp-end and a head connected to the shaft, a plurality of fasteners being directed in parallel with the moving direction of the driver blade in the magazine and being positioned side by side to form the fastener array, the accommodation portion comprising an expanding portion having a width delimited between the two opposing walls in a direction perpendicular to the shaft of the fastener and to the fastener array, the width being gradually increased from the one end close to the sharp end of the fastener toward the another end close to the head of the fastener" ..................................... 76

**HIGHLY CONFIDENTIAL INFORMATION**

E.    Schrepferman In View of Ohuchi Does Not Render Claims 5 and 14 of the '709 Patent Obvious ............................................................. 81

    1.    There is No Motivation or Reason to Combine Schrepferman and Ohuchi ............................................................. 81

F.    Wingert Does Not Anticipate or Render Obvious Claims 1, 8, or 10 of the '709 Patent ............................................................. 83

    1.    Overview of Wingert ............................................................. 83

    2.    Claim Element 1(e): "a magazine device bridging between the nose portion and the handle portion for supplying fasteners to a position of the ejection passage" ............................................................. 84

    3.    Claim Elements 1(g) and 10(a): "a magazine having one end and another end in a moving direction of the driver blade, and defining an accommodation portion having two opposing walls for accommodating therein a fastener array, each fastener having a shaft with a sharp-end and a head connected to the shaft, a plurality of fasteners being directed in parallel with the moving direction of the driver blade in the magazine and being positioned side by side to form the fastener array, the accommodation portion comprising an expanding portion having a width delimited between the two opposing walls in a direction perpendicular to the shaft of the fastener and to the fastener array, the width being gradually increased from the one end close to the sharp end of the fastener toward the another end close to the head of the fastener" ................................... 89

    4.    Claim Elements 8(a) and 8(b): "wherein the magazine has an outer flat surface; and the fastener driving tool further comprising a handle arm connected to the handle portion and having a flat region in surface contact with the outer flat surface of the magazine" ............................................................. 93

G.    Wingert In View of Ohuchi Does Not Render Claims 5 and 14 of the '709 Patent Obvious ............................................................. 95

    1.    There is No Motivation or Reason to Combine Wingert with Ohuchi ............................................................. 95

H.    Wingert in View of Monacelli Does not Render Claim 9 of the '709 Patent Obvious ............................................................. 98

    1.    There is No Motivation or Reason to Combine Wingert with Monacelli ............................................................. 99

HIGHLY CONFIDENTIAL INFORMATION

I.       Schell Does Not Anticipate or Render Obvious Claims 1, 8, 9, or 10 of the '709 Patent ........................................................................... 100

        1.      Overview of Schell ................................................................. 100

        2.      Claim Elements 1(g) and 10(a): "a magazine having one end and another end in a moving direction of the driver blade, and defining an accommodation portion having two opposing walls for accommodating therein a fastener array, each fastener having a shaft with a sharp-end and a head connected to the shaft, a plurality of fasteners being directed in parallel with the moving direction of the driver blade in the magazine and being positioned side by side to form the fastener array, the accommodation portion comprising an expanding portion having a width delimited between the two opposing walls in a direction perpendicular to the shaft of the fastener and to the fastener array, the width being gradually increased from the one end close to the sharp end of the fastener toward the another end close to the head of the fastener" ................................. 101

J.       Schell In View of Ohuchi Does Not Render Claims 5 and 14 of the '709 Patent Obvious ........................................................................... 104

        1.      There is No Motivation or Reason to Combine Schell and Ohuchi 104

K.       Ohuchi in view of Novak, Schrepferman, Schell, and Wingert Does Not Render Obvious Claims 1, 5, 10, or 14 of the '709 Patent ................. 105

        1.      Claim Elements 1(i) and 10(c): "wherein the one end of the magazine close to the sharp end of the fastener is a closed end formed by joining of the two opposing walls of the accommodation portion, the width of the accommodation portion being continuously increased from the closed end to at least a portion of the opposing walls accommodating the shaft of the fastener therebetween" ....................................................................... 105

L.       Objective Indicia of Non-Obviousness ............................................. 106

XI.      Validity of U.S. Patent No. 7,398,647 ................................................ 109

A.       Ishizawa In View of the SN325+ Does Not Render the Asserted Claims of the '647 Patent Obvious ..................................................... 109

        1.      Overview of Ishizawa ........................................................... 109

        2.      Overview of the SN325/SN325+ Documentation .................. 110

HIGHLY CONFIDENTIAL INFORMATION

3.      Claim Element 1(c): "a piston upper chamber being defined by an inner peripheral surface of the cylinder and an upper surface of the piston".................................................................... 111

4.      Claim Element 1(d): "a main valve section disposed in the frame and having a main valve movable between a top dead center and a bottom dead center to alternately open and block fluid communication between the piston upper chamber and the accumulator, a main valve chamber being defined by an upper surface of the main valve and a part of the frame"............................................. 111

5.      Claim Element 1(h): "a ratio obtained from dividing a maximum internal volume of the main valve chamber measured in $m^3$ by a cross sectional area of the first channel measured in $m^2$ is no greater than 0.8"................................................................ 112

B.      The SN325 Does Not Anticipate the Asserted Claims of the '647 Patent............................................................................................ 120

1.      Claim Element 1(e): "a trigger valve section having a plunger movable between a top dead center and a bottom dead center so as to alternately open and block fluid communication from the accumulator to the main valve chamber, and fluid communication from the main valve chamber to atmosphere" .......................... 121

2.      Claim Element 1(h): "a ratio obtained from dividing a maximum internal volume of the main valve chamber measured in $m^3$ by a cross sectional area of the first channel measured in $m^2$ is no greater than 0.8".................................................................. 121

C.      Objective Indicia of Non-Obviousness ................................................. 124

XII.      Validity of U.S. Patent No. 7,156,012 ................................................. 127

A.      Ishizawa In View of the SN325 Does Not Render the Asserted Claims of the '012 Patent Obvious .................................................... 129

1.      Claim Element 1(c): a piston upper chamber being defined by an inner peripheral surface of the cylinder and an upper surface of the piston........................................................................................... 129

2.      Claim Element 1(g): a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in $m^3$ by the cross-sectional area of the main valve control channel measured in $m^2$ being not more than 1.0............................................ 130

**HIGHLY CONFIDENTIAL INFORMATION**

3.      Claim Element 2(g): the air discharge channel having a cross-sectional area not less than the cross-sectional area of the main valve control channel. ................................................................. 130

4.      Claim 3: The fastener driving tool as claimed in claim 2, wherein the main valve intake channel has a cross-sectional area, a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in $m^3$ by the cross-sectional area of the main valve intake channel measured in $m^2$ being not more than 1.0.      131

B.     The SN325 Does Not Anticipate the Asserted Claims of the '012 Patent.................................................................................................. 133

1.      Claim Element 1(g): a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in $m^3$ by the cross-sectional area of the main valve control channel measured in $m^2$ being not more than 1.0............................................. 133

C.     Claims 2, 3, and 4 of the '012 Patent Satisfy 35 U.S.C. § 112 .......................... 133

1.      Allegations regarding indefiniteness...................................... 134

D.     Objective Indicia of Non-Obviousness.............................................. 137

XIII.     Conclusion ....................................................................................... 139

HIGHLY CONFIDENTIAL INFORMATION

I, Glenn E. Vallee, Ph.D., declare as follows:

## I.        INTRODUCTION

1.        My name is Glenn E. Vallee, Ph.D. I am the same Glenn E. Vallee that previously prepared and submitted an "Initial Expert Report of Dr. Glenn Vallee" ("Vallee Opening Report" or "my Opening Report") dated February 28, 2020 in which I presented my opinions on matters relating to Kyocera Senco's infringement of the Asserted Patents and Koki's practice of the Asserted Patents. My professional background and qualifications, my compensation, as well as certain legal guidelines used in my analysis may be found in my Opening Report, which I hereby incorporate by reference.

2.        I have been asked to offer my opinions in response to the Initial Expert Report of Keven Miller Regarding Invalidity ("Miller Initial Report" or "Miller Invalidity Report"), including but not limited to the validity of various claims in U.S. Patent Nos. 8,118,204 (the '204 patent), RE42,987 (the '987 patent), 7,156,012 (the '012 patent), 7,398,647 (the '647 patent), and 7,325,709 (the '709 patent) (collectively the "Asserted Patents"). In forming my opinions, I rely on my knowledge and experience in the field, and on the documents and information reference in this Report. If called to testify in this matter, I am prepared to explain in detail, with appropriate visual aids, the opinions expressed in this Report and my basis for those opinions.

3.        I am being compensated for my time at my standard rate of $250 per hour. For time spent providing deposition and trial testimony, I am being compensated at my standard rate of $350 per hour. I am also being reimbursed for reasonable expenses and out-of-pocket expenses at cost. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in the outcome of this proceeding.

HIGHLY CONFIDENTIAL INFORMATION

| CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|
| "push portion"<br><br>U.S. RE42,987, claims 14-19 | Means-plus-function claim term subject to 35 U.S.C. §112, ¶6<br><br>Structure: "safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22"<br><br>Function: "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward" |
| "a trigger valve exterior frame to which the main valve control channel is fluidly connected"<br><br>U.S. 7,156,012, claims 2-4 | "a trigger valve exterior frame connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel" |
| "closed end formed by joining of the two opposing walls"<br><br>U.S. 7,325,709, claims 1, 3, 4, 5, 8-10, and 14 | "closed end formed by joining of the two opposing walls" |
| "a handle portion extending from the housing"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "a handle portion extending from a separate and distinct housing" |
| "the battery pack having an extending portion extending from the housing"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "the battery pack has an extending portion that attaches to a portion of the housing" |
| "a bottom view"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "a view that is perpendicular to the side view" |

## VII.    TECHNICAL BACKGROUND

45.       I disagree with Mr. Miller's opinion in ¶¶ 41-46 of his report that the invention

disclosed in the '987 patent was fully disclosed by Singer, Moorman, and Klaus. While these three

patents do disclose varying safety mechanisms which make the nail visible prior to driving, Mr.

Miller is overly broad in his interpretation of these patents. For example, each patent discloses

inventions which are much different than that disclosed in the '987 patent. Singer and Moorman

14

HIGHLY CONFIDENTIAL INFORMATION

teach that the tip of the nail may be rendered visible to the operator through motion of the nail magazine which is coupled to the safety mechanism. This requires a large moving mass guided within a set of guide channels, whereas the mechanism disclosed by the '987 patent teaches a novel contact trip design which relies only on the motion of a small number of light weight components which sense the presence of the nailer against the workpiece and actuate the safety mechanism. On the other hand, Klaus discloses a complex combination pneumatic and mechanical safety mechanism which is prone to clogging due to the complex pneumatic network, as opposed to the purely mechanical safety mechanism disclosed in the '987 patent

46.     Mr. Miller is again overly broad in his interpretation of the '204 patent when compared to the patents of Buck and Kondo. *See* Miller Initial Rpt. at ¶¶ 47-51. For example, unlike the '204 patent, Buck does not disclose the location of any internal components, such as the motor, which are critical to the balance and ease of use of the nailer. Kondo does not disclose a magazine that is inclined with respect to the ejecting direction at all.

47.     Mr. Miller is again overly broad when comparing the patents of Schrepferman, Novak, Wingert, and Schell. *See* Miller Initial Rpt. at ¶¶ 52-55. He states that each describes a V-shaped magazine cross section, yet the shape of each of these magazines is much different than that disclosed and claimed in the '709 patent. The '709 patent discloses a unique cross section which results in a different stiffness, weight, and nail support position.

48.     Finally, Mr. Miller is again overly broad when comparing the '647 and '012 patents with the Ishizawa and the Senco SN325+ nailer. *See* Miller Initial Rpt. at ¶¶ 56-60. The main valve design of Ishizawa functions in an opposite direction than that taught in the '647 and '012 patents, which would result in different nailer performance and response. The SN325+ nailer utilized a completely different trigger valve system pneumatically connected to multiple channels used to

15

HIGHLY CONFIDENTIAL INFORMATION

feed and purge the main valve chamber, which again would result in much different nailer performance and response time.

## VIII.        VALIDITY OF U.S. PATENT NO. RE42,987

49.          Claims 14, 15, 16, 17, 18, and 19 of the '987 patent are reproduced below:

| Claim 14 | |
|---|---|
| 14. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 14(a) | a body; |
| 14(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 14(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 14(d) | a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 14(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 14(f) | a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. |

| Claim 15 | |
|---|---|
| 15. | A nail gun according to claim 14, wherein said connected nails are arranged on a single plane. |

| Claim 16 | |
|---|---|
| 16. | A nail gun according to claim 14, wherein the tips of the connected nails are arranged in a single line. |

| Claim 17 | |
|---|---|
| 17. | A nail gun according to claim 14, wherein said magazine further includes a feeder which feeds said connected nails by pressure from a feeder spring. |

| Claim 18 | |
|---|---|
| 18. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 18(a) | a body; |

16

HIGHLY CONFIDENTIAL INFORMATION

| | |
|---|---|
| 18(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 18(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 18(d) | a striking mechanism that strikes a lead nail of the connected nails disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 18(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 18(f) | a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein |
| 18(g) | operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, |
| 18(h) | when the lead nail reaches the nosepiece, at least a tip of the lead nail protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. |

| Claim 19 | |
|---|---|
| 19. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 19(a) | a body; |
| 19(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 19(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 19(d) | a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 19(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 19(f) | a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center, wherein |
| 19(g) | operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, |
| 19(h) | at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position, and |
| 19(i) | said magazine is disposed at the position of said tip of the nosepiece. |

### A.   Singer In View of Klaus Does Not Render The Asserted Claims of the '987 Patent Obvious

50.         In this section, I express my opinions in rebuttal to Mr. Miller's assertion that the Asserted Claims of the '987 patent are obvious based on U.S. Patent No. 5,803,338 (Singer) in view of U.S. Patent No. 4,509,668 (Klaus).

17

**HIGHLY CONFIDENTIAL INFORMATION**

124.        In addition, Buck does not show a motor, let alone that any such motor is positioned below the handle. And, as I discussed above, the motor in the DeWalt tool that embodies Buck is located above the handle portion of the tool.

### 7.    Motivation to Combine Kondo and Buck

125.        Mr. Miller states that this claim simply rearranges known elements found in battery operated nailers in a predictable manner that would have been obvious to one skilled in the art.  I disagree. Designing a power nailer for proper ergonomics, including minimum weight, balance, noise level and transmitted load, along with durability, consistent performance and overall utility, requires much more than simply rearranging components. For example, spacing between gear drives and motors must be minimizes to reduce train weight and stress.  Piston lifting mechanisms must be located close to the piston to minimize lifting moments which can cause increased bending stresses.  However, the center of gravity of the tool must be maintained near the trigger for proper balance.  As discussed above, the motor of Kondo would have to be relocated to incorporate the Buck magazine, which would result in a shift in the location of the center of gravity of the tool, the gear train and lifting mechanism, all of which must then be compensated for.

### B.    Claims 12, 13, and 15 of the '204 Patent Satisfy 35 U.S.C. § 112

126.        In this section, I express my opinion to Mr. Miller's assertion that claims 12, 13, and 15 of the '204 patent are indefinite, lack enablement, and/or lack written description under 35 U.S.C. § 112.

127.        As a preliminary matter, while Mr. Miller states that that "[i]n [his] opinion, Claims 12, 13, and 15 of the '204 patent are indefinite, lack enablement, and/or lack written description under 35 U.S.C. § 112 (see Miller Initial Rpt. at ¶ 184), he provides no explanation as to why he asserts these claims lack enablement. Instead, he only asserts these claims lack written description

48

HIGHLY CONFIDENTIAL INFORMATION

(*id*. at ¶¶ 185-188) and are indefinite (*id*. at ¶¶ 189-192). To the extent Mr. Miller provides additional detail regarding his opinions, I reserve the right to supplement my report.

### 1. Allegations regarding written description

128.     I disagree with Mr. Miller's assertion that claims 12, 13, and 15 lack sufficient written description under § 112 because the specification fails to provide an adequate written description of the Court's construction of the term "the battery pack having an extending portion extending from the housing" in combination with other elements of the asserted claims. *See* Miller Initial Rpt. at ¶ 185-188.  I disagree.

129.     I understand the Court construed the term "a handle portion extending from the housing" to mean "a handle portion extending from a separate and distinct housing." One of skill in the art would understand, after reading the disclosure of the '204 patent and in light of the Court's claim construction, any portion of the nailer's exterior, exclusive of the handle portion, is generally referred to as the housing. *See* '204 patent at 3:30-32 ("In an electric fastening tool 1 according to this embodiment, numeral 2 designates a housing made of a resin and acting as an exterior member"). Furthermore, the battery pack supporting portion supports the portion of the battery that is inside the tool. In the embodiment shown in FIGs. 1 and 3 of the '204 patent, the battery pack supporting portion is located on the inside of the handle.  *See* '204 patent at 3:35-41 ("At the trailing end portion of the handle portion 2B (or at the free end portion on the side opposed to the trunk portion 2A) of the housing 2, moreover, there is disposed a battery pack 3, attached to the end of handle portion 2B through a battery back supporting portion 2C, for housing the not-shown battery as the power source."). I have provided an annotated version of FIGs. 1 and 3 of the '204 patent below in order to demonstrate that these figures fully support and disclose all of the elements present in claims 12, 13, and 15.

49

**HIGHLY CONFIDENTIAL INFORMATION**



A

HIGHLY CONFIDENTIAL INFORMATION



FIG. 3

130.      As shown above, FIGS. 1 and 3 show: a housing (green), a handle portion (blue) extending from a separate and distinct housing (red annotation area A), a battery pack supporting portion (orange; shown in phantom in FIG. 1) connected to the handle (as the battery pack supporting portion is located inside the handle, it is connected to the handle), a battery pack (purple) with a battery pack extending portion (magenta) that attaches to a portion of the housing (red annotation area B). Thus, the written description of the '204 patent describes claims 12, 13, and 15 of the '204 patent in sufficient detail such that one skilled in the art can reasonably conclude that the inventor had possession of the claimed invention.

51

HIGHLY CONFIDENTIAL INFORMATION

characteristics as the main valve chamber is evacuated.  It is therefore unreasonable to assume that imply utilizing the same ratio would result in the desired response within the Ishizawa design.

**B.    The SN325 Does Not Anticipate the Asserted Claims of the '012 Patent**

298.        In this section, I express my opinions in rebuttal to Mr. Miller's assertion that Claim 1 of the'012 patent is anticipated by the SN325+ Nailer.

299.        As I noted above, I understand that Kyocera Senco recently indicated it is also relying on an alleged physical sample of the SN325+. I also understand the tool is being made available in a conference room at a law firm in Chicago, but I have not had an opportunity to travel to Chicago analyze the physical tool. In fact, even if I were to inspect the tool in a law firm conference room, I would not have the necessary equipment and space to properly inspect the tool. I reserve the right to supplement my opinions to the extent that Kyocera Senco is permitted to rely on the tool and I am able to properly analyze the tool in a laboratory.

**1.    Claim Element 1(g): a ratio obtained from dividing the maximum internal volume of the main valve chamber measured in $m^3$ by the cross-sectional area of the main valve control channel measured in $m^2$ being not more than 1.0**

300.        Mr. Miller asserts claim element 1(g) of the '012 patent is anticipated by the SN325+ for the same reasons that claim element 1(h) of the '647 patent is met. *See* Miller Initial Rpt. at ¶ 476. I disagree for the reasons discussed above in Section  XI.A.5

**C.    Claims 2, 3, and 4 of the '012 Patent Satisfy 35 U.S.C. § 112**

301.        In this section, I express my opinion to Mr. Miller's assertion that claims 2, 3, and 4 of the '012 patent are indefinite, lack enablement, and/or lack written description under 35 U.S.C. § 112.

302.        As a preliminary matter, while Mr. Miller states that that "[i]n [his] opinion, Claims 2, 3, and 4 of the '012 patent are indefinite, lack enablement, and/or lack written description under

HIGHLY CONFIDENTIAL INFORMATION

35 U.S.C. § 112 (*see* Miller Initial Rpt. at ¶ 477), he provides no explanation as to why he asserts these claims lack written description or enablement. Instead, he only asserts these claims are indefinite (*id*. at ¶¶ 478-480). To the extent Mr. Miller provides additional detail regarding his opinions, I reserve the right to supplement my report.

### 1.    Allegations regarding indefiniteness

303.      I disagree with Mr. Miller's assertion that claims 2, 3, and 4 of the '012 patent are indefinite under § 112 because they do not, with reasonable certainty, inform a person skilled in the art about the scope of the invention with respect to the limitation with respect to the limitation "a trigger valve exterior frame to which the main valve control channel is fluidly connected." *See* Miller Initial Rpt. at ¶ 478.

304.      In my opinion, a person of ordinary skill in the art would understand the term "a trigger valve exterior frame to which the main valve control channel is fluidly connected" to have its plain and ordinary meaning, which is "a trigger valve exterior frame connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel."

305.      It appears Mr. Miller is asserting that this limitation is indefinite under 35 U.S.C. § 112 because "a channel cannot be fluidly connected to an exterior frame." Mr. Miller is wrong. A person of ordinary skill in the art reading the claims and specification would understand that the exterior frame is the outside of the trigger valve. The skilled artisan would further understand that the exterior frame has to be in in fluid communication with the main control valve so that the air above the main valve can pass through it to release air to atmosphere and actuate the nailer. In other words, the main valve control channel must be connected to the frame to seal the channel and allow air to be directed through it in a controlled manner.

HIGHLY CONFIDENTIAL INFORMATION

306.	This understanding is exactly what is recited in the plain language of the claims and further described in the specification. The specification makes clear that the trigger valve exterior frame is connected to the main valve control channel so that fluid can pass between the trigger valve and the main control valve channel. Specifically, the specification discloses a trigger valve 6, which is illustrated in FIG. 2 below.



307.	In the illustration above, the trigger valve 6 has a trigger valve exterior frame (green) that is connected to the main valve control channel (light blue). (*See* '012 patent, at col. 7:22-27 ("The trigger valve 6 shown in FIG. 1 and FIG. 2 mainly includes an outer valve bush 10, an inner valve bush 11… [and] [t]he outer valve bush 10 and inner valve bush 11 are fixed to the frame 60 to form a trigger valve exterior frame which constitutes an outer wall of the trigger valve"); 7:38-40 "The trigger valve 6 is fluidly connected to a main valve control channel 40"). The specification further explains that the main valve control channel (light blue) is connected to a space between the components of the trigger valve exterior frame (*i.e.*, outer valve bush 10 and an inner valve bush 11 and opens into the trigger valve 6. (*Id*. at 7:40-43.). The location identified by the red circles and yellow is where the fluid is exchanged between the main valve control

135

HIGHLY CONFIDENTIAL INFORMATION

channel and the trigger valve exterior frame. In my opinion, a person of ordinary skill in the art reading these passages and analyzing FIG. 2 would understand that the trigger valve exterior frame is connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel.

308.     I also disagree with Mr. Miller's assertion that a channel cannot be fluidly connected to a frame as misapprehending the manner in which one of skill in the art would understand the claim language. As noted above, the specification clearly explains that the main valve control channel (blue) is connected to the outer valve bush 10 and inner valve bush 11 (red circles) such that the space between those two bushes (yellow) opens into the trigger valve. Moreover, FIG. 2 illustrates that the main valve control channel (blue) is connected to the trigger valve exterior frame at the outer valve bush 10 and inner valve bush 11 (red circles), which form the trigger valve exterior frame. A person skilled in the art would understand that the specification is teaching that the trigger valve exterior frame (green) is connected to the main valve control channel (blue) at the outer and inner valve bushes (red circle) such that fluid can pass between the trigger valve and the main control valve channel.

309.     Mr. Miller's identification of additional channels within the trigger frame in ¶¶ 479-480 of his Report severely overcomplicates the analysis. The fact that the trigger valve may include any number of channels does not mean that the trigger valve exterior frame cannot be fluidly connected to the main valve control channel. In fact, the specific channels that lie inside the trigger valve are irrelevant since the claims simply require that the main valve control channel is fluidly connected to the trigger valve frame.

310.     In addition, the other portions of the claim recite the connections amongst the other channels identified by Mr. Miller. For instance, col. 30:46-51 of the '012 patent explains that the

136

**HIGHLY CONFIDENTIAL INFORMATION**

main valve intake channel connects the main valve control channel to accumulator and col. 3:51-54 of the '012 patent claims that the air discharge channel connects the main valve control channel to the atmosphere. For the other channels identified by Mr. Miller, the claims do not require any connection to the main valve control channel. For instance, col. 31:8-11 explains that the trigger valve intake channel connects the accumulator to the trigger valve chamber and col. 31:13-15 explains that the trigger valve control channel connects the trigger valve chamber to the atmosphere.

311.      Accordingly, it is my opinion that because the subject claim recitation, read in light of the specification, informs a person of ordinary skill in the art with reasonable certainty about the scope of the invention, claims 2-4 of the '012 patent are not indefinite.

###      D.      Objective Indicia of Non-Obviousness

312.      In addition to the reasons presented above, the Asserted Claims of the '012 patent are not obvious because there are objective indicia of non-obviousness. The invention of the '012 patent offers significant benefits to the operator.  The invention results in a fast acting trigger which improves nailing performance, allows faster operation and improves the responsiveness of the nailer.  It also reduces air consumption which in turn reduces compressor wear and lowers the amount of electricity or fuel required to operate the compressor.

313.      As set forth in my Opening Report, it is my opinion that the Koki NR90AD/AE/AF and NV90AG practice claim 1 of the '012 patent and the Koki NT50AE2 and N3804AB3 practice claims 1, 2, 3, and 4 of the '012 patent. The  Koki NR90AD/AE/AF and NV90AG have received praise for their improved response time and air consumption efficiencies. Example of such praise are provided in the paragraphs 280-285 above.

314.      I also understand that the NR90AD/AE/AF, NV90AG, NT50AE2 and N3804AB3 have achieved a high level of sales as set forth below:

**HIGHLY CONFIDENTIAL INFORMATION**





. *See* Koki Resp. to ROG. No. 11.

*See* Koki Resp. to ROG. No. 11.

*See* Koki Resp. to ROG. No. 11.

HIGHLY CONFIDENTIAL INFORMATION

315.        Based on my thirty years of experience in the field of powered nailers, I believe these high level of sales demonstrate commercial success of the products, particularly in view of the high praise that the tools have received for their improved response time and air consumption efficiencies.

## XIII.        CONCLUSION

316.        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 27, 2020.

Glenn E. Vallee, Ph.D., P.E.

# EXHIBIT 11

HIGHLY CONFIDENTIAL INFORMATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KOKI HOLDINGS CO. LTD.,                          )
                                                 )
                    Plaintiff,                   )
          v.                                     )        C.A. No. 18-313-CFC
                                                 )
KYOCERA SENCO INDUSTRIAL TOOLS,                  )
INC.,                                            )
                                                 )
                                                 )
                    Defendant.                   )


REPLY EXPERT REPORT OF GLENN VALLEE, PH.D.

HIGHLY CONFIDENTIAL INFORMATION

## Table of Contents

I.      Introduction ................................................................................................. 1

II.     Materials Considered .................................................................................. 2

III.    Summary of Opinions ................................................................................. 2

IV.     Relevant Legal Principles .......................................................................... 4

V.      Level of Ordinary Skill in the Art ............................................................. 4

VI.     Claim Constructions Adopted By The Court ........................................... 7

VII.    Infringement of U.S. Patent No. RE42,987 ............................................. 8

        A.   "Push Portion" ................................................................................. 10

VIII.   Infringement of U.S. Patent No. 8,118,204 ........................................... 17

        A.   "A battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing" ........................................................................................ 19

IX.     Infringement of U.S. Patent No. 7,325,709 ........................................... 30

        A.   "Formed By Joining" ...................................................................... 33

X.      Conclusion ................................................................................................ 37

HIGHLY CONFIDENTIAL INFORMATION

I, Glenn E. Vallee, Ph.D., declare as follows:

## I.     **INTRODUCTION**

1.      My name is Glenn E. Vallee, Ph.D. I am the same Glenn E. Vallee that previously prepared and submitted (i) an "Initial Expert Report of Dr. Glenn Vallee" ("Vallee Opening Report" or "my Opening Report") dated February 28, 2020 in which I presented my opinions on matters relating to Kyocera Senco's infringement of the Asserted Patents[1] and Koki's practice of the Asserted Patents and (ii) a "Rebuttal Expert Report of Dr. Glenn Vallee" ("Vallee Rebuttal Report" or "my Rebuttal Report") dated March 27, 2020 in which I presented my opinions on matters relating to validity of various claims in the Asserted Patents. My professional background and qualifications, my compensation, as well as certain legal guidelines used in my analysis may be found in my Opening Report, which I hereby incorporate by reference.

2.      I have been asked to provide this Reply Report to offer my opinions in response to the Rebuttal Expert Report of Keven Miller Regarding Non-Infringement ("Miller Rebuttal Report"). In forming my opinions, I rely on my knowledge and experience in the field, and on the documents and information reference in my Opening, Report, Rebuttal Report, and this Reply Report. If called to testify in this matter, I am prepared to explain in detail, with appropriate visual aids, the opinions expressed in this Report and my basis for those opinions.

3.      I am being compensated for my time at my standard rate of $250 per hour. For time spent providing deposition and trial testimony, I am being compensated at my standard rate of $350 per hour. I am also being reimbursed for reasonable expenses and out-of-pocket expenses at cost. My compensation is in no way contingent on the nature of my findings, the presentation of

---

[1] The Asserted Patents are U.S. Patent Nos. 8,118,204 (the '204 patent), RE42,987 (the '987 patent), 7,156,012 (the '012 patent), 7,398,647 (the '647 patent), and 7,325,709 (the '709 patent)

HIGHLY CONFIDENTIAL INFORMATION

| CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|
| "a trigger valve exterior frame to which the main valve control channel is fluidly connected"<br><br>U.S. 7,156,012, claims 2-4 | "a trigger valve exterior frame connected to the main valve control channel such that fluid can pass between the trigger valve and the main control valve channel" |
| "closed end formed by joining of the two opposing walls"<br><br>U.S. 7,325,709, claims 1, 3, 4, 5, 8-10, and 14 | "closed end formed by joining of the two opposing walls" |
| "a handle portion extending from the housing"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "a handle portion extending from a separate and distinct housing" |
| "the battery pack having an extending portion extending from the housing"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "the battery pack has an extending portion that attaches to a portion of the housing" |
| "a bottom view"<br><br>U.S. 8,118,204, claims 12, 13, and 15 | "a view that is perpendicular to the side view" |

## VII.    INFRINGEMENT OF U.S. PATENT NO. RE42,987

30.    As I noted in my Opening Report, it is my opinion that the JoistPro 150XP infringes claims 14, 15, 16, 17, 18, and 19 of the '987 patent. In his report, Mr. Miller contends that the only claim limitation missing from the JoistPro 150XP is a "push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center."

31.    Claims 14, 15, 16, 17, 18, and 19 of the '987 patent are reproduced below and I have highlighted the claim limitation that Mr. Miller contends is missing from the JoistPro 150XP:

| Claim 14 | |
|---|---|
| 14. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 14(a) | a body; |
| 14(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 14(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 14(d) | a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |

HIGHLY CONFIDENTIAL INFORMATION

| 14(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 14(f) | **a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center**, wherein operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. |

| Claim 15 | |
| --- | --- |
| 15. | A nail gun according to claim 14, wherein said connected nails are arranged on a single plane. |

| Claim 16 | |
| --- | --- |
| 16. | A nail gun according to claim 14, wherein the tips of the connected nails are arranged in a single line. |

| Claim 17 | |
| --- | --- |
| 17. | A nail gun according to claim 14, wherein said magazine further includes a feeder which feeds said connected nails by pressure from a feeder spring. |

| Claim 18 | |
| --- | --- |
| 18. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 18(a) | a body; |
| 18(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 18(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 18(d) | a striking mechanism that strikes a lead nail of the connected nails disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 18(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 18(f) | **a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center**, wherein |
| 18(g) | operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, |
| 18(h) | when the lead nail reaches the nosepiece, at least a tip of the lead nail protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. |

HIGHLY CONFIDENTIAL INFORMATION

| Claim 19 | |
|---|---|
| 19. | A nail gun for driving a nail into a work piece, the nail gun comprising: |
| 19(a) | a body; |
| 19(b) | a nosepiece through which nails are ejected, the nosepiece being provided on a lower end of the body; |
| 19(c) | a magazine housing a plurality of connected nails and that disposes said connected nails one at a time to the nosepiece; |
| 19(d) | a striking mechanism that strikes a nail disposed in the nosepiece, the striking mechanism being provided in the body at a position above the nosepiece; |
| 19(e) | a trigger switch that activates the striking mechanism, the trigger switch being provided in the body, |
| 19(f) | **a push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center**, wherein |
| 19(g) | operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward, |
| 19(h) | at least a tip of the nail disposed in the nosepiece protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position, and |
| 19(i) | said magazine is disposed at the position of said tip of the nosepiece. |

### A.    "Push Portion"

32.    I disagree with Mr. Miller's opinion in ¶¶ 36-48 that the JoistPro 150XP does not have a "push portion with an end that is movable following the nosepiece and that is normally positioned in an upper dead center."

33.    Mr. Miller states in ¶ 37 of his report that "[t]he '987 Patent explains that the upper safety portion 20, cam member 21, and lower safety portion 22 are mechanically coupled such that linear movement of the upper safety portion 20 mechanically translates to corresponding linear movement of the cam member 21 and lower safety portion 22."  However, he fails to recognize that the motion of the cam member is not linear, but also rotates as it moves downward when the lower safety portion does not contact a workpiece. This is shown in FIG. 3 and FIG. 11 of the '987 patent. I have annotated FIG. 3 and FIG. 11, coloring the cam member in red and showing the direction of the rotation by the red arrow:

HIGHLY CONFIDENTIAL INFORMATION



FIG. 3
(partial)

FIG. 11
(partial)

34.     Mr. Miller also states "[t]hus, when the trigger 11 is pulled, the mechanical coupling between the trigger 11 and safety portion 12 results in the safety portion 12, including the upper and lower safety portions 20, 22 and cam member 21, moving downward."  Here, he fails to recognize that in the absence of a workpiece, cam member 21 decouples from the lower safety portion 22 as the cam member rotates.  This is what allows the lower safety portion to move downward without allowing trigger actuation if the lower safety were subsequently moved upward.  Mr. Miller's failure to recognize these issues prevented him from correctly concluding not only that the JoistPro 150 XP does in fact have a push portion which fits the court's construction, but also that it functions as taught by the '987 patent.

35.     I also note that Mr. Miller states in ¶ 38 of his report that "[at] a high level, in my opinion the claimed "push portion" is classified as a purely mechanical safety."  Mr. Miller does not define or otherwise explain the meaning of the term "purely mechanical" and further fails to provide a basis for this statement.  It is well known to persons of skill in the art that mechanical

HIGHLY CONFIDENTIAL INFORMATION

systems may include pneumatic elements such as air springs and pneumatic pistons, and hydraulic elements such as hydraulic pistons. For instance, an article title "Principles of Pneumatic Systems" confirms that "Pneumatic systems are mechanical systems that use compressed gasses. They are similar to hydraulic systems, which are mechanical systems that use liquids in the transfer of forces." *See* KHD00007596 (Mano, Carlos. "Principles of Pneumatic Systems" sciencing.com, https://sciencing.com/principles-pneumatic-systems-6614537.html).

36.     I disagree with Mr. Miller's assertion in ¶ 39 of his report that I failed to explain how the identified upper safety portion 20, cam member 21, and lower safety portion 22 in the JoistPro 150XP work together to achieve the function. Based on the Court's claim construction, the function of the "push portion" is "operation of the trigger switch is enabled when the end of the push portion is prevented from moving downward." Here, the "end of the push portion" is the end of the lower safety portion 22.

37.     As I explained in ¶ 136 of my Opening Report, the operation of the trigger switch is enabled when the end of the push portion (*i.e.*, end of lower safety portion 22) is prevented from moving downward. At this point, at least a tip of the nail disposed in the nosepiece is protruding from a tip of the nosepiece and protruding farther in a tip-side direction than the push portion so that the nail tip can be easily aligned with a desired position. The Operating Instructions for the JoistPro 150XP and videos confirm this operation:

> Joist Pro150XP: WORK CONTACT ELEMENT The moveable nose, which acts as the contact trip, is in the "depressed" position at rest to allow visibility of the nail points. When the tip of the nail is placed in the pre-punched metal connector hole and the trigger is pulled, the moveable nose moves out from the tool to detect the work surface. If the moveable nose does not detect the work surface close to the nose of the tool, the tool will not actuate.

*See* KSIT000082 at 85; https://www.youtube.com/watch?v=DebvO2QzSBI (at ~1:00 to ~1:11 and ~3:23 to ~3:58); KSIT00098322 (video showing same); *see also* McCardle Tr. at 120:1-121:4,

## HIGHLY CONFIDENTIAL INFORMATION

132:18-133:22 (describing operation of safety in JoistPro 150XP); KSIT00095901 at 4, 5, 7.  If the lower safety portion contacts a workpiece, thus preventing its further downward motion, the upper safety portion 20 remains in a position to engage the trigger arm 19 and actuate the nailer. However, if the lower safety portion does not contact a workpiece, the lower safety portion moves to a lowered position (since it is biased downward by the pneumatic air spring), which causes the cam surface 22a to move the upper safety portion out of position such that trigger arm 19 is not in a position to actuate the nailer.

38.     Mr. Miller appears to assert that the identified upper safety portion 20, cam member 21, and lower safety portion 22 in the JoistPro 150XP do not perform the claimed function because *additional* pneumatic components and pressurized air are also necessary. As a preliminary matter, it does not appear that Mr. Miller disputes that the upper safety portion 20, cam member 21, and lower safety portion 22 in the JoistPro 150XP are involved in performing the claimed function. Rather, his concern appears to be that additional unclaimed components are required to carry out the function in the JoistPro 150XP. In my opinion, Mr. Miller's reliance on additional components contradicts the Court's claim construction, which requires that the safety portion is mechanically coupled to trigger and does not preclude the inclusion of an additional pneumatic component.

39.     Mr. Miller again argues in ¶¶ 40-42 of his report that pneumatic components are required to operate the claimed safety portion.  However, there is nothing in the '987 patent which precludes the use of pneumatic components since, as explained above, such components are also mechanical in nature.

40.     I also disagree with Mr. Miller's opinion in ¶ 43 of his report that the JoistPro 150XP does not have a cam element between the upper and lower safety portion as required by the Court's construction of "push portion." However, as I addressed in ¶ 137 of my Opening

HIGHLY CONFIDENTIAL INFORMATION

Report, surface 21a on the upper safety portion 20 contacts the cam surface 22a which is always connected to the lower safety portion 22 when the safety mechanism is activated during operation. This contact constitutes a true cam connection, as the motion of cam surface 22a results in the motion of contacting surface 21a which causes the upper safety portion to rotate through sliding contact.  This is precisely what is described in the '987 patent.

41.     I disagree with Mr. Miller that the alleged safety portion 12 is not mechanically coupled to the trigger 11. *See* Miller Rebuttal Rpt. at ¶ 45. As a threshold matter, Mr. Miller provides no support for his assertion that "mechanically coupled" requires more than temporary contact or coupled movement between two components.  As I stated in paragraph 137 of my Opening Report, "mechanically coupled" is not restricted to a continuous mechanical connection, but is generally understood by those skilled in the art as mechanical contact between components when they perform their intended function.  For example, Wikipedia states in its definition of the word "coupling" that "[c]ouplings do not normally allow disconnection of shafts during operation, however there are torque limiting couplings which can slip or disconnect when some torque limit is exceeded." Accordingly, couplings can be temporary or intermittent. Similarly, Dictionary.com defines coupling with respect to machinery as "a device for joining two rotating shafts *semipermanently* at their ends so as to transmit torque from one to the other." *See* KHD00007592 (emphasis added). By way of example, another type of mechanical coupling having temporary engagement includes rail car couplings, which are used to connect rail cars.  When the coupling is engaged, the cars move together. To separate the cars, the coupler is disengaged and the cars can move independently.

HIGHLY CONFIDENTIAL INFORMATION



(*See*  https://upload.wikimedia.org/wikipedia/commons/6/62/Railroad_coupler.agr2.jpg).  These examples further demonstrate that a person of ordinary skill in the art would understand that "mechanically coupled" includes temporary contact or coupled movement between two components.

42.     As I explained in my Opening Report, the safety portion 12 is mechanically coupled to the trigger in the Joist Pro150XP. Specifically, surface 21a on the upper safety portion 20 contacts the cam surface 22a which is always connected to the lower safety portion 22 when the safety mechanism is activated during operation. This contact constitutes a true cam connection, as the motion of cam surface 22a results in the motion of contacting surface 21a which causes the upper safety portion to rotate through sliding contact.

43.     Mr. Miller purports to identify seven differences between the JoistPro 150XP and the teaching of the '987 patent. See Miller Rebuttal Rep. at ¶ 47.  In doing so, however, Mr. Miller either focuses on aspects of the JoistPro 150 XP that are not relevant to the issue of infringement or misconstrue the structure and operation of the JoistPro 150XP.  In summary and as discussed

15

HIGHLY CONFIDENTIAL INFORMATION

above, none of these seven items are different from the teachings of the'987 patent. Accordingly, (1) The JoistPro 150XP's safety mechanism does perform the claimed function;  (2) the JoistPro 150XP's "upper safety portion" is mechanically coupled to the trigger; (3) the JoistPro 150XP's reciprocating safety portion does in fact have a cam;(4) the JoistPro 150XP's actual "upper safety portion" does engage with the trigger arm; (5) the claims do not require that the JoistPro 150XP's cam element purely translate; (6) the JoistPro 150XP's cam element engages the trigger arm and is mechanically coupled to it; and (7) there is nothing in the claims that precludes the JoistPro 150XP's cam element from temporarily separating itself from the lower safety portion, as they are still mechanically coupled as discussed above.

44.     As to the doctrine of equivalents, I disagree with Mr. Miller's accusation in ¶ 48 of his Report that I regurgitate the claim construction provided by the Court and fail to explain how the structure of the JoistPro 150XP is equivalent to the "push portion" structure claimed in the'987 patent.  He states "Dr. Vallee's high level analysis is just a regurgitation of the claim construction provided by the Court and does not explain how the JoistPro 150XP has structure equivalent to the "push portions" structure: "safety portion 12 that is mechanically coupled to trigger 11, the safety portion 12 consisting of upper safety portion 20, cam member 21, and lower safety portion 22."  I disagree.  The safety portion 12 is mechanically coupled to the trigger through its connection between the cam surfaces 22a on the lower safety portion 22, and 21a of the upper safety portion 20.  The surface 12a of the upper safety portion 20 contacts the trigger arm 19 which is pinned to the trigger 11 using pin 18.  He then states "[i]n addition, even at a high-level Dr. Vallee's analysis is improper as the "way" the JoistPro 150XP achieves the claimed function is through the use of pneumatic components whereas the '987 Patent uses purely mechanical components to achieve the function."  I disagree. As discussed above, Mr. Miller contends that the '987 patent requires a

**HIGHLY CONFIDENTIAL INFORMATION**

"purely mechanical" connection, which is incorrect, as the patent does not preclude the use of pneumatic components, and such components are in fact mechanical in nature. It is therefore immaterial whether the safety in the JoistPro 150 XP also includes an additional pneumatic element.

45. As to the "insubstantial differences" test, I explained in my Opening Report why it is immaterial whether the JoistPro 150XP also includes a pneumatic element in performing this function. As noted above and in my Opening Report, the JoistPro 150XP has a "push portion" as required by the Court's claim construction. The fact that the additional components in the tool may contribute to the claimed function (*i.e.*, operation of the trigger switch) does not change the fact that the "push portion" in the JoistPro 150XP also preforms the claimed function.

## VIII.  INFRINGEMENT OF U.S. PATENT NO. 8,118,204

46. As I noted in my Opening Report, it is my opinion that the Fusion F-15 infringes claims 12, 13, and 15 of the '204 patent. In his report, Mr. Miller contends that the only claim limitation missing from the Fusion F-15 is "a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing."

47. Claims 12, 13, and 15 of the '204 patent are reproduced below and I have highlighted the claim limitation that Mr. Miller contends is missing from the Fusion F-15:

| Claim 12 | |
|---|---|
| 12. | A portable fastening tool comprising: |
| 12(a) | a housing; |
| 12(b) | a handle portion extending from the housing in a handle extending direction; |
| 12(c) | a battery pack supporting portion connected to the handle portion; |
| 12(d) | a motor housed in the housing; |
| 12(e) | **a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing**; |
| 12(f) | an ejection unit disposed at a lower end of the housing and configured to guide a nail in an ejecting direction; and |
| 12(g) | a magazine connected to the ejection unit, |

17

HIGHLY CONFIDENTIAL INFORMATION

| 12(h) | wherein the magazine is inclined with respect to the ejecting direction in a side view, the side view being perpendicular to the handle extending direction and the ejecting direction, |
|---|---|
| 12(i) | wherein the magazine is inclined with respect to the handle portion in a bottom view, |
| 12(j) | wherein, in the side view when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine, |
| 12(k) | wherein, in the side view when the ejection unit is placed downwardly, an upper end of the battery pack is positioned lower than an upper end of the housing, and |
| 12(l) | wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion. |

| Claim 13 | |
|---|---|
| 13. | A portable fastening tool comprising: |
| 13(a) | a housing; |
| 13(b) | a handle portion extending from the housing in a handle extending direction and having a central axis; |
| 13(c) | a battery pack supporting portion connected to the handle portion; |
| 13(d) | a motor housed in the housing; |
| 13(e) | a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing; |
| 13(f) | an ejection unit disposed at the lower end of the housing and configured to guide a nail in an ejecting direction; and |
| 13(g) | a magazine connected to the ejection unit, |
| 13(h) | wherein the magazine is inclined with respect to the ejecting direction in a side view, the side view being perpendicular to the handle extending direction and the ejecting direction, |
| 13(i) | wherein the magazine is inclined with respect to the handle portion in a bottom view, |
| 13(j) | wherein, in the side view when the ejection unit is placed downwardly, a part of the extending portion being positioned below the handle portion and overlapping with the magazine, |
| 13(k) | wherein the central axis of the handle portion is inclined with respect to the ejecting direction, |
| 13(l) | wherein, in the side view when the ejection unit is placed downwardly, an upper end of the battery pack is positioned lower than an upper end of the housing, and |
| 13(m) | wherein, in the side view when the ejection unit is placed downwardly, a center of the battery pack is positioned lower than the central axis of the handle portion. |

| Claim 15 | |
|---|---|
| 15. | The portable fastening tool as set forth in claim 13, wherein, in the side view when the ejection unit is placed downwardly, the motor is positioned lower than the handle portion. |

HIGHLY CONFIDENTIAL INFORMATION

### A. "A battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing"

48.     In my opinion, Mr. Miller has incorrectly interprets the battery pack supporting portion on the FUSION F-15 tool.  As I note in my Opening Report, it is my opinion that the "battery pack supporting portion" is met by the component in the FUSION F-15 identified by part no. YK0848. *See* Vallee Opening Rpt. at ¶79. I have reproduced below various annotated figures from my Opening Report which identify the battery back supporting portion, handle portion, and housing on the FUSION F-15.  *See id.*



HIGHLY CONFIDENTIAL INFORMATION



49.     Conversely, Mr. Miller identifies the battery pack supporting portion as a much larger area of the FUSION F-15 tool.  *See* Miller Rebuttal Rpt. at ¶ 56.  I have reproduced an image below which shows the area of the FUSION F-15 tool that Mr. Miller identifies as the "battery pack supporting portion." *See id.*

20

HIGHLY CONFIDENTIAL INFORMATION



50.    Mr. Miller's designation of the battery pack supporting portion on the FUSION F-15 is incorrect for multiple reasons. Mr. Miller attempts to import limitations from the patent specification that are not included in the claims. Mr. Miller's interpretation of the term "battery pack supporting portion" is a clear attempt to limit the definition of the term to the specific embodiment shown in FIG. 2 of the '204 Patent. *See* Miller Rebuttal Rpt. at ¶¶ 57-58. When interpreting claim terms, it is my understanding that importing limitations from the specification is impermissible.

51.    Furthermore, when interpreting claim terms, it is my understanding that while the written description is important, one must also look to the claim language itself and the prosecution history. The claims require only that the "battery pack [is] supported by the battery pack supporting

HIGHLY CONFIDENTIAL INFORMATION

portion." *See* '204 Patent at claim 12.  Importantly, the claim language does not define the shape of the battery pack supporting portion. Accordingly, one of skill in the art would understand that the battery pack supporting portion must simply support the battery.

52.    Mr. Miller indicates that his interpretation is correct because there are multiple unasserted claims that recite a "battery pack supporting portion [that] has a portion which elongates below the handle portion" and "the magazine is connected to said portion of the battery pack supporting portion which elongates below the handle portion." *See* Miller Rebuttal Rpt. at ¶ 59; '204 patent at claims 1, 5, 6, 7, 10, and 11. It is my opinion that these unasserted claims actually support my interpretation of the battery pack supporting portion and conflict with Mr. Miller's interpretation.  It is my understanding that other claims in a patent can be informative, because claim terms are normally used consistently throughout the patent.  Furthermore, I understand that language in a claim should not be construed so as to render claim language superfluous. I understand that these concepts is akin to the rule of claim differentiation.  It is my opinion that Mr. Miller's interpretation of the term battery pack supporting portion would render the additional limitations found in claims 1, 5, 6, 7, 10, and 11 (identified above) to be superfluous.  For instance, as shown in the annotated figure from Mr. Miller's Rebuttal Report below, Mr. Miller's battery pack supporting portion already contains "a portion which elongates below the handle portion," thus rendering this limitation in claim 1 superfluous. *See* Miller Rebuttal Rpt. at ¶ 65.

HIGHLY CONFIDENTIAL INFORMATION



53.     Furthermore, I can infer from Koki's decision not to assert claims 1, 5, 6, 7, 10, and 11, that it did not believe that the FUSION F-15 infringed these claims. This further supports my interpretation of the battery pack supporting portion and conflicts with Mr. Miller's interpretation.

54.     The "battery pack supporting portion" identified in my Opening Report is consistent with these determinations, which are supported by the claims and prosecution history. First, the battery pack supporting portion actually supports the battery.  Though not identified in Mr. Miller's report, the battery pack contains an upper lip, which is received by and rests on top of the battery pack supporting portion. Below I have provided images of the upper lip on the battery pack (green) and the receiving portion (red) on the battery pack supporting portion.

23

HIGHLY CONFIDENTIAL INFORMATION



55.     My interpretation is also supported by the prosecution history cited in Mr. Miller's

Report.  *See* Miller Rebuttal Rpt. at ¶¶ 57-58.  Specifically, during prosecution, Koki explained

that "one of skill in the art would readily understand that a battery pack, which is detachable, is

**HIGHLY CONFIDENTIAL INFORMATION**

attached to the *handle* through an attachment portion, which is a battery pack supporting portion." *See* Office Action Response dated Sept. 16, 2011 at 4 (emphasis added).  From this disclosure, it is my opinion that the battery pack supporting portion provides a connection point between the battery pack and the handle portion.

56.     The battery pack supporting portion provides a connection point between the battery pack and the handle portion.  This connection point is identified in my Opening Report at paragraph 79.  I have reproduced images from my Opening Report below, which identify the connection point.



57.     Furthermore, as described in my Opening Report, the battery pack has an extending portion that extends from the housing as the battery pack extending portion is connected directly to the housing via the grooves identified by Mr. Miller in ¶ 64 of his report (reproduced below).



58.     Additionally, one of skill in the art would appreciate that designation of the battery

pack supporting portion should not be by "arbitrary and non-existent boundaries."  *See* Miller

Rebuttal Rpt. at ¶ 52.  Accordingly, one of skill in the art, when identifying the battery pack

supporting portion, would look to concrete boundaries, discrete components, or other delineations

between components or portions of components. As discussed above, the battery pack supporting

portion has a clearly defined boundary which acts to restrain the motion of the battery pack and

position it in a fixed location on the tool when the battery is locked into place upon installation.

59.     Mr. Miller's interpretation of the battery pack supporting portion suffers from this

"arbitrary" designation.  Specifically, Mr. Miller's interpretation provides no indication to one of

skill in the art to determine where the battery pack supporting portion ends, and the handle portion

HIGHLY CONFIDENTIAL INFORMATION

begins.  This arbitrary designation is best demonstrated in paragraph 65 of Mr. Miller's Rebuttal

Report, reproduced below.



60.     Conversely, one of skill in the art would appreciate that FUSION F-15 component

identified by part no. YK0848 (shown in red in the figure below) contains a clear delineation of

the battery pack supporting portion.



27

**HIGHLY CONFIDENTIAL INFORMATION**

61.     I also note that Mr. Miller indicates that the interpretation of the housing and handle portion boundaries contained in my Opening Report are "arbitrary."  *See* Miller Rebuttal Rpt. at ¶ 52.  However, one of skill in the art would appreciate that these boundaries are defined based on the internal mold lines contained on the interior of the housing and handle portions respectively.  I have reproduced figures of the FUSION F-15 showing the boundaries between these two claim elements and the internal mold lines.  One of skill in the art would appreciate that this is an appropriate method for identifying delineations between attached components.  These delineations also serve additional functions.  For example, they can serve to protect the internal components from outside debris entering the interior of the tool and can act as a barrier between internal electrical components which may become dislodged under heavy impact, such as that caused by a drop or other wear and tear that occurs in the typical work environment of the tool.  It also serves to reinforce the boundary between structures. Furthermore, this is a cost effective method of joining these structures, since it is much less expensive to use a single mold to mold and connect multiple separate structures than to use many separate molds to form separate structures which must then be fastened together in some other way.



HIGHLY CONFIDENTIAL INFORMATION



Mold line used to determine boundary

62.     Mr. Miller's comparison of the FUSION F-15, a battery powered nailer, with the JoistPro 150XP, a pneumatic nailer, is irrelevant.  *See* Miller Rebuttal Rpt. at ¶¶ 60-61. For various reasons, the design considerations for battery powered nailers are quite different than those for pneumatic nailers.  For example, the housing and handle portions of a battery-powered nailer serves the function of routing and securing electrical and electromechanical components within the tool, whereas the housing of a pneumatic nailer contains no such electrical or electromechanical components, but must instead act as a pneumatic accumulator.  The housing and handle of a pneumatic nailer must therefore conform to standards associated with pressure vessels (*see e.g.*, KHD00007578 (ANSI SNT101 2002)).

63.     Furthermore, Mr. Miller indicates that identifying the "battery pack supporting portion" as "the entire widened structure at the base of the handle . . . makes sense since this widened structure exists *solely* for the purpose of interfacing with and supporting the battery pack." Miller Rebuttal Report at ¶ 60 (emphasis added).  This is incorrect.  Mr. Miller neglects the fact that in a battery powered nailer, such as the Senco FUSION F-15, Hitachi NT1865DMA, and Hitachi NT1890DC, the motor is housed in a front portion of the housing which is relatively parallel to the handle portion.  This front portion of the housing must connect to the handle portion,

and therefore, the "widened structure at the base of the handle" must exist regardless as to whether this is the connection portion for the battery or not. I have reproduced annotated portions of the FUSION F-15 nailer below which show the motor (green), handle portion (yellow), and front portion of the housing (blue).



64. Accordingly, it is my opinion that Mr. Miller's interpretation of the term "battery pack support portion" is incorrect. For these reasons and the reasons indicated in my Opening Report, it is my opinion that the FUSION F-15 includes a battery pack supported by the battery pack supporting portion, the battery pack having an extending portion extending from the housing, and therefore, infringes claims 12, 13, and 15 of the '204 patent.

IX.     **INFRINGEMENT OF U.S. PATENT NO. 7,325,709**

65. As I noted in my Opening Report, it is my opinion that the FramePro 325FRHXP and FramePro 325XP infringe claims 1, 3, 4, 5, 8, 9, 10, and 14 of the '709 patent. In his report,

**HIGHLY CONFIDENTIAL INFORMATION**

understand that it would be far less expensive to join two walls within a single extrusion than to use fasteners, welding or some other additional operation to join the walls.

## X.        CONCLUSION

76.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 24, 2020.

Glenn E. Vallee, Ph.D., P.E.

# EXHIBIT 12

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF DELAWARE

2

3

4    KOKI HOLDINGS, CO., LTD.,        )

                                      )

5                    Plaintiff,       )

                                      )

6          -vs-                       )C.A. No. 18-313-CFC

                                      )

7    KYOCERA SENCO INDUSTRIAL         )

     TOOLS, INC.,                     )

8                                     )

                     Defendant.       )

9

10

11              HIGHLY CONFIDENTIAL

12

13          Videotaped remote deposition of GLENN VALLEE,

14   Ph.D. taken before CAROL CONNOLLY, CSR, CRR, and Notary

15   Public, pursuant to the Federal Rules of Civil Procedure

16   for the United States District Courts pertaining to the

17   taking of videotaped remote depositions, commencing at

18   8:57 a.m. on the 3rd day of June, A.D., 2020.

19

20

21

22

23

24

HIGHLY CONFIDENTIAL

Page 2

```
 1           There were present at the taking of this
 2   deposition the following counsel:
 3           MCDERMOTT, WILL & EMERY by
             MR. AMOL PARIKH and (via Zoom)
 4           MR. THOMAS DaMARIO (via Zoom)
             444 West Lake Street
 5           Suite 4000
             Chicago, Illinois  60606
 6           (312) 372-2000
             aparikh@mwe.com
 7           tdamario@mwe.com
 8               appeared on behalf of the Plaintiff;
 9
10           VEDDER PRICE, P.C. by
             MR. DAVID BERNARD and (via Zoom)
11           MR. ROBERT S. RIGG (via Zoom)
             222 North LaSalle Street
12           Chicago, Illinois  60601
             (312) 609-7500
13           dbernard@vedderprice.com
             rrigg@vedderprice.com
14
                 appeared on behalf of the Defendant.
15
16   ALSO PRESENT:
17           Mr. Dave Young, Videographer
18           Mr. Kevin Miller
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL

Page 3

1                    I N D E X

2    VIDEOTAPED REMOTE DEPOSITION OF GLENN VALLEE, Ph.D.

3                  TAKEN June 3, 2020

4

5    EXAMINATION BY                                PAGE

6    Mr. Bernard                                    6

7

8

9                  - - - - - - - -

10

11                  EXHIBITS MARKED

12                                                 PAGE

13   Exhibit 1          Glenn Vallee opening        11
                        report
14
15   Exhibit 2          Glenn Vallee rebuttal       23
                        report
16
17   Exhibit 3          Glenn Vallee reply          24
                        expert report
18
     Exhibit 4          Glenn Vallee supplemental   24
19                      expert report
20   Exhibit 5          U.S. Patent No. 8,118,204   26
21   Exhibit 6          U.S. Patent No. RE42,987    27
22   Exhibit 7          U.S. Patent No. 7,325,709   27
23   Exhibit 8          U.S. Patent No. 7,156,012   28
24   Exhibit 9          U.S. Patent No. 7,398,647   29

HIGHLY CONFIDENTIAL

Page 4

| | | | |
|---|---|---|---|
| 1 | Exhibit 10 | File History | 67 |
| 2 | Exhibit 11 | Rebuttal Expert Report of | 77 |
| | | Kevin Miller Regarding | |
| 3 | | Noninfringement | |
| 4 | Exhibit 12 | U.S. Patent No. 5,830,338 | 98 |
| 5 | Exhibit 13 | U.S. Patent No. 4,509,668 | 98 |
| 6 | Exhibit 14 | U.S. Patent No. 5,720,423 | 123 |
| 7 | Exhibit 15 | U.S. Patent No. D440,136 | 123 |
| 8 | Exhibit 16 | U.S. Patent No. 5,816,469 | 139 |
| 9 | Exhibit 17 | U.S. Patent No. 2001/0009260 | 152 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

HIGHLY CONFIDENTIAL

Page 37

1    blow my nose.  It's allergy season.

2            Okay.

3        Q    So going back to how you're defining mold line,

4    it's your opinion that a mold line can appear even though

5    a -- I'd like to refer to your reply expert report, which

6    is Exhibit 3.

7        A    Okay.

8        Q    And page 28 of Exhibit 3, please.

9        A    Okay.

10       Q    And in paragraph 61 you discuss internal mold

11   lines contained on the interior of the housing and handle

12   portion respectively.  Do you see that?

13       A    Where is this now?

14       Q    Four lines down on paragraph 61.

15       A    Okay.

16            I see it.

17       Q    Actually, Doctor, I'd like to go back to your

18   opening report, Exhibit 1, please.

19       A    Okay.

20       Q    In that I'd like to refer you to page 27 in

21   paragraph 79 of Exhibit 1.

22       A    Okay.

23       Q    And in paragraph 79 and the images following

24   that on pages 28 and 29, you identified battery pack

HIGHLY CONFIDENTIAL

Page 38

1     supporting portion, correct?

2         A     Correct.

3         Q     And that battery pack supporting portion

4     several images is highlighted in red, correct?

5         A     Yes, the figure middle right is red, the

6     colors -- the black part color is really difficult to

7     see, but, yeah, that's red.

8         Q     What's the function of this component in red on

9     the --

10         COURT REPORTER:  I'm sorry, Counsel.  Could you

11     repeat that?

12         MR. BERNARD:  What is the function of this component

13     identified in red in the Fusion F-15 figure?

14         A     I'm going to refer back to the patent now.  I

15     also have the patent on the screen.  Just like it states

16     in Claim 1, element B -- sorry, F, it supports the

17     battery pack.

18         Q     I'm not asking about a claim element.  I'm

19     asking about what this component that you identified as a

20     battery pack supporting portion is as well as what the

21     function of that is.

22         A     Then it's not in the claims.  Are you referring

23     to the specification?

24         Q     I'm referring to the Fusion F-15 nailer that

HIGHLY CONFIDENTIAL

Page 39

1    you define in red.

2         A    I see.  The function is to prevent -- the

3    making an electrical connection with the battery and

4    supporting it in the vertical direction.  There is a --

5    when I say vertical -- I'm sorry -- it's a tool where a

6    point is so that the drive axis is vertical, that would

7    be the vertical direction.

8         Q    When you say the drive axis is vertical, you're

9    referring to using the nailer in on a horizontal surface

10   pointing downward, is that correct?

11        A    Yes, pointing downward.  I have a picture here

12   if you bear with me that I think explains it more

13   clearly.  Bear with me while I find the right section of

14   the proper report.

15             Okay.  I am in -- please remind me after this

16   question I'll write the exhibit numbers down, please.

17        Q    Yes.

18        A    I'm on the reply expert report, which I might

19   as well write it down, which is which exhibit?

20        Q    It's Exhibit 3.

21        A    3.  Okay.  I am on page 24 where you see the

22   two lower figures, and in red it says receiving error for

23   battery pack, I call it an upper lip.  So it supports the

24   battery in the vertical direction by contact between the

HIGHLY CONFIDENTIAL

Page 40

1    nailing portion and the battery, and that area I circle

2    in the figure on the right.  So that's how it supports

3    the battery, connects electrically and supports it there.

4         Q    So is the battery pack -- it mentions a battery

5    pack upper lip in identifying support for that battery

6    pack vertically in the orientation of a downward driving

7    motion.  Does it support the battery pack horizontally or

8    any other direction, that same orientation?

9         A    Well, the upper left contacts the lower surface

10   vertically, and the connection, the way it's connected

11   can also support it -- Let me put it this way.  If the

12   support portion were -- which is connected to the handle

13   were the only means of support, then it would support it

14   vertically, and it's likely it would keep it from moving,

15   from rotating outward from the back of the tool because

16   of the grooves in the electrical connection.

17        Q    So --

18        A    I'm sorry.  Go ahead.  I'm done.

19        Q    The grooves and the electrical connection also

20   support the battery pack?

21        A    What -- if there were no -- for example, the

22   body, the housing has grooves in the rear, I believe that

23   is the main means of preventing the battery from falling

24   backward, but in the absence of those -- what I'm saying

HIGHLY CONFIDENTIAL

Page 41

1    I believe is that the battery support portion would also

2    do that.

3        Q    We'll move to page 26 of your expert report,

4    Exhibit 3.

5        A    Page 26.  Okay.

6        Q    Do you see there's images on that screen, on

7    that page, correct?

8        A    Correct.

9        Q    These images were reproduced from Mr. Miller's

10    -- Mr. Miller's expert report, correct?

11        A    I believe so, yes.

12        Q    And in this -- in these images there are

13    grooves and tongues identified.  Do you see that?

14        A    I see -- yes, I do.

15        Q    Now, are those the grooves that you were

16    previously discussing that are the main means of

17    preventing the battery from falling backwards?

18        A    It's difficult to see in the figure because

19    it's black.

20            I'm going to just -- I'm going to just quickly

21    go back to the frame what I was discussing when I get to

22    that paragraph.

23            Okay.  I'm sorry.  Your question was again?

24        Q    Are the grooves shown on page 26 of Exhibit 3

HIGHLY CONFIDENTIAL

Page 42

1    the main means of preventing the battery from falling

2    backwards that you discussed previously?

3         A    Well, as I said, the support portion also has

4    the ability to prevent the battery from falling

5    backwards.

6         Q    Okay.  And I'll ask my question again.  Are the

7    grooves shown on page 26 of Exhibit 3 the main means of

8    preventing the battery from falling backwards as you

9    discussed previously?

10        MR. PARIKH:  Objection, vague, mischaracterizes

11   testimony.

12        THE WITNESS:  The grooves that are indicated in

13   Mr. Miller's figure are a means to prevent it from

14   falling backwards.  Not necessarily the primary means.

15   It all depends on the clearances between the mating part

16   in the battery and the grooves and what the fit is on the

17   support portion.  For example, if the grooves -- how can

18   I put this?

19             If the clearance between the connection of the

20   electrical portion and the classic part that surrounds

21   the electrical portion, how they slide into the support

22   portion, which is the red piece we talked about -- in

23   Mr. Miller's report it's the black piece -- in my

24   opinion, if that tight is fitter than the fit between the

HIGHLY CONFIDENTIAL

Page 43

1    grooves and the mating part in the battery then the

2    grooves really wouldn't play much of a role other than

3    perhaps when the tool -- the impact of the tool forces

4    the battery to try to vibrate, and without them -- I'm

5    not going to say that's the primary meant that prevents

6    the rearward motion.   It can be a means of preventing the

7    rearward motion.

8         Q    In the absence of those grooves on the Fusion

9    F-15 nailer, you agree that the only means that would be

10   preventing the -- I'm going -- I think the orientation is

11   important for these questions.  So for these next couple

12   of questions can we agree that when I'm talking about

13   orientation of the tool both vertical and horizontal, I'm

14   talking about the orientation of the tool as if you were

15   firing downward on a horizontal surface?

16        A    That's the drive axis is vertical, correct,

17   okay.

18        Q    Okay.  So in the absence of these grooves shown

19   on page 26 of Exhibit 3, on the Fusion F-15 nailer, what

20   would be the means that are preventing the battery pack

21   from sliding horizontally?

22        A    In the absence of the grooves, are you saying

23   that there are no grooves and therefore no interlocking

24   parts on the battery?

HIGHLY CONFIDENTIAL

Page 44

1      Q      Correct.

2      A      Well, in the absence of the grooves that the

3   rear surface of the housing which is the very outside

4   portion of the housing can also prevent rotation so it

5   can't move horizontally because the battery support

6   portion maintains a vertical orientation but the battery

7   -- if all we're doing is taking the grooves out, then

8   battery still contacts the rear of the housing, so that

9   would provide kind of like a stop to prevent it from

10   rotating backwards.

11      Q      That prevents from moving horizontally in the

12   direction towards the housing of the nailer.  Does that

13   prevent it from moving towards -- the battery pack from

14   moving horizontally away from the housing of the nailer?

15      A      That contact can.  Again, this all depends on

16   what the fits are, but it can prevent it from rotating

17   back.

18      Q      If the grooves as identified on page 26 of

19   Exhibit 3 were removed from the Fusion F-15 nailer, do

20   you believe the Fusion F-15 nailer could be commercially

21   available?

22      MR. PARIKH:  Objection, incomplete hypothetical.

23      THE WITNESS:  I'm sorry.  One more time with that

24   question, please.  I was finding the figure while you

HIGHLY CONFIDENTIAL

Page 54

1          Q    Do you have the --

2          COURT REPORTER:  I'm sorry.

3          MR. BERNARD:  Q  Do you have a physical sample of

4     that Fusion 15 nailer available?

5          A    I believe I still have one.  I think I have

6     one.

7          Q    And if you reviewed that, would you be able to

8     determine whether the image shown -- and if you reviewed

9     the physical sample, the Fusion F-15 nailer, would you be

10    able to determine whether the motor casing extends past

11    the -- to the right of the green line shown on the left

12    image on page 36 of Exhibit 1?

13         A    Yes.

14         Q    Would you be willing to do that during a break?

15         A    Sure.

16         MR. PARIKH:  I'm going to object to that, Dave.  He

17    can if you want him to grab the tool during the break,

18    that's fine, but if you're going to ask questions and

19    examine the tool, we're going to do that the record.

20         MR. BERNARD:  Let's keep going.  We'll do that with

21    the tool sometime later.

22         MR. PARIKH:  That's fine.

23         Q    Dr. Vallee, I'd like to refer you to Exhibit 5

24    which is the '204 patent.

HIGHLY CONFIDENTIAL

Page 55

1      A    Okay.

2      Q    Figures 1 through 4 of this patent show various

3   views of a single embodiment of a power nailer.

4      A    I didn't catch the first -- what 1 through 4?

5      Q    Figures 1 through 4 of the '204 patent show

6   various views of a single embodiment of a power nailer,

7   is that correct?   If it would help looking at Columns 3

8   -- looking at Column 3, lines 15 through 20 of the '204

9   patent discusses those figures.

10     A    I was looking at the description of the

11  drawing, yes, they do.

12     Q    Figures 1 and 2 show the external -- Let me

13  start over.

14          Figures 1 and 2 show the outside of the power

15  nailer, correct?

16     A    As opposed to any internal components you mean?

17     Q    Yes.

18     A    Of the exterior, yes.   The side view is

19  Figure 1 and bottom view is figure 2.

20     Q    And in contrast 3 shows the exterior component

21  of the power nailer, correct?

22     A    Figure 3 is a section view of the nailer.

23     Q    Looking at Figure 1, reference number 2C is

24  pointing to the housing side of a portion of the Figure 1

HIGHLY CONFIDENTIAL

Page 56

1   nailer, is that correct?

2        A    Wait a minute.

3        MR. PARIKH:  Objection, mischaracterizes the

4   document.

5        THE WITNESS:  I thought 2C referred to the interior.

6   I'm just going to look at the specification for a second.

7   I need the close up reading glasses.  2C is the battery

8   pack supporting position.  I'm looking at specification

9   Column 3, line 35, if a trailing end portion of the

10  handle portion to the, correct, the free end portion on

11  the side opposed to the trunk portion 2A, of the housing

12  2, moreover, there is disclosed a battery pack 3 attached

13  to the end of the handle portion 2B to the battery pack

14  supporting portion 2C, which is in the interior of the

15  two.  This is why Figure 3, the section view, you can see

16  it.  That's got the electrical connections, and that's

17  the support portion.

18       MR. BERNARD:  Q  Is Figure 1 showing the electrical

19  connection to where 2C is showing?

20       A    My understanding they're pointing to like an

21  interior component.  Let me go to the description

22  Figure 1.  2C is an interior component.

23       Q    Where does it say that in the '024 patent?

24       A    Well, you can't have a section view like

HIGHLY CONFIDENTIAL

Page 57

1   Figure 3 showing it clearly labeled 2C and having 2C on

2   the outside as well.

3        Q    Why can't it be the inside and outside

4   components?

5        A    Because you took a section view of it, and you

6   can in outline of the components that's the outline, it

7   doesn't extend to the exterior.  You can see -- if you

8   just look at Figure 3, you can see the housing above that

9   component 2C.  For the sake of argument, let's say it's

10  basically a square shape it's pointing to.  You can see

11  the wall -- I'm sorry -- not the housing, the handle.

12  You can see the wall of the handle above that, therefore,

13  it would block your view.  It's got to be interior.

14       Q    Does the 2C reference number in Figure 1 point

15  to an interior component of the tool?

16       MR. PARIKH:  Objection.

17       THE WITNESS:  A material component of the tool, is

18  that correct?

19       MR. BERNARD:  Q  Yes.  Interior.  I'm sorry.  I'm

20  looking at the transcript.

21       A    Let's start again.

22       Q    Does the 2C -- Does the 2C reference number in

23  Figure 1 point to an interior of the tool?

24       A    Does the -- I'm in Column 3, around line 37,

HIGHLY CONFIDENTIAL

Page 58

1    there was -- there was exposed a battery pack 3 for

2    battery pack supporting portion 2C.  So it's an exterior

3    view but indicating where an interior component is.

4         Q    Dr. Vallee, looking at Figure 3, you'll see

5    lots of interior components on the tool area by reference

6    numbers.  Do you see those, for example, reference

7    number 7 and 10?

8         A    7 and 10, yes.

9         Q    Are reference number 7 and 10 identified on

10   Figure 1 and 2?

11        A    Well, no, but just they're not identified on

12   that figure they just don't want to discuss those.

13        Q    Can you see the interior 7 and 10 on Figures 1

14   and 2?

15        A    No.  My point is you can -- you can on a

16   drawing -- you can identify the general location of an

17   interior component without having a section view, that's

18   not a requirement.

19        Q    Are you finished now?

20        A    I'm sorry.  Yes, I'm done.

21        Q    Where in this 204 patent does it say that 2C

22   only points to an interior component of the tool?

23        MR. PARIKH:  Objection, asked and answered.

24        THE WITNESS:  It indicates it by showing you the cut

HIGHLY CONFIDENTIAL

Page 59

1    away of the section view in Figure 3 indicating it's an

2    interior component.  It's clear from Figure 3 that it's

3    an interior component.  It does not say verbatim what it

4    is.  It's when you look at Figures 1 and 3 then you know

5    that it's an interior component.  Anyone -- an engineer

6    who looked at these two drawings would say, you know,

7    it's an interior component because I see it, I see the

8    entire part clearly outlined in Figure 3 and it indicates

9    where it is in Figure 1.

10       MR. BERNARD:  Q    Is the part identified in Figure 3

11   shown in Figures 1 and 2?  Let me start over.

12            Is the part identified as 2C in Figure 3 shown

13   in Figures 1 and 2?

14       A    The component itself is shown in Figure 3 and

15   its general location is indicated in Figure 1.

16       Q    Is it your opinion that the battery pack

17   support portion can only be --

18       COURT REPORTER:  I'm sorry, Counsel.  Can you repeat

19   that?

20       MR. BERNARD:  Is it your opinion that the battery

21   pack supporting portion can only be a single component of

22   the tool?

23       A    Well, if we look at the claim, for example --

24   I'll go to -- Bear with me.  The claims only require that

HIGHLY CONFIDENTIAL

Page 60

1    the battery pack supporting portion is connected to the

2    handle portion and that the battery pack supported by the

3    battery pack supporting portion, the battery pack having

4    an extending portion -- okay.  So there's nothing there.

5           I'm sorry.  One more time your question

6    specifically was?

7    MR. BERNARD:  Q   Is it your opinion that the

8    battery pack supporting portion can only be a single

9    component of the tool?

10   A    Well, in the claim it just calls it for a

11   battery pack supporting portion.  The specification --

12   when I read the specification it's a -- it's a structure,

13   it's identified with a label and a number, and it's a

14   particular kind of structure that's going to support the

15   battery.  It doesn't indicate there are multiple

16   batteries support portion.  It says there is a battery

17   pack supporting portion.  So the structure that creates

18   the supporting portion, it does not say there are

19   multiple ones.

20   Q    So is it your opinion that the battery pack

21   supporting portion can only -- it's limited -- Let me

22   start over.

23          So is it your opinion that the battery pack

24   supporting portion can only be a single component of the

HIGHLY CONFIDENTIAL

Page 61

1   tool?

2        MR. PARIKH:  Objection, mischaracterizes testimony.

3        THE WITNESS:  Basically my opinion is exactly what

4   the claim said.  There is a battery pack supporting

5   portion connected to the handle portion.

6        MR. BERNARD:  Q   It's a yes-or-no question,

7   Dr. Vallee.  Is it your opinion that the battery pack

8   supporting position can only be the supporting component

9   of the tool?

10       MR. PARIKH:  Objection, calls for a legal

11  conclusion.

12       THE WITNESS:  Again, my answer was the battery pack

13  -- Let me back up a little.  When we discussed the

14  battery pack supporting portion in the Fusion nailer, I

15  indicated that it was the black structure that had the

16  electrical connectors in it.  So while there were

17  different pieces to the supporting portion, the portion

18  itself is its own structure.  I think we're getting tied

19  up with what I'm calling a structure and you're calling a

20  component.  There is one battery pack supporting portion

21  in the nailer, that's what the claims say and the

22  specification.  Nothing indicates that there's anything

23  different.

24       MR. BERNARD:  Q  Is it your opinion that the battery

HIGHLY CONFIDENTIAL

Page 62

1   supporting portion can be made up of multiple components

2   of the tool?

3        MR. PARIKH:  Objection, vague, calls for a legal

4   conclusion.

5        THE WITNESS:  My opinion that there is a battery

6   pack supporting portion described in the specification

7   and in the claim.

8        MR. BERNARD:  Q   That wasn't an answer to my

9   question, Dr. Vallee.

10           Is it your opinion that the battery pack

11  supporting portion can be made up of multiple components

12  of the tool?

13       MR. PARIKH:  Same objection.

14       THE WITNESS:  As I just explained, you can have

15  different parts that are inside the supporting portion to

16  help it do its job, but the single supporting portion is

17  what supports the battery pack.

18       MR. BERNARD:  Q   So the different parts are

19  different components in multiple components of the

20  battery pack supporting portion, correct?

21           A    The purpose of the supporting portion is to

22  support the battery.  If that portion happens to have

23  electrical connectors in it, then that would be an

24  additional component, yet that component doesn't

HIGHLY CONFIDENTIAL

Page 63

1    necessarily support the battery.  Do you see what I'm

2    saying?

3        Q    I don't.

4        A    I'm not intentionally trying to be vague.  I'm

5    trying to explain the battery portion supports the

6    battery.  The specification and claims identify what it

7    does.  The battery which is supported also has an

8    electrical connection that has to be made.  That occurs

9    inside the supporting portion.  But the portion itself --

10   there's one portion which is that support portion that

11   does the job of supporting the nail -- not the nail, the

12   battery.  It can have other parts in it, but the

13   supporting portion is one item.  I don't know if there's

14   anything else I can add to that.

15       Q    I think that helps, sir.  So it's your opinion

16   that the battery pack supporting portion, actual part

17   that supports the battery pack, can only be made up of a

18   single component, is that correct?

19       MR. PARIKH:  Objection, mischaracterizes testimony.

20       THE WITNESS:  No.  What I said was that battery pack

21   portion can have different components in it.  That's what

22   I was thinking.

23       MR. BERNARD:  Q   Wouldn't it perform the function

24   of supporting the battery pack, is that what you're

HIGHLY CONFIDENTIAL

Page 64

1    saying?

2        MR. PARIKH:  Objection, mischaracterizes testimony.

3        THE WITNESS:  The support portion is what supports

4    the battery.  Okay.  It keeps it in its position.  It has

5    other electrical connections inside it that don't

6    necessarily -- whose purpose is to electrically connect

7    the battery.  So the supporting portion which supports

8    the battery can have other components in it, but there's

9    one battery pack support portion.  That's what the

10   specification says, that's what 2C is, and that's what

11   the claims say.

12       MR. BERNARD:  Q   I'd like to refer you to Claim 3

13   of the '204 patent, Column 6 of Exhibit 5.

14       A    As I recall, it wasn't one of the asserted

15   claims, correct?

16       Q    Correct.

17       A    Okay.  I'm sorry.  You said 3?

18       Q    Actually.  The Claim 6.  Actually it's at the

19   top of Column 7.

20       A    Okay.

21       Q    Do you see it says the tool as set forth in

22   Claim 1, wherein the magazine is connected to a side

23   portion of the battery pack supporting portion?  Do you

24   see that?

HIGHLY CONFIDENTIAL

Page 70

1      A    Yes.

2      Q    Do you know is it your understanding that this

3   indicates that Figure 1 shows the battery pack supporting

4   portion 2C?

5      A    It shows it as referring to it as an interior

6   component.  In other words, if Figure 1C indicates from a

7   side view the battery pack supporting portion 2C, so it

8   points to, hey, guys, it's inside here, inside the

9   handle, and then Figure 3 actually shows a cut away

10  showing where it is, which I believe is what I testified

11  to earlier.

12     Q    Let's go to the next page of Exhibit 10, which

13  is labeled KHD 001092.

14     A    Okay.

15     Q    There's a figure that's circled -- a circle in

16  the annotation that's labeled elongated according to the

17  battery pack 3 and battery pack supporting portion 2C.

18  Do you see that?

19     A    I do.

20     Q    Does the elongated portion of the battery pack

21  supporting portion 2C extend beyond the component

22  specifically identified as 2C in Figure 3?

23     A    That shows in that -- the dash ellipse

24  elongated portion of the battery pack 3, so it shows that

HIGHLY CONFIDENTIAL

Page 71

1    elongated portion, and the supporting portion 2C, which

2    is cross-hatched.  That actually indicates a --

3    delineates it from the handle so you can see it's inside.

4    So it shows an elongated battery pack and the interior

5    supporting portion.

6         Q    The cross-hatching that identifies the battery

7    pack supporting portion 2C extends below that rectangular

8    component that is specifically labeled as 2C, correct?

9         A    I'm going to blow this up a little bit.  So the

10   cross-hatching goes -- overlaps the battery portion of

11   the battery pack.  I'm just rereading the previous

12   paragraph on page 5.  Are we toward the middle of the

13   file history here?  I really don't want to touch this to

14   see where we are.

15        Q    Of the PDF, we're on the page 354 of 386.  Near

16   the end.

17        A    It's near the end, okay.  That crosshatch

18   appears to be 2C with a portion of the handle elongated

19   below.  So they're pointing to the portion below, below

20   the end of 2C that seems to meet with a portion of the

21   elongated portion of the battery pack.

22        Q    So the battery pack supporting portion 2C

23   extends below that square or rectangular component that

24   is that the 2C reference numbers specifically point to,

HIGHLY CONFIDENTIAL

Page 72

1   correct?   I'm referring to the Figure 3 that's shown.

2          A     Right.   I understand.   I'm just going up and

3   when they have that discussion in my opinion was based on

4   primarily what -- how the patent reads.   I would discuss

5   that region it would be discussed in the asserted claims.

6   So that cross-hatching seems to go from 2C to the region

7   below 2C.

8          Q     Dr. Vallee, I'd like to refer you back to

9   Exhibit 3 which is your reply expert report, specifically

10   page 21, paragraph 50.

11          A     Okay.

12          Q     You state in the second sentence of

13   paragraph 50:  Mr. Miller's interpretation of the battery

14   pack supporting portion is a clear attempt to limit the

15   definition of the term the specific embodiment shown in

16   Figure 2 of the '204 patent.

17              Do you see that?

18          A     I'm sorry.   Figure -- Figure 2 of the '204

19   patent, yeah.

20          Q     Can you explain what you mean by that?

21          A     What I mean is if you read the claim as I read

22   before, in claim -- I believe it's 13, it says, Claim 13,

23   A, B, C, D, E, battery pack supported by the battery pack

24   supporting portion.   What I'm saying is based on the way

HIGHLY CONFIDENTIAL

1    the claims read, he's also calling the supporting portion

2    what he labels there in green.  It doesn't say that.  The

3    black component, which is the battery pack supporting

4    portion is what supports the battery.  That's what

5    supports the battery through the lip and the tab that I

6    discussed earlier.  Okay.

7            So that what he points to a supporting portion

8    is a part of that.  There's nothing in the claims that

9    indicate it is.  It just has to support -- the wording

10   exactly is, battery pack supported by the supporting

11   portion.  That's just the black part.

12       Q    Is there anything that's in the claim section

13   that indicates that the battery pack supporting portion

14   can't be more than just the black component identified on

15   the Fusion F-15 nailer?

16       A    It's got to be what supports the battery.  The

17   black part is what supports the battery.  Earlier your

18   discussion was that when we were discussing grooves and

19   tabs that that's not what -- the main component that's

20   supporting the battery.  The main portion that supports

21   the battery is that black portion.

22       Q    But other components do also assist in

23   supporting the battery outside that black portion on the

24   Fusion --

HIGHLY CONFIDENTIAL

Page 74

1        A    As I said earlier, the groove, for example,

2    inside of the groove if during vibration it could prevent

3    the motion, it could be useful in other situations, but

4    it's the black part that supports the battery.   That

5    figure the black part in that figure points to it.

6        Q    Going back to paragraph 50, you state in that

7    second sentence that Mr. Miller's interpretation of the

8    battery pack supporting portion is a clear attempt to

9    limit the definition of the term to the specific

10   embodiment shown in Figure 2 of the '204 patent.  So is

11   it your opinion that Mr. Miller's interpretation of

12   battery pack supporting portion is consistent with the

13   specific embodiment shown in Figure 2 of the '204 patent?

14       A    No.  My opinion is as what I said, he's trying

15   to limit it to only that.

16       Q    So does that mean then that it's your opinion

17   that Figure 2 of the '204 patent shows an embodiment that

18   is consistent with Mr. Miller's interpretation of the

19   battery pack supporting portion, correct?

20       MR. PARIKH:  Objection.

21       COURT REPORTER:  I'm sorry.

22       MR. PARIKH:  Objection, mischaracterizes prior

23   testimony.

24       THE WITNESS:  What I'm saying that he's trying to

HIGHLY CONFIDENTIAL

```
 1    limit it to just Figure 2 to that one embodiment.  The

 2    claims don't -- the claims aren't that limiting.  I'm not

 3    a patent attorney, but my understanding the embodiments

 4    are examples on how this could be implemented, but the

 5    claims don't limit it specifically to what is indicated

 6    in Figure 2.

 7         MR. BERNARD:  Q  And is it your opinion that Figure

 8    2 of the '204 patent shows an embodiment that's

 9    consistent with Mr. Miller's interpretation of the

10    battery pack supporting portion?

11         A    No.  Figure 2 is an embodiment that fits what

12    the patent claims say.

13         Q    How do you reconcile that with your statement

14    that second sentence of paragraph 50?  How can

15    Mr. Miller's identification of the term battery pack

16    supporting portion be an attempt to limit to a specific

17    embodiment if that embodiment is not consistent with his

18    interpretation?

19         A    That's the reverse of what I said.  The claims

20    are not limiting and because an embodiment is of the

21    claim doesn't mean it works the other way around.

22         Q    Are you applying claim construction principles,

23    Dr. Vallee?

24         A    I'm basically stating my understanding -- you
```

www.veritext.com                                                    888-391-3376

HIGHLY CONFIDENTIAL

Page 81

1        MR. PARIKH:  He just answered.

2        THE WITNESS:  It says mechanically coupled, which

3    means there is mechanical coupling between the mechanical

4    components, and I'm saying that pneumatic is a form of a

5    mechanical component.

6        MR. BERNARD:  Q  Does the safety portion 12

7    identified in the '987 -- Off the record.

8        THE VIDEOGRAPHER:  Off the record.

9            (Off the record)

10       THE VIDEOGRAPHER:  We are back on the record.  The

11   time now is 12:35.

12       MR. BERNARD:  Q  Dr. Vallee, I'm referring to the

13   safety portion 12 that's specifically discussing the

14   specification of the '987 patent.  Does that safety

15   portion 12 include any pneumatics components?

16       A    It's not that narrow.  It just reads what the

17   court said the structure was.  So because it's

18   mechanically coupled to the trigger it implies there are

19   mechanical components of which pneumatic can be one.

20       Q    Let's go specifically to Exhibit 6.  I'm

21   looking at the specific embodiments that is described in

22   the '987 patent that includes safety portion 12

23   consisting of upper safety portion 20, cam member 21, and

24   lower safety portion 22.  I'm asking if the specific

HIGHLY CONFIDENTIAL

Page 82

1    embodiment described in the '987 patent, can you identify

2    any pneumatic component?

3         A    That embodiment -- I'm sorry.  You didn't

4    finish your answer?

5         Q    Any pneumatic -- that was my question, yeah.

6         A    Okay.  That embodiment doesn't show pneumatic

7    components.

8         Q    Okay.  I'd like to refer you to Exhibit 3, your

9    reply expert report, on page 13.

10        COURT REPORTER:  Page what?

11        MR. BERNARD:  13.

12        THE WITNESS:  13 of my reply report.  That's

13   Exhibit 3, page 13?

14        MR. BERNARD:  Q  Correct.

15        A    I have it.

16        Q    So I'm looking at paragraph 38.  In the last

17   sentence, midway through that second to the last line,

18   you say:  The Court's claim construction, which requires

19   the safety portion is mechanically coupled to a trigger,

20   does not preclude the inclusion of an additional

21   pneumatic component.  Do you see that?

22        A    I do.

23        Q    So it's your opinion of the Court's claim

24   construction, the first portion does not preclude the

HIGHLY CONFIDENTIAL

Page 83

1    inclusion of additional components in the JoistPro safety

2    mechanism?

3         A    I'm am going back to the Court's claim

4    construction.  So was your question the Court's claim

5    construction doesn't preclude the use of a pneumatic

6    component, was that your question?

7         Q    Yeah.  I'm asking if it's your opinion that the

8    Court's construction of push portion does not preclude

9    the inclusion of additional components in the JoistPro

10   safety mechanism.

11        A    Additional component.  It simply states that

12   safety portion is, the safety portion consists of, upper

13   safety portion, cam member, lower safety portion.  So it

14   doesn't -- it's not more limiting than that.  It has to

15   have those three portions.

16        Q    The claim construction of the push portion

17   requires those three specific identified components but

18   can also include additional unclaimed components, is that

19   correct?

20        A    It doesn't say components, it says portions.

21   So there could be two different parts that make up a

22   portion, for example, the lower safety portion can

23   have -- for example, lower the safety portion could have

24   two parts screwed together, for example, and in fact if

HIGHLY CONFIDENTIAL

Page 84

1    you bear with me just a second, I believe I had a

2    photograph of that, of the JoistPro.

3                I'm on Exhibit 1, page 54.  I'm specifically

4    looking at the figure at the lower right.  Okay.  So

5    item 22 which I believe is the lower safety portion

6    actually is comprised of two parts.  So what I'm saying

7    is is that there's one portion, but it could be two

8    parts, for example, or more that form that portion.

9         Q    Okay.  So -- Maybe my question wasn't clear.  I

10   want to refer you back to Exhibit 3, which is your reply

11   report in paragraph 38.  And I'm specifically trying to

12   understand that last sentence of paragraph 38 in your

13   opinion there where you say that the Court's claim

14   construction does not preclude the inclusion of an

15   additional pneumatic components.  Do you see that?

16        A    Yes.

17        Q    So I'm trying to make sure I understand it that

18   it's your opinion that the Court's claim construction

19   allows additional components in addition to the specific

20   components the upper safety portion 20, cam member 21,

21   and lower safety portion 22.

22        MR. PARIKH:  Objection, vague.

23        MR. BERNARD:  Q    So I will now ask my question.  Is

24   it your opinion that the Court's construction of push

HIGHLY CONFIDENTIAL

Page 85

1    portion does not preclude the inclusion of additional

2    components in the JoistPro safety mechanism?

3         A    Yeah, that's exactly what I said in that

4    sentence.

5         Q    Okay.  Thank you.  I'm sorry.

6              The JoistPro safety mechanism includes

7    pneumatic components, correct?

8         A    It does.

9         Q    Do the upper safety portion cam member and

10   lower safety portion that you identified in a

11   JoistPro 150 XP perform the function of the push portion

12   which is operation of the trigger switches enabled of the

13   end portions prevent it from moving downward alone or

14   does it require those pneumatic components to perform

15   that function?

16        A    We're referring to which part of which report

17   now?

18        Q    It's a general question.  If there's somewhere

19   in the report that would assist you in answering that,

20   please look through it and identify that portion.

21        A    I'm sorry.  One's more time with the question.

22        Q    Sure.  I'm looking specifically at the claim

23   functions of the push portion, claim operation -- which

24   is enabled when the end of the push portion is put in a

HIGHLY CONFIDENTIAL

Page 86

1    downward position.  My question is does the upper safety

2    portion cam member and lower safety portion that you

3    identified in that JoistPro 150 XP perform the function

4    of the push portion alone or does it require additional

5    pneumatic components to perform that function?

6         A     Okay.

7               All right.   So the function is operation of the

8    trigger switch is enabled when the end of the push

9    portion is prevented from moving downward and -- all the

10   claim says is so long as you have a key element such that

11   it has an upper safety cam member and lower safety

12   portion, and that's -- so long as you have that structure

13   of the push portion and it behaves as, for example,

14   described in Claim 14A, B, C, D, F such that the end of

15   the movable (inaudible) following the nose piece and

16   normally position the upper (inaudible), operation of the

17   trigger is enabled when the end of the push portion is

18   prevented from moving downward, it leaves the tip of the

19   nail (inaudible) in the nose piece protruding from the

20   tip of the nose piece and protruding farther and it fits

21   in the direction and the push portion so that the nailer

22   could be used in a line.

23               So, so long as you have the required component

24   and they operate in that fashion as described in that

HIGHLY CONFIDENTIAL

Page 87

1   claim, okay, there can be additional -- there can be a

2   pneumatic component used to do that, but so long as it

3   functions that way and it operates according to the

4   claims in the claim construction.  So in that tool the

5   pneumatic component is one part of it that allows it to

6   operate like the claim suggests.

7        Q    Those pneumatic components and safety mechanism

8   in the JoistPro 150 XP are necessary to perform the

9   function of operation of the trigger switch is enabled

10  when the head of the push portion is prevented to move

11  downward?

12       A    They need that structure and that design in the

13  pneumatic component is part of the section that makes it

14  function that way.

15       Q    Does the safety mechanism in the JoistPro 150

16  XP perform the function of operation of the trigger

17  switch is enabled when another push portion is prevented

18  from moving downward when those pneumatic components were

19  removed?

20       MR. PARIKH:  Objection, incomplete hypothetical.

21       THE WITNESS:  So failure to remove is -- what other

22  changes were made -- simply removing those components?

23       MR. BERNARD:  Q  Yes.

24       A    If you simply remove the components, the tool

HIGHLY CONFIDENTIAL

Page 88

1   would simply leap when you plug it into the air.  It
2   wouldn't function anywhere.

3        Q    I'd like to refer to paragraph 41 of page 14 of
4   your reply report, Exhibit 3.

5        A    I'm sorry.  Did you say page 41?

6        Q    Page 14, paragraph 41.

7        A    Okay.  Because there aren't 41 pages.

8             Okay.  Paragraph 41 of Exhibit 3.

9        Q    In it you -- in paragraph 41, Exhibit 3, you
10  disagree with Mr. Miller's opinion that the safety
11  portion 12 that you identified in the JoistPro 150 XP is
12  not coupled to the trigger 11, correct?

13       A    Correct.

14       Q    In your opinion is the safety portion 12
15  coupled to the trigger 11 throughout the entire operation
16  of this portion?

17       A    If coupled when the tool is actuated.

18       Q    Does it disconnect at any point or loss that
19  coupling or does it decouple during operation?

20       A    I believe -- you know, I studied the nailer
21  during the actuation, but I haven't actually witnessed
22  the components coming apart afterwards.  I know during
23  the nail driving operation, which is what the tool is
24  intended for, that at all times they are mechanically

HIGHLY CONFIDENTIAL

Page 99

1      A    That's Klaus.

2      Q    So if I were to refer to Exhibit 13 as Klaus,

3    you'll understand what I'm referring to, correct?

4      A    Correct.

5      Q    So now turning back to paragraph 45, Exhibit 2,

6    your rebuttal expert report.  You can keep Singer and

7    Klaus in front of you because I'll reference them from

8    time to time.

9      A    Okay.  I have the Klaus patent and I have

10   paragraph 45.

11     Q    So going to the third to last line of paragraph

12   45, there's a sentence that starts with on the other

13   hand.  Do you see that?

14     A    Correct.  On the other hand.

15     Q    It says:  On the other hand, Klaus discloses a

16   complex combination pneumatic and mechanical safety

17   mechanism which is prone to clogging due to the complex

18   pneumatic network as opposed to the purely mechanical

19   safety mechanism disclosed in the '987 patent.  Do you

20   see that?

21     A    I do.

22     Q    Is it your opinion that one distinction between

23   Klaus' safety mechanism is that the combination of the

24   pneumatic and mechanical safety whereas the safety

HIGHLY CONFIDENTIAL

Page 100

1   mechanism disclosed in the '987 patent is purely

2   mechanical?

3       A    What I'm saying there is they're not chemical,

4   they're not electrical, they're not mechanical systems.

5   In Klaus you have -- I'll put it this you have pneumatic

6   mechanical components, I'm looking in Klaus Figure 1,

7   item 18 which is a pneumatic and mechanic component which

8   requires air pressure underneath it to move it as opposed

9   to spring mechanical component.  So it was the cleanest

10  way I could try to take a purely mechanical system and

11  say here's the submechanical form which is pneumatic, and

12  what else do you call the other mechanical components.  I

13  just called it by default mechanical alone.

14      Q    And you're identifying distinction between

15  Klaus' safety mechanism and the safety mechanism as

16  disclosed in '987 patent, correct?

17      A    Just a minute, please.  I'm reading that

18  paragraph from the beginning.

19           I'm sorry.  Your question was one more time?

20      Q    You identified in paragraph 45 a distinction

21  between the Klaus' -- Let me start over.  A distinction

22  that you identified in paragraph 45 of Exhibit 2 is that

23  between Klaus' safety mechanism and the '987 safety

24  mechanism is that Klaus uses a combination pneumatic

HIGHLY CONFIDENTIAL

Page 101

1    mechanical safety mechanism whereas the '987 patent's

2    safety mechanism is purely mechanical, is that correct?

3        A    That's what that sentence says, yes.

4        Q    I'd like to draw your attention to paragraph 62

5    on page 22 of your rebuttal report.

6        A    Can I just clarify the answer before we go

7    ahead previously?

8        Q    Sure.

9        A    As I read this paragraph, I was not limiting

10   the difference to the pneumatic and mechanical.  There

11   were many differences between Klaus and the '987 just to

12   be clear.  Now moving on to paragraph -- What was it now?

13       Q    62.

14       A    62.  Got it.

15       Q    And in paragraph 62 you disagree with

16   Mr. Miller's identification of the lateral lug 21 in

17   Klaus as a cam member, is that correct?

18       A    That's correct.

19       Q    Does the lateral -- Sorry.

20            During the operation of Klaus' safety

21   mechanism, does lateral movement of the lug 21 result in

22   rotation of a swing strap plane?  Feel free to review

23   Klaus.

24       A    Well, lug 21 is not a Figure 1 item typically.

HIGHLY CONFIDENTIAL

Page 127

1        Q    Are the dimensions mentioned of the motor for

2    the gear train?

3        A    The only -- Going back to the Kondo patent.

4             I don't believe he has dimensions in the

5    specification so all we have to go on is figures.

6        Q    Dr. Vallee, I'd like to refer you to the '204

7    patent, Exhibit 5.

8        A    Yes.

9        Q    Can you explain your understanding of how the

10   battery pack identified in the '204 connects to the rest

11   of the tool?

12       A    The battery has an electrical connection

13   portion that appears to be in the area of the battery

14   support portion 2C.  And it is the placed along the end

15   of the handle.

16       Q    Is the battery connected in any other way to

17   the nailer that is shown in the '204 patent?

18       A    Connected in the battery support portion.  It

19   also acts as the electrical connection.

20       Q    I'd like to refer you to -- just random noise.

21            I'd like to refer you to page 51 of your

22   rebuttal report, Exhibit 2.

23       A    51.  Okay.

24       Q    And in that image you have what you described

HIGHLY CONFIDENTIAL

Page 128

```
 1    as the handle portion highlighted in blue, correct?

 2         A    Correct.

 3         Q    And so it's your opinion that the entire

 4    portion shown on the image on page 51 of Exhibit 2 --

 5    Strike that.

 6              It's your opinion that the portion highlighted

 7    in blue on the image on page 51 of Exhibit 2 is the

 8    handle portion, correct?

 9         A    Correct.

10         Q    And it's your opinion that the portion

11    highlighted in green is the housing, correct?

12         A    Correct.

13         Q    In that image you have red B annotation that's

14    pointing to a portion of the tool in Figure 3.  Do you

15    see that?

16         A    Yes.

17         Q    Can you explain what that reference is -- what

18    that reference number is referring to or reference letter

19    is referring to?

20         A    It's the battery pack extending portion, I

21    believe forward.  You're talking about B itself?

22         Q    Yes, the red B.

23         A    Okay, okay.  That's the portion of the housing

24    where the battery pack extending portion is.
```

HIGHLY CONFIDENTIAL

Page 161

1      Q    Dr. Vallee, I'd like to direct your attention

2  to paragraph 307 of your rebuttal report, which is

3  Exhibit 2, that starts on page 135.

4      A    Okay.

5      Q    And the last sentence that starts on page 135

6  starts with the location identified.  Do you see that?

7      A    Yes, yes.

8      Q    Is the location identified by the red circles

9  and yellow is where the fluid is exchanged between the

10 main valve control channel and trigger channel exterior

11 frame?

12     A    Yes.

13     Q    Can you explain how fluid is exchanged between

14 a main valve control channel and trigger valve exterior

15 frame?

16     A    Well, the trigger valve exterior frame contacts

17 the edges of the main valve control channel where I

18 circled it.  So as the air passes through the exterior

19 frame through those yellow -- they're really slots I

20 believe, through those yellow slots, the fluid passes

21 through the slots that poke through the exterior frame

22 that is connected through those upper ends of those

23 circles -- the circle regions where it connects to the --

24 via the channel.  That's how the air gets through the

HIGHLY CONFIDENTIAL

Page 162

1    trigger valve through the yellow and through that arrow.

2    I guess the tip of the arrow is circled 8.

3         Q    Is any fluid exchanged between the portion

4    that's highlighted in light blue and the frame that's

5    highlighted in green as shown on the image on page 135 of

6    Exhibit 2?

7         A    You're asking is there fluid exchanged between

8    the green and the blue?

9         Q    Yes.

10        A    Yes, through where the yellow portion is.

11   Don't forget the yellow portion does not circumnavigate

12   the trigger valve housing.  There's a slot.  It's a

13   little misleading in a section view like this, but that's

14   how the fluid exchanges -- See the green?  What I'm

15   saying is the green wraps around the yellow.

16        Q    I understand that.  And so it sounds like

17   you're saying that fluid is exchanged between the light

18   blue portion and the yellow portion highlighted on the

19   image shown in paragraph 135, correct?

20        A    I'm sorry.  The yellow portion is formed by the

21   green portion.  Without the green portion there is no

22   yellow portion.  That's the trigger valve housing -- the

23   trigger valve housing geometry forms that yellow area.

24   So that's how it allows the transfer of the fluid from

HIGHLY CONFIDENTIAL

Page 163

1    the green to the blue.

2        Q    So fluid is being exchanged from the light blue

3    portion to the yellow portion, correct?  And I'm just

4    talking about the fluid, not how it's formed or anything.

5    I just want to know how fluid is exchanged.  Is fluid

6    exchanged between the light blue portion and the yellow

7    portion as identified on page 135 of Exhibit 2?

8        A    You have to understand.  The yellow portion --

9    I distinguished it with colors.  It's difficult to

10   explain.  The yellow portion is formed by the green

11   portion, right, because they're slots, so the fluid

12   exchange in the green portion is passing from the green

13   to the blue, but I had to somehow show -- delineate

14   between the holes in the green -- the holes formed by the

15   green portion and the green portion that doesn't have a

16   hole.

17       Q    I think I'm understanding.  So fluid passes

18   through a gap that is formed by the trigger valve

19   exterior frame, is that correct?

20       A    It passes through the exterior frame in the

21   yellow area which is formed basically by a bounding green

22   area.  So you go from green to blue.

23       Q    How does it -- how does it pass through the

24   exterior frame?

HIGHLY CONFIDENTIAL

Page 164

1        A    In the manner I just explained.  You have --

2   you have bounding -- I'm going -- if you can see my

3   hands.  You have a bounding green portion, so imagine

4   that's a line and it's green because it's part of the

5   exterior frame.  So it goes through the green into the

6   blue.

7        Q    So it's going through an opening or channel

8   that's formed by the green, is that what you're saying?

9        A    Yes, the green connects to the blue through the

10  opening.  You have green contacting blue so the trigger

11  valve frame which is green passes through it.

12       Q    As far as the solid structure of the exterior

13  frame, fluid doesn't pass through that for that material,

14  correct, it just passes through the opening formed by

15  that solid material, correct?

16       A    It passes through the green in the opening.

17       Q    Let's take a short break.  I think I'm done.  I

18  just need to review some notes and to confirm.  So can we

19  do like five minutes for me to confirm that and then I'll

20  be good to go, unless Amol has some questions.

21       THE VIDEOGRAPHER:  We're going off the record.  The

22  time is 4:08.

23            (Off the record)

24       THE VIDEOGRAPHER:  We are back on the record.  The

HIGHLY CONFIDENTIAL

Page 165

1    time now is 4:15.

2         MR. BERNARD:  Dr. Vallee, thank you for your time.

3    I have no further questions.

4         THE WITNESS:  Thank you.

5         MR. PARIKH:  I do not have any questions.  We'll

6    reserve signature on the transcript.  And then -- We can

7    go off the record and I can talk to you.

8         THE VIDEOGRAPHER:  This concludes today's

9    deposition.  The time now is 4:15 p.m.

10              (Off the record)

11                        - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL

Page 166

1    STATE OF ILLINOIS  )

                       )  SS:

2    COUNTY OF C O O K  )

3

4           The within and foregoing deposition of the

5    aforementioned witness was taken before CAROL CONNOLLY,

6    CSR, CRR and Notary Public, at the place, date and time

7    aforementioned.

8           There were present during the taking of the

9    deposition the previously named counsel.

10          The said witness was first duly sworn and was

11   then examined upon oral interrogatories; the questions

12   and answers were taken down in shorthand by the

13   undersigned, acting as stenographer and Notary Public;

14   and the within and foregoing is a true, accurate and

15   complete record of all of the questions asked of and

16   answers made by the forementioned witness, at the time

17   and place hereinabove referred to.

18          The signature of the witness was not waived,

19   and the deposition was submitted, pursuant to Rule 30 (e)

20   and 32 (d) 4 of the Rules of Civil Procedure for the

21   United States District Courts, to the deponent per copy

22   of the attached letter.

23

24

HIGHLY CONFIDENTIAL

Page 167

1          The undersigned is not interested in the within

2    case, nor of kin or counsel to any of the parties.

3          Witness my official signature and seal as

4    Notary Public in and for Cook County, Illinois on this

5    10th day of June, A.D. 2020.

6

7

8

9          CAROL CONNOLLY, CSR, CRR

           CSR No. 084-003113

10         Notary Public

           One North Franklin Street

11         Suite 3000

           Chicago, Illinois 60606

12         Phone:  (312) 386-2000

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL

Page 168

```
                         Veritext Legal Solutions

  1                          1100 Superior Ave

                                Suite 1820
  2
                          Cleveland, Ohio 44114

  3                       Phone: 216-523-1313

  4
       June 10, 2020
  5

       To: Amol Parikh, Esq.
  6

       Case Name: Koki Holdings Company, Ltd. v. Kyocera Senco Industrial
  7    Tools, Inc.

  8    Veritext Reference Number: 4128651

  9    Witness:  Glenn Vallee, Ph.D.       Deposition Date:  6/3/2020

 10
       Dear Sir/Madam:
 11

 12    Enclosed please find a deposition transcript.  Please have the witness

 13    review the transcript and note any changes or corrections on the

 14    included errata sheet, indicating the page, line number, change, and

 15    the reason for the change.  Have the witness' signature notarized and

 16    forward the completed page(s) back to us at the Production address

       shown
 17
       above, or email to production-midwest@veritext.com.
 18

 19    If the errata is not returned within thirty days of your receipt of

 20    this letter, the reading and signing will be deemed waived.

 21
       Sincerely,
 22

       Production Department
 23

 24    NO NOTARY REQUIRED IN CA
```

HIGHLY CONFIDENTIAL

Page 169

```
 1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 4128651
 3       CASE NAME: Koki Holdings Company, Ltd. v. Kyocera Senco
    Industrial Tools, Inc.
         DATE OF DEPOSITION: 6/3/2020
 4       WITNESS' NAME: Glenn Vallee, Ph.D.
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8

    _____        _____
 9  Date                    Glenn Vallee, Ph.D.
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
             _____
18           Notary Public
19           _____
             Commission Expiration Date
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 170

```
 1                  DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 4128651
 3        CASE NAME: Koki Holdings Company, Ltd. v. Kyocera Senco
      Industrial Tools, Inc.
          DATE OF DEPOSITION: 6/3/2020
 4        WITNESS' NAME: Glenn Vallee , Ph.D.
 5        In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7        I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9        I request that these changes be entered
      as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____     _____
      Date                 Glenn Vallee, Ph.D.
14
          Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22    this _____ day of_____, 20____.
23        _____
                  Notary Public
24
          _____
25            Commission Expiration Date
```

HIGHLY CONFIDENTIAL

Page 171

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 4128651
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                   Glenn Vallee, Ph.D.
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

HIGHLY CONFIDENTIAL

**[& - 2002]**                                            Page 1

| & |
|---|
| **&**   2:3 |

| 0 |
|---|
| **0009**   23:3 |
| **001087**   68:6,11 |
| **001090**   68:19 |
| **001091**   69:15 |
| **001092**   70:13 |
| **012**   28:23 29:3,5,6 |
|   96:23 97:3,19 |
| **024**   56:23 |
| **084-003113**   167:9 |

| 1 |
|---|
| **1**   3:13 5:9 11:3,11 |
|   11:13,15,17,19 |
|   12:12,12 13:2 |
|   16:9,21 22:8,10 |
|   26:10,13 29:21 |
|   34:4,19,22 36:6 |
|   37:18,21 38:16 |
|   46:23 48:7,10 |
|   50:7,11,21 51:9 |
|   52:13 53:9 54:12 |
|   55:2,4,5,12,14,19 |
|   55:23,24 56:18,22 |
|   57:14,23 58:10,13 |
|   59:4,9,11,13,15 |
|   64:22 65:24 69:2 |
|   69:9,19 70:3 |
|   77:22 80:15 84:3 |
|   90:9,10 91:10 |
|   94:7,8,12 100:6 |
|   101:24 104:2 |
|   108:21 109:16 |
|   116:23 117:11 |
|   125:1 126:7 130:2 |
|   137:2 144:6 |
|   148:12,13 159:4,6 |
|   160:6 |

**1.116**   68:12
**10**   4:1 46:4 58:7,8
   58:9,13 65:10
   66:24 67:2,5,23
   68:1,12,20 69:15
   70:12 110:12
   111:6,11 114:23
   151:19 168:4
**103**   155:17
**106**   122:18,21
   123:14 124:4
**1072**   68:7
**108**   153:2,4,11,17
   153:18,20,21
   154:4,21
**1087**   68:8
**10:29**   46:7
**10:41**   46:10
**10th**   167:5
**11**   3:13 4:2 77:13
   77:14,15 78:10
   80:5,18 88:12,15
   92:15 93:8 94:20
   153:14,15
**1100**   168:1
**111**   152:14
**112**   68:23
**119**   153:3,11,17,20
   153:21 154:5
**11:58**   79:7
**12**   4:4 79:13 80:4
   80:5,17,18 81:6,13
   81:15,22 88:11,14
   98:7,9,10,12,16,17
   98:20 103:19
   108:4
**123**   4:6,7
**12:30**   79:10
**12:35**   81:11
**13**   4:5 72:22,22
   76:1 82:9,11,12,13

**98**:8,11,24 99:2
   110:6,7
**130**   129:1
**135**   161:3,5 162:5
   162:19 163:7
**139**   4:8
**14**   4:6 88:3,6
   122:24 123:4,8
**14a**   86:14
**15**   4:7 27:7 30:13
   30:19 31:16 38:13
   38:24 43:9,19
   44:19,20 45:3,4
   46:12,12,14 47:5
   47:11,12 48:12,13
   48:17 49:18 50:3
   50:5 52:2,20 53:1
   54:4,9 55:8 73:15
   80:15 117:15,24
   119:15 123:6,9,10
**150**   27:19 85:11
   86:3 87:8,15
   88:11 89:9 90:4
   108:12,14
**152**   4:9
**15s**   120:13
**16**   4:8 89:19,21
   139:20,21,23
   140:3
**166**   135:17
**16a**   120:2 122:1,4
**16s**   120:2,7,8
   121:11,15,19,21
**17**   4:9 152:16,19
   152:20,21 153:8
   153:10 155:16
**18**   100:7 110:9,10
   110:11 115:8,11
**18-313**   1:6 5:15
**1820**   168:2

**19**   46:19 47:2
   49:24 110:10
   114:23,24 154:22
**1985**   14:22
**1987**   15:7,8,14
**1990**   157:18 158:8
**1997**   14:23
**1:58**   115:16
**1c**   70:6

| 2 |
|---|
| **2**   3:15 16:9 23:7,8 |
|   23:23 32:23 34:19 |
|   34:22 46:10 55:12 |
|   55:14,19 56:12 |
|   58:10,14 59:11,13 |
|   72:16,18 74:10,13 |
|   74:17 75:1,6,8,11 |
|   76:10,22 77:1,3,17 |
|   77:22 78:4,5,8,24 |
|   94:13,19 96:11,21 |
|   99:5 100:22 |
|   106:13 117:4,11 |
|   122:19 127:22 |
|   128:4,7 129:1 |
|   130:3 134:24 |
|   135:5,19 138:9 |
|   139:23 140:4,5,8 |
|   140:12,13,14,23 |
|   141:3,16,19 142:1 |
|   142:4,5,9,9,14,17 |
|   143:2,18,23 144:1 |
|   144:4,11 152:14 |
|   161:3 162:6 163:7 |
| **20**   55:8 80:6 81:23 |
|   84:20 102:4,6 |
|   169:16 170:22 |
|   171:22 |
| **2001/0009260**   4:9 |
|   152:17 |
| **2002**   15:22 |

HIGHLY CONFIDENTIAL

**[2017 - 4,509,668]**

**2017**   21:24
**2018**   8:23 21:24
**2020**   1:18 3:3 5:2
   167:5 168:4
**204**   22:11,13 26:19
   26:20 27:1,8 52:6
   54:24 55:5,8
   58:21 64:13 67:23
   68:16 72:16,18
   74:10,13,17 75:8
   77:21 78:5,9
   94:21,23 95:2,18
   95:22 96:4 116:4
   116:15,19,24
   117:12 127:6,10
   127:17 129:24
   130:14,16 131:2
   133:21
**20551**   167:8
**21**   72:10 80:6
   81:23 84:20
   101:16,21,24
   102:1 103:14,15
   103:16
**216-523-1313**
   168:3
**22**   80:6 81:24 84:5
   84:21 101:5
   110:14 143:2
   144:5
**222**   2:11
**23**   3:15 111:8
   114:24 115:5
**24**   3:17,18 39:21
   78:10 106:13
   136:17 160:17
**25**   93:21 134:4,8
   134:10 136:10
   139:16,18
**250**   14:4

**251**   153:23 154:11
**252**   152:13 153:23
**25a**   135:15,15
   136:15 138:3,17
   139:5,13
**25b**   136:15
**26**   3:20 22:10
   29:20,23 34:4,5,6
   35:15 36:5 41:3,5
   41:24 42:7 43:19
   44:18 45:3
**260**   14:5
**27**   3:21,22 37:20
**28**   3:23 33:17
   35:18 37:8,24
**29**   3:24 37:24
**2:09**   115:19
**2:17**   120:22
**2:19**   121:1
**2a**   56:11 143:18,19
   143:20 144:6,8
   145:1
**2b**   56:13 69:3,5,21
   69:23 143:19,19
   143:20 144:1,9
   145:1
**2c**   55:23 56:5,7,14
   56:19,22 57:1,1,9
   57:14,22,22 58:2
   58:21 59:12 64:10
   65:3,15,22 66:11
   66:21,22 69:4,22
   70:4,7,17,21,22
   71:1,7,8,18,20,22
   71:24 72:6,7 78:7
   78:11,14 127:14
   131:7

**3**

**3**   3:3,17 14:20
   16:9 24:7,8,18
   26:23 34:19,23

37:6,8 39:20,21
41:4,24 42:7
43:19 44:19 45:3
46:22 47:2 49:24
55:7,8,20,22 56:9
56:12,15 57:1,8,24
58:1,4 59:1,2,4,8
59:10,12,14 64:12
64:17 65:3,15,22
66:2,17 69:2,2,9
69:19 70:9,17,22
70:24 72:1,9 78:1
79:10 82:8,13
84:10 88:4,8,9
89:18 91:21 94:12
128:14 131:5,6
136:24 137:1
140:11 141:24
142:6,6,9,23
158:24 159:1,2
160:21
**30**   134:5,8 166:19
**3000**   167:11
**300s**   14:10
**307**   161:2
**312**   2:6,12 167:12
**32**   166:20
**33**   92:15,19,19,20
   93:8 142:24 159:2
**338**   103:21
**34**   159:8,21 160:11
**349**   68:4
**35**   52:13 56:9
   68:23 158:21,23
   159:7,10,16,16,18
   159:20,20,23
   160:1,1,5,6,11,14
   160:20
**354**   13:7 14:12
   25:22 71:15

**36**   48:6,10,11 50:7
   50:11,21 51:8
   53:9 54:12 91:21
   91:22 133:24
   134:2
**360**   13:2,3 14:6,13
   25:21
**37**   53:18 57:24
   68:12 94:17,19
   95:2
**372-2000**   2:6
**38**   82:16 84:11,12
   96:10
**386**   71:15
**386-2000**   167:12
**39**   96:21 122:19
   125:1 142:9
**3:30**   152:2
**3:40**   152:5
**3a**   140:19 144:14
   144:21
**3rd**   1:18 5:2

**4**

**4**   3:18 16:9,20,22
   17:10,18 20:17
   24:22,23 25:6,8
   26:10,13 34:19,23
   55:2,4,5 102:1
   115:19 136:19,23
   136:23 140:6,9,11
   140:17 141:15,17
   141:19,22,24
   142:2,4,6,10,11,15
   142:17,18,19,22
   142:22 143:7,10
   143:14,20 144:12
   144:20 145:1
   166:20
**4,509,668**   4:5
   98:24

HIGHLY CONFIDENTIAL

**[40 - acknowledge]**

Page 3

**40**   97:22 122:20 123:15 134:2
**4000**   2:5
**41**   29:3,18 88:3,5,6 88:7,8,9
**4128651**   168:8 169:2 170:2 171:2
**44**   89:17,21 90:1,2 90:15 110:14
**44114**   168:2
**444**   2:4
**45**   34:18 89:18,21 90:2,15 98:2 99:5 99:10,12 100:20 100:22
**46**   110:10,11
**4:08**   164:22
**4:15**   165:1,9
**4a**   140:9,14,18 141:12,12,14,14 141:20,21 142:18 142:20 143:10,20 144:13,17 145:6 145:19,20
**4b**   142:21
**4c**   140:10,10,14 143:9 144:24 145:4,19,20

**5**

**5**   3:20 16:3,9 25:11 26:15,16,18 27:2 46:4 54:23 64:13 71:12 104:3 104:4,5,9,20 109:22 110:6 114:17,21 127:7 133:24 134:2 142:4,9 143:1 152:5
**5,720,423**   4:6 123:1

**5,803,338**   98:18
**5,816,469**   4:8 139:20
**5,830,338**   4:4
**50**   72:10,13 74:6 75:14 76:12 77:24 78:22
**51**   127:21,23 128:4 128:7 129:1 130:2
**52**   108:21
**54**   84:3
**56**   140:5 141:5,19 144:11
**57**   77:22
**58**   158:18,20 160:4

**6**

**6**   3:6,21 21:10 27:10,11,15,16 64:13,18 65:17,19 79:12 81:20 158:18 160:4,17
**6/3/2020**   168:9 169:3 170:3
**60**   158:18
**60601**   2:12
**60606**   2:5 167:11
**609-7500**   2:12
**61**   37:10,14 140:5 141:5
**62**   101:4,13,14,15
**647**   29:14,18 96:23 97:3,19 147:20,22 147:22,24 158:15 160:13
**66**   106:12,14,15 109:4 114:16 139:23
**67**   4:1 134:24 135:5,19

**7**

**7**   3:22 7:1 27:22 27:23,24 28:2,5 58:7,8,9,13 64:19 90:20 133:22
**7,156,012**   3:23 28:21
**7,325,709**   3:22 28:3
**7,398,647**   3:24 29:11
**709**   28:5,10,14 90:20,21 91:3,15 91:18 93:17,19 94:2,6 96:12,16 133:22 135:19
**71**   139:24
**72**   92:9
**73**   91:20,23,23,24
**77**   4:2 22:9 29:24 30:4 31:9
**79**   37:21,23

**8**

**8**   3:23 7:1 28:16 28:17,20,23 162:2
**8,118,204**   3:20 26:21
**8:57**   1:18 5:2

**9**

**9**   3:24 29:8,9,11,14 90:10 147:20,21 158:16 160:3
**95**   53:19
**98**   4:4,5
**987**   27:15,20 79:12 79:12,18 81:7,14 81:22 82:1 97:24 98:4 99:19 100:1 100:16,23 101:1

101:11 102:20 103:4 113:16,23 114:5,9,14,19
**9:10**   12:7
**9:18**   12:10

**a**

**a.d.**   1:18 167:5
**a.m.**   1:18 5:2 12:7 46:7,10
**abbreviation**   26:21
**ability**   42:4 137:23
**able**   45:10 54:7,10 119:17 125:12,15
**absence**   40:24 43:8,18,22 44:2
**abuse**   96:17
**accelerated**   150:1 150:2,4
**acceleration**   102:14,15 103:2,3 103:6
**access**   9:4
**accommodation**   134:5,8,10,12,15 134:16,19 135:4 135:10,14,20 136:2,3 137:2,5,6 137:7,10 138:6,15 138:17,22,24 139:13,15,17
**account**   97:16 157:22
**accumulates**   160:18
**accumulator**   111:10 155:9
**accurate**   8:14 134:14 166:14
**acknowledge**   169:11 170:16

[acrobat - areas]                                                                 Page 4

acrobat  13:22
act  150:23 169:14
  170:20
acting  166:13
action  5:18 68:16
  155:7
activate  131:9
activating  111:20
acts  33:18 110:16
  127:19 149:23
actual  63:16 133:2
  136:11,21
actuate  89:3
  111:19
actuated  88:17
  149:22
actuates  115:10
actuating  112:18
actuation  88:21
  151:14
add  9:24 63:14
adding  107:21
addition  84:19
additional  22:18
  62:24 82:20 83:1
  83:9,11,18 84:15
  84:19 85:1 86:4
  87:1 112:19
address  168:16
adequate  47:3
adjacent  66:5,6,18
  66:20 137:14
adobe  13:22
advance  112:22
advantage  112:23
  113:15 114:9,14
  114:19
advisor  21:21 22:2
  22:3
affect  102:14
  105:5 112:14

115:8
affixed  169:15
  170:21
aforementioned
  166:5,7
ago  52:3
agree  5:8 7:12
  11:15,17 26:2
  43:9,12 67:20
  92:3,22 93:23
  134:19 154:24
agreed  7:13,17,18
  7:21,22 137:9
ahead  22:15 40:18
  98:5 101:7 104:7
  106:6
air  18:15,19 88:1
  100:8 106:24
  110:14 111:7,8,10
  112:19 149:22
  158:3,20,23,24
  159:2,6,17,23,23
  160:5,8,14,18,20
  160:21 161:18,24
airflow  106:19
allergy  37:1
allow  111:19
allowing  160:21
allows  84:19 87:5
  142:12 159:17
  162:24
alternative  10:19
altogether  155:21
aluminum  157:17
amended  69:2
amol  2:3 6:3 10:21
  11:5 146:9 164:20
  168:5
amount  109:12,12
  118:21,23

analyses  150:24
analysis  45:12,15
  53:4 76:14 90:15
analyze  45:10
analyzed  76:20
angle  34:18 46:13
  47:6,8 48:2 49:11
  50:14 51:7 52:14
  52:17 102:18
  116:9,12 117:8,16
  117:19,23 118:4,7
  118:20 119:13
  121:19 122:8
  123:24 124:7,9,12
  124:14,17,19,23
  125:2,14 126:8,8
  126:21 131:21
  133:5
angled  95:5,23
  96:5 117:1 121:21
  122:4,6 125:16
  133:3,17
angles  105:14
  117:10,10 124:22
  131:23 132:6,8,9,9
  132:11,12,13,15
  132:23 133:19
angling  133:1,2
animals  20:6
annotated  51:9
  135:5,19
annotation  70:16
  128:13 129:5,8
  130:1
answer  7:17,20
  8:3 33:12 61:12
  62:8 82:4 90:18
  101:6 108:18
answered  58:23
  80:23,24 81:1

answering  85:19
answers  139:12
  166:12,16
anybody  152:10
anymore  65:17
anyway  33:19
  93:12 103:8
  145:16
aparikh  2:6
apart  88:22
apologize  121:10
apparatuses  21:3
apparent  115:3
appear  10:15 23:2
  37:4 159:10
  169:11 170:15
appearance  5:22
appeared  2:8,14
appears  71:18
  127:13 144:3
appended  170:11
  170:18
applicants  69:8
application  90:3
  133:12
applied  90:13
applying  75:22
  76:13
appropriate  32:15
  94:22 96:22 97:15
  97:23
approximately
  34:18
area  19:11 34:19
  35:20 40:1 58:5
  126:15 127:13
  129:5,8 130:1
  138:11 162:23
  163:21,22
areas  77:23
  131:17

HIGHLY CONFIDENTIAL

**[argument - battery]**

**argument**  23:19 57:9

**arm**  68:9

**arrangement** 124:4,8 125:7 126:15,18,20 154:19 155:1

**arrow**  162:1,2

**art**  10:1 93:15,16 94:23 95:9,11,12 95:13 96:4,12,23 97:23 120:15 131:3 146:23 154:21

**artisan**  95:11,17 95:22 96:15 97:2 97:15 119:7,12,16 143:24

**aside**  94:12

**asked**  58:23 80:23 129:15 166:15

**askew**  138:19

**asking**  38:18,19 46:18 49:20 81:24 83:7 106:4,5 110:22 146:16 147:16 149:12 162:7

**aspect**  147:2

**aspects**  23:19 52:5

**assembly**  93:6

**assert**  154:14

**asserted**  8:20 10:1 64:14 72:5 79:18 91:11,15,18 116:15

**asserting**  76:2

**asserts**  27:4,6,18 28:8,12 29:2,17 154:11,14,16,18

**assignment**  169:2 170:2 171:2

**assist**  73:22 85:19

**assisting**  15:12

**assume**  7:11 11:7 13:23 25:13 115:1

**assuming**  10:21

**atop**  148:5

**attach**  129:24 130:11

**attachable**  69:3

**attached**  56:12 69:3 130:12,20,21 130:24 142:1 166:22 170:7

**attaches**  129:4 130:4,9

**attaching**  129:7

**attachment**  19:6

**attachments**  18:8 18:11,24 19:4

**attempt**  72:14 74:8 75:16 124:3 124:7

**attention**  53:18 94:13 101:4 161:1

**attorney**  5:23 8:4 75:3 76:19

**audio**  5:7,7 89:23

**author**  25:13

**authoring**  25:18

**authorize**  170:11

**available**  44:21 54:4 148:6

**ave**  168:1

**avoid**  33:6 154:12 154:16,18

**aware**  154:7,8 155:19 156:20,22 157:1

**axial**  137:19

**axis**  39:6,8 43:16 137:20 138:20 139:9

---

**b**

**b**  38:16 72:23 86:14 128:13,21 128:22 129:5,8 130:1,12,13 135:15 142:18 144:6

**back**  12:9,11 19:14 20:16 22:21 22:23 33:16 36:5 37:3,17 38:14 40:15 41:21 44:17 46:9,11 52:13 53:8 61:13 72:8 74:6 78:19 79:9 81:10 83:3 84:10 95:9 99:5 109:15 113:9 115:18 117:14,21 120:24 125:19 126:1,6,17 127:3 129:11,12 129:21 130:16 135:12 137:1 143:1 144:22 152:4 156:5 164:24 168:16

**background**  14:18

**backward**  40:24

**backwards**  41:17 42:2,5,8,14 44:10

**balance**  48:8

**band**  159:18

**bar**  14:2 146:2

**barbecue**  18:8,11 19:11

**bars**  145:7,9

**based**  32:6,12 35:15 53:5 72:3 72:24 122:7 135:24 143:9 149:4

**basic**  121:15

**basically**  21:15 57:10 61:3 66:8 75:24 102:1,7 108:3 118:17 125:9,18 163:21

**bates**  68:5

**batteries**  60:16

**battery**  37:24 38:3 38:17,20 39:3,23 39:24 40:1,3,4,4,5 40:7,20,23 41:1,17 42:1,4,8,16 43:1,4 43:20,24 44:5,6,8 44:13 45:8,9 56:7 56:12,13 58:1,2 59:16,20 60:1,2,3 60:3,8,11,15,16,20 60:23 61:4,7,12,14 61:20,24 62:5,10 62:17,20,22 63:1,5 63:6,7,12,16,17,20 63:24 64:4,7,8,9 64:23 65:20 66:1 66:3,5,7,9,10,11 66:16,19 69:2,4,10 69:11,11,20,22 70:3,7,17,17,20,24 71:4,6,10,11,21,22 72:13,23,23 73:3,4 73:5,10,13,16,17 73:20,21,23 74:4,8 74:12,19 75:10,15 76:3,4,8 78:3,8,13 78:17 120:3 127:10,12,13,16

HIGHLY CONFIDENTIAL

**[battery - cam]**                                                                                      Page 6

127:18 128:20,24
129:2,3,7,23,24
130:5,11,14 131:4
131:5,7
**batting**  20:4
**bear**  10:4 12:21
13:14 21:8 23:24
39:12,13 59:24
77:16 84:1 91:4
129:11
**beauty**  102:12
**began**  15:7
**beginning**  5:22
67:15 94:16
100:18 151:8
**behalf**  2:8,14 6:1,3
**behaves**  86:13
**believe**  6:24 8:23
12:12 16:1,17
19:18 21:16,20
22:1,6,11 26:11,14
32:10,14,18,19
35:21 40:22 41:1
41:11 44:20 45:4
45:17 53:10 54:5
70:10 72:22 76:2
80:15 84:1,5
88:20 92:7,8
110:1,14 111:8
116:4 119:2
121:18 124:22
127:4 128:21
129:9,14 130:19
131:10,22 136:10
136:17 157:17
159:4 161:20
**beneath**  155:3
**bernard**  2:10 3:6
5:24,24 6:13 9:19
10:10,15 11:10
12:11 13:23 33:5

38:12 45:2,21
46:1,4,11 47:10
49:7 50:13 53:8
54:3,20 56:18
57:19 59:10,20
60:7 61:6,24 62:8
62:18 63:23 64:12
65:6 75:7 77:1
79:2,11,21,23
80:24 81:6,12
82:11,14 84:23
87:23 92:17,22
115:20 121:4
122:24 146:12,14
146:22 147:5,9,12
147:19 151:20
152:6 155:14
165:2
**best**  8:1,3 65:8
89:24
**better**  46:23 89:24
113:24 130:10
**beyond**  70:21
110:21
**bit**  13:10 14:18
29:7 31:8 67:11
71:9 139:3
**bits**  108:7
**black**  38:6 41:19
42:23 61:15 73:3
73:11,14,17,21,23
74:4,5
**bleeding**  122:19
**bless**  65:11
**block**  57:13
**blocked**  123:21
**blow**  37:1 71:9
**blows**  109:23
**blue**  34:7 36:22
128:1,7 162:4,8,18
163:1,2,6,13,22

164:6,9,10
**body**  30:9 31:9,13
31:17,20 32:3
33:19 34:16 36:22
40:22 125:12
143:18,19,21
144:4 149:23
150:1,2,13
**boggs**  18:22 19:17
20:16
**bolt**  66:15,22
**bolts**  66:8
**bostitch**  14:19,22
92:2,4,23
**bottom**  12:17
21:19 34:16,22
35:18 48:14 50:6
50:11 51:23 53:8
55:19 68:5 78:13
93:2,4,11 97:13
118:6 136:5 138:8
148:8 150:6,7,17
151:12
**bound**  134:20
**boundaries**  34:10
35:2,7,11,14
**boundary**  34:15
35:3,10
**bounded**  134:15
139:17
**bounding**  163:21
164:2,3
**box**  119:11,20
**boy**  148:23
**brad**  16:8
**break**  7:14,15 46:2
54:14,17 79:4
108:1 115:13,20
115:21 151:18,22
151:24 152:6,11
164:17

**bring**  51:6 53:18
**broad**  80:16
**bt35**  92:7
**bt35b**  92:2,4,23
**buck**  124:13,17,20
124:23
**buck's**  124:3,8,23
**buffering**  67:14
**building**  133:15
**built**  138:1
**bulging**  51:2
**bullet**  17:22,22
18:6,13,22 20:17
**bumper**  16:7
150:7,9,16 151:12
**bumpers**  16:5,6
149:1
**business**  126:2
**butter**  22:3,5
**button**  131:8
**buttons**  131:15,17

**c**

**c**  72:23 86:14
143:20 145:16
166:2
**c.a.**  1:6
**ca**  168:24
**cable**  20:19,22
**call**  35:24 36:21
39:23 93:7 100:12
102:3 111:6
112:21 115:9
126:12 159:21
**called**  6:9 100:13
**calling**  61:19,19
73:1
**calls**  60:10 61:10
62:3 76:17 144:4
**cam**  49:1 80:6,19
81:23 83:13 84:20
85:9 86:2,11

101:17 102:8,11
102:12,12,13,16
102:23,24 103:5,9
103:12,18 119:21
125:7 126:14,18
**camming** 126:14
**cap** 157:17
**capacity** 7:3 8:18
**capping** 158:1
**caps** 148:23
**car** 17:13,15 19:21
19:24
**carlin** 17:20,21
**carol** 1:14 5:16
166:5 167:9
**cartridge** 16:4
**case** 5:14 8:22
32:4 146:21,24
167:2 168:6 169:3
170:3
**casing** 51:13,14,16
53:12,16 54:10
117:24 118:1
**catch** 55:4
**caught** 143:12
**cause** 102:2
111:12 149:20
150:20
**causes** 102:2
150:13
**cb** 19:5
**ceilings** 105:14
**cell** 5:5
**cellular** 5:4
**center** 20:10 97:13
97:13 124:10
148:5,8
**central** 79:3
**certain** 8:19 12:1,2
15:12 17:4 23:16
23:19 25:19 27:4

27:7,19 28:9,13
76:15 97:11
118:21,23
**certainly** 35:19
108:10
**certificate** 170:11
**certification** 169:1
170:1
**cetera** 114:16
**cfc** 1:6 5:15
**cfr** 68:12
**chamber** 147:23
148:2,4,10,13,14
153:2,4,17,20,21
154:4,9,21 155:2,3
155:21,24 156:4
156:24 157:11,12
157:14,18,22,24
158:1,5,8,8 159:2
160:17,19
**chambers** 112:4,8
148:23
**chance** 8:4 107:13
108:5
**change** 7:20
102:15,22,24
103:2,6,17 148:16
151:18 168:14,15
170:8 171:3
**changed** 121:7
**changes** 87:22
102:13 148:8,10
168:13 169:7
170:7,9
**channel** 114:21
115:5 158:3,21,23
159:7,16,18,19,19
159:20,23 160:1,5
160:9,9,14,20
161:10,10,14,17
161:24 164:7

**channels** 112:4
114:17 115:2
**characteristic**
102:17
**characteristics**
107:22
**check** 46:23
160:10
**chemical** 100:3
**chicago** 2:5,12
167:11
**child** 20:10
**children** 17:24
20:1,3
**children's** 18:4
19:9,11,23 20:14
**chip** 21:17 22:2
**chips** 21:17
**choice** 31:24
**choices** 154:20
155:1
**choose** 155:1
**chose** 118:20
**circle** 40:1 70:15
161:23
**circled** 70:15
161:18 162:2
**circles** 161:8,23
**circuit** 92:14
**circumnavigate**
162:11
**citation** 25:23 26:5
**citations** 25:19
**cite** 77:4 106:21
153:12
**civil** 1:15 166:20
169:5 170:5
**claim** 31:21 38:16
38:18 59:23 60:10
61:4 62:7 64:12
64:18,22 65:17,19

65:24 72:21,22,22
73:12 75:21,22
76:1,7,15,20,21,23
76:24 77:2 78:16
79:1 80:1,14
82:18,23 83:3,4,16
84:13,18 85:22,23
86:10,14 87:1,4,6
90:7 91:9 94:4,6
136:19,23,23,24
137:1,2 148:11,13
**claimed** 154:19
**claiming** 8:19
**claims** 27:8,19
28:9,14 38:22
52:6 59:24 61:21
63:6 64:11,15
72:5 73:1,8 75:2,2
75:5,12,19 76:13
79:18 87:4 91:11
91:15,18 93:18
116:16 135:12
148:12
**clarification** 7:10
7:11 33:1 97:21
**clarify** 7:20 101:6
124:18 146:3
149:15
**classic** 42:20
**cleanest** 100:9
**clear** 8:2 36:11,12
50:17 52:12 59:2
72:14 74:8 84:9
89:4 101:12
117:19 124:1,18
124:20,24 126:5
134:7 140:2 144:5
147:16
**clearance** 42:19
117:19 138:1,4

clearances  42:15
clearest  8:5
clearly  39:13 57:1
  59:8 69:9 113:23
  119:22
cleveland  168:2
clog  107:6,13,15
  107:22 108:10,24
  109:1 111:11
clogging  99:17
  108:8 109:6,17
clogs  106:22
  107:11 108:15
  109:1 110:2 111:2
  111:18 112:5
close  14:5 51:21
  56:7 125:20
closed  92:4,23
  93:3,6,6,9,9,11
  94:1,1,9 142:6
closer  65:6 126:10
co2  16:4
coffee  115:23
coil  155:12
collated  121:18
color  38:6
colors  38:6 163:9
column  55:8 56:9
  57:24 64:13,19
  133:24 134:2
  139:23 140:4,5
  141:3,19 142:9
  144:11 158:18,20
  160:17
columns  55:7
combination
  99:16,23 100:24
  126:12
combinations
  133:19

come  31:1
comfortable  53:21
coming  26:17
  88:22
commencing  1:17
comments  9:20
commercially
  44:20 45:5
commission
  169:19 170:25
  171:25
common  106:23
  120:14 133:10
  156:7
compact  119:10
companies  156:16
company  5:11
  12:17 14:19 15:10
  15:12 16:9 168:6
  169:3 170:3
compare  67:7
compared  108:11
  109:5 115:3
comparing  107:7
  113:13 114:5
comparison  114:3
  114:10
complete  8:14
  166:15
completed  168:16
complex  99:16,17
  113:3
component  38:8
  38:12,19 55:20
  56:21,22 57:9,15
  57:17 58:3,17,22
  59:2,3,5,7,14,21
  60:9,24 61:8,20
  62:24,24 63:18
  65:21 66:12 70:6
  70:21 71:8,23

73:3,14,19 78:12
  80:16 81:5 82:2
  82:21 83:6,11
  86:23 87:2,5,13
  100:7,9 102:14
  104:17,20,22
  105:4 110:15
  112:9 114:2 140:9
components  15:13
  17:5 31:5,15 32:1
  32:6,11 55:16
  57:4,6 58:5 62:1
  62:11,19,19 63:21
  64:8 73:22 80:9
  80:10,12,13,22
  81:4,15,19 82:7
  83:1,9,17,18,20
  84:15,19,20 85:2,7
  85:14 86:5 87:7
  87:18,22,24 88:22
  97:4,8 100:6,12
  103:1 107:20,24
  108:22 109:19,24
  112:24 113:6,17
  113:18 114:1,10
  114:11 117:21
  136:1 142:22
  148:19,22,24
  149:1,3,20 150:10
  150:24 151:1
  157:8 160:14
compound  46:13
  47:6,8 116:9,12
  117:8,15,19,23
  118:3,19 119:13
  119:19 122:8
  123:24 124:7,12
  124:13,16,19
  126:8
compressed
  106:23 158:24

160:18,21
comprised  84:6
comprises  30:9
comprising  137:3
computer  118:10
concept  95:12
concludes  165:8
conclusion  61:11
  62:4 76:18
confidential  1:11
confirm  12:14
  23:6 53:15 98:12
  164:18,19
confirmed  104:4
confusing  141:23
confusion  33:7
  138:21 139:3
  141:18 143:4
  149:14
conjunction  16:15
connect  64:6
  91:19
connected  32:8,13
  40:10,12 48:24
  60:1 61:5 64:22
  65:3,15,19,22 66:1
  108:4 127:16,18
  130:12 161:22
connecting  45:8
  92:5,24 93:11
connection  35:20
  39:3 40:10,16,19
  42:19 56:19 63:8
  67:10 127:12,19
connections  56:16
  64:5
connectors  61:16
  62:23
connects  35:24
  36:20 40:3 66:16
  110:20 111:1

127:10 161:23
164:9
connolly   1:14 5:16
166:5 167:9
consider   143:24
158:6
considerations
157:21
considering   158:7
consistent   74:12
74:18 75:9,17
consisting   80:5,18
81:23
consists   83:12
construction
75:22 80:3,14
82:18,24 83:4,5,8
83:16 84:14,18,24
87:4 95:5 96:8
156:12
construed   79:24
consultant   15:21
consulting   15:19
15:19,24 16:10
contact   39:24
44:15 50:16 89:10
89:15 130:7,9
136:16,20 137:16
137:18,21 138:12
138:14 139:9
141:1,10 142:16
143:15 149:1
contacted   130:5
contacting   164:10
contacts   35:20
40:9 44:8 130:12
137:1 139:6
141:12 150:7
161:16
contained   20:8
37:11 50:20

container   21:17
22:3
containing   151:3
contains   11:24
12:1 23:16 97:22
contaminants
96:17 114:16
context   130:6
continue   5:7
143:22
continued   147:17
continuing   77:3
continuously
15:15,17,17
contrast   55:20
control   161:10,14
161:17
conventional
112:21
conversation
151:9
conversations   5:4
cook   167:4
copies   9:13,21
33:9 77:7
copy   10:1,20,21
24:1 67:3,4 98:13
166:21
corner   36:16,23
68:6
correct   11:23 12:3
14:23,24 15:2
16:24 17:1,6
19:16,22 20:14,15
23:17 25:23 26:8
26:22,23 27:3,13
27:14 28:4,21,22
29:12,13 30:1,20
31:21 33:24 34:8
34:9,13 35:2,8,12
35:16 38:1,2,4

39:10 41:7,8,10
43:16 44:1 47:18
50:12,13 53:13,14
55:7,15,21 56:1,10
57:18 62:20 63:18
64:15,16 66:12
68:18 69:5 71:8
72:1 74:19 79:13
79:14 80:1,2,6
82:14 83:19 85:7
88:12,13 89:11,16
90:4,5,16 91:6,12
91:13 94:24 95:1
96:13,14,20,24
97:1,5,6,17,24
98:1,18,22,23 99:3
99:4,14 100:16
101:2,17,18
111:15,24 112:6
115:6,7 116:18
117:16 118:5
121:12,13,20,22
121:23 122:2,3,5
122:11 123:4,5,12
123:13,23 124:2
124:21 128:1,2,8,9
128:11,12 132:1,5
132:8,22,24 133:7
134:5,9,13,20
135:7 136:2,8,13
137:11 138:8,16
140:6,7,10 141:11
141:15 142:16
144:9,18 145:3,8
145:18,21 148:10
150:15,18 151:13
153:12 154:5,6
159:3 162:19
163:3,19 164:14
164:15

correcting   19:19
correction   26:5
corrections   168:13
170:17
correctly   157:10
corresponds   68:6
counsel   2:2 5:10
5:20 26:1,7,12
38:10 59:18 65:4
90:12 115:22
152:7 166:9 167:2
count   34:19
counting   111:13
county   166:2
167:4 169:10
170:15
couple   43:11 98:5
151:21 156:8
coupled   80:4,17
80:20 81:2,18
82:19 88:12,15,17
89:1 136:18,19
coupling   81:3
88:19
course   7:19 26:24
27:16 80:3 150:3
court   1:1 5:14,16
6:6 7:23 38:10
49:5 54:2 59:18
65:4 74:21 78:20
79:20 81:17 82:10
169:7
court's   82:18,23
83:3,4,8 84:13,18
84:24
courtroom   8:11
courts   1:16 79:24
166:21
cover   143:19,21
144:4

HIGHLY CONFIDENTIAL

**[cradle - detached]** Page 10

**cradle** 21:18
**create** 36:14 91:16
  134:10
**created** 16:4 30:5
  30:8 96:18 149:13
  149:18
**creates** 36:23
  60:17 93:24 150:8
**critical** 93:16
**cross** 71:2,6,10
  72:6 110:16
**crosshatch** 71:17
**crr** 1:14 166:6
  167:9
**csr** 1:14 166:6
  167:9,9
**cumbersome**
  126:20
**cumulative** 148:6
**curfman** 17:20,21
**currently** 65:7
**cut** 58:24 70:9
  96:2
**cv** 14:10,14,15,21
  16:1,3,20 17:10,19
  20:17 21:9
**cylinder** 148:15,23
  155:6,8,14,17
  157:17 158:1,24
  159:1,2,12,14
  160:5,21
**cylindrical** 36:21
  36:21

**d**

**d** 3:1 72:23 86:14
  166:20
**d440,136** 4:7
  123:7
**damario** 2:4 6:5
**dash** 70:23

**data** 93:16
**date** 8:24 166:6
  168:9 169:3,9,19
  170:3,13,25
  171:20,25
**daughter** 65:7
**dave** 2:17 5:15
  54:16 146:5
**david** 2:10 5:24
  9:11 13:17 78:19
  92:16
**day** 1:18 6:19
  167:5 169:16
  170:22 171:22
**days** 168:19
**dbernard** 2:13
**dead** 97:13,13
  148:5,8
**deal** 6:18
**dealt** 157:12
**dear** 168:10
**debris** 108:7
**declaration** 17:23
**declarations** 17:11
  18:7,14,23 20:18
  21:2
**decouple** 88:19
**decrease** 104:15
**deed** 169:14
  170:20
**deemed** 168:20
**default** 100:13
**defeating** 112:10
**defendant** 1:8
  2:14 6:1
**defendants** 5:11
**define** 32:6,11
  39:1 90:21 103:10
  109:1,3 116:11
**defined** 33:22,23
  33:23 34:1 135:6

135:20 148:14
**defines** 143:17
**defining** 37:3
**definitely** 114:18
  118:22 122:6
**definition** 36:18
  72:15 74:9 90:24
  91:5 138:2
**degree** 34:18
**degrees** 133:11
**delaware** 1:1 5:14
**delineate** 32:15
  33:18 163:13
**delineates** 71:3
**delineation** 36:6
**delineations** 33:20
**delivery** 17:4,8
  21:12,15
**department**
  168:22
**dependent** 107:16
**depending** 49:12
  141:23
**depends** 42:15
  44:15 105:1,5
  106:2 111:16
  113:2,19 119:13
  133:12
**deponent** 166:21
**deposed** 6:21 7:2,6
  8:17
**deposition** 1:13
  2:2 3:2 5:6,10
  6:16 7:6,8,19
  17:11 18:14,23
  26:24 116:1 147:6
  165:9 166:4,9,19
  168:9,12 169:1,3
  170:1,3
**depositions** 1:17
  12:17

**depressed** 97:10
**described** 62:6
  81:21 82:1 86:14
  86:24 107:3,24
  127:24 140:17
  143:21 151:8,10
**describes** 134:4
  140:6 147:23
  153:16
**describing** 140:23
**description** 36:13
  55:10 56:21 144:3
  160:2
**design** 15:8,9,12
  16:10,14 19:10,14
  19:21,21 20:21
  21:8,20 36:15
  45:7 87:12 95:4,5
  95:23 96:5,19
  106:18,20,22
  108:6 109:8,15,17
  113:2,5,6,20 114:2
  118:4 119:13,19
  120:6 121:15
  125:12 148:22
  149:4 154:19
  155:1,22 156:7
  157:9,21
**designed** 16:7,7
  20:4 113:19
  144:17 148:18,19
  158:6
**designing** 15:1,4,6
  15:22 17:7,15,17
  18:3,10,18 19:3,5
  19:9 20:14 21:6
  97:17 148:21
  157:22 158:8
**desired** 119:7
**detached** 130:20

**determine** 45:8
48:23 49:2 54:8
54:10 131:2
**determines** 49:16
**determining** 76:15
**developing** 16:4
**deviate** 137:19,21
**device** 16:8 19:6
20:10 21:19 22:5
**devices** 18:24 19:4
**diagram** 140:17
**diameter** 115:3
**dictate** 158:10
**difference** 76:13
101:10 102:10
103:3 112:7
118:21 130:7
154:12,16,18
**differences** 101:11
**different** 13:10
14:1 22:3 32:1
47:10 61:17,23
62:15,18,19 63:21
76:5 83:21 93:13
95:10,14 105:20
113:4 117:11
126:21 133:18,19
142:2,5 145:15
150:11 151:7
156:16,16 160:14
**differentiate** 156:5
**differently** 157:3
**difficult** 34:3 36:4
38:6 41:18 50:15
104:11 106:20
126:1 163:9
**digits** 26:23
**dimensions** 103:10
104:11 115:1
127:1,4 146:2

**dinosaur** 20:11
**direct** 94:17 161:1
**directed** 137:20
**direction** 30:8
39:4,7,24 40:8
44:12 48:5 53:7
86:21 102:18
117:1 123:20
124:10 131:21
132:17 136:22
145:2,24 146:3
150:3,14 159:1
**directions** 116:13
150:2
**dirt** 106:23
**disabled** 20:3
**disagree** 88:10
101:15 154:2
**disclose** 124:13
**disclosed** 56:12
99:19 100:1,16
113:16,18 124:17
124:19
**discloses** 79:13
99:15 153:2
**disclosure** 69:9
**disconnect** 88:18
**discuss** 33:14
37:10 58:12 72:4
77:5 96:11 116:4
116:11 141:5
149:12 152:10
**discussed** 19:12
42:2,9 61:13 72:5
73:6 140:17
150:12 151:11,13
156:23
**discusses** 55:9
76:1,2 116:15
137:2

**discussing** 14:14
29:24 35:9 41:16
41:21 73:18 81:13
114:20 117:18
129:19 131:22
146:22 157:8
**discussion** 52:14
72:3 73:18 115:7
115:21 152:7
**displace** 131:5
**displacement**
102:13
**distance** 138:2
**distinct** 92:5,24
**distinction** 99:22
100:14,20,21
130:8 146:1
**distinguished**
133:1 163:9
**district** 1:1,1,16
5:13,14 166:21
**divides** 137:10
**doctor** 9:4 10:6
37:17
**doctrine** 30:1 90:3
90:6,11,14
**document** 11:12
22:24 23:9 24:10
25:1 34:3 56:4
**dog** 21:24
**doing** 44:7 112:20
115:9 147:16
**double** 112:17
115:9
**downward** 39:10
39:11 40:6 43:15
85:13 86:1,9,18
87:11,18
**downwardly**
69:20

**dr** 5:10 6:4,14
9:13 10:20,21
11:7 12:11 22:18
33:2,5 46:11
54:23 58:4 61:7
62:9 66:23 72:8
75:23 77:19 79:11
81:12 90:19 94:10
95:6 98:8 115:20
121:5 123:2,10
127:6 138:21
139:20 146:10,19
147:19 148:17
151:23 152:6
161:1 165:2
**dragging** 137:24
**draw** 101:4
**drawing** 55:11
58:16
**drawings** 59:6
115:1,2
**drive** 39:6,8 43:16
48:24 89:7,12
97:5 115:10 125:8
125:9,9 126:12,13
126:13,19 149:11
**driven** 89:2,13
148:7 150:13
**drives** 155:18
**driving** 40:6 88:23
89:2 150:3
**drops** 155:8
**due** 99:17
**duly** 6:9 166:10
**duty** 112:17
115:10

| e |
|---|

**e** 3:1 72:23 166:19
**earlier** 7:15 70:11
73:6,17 74:1
115:7 117:18

**[earlier - exhibit]**                                                                 Page 12

118:5 122:8
**easier** 24:2,3 35:18
**easily** 14:3 116:11
   130:4
**edges** 161:17
**effect** 48:3 49:9,12
   52:22 95:4,19
   112:16 149:16,21
   150:21
**either** 36:13,15
   108:7 137:21
   155:2
**ejected** 31:5
**ejecting** 123:20
**ejection** 69:20
   117:1
**elastic** 159:8,21
**elastomer** 149:1
**electrical** 39:3
   40:16,19 42:20,21
   56:16,18 61:16
   62:23 63:8 64:5
   100:4 127:12,19
**electrically** 40:3
   64:6
**electronic** 13:4
   17:4,7 98:13
**element** 38:16,18
   86:10 108:4
   115:11 148:14
**elements** 109:7
**eliminate** 155:20
**ellipse** 70:23
**elongated** 70:16
   70:20,24 71:1,4,18
   71:21 145:6,9,21
   145:23
**elongates** 69:21,22
**email** 168:17
**embodiment** 55:3
   55:6 72:15 74:10

74:13,17 75:1,8,11
   75:17,17,20 76:7,9
   76:21 78:23 79:1
   82:1,3,6 114:19
   142:14,24
**embodiments** 75:3
   81:21 142:11
**emery** 2:3 6:5
**enabled** 85:12,24
   86:8,17 87:9,17
**enclosed** 168:12
**encourage** 20:4
**encouraged** 20:11
**ends** 14:11 51:15
   161:22
**energy** 16:8
**engaged** 8:21
**engineer** 15:8 59:5
**england** 15:11
**enlarged** 35:18
**ensure** 48:16
**enter** 159:17
**entered** 170:9
**entire** 59:8 88:15
   89:5 128:3 148:21
   155:7 169:5 170:5
**enunciate** 89:24
**equivalents** 30:1
   90:3,7,11,14
**errata** 168:14,19
   170:7,10,18 171:1
**error** 39:22
**escape** 160:21
**especially** 7:24
**esq** 168:5
**et** 114:16
**evacuate** 97:11
   158:5,13,14
**evacuated** 158:4
**exact** 8:24

**exactly** 9:12 47:14
   61:3 73:10 85:3
   120:11 134:18
   144:19 157:19
**examination** 3:5
   6:12
**examine** 54:19
**examined** 6:10
   108:13 120:10
   166:11
**examining** 108:16
**example** 25:21,23
   36:16 40:21 42:17
   49:10 50:17 58:6
   59:23 74:1 77:17
   83:22,23,24 84:8
   86:13 97:12
   102:17 103:13
   105:2,2 106:8
   107:7 109:18
   114:22 116:23
   118:2 119:20
   131:6 132:20
   135:15 136:10
   143:7 148:12
   151:4 155:12,16
**examples** 75:4
**excerpt** 134:7
   140:23
**excessive** 124:23
   124:24 125:2
**excessively** 124:9
**exchange** 163:12
**exchanged** 161:9
   161:13 162:3,7,17
   163:2,5,6
**exchanges** 162:14
**excuse** 52:11
**executed** 170:10
**execution** 169:14
   170:19

**exercise** 20:6
**exhibit** 3:13,15,17
   3:18,20,21,22,23
   3:24 4:1,2,4,5,6,7
   4:8,9 9:5,14 10:7
   11:3,11,13,15,17
   11:19 12:12,12,13
   12:15,16,18 13:2
   13:10,18 14:11,12
   16:21 22:8,10,19
   23:3,7,8,23 24:7,8
   24:18,22,23 25:6,8
   25:11 26:15,16,18
   27:2,10,11,15,16
   27:22,23,24 28:2,5
   28:16,17,20,23
   29:8,9,11,14,21
   32:20,22,23 33:6,8
   33:13 34:4 36:6
   37:6,8,18,21 39:16
   39:19,20 41:4,24
   42:7 43:19 44:19
   45:3 46:22,22,23
   47:2 48:7,10
   49:24 50:7,11,21
   51:9 52:13 53:9
   54:12,23 64:13
   65:3 66:24,24
   67:2,5,23 68:1,12
   68:20 69:15 70:12
   72:9 77:9,13,14,15
   78:1,10 79:12
   80:15 81:20 82:8
   82:13 84:3,10
   88:4,8,9 89:18
   90:9,10,20 91:21
   92:15 93:8 94:13
   94:19 96:11,21
   98:7,8,9,10,11,12
   98:14,16,17,20,24
   99:2,5 100:22

HIGHLY CONFIDENTIAL

103:19 106:13
108:21 122:19,24
123:4,6,8,9,10
127:7,22 128:4,7
129:1 130:3
133:22 134:24
135:5 139:19,21
139:22 140:3
147:20,21 152:14
152:16,19,20,21
158:16 160:3
161:3 162:6 163:7
**exhibits** 3:11 9:9
9:12,18 10:13,14
12:13,18 13:11
22:16,19 23:1
26:10,13 94:12
98:6
**exists** 148:4
**expand** 25:17 97:7
**expanding** 137:3
145:14
**expected** 96:17
**experience** 14:18
15:5,14 16:23
17:7,15 18:3,10,18
19:3,14 20:13,21
21:6 95:23 96:5
133:10 148:17
149:4 157:9
**expert** 3:17,19 4:2
7:3 8:21 11:20,22
12:22 16:24 17:3
17:11,23 18:6,13
18:23 20:18 21:1
23:10,14 24:11,14
24:15 25:3 29:21
32:21 33:3,11,16
37:5 39:18 41:3
41:10 45:21 72:9
77:12 82:9 89:18

90:15 91:21 94:13
99:6
**expiration** 169:19
170:25 171:25
**explain** 63:5 72:20
127:9 128:17
149:5 161:13
163:10
**explained** 25:24
62:14 164:1
**explains** 39:12
143:4
**exposed** 58:1
**extend** 57:7 70:21
143:11
**extending** 30:7,8
60:4 128:20,24
129:3
**extends** 30:5 53:12
53:16 54:10 71:7
71:23 160:6
**extent** 22:6 125:12
125:15
**exterior** 30:14
55:18,20 57:7
58:2 161:10,14,16
161:18,21 163:19
163:20,24 164:5
164:12
**external** 55:12
121:15 149:15
**extruding** 93:14
**extrusion** 93:4,5

**f**

**f** 27:7 30:19 31:16
38:13,16,24 43:9
43:19 44:19,20
45:3,4 46:12,12,14
47:5,11,12 48:12
48:13,17 49:18
50:3,5 52:2,20

53:1 54:9 73:15
86:14 117:15,24
119:15 120:2,2,7
121:11,15,19,21
122:1,4
**facing** 106:3,4
**fact** 7:2,3,7 31:19
83:24 93:23 160:5
**faculty** 15:10 16:3
**faded** 29:6 31:8
**failure** 87:21
**falling** 19:14 40:23
41:17 42:1,4,8,14
**familiar** 7:7 52:4,5
93:4 119:24 120:6
147:24
**far** 49:15 53:22
105:10 118:7
126:21 156:3
164:12
**farther** 86:20
118:19 126:1,17
**fashion** 86:24
135:11
**fastener** 89:9,13
89:13 93:9,10
97:5 103:9 112:19
136:16,21,22
137:8,15,18 138:7
138:13 139:4,6
141:2,10,13
142:16 143:16
145:2,4
**fasteners** 96:18
103:11 134:17
135:10 136:12
138:16,18,19
139:14 143:2,3
144:17 145:8
**fastening** 16:11,16
16:18 30:22 65:24

**faster** 13:14
**feature** 69:10
**federal** 1:15
**feed** 95:5,23 96:5
**feeding** 96:18
124:9
**feel** 46:17 101:22
145:11
**feels** 149:16 150:8
**felt** 113:3
**fi** 67:11
**fields** 106:19
110:12
**fifth** 17:18 69:18
**figure** 13:21 33:18
34:14 35:17 36:4
36:11 38:5,13
40:2 41:18 42:13
44:24 46:14,16
53:18,19 55:19,19
55:22,23,24 56:15
56:18,22 57:1,8,14
57:23 58:4,10,12
59:1,2,8,9,10,12
59:14,15 65:15,22
66:2,17 69:19
70:3,6,9,15,22
72:1,16,18,18 74:5
74:5,10,13,17 75:1
75:6,7,11 76:10,11
76:22 77:1,3,17,22
77:22 78:4,5,8,14
78:24 79:13 84:4
92:8 93:2,8,23
100:6 101:24
102:1,6,21 104:2
108:22 109:15,16
109:22,22 110:6
114:17,21,23
115:4 116:23
117:4 118:16

HIGHLY CONFIDENTIAL

[figure - fusion]                                                        Page 14

125:1,18,23 126:7
128:14 130:2
131:6 134:21,23
135:19 136:9
138:9 140:8,11,12
140:14,23 141:16
141:17,23,24
142:1,3,6,14,17,23
143:1,2,7,23 144:3
144:4,6,23 153:5,8
153:10 159:4,6
160:6,23
**figures**  39:22 47:3
48:1 50:1 55:2,5,9
55:12,14 58:13
59:4,11,13 69:2,9
104:16 117:11
127:5 131:2,14,19
142:4,9 144:22
**file**  4:1 12:15 67:5
67:6,23 71:13
**filed**  5:13 9:2 69:8
**fill**  97:11 148:6
158:11
**financially**  5:18
**find**  31:12 32:18
39:13 77:16 80:14
107:19 110:12
129:11 153:12
168:12
**finding**  44:24
104:6
**fine**  9:23 11:6,7,8
54:18,22 78:20
79:5
**finger**  105:3
**finish**  82:4 121:17
121:17 122:1
**finished**  31:7
58:19

**fire**  89:8
**fired**  149:6,16,19
150:21,22
**firing**  43:15 89:6
149:9,10
**firm**  17:19 26:6
45:19
**first**  6:9 7:5 8:21
14:15 17:2,22
18:22 55:4 82:24
96:1 105:19
132:13 166:10
**fit**  42:16,24 45:8
**fits**  44:16 75:11
86:20 144:7
157:11
**fitter**  42:24
**five**  164:19
**fixturing**  16:6
**flip**  46:17
**flipper**  102:4,4
**floor**  133:15
**flow**  158:24
**flows**  36:17
**fluid**  161:9,13,20
162:3,7,14,17,24
163:2,4,5,5,11,17
164:13
**focus**  36:6
**folder**  10:13 12:14
23:1
**following**  2:2
37:23 69:16 86:15
**follows**  6:11
**food**  21:3,7,11,12
21:14 22:1,7
**force**  149:18 150:4
150:5,8,9,12,16
151:11,13 158:2
**forces**  43:3 95:3
95:19 111:10

149:5,8,12,15
150:11,19,20,22
151:7,8,15
**foregoing**  166:4
166:14 169:13
170:18
**forementioned**
166:16
**forget**  102:3 139:7
155:11 162:11
**form**  30:7 81:4
84:8 90:22,24
91:2,6,7,14 100:11
155:4
**formed**  30:23 92:5
92:24 93:3 94:6,9
158:23 160:20
162:20 163:4,10
163:14,18,21
164:8,14
**formerly**  160:5
**forms**  162:23
**forth**  64:21
**forward**  33:7
106:9 128:21
150:4 168:16
**found**  50:7 68:7
112:5
**foundation**  98:4
**four**  34:21 37:14
**fourth**  18:13 30:3
123:15 129:1
**frame**  20:5,9
41:21 150:10
161:11,15,16,19
161:21 162:4
163:19,20,24
164:5,11,13
**framed**  136:4
**framepro325**
28:13

**framepro325xp**
28:9
**framing**  133:15
**franklin**  167:10
**free**  46:17 56:10
101:22 145:11
169:14 170:20
**frequencies**
150:23
**frh**  28:13
**friction**  137:17
**front**  9:14 10:20
11:9,10,15 22:9,14
53:17,23 99:7
105:3,21 106:1,3
125:21 126:15,19
**froze**  146:9,12,14
**fulcrum**  102:2,7,9
102:10 103:13
**full**  26:21
**function**  38:8,12
38:21 39:2 47:14
52:5 63:23 79:24
85:11,15 86:3,5,7
87:9,14,16 88:2
90:7
**functions**  85:23
87:3
**further**  69:18
126:6,9 141:5
165:3
**fusion**  27:7 30:19
31:16 38:13,24
43:8,19 44:19,20
45:3,4 46:12,12
47:5,11,12 48:12
48:12,17 49:18
50:3,5 52:2,20
53:1 54:4,9 61:14
73:15,24 117:15
117:24 119:15,24

120:2,6 122:13
125:20 129:12,19

**g**

**gap**   134:12 163:18
**gear**   49:1 119:11
119:20,21 125:6
126:11,13,14,18
127:2
**gears**   90:19 94:10
133:21
**general**   58:16
59:15 85:18
104:17,22 107:10
137:6 149:9
**generally**   46:18
113:12 145:20,20
148:20,21 158:14
**geometry**   162:23
**getting**   14:4,5
61:18 147:3
**give**   8:4 19:7 25:3
32:24 67:1 94:7
108:16 134:21
153:7 159:23
**given**   49:19 90:12
146:10
**gives**   125:21 142:5
142:5
**glands**   20:19,22
**glasses**   56:7
118:11
**glenn**   1:13 3:2,13
3:15,17,18 5:10
6:8 11:20 12:22
23:10,14 24:11,15
25:3 32:21 168:9
169:4,9 170:4,13
171:20
**glued**   32:2
**go**   5:8 6:20 7:5
9:11 12:5 14:17

22:15,20 24:24
33:16 35:17 37:17
40:18 41:21 56:21
59:24 70:12 72:6
78:15 81:20 98:5
101:6 104:7
106:12 109:16
110:14 112:3
113:9 117:14,21
120:20 122:23
126:21 127:5
129:11,21 130:16
139:8 146:17
163:22 164:20
165:7
**god**   65:11
**goes**   34:19 71:10
89:23 106:21
126:1,17 137:1,18
146:6 151:4
154:15 164:5
**going**   5:1 7:5,8 9:8
9:12 10:22 11:2
12:6 14:8,13
17:10 20:24 21:18
23:5 31:12 32:1
33:7 36:24 37:3
38:14 41:20,20
43:5,10 45:16
46:6 48:23 53:8
54:16,18,19,20
56:6 60:14 67:15
68:9,19 71:9 72:2
74:6 77:3 79:6
80:14 83:3 98:5
99:11 108:17
109:21 110:7,21
111:4 115:12,15
116:18,19 118:10
120:21 122:10,24
125:4,10 126:18

127:3 133:21
134:21 139:6
146:20 147:5,7
151:17 152:1,16
157:16 158:15
164:2,7,21
**good**   5:1 6:14,15
12:20 46:1 79:4
115:14 151:21
164:20
**goodrich**   21:1
**grab**   54:17
**great**   12:24 14:17
118:9 125:12,15
**greater**   125:21
138:3
**green**   51:12,14,17
53:9,12,16 54:11
73:2 128:11 135:4
135:14,20 136:12
138:22 139:4
162:5,8,14,15,21
162:21 163:1,10
163:12,12,14,15
163:15,21,22
164:3,4,5,8,9,10
164:11,16
**grills**   18:8,11
19:11
**grip**   131:17
**groove**   34:16
35:19 74:1,2
129:9,10,14,15,19
**grooves**   40:16,19
40:22 41:13,15,24
42:7,12,16,17 43:1
43:2,8,18,22,23
44:2,7,18 45:2
73:18
**ground**   7:6 132:23
133:3,4

**guess**   79:16
114:15 146:3
155:16 162:2
**guessing**   131:12
**guide**   134:4,7,10
134:17 135:10,15
135:21 136:1,4,7,7
136:15,16,17,19
137:1,7,11,14,15
137:24 138:2,8,9
138:15,18,23
139:1,4,14,16
140:6,19,24,24
141:9,12,14,15,16
141:19,20,21,21
142:10,11,15,17
142:19,20,21,22
143:8,10,14
144:12,13,14,17
144:19,20,24
145:6
**guides**   135:16
137:7 140:18
**guiding**   136:6,20
136:21
**guys**   70:8

**h**

**half**   109:2 115:12
**halfway**   153:16
**hand**   36:2 68:5
99:13,14,15
**handle**   30:4,6,7,8
30:9,15,18 31:1,16
32:16 33:19,21
34:7,11,16 35:7
36:1,7,20 37:11
40:12 48:13,22
49:8 50:6 51:10
51:19,23 52:19
53:7,10 56:10,13
57:11,12 60:2

HIGHLY CONFIDENTIAL

**[handle - inclined]**

61:5 66:7,14 69:3
69:5,13,21,23 70:9
71:3,18 117:5
118:14 124:10
127:15 128:1,8
131:20,21 151:2,4
151:5
**hands** 164:3
**happen** 30:16
107:18
**happens** 62:22
78:23
**happy** 77:9
**hard** 9:13,20 10:1
10:20 33:9 51:22
67:3,4 77:6
104:13,14
**hatched** 71:2
110:16
**hatching** 71:6,10
72:6
**head** 87:10 89:22
**heading** 68:23
**hear** 78:18 146:13
**held** 144:20
**help** 55:7 62:16
136:7 138:6
**helped** 19:10
32:15 157:9
**helpful** 13:20 33:5
46:17 110:5
134:23
**helps** 63:15 117:19
125:7
**hereinabove**
166:17
**hey** 70:8
**highlighted** 38:4
78:9 128:1,6,11
135:6 162:4,5,18

**highlights** 34:7
77:18
**highly** 1:11
**history** 4:1 67:23
71:13
**hitachi** 155:5
156:8,11,15,17
**hitting** 151:12
**hold** 47:3 98:15
134:21
**holdings** 1:4 5:11
12:16 168:6 169:3
170:3
**hole** 160:8,9,11,15
160:16 163:16
**holes** 107:17
159:10,10,12,14
159:19,19,20,23
159:24 160:14,22
163:14,14
**hope** 6:17 9:15
**hopefully** 11:3
**horizontal** 33:19
34:17 39:9 43:13
43:15 105:13
122:7 131:24
132:6,17,18,24
133:1,4,5,15
142:21 143:10
144:24 145:4,16
145:19
**horizontally** 40:7
43:21 44:5,11,14
159:11
**hour** 7:14 115:12
**house** 133:16
**housing** 30:5,6,7
30:10,15,18 31:1
31:16 32:16 33:21
34:7,11 35:8 36:7
37:11 40:22 44:3

44:4,8,12,14 48:22
50:15,18,19,19
51:1,2,21,23 53:20
53:20 55:24 56:11
57:8,11 110:16
111:6,7 118:13
119:4 123:22
124:1,18,20 126:6
128:11,23 129:5
162:12,22,23
**huge** 155:9
**hung** 20:5
**hypothetical**
44:22 45:6 50:9
53:3 87:20

---

**i**

**i.e.** 30:6 159:1
**identification**
75:15 91:24 92:1
101:16
**identified** 31:15
33:21 35:11,14
37:24 38:13,19
41:13 44:18 45:2
58:9,11 59:10,12
60:13 65:15,22
70:22 73:14 81:7
83:17 85:10 86:3
88:11 90:13
100:20,22 104:3
127:10 138:22
146:23 159:7
161:6,8 163:7
**identifies** 71:6
**identify** 46:17
58:16 63:6 78:7,9
82:1 85:20 110:4
113:13 160:13
**identifying** 40:5
100:14 136:1

**illinois** 2:5,12
166:1 167:4,11
**illustrated** 69:1
123:16,19
**image** 34:6,13
35:15 36:8 47:1
51:8,9 53:8,13
54:8,12 121:4,11
126:7 127:24
128:4,7,13 130:2
145:22 162:5,19
**images** 37:23 38:4
41:6,9,12 48:11
**imagine** 164:3
**immaterial** 30:4
**immediately** 51:12
**impact** 16:5 43:3
95:3,19 150:5,7,8
150:9,16 151:8,11
155:9
**impacts** 45:13
**implement** 76:5
**implemented** 75:4
**implied** 76:11
**implies** 81:18
**important** 7:24
43:11 76:21
**inappropriate**
32:6,11
**inaudible** 31:7
35:7 86:15,16,19
102:6
**inclination** 49:14
49:16 51:4 52:7,9
52:14,18,21 53:5
117:10
**incline** 48:2,5,16
48:19 50:10
**inclined** 48:13
49:7,11,20 50:4,6
50:14 53:6 116:13

116:16,24 117:5
123:21
**inclines** 34:23
**include** 80:8,11,20
80:22 81:15 83:18
119:12 139:18
**included** 168:14
**includes** 13:11
81:22 85:6 139:1
139:15 142:20
**including** 13:11
**inclusion** 82:20
83:1,9 84:14 85:1
**incomplete** 44:22
45:6 50:9 53:3
87:20
**incorporate** 124:3
124:8 125:13,13
**incorporated** 5:13
170:12
**increase** 104:14,18
104:23
**increased** 104:9
**independent** 49:10
136:23,24
**indicate** 60:15
73:9 78:16
**indicated** 42:12
59:15 61:15 75:5
93:20
**indicates** 58:24
59:8 61:22 70:3,6
71:2 73:13
**indicating** 58:3
59:1 168:14
**individual** 35:6
94:1
**industrial** 1:7 5:12
19:13 21:8 168:6
169:3 170:3

**industry** 16:15
20:13,21 148:17
157:9
**infinite** 139:7
**inflatable** 18:15
18:19
**infringe** 8:20 12:2
**infringement**
76:14 90:10
**infringers** 29:3
**infringes** 27:7,19
28:9,13 29:4,18
**inner** 108:4
148:14
**inserted** 130:5
**inside** 20:7,12
32:17 57:3 62:15
63:9 64:5 66:13
70:8,8 71:3 74:2
78:13 108:2,7
118:12,13 119:10
159:1
**insufficient** 124:1
124:17,20
**integral** 18:16,19
**intend** 9:17
**intended** 88:24
**intentionally** 63:4
**interested** 5:19
167:1
**interface** 141:3
**interfere** 5:6 47:11
47:13,18,21 48:17
48:24 50:8,24
51:1 117:21
**interference** 5:4
21:2 48:3 49:3,17
51:7 53:22 117:24
119:2,3 138:5,7
**interferes** 49:9

**interfering** 49:21
51:4
**interior** 32:18
35:23 36:1,15
37:11 56:5,14,21
56:22 57:13,15,19
57:23 58:3,5,13,17
58:22 59:2,3,5,7
70:5 71:4 78:11
**interlocking** 43:23
45:9
**intermediate**
160:20
**intermittent**
137:17
**internal** 32:7,12
33:14,22,23 34:2
37:10 55:16 65:2
66:12 149:18
**interpretation**
72:13 74:7,11,18
75:9,18
**interrogatories**
6:10 166:11
**interrupt** 118:8
**intricate** 131:13
**intricately** 126:22
**introduce** 9:8,18
10:10 22:16,21
66:23 77:9 92:12
98:5 122:22
152:16
**introduced** 10:16
11:3 13:10 22:18
92:15 98:14
139:19
**introducing** 98:7,8
123:6
**invalidity** 23:19
**invented** 22:5

**investigation** 17:3
**involved** 15:9 19:5
19:8,15,20 20:2
21:15,20,23
**involvement** 22:6
**involves** 22:11
**involving** 8:18
15:21
**ipad** 9:6 67:10
**ipr** 17:23 18:7
20:18
**irrelevant** 31:21
93:12
**ishizawa** 152:21
153:2,8,10 154:21
154:24
**issue** 9:16 10:12
10:18 19:12
111:12
**issued** 68:16
**issues** 6:18 7:1
111:17 112:13
146:20,22
**item** 17:2,10,18
18:21 20:24 51:12
63:13 65:2,15
84:5 93:21 100:7
101:24 104:2
108:18 110:6,7,9
110:11,14,15
141:12 143:18
144:8 145:1
153:19 155:17
**items** 19:8 20:17
97:16

---

**j**

**jar** 22:5
**jerk** 102:16
**job** 62:16 63:11
**join** 93:13

**joined** 45:18 93:21
  94:3,5
**joining** 30:6 36:14
  90:22 91:1,2,6,7
  91:17 93:24 94:6
  94:9
**joistpro** 27:19
  83:1,9 84:2 85:2,6
  85:11 86:3 87:8
  87:15 88:11 89:6
  89:9 90:4 108:12
  108:14
**jump** 13:18
**june** 1:18 3:3 5:2
  167:5 168:4

**k**

**k** 45:18 166:2
**keep** 40:14 54:20
  65:7 99:6
**keeps** 51:4 64:4
**kevin** 2:18 4:2
  45:21
**key** 86:10
**khd** 68:6,11,19
  69:15 70:13
**kin** 167:2
**kind** 26:1 44:9
  60:14 78:18 80:16
  97:13 107:17
  113:4,9 118:7
**klaus** 98:4 99:1,2
  99:7,9,15,23 100:5
  100:6,15,21,23,24
  101:11,17,20,23
  102:1 103:14
  106:18,22 107:3
  108:11 109:15,15
  109:16,20,21,22
  109:22 111:22
  112:13,15,17
  113:1,2,9,11,18

114:5,11,16,18,22
**klaus's** 114:13
**know** 6:18 7:6,16
  7:21,24 9:1,3,13
  10:6,6,17,19 13:17
  29:22 30:14 32:22
  51:6 52:21 53:21
  59:4,6 63:13 70:2
  78:19 79:3,16
  88:20,22 93:6
  102:4 105:24
  106:1,8 108:14,20
  109:19 114:18
  116:9,14 120:13
  126:22 131:18
  132:7,12 146:1,17
  155:17 156:3,10
  159:13 163:5
**knowledge** 95:3
  95:18,23 96:5,16
  97:3,16 131:18
**known** 93:15,16
  93:18 103:8,11
**knows** 103:11
**koki** 1:4 5:11 8:22
  9:1 12:1,3,16
  23:17 26:9,11
  27:4,6,18 28:8,12
  29:2,17 168:6
  169:3 170:3
**komazaki** 147:21
**kondo** 119:20
  123:1,3,3,20 124:2
  124:18,21 125:3
  125:17,18 126:3,7
  127:3
**kyocera** 1:7 5:12
  5:12 6:1 8:19 12:2
  27:7,19 28:13
  29:3,18 168:6
  169:3 170:3

**kyocera's** 28:9

**l**

**label** 60:13 68:5
**labeled** 53:10 57:1
  70:13,16 71:8
  136:9,11 140:9
**labels** 73:2
**lake** 2:4
**land** 67:10
**language** 31:10
  65:18 94:4
**lap** 48:9
**large** 67:5 106:19
  124:9 125:8,10,24
  126:3,15 137:12
  158:12,13
**larger** 119:21
  126:3 151:15
**lasalle** 2:11
**lateral** 101:16,19
  101:21
**laterally** 103:15
**law** 17:19
**lawsuit** 9:2
**layout** 125:3
**lead** 159:16
**leader** 159:9
**leak** 107:15,23
**leaks** 107:10
  108:15 110:1
  112:5
**lean** 78:19
**leap** 88:1
**leaps** 106:22
**leaves** 86:18
**left** 9:7 15:9 16:9
  34:12,23 35:23
  36:8 40:9 50:23
  51:2,8,14 53:19
  54:11 93:10
  118:18,19 125:5

**legal** 5:17 25:24
  61:10 62:3 76:17
  168:1 171:1
**length** 115:2
  136:21 158:4
**letter** 128:18
  166:22 168:20
**level** 94:22 95:13
  96:11,22 97:23
  132:23 151:1
**lift** 20:12 125:7
**lifted** 21:19
**lifting** 125:7
**lifts** 49:1
**light** 162:4,17
  163:2,6
**lighter** 149:24
**limbs** 20:6
**limit** 72:14 74:9,15
  75:1,5,16 76:23,23
  77:2 79:1
**limitation** 31:21
  147:1
**limitations** 90:8
**limited** 5:11 60:21
  76:9 80:21 122:16
  137:3
**limiting** 75:2,20
  83:14 101:9
**line** 30:4 33:15,17
  33:22 34:2 35:10
  35:12,15,23 36:1,3
  36:10,12,13,15,19
  36:20,22 37:3,4
  51:10,13,15,17
  53:9,12,16 54:11
  56:9 57:24 69:18
  82:17 86:22 98:13
  99:11 105:7
  106:15 119:24
  123:15 124:10

129:2 133:24
139:23 140:5,5
141:19 142:9,24
144:11 158:24
159:9 160:4,6,7,17
164:4 168:14
170:7 171:3
**linear** 35:2,3
**lines** 32:7,12,17
33:24 35:4,19
37:11,14 55:8
134:2 158:18
**links** 115:11
**lip** 39:23 40:5 73:5
**list** 16:2 147:13
**listed** 16:3 17:2
107:1 155:16
170:7,17
**listing** 170:7
**lists** 16:23
**litigation** 8:16
17:12,24 18:7,15
20:19 21:2
**litigations** 16:24
**little** 13:10 14:2
20:5,11 21:18
29:7 31:8 34:2,23
35:18 36:11 61:13
67:11 71:9 139:3
162:13
**loading** 25:2 28:18
67:5,12
**locate** 152:17
**located** 48:21 51:3
104:18,23
**location** 58:16
59:15 161:6,8
**lodge** 146:6,17,20
147:3
**lodging** 147:17

**logo** 121:6
**long** 25:22 67:19
86:10,12,23 87:2
114:16 115:3
147:13
**longer** 142:13
157:6 158:13
**longitudinal**
137:20 138:19
139:8
**look** 19:7 45:7
51:5 56:6 57:8
59:4,23 76:20,21
85:20 90:23 91:4
93:23 102:1,20
108:2 116:14
125:4 130:22
131:16 140:8
141:18,24 142:1,6
142:12,14 145:21
160:6
**looked** 59:6 143:5
**looking** 17:2 32:17
33:14 34:3,4
45:16 47:24 48:6
49:24 51:8,20,22
52:6 55:7,8,10,23
56:8 57:20 58:4
65:21 69:7 81:21
82:16 84:4 85:22
100:6 103:24
104:2,13 108:20
109:15 116:23
118:6 119:10
123:14 125:3
126:23 131:6
135:17 140:23
141:24 144:5,11
153:8,14 159:6
**looks** 10:4 33:20
66:2,6 118:4

131:19 145:16,16
**loss** 88:18
**lot** 108:22 111:13
156:13,14,15,15
**lots** 58:5
**low** 151:1
**lower** 33:18 39:22
40:9 80:6,19
81:24 83:13,22,23
84:4,5,21 85:10
86:2,11
**lug** 101:16,21,24
102:1,22 103:14
103:15
**lunch** 79:4

| m |
| --- |

**machine** 21:24
**madam** 168:10
**magazine** 46:12
47:2,5,11 48:2,4
48:12,16,17,20
49:4,7,9,11,15,16
49:20,21 50:3,5,7
50:10,24 51:1,3,4
51:21 52:7,10,15
52:18,21,24 53:5,6
53:21 64:22 65:16
65:19,23 66:1,16
92:4,7,23 95:4,19
108:2,3,4 109:8
116:16,24 117:4,9
117:19,20 118:3
119:1,4,6,8,12,17
120:14 121:21
122:4 123:19
124:1,4,8,10,14,17
124:19,24 125:11
125:13,14,16,17
125:22 126:4,9,16
136:24 137:18,21
138:20 139:9

141:1,10 142:16
143:1,11,15,18,19
143:21,21 144:2,7
144:18,20 145:14
148:24 150:10
151:6,6
**magazines** 126:20
**magenta** 129:4
**magnesium**
157:17
**mailer** 49:19
**main** 9:7 40:23
41:16 42:1,7
73:19,20 102:14
103:1 141:1,10
142:15 143:15,17
144:1 148:23,24
154:8,9 155:2,3,20
155:21,23,24
156:3,4,23,23
157:4,10,11,11,14
157:14,18,22
158:1,2,3,4,5,8
161:10,14,17
**maintains** 44:6
**maintenance**
96:18
**making** 12:24
21:24 39:3 147:15
**malfunction** 108:1
108:10 113:7
**manifold** 159:17
159:24
**manner** 164:1
**manufacture**
106:20
**manufactured**
31:17,20 32:1
**manufacturer**
120:16

mark  11:2
marked  3:11
  10:14 11:11,13
  12:13,18 23:1,8
  24:8,23 26:16
  27:11,23 28:17
  29:9 67:2 77:13
  77:14 98:10,11
  123:8,9 139:21
  152:19
match  142:6
material  36:17
  57:17 158:2
  164:13,15
materials  157:24
mathematical
  16:5
mating  42:15 43:1
matter  5:11
mattresses  18:15
  18:19
mcdermott  2:3 6:5
mean  25:17 28:6
  30:23 31:13,18
  47:14,15 50:19
  51:24 55:16 72:20
  72:21 74:16 75:21
  91:19 97:7,9
  102:5 104:12
  111:10 112:16
  129:10,15 131:16
  132:9 134:18
  154:14 156:9
meaning  7:3
means  40:13,23
  41:16 42:1,7,13,14
  43:6,9,20 81:3
meant  25:13 43:5
  78:21
measuring  16:8

mechanic  100:7
mechanical  81:3,3
  81:5,19 99:16,18
  99:24 100:2,4,6,9
  100:10,12,13
  101:1,2,10 107:24
  111:21 113:4,5,8
  113:10,12,21,22
mechanically  80:4
  80:17,20 81:2,18
  82:19 88:24
mechanism  79:15
  79:16 83:2,10
  85:2,6 87:7,15
  89:6 90:4 99:17
  99:19,23 100:1,15
  100:15,23,24
  101:1,2,21 107:3,5
  107:8,20 108:15
  109:20 110:23,24
  111:1,2,11,16,20
  111:22 112:11,14
  112:20,23,23
  113:16,17 114:6,9
  114:12 125:9
  131:9
mechanisms  107:7
media  5:9 46:10
  79:10 115:19
  151:18 152:5
meet  71:20 91:19
  93:21,22
megabytes  67:6
member  15:10
  80:19 81:23 83:13
  84:20 85:9 86:2
  86:11 101:17
  141:15,17,19,22
  142:10,17,19,22
  142:22 143:10
  144:20 145:1

159:8
members  143:8
  145:1
memory  120:11
mentioned  16:14
  19:8,20 53:11
  103:5 112:5 116:5
  116:9 119:5 127:1
  129:14
mentions  40:4
method  130:21
methods  21:3
  93:18
meunier  17:20,21
microphones  5:3,6
middle  38:5 71:12
  146:12,14 147:6
midway  82:17
midwest  168:17
  171:1
miller  2:18 4:2
  45:18,22,24 76:8
  77:4,11 92:3,22
  154:11,14,15,18
miller's  23:18 41:9
  41:10 42:13,23
  72:13 74:7,11,18
  75:9,15 77:12
  88:10 91:24 92:1
  92:18 101:16
  154:3
millions  156:9
mind  108:18
minute  25:3 27:24
  56:2 67:17 68:9
  100:17 134:22
minutes  46:4 67:9
  151:19 164:19
mischaracterizes
  42:10 53:2 56:3
  61:2 63:19 64:2

74:22
misleading  162:13
missed  114:4
missing  90:23
  130:21
mixed  129:16
mns  29:3,18
mobile  18:24 19:4
  19:6,12
mode  151:5
model  16:5 116:5
  155:11 156:15
models  156:16,18
modes  151:6
modify  154:21
mold  30:21 31:2,5
  32:12 33:15,17,22
  33:24 34:2 35:10
  35:12,15,19,23,24
  36:3,10,12,13,14
  36:15,16,18,19,19
  36:23 37:3,4,10
  150:24
molded  30:17,19
  30:21 32:4
molds  30:22
moment  130:18
months  65:10
morning  5:1 6:14
  6:15
motion  40:7 43:6,7
  74:3 102:12,19
  155:6
motor  47:12,13,17
  47:22 48:1,4,18,20
  48:21,21 49:1,9,13
  49:15,19,22 50:8
  50:18,19,20 51:13
  51:14,16,19,21,23
  52:24 53:11,16,19
  53:20 54:10

HIGHLY CONFIDENTIAL

117:20,24 118:1,2
118:12,17,18,21
118:22,22 119:4,5
119:18 124:11,20
125:1,4,5,6,19,20
125:24 126:11,12
126:13,13,17
127:1
**motorcycle**  21:12
21:14
**motors**  119:12
126:6
**mounting**  118:24
**movable**  86:15
**move**  20:4,11
25:12 41:3 44:5
79:3 87:10 97:12
98:2 100:8 103:15
118:1,2,21,22
119:12,18 122:10
150:13
**moved**  118:17,18
118:22
**movement**  101:21
**moves**  97:10
102:24 148:7,9,16
**moving**  20:5 40:14
44:11,13,14 85:13
86:9,18 87:18
101:12 102:7
103:13 106:19
119:5 155:11
**muffled**  65:5
**multiple**  60:15,19
62:1,11,19
**mute**  36:24
**mwe.com**  2:6,7

**n**

**n**  3:1
**nail**  63:11,11
86:19 88:23 89:1

104:10,18,19,21
104:23,24 105:2,3
105:3,5 115:10,10
124:9 125:8 126:2
136:7 137:14,24
138:3 139:10
140:19 142:12
144:14 148:7
151:3 155:18
**nailer**  27:7 29:3
31:16 38:24 39:9
43:9,19 44:12,14
44:19,20 45:4,4
46:12,13,14 47:1,5
47:11,12 50:3,5
52:2,20 53:1,24
54:4,9 55:3,6,15
55:21,22 56:1
61:14,21 73:15
86:21 88:20 92:2
92:4,7,23 97:17,18
97:20 104:13
105:11 106:2,3
112:8,15,18,21
114:1 117:15,15
120:7,17 121:11
121:15,17,18,19
122:1,4,13 125:21
125:24 126:19
127:17 129:8,20
130:1,15 131:4
132:17 133:2,6
148:18,20,21
149:6,11 153:11
155:5,10 156:11
156:15
**nailer's**  48:17
**nailers**  15:2,4,6,13
15:15,22 16:11,18
107:2,10,14,15
112:6 120:1,3

131:23 132:5,14
132:22 154:9
155:12 156:8,10
156:11 157:2,3,5
**nailing**  40:1 45:14
106:9 126:24
**nails**  135:16
144:20
**name**  5:15 168:6
169:3,4,15 170:3,4
170:21
**named**  166:9
**names**  157:5
**napping**  65:8
**narrow**  81:16
114:17,21 145:21
145:23 146:2
**narrowest**  139:5
**narrows**  137:5
**natural**  150:23
**nature**  8:1
**near**  69:3 71:15,17
104:18,23 129:2
135:18
**nearly**  34:17 150:6
**necessarily**  42:14
63:1 64:6
**necessary**  87:8
**need**  7:15,20 10:23
11:14 53:15,22
56:7 77:6 87:12
118:19 146:6
147:3 164:18
**negligible**  109:12
**network**  99:18
**never**  78:2 106:3
**new**  6:16 10:8
15:11 66:23 79:3
98:16 106:21
139:19

**news**  12:20
**nicotine**  17:4,8
**nod**  19:11
**noise**  127:20
**nomenclature**
145:10,11
**noninfringement**
4:3 17:12 18:14
**noon**  79:3
**normal**  126:3
151:14
**normally**  86:16
**north**  2:11 167:10
**nose**  37:1 86:15,19
86:20 126:10
**notarized**  168:15
**notary**  1:14 166:6
166:13 167:4,10
168:24 169:10,18
170:15,23 171:23
**notations**  25:23
**note**  5:2 78:12
147:12 168:13
**notes**  9:20 10:2
164:18
**notice**  125:19
**noticeable**  109:13
**noticeably**  109:17
**noticing**  5:23
**notwithstanding**
78:15
**novel**  21:16
**number**  5:14
14:13 15:3 26:21
28:2 48:22 49:2
55:23 57:14,22
58:7,9 60:13 78:7
79:10 80:6 93:20
104:3 106:19
110:5,13 114:23
115:19 128:18

139:8,16,22 140:6
140:9,14 142:11
143:20 144:12
149:1 152:5
159:21 168:8,14
**numbering** 14:11
**numbers** 32:20
33:6,8,13 39:16
46:22 58:6 71:24
144:1,8 153:6
170:7

**o**

**o** 110:9,11 111:5,9
166:2,2
**oath** 8:8
**object** 8:4 54:16
147:7 155:4
**objection** 42:10
44:22 45:6 47:7
50:9 53:2 56:3
57:16 58:23 61:2
61:10 62:3,13
63:19 64:2 74:20
74:22 76:17 80:23
84:22 87:20 146:7
146:17,20 147:3
147:12,15,18
**objections** 5:21
**obvious** 154:3,20
**obviously** 26:1
**occur** 149:21
151:2,7
**occurred** 149:5
**occurs** 63:8 97:11
136:16
**office** 68:16
**official** 167:3
169:15 170:21
**officially** 11:4
**oh** 8:23 10:9 24:3
26:6 33:4 148:23

**ohio** 168:2
**ohuchi** 140:1,2,8
141:9 142:15
143:14 146:11,19
146:23 147:17
**oil** 106:23
**okay** 9:8,23 10:9
11:1,2,5,18 12:15
12:21,24 14:7,10
14:16,16,17,21
16:22 19:12 22:8
22:9,23,23,24 23:3
23:10 24:4,6,9
25:17 26:4,17
27:24 29:24 31:13
31:13,19 32:24,24
33:8,11,13 34:20
36:5,9,17 37:2,7,9
37:15,19,22 39:15
39:21 41:5,23
42:6 43:17,18
45:23 46:19 48:10
52:13,15 55:1
60:4 64:4,17,20
66:23 67:9 68:10
68:11 70:14 71:17
72:11 73:6 76:1,6
77:23 78:18,24
80:15 82:6,8 84:4
84:9 85:5 86:6
87:1 88:7,8 90:13
91:5 94:7,8 99:9
102:21 104:8
108:19,20,22,23
109:22 111:5
112:3 113:23
116:20,21,22
117:14 118:10,15
120:18 121:4
122:16 126:14
127:23 128:23,23

129:12,13,18,21
130:16 133:23
135:12 140:11,16
140:20 141:8
143:9,11,24 147:7
147:9 151:20
152:24 153:9,18
153:18,21,22
154:1 156:1,3
158:17,19 159:5
161:4
**old** 65:9
**once** 10:16 129:12
**one's** 85:21
**ones** 10:8 60:19
107:2
**onsite** 96:17
**open** 12:20 22:13
134:16,18,20
135:4,9 136:5,5,11
137:10,12,12,13
137:15,22,23
138:6,11
**opening** 3:13
10:22,23 11:20
12:21,22 22:10,22
29:21 33:16 37:18
48:6 67:18,19
155:8 164:7,10,14
164:16
**operate** 86:24 87:6
111:24 112:2
**operated** 108:13
120:3
**operates** 87:3
**operation** 45:14
85:12,23 86:7,16
87:9,16 88:15,19
88:23 89:2,6,10
101:20

**operator** 104:12
105:18 109:13
132:4
**opinion** 11:24 12:1
23:16 30:1,13
31:19 32:5,10
37:4 42:24 59:16
59:20 60:7,20,23
61:3,7,24 62:5,10
63:15 66:15 72:3
74:11,14,16 75:7
82:23 83:7 84:13
84:18,24 88:10,14
89:5,5,8 94:22
95:8,17,21 96:3,11
96:15,22 97:2
99:22 108:9
109:17 112:22
113:15 114:8
117:23 123:24
124:16,19 128:3,6
128:10 130:8
146:6 154:3 160:3
**opinions** 25:20
90:2 94:11 97:23
98:3 139:2 146:8
146:16,19
**opportunity**
125:22
**opposed** 55:16
56:11 99:18 100:8
103:12 112:24
119:20
**opposing** 94:9
134:13 135:21
137:4,11 138:23
**opposite** 53:20
144:6 150:2,14
**option** 10:19
155:13 156:2

HIGHLY CONFIDENTIAL

[options - part]                                                          Page 23

**options** 14:1
**oral** 6:10 166:11
**orange** 139:4
**order** 14:8,11
  34:24
**ordinary** 94:23
  95:11,12,13
**orient** 156:23
**orientation** 40:6,8
  43:10,13,14 44:6
  105:12,15,16,21
  106:10 133:9,18
  154:4 156:4
**orientations**
  105:12,21 106:5,7
  132:1 154:8
  156:23
**oriented** 133:13
  145:7 159:11
**orifices** 107:12,16
**original** 25:21
  31:14 67:7 90:10
**originally** 69:8
**origins** 144:24
**outcome** 5:19
**outer** 66:13
**outline** 57:6,6
**outlined** 59:8
**output** 125:5
**outside** 44:3 48:1
  55:14 57:2,3
  73:23 108:7 146:7
  146:18 147:4,8,10
  159:2
**outward** 40:15
**oven** 21:15
**overlaps** 71:10
**overly** 113:3

## p

**p.c.** 2:10
**p.m.** 165:9
**pack** 37:24 38:3
  38:17,20 39:23
  40:4,5,6,7,20
  43:20 44:13 56:8
  56:12,13 58:1,2
  59:16,21 60:1,2,3
  60:3,8,11,17,20,23
  61:4,7,12,14,20
  62:6,10,17,20
  63:16,17,20,24
  64:9,23 65:20
  66:1,3,5,7,9,11,17
  66:19 69:2,4,10,11
  69:12,20,22 70:3,7
  70:17,17,20,24
  71:4,7,11,21,22
  72:14,23,23 73:3
  73:10,13 74:8,12
  74:19 75:10,15
  76:3,4,8 78:3,8,13
  78:17 121:19
  127:10 128:20,24
  129:2,3,7,23,24
  130:14
**page** 3:5,12 13:2,7
  13:8,18 14:12,15
  14:20 16:3,20,22
  17:10,18 20:17
  21:10 22:8,10
  23:23 24:4,17
  25:8 29:20,23
  33:17 34:4,5,6
  35:15,18 36:5
  37:8,20 39:21
  41:3,5,7,24 42:7
  43:19 44:18 45:3
  46:19 47:2 48:6
  48:10,11 49:24

50:7,11,21 51:8
52:13 53:9,18
54:12 68:4,11,19
69:15,16 70:12
71:12,15 72:10
78:10 80:15 82:9
82:10,13 84:3
88:3,5,6 89:19,21
89:21 90:9,10
91:21,22 92:15,19
92:20 93:8 94:20
96:10 101:5
106:13 108:21
109:4 121:24
122:19,20 123:15
125:1 126:4
127:21 128:4,7
129:1 130:2
134:24 135:3,5,18
152:14 161:3,5
162:5 163:7
168:14,16 170:7
171:3
**pages** 25:22,22
  37:24 88:7
**pair** 140:18
  141:14,20 142:20
  144:13
**paneling** 133:13
**paper** 24:1
**paragraph** 22:9
  29:24 30:4 31:9
  37:10,14,21,23
  41:22 53:19 68:22
  69:7,17,18 71:12
  72:10,13 74:6
  75:14 76:12 77:22
  77:24 78:22 82:16
  84:11,12 88:3,6,8
  88:9 90:1 91:20
  91:22,23,24 92:9

92:19 94:17,19
95:2 96:10,21
97:22 98:2 99:5
99:10,11 100:18
100:20,22 101:4,9
101:12,15 106:12
106:14,15 107:18
108:5 114:15,15
122:18,21 123:14
124:4 129:1
135:17,18 142:8
152:13 153:14,15
154:11 160:4
161:2 162:19
**paragraphs** 89:17
  90:2,14,15 153:23
  154:2
**parallel** 118:13
  145:7
**parameter** 102:19
**parentheses** 129:2
  129:4 135:20,22
**parikh** 2:3 6:3,3
  9:11 10:6,13 11:6
  13:17 33:1 42:10
  44:22 45:6,16,23
  46:3,5 47:7 50:9
  53:2 54:16,22
  56:3 57:16 58:23
  61:2,10 62:3,13
  63:19 64:2 74:20
  74:22 76:17 80:23
  81:1 84:22 87:20
  92:14,18,20 146:5
  146:10,13,16
  147:1,7,10,15
  155:4 165:5 168:5
**parikh's** 26:6
**part** 38:6 42:15,20
  43:1 45:9,11
  49:21 50:15,20

51:16,18,19,21
59:8,10,12 63:16
73:8,11,17 74:4,5
78:2,16 85:16
87:5,13 94:1 96:1
110:16,24 111:14
115:5 141:15,21
164:4 170:9
**particular**  13:18
46:14 60:14 69:9
96:19 114:24
**particularly**
114:16 126:23
138:17 139:13
**parties**  5:8 167:2
**parting**  32:17
**parts**  43:24 62:15
62:18 63:12 83:21
83:24 84:6,8
93:12 106:19
**party**  5:18
**pass**  142:12
163:23 164:13
**passage**  108:8
**passages**  107:6
**passed**  149:22
**passes**  161:18,20
163:17,20 164:11
164:14,16
**passing**  163:12
**patent**  3:20,21,22
3:23,24 4:4,5,6,7,8
4:9 7:1 10:1 16:24
17:12,23 18:7,15
20:18 21:2 22:11
22:13 26:19,21
27:1,8,13,15,20
28:2,5,10,14,20
29:3,5,6,11,14,18
38:14,15 52:7
54:24 55:2,5,9

56:23 58:21 64:13
68:17 72:4,16,19
74:10,13,17 75:3,8
75:12 76:19 77:21
77:23 78:2,5,9
79:3,12,12,18
81:14,22 82:1
90:20,21 91:3,15
91:18 93:17,19
94:2,15,21,23 95:2
95:18,22 96:4,12
96:16 97:3,24
98:17,24 99:9,19
100:1,16 103:4,8
103:10 114:5,9,14
116:4,15,24
117:12 123:1,6
127:3,7,17 130:15
130:16 131:2
133:22,22 135:12
138:10 139:20
143:6 147:20,22
147:24 148:11
152:17 158:15
160:13,23
**patent's**  101:1
**patentability**
68:23
**patents**  8:20 12:1
12:3 22:16 23:17
94:11 96:23 98:5
**path**  137:19
**pathway**  110:9,10
110:11,12,15
111:6,8,11 112:11
**pathways**  106:19
**patient**  6:17 28:23
113:16
**patton**  18:21
19:17 20:16

**pdf**  67:20 71:15
**peanut**  22:3,4
**pending**  7:17
**people**  26:6
**percussive**  157:3
**perfect**  109:5
**perform**  63:23
85:11,14 86:3,5
87:8,16 155:6
**performance**
115:8
**perpendicular**
123:20 133:6
145:2,5
**person**  25:14
93:16 95:8,11
96:3 131:3 148:21
**personally**  169:11
170:15
**persons**  95:11
**perspective**  131:3
142:5
**pertaining**  1:16
**pertains**  90:7
**ph.a.**  25:3
**ph.d.**  1:14 3:2 6:8
11:21 23:11,15
24:11,15 168:9
169:4,9 170:4,13
171:20
**phone**  19:12 98:15
167:12 168:3
**phones**  5:5
**photograph**  84:2
**phrase**  90:22
**physical**  52:1 54:3
54:9 116:5
**physically**  25:14
25:18,21 105:24
**pick**  5:3

**picked**  108:21
**picture**  39:11
46:24 92:11
108:17,18
**piece**  30:19,24
31:3,4 42:22,23
86:15,19,20 93:10
93:14 132:10,11
132:13,15,16
133:1,2,4,14,17
**pieces**  30:6 61:17
93:24 131:24,24
132:6,7
**pile**  97:10
**pins**  108:9
**piston**  97:12 125:7
147:23 148:2,4,5,7
148:9,10,13,14,15
149:9,23,24,24
150:3,5,12,17
151:11 155:8,17
**pivot**  102:9
**pizza**  21:15
**place**  5:5,8 111:22
166:6,17
**placed**  49:13,15
69:20 127:14
**placement**  48:20
**places**  126:24
147:23
**plaintiff**  1:5 2:8
6:4
**plaintiffs**  8:19
**plane**  101:22
116:16,17 117:5
125:22 126:5
151:3,7
**planes**  116:14
117:11
**plate**  133:16

HIGHLY CONFIDENTIAL

**[play - preclude]**

**play** 17:24 18:4
  19:11 43:2 50:2
**played** 49:21
**plays** 50:2
**please** 5:2,4,21 6:7
  7:10,15,21 37:8,18
  39:15,16 44:24
  65:14 67:1 85:20
  100:17 130:22
  168:12,12
**plug** 88:1
**plunger** 97:9
  110:18
**plus** 90:7
**pneumatic** 80:8,10
  80:11,22 81:4,19
  82:2,5,6,21 83:5
  84:15 85:7,14
  86:5 87:2,5,7,13
  87:18 97:4,8,18,18
  97:19 99:16,18,24
  100:5,7,11,24
  101:10 107:2,3,8
  107:10,14,15,20
  107:22 109:7,19
  109:24 111:22,24
  112:2,6,9,14,21,24
  113:5,12,17,18,20
  113:24 114:2,10
  114:11,13 148:18
  148:19 149:5,11
  153:10 154:9
  157:5
**pneumatics** 80:20
  81:15
**point** 17:22,22
  18:6,13,22 20:17
  35:20 39:6 45:17
  51:19,20 52:17
  57:14,23 58:15
  71:24 77:19,24

78:4,5,23 88:18
  89:17 102:9 107:4
  107:18 108:5
  126:8 131:23
  139:12 151:21
  160:11
**pointed** 159:10
**pointing** 39:10,11
  46:15 55:24 56:20
  57:10 71:19 78:1
  128:14 160:8,11
**points** 58:22 70:8
  73:7 74:5 77:23
  78:11,12 139:10
  143:18 160:7,15
  160:23
**poke** 161:21
**portable** 21:15
  65:24
**porting** 112:19
**portion** 13:5 30:5
  30:7,9,15,18 31:16
  32:16 33:21 34:8
  34:11 35:7,9,21
  36:1,7,14,20,22
  37:12 38:1,3,20
  40:1,12 41:1 42:3
  42:17,20,21,22
  44:4,6 45:9 48:13
  49:8 50:6,18,19
  55:24 56:9,10,10
  56:11,13,14,17
  58:2 59:17,21
  60:1,2,3,4,8,11,16
  60:17,18,21,24
  61:5,5,14,17,17,20
  62:1,6,11,15,16,20
  62:21,22 63:5,9,9
  63:10,10,13,16,21
  64:3,7,9,23,23
  65:3,20,20 66:1,3

66:3,4,4,6,7,9,16
  66:17,18,20,21
  69:3,4,11,12,13,13
  69:21,21,22,23
  70:4,7,17,20,21,24
  71:1,1,5,7,10,18
  71:19,20,21,22
  72:14,24 73:1,4,7
  73:11,13,20,21,23
  74:8,12,19 75:10
  75:16 76:3,4,6,9
  78:3,4,8,14,17
  79:13,19,21,24
  80:4,5,5,6,17,18
  80:18,19 81:6,13
  81:15,22,23,24
  82:19,24 83:8,12
  83:12,13,13,16,22
  83:22,23 84:5,7,8
  84:20,21 85:1,9,10
  85:11,20,23,24
  86:2,2,4,9,12,13
  86:17,21 87:10,17
  88:11,14,16 89:9
  89:14 111:9 115:8
  115:11 117:6
  118:14 125:8,10
  125:24 126:10
  127:13,14,18
  128:1,4,6,8,10,14
  128:20,23,24
  129:3,4 130:11
  131:7 134:3,5,8,10
  134:11,12,15,16
  134:19 135:4,10
  135:14,20 136:2,3
  136:17,18,20
  137:1,2,3,6,6,7,10
  138:7,9,15,17,22
  138:24 139:5,13
  139:15,17 140:24

140:24 141:9
  142:15,21 143:14
  144:8 145:14
  147:11 162:3,10
  162:11,18,18,20
  162:21,21,22
  163:3,3,6,7,8,10
  163:11,12,15,15
  164:3
**portions** 30:16
  78:9 83:15,20
  85:13 134:4,8
  140:19 143:10,11
  144:13 149:7,8
**position** 49:19
  56:8 61:8 64:4
  66:8,11,19 86:1,16
  102:2 160:20
**positioned** 47:17
  105:6,6
**positioning** 52:24
**possibility** 155:7
**possible** 6:20
  67:13
**potato** 21:17,17
  22:2
**potential** 6:18
  132:7
**potentially** 111:12
  119:5 133:3
**power** 8:18 15:1,4
  15:6,13,15,22
  16:10,18 55:3,6,14
  55:21 97:17,18,20
  120:1
**practice** 132:3,5
  132:14 133:11
**preclude** 80:10
  82:20,24 83:5,8
  84:14 85:1

preferred  142:24
prepare  125:16
preparing  26:9,13
present  2:1,16
  15:14,22 106:23
  109:20 166:8
pressure  100:8
  149:23
pressurize  158:11
  159:16,19,20
  160:1
pressurized
  160:10
pressurizes  158:11
pretty  113:23
  119:10 151:18
prevent  39:2 42:4
  42:13 44:4,9,13,16
  74:2 85:13 111:18
  111:19
prevented  86:9,18
  87:10,17
preventing  40:23
  41:17 42:1,8 43:6
  43:10,20
prevents  43:5
  44:11
previous  7:20
  71:11
previously  41:16
  42:2,9 53:10
  66:10 101:7
  131:22 137:9
  151:13 166:9
price  2:10 5:24 6:2
  121:6
primarily  72:4
  151:11
primary  42:14
  43:5 150:20

principles  25:24
  75:22
pringle's  21:18
printed  13:6
prior  9:24 74:22
  146:23
private  5:4
probably  9:24
  46:1
problem  108:6
  112:10 142:23
procedure  1:15
  166:20 169:5
  170:5
proceed  6:7 10:19
proceeding  5:21
process  21:6
processing  21:3,7
procures  141:9
produce  122:24
product  20:9 21:9
  76:14
production  168:16
  168:17,22
products  8:19
  12:2
progress  12:24
project  19:5,9,10
  19:15,21,21 21:22
projects  15:11,18
  15:19,19,20,21,24
  16:9,13,14,15,17
  21:11 157:15
prone  99:17
  106:22 107:10,14
  108:10,15,24
  109:1,6,6,9 110:1
  112:4 113:7,11
pronounce  17:19
propensity  107:6

proper  33:13
  39:14
prosecution  68:16
prospective  143:7
protrude  140:24
  143:15,20 145:1
protrudes  142:15
  144:8
protruding  50:22
  50:23 86:19,20
  136:17,18,19,22
provide  8:13
  17:23 18:6,13
  44:9 90:2 96:22
  117:19 124:11
  136:12
provided  18:23
  20:18 21:1 69:4
  69:12 160:19
provides  17:11
  138:11,14
public  1:15 166:6
  166:13 167:4,10
  169:10,18 170:15
  170:23 171:23
publication
  152:17
publish  9:12
pull  108:17 116:18
  116:19 131:7,10
  131:14
pulling  131:20
pumps  18:16,19
pure  19:13
purely  99:18
  100:1,10 101:2
  111:21 112:23
  113:4,21
purple  129:3
  148:14

purpose  62:21
  64:6 79:16 159:15
purposes  76:14
pursuant  1:15
  166:19
push  79:19,21,23
  83:8,16 84:24
  85:11,23,24 86:4,8
  86:13,17,21 87:10
  87:17 131:14
put  33:12 40:11
  42:18 85:24 93:22
  100:5 103:7
  107:18 118:10
  120:12 122:13

                q

quantify  109:9
  125:15
quantitatively
  109:11
question  7:10,12
  7:17 8:3 31:14
  33:12 39:16 41:23
  42:6 44:24 45:17
  47:4,10,24 49:23
  60:5 61:6 62:9
  65:14 82:5 83:4,6
  84:9,23 85:18,21
  86:1 90:18 91:5
  92:21 96:1 100:19
  108:24 109:23
  110:22 114:8
  117:22 119:2
  129:13,21 135:2,9
  141:8 143:14
  145:17 146:5
questions  7:9
  43:11,12 54:18
  116:10 146:17
  147:14 151:21
  164:20 165:3,5

166:11,15
**quick**   7:5 22:20
   23:6 33:1 90:17
   107:19 108:17
   122:9
**quickly**   9:9 21:23
   41:20 158:10,12
**quite**   35:22 52:3
   118:23 125:19

**r**

**ramble**   138:19
**ran**   20:9
**random**   127:20
**rarely**   109:2
**rate**   102:15
**re42,987**   3:21
   27:13
**reach**   21:19 106:1
**reaches**   150:6,17
**reacts**   149:10
**read**   60:12 72:21
   72:21 73:1 77:6
   101:9 169:5,6,12
   170:5,6,17
**reading**   56:7 76:3
   90:17 100:17
   168:20
**reads**   72:4 81:16
**ready**   79:2 89:12
**real**   21:23 90:17
**realize**   7:20
**really**   9:9 13:22
   22:4,20 23:5 38:6
   43:2 51:15 52:7
   53:23 71:13 78:14
   102:8 103:13
   104:15,20 107:19
   108:17 122:7,9
   126:11 130:6
   144:5 149:18
   160:22 161:19

**rear**   32:16 40:22
   44:3,8
**rearward**   43:6,7
**reason**   8:13
   118:20 168:15
   170:8 171:3
**reasons**   114:15
**rebuttal**   3:15 4:2
   23:10,14,18 25:2
   32:19,21 33:2
   77:4,11,12 92:18
   94:13 98:3 99:6
   101:5 106:12
   109:4 122:18
   123:14 127:22
   134:24 135:17
   152:14 153:24
   161:2
**recall**   21:10 36:3
   64:14 130:17
**recalling**   157:10
**receipt**   168:19
**receiving**   39:22
**recognize**   11:11
   23:9,12 24:10,13
   25:1,5 26:18
   36:19
**recoil**   149:8,16,21
   150:4,12,21
   151:12 155:10
**recollection**
   121:14
**reconcile**   75:13
   139:1
**record**   5:2,8 12:5
   12:6,8,9 45:23
   46:6,8,9 54:19
   77:6 79:6,8,9 81:7
   81:8,9,10 115:15
   115:17,18 120:20
   120:21,23,24

122:23 152:1,3,4
   164:21,23,24
   165:7,10 166:15
   170:9
**recorded**   5:9
**recording**   5:7
**rectangular**   71:7
   71:23
**red**   38:4,5,7,8,13
   39:1,22 42:22
   128:13,22 129:5,8
   130:1 161:8
**reducing**   155:9
**refer**   9:14 14:13
   14:15 16:20 22:8
   22:9,21 23:7 24:1
   27:1,15 28:5,23
   29:14 37:5,20
   38:14 54:23 64:12
   68:3,19 72:8 77:8
   82:8 84:10 88:3
   91:20 95:12 98:20
   99:2 103:19
   109:21 114:21
   122:18 123:10
   127:6,20,21
   133:24 139:23
   140:2 144:22
   147:19 152:13,21
   158:15
**reference**   55:23
   57:14,22 58:5,6,9
   71:24 78:7 99:7
   104:3 110:4
   114:22 123:2,3
   128:17,18,18
   139:16 140:14
   144:1 152:18
   153:6 159:4 168:8
   169:2 170:2

**referenced**   169:11
   170:15
**references**   146:23
**referred**   56:5
   78:11 166:17
**referring**   9:15
   12:11 13:2,5,9
   17:18 20:16 21:13
   23:23 24:7,17,22
   25:8,11 26:5,15,20
   27:2,10,16,22
   28:16,24 29:8,15
   29:20 30:3 33:2
   35:1,5,6 36:5
   38:22,24 39:9
   46:11 65:18 70:5
   72:1 77:20 81:12
   85:16 98:21 99:3
   114:22 116:12
   117:8,9 118:9
   120:1 123:3,11
   128:18,19 131:1
   140:3 143:23
   152:22 153:23
   155:15
**refers**   51:10 78:2
   98:3 120:13 134:3
   136:23 142:8
   144:12
**reflect**   45:24
**reflects**   90:11
**refresh**   10:7 23:2
   98:15 120:11
   121:14
**regard**   98:8
**regarding**   4:2
   90:12 98:4 115:22
   116:1 152:7
**region**   72:5,6 93:9
   110:17

regions   161:23
related   5:18 6:24
   16:18 17:3,12
   18:7,15,24 20:19
   21:2,11 22:1
   111:17 142:3
relates   146:10
relating   17:24
   146:22
relationship   52:23
release   131:8,9
relevant   107:1
reliable   113:21
relies   106:18
relying   94:4
remember   8:24
   21:11 52:16 92:11
   119:10 120:19
remind   39:15
remote   1:13,17 3:2
   7:8 8:1
removal   104:4,9
   117:23 130:18
remove   87:21,24
   118:24 130:14
removed   44:19
   45:3 87:19 130:23
   131:4,19,20
removing   87:22
   104:17,22
repeat   32:9 38:11
   59:18
rephrase   35:12
reply   3:17 24:11
   24:15 33:3,11
   37:5 39:18 72:9
   82:9,12 84:10
   88:4 89:18 90:15
   91:21
report   3:13,15,17
   3:19 4:2 6:24 9:14

9:16,17 10:22,23
   11:9,20,22,24 12:1
   12:22 13:11 14:9
   22:10,22 23:10,14
   23:16,18,21 24:11
   24:14,15 25:2,3,13
   25:14,15,16,18,20
   25:21,24 26:2
   29:21 32:14,19,21
   33:2,11,17 37:5,18
   39:14,18 41:3,10
   42:23 46:20,20,21
   48:6,8 67:7,8,18
   67:19 72:9 77:4,5
   77:7,11,12 80:15
   82:9,12 84:11
   85:16,19 88:4
   89:18 90:9,10,16
   91:21 92:18 94:14
   94:18 98:3 99:6
   101:5 106:13
   109:4 122:19
   123:15 125:1
   127:22 134:24
   135:18 147:2,8,11
   152:14 153:24
   161:2
reporter   5:16 6:6
   7:23 38:10 49:5
   54:2 59:18 65:4
   74:21 78:20 79:20
   82:10 169:7
reports   10:4 26:3
   77:9 122:17
represent   5:20
representing   5:17
reproduced   41:9
reproduces   77:22
request   170:9,11
requested   11:13
   23:8 24:8,23

26:16 27:11,23
   28:17 29:9 67:2
   77:14 98:10,11
   123:8,9 139:21
   152:19
require   59:24
   85:14 86:4
required   86:23
   97:4,12 124:11,24
   168:24
requirement
   58:18
requires   82:18
   83:17 95:3 100:8
   103:5
rereading   71:11
reserve   165:6
respect   47:9 48:13
   48:22 49:8 50:6
   50:11 52:6,19
   53:4,6 95:18,22
   96:4,12,16 97:3,19
   102:18 105:1,7,17
   105:18,19,20
   107:6 117:1,5
   122:6,21 132:10
   132:11,12,13,15
   132:23 133:3,5,14
   145:23 147:1
respectively   37:12
responding   91:23
   92:1
response   68:12,15
rest   68:9 127:10
   129:7 130:1,15
   131:4
result   101:21
   102:13 104:9
   112:9 117:24
   124:8

resume   13:12
return   159:2
   160:16,18,19
returned   168:19
reverse   75:19
review   77:10
   101:22 131:1
   141:6 164:18
   168:13 169:1
   170:1
reviewed   52:1
   54:7,8 68:1
rigg   2:11 6:2
right   13:9 14:7,20
   24:7 26:17 29:20
   30:2 31:18,22
   34:11,15,22 35:2,9
   35:15 36:3 38:5
   39:13 40:2 50:21
   51:15,17,22 53:12
   54:11 66:13 67:22
   67:24 68:5,11
   69:6 72:2 77:4,17
   80:7 84:4 86:7
   98:16 109:16,21
   111:21 113:6
   124:5 126:7 132:2
   135:23 136:7
   137:12 141:13
   145:13 148:11
   151:16,24 159:9
   160:4 163:11
ring   110:9,11
rings   111:5,9
riveting   93:14
rivetted   32:3
robert   2:11 6:1
robust   45:13
   113:20
role   43:2 50:2,2

rosati   21:1
rotate   102:8
   103:16
rotates   103:17
rotating   40:15
   44:10,16
rotation   44:4
   101:22 102:3
roughly   157:13
rrigg   2:13
rule   166:19
rules   1:15 7:6
   166:20 169:5
   170:5
run   23:5

**s**

s   2:11 120:13
   168:16 170:8,8
   171:3
safety   79:13,15,16
   80:4,5,5,6,17,18
   80:18,19 81:6,13
   81:14,22,23,24
   82:19 83:1,10,12
   83:12,13,13,22,23
   84:5,20,21 85:2,6
   85:9,10 86:1,2,11
   86:11 87:7,15
   88:10,14 89:6,9,14
   90:4 99:16,19,23
   99:24,24 100:15
   100:15,23,23
   101:1,2,20 107:5,7
   107:8 108:14
   109:20 110:22,24
   111:1,2,11,16,20
   111:21,22 112:9
   112:10,10,12,14
   112:15,16,20,23
   113:5,15,17 114:5
   114:9,11 115:8,11

115:11
sake   57:9
sample   52:1 54:3,9
saw   118:16 121:6
saying   30:13 34:1
   40:24 43:22 51:16
   51:18 53:1,21
   63:2 64:1 72:24
   74:24 76:6,22
   81:4 84:6 95:14
   100:3 106:22
   113:24 130:10
   136:3 138:24
   139:15 146:15
   156:14 162:15,17
   164:8
says   17:2,23 18:6
   18:13,22 20:18,24
   39:22 60:16 64:10
   64:21 65:19 66:2
   69:1,18 72:22
   80:13 81:2 83:20
   86:10 93:3 99:15
   101:3 106:18
   121:2 124:7
   130:19,23,24
   141:19 142:9
   144:4,19,19,21
   158:23 160:16
scale   115:2
scaled   97:15
scope   76:15 146:8
   146:18 147:4,8,10
scratching   137:24
screen   9:7,15 10:7
   34:12 38:15 41:6
   121:2,10 122:11
screw   66:2
screwed   83:24
scroll   13:14 14:2,3
   16:1 23:11 24:12

scrolled   25:4
scrolling   13:19
   16:2
se   52:8 53:24
seal   167:3 169:15
   170:21
seals   107:12,16
season   37:1
second   12:5,21
   13:15 17:22 19:7
   20:17 32:24 36:24
   52:11 56:6 67:1
   68:22 69:1,12
   72:12 74:7 75:14
   82:17 84:1 94:7
   108:16 120:20
   153:7
secondary   16:8
section   21:9 39:13
   55:22 56:15,24
   57:5 58:17 59:1
   66:6 68:12 69:5
   73:12 78:24 87:13
   139:7 142:23
   143:2 144:5
   162:13
sections   36:14
   78:1,2 139:8
see   10:7 12:13,15
   13:13 17:13,20,24
   18:8,16,24 19:11
   20:19 21:4,12,24
   23:3 27:12 28:19
   30:10 31:12,13
   33:17 36:4,11
   37:12,16 38:7
   39:2,21 41:6,13,14
   41:18 45:12,14
   46:23 47:19 48:14
   50:1,15,18,20,22
   50:22 51:1,5,10,15

51:20,23 53:22
   56:15 57:7,8,10,12
   58:4,6,13 59:7,7
   63:1 64:21,24
   66:21 68:5,13,22
   69:13,24 70:18
   71:3,14 72:17
   82:21 84:15 90:24
   91:2,5,9,9 92:10
   92:12 93:2 94:7
   95:6 99:13,20
   104:12,13 106:8
   106:16 108:2
   110:3,7,12,17
   114:14 115:3
   117:2,6 118:12
   121:2,5,6,8,11
   123:16 125:23
   128:15 129:5
   130:20,23 131:14
   133:19 139:3
   140:11,15,16,21
   141:16 142:23
   143:5 144:14
   146:1 148:13
   153:3,4,17,18,18
   154:12,16,22
   158:21 159:6,9
   160:7,22 161:6
   162:14 164:2
seeing   92:11 118:7
seen   35:21 120:5
   125:1 155:22
   156:7,8
senco   1:7 5:12
   12:2 121:24 168:6
   169:3 170:3
senco's   27:7,19
   28:13 29:3,18
   108:12 119:24
   121:5

**send** 125:4
**sense** 110:17
  116:13 136:14
  141:22 149:17
**sensitive** 5:3
**sentence** 69:1
  72:12 74:7 75:14
  82:17 84:12 85:4
  99:12 101:3
  106:16,21 123:16
  154:12,15 158:20
  160:4 161:5
**separate** 15:18
  30:6,9,16,22 92:5
  92:24 134:8 136:1
**separately** 160:13
**separates** 34:15
**sequential** 14:11
**series** 7:9 9:8
**served** 9:17 22:2
**service** 96:17
**set** 64:21 94:12
  104:8 125:19
**shaft** 125:6 145:2
**shape** 57:10 91:16
  102:22,23,24
  121:15 142:2
**share** 9:5 10:7
  12:13,15,16 22:19
  22:24 98:14
**sharing** 121:2
  122:11
**sharp** 36:16,23
  93:3,10
**sheet** 168:14 170:7
  170:10,18 171:1
**shifted** 119:4
**short** 34:17 92:14
  142:13 164:17
**shorter** 34:18

**shorthand** 166:12
**shortly** 11:4
**show** 11:14 50:23
  51:3 55:2,5,12,14
  65:2,14,21 82:6
  103:4 114:1 118:8
  135:19 141:24
  142:17 163:13
**showing** 56:18,19
  57:1 58:24 70:10
  121:4 141:21
  142:19
**shown** 36:7 41:24
  42:7 43:18 51:12
  54:8,11 59:11,12
  59:14 69:19 72:1
  72:15 74:10,13
  76:10 78:9 111:22
  113:23 117:11
  126:7 127:17
  128:4 130:2 138:9
  142:9,14,20 162:5
  162:19 168:16
**shows** 53:19 55:20
  70:3,5,9,23,24
  71:4 74:17 75:8
  76:11 92:4,23
  108:22 116:24
  117:15 122:1
  140:8 144:6
  153:10
**side** 14:2 34:11,12
  35:2,15 36:8
  47:17 50:23 51:22
  55:18,24 56:11
  64:22 65:3,19
  66:2,4,5,7,8,16,18
  66:19,20,21,22
  69:19 70:7 118:17
  137:22 138:12
  144:8 151:3

155:24
**sides** 137:16,24
  144:6
**sight** 105:7
**signature** 13:8
  24:5,20 25:9
  165:6 166:18
  167:3,8 168:15
**signed** 169:13
  170:18
**significant** 109:11
**signing** 168:20
**similar** 146:2
  156:12
**simplicity** 108:11
**simply** 31:24
  76:20 83:11 87:22
  87:24 88:1 93:19
  93:21 94:2,3,5
  118:2 154:19
**sincerely** 168:21
**singer** 98:4,19,20
  99:6 103:20 104:2
  104:10,13 107:8
  107:19 108:1,2
  109:5,6,7,18
  113:10
**single** 30:8,14,24
  31:3,9,17,20 32:2
  55:3,6 59:21 60:8
  60:24 62:16 63:18
  93:14
**sir** 63:15 168:10
**sit** 157:7
**sits** 154:22
**situations** 74:3
**size** 10:5,11 48:21
  48:24 49:12 67:6
  67:8,18 107:17
  125:13 158:3

**sizes** 157:23
**skill** 94:23 95:8,11
  95:13 96:12,23
  97:23
**skilled** 95:10,17,21
  96:3,15 97:2
  119:7,11,16 131:3
  143:24 154:20
**skinny** 121:17
**sleeve** 153:2,3,4,11
  153:11,16,17,20
  153:20,21 154:4,5
  154:9,21,22 155:6
  155:8,10,14,23,24
  159:12,14
**slide** 42:21 104:4,5
  104:9 140:9
**slides** 108:3
**sliding** 43:21 93:7
**slipfit** 93:13
**slot** 108:9 162:12
**slots** 161:19,20,21
  163:11
**slow** 110:7
**slowly** 158:12
**slows** 67:11
**small** 16:7 20:4
  34:14 108:7,8
**smaller** 158:11,14
**smoothly** 6:20
**software** 9:5 11:4
  98:14
**sold** 156:9,16
**sole** 133:16
**solid** 164:12,15
**solutions** 5:17
  168:1 171:1
**somebody** 45:18
  45:19,19 103:11
**sonsini** 21:1

**soon**  151:18
**sorry**  5:12 19:13
  29:4 31:4,8,14
  32:9 38:10,16
  39:5 40:18 41:23
  44:23 49:5 50:22
  54:2 57:11,19
  58:20 59:18 60:5
  64:17 65:4 67:4
  72:18 74:21 76:23
  77:21,21 82:3
  85:5,21 88:5 93:4
  96:1 100:19
  101:19 104:6
  109:23 114:7,7
  116:18 121:20
  129:13,17 141:3
  144:23 149:7
  153:1,5 162:20
**sort**  131:8,15
**sounds**  115:14
  150:11 162:16
**space**  118:23
  122:16 124:11
  134:16,18,20
  135:4,9 136:5,11
  137:10,13,13,15
  137:23 138:4,6,11
  138:14
**spacing**  47:14,16
  95:5 96:8
**speak**  8:1 26:9,12
**specific**  36:2 72:15
  74:9,13 75:16
  76:9 81:21,24
  83:17 84:19 90:24
  119:9,23 130:21
  133:9
**specifically**  12:12
  19:24 49:18 60:6
  70:22 71:8,24

72:9 75:5 81:13
  81:20 84:3,11
  85:22 107:5
  113:13 114:5
  116:8 117:22
  119:15 120:1
  130:17
**specification**
  38:23 56:6,8
  60:11,12 61:22
  62:6 63:6 64:10
  78:16 81:14 90:21
  90:24 91:3,6,8,12
  104:6 127:5
  130:19 131:11
  134:3 142:4
  153:13
**specifications**
  104:4
**specifies**  80:13
**specifying**  80:16
**speed**  23:4
**split**  30:14 118:20
**spoken**  115:24
**spring**  100:9 158:2
**square**  57:10
  71:23
**squiggly**  160:7
**squire**  18:21 19:17
  20:16
**ss**  166:1
**stanley**  14:19,22
  15:8,18 16:11,16
  16:18 157:16
**stapler**  29:18
**start**  10:22 27:5
  50:4 52:22 55:13
  57:21 59:11 60:22
  67:15 78:5 79:10
  79:17 89:7 100:21
  110:6 115:19

129:23 132:4
  142:10 148:5
  152:5 154:10
**started**  116:1
**starting**  14:19
  21:10 69:17 89:18
  94:16 106:16
  122:19 123:16
  129:2 144:11
  154:11
**starts**  69:7 99:12
  152:14 158:20
  161:3,5,6
**state**  5:20,22 25:23
  72:12 74:6 95:2
  166:1 169:10
  170:15
**stated**  114:15
**statement**  75:13
  169:13,14 170:19
  170:19
**states**  1:1,16 5:13
  38:15 83:11
  166:21
**stating**  75:24
**stationary**  130:6
**stay**  65:6
**steel**  140:18
  141:20 144:12
**stems**  144:14
**stenographer**
  166:13
**step**  95:9 145:16
**steps**  140:19
**stick**  120:17
  121:18
**stop**  44:9
**stopping**  151:21
**straight**  35:3,6
  51:10,20 106:6
  113:8 118:3 119:1

119:6,8,17 120:14
  120:16 121:18,19
  121:21 133:2
**strap**  101:22
**street**  2:4,11
  167:10
**strength**  45:11
**strike**  128:5
**stroke**  150:6,7,17
**structure**  12:15
  60:12,14,17 61:15
  61:18,19 80:3,8,11
  81:17 86:12 87:12
  136:15 164:12
**stuck**  126:19
**student**  15:11,19
  16:13,14,17 19:9
  19:15,21 21:9
  22:4
**students**  19:10
  20:3
**studied**  52:20,23
  88:20
**studs**  95:6 96:8
  133:16
**study**  52:7,9,17
  89:1
**studying**  52:17
  53:23
**stuff**  21:4,7 22:1,7
  107:17
**subfolder**  12:16
**submechanical**
  100:11
**submit**  69:8
**submitted**  166:19
**subscribed**  169:10
  170:14 171:21
**substance**  115:22
  116:1 152:8,11

sufficiently 52:21
suggests 87:6
suite 2:5 167:11
  168:2
superior 168:1
supervisor 21:22
supplemental 3:18
  25:2
supply 106:24
support 35:21
  40:5,7,11,12,13,13
  40:20 41:1 42:3
  42:17,21 44:5
  56:17 59:17 60:14
  60:16 62:22 63:1
  63:10 64:3,9
  69:10 73:9 76:3
  127:14,18 130:11
  131:7 136:12
  144:17
supported 60:2
  63:7 72:23 73:10
  76:4
supporting 38:1,3
  38:20 39:4 56:8
  56:14 58:2 59:21
  60:1,3,8,11,17,18
  60:21,24 61:4,8,8
  61:14,17,20 62:1,6
  62:11,15,16,20,21
  63:9,11,13,16,24
  64:7,23 65:20
  66:3,5,7,9,11,17
  66:19 69:4,10,11
  69:12,22 70:3,7,17
  70:21 71:1,5,7,22
  72:14,24 73:1,3,7
  73:10,13,20,23
  74:8,12,19 75:10
  75:16 76:4,6,9
  78:3,8,14,17

supports 38:16
  39:23 40:2,3
  62:17 63:5,17
  64:3,7 73:4,5,16
  73:17,20 74:4
  160:2
sure 8:4,5 9:11
  10:11,18 13:16
  17:19 32:10 35:23
  46:3,5 52:3,12
  54:15 79:5 84:17
  85:22 89:4 101:8
  110:6,21 111:3
  120:19 135:3
  141:7 143:13
  149:2 151:20
  157:19
surface 39:9 40:9
  43:15 44:3 45:10
  66:13 102:16,18
  132:24,24 136:20
  136:21 140:18
  141:14 142:20
  148:15,15
surfaces 105:13,13
  136:6 141:20,21
  144:13,17 145:6
surprised 156:21
surrounds 42:20
suspect 9:17
  132:18
sustain 45:10
swear 6:7
swing 101:22
  103:15 125:11,22
  126:4,16,20
switch 86:8 87:9
  87:17 90:19 94:10
  132:12 133:21
  154:4

switches 85:12
switching 121:24
sworn 6:9 166:10
  169:10,13 170:14
  170:18 171:21
system 16:19
  17:13 19:22,24
  20:7 21:15 22:19
  100:10 107:22
  112:13 113:20,21
  113:22 114:13
systems 16:11,16
  17:4,8,16 21:3,7
  21:12 95:5,24
  96:6 100:4

t
tab 73:5
tablet 13:23
tabs 73:19
take 5:7 6:17 7:14
  10:5,17 33:12
  46:1 67:9,19 68:4
  97:16 100:10
  102:16 115:13
  122:9 130:22
  141:6 151:17,22
  151:23 157:21
  164:17
taken 1:14 3:3
  5:10 142:24 166:5
  166:12
takes 121:17
  158:13
talk 14:18 35:19
  94:8 116:8 160:22
  165:7
talked 42:22 122:8
  125:20
talking 33:17
  43:12,14 45:1
  49:18 78:19 93:19

94:3 105:16 107:5
  109:14 114:2
  119:14 128:21
  129:20 139:11
  140:11 142:10
  146:20 163:4
talks 130:17
  160:16
tdamario 2:7
teach 131:12
teaches 125:18
teaching 131:18
teams 148:20
technical 10:18
  16:23 17:3 45:21
tell 51:18,22
  104:14,16 118:5
  122:7 131:19
  147:5
tension 131:10
term 72:15 74:9
  75:15 76:16,24
  77:2 80:1 90:12
  91:14,17 102:3
  103:8 116:9 124:7
  147:24
terminology 95:10
  120:14
terms 95:15
test 16:6,6
testified 6:10
  70:10
testimony 8:10,14
  17:12 18:14,23
  42:11 53:2 61:2
  63:19 64:2 74:23
  115:22 116:2
  152:8,11 169:6,7
  170:6,9,12
thank 11:1 19:19
  79:2 85:5 92:17

97:21 106:11 117:14 122:15 139:19 165:2,4

**theory** 113:20

**thereof** 17:5 140:19 144:14

**thickness** 45:11

**thing** 7:16 26:1 78:12

**things** 15:3 20:7 25:20 45:12 48:23 49:2 67:11 93:13 93:14 95:3 97:14 122:10 131:16 135:21

**think** 8:3 13:21 32:5,22 35:17 39:12 43:10 46:16 50:17 54:5 61:18 63:15 67:10,15 93:12,20 107:4 109:14,22 113:8,9 113:10 114:13,24 116:15 118:5 119:11 130:6,10 133:18 134:14 142:7 143:12,12 143:13 144:5 145:17 147:4 153:6 157:1,5 160:15,16 163:17 164:17

**thinking** 19:13 63:22 129:12,16 145:15 149:15

**third** 17:10 18:6 69:17,18 99:11 106:15 123:15 148:13 155:13

**thirty** 168:19

**thomas** 2:4

**thought** 56:5 118:16 157:6

**three** 83:15,17 156:22 157:4,7

**tied** 61:18

**tight** 42:24 126:24

**time** 5:22 6:17 7:15 10:5,18 12:7 12:10 14:19 15:1 15:3,8,16,18 16:6 31:2,6 33:12 44:23 46:1,7,10 50:1 60:5 68:4 79:3,4,6,10 81:11 85:21 89:12,13,14 97:10,12 99:8,8 100:19 102:15 109:1,2 115:19 120:22 121:1 141:6 152:2,5 157:16,20 164:22 165:1,2,9 166:6,16

**timed** 67:13

**timeframe** 15:22 157:13,19 158:9

**times** 6:23 7:1,7 88:24 97:9 144:20

**timing** 97:4,7 103:2

**tip** 86:18,20 104:10,18,19,20 104:23,24 105:2 132:17 162:2

**titled** 11:20 28:2 28:20 68:12 98:17 139:20

**today** 7:9,24 8:8 8:10,14

**today's** 165:8

**toenailing** 132:20 133:16

**tom** 6:4

**tongues** 41:13

**tool** 16:4,8 32:7,12 39:5 40:15 43:3,3 43:13,14 49:19 53:17,23 54:17,19 54:21 57:15,17,23 58:5,22 59:22 60:9 61:1,9 62:2 62:12 64:21 65:24 87:4,24 88:17,23 89:3 93:5 105:17 105:17 108:8,13 111:19,24 112:2 118:7 119:3,9,9,22 126:9,10,16,16,23 127:11 128:14 132:3 133:13,17 136:24 149:10,13 149:16,19,20,24 150:1,2,13,21,22 150:24 158:1

**tools** 1:7 5:13 8:18 129:16 133:11 168:7 169:3 170:3

**top** 12:22 50:17,21 51:5,20 64:19 93:5,8 97:12 104:13 108:21 110:10 118:6 136:6 142:8 154:22 155:2,8

**torsional** 151:5

**touch** 36:2 71:13

**toy** 17:13,15 19:21 19:24 20:2,5,12 21:24

**toys** 19:9,23 20:1,5 20:14 21:23

**track** 17:13,16 19:22,24 20:9,12

**trailing** 56:9

**train** 48:24 49:1 119:21 125:6 126:11 127:2

**transcribed** 169:7

**transcript** 8:2,5 57:20 165:6 168:12,13 169:5 169:12 170:5,11 170:17

**transfer** 162:24

**transmitted** 150:9

**travels** 155:18

**tries** 137:21

**trigger** 80:4,17 81:18 82:19 85:12 86:8,17 87:9,16 88:12,15 89:10,15 110:17,20 111:1,6 111:7,14,16,17,18 111:23 112:1,3,8 112:12,13,17 115:5,9 148:24 149:22 158:4 161:10,14,16 162:1,12,22,23 163:18 164:10

**trip** 149:1

**troubling** 146:5

**true** 89:15 132:3 132:14 166:14

**trunk** 36:21 56:11

**truthful** 8:14

**try** 6:19 7:14 8:1,5 20:6 21:19 31:12 32:6,11 43:4 65:6 65:13 67:14,16,20 77:1,2 100:10 116:10 126:20

149:14 153:12
**trying**   10:10 30:12
  31:10 48:8 63:4,5
  65:7 74:14,24
  76:22 84:11,17
  139:1 146:1 147:2
  147:6 149:9 156:5
  157:1
**tube**   17:13,16
  19:22,24 20:7
**turn**   5:5 69:15
  79:11 89:22 94:12
**turning**   18:21
  96:10,21 97:22
  99:5
**twists**   151:5
**two**   30:6,14,16,21
  31:5,24 33:20
  34:10 36:14 39:22
  47:3,19 48:11
  56:15 59:6 67:17
  83:21,24 84:6,7
  92:5,24 93:12,20
  93:24 94:3,4,9
  108:8 111:5
  113:13 116:13,13
  117:10,10,10,20
  133:11,19 135:21
  137:4,11 138:2,22
  142:11 143:18
  148:12 150:11,19
  151:14 154:19
  155:1,3 156:10,17
**type**   6:16 25:22
  26:4 112:15
  125:14
**typed**   25:14
**typically**   101:24
**typing**   25:18

**u**

**u.s.**   3:20,21,22,23
  3:24 4:4,5,6,7,8,9
  26:21 27:13 28:2
  28:20 29:11 98:17
  98:24 123:1,6
  139:20 152:16
**unaware**   156:19
**unclaimed**   83:18
**unclear**   121:20
**underlined**   18:22
**underneath**   100:8
**undersigned**
  166:13 167:1
**understand**   7:10
  7:12 8:8 27:1,4,16
  28:6,24 29:15
  30:12 31:11,18
  34:21 49:5,23
  68:15 72:2 79:23
  84:12,17 95:14
  98:21 99:3 112:16
  117:9 123:2,11
  140:3 147:2
  149:14 162:16
  163:8
**understandable**
  116:12
**understanding**
  8:16 25:15 27:6
  27:18 28:8,12
  29:2,17 56:20
  70:2 75:3,24 90:6
  90:12,13 91:14,17
  127:9 149:10
  152:22 163:17
**understood**   9:19
  20:1 29:8 35:5
  79:2 111:3,14
  113:14 122:9
  124:13

**unfortunately**
  14:6 68:3
**unit**   5:9 69:20
**unitary**   30:9,14,19
  30:24 31:3,4,9,10
  31:13,17,20 32:2
**united**   1:1,16 5:13
  166:21
**university**   15:11
**unsure**   53:11
**untimely**   147:13
**upper**   35:22 39:23
  40:5,9 80:5,18
  81:23 83:12 84:20
  85:9 86:1,11,16
  89:9,14 147:23
  148:2,4,10,13,14
  148:15 161:22
**upward**   118:1
**usc**   68:23
**use**   76:7,22 77:1
  78:24 83:5 91:7
  95:10,14 105:11
  105:11,12,14,20
  106:3 107:2
  109:14 114:11,13
  119:16 126:22
  132:4 140:2
  145:12 155:11,12
**useful**   74:3
**user**   149:16 150:8
  150:21
**uses**   100:24
  145:14 155:23
**utility**   126:23
**utilizes**   155:6

**v**

**v**   168:6 169:3
  170:3
**vague**   42:10 47:7
  62:3 63:4 84:22

**valid**   23:17,20
**validity**   94:11
  147:10
**vallee**   1:13 3:2,13
  3:15,17,18 5:10
  6:4,8,14 9:13
  10:20 11:7,21
  12:11,23 22:18
  23:10,15 24:11,15
  25:3 32:21 33:2,5
  46:11 54:23 58:4
  61:7 62:9 66:23
  72:8 75:23 77:19
  79:11 81:12 90:19
  94:10 95:6 98:8
  115:20 121:5
  123:2,10 127:6
  138:21 139:20
  146:10 147:19
  148:17 151:23
  152:6 161:1 165:2
  168:9 169:4,9
  170:4,13 171:20
**vallee's**   10:21
  146:19
**valve**   110:17 111:1
  111:7,17,18,23
  112:1,8,12,14,17
  112:18 115:6,9
  148:23 153:16,17
  153:21,22 154:8,9
  155:2,3,20,21,23
  155:24 156:4,4,23
  156:24 157:4,10
  157:11,11,14,14
  157:18,22 158:1,2
  158:3,4,4,5,8
  159:22 160:10,10
  160:19 161:10,14
  161:14,16,17
  162:1,12,22,23

163:18 164:11
**valves** 107:12
  111:15 112:3
  148:24,24
**variable** 148:3
**variables** 103:5
**variations** 107:1
**variety** 133:18
**various** 12:2 55:2
  55:6 97:4,8
  105:12 132:14
  139:10 151:1,6
  157:15
**vary** 102:19,19,21
  102:22 105:14
  133:5
**varying** 131:23
  132:4,6,23 133:11
  149:5,8
**vedder** 2:10 5:24
  6:2 121:6
**vedderprice.com**
  2:13,13
**velocity** 102:13,20
  102:23 103:1,6,6
  103:18
**verbatim** 59:3
**verifying** 53:5
**veritext** 5:17 9:4
  11:4 22:19 45:20
  98:14 168:1,8
  171:1
**veritext.com.**
  168:17
**version** 13:4,6
  119:21 142:13
**versus** 5:12 25:18
  76:15 113:8,17
  133:2 146:2
**vertical** 39:4,5,6,7
  39:8,24 43:13,16

44:6 102:2 105:13
  131:24 132:7
  133:14,17 136:6
  137:14 140:19
  143:11 144:13
  145:5,17,19
**vertically** 40:6,10
  40:14 48:21 145:7
**viable** 45:5
**vibrate** 43:4 151:3
**vibrates** 151:6
  157:4
**vibration** 74:2
  95:4
**vibrations** 95:19
  151:2,10
**video** 5:7,9
**videographer** 2:17
  5:1,16 6:6 7:23
  12:6,9 46:6,9 79:6
  79:9 81:8,10
  115:15,18 120:21
  120:24 122:23
  151:17 152:1,4
  164:21,24 165:8
**videotaped** 1:13
  1:17 3:2
**view** 46:19 48:14
  49:8,20 50:7,11,14
  50:17,18,21 51:5
  51:20,23 53:8
  55:18,19,22 56:15
  56:24 57:5,13
  58:3,17 59:1
  69:19 70:7 118:6
  122:7 139:7
  142:24 143:2,7
  151:3 162:13
**views** 47:19 55:3,6
**visibility** 104:10
  104:15,18,23

105:5,10
**voice** 29:6
**volume** 148:2,6,9
  157:24 158:10,11
  158:12,13
**volumes** 97:11
  158:7
**vs** 1:6

### w

**wait** 56:2 67:16
**waived** 166:18
  168:20
**wake** 65:11,11
**wall** 45:11 57:11
  57:12 136:17,19
  138:1 141:10,12
  142:16
**walls** 92:6 93:1,20
  94:3,4,9 134:13,15
  134:20 135:6,15
  135:21 136:1,4,7,9
  136:15 137:4,7,11
  137:14 138:3,8,9
  138:12,23 139:1,5
  139:10,16,18
  141:1 142:1
  143:15,17 144:1
**want** 22:13 36:12
  45:17 52:11 54:17
  58:12 67:16 71:13
  84:10 89:4 110:21
  111:3 117:14
  118:8 122:23
  135:3 143:13
  151:2 163:5
**wanted** 9:12 19:15
  22:4 45:23 119:1
  119:6,16
**wants** 137:19
**way** 9:10 13:14,17
  22:4 32:7 40:10

40:11 72:24 75:21
  76:11,20 87:3,14
  93:22 100:10
  105:23 111:6
  116:11 127:16
  130:10 138:1
  144:16 155:20
  158:13 159:21
  160:10,19
**ways** 76:5 93:13
  93:15 125:19
  154:7 157:1
**we've** 22:15 92:15
  115:12 147:13
**wear** 96:18
**website** 13:21
  121:5 122:1
**weight** 158:2
**weights** 20:8,12
**west** 2:4
**western** 15:10
**whispering** 5:3
**wi** 67:11
**width** 137:3 138:3
**willing** 54:14
**wilson** 21:1
**withstand** 45:13
**witness** 6:7,9 7:2,3
  10:9 11:8 13:20
  33:4 42:12 44:23
  45:7 47:8 50:10
  53:4 56:5 57:17
  58:24 61:3,12
  62:5,14 63:20
  64:3 74:24 76:19
  78:21 79:5,22
  81:2 82:12 87:21
  92:19,21 121:2
  146:9 155:5 165:4
  166:5,10,16,18
  167:3 168:9,12

HIGHLY CONFIDENTIAL

**[witness - zoom]**

| | |
|---|---|
| 169:1,4,11 170:1,4 170:15 | **y** |
| **witnessed**  88:21 | **y**   146:3 |
| **witness'**  168:15 | **yards**   17:24 18:4 |
| **wondering**  142:3 | **yeah**   38:7 72:19 |
| **word**   25:14 | 82:5 83:7 85:3 |
| **wording**  73:9 | 113:10 135:1 |
| **words**   30:12 49:13 | 142:23 154:15,17 |
| 51:2,6 70:6 | **years**   15:5 109:14 |
| 112:10,17 132:16 | 120:10 149:2 |
| **work**   6:19 14:18 | **yellow**   34:7 77:18 |
| 16:10 19:14 | 135:6,22 136:4,4 |
| 105:17,19 111:2 | 138:23 139:4 |
| 131:24,24 132:6,7 | 161:9,19,20 162:1 |
| 132:10,11,13,15 | 162:10,11,15,18 |
| 132:16 133:1,4,6 | 162:20,22,23 |
| 133:14,17 | 163:3,6,8,10,21 |
| **worked**   15:11,15 | **young**   2:17 5:15 |
| 16:3 157:2 | |
| **working**   126:2 | **z** |
| 133:13 157:13 | **zero**   49:14 51:7 |
| **workplace**  133:20 | **zoom**   2:3,4,10,11 |
| **works**   75:21 135:1 | 12:22 |
| **wraps**   162:15 | |
| **write**   25:6,12,16 | |
| 26:1 33:6,8 39:16 | |
| 39:19 77:15 | |
| **written**   32:20 | |
| **wrong**   121:10 | |
| 153:7 | |
| **wrote**   23:21 77:24 | |
| 78:21 | |
| **x** | |
| **x**   3:1 30:13 146:3 | |
| **x150**   116:6 | |
| **xp**   27:19 28:13 | |
| 85:11 86:3 87:8 | |
| 87:16 88:11 89:9 | |
| 90:4 108:12,14 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 13

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                               - - -

4

     KOKI HOLDS CO. LTD.,            :    CIVIL ACTION
5                                    :
                       Plaintiff,    :
6                                    :
          vs.                        :
7                                    :
     KYOCERA SENCO INDUSTRIAL        :
8    TOOLS, INC.,                    :
                                     :
9                      Defendant.    :    NO. 18-313-CFC

10

11                                   Wilmington, Delaware
                                     Wednesday, October 2, 2019
12                                   1:20 o'clock, p.m.

13                               - - -

14

     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
15
                                 - - -
16

     APPEARANCES:
17

18               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                 BY:  KAREN JACOBS, ESQ.
19

20                      -and-

21

22

23

24                                   Valerie J. Gunning
                                     Official Court Reporter
25
```

```
 1    APPEARANCES (Continued):

 2
                    McDERMOTT WILL & EMERY LLP
 3                  BY:  PAUL DEVINSKY, ESQ.
                         (Washington, D.C.)
 4

 5                          -and-

 6
                    McDERMOTT Will & EMERY LLP
 7                  BY:  THOMAS DaMARIO, ESQ.
                         (Chicago, Illinois)
 8

 9                      Counsel for Plaintiff.

10

11                  RICHARDS, LAYTON & FINGER, P.A.
                    BY:  KELLY E. FARNAN, ESQ.
12

13                          -and-

14
                    VEDDER PRICE P.C.
15                  BY:  ROBERT S. RIGG, ESQ. and
                         DAVID BERNARD, ESQ.
16                       (Chicago, Illinois)

17
                        Counsel for Defendant
18

19                          -  -  -

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3            (Proceedings commenced in the courtroom,

 4    beginning at 1:20 p.m.)

 5

 6            THE COURT:  Good afternoon.  Please be seated.

 7    Ms. Jacobs?

 8            MS. JACOBS:  Good afternoon, your Honor.  For

 9    the plaintiff, Koki Holdings, Karen Jacobs from Morris

10    Nichols, and I have here at counsel table with me Amol

11    Parikh, Tom DiMario and Paul Devinsky, all from McDermott

12    Will & Emery.

13            THE COURT:  Okay.  Ms. Farnan?

14            MS. FARNAN:  Good afternoon, Your Honor.  Kelly

15    Farnan from Richards, Layton & Finger on behalf of the

16    defendant Kyocera.  I'm joined by my co-counsel from Vedder

17    Price, Robert Rigg and David Bernard.

18            MR. BERNARD:  Good afternoon, Your Honor.

19            MR. RIGG:  Good afternoon, Your Honor.

20            THE COURT:  Good afternoon.  So before we get

21    started, housekeeping.  And I think you all litigate here

22    fairly frequently and I just had to make this announcement

23    about an hour ago.  I have in my form order, including the

24    order that's in place in this case, a requirement that

25    separate searchable PDFs be filed for each patent, and that
```

1    That's shown on slide 25.

2              Turning to slide 26, each party's proposed

3    construction provided on the screen.   Koki proposes that

4    this term is a trigger valve exterior frame connected to the

5    main valve control channel such that fluid can pass between

6    the trigger valve and the main control valve channel.   On

7    the other hand, Senco proposes that term is indefinite.   So

8    the dispute comes down to whether an exterior frame can be

9    fluidly connected to the control channel.

10             We understand with your Honor's indulgence that

11   indefiniteness is a merits issue.   Some Courts analyze it at

12   Markman.   Others discuss it later.   We're prepared to

13   address the construction if the Court would like or is

14   inclined to consider indefiniteness at this stage.

15             THE COURT:   So I generally -- actually, not

16   generally.   I have never done indefiniteness at a Markman,

17   mainly because Ms. Jacobs persuaded me to wait for summary

18   judgment in a hearing many, many months ago.

19             I have to tell you, I don't know how you fluidly

20   connect a frame to a chamber.   It doesn't make any sense to

21   me.

22             MR. PARIKH:   I'm happy to --

23             THE COURT:   Well, go ahead.   Explain it.   I

24   mean, let's put it this way.   So I'm certainly skeptical.   I

25   guess then the problem is, you know, and this varies, I

1    notice.

2              So in this case, there has been no alternative

3    construction proposed by the defendant, and I get the logic

4    is -- well, if I propose a construction, then you're going

5    to say, you know, I can figure something out, so I don't get

6    that.

7              You know, I think not only do the words

8    themselves make no sense to me because fluidly connecting a

9    hard object doesn't make sense, but you say plain and

10   ordinary meaning and then you redefine the term.  So that

11   doesn't help your argument either down the road for

12   indefiniteness.

13             MR. PARIKH:  I think we're providing color on

14   what the claim means and what's described in the

15   specification, and I think you can -- you know, fluidly

16   connected means the fluid is in contact with.  So if we look

17   at Figure 2 of the '012 patent.

18             THE COURT:  Well, then why would you say fluid?

19   Why don't you say it's connected?  You're giving no meaning

20   to fluid.

21             MR. PARIKH:  The fluid from the main valve

22   control channel still has to be in contact with the trigger

23   valve exterior frame.  So if you had a main valve control

24   channel that was connected to an exterior frame, that could

25   be a pipe, for example, that clamps onto an exterior frame,

1   and the fluid from the main valve control channel would not

2   be in contact with the trigger valve exterior.    Correct.

3            Here, the claim requires that the fluid from the

4   main valve control channel still be in contact with the

5   exterior frame of the trigger valve, and that's exactly

6   what's shown in the annotation we provided on slide 29 in

7   the red circles as well as the yellow portion.

8            There, the fluid from the main valve control

9   channel is in contact with the exterior frame of the trigger

10  valve.    It may be in contact with other portions, but if the

11  claim just says that the trigger valve exterior frame was

12  connected to the main valve control channel, that could mean

13  that the control channel is completely enclosed and it

14  somehow is connected to the trigger valve exterior frame,

15  but the fluid from the main valve control channel would

16  never have to contact the trigger valve exterior frame.    But

17  the claim here requires that there's actually contact

18  between the fluid and the main valve control channel and the

19  trigger valve exterior frame as shown in slide 29.

20            THE COURT:  All right.  Here's what I'm going to

21  do.  I will give the defendants a few minutes if you want.

22  I'm sympathetic to the defendant's argument.  I've read the

23  briefs.  I think it's a switch.  There has been alternative

24  claim construction, so I'm inclined to adopt plaintiff's

25  construction and the defendants reserve their right to raise

```
 1    indefiniteness at an appropriate time.  All right?

 2                MR. RIGG:  With that, Your Honor, I don't think

 3    it requires us to give any presentation.

 4                THE COURT:  Okay.

 5                MR. RIGG:  I've given you what we've said

 6    already.

 7                THE COURT:  All right.  So let's do that.  Then

 8    what I say to the parties is, and Ms. Jacobs is in this case

 9    that I'm about to reference.  You know, I'm willing to

10    entertain if there really is, you know, an indefinite issue

11    that is case dispositive, to entertain the possibility of

12    addressing that issue up front.

13                Now, there are other claims here.  I don't know

14    how all of these claims relate to the case as a whole, but

15    it's something to consider.  And basically, you know, I did

16    have a case where the parties essentially agreed that a

17    particular interpretation of one claim kind of decided the

18    case, and then there were also agreements made by the

19    defendants to forego enhanced damages and other, I will call

20    it collateral issues, and then we addressed indefiniteness

21    up front.  I don't know if this case gives rise to that.  My

22    guess is no, but I just put it out there for the parties to

23    discuss.  All right?

24                MR. PARIKH:  I don't think it does.

25                THE COURT:  There are a lot of other patents and
```

1    other terms.

2              MR. PARIKH:  And I would also point out this

3    limitation isn't a dependent claim, and the independent

4    claim has also been asserted in the case.

5              THE COURT:  Well, think about then why you need

6    to bring it, because I think it's problematic.  I mean,

7    seriously, these cases are expensive to litigate.  They tax

8    the Court.  And is there really a need to address a term

9    where you've got problematic language like that?

10             MR. PARIKH:  Okay.  We'll consider it, Your

11   Honor.  Thank you.

12             THE COURT:  All right.  Next term.

13             MR. DaMARIO:  Good afternoon, your.  Tom DaMario

14   for Koki.

15             THE COURT:  So you just passed the bar recently?

16             MR. DaMARIO:  That's correct.

17             THE COURT:  Okay.

18             MR. DaMARIO:  I'm going to be talking about

19   Patent No. 7,325,709, which I will refer to as the '709

20   patent.

21             The '709 patent is entitled fastener driving

22   tool and magazine device, and it dates back on March 29,

23   2004, and is directed to a fastener tool having a magazine

24   containing an accommodation portion for housing a fastener

25   array.

1   which includes the yellow and the red in slide 54.

2           THE COURT:  But I think the problem -- I think

3   the problem is the language.  Whoever wrote this patent I

4   think had a love a fair with the word portion.  I see how

5   many times it's used and it certainly doesn't lend clarity

6   to a layperson like me.

7           So on one hand, you can read the claim and when

8   you get to handle portion, because portion is referential,

9   you could say, oh, it must be referring back to the housing,

10  and we're talking about a portion of the housing, handle

11  portion of the housing.  But the problem is then, the next

12  three words distinguish the portion from the housing because

13  they refer to it as a separate entity.  It's extending from

14  the housing.  For instance, it doesn't say just extending

15  outward or extending toward something else.  It's actually

16  extending from the housing in a handle extending direction.

17  That's kind of, again, you wonder sometimes who writes these

18  things.

19          But it seems to me the bigger problem is that

20  you've got the identification of numerous components all

21  separated by a semicolon, in some cases having descriptive

22  words, and that would strongly suggest that a handle is to

23  be considered something separate from housing.

24          And it's true that if you limited yourself to

25  this limitation, you can read out the only embodiment of the

1    claim, but if you read claim 1, you don't read out the

2    embodiment in the written description, and claim 1 would

3    suggest that housing is actually something different than

4    handle because it actually describes a housing having a

5    handle portion.  And I have to give meaning to the claim.

6    Right?  All of the claims in the patent if I can?  I have to

7    read them in a consistent manner.

8              MR. PARIKH:  That's correct, Your Honor, but I

9    point out claim 1 has additional limitations which are not

10   present in claim 12 even with the handle portion, where it

11   specifically requires that it be formed in the shape of a

12   "T."  There's nothing in claim 12 that requires that

13   additional limitation.

14             And, in fact, if we look at claim 12 you, you

15   have a housing, which can be the yellow part, and it can

16   include the handle portion, but you still need a handle

17   portion that's extending from the housing.  There's nothing

18   in the claim which requires that a handle portion be a

19   separate and distinct component from the housing.

20             So I think claim 12, a handle portion extending

21   from the housing, is what is shown in Figure 1 of the

22   patent, and it's extending in a handle extending direction,

23   which if we look at Figure 1, it's from left to right, the

24   red colored portion, which is shown on slide 54.

25             THE COURT:  Now, is the battery pack supporting

1      portion part of the housing?

2                   MR. PARIKH:   The battery pack supporting portion

3      is not part of the housing.

4                   THE COURT:   Yes.   See, I think that hurts you

5      because if you want to be consistent, you read the second

6      clause the same way with the third and you don't want to,

7      because the second clause recites "a handle portion

8      extending from the housing," and you want to say that's part

9      of the housing.

10                  The third clause reads, "A battery pack

11     supporting portion connected to the handle portion," and you

12     want to say that's different.   And you're reading the

13     limitation in a consistent manner.

14                  So I'm going to rule for the defendants on this

15     one.   I think the better reading of the claim is, and I've

16     articulated all the reasons, so rather than repeat them, but

17     I will just summarize them to say that it's not a model of

18     clarity, but the separate recitation of the components in

19     claim 12 and the different manner in which the handle

20     portion and the battery pack supporting portion are recited,

21     and plaintiff's position that a battery pack supporting

22     portion is not part of the housing whereas trying to contend

23     that a handle portion is part of the housing.

24                  And, finally, looking at claim 1 of the

25     language, which, consistent with the single embodiment of

1    the written description and is different from the, or has

2    different language than claim 12 does, all lead me to

3    believe that the defendant has the better reading of the, or

4    better construction of the challenged claim.

5              MR. PARIKH:  If I could just make one comment,

6    Your Honor.

7              THE COURT:  Let's move on.

8              MR. PARIKH:  Okay.

9              THE COURT:  It's 3:00 o'clock.  I've been

10   generous.  Let's go onto the next one.

11             MR. RIGG:  Your Honor, we may be able to

12   shortchange the next claim construction given your

13   construction on handled portion, the battery pack extending

14   portion.  I think we can agree with their construction.

15   They're both very close.  They are very similar, but we can

16   agree.

17             THE COURT:  Okay.

18             MR. RIGG:  Given the construction --

19             THE COURT:  So, in other words, there's no

20   longer a dispute between the parties on the battery pack

21   having an extending portion extending from the housing.

22             MR. RIGG:  Right.

23             THE COURT:  All right.  So I will construe that

24   the way the plaintiffs have asked and give it the plain and

25   ordinary meaning, which is, "The battery pack has an

1    extending portion that attaches to a portion of the

2    housing."

3              All right.  What about the last, the bottom?

4    Are there any disputed terms?

5              MR. RIGG:  It's indefiniteness on our side, so

6    if we want to wait, if we are waiting on that from an

7    indefinite standpoint?

8              THE COURT:  That's what we're going to do.

9              MR. RIGG:  Okay.

10             THE COURT:  So I'm not going to rule on

11   indefiniteness.  I'm going to at this point construe a

12   bottom view as the plaintiffs have asked, which is, "A view

13   that is perpendicular to the side view."

14             All right?

15             MS. FARNAN:  Sorry, Your Honor.

16             THE COURT:  Ms. Farnan?

17             MS. FARNAN:  Yes.

18             THE COURT:  Mr. Parikh, you wanted to make

19   another argument and I think we've had plenty of argument,

20   so that's why we're going to move on.

21             MR. RIGG:  I understand, Your Honor.  Thank you.

22             THE COURT:  Thank you very much.

23             MS. FARNAN:  Your Honor, just on the

24   indefiniteness term, so I think I understand what you've

25   done, is you've adopted the plaintiff's construction, but I

1    think we just want to make sure that that is not a waiver of

2    our indefiniteness position.  That what you are saying is

3    for now, for purposes of their infringement case, that's

4    what we'll use, but our position is preserved and that won't

5    be used against us later if there's a construction out

6    there.

7              THE COURT:  Well, what's going to happen is,

8    you're going to get to argue indefiniteness at some point.

9              MS. FARNAN:  Right.

10             THE COURT:  But what you are not going to be

11   allowed to do is come up with an alternative claim

12   construction.  You're arguing indefiniteness.

13             MS. FARNAN:  Right.

14             THE COURT:  You reserved your right to argue

15   that and we'll have a day where we'll decide either in

16   summary judgment or, it sounds like this would be a summary

17   judgment issue, because it doesn't sound like this would be

18   a case where it would be efficient to tee up an

19   indefiniteness argument early on in the case.

20             MS. FARNAN:  Right.  We're fine with that.  I

21   think Your Honor recognized earlier, when you get to a point

22   and you adopt a construction, then someone could say, well,

23   if the claim has been construed, it's not in issue, it's not

24   indefinite.  Look, we didn't put up an alternative

25   construction and we wouldn't and we're not going to later,

1    but we don't want the fact that you are construing it today

2    to somehow be used against us later in indefinite.

3              THE COURT:  Oh, no, absolutely not.  What I'm

4    getting at is, I don't know -- I've had a very few cases,

5    very few cases where a defendant decided to argue

6    indefiniteness, but argue in the alternative for a

7    construction different from what plaintiff offered.  And

8    what I understand is that folks generally don't want to do

9    that because, to a certain extent, it undermines their

10   indefiniteness argument, because if they can come up with a

11   construction, then how can they claim it's indefinite?  And

12   I get that.  I also get that lawyers argue in the

13   alternative.

14             So what I was saying is that I wouldn't hold it

15   against the party for arguing in the alternative.  I'm not

16   saying subconsciously though it doesn't affect the

17   rationale, because if they do propose an alternative

18   construction and if the Court believes, hey, that might

19   work, right, you might say, yes.  I'm going to reject the

20   indefiniteness argument.

21             MS. FARNAN:  We just wanted to make sure that

22   because, and, again, we didn't and we're not proposing an

23   alternative construction, but just wanted to make sure

24   the fact that you were construing it today is not -- I

25   don't hear you to say it's somehow undermining our

1    indefiniteness.

2              THE COURT:  It is not.  I have not ruled.  In

3    fact, if anything, on fluidly connecting, you know, my

4    initial take, which I'm offering is, that's a hard thing to

5    understand to a layperson and maybe you can bring in expert

6    testimony that says a POSITA would know what they are

7    talking about, but I don't know how you fluidly connect a

8    solid.

9              MS. FARNAN:  Right.

10             THE COURT:  That's the argument you all made in

11   your brief and it resonated with me.  I'm letting the

12   plaintiff know, because if there's an issue we can avoid,

13   let's avoid it down the road.

14             MS. FARNAN:  I think we're all set, Your Honor.

15             THE COURT:  Thank you all very much.  Anything

16   else?

17             All right.  Ms. Jacobs, can I ask you as the

18   plaintiff to take the lead on this?  Could you all submit

19   jointly an order which just summarizes the claim

20   construction rulings that I made, and it can just say for

21   the reasons articulated by the Court at today's hearing, the

22   Court adopts the following constructions, and they should

23   just set forth the constructions.  There's no need to put in

24   the order anything about indefiniteness.  That's very clear

25   on the record, that these positions can be raised at a later

1     time.  Would you do that, please?

2               MS. JACOBS:  Yes, Your Honor.

3               THE COURT:  And, Ms. Farnan, are you okay?

4     Obviously, you'll consult with the other side, but you're

5     okay with proceeding that way, I take it?

6               MS. FARNAN:  Yes, Your Honor.

7               THE COURT:  Thank you.  Very well argued.

8     Appreciate it.

9               MR. RIGG:  Thank you, Your Honor.

10              MS. JACOBS:  Thank you.

11              (Hearing concluded at 3:12 p.m.)

12                        -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25